# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

RADOLF
    Plaintff

    CASE NO. 3:03CV242(MRK)
    LEAD/MASTER DOCKET NO.

    CASE NO. 3:03CV242(MRK)
    MEMBER CASE

v.

UNIVERSITY OF CONNECTICUT, ET AL
    Defendants

    AUGUST 16, 2004

# DEFENDANTS' MEMORANDUM IN SUPPORT
# OF MOTION FOR SUMMARY JUDGMENT

## I.    PRELIMINARY STATEMENT

Plaintiff has raised eight separate causes of action in his First Substituted Complaint. Plaintiff claims: (a) deprivation of his constitutional rights to due process of law in violation of the Fourteenth Amendment in the course of his stepping down from a directorship position; (b) deprivation of his academic freedom in violation of the First Amendment when defendants allegedly excluded him from participation in a research project funded by the U.S. Department of Defense in which plaintiff claims a vested proprietary interest; (c) deprivation of his constitutional right to due process of law in violation of the Fourteenth Amendment due to defendants allegedly barring him from participating in that research project; (d) violations of the public policy of the United States due to intentional subjection of plaintiff to a reputation stigmatizing investigatory proceeding in retaliation for plaintiff's alleged insistence that defendants be guided by appropriate federal regulations in determining allowable expenditures against certain federal grants; (e) deprivation of and/or misappropriation of his ownership rights

to a body of research data in violation of the Lanham Act, Title 15 U.S.C. § 1125(a) et seq.; (f) deprivation of and/or misappropriation of his proprietary rights to a body of research data in violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50 et seq.; (g) violation of plaintiff's exercise of right to freedom of speech under the First Amendment in retaliation for his alleged voicing of opposition to defendants' allegedly wrongful use of federal grant funds; and (h) tortious interference with plaintiff's employment relationship with defendants and tortious interference with his professional opportunities  The facts of the case are set out in Defendants' Local Rule 56(a)(1) Statement, referred to as "SF ____" and are not reiterated here.

## II.    STANDARD OF REVIEW

A motion for summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. See Howard v. Gleason Corp., 901

2

F.2d 1154, 1159 (2d Cir. 1990).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir 2000), if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . .[and] must come forward with specific facts showing that there is a genuine issue for trial."  Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted).  "[U]nsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41.  "[M]ere speculation and conjecture" is insufficient to defeat a Motion for Summary Judgment.  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2nd Cir. 1997).

## III.    ARGUMENT

### A.    FIRST CAUSE OF ACTION - FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW REGARDING THE DEFENDANT'S REMOVAL OF THE PLAINTIFF FROM THE POSITION OF DIRECTOR

Plaintiff alleges that defendants Deckers and Berlin removed him from the Director position without notice and a meaningful hearing violating his due process rights in violation of

3

42 U.S.C. § 1983.  He seeks a mandatory injunction reinstating him to the position as well as damages against the defendants in their individual capacities.

### 1.    Directorship Is Not A Protected Property Interest

In order to state due process claim, plaintiff must be able to allege that he has a constitutionally protected property interest in a benefit.  The existence of such interest is determined by reference to state law.  Bishop v. Wood, 426 U.S. 341, 344 (1976); Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Roth, 408 U.S. at 577.  "Neither the hope for professional advancement nor a unilateral anticipation of possible job-related perquisites gives rise to a constitutionally protected property interest."  Hunt v. Prior, 236 Conn. 431, 439, 673 A.2d 514 (1996).  The relationship between a state institution and one of its teachers is essentially a matter of state concern and state law.  An examination of relevant state law, consisting of state statutes, case law and university bylaws, establishes that plaintiff has no constitutionally protected property interest in the administrative position of Director of the Center for Microbial Pathogenesis.

"[P]ersonnel decisions short of termination do not constitute deprivations of a property interest under the Fourteenth Amendment."  Rode v. Dellariprete, 646 F. Supp. 876, 880 (M.D. Pa. 1986), vacated in part on other grounds, 845 F.2d 1195 (3d Cir. 1988) (quoted in Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 788 (2d Cir. 1991)).  See also Wargat v. Long, 590 F. Supp. 1213, 1215 (D. Conn. 1984).  In Ezekwo, the Second Circuit stated:  "'[t]hus far, the course of the law in this Circuit has not moved beyond according procedural due process

protection to interests other than those well within the contexts illustrated by Goldberg [v. Kelly, 397 U.S. 254, 261-62 (1970)] and Roth.' S+D Maintenance Co. v. Goldin, 844 F.2d 962, 967 (2d Cir. 1988)." 940 F.2d at 788 (court did not equate plaintiff's "expectation of serving a term as chief resident with the loss of employment or of subsistence benefits.") If plaintiff's argument held sway then every public employee would have a protected property interest not only in continued employment but in every condition of employment however trivial. Mahaffey v. Kansas Board of Regents, 562 F. Supp. 887, 889-90 (D. Kan. 1983).

In the present case, plaintiff is still a Professor, still tenured, and still receiving the same pay. (SF 171, 172). In Huang v. Board of Governors of Univ. of North Carolina, 902 F.2d 1134, 1142 (4th Cir. 1990), the Court rejected a procedural due process challenge by a full tenured professor to an interdepartmental transfer on the basis that the transfer of a tenured professor from one department to another, without loss of rank or pay, does not implicate any property interest protected by the Due Process Clause. Id. (citing Garvie v. Jackson, 845 F.2d 647, 651 (6th Cir. 1988) (demotion from department chairman to professor not a denial of a protected property interest)); Kelleher v. Flaw, 761 F.2d 1079, 1087 (5th Cir. 1985) (reduction of graduate student's teaching duties not denial of a protected property interest). See also Parkman v. University of South Carolina, et al, (4th Cir. 2002) (Reassignment of tenured faculty member from Head Librarian at Univ. of South Carolina's Music Department to a Special Project Librarian position outside the Music Department, without reduction in pay or benefits, not a denial of a protected property interest); Dorsett v. Board of Trustees for State Colleges and Universities, 940 F.2d 121, 123 (5th Cir. 1991) (plaintiff not deprived of constitutional rights, despite allegations of harm from lack of pay increases, change in teaching assignments, and department procedures); Edwards v. California University of Pennsylvania, 156 F.3d 488, 492

5

(3rd Cir. 1995) (tenured professor's removal from class duties when suspended with pay for one semester not a deprivation of employment); Schrier v. University of Colorado, et al, Civ. No. 02-mk-2366(BNB) (D. Colo. May 19, 2003) (attached) ("Dr. Schrier's claim that he has a property interest in his continuous appointment as chairman [of the department of medicine] must find its base, if at all, in some substantive restriction on the University's discretion to terminate the chairmanship;" no irreparable harm found). See also Garvie v. Jackson, 845 F.2d 647, 651 (6th Cir. 1988) Plaintiff had no property interest in Department Headship; termination of the appointment without a hearing did not violate due process).

"The constitutionally protected property interest in employment does not extend to the right to possess and retain a particular job or to perform particular services." Fields v. Durham, 909 F.2d 94, 98 (4th Cir. 1990). ("[T]he property interest is more generally in continued employment and no deprivation exists so long as the employee received payment of the full compensation due under the contract.") Therefore, Dr. Radolf possesses no property right in the administrative position of director.

Plaintiff points to no statute, rule, regulation, or contractual term that reasonably could be read as providing him with an entitlement to the above "benefits."

> Even if plaintiff could prove some contractual benefit, not every contractual benefit rises to the level of a constitutionally protected property interest. Rather, "[a] mere breach of a contractual right is not a deprivation of property and thus is not actionable under § 2983. There is a distinction between contract interests and protectable property interests." Walentas v. Lipper, 636 F. Supp. 331, 335 (S.D.N.Y. 1986). Even where a public employment contract is involved, "not every breach…is a deprivation of property within the meaning of the due process clause." Brown v.

6

> Brienen, 722 F.2d 360, 364 (7th Cir. 1983)] see also
> Costello v. Town of Fairfield, 811 F.2d 782, 784 (2d
> Cir. 1987) ("a contract dispute...does not give rise to a
> cause of action under section 1983.")

Ezekwo, 940 F.2d at 787.

Plaintiff's claim that he has a property interest in the Directorship position must find its

base, if at all, in some substantive restriction in the defendants' discretion to terminate that

Directorship. "Generally, a government employee who may be dismissed only 'for cause' has a

protected property interest, whereas one who may be dismissed 'at will' does not." Lentach v.

Marshall, 741 F.2d 301, 305 (10th Cir. 1984). As with department chairs, directors sit at the

pleasure of the Dean and Executive Vice President for Health Affairs. The Directorship, like all

other administrative offices, carries neither tenure nor financial benefit. (SF 23-29). Therefore,

plaintiff does not have a property interest in his appointment as Director. See Schrier; supra;

Jahannes v. Mitchell, 469 S. E.2d 255 (Ga. App. 1996) (court rejected dean's contention that the

college should have followed the provisions of the faculty contract that would have entitled him

to a hearing prior to removing him as dean. The court ruled that provisions of the faculty

contract applied to the plaintiff's position as a tenured faculty member, but not to his position as

dean. Because his position as dean was at-will, he had no contractual right nor property right in

that position); Webb v. Bd. of Trustees of Ball State University et al, 2001 U.S. Dist. Lexis 6779

(S.D. Ind. 2001), aff'd, 234 F.3d 1275 (7th Cir. 2000) (plaintiff's due process claims based on

alleged deprivation of property interests in his pay raise and Department Chair position were

legally and factually groundless and are sanctionable under § 1988), cert. denied, 532 U.S. 942

(2001).

7

In <u>Raju v. Rhodes</u>, 809 F. Supp. 1229 (S.D. Miss.), <u>aff'd</u>, 7 F.3d 1210 (5th Cir.), <u>cert.</u> <u>denied</u>, 114 S. Ct. 1543 (1992) plaintiff was removed from his position of Director of the University of Mississippi Medical Center Transplant Program by the defendant chairman of the Department of Surgery.  He alleged his removal deprived him of property interests in his directorship in violation of the Fourteenth Amendment and further constituted a violation of his due process rights.  Ruling on a motion for summary judgment, the Court held that Dr. Raju had no "clearly established" constitutionally protected or liberty interest which was implicated by defendant's actions.  <u>Id</u>. at 1239.[1]  Defendant's actions were within his authority as Chairman of the Department, were not arbitrary or capricious, and were for legitimate administrative and financial concerns.  <u>Id</u>. at 1241.  Regarding Dr. Raju's claim that it was implicit in his understanding that his appointment was a permanent one and that it was mutually understood he was hired as a permanent employee, the Court concluded this would not create a property interest.  Under Mississippi law, an agreement for "permanent" employment is terminable at the will of either party.  Moreover, while "an implied contract can be the source of a protected property interest in employment, it cannot do so in the absence of "mutually explicit understandings that support [the employee's] claim of entitlement.'" <u>Perry v. Sindermann</u>, 408 U.S. at 601, 92 S.Ct. at 2699." <u>Id</u>. at 1242.  The Court concluded: "It is clear under Mississippi law that Dr. Raju's affidavit in support of his claim that it was mutually understood that his appointment as Director was a 'permanent' one, is proof of only an "at-will" relationship and therefore, is insufficient to establish a property interest in that position.  The Court thus rejected

---

[1] The Court also noted that, as here, the position of director of the transplant program was an uncompensated position and that Dr. Raju remained on the university faculty as a full professor and continued to be compensated pursuant to his university contract, like plaintiff in this case.  (SF 29, 171, 172).

8

Dr. Raju's further argument that his "legitimate claim of entitlement" to the directorship position was based on custom and practice at UMC and his communications with university officials.[2]

So too, in the present case, defendant Decker's actions relative to plaintiff stepping down from the directorship were within his authority as Dean of the School of Medicine and Executive Vice President for Health Affairs. (SF 2-5, 23-25, 28). His action was not arbitrary or capricious but undertaken for legitimate administrative reasons, (SF 30-38), which ultimately were proven well-founded. (SF 155-168). There were no "mutually explicit understandings" between the parties that the position was permanent (SF 25-28). And, at best, plaintiff's claim that the position was a permanent one "is proof of only an 'at-will' relationship and, therefore, insufficient to establish a property interest in that position." Id. See Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 159, 745 A.2d 178 (2000) ("In Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 427 A.2d 385 (1980), we recognized that it is a 'general proposition that contracts of permanent employment, or for an indefinite term, are terminable at will.' Id. at 474.") See also Engelstad v. Virginia Municipal Hospital, 718 F.2d 262, 269 (8th Cir. 1983) (plaintiff claimed a tenured position as director of pathology which could be terminated only for cause after a due process hearing. "Not only would this be at odds with the terms of the parties' oral contract, a contract which was clearly terminable at will, but it would also seriously undermine the hospital's flexibility in making essential administrative decisions. The choice of a department head is largely an administrative function.")

---

[2] The Raju Court also observed that although Dr. Raju enjoyed tenure as a professor at UMC, he had never been granted tenure as Director of the Transplant Program. Nor did he allege that he was tenured in his position as Director. The same is true in the present case. "Ordinarily, when an educational institution has a formal tenure system in place, a faculty member must be tenured in a particular position in order to claim a protectable property interest in that position. Id. at 1243. UConn's formal tenure system did not grant plaintiff tenure in this position of Director. (SF 28).

Therefore, while defendants do not dispute that plaintiff was appointed by the Dean as Director of the Center, such appointment does not create in plaintiff a constitutionally protected property interest in this administrative position.

2.  **Plaintiff Was Afforded Due Process**

Even if this Court should find that such a property interest existed, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards. Cleveland v. Bd. of Educ. v. Loudermill, 470 U.S. 532, 545-46 (1985).

In the present case, defendant Deckers met with the plaintiff prior to plaintiff electing to remove himself from the position. (SF 30-39). "[P]retermination warnings and an opportunity for a face-to-face meeting with supervisors" satisfies due process requirements. West v. Grand County, 967 F.2d 362, 368 (10th Cir. 1992). Plaintiff was also given numerous other opportunities to meet with Dr. Deckers (SF 43). Plaintiff is now attempting to allege that he was forced to relinquish his position and that he has been "permanently" removed. The facts do not support this. (SF 23-29, 41).

Even if his claims are true, it is irrefutable that plaintiff never availed himself of the UConn faculty grievance procedure set forth in University ByLaws which provides adequate due process. In order to state a claim for failure to provide due process a plaintiff must have taken advantage of the processes that are available to him. Plaintiff has failed to do so. (SF 15, 44). "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them". Plaintiff has failed to do so. Dusanek v. Hannon, 677 F.2d 538, 543 (7th Cir. 1982). A due process violation

10

"is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." Zimerman v. Burch, 494 U.S. 113, 126 (1990). If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants. See Neiman v. Yale University, 270 Conn. 244, 253-57, -A.2d-(2004); see also Dwyer v. Regan, 777 F.2d 825, 834-35 (2d Cir. 1985), modified on other grounds, 793 F.2d 457 (2d Cir. 1986); McDaniels v. Flick, 59 F.3d 446, 460 (3d Cir. 1995); Bohn v. County of Dakota, 772 F.2d 1433, 1441 (8th Cir. 1985); Alvin v. Suzuki et al, 227 F.3d 107, 116 (3rd Cir. 2000); Riggins v. Board of Regents, 790 F.2d 707, 711-12 (8th Cir. 1986); UDC Chairs Chapter, American Association of University Professor v. Board of Trustees of the University of the District of Columbia, 56 F.3d 1469 (D.C. Cir. 1995) (Because the faculty chairs had not used the University Grievance System to challenge the denial of summer pay contracts, any lack of due process protections was the result of their own inaction); Weinrach v. Park City, 751 F.2d 357, 360 (10th Cir. 1984). Correa v. Nampa School Dist. No. 131, 645 F.2d 814, 817 (9th Cir. 1981); Stewart v. Bailey, 556 F.2d 281, 285-86 (5th Cir. 1977). Plaintiff's failure to utilize this process belies his claim that he has been permanently removed with no possibility of reinstatement.

### 3.    The State Officials Sued In Their Official Capacities Are Immune From Suit Under Section 1983

The State and State officials acting in their official capacities are immune from suit under the 11th Amendment and thus a cause of action cannot be maintained against the State under 42 U.S.C. § 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 64 (1989). UConn and the University of Connecticut Health Center are an arm of the state and not subject to suit under section 1983. Id.; Howlett ex rel. Howlett v. Rose, 496 U.S. 356 (1990); Fetterman v. University

11

of Connecticut, 192 Conn 539 (1984); Kirkendall v. University of Connecticut Health Center,

205 F.3d 1323 (2d. Cir. 2000).  Actions against state officials in their official capacities are

actions against the state.  Kentucky v. Graham, 105 S.Ct 3099 (1985).  Therefore, this action

against defendants Deckers and Berlin in their official capacities for damages is barred.

> **4.    Claims For Money Damages Against State Officials Sued In Their Individual Capacities Are Barred By The Doctrine Of Qualified Immunity**

The doctrine of qualified immunity balances society's need to allow public officials to

discharge their duties without fear of litigation against the individual's interest in being safe from

official abuse.  See Harlow v. Fitzgerald, 457 U.S. 800, 813-15 (1982).  It shields state actors

from liability for their official acts unless they violated "clearly established statutory or

constitutional rights of which a reasonable person would have known."  Id. at 818  See White

Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1063-64 (2d Cir.), cert. denied, 114 S. Ct. 185

(1993).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of

litigation."  Mitchell v. Forsyth, 471 U.S. 511 (1985); Giacalone v. Abrams, 850 F.2d 79, 84 (2d

Cir. 1988).  The Supreme Court has expressly encouraged the use of summary judgment to

quickly extricate government officials from the burdens of defending against insubstantial suits.

Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991).

A right is "clearly established" if: (1) it is defined with reasonable clarity; or (2) the

Supreme Court or the Second Circuit has affirmed its existence; or a reasonable defendant would

understand from existing law that his acts were unlawful.  Malley v. Briggs, 475 U.S. 335, 341

(1986); White Plains, 991 F.2d at 1064.  Therefore, when government officials perform

discretionary functions, they "generally are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. In determining whether a particular right was clearly established, the Court must first identify the claimed right in a manner suited to the facts and circumstances of the particular case. Anderson v. Creighton, 107 S. Ct. 3034, 3039 (1987). "Even where the permissible scope of activity is clearly defined, the qualified immunity defense protects an official if it was 'objectively' reasonable for him to believe his acts were lawful." Magnott v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (citing Anderson, 483 U.S. at 638). It is important for a Court "not to pose the issue in terms that are too general or abstract." Mozzochi v. Borden, 959 F.2d 1174, 1177 (2d Cir. 1992).

An allegation of malice will not alone defeat an official's claim to immunity. Malley, 475 U.S. at 341. Instead, the Court must decide whether defendants could have thought their actions were consistent with the rights that plaintiff claims to have been violated. Anderson, 107 S. Ct. at 3038. It is not determinative that the plaintiff has asserted a broadly stated right. Id. at 3039; see also Malley, 475 U.S. at 341 (if officers of reasonable competence could disagree on an issue, immunity should be recognized). Even if applicable caselaw can be said to have foreshadowed the unconstitutionality of a given act, when that caselaw leaves "open a 'legitimate question'" regarding the constitutionality of a given practice, the immunity lies. Gittens v. LeFevre, 891 F.2d 38, 42-43 (2d Cir. 1989) (holding immunity applies when "no case had ever marked the boundaries of reasonableness with sufficient clarity."). An official is not bound to anticipate correctly possible future extensions of the law if the question was open at the time he acted. Mitchell, 472 U.S. at 535. This question of whether qualified immunity attaches to an official's actions is a purely legal question for the trial judge to determine prior to trial.

13

Defendants submit that the acts of supervising a director of an academic center are clearly discretionary. (SF 1-5, 23-25, 28). Further, it was not clearly established that plaintiff possessed a property interest in the position of Director. (See pp. 4-9, supra.) See also Garvie, 845 F.2d at 651 (as to whether Garvie's asserted property interest in Department Headship was clearly established, "reasonably competent university administrators could have decided Garvie was removable, and thus had no property interest in his Headship; defendants entitled to qualified immunity); Raju, 809 F. Supp. 1229, supra p. 8-9. Moreover, even if such a property right existed, it was objectively reasonable for defendants to have understood its actions were not unlawful and volative of due process projections particularly in light of Dr. Deckers meeting with plaintiff prior to removal and the provision of a faculty grievance procedure which was available to plaintiff to challenge the decision. (SF 15, 30-39, 43, 44). Finally, plaintiff has suffered no harm and any alleged harm is speculative. (SF 169-172, 176-181).

## B.     SECOND CAUSE OF ACTION - FIRST AMENDMENT RIGHT TO ACADEMIC FREEDOM

Plaintiff claims a deprivation of his First Amendment right to academic freedom when defendants allegedly excluded him from participation in a research project funded by the U.S. Department of Defense. In order for plaintiff to prevail on this claim, he must show a constitutional right to academic freedom is established, that he engaged in constitutionally protected speech, and that as a result of that speech, he suffered an adverse employment action.

### 1.     Defendants Are Entitled To Qualified Immunity As It Is Not Clearly Established That Plaintiff Possesses A Constitutional Right to Academic Freedom In The Particularized Sense

Plaintiff's "claimed constitutional right to academic freedom finds no textual basis in the Constitution." Schrier. One Court has held that "to the extent the Constitution recognizes any

14

right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors…" <u>Urofsky v. Gilmore</u>, 216 F.3d 401, 410 (4th Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 759 (2001) (claim that interference with research burdened First Amendment Right to academic freedom). "Academic freedom" is a term often used, but little explained, by federal courts. <u>See</u> W. Stuart Stuller, <u>High School Academic Freedom: The Evolution of A Fish Out of Water</u>, 77 Neb. L. Rev. 301, 302 (1998) ("[c]ourts are remarkably consistent in their unwillingness to give analytical shape to the rhetoric of academic freedom.").[3]  "The Supreme Court to the extent it has constitutionalized a right of academic freedom at all, appears to have recognized only an institutional right of self-governance in academic affairs." <u>Id.</u> at 412 (citing <u>Regents of the Univ. of Mich. v. Ewing</u>, 474 U.S. 214, 226 & n. 12 (1985); <u>Regents of the Univ. of Cal. v. Bakke</u>, 438 U.S. 265, 312-13 (1978) (opinion of Powell, J.); <u>Keynishian v. Board of Regents</u>, 385 U.S. 589, 603 (1967); <u>Sweezy v. New Hampshire</u>, 354 U.S. 234, 250 (1957) (plurality opinion)).

In <u>Sweezy</u>, 354 U.S. at 261-62 (Frankfurter, J., concurring in the result), Justice Frankfurter did not recognize the individual right claimed by the appellee professor but rather an institutional right belonging to the University.[4]  <u>Urofsky</u>, 216 F.3d at 413

> At best, it can be said that six justices agreed that the First Amendment protects values of academic freedom.

---

[3] "Significantly, the AAUP [American Association of University Professors] conceived academic freedom as a professional norm, not a legal one:  The AAUP justified academic freedom on the basis of its social utility as a means of advancing the search for truth, rather than its status as a manifestation of First Amendment rights.  <u>See</u> Hofstadter & Metzger, [<u>The Development of Academic Freedom in the United States</u>] at 398-400; Byrne, <u>supra</u>, at 277-78".  <u>Urofsky</u>, 216 F.2d at 410-11.

[4] Justice Frankfurter summarized the "four essential freedoms of the university at p. 263:
> "It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation.  It is an atmosphere in which there prevails "the four essential freedoms" of a university – to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."

15

> However, the six justices were plainly of very different
> minds as to the nature of this "right." And, even if <u>Sweezy</u>
> could be read as creating an individual right of academic
> freedom, such a holding would not advance Appellee's
> clam of a First Amendment right pertaining to their work as
> scholars and teachers because <u>Sweezy</u> involved only the
> right of an individual to speak in his capacity as a private
> citizen. <u>See id</u>. at 249 (explaining that "[t]he sole basis for
> the inquiry was to scrutinize [<u>Sweezy</u>] as a person", not as
> a teacher).

<u>Id</u>. In <u>Keyishian</u>, the Court focused not on the individual rights of teachers, but rather on the

impact of New York laws on schools as institutions. <u>See University of Pa. v. EEOC</u>, 493 U.S.

182, 198 (1990) (noting that <u>Keyishian</u> was a case involving governmental infringement on the

right of an institution "to determine for itself on academic grounds who may teach." <u>Urofsky</u>,

216 F.3d at 414. This emphasis on institutional rights is more evident in recent Supreme Court

decisions. In <u>Bakke</u>, Justice Powell characterized academic freedom as "[t]he freedom of a

university to make its own judgments as to education." 438 U.S. at 312 (opinion of Powell, J.).

Similarly, in <u>Ewing</u>, the Court described academic freedom as a concern of the institution. 474

U.S. at 226.

Taking all of the cases together, the best that can be said for Appellees' claim that the

Constitution protects the academic freedom of an individual professor is that teachers were the

first public employees to be afforded the now-universal protection against dismissal for the

exercise of First Amendment rights. Nothing in Supreme Court jurisprudence suggests that the

"right" claimed by Appellees extends any further. <u>Id</u>. <u>See also</u> Katz, <u>The First Amendment's</u>

<u>Protection of Expressive Activity in the University Classroom: A Constitutional Myth</u>, 16 Univ.

Calif. Davis L. Rev. 857, 906 (1983) ("academic freedom, whatever its constitutional

dimensions, is an institutional interest" rather than an individual interest); Main and Ladenson,

16

University Faculty Members' Right to Dissent:  Toward a Unified Theory of Contractual and
Constitutional Protection, 16 Univ. Calif. Davis L. Rev. 933, 948-49 (1983) (concluding that the
U.S. Supreme Court has never held categorically that faculty at state institutions have a right to
academic freedom under the first amendment but instead have first amendment rights of free
expression by virtue of their status as public employees).  See also Edwards v. A. Gillard, 482
U.S. 578 (1987) and Epperson v. Arkansas, 393 U.S. 97 (1968), in which the Supreme Court
could have invalidated a statute based on an individual teacher's academic freedom, but did so
on Establishment Clause grounds instead.  Urofsky, 216 F.3d at 414-15.

While as a matter of professional practice, university professors may in fact possess the
type of academic freedom alleged by plaintiff, "the wisdom of a given practice as a matter of
policy does not give the practice constitutional status."  See Minnesota State Bd. For Community
Colleges v. Knight, 465 U.S. 271, 288 (1984) (concluding that "[f]aculty involvement in
academic governance has much to recommend it as a matter of academic policy, but it finds no
basis in the constitution.")  "The term 'academic freedom,' in obvious contrast to 'freedom of the
press,' is nowhere mentioned in the text of the first amendment.  It is inconceivable that those
who debated and ratified the first amendment thought about academic freedom."
David M. Rabban, Functional Analysis of "Individual" and "Institutional" Academic
Freedom Under the First Amendment, 53 Law & Contemp. Probs. 227, 237 (1990).[5]

---

[5]  As the Urofsky Court stated at 216 F.3d at 411 n.13:

> Irrespective of the validity of this claim as a matter of constitutional law, we note that the
> argument raises the specter of a constitutional right enjoyed by only a limited class of
> citizens.... Indeed, the audacity of Appellees' claim is revealed by its potential impact in this
> litigation.  If Appellees are correct that the First Amendment provides special protection to
> academic speakers, then a professor would be constitutionally entitled to conduct a research
> project on sexual fetishes while a state-employed psychologist could constitutionally be
> precluded from accessing the very same materials.  Such a result is manifestly at odds with a
> constitutional system premised on equality.

17

In short, it is arguable that Supreme Court's decisions concerning academic freedom have protected principally and expressly a First Amendment right of the <u>university</u> itself largely to be free from government Interference in the performance of core educational functions, and not a right in an individual faculty member. And even if such a right does exist it is not clearly defined. Recent Cases: Constitutional Law – First Amendment, 114 Harv. Law Rev. 1414, 1414 (2001). ("Although the Supreme Court has identified academic freedom as a "special concern of the First Amendment," it has yet to articulate a coherent analytic framework for protecting that concern"); W. Stuart Stuller, <u>High School Academic Freedom: The Evolution of a Fish Out of Water</u>, 77 Neb. L. Rev. 301, 302 (1998) ("Courts are remarkably consistent in their unwillingness to give analytical shape to the rhetoric of academic freedom."); David M. Rabban, <u>A Functional Analysis of "Individual" and "Institutional Academic Freedom Under the First Amendment</u>, 53 Law & Contemp. Probs. 227, 230 (1990) ("Unfortunately, the Supreme Court's glorification of academic freedom as a 'special concern of the First Amendment' has produced hyperbolic rhetoric but only scant, and of the ambiguous, analytic content. The Court has never explained systematically the theory behind its relatively recent incorporation of academic freedom into the first amendment, a problem occasionally acknowledged by the justices themselves"). "Lower court decisions seem confused and contradictory." <u>Byrne</u>, supra, at 288.

This failure to give "analytical shape to rhetoric of academic freedom" is certainly true in the Second Circuit where cases have failed to squarely address several significant issues: how closely constitutional academic freedom is meant to overlap with the AAUP's professional definition, whether academic freedom is an individual right of a professor and institutional right of a university, and what types of expression by a <u>professor</u> merit protection under the rubric of academic freedom. "At best we will encounter only a symbolic affirmation by the courts of

18

academic freedom as personal autonomy, an approach readily evidenced by the near absence of clear-cut academic freedom holdings, despite some extravagant language by our most able jurists." Mark Yudof, Three Faces of Academic Freedom, 32 Loy. L. Rev. 831, 844 (1987). Thus, neither the Supreme Court nor the Second Circuit have yet to articulate the specific kinds of expression that might fall under the academic freedom umbrella. The Second Circuit, while mentioning a right to academic freedom, has left any such alleged right undefined and never grounded in precedent or the Constitution; See, e.g. Vega v. Miller, 273 F.3d 460, 466-67 (2d Cir. 2001); Dube v. SUNY, 900 F.2d 587 (2nd Cir. 1990); Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S. Ct. 562 (1988); particularly outside the classroom context.[6]

The extent to which the Second Circuit has explicitly established any right to academic freedom is relative to speech in the classroom and found in dictum in East Hartford Educational Assn. v. Bd. Of Educ., 562 F.2d 838, 843, vacated on rh'g en banc, 562 F.2d 838, 856 (2d Cir. 1977) ("freedom to teach in the manner of one's choice is a form of academic freedom that is universally recognized, if not invariably protected, at the college level."); cf. id. at 847 (Meskill, J., dissenting). See also Kracunas v Iowa College, 119 F.3d 80, 88 & n.5 (2d Cir. 1997) (speech by professors in the classroom is protected under the First Amendment); Vega, 273 F.3d at 460 (teaching methods).

More specifically, neither the Supreme Court nor the Second Circuit has ever established a constitutional First Amendment right to academic freedom in research of the particularized sort raised here. Nor have these Courts determined that research is protected "speech" under the First

---

[6] Cases dealing with the issue can be categorized into three types of claims not alleged in the present case: retaliatory dismissal or denial of tenure for expression of unpopular or dissenting views protected by the first amendment, See, e.g. Jefferies v. Harleston, 52 F.3d 9 (2d Cir. 1995); charges of discrimination, See, e.g. Powell v. Syracuse Univ., 580 F.2d 1150, 1153 (2d Cir.), cert. denied, 439 U.S. 984 (1978); and disclosure of confidential university tenure review files during discovery, See, e.g., Gray v. Board of Higher Education, 692 F.2d 901 (2d Cir. 1982).

19

Amendment.  Certainly, no decision has clearly established that conduct of the sort the UConn

defendants allegedly engaged in violated a professor's First Amendment right to academic

freedom.  At best, "the available precedents that might usefully have guided the Defendants

leave the alleged unlawfulness of their action at least unclear."  Vega, 273 F.3d at 467.  Cases

concerning violations of constitutional rights of government employees for exercising their First

Amendment rights provide little guidance in analyzing the particularized issue presented here.

Indeed, research activities do not ordinarily constitute intentional communications of information

from a research scientist to audience.[7]  While a researcher may have a right to speak freely as a

citizen, these cases do not support the proposition that the researcher enjoys, as a citizen, a right

to conduct state-funded research in the manner in which plaintiff alleges.  The predominant use

of Connick v. Myers, 461 U.S. 138 (1983), to adjudicate these First Amendment claims only

further adds to the lack of clarity relative to individual academic freedom and the case at hand

where there is no obvious speech infringement.  See e.g., Mahoney v. Hankin, 593 F. Supp.

1171, 1174 (S.D.N.Y. 1984) (recognizing the parameters of academic freedom "are not well-

defined").  See Ferguson, Scientific Inquiring and the First Amendment, 64 Cornell L. Rev. 639,

650 n.41 (1979) (the availability of the concept of academic freedom to scientific research is

limited because Supreme Court cases referring to academic freedom all involve obvious speech

infringement).

    Plaintiff claims, in essence, that the defendants chose to sponsor another researcher's

science.  Even assuming that a constitutional right to engage in research is found, the Supreme

Court has held that constitutional rights are not abridged merely because the government refuses

---

[7] At best, one might argue that where a public university discharges a scientist because of his research topic or the
content of his research, First Amendment rights have been implicated.  Plaintiff, however, makes no such claim
here.  Content-neutral restrictions on free speech do not infringe on First Amendment rights.

20

to subsidize those rights, see, e.g., Harris v. McRae, 448 U.S. 297, 317-18 (1980), or makes value judgments favoring alternative activities, see Maher v. Roe, 432 U.S. 464, 474 (1977). Defendants must be permitted to allocate their resources in a manner consistent with their goals. A potential recipient of governmental funding cannot successfully make the claim that denial of funding to support the exercise of an alleged protected right of free expression is unconstitutional.

Defendants submit that they are entitled to qualified immunity. Neither the Supreme Court nor the Second Circuit has addressed the precise legal issue framed by plaintiff's cause of action. No decision of the Supreme Court or the Second Circuit has clearly established that conduct of the sort allegedly engaged in by defendants violates a faculty member's First Amendment rights. Any available precedents leave the unlawfulness of defendants' action at least unclear.

Moreover, defendants actions in this regard were objectively reasonable in light of the existing law and circumstances given that, as shown in the Statement of Material Facts, the science involved was that of Dr. Wikel and not Dr. Radolf (SF 45-80, 96). Indeed, Dr. Radolf admits that if Dr. Wikel's work explores new areas, then Dr. Wikel is not required to join Dr. Radolf in a collaboration. (SF 77-78).

### 2.    **Plaintiff Did Not Engage In Constitutionally Protected Speech**

Should this Court find that plaintiff's alleged right to academic freedom is rooted in the First Amendment, any claim of its violation is subject to all the usual tests that apply to assertions of First Amendment rights. (See p. 49-51, infra). Thus the first inquiry is whether the "speech" at issue was that of a private citizen speaking on a matter of public concern. Connick,

461 U.S. at 146. In that light, plaintiff's academic freedom claim must fail because he did not

allege nor could he establish that he was ever restricted from or sanctioned for speaking publicly

about an issue as a private citizen.

> For, when university professors conduct university research
> on university time, on university computers, and in conduct
> of their university duties, it is indisputable that they are
> performing in their role as public employees of the
> university, even though Judge Wilkinson is unwilling to
> accept as much. See post at 45 ("[I]n their research and
> writing university professors are not state mouthpieces – they
> speak mainly for themselves."). They are as different as can
> be imagined from the teacher who wrote to the newspaper in
> Pickering, the prosecutor who circulated the questionnaire in
> Connick, or the federal government employees who give
> speeches and wrote articles for the general public in NTEU.
> The professors' research is conducted on computers and via
> Internet access services that are both paid for by the public;
> thus, the professors' research is itself paid for by the people
> of the Commonwealth of Virginia. Indeed, the professors are
> paid to conduct the research that they do. The professors'
> research thus belongs to the public (at least in the only sense
> that matters here). In a word, when conducting their research
> so that they may better discharge their professorial
> responsibilities to the public, these professors are speaking
> qua public employees, not qua private citizens. I cannot
> imagine that anyone would contend otherwise. Certainly, the
> professors before us are not so brazen as to do so.

Urofsky, 216 F.3d at 421, (Luttig, J. concurring). Here, plaintiff's "speech" in the form of

research is made in his role as public employee, not private citizen, and is not entitled to First

Amendment protection.

Defendants have not prevented plaintiff from pursuing his chosen area of research based

on the content of his research. He is free to apply for grants in any area. (SF 98). He has not

and cannot allege that the University has ever refused to sign off on a grant application.

Moreover, the research funded by the DOD grant involves techniques, ideas and concepts

22

discovered by defendant Wikel and moved beyond the technology of the old original data jointly owned by Drs. Radolf and Wikel. (SF 45-80, 96, 99). As stated in <u>McElearney v. University of Illinois</u>, 612 F.2d 285, 288 (7th Cir. 1979):

> By dismissing McElearney the University administrators did not prevent him from pursuing his chosen area of research. They simply refused to underwrite it. The First Amendment does not require the State, though its University, to provide McElearney with facilities and financing for his research. Furthermore, McElearney's contention is internally inconsistent. The argument itself makes it clear that the University was not suppressing the content of McElearney's research, because the reason given was that another professor was already pursuing research in the same area. And finally, in deciding to terminate McElearney partly to avoid an overlap in research, the University merely exercised its undeniable power to determine what will be studied or taught at the University. Academic freedom does not empower a professor to dictate to the University what research will be done using the school's facilities or how many faculty positions will be devoted to a particular area.

In short, plaintiff's First Amendment rights have not been violated.

### 3.  Plaintiff Did Not Suffer An Adverse Employment Action

Even if it were assumed, <u>arguendo</u>, that plaintiff had established he had engaged in constitutionally protected speech, he still bears the burden of establishing that he (a) suffered an adverse employment action and (b) there was a causal connection between his speech and the adverse employment action. See <u>Blum v. Schlegel</u>, 18 F.3d 1005, 1010 (2nd Cir. 1994).

An adverse employment action is a materially adverse change in the terms and conditions of employment. <u>Galabaya v. New York Board of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices...unique to a particular

situation." Id. (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). Accord Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 446 (2d Cir. 1999); Patrolmen's Benevolent Association of the City of New York v. City of New York, 2002 U.S. App. LEXIS 21656 (2d Cir. 2002). "[M]ere changes in working conditions that cause some inconvenience do not constitute adverse employment actions as a matter of law." Montanile v. Nat'l Broadcasting Co., 211 F. Supp. 481, 486 (S.D.N.Y. 2002). See also Dortz v. City of New York, 904 F. Supp. 127, 156 (S.D.N.Y. 1995). "To be an 'adverse employment action,' the step taken by the employer must affect the plaintiff's employment in a way that is both detrimental and substantial. Mishk v. Destafano, 5 F. Supp. 2d 194, 202 (S.D.N.Y. 1998), quoting Bernheim v. Litt, 79 F.3d 318, 327 (2d Cir. 1996) (Jacobs, J., concurring)." Boykab v. Arruda, 42 F. Supp. 2d 352, 354-55 (S.D.N.Y. 1999).

Plaintiff has produced no evidence that he has experienced an employment action that is "both detrimental and substantial." Bernheim, 79 F.3d at 327. To the extent he is claiming he has been precluded from this research, the facts prove otherwise. (SF 92-96, 106-108). An investigative committee of faculty peers found that plaintiff was not removed from the DoD project (SF 92-96). He continues to fully participate in the research world (SF 114-116, 176-181). The DOD grant is based on the immunobiology of blood-feeding anthropod (tick vector) – host interactions in which Dr. Wikel is internationally recognized and published. (SF 45-47, 73-74). Plaintiff's work focuses on a tick transmitted spirochete, Borrelia burgdorfei. (SF45-47). As such, plaintiff is not a recognized or published authority in the area of tick immunology. (SF 45). Therefore, the research project regarding the immunobiology of authropod – host interactions as defined and agreed to by the U.S. Army Research and Material Command is the exclusive responsibility of Dr. Wikel except as he may wish to seek collaborative research with

others. (SF 61, 73-80, 96). Dr. Radolf is free to apply for grant funding in any area. (SF 60, 67, 107-108, 176-77). It is inconceivable that plaintiff has suffered an adverse employment action as he so claims by not being given credit for the work of another scientist.

**C.     THIRD CAUSE OF ACTION - FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS REGARDING BARRING PLAINTIFF FROM PARTICIPATING IN HIS SCIENTIFIC ENDEAVORS**

**1.     Plaintiff Does Not Possess A Property Right**

Plaintiff alleges that defendants, Deckers, Berlin and Wikel, violated his right to due process of law when they intentionally barred plaintiff from participating in scientific research in which he alleges he possessed a recognizable property interest; when they excluded plaintiff from participating in the formulation of a research proposal submitted to the U.S. Department of Defense, and when they intentionally misappropriated plaintiff's intellectual property rights to said scientific research, data, and results. (First Substituted Complaint (FSC) ¶319, 325-326).[8] First, an internal UCHC investigative committee of plaintiff's peers found none of these allegations to be true. (SF 96).

Second, plaintiff has, in essence, couched an intellectual property dispute in terms of a violation of procedural due process. Plaintiff must establish that he has been deprived of a constitutionally protected property interest. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 538 (1985).[9] Whether or not a "property" interest exists for due process purposes depends upon "independent sources such as state law." Roth, 408 U.S. at 577; Bishop, 426 U.S.

---

[8] Plaintiff's complaint is devoid of an allegation that defendants' actions were arbitrary or capricious so as to form the basis for a substantive due process claim.

[9] Interestingly, ORI policy holds that scientific research notes and data belong to the federally funded institution rather than to the individual researcher, in which case the data which plaintiff claims is his from his tenure in Texas would belong to the University of Southwestern Texas Medical Center, not plaintiff. See 42 C.F.R. § 50.102, 52.2(e) (2000). Defendants dispute that plaintiff has an intellectual property right to the research. (SF 45-80, 96-99). This dispute is not relevant to the legal issues raised in the Third Cause of Action and does not establish a property right.

at 344. Property interests cannot emanate from "mere subjective expectancy." Roth, 408 U.S. at

577. "Neither the hope for professional advancement nor a unilateral anticipation of possible

job-related perquisites gives rise to a constitutionally protected property interest. Hunt v. Prior,

236 Conn. 431, 439, 673 A.2d 514 (1996). Plaintiff is alleging, in essence, the right to be placed

on a grant application to be submitted to the DOD. The so-called "right" to be placed on a grant

application to obtain funding to perform research, particularly when based on another

researcher's work, is not established by state law.

Even if plaintiff's allegations are accepted as true that the research that was ultimately

funded was his intellectual property, plaintiff still does not possess a state law right to be placed

on a grant application and granted funding by the DOD or any other agency. "Such funding is

always discretionary with the funding agency." Abbs v. Sullivan, 756 F. Supp. 1172, 1182

(W.D. Wisc. 1990), vacated on jurisdictional grounds, 963 F.2d 918 (7th Cir. 1992). "Under the

terms of a research grant, the institution and principal investigator enter into a special

relationship with the Public Health Service for the utilization of grant funds. This relationship

results from the basic nature of the grant as a conditional gift in response to a request for support

of a project in which there is a substantive measure of public interest." Wahba v. New York

University, 492 F.2d 96, 100 n.3 (2d Cir. 1974). "A property interest does not exist solely

because of the importance of the benefit to the recipient." Kelly Kare, Ltd. V. O'Rourke, 930

F.2d 170, 175 (2d Cir. 1991), cert. denied, 502 U.S. 907 (1991). Plaintiff "must have more than

abstract need...for it.....He must have a legitimate claim of entitlement to it." Plaza Health

Labs. Inc. v. Perales, 878 F.2d 577, 581 (2d Cir. 1989). See also id. at 577 ("[t]he existence of

provisions that retain for the state significant discretionary authority over the bestowal or

continuation of a government benefit suggests that the recipients of such benefits have no

26

entitlement to them.")  There is no legitimate state claim to be placed on a grant application and funded.

Plaintiff can point to no independent source of <u>state law</u>[10] that creates such an entitlement to have his name placed on a grant <u>application</u>.  <u>Compare Hamid v. John Jay College of Criminal Justice</u>, 2000 U.S. Dist. Lexis 6915 (S.D.N.Y. 2000) (plaintiff has a right to plead deprivation without due process of a protected interest in <u>remaining</u> as principal investigator (PI) of funded research grants).  Here, plaintiff was never the PI on a <u>funded</u> DoD grant.  (SF 108).  Rather, plaintiff is claiming he has the right to be placed on a grant application to be proposed to the federal government for a determination as to whether the DOD would fund the research. <u>Compare Abbs v. Sullivan</u>, 756 F. Supp. 1172, 1182-83 (W.D. Wisc. 1990), <u>vacated on jurisdictional grounds</u>, 963 F.2d 918 (7th Cir. 1992) (professor accused of scientific misconduct held no property interest in his appointment as PI of an ongoing federal grant because the university, not the professor, was the grantee of the award); <u>Needleman v. Healy</u>, 1996 U.S. Dist. Lexis 21614 (W.D. Pa. 1996) (citing <u>Hiserodt v. Shalala</u>, No. 91-224 (W.D. Pa.), <u>aff'd sub nom.</u>, <u>Hiserodt v. Secretary of H.H.S.</u>, 65 F.3d 162 (Table) (3d Cir. 1995) (plaintiff has no constitutionally protected property interest in continuing to serve as PI on his NIEHS research grants)).  "[T]he fact that plaintiff was not put in a position to defend against the loss of his tenured position or his role as principal investigator, inexorably leads to the conclusion that plaintiff has suffered no deprivation of any constitutionally recognized property interest." <u>Needleman, id.</u> at 11).  This case is not about plaintiff's removal as PI from a <u>funded</u> grant, but

---

[10]  Indeed, in plaintiff's Second Substituted Complaint at ¶137, filed in Member Case <u>Radolf v. Deckers</u>, 3:03CV672(MRK), plaintiff alleges: "Based on <u>federal</u> law and regulations, the plaintiff possessed a vested interest in participating in the federal grant programs sponsored by the United States Public Health Service, and to compete for grants made available by the United States Public Health Service and/or its agencies…." (emphasis added).