UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

*FILED*
*AUG 17*
*12 25 PM '04*
*NEW DISTRICT COURT*
*HAVEN, CONN.*

RADOLF
    Plaintiff

v.

CONNECTICUT, ET AL
    Defendants

CASE NO. 3:03CV242(MRK)
LEAD/MASTER DOCKET NO.

CASE NO. 3:03CV242(MRK)
MEMBER CASE

AUGUST 16, 2004

## LOCAL RULE 56(a)(1) STATEMENT OF MATERIAL FACTS

### A.    PARTIES

1.    Peter J. Deckers, M.D. is Executive Vice President for Health Affairs of the University of Connecticut Health Center ("UCHC") and Dean of the University of Connecticut School of Medicine ("UCSOM"). (Affidavit of Peter Deckers ("Deckers Aff.") ¶3, 6).

2.    Per University ByLaws, Article VIII. D., the Executive Vice President for Health Affairs ("EVP") is the executive director and chief operating officer of the Health Center as well as the coordinator of the University of Connecticut's programs of instruction, research, and health care performed by the University Health Center including the Schools of Medicine and Dental Medicine, and the John N. Dempsey Hospital, and is responsible and accountable to the President of the University for the implementation, and administration at UCHC. (Deckers Aff. ¶4).

3.    Per University ByLaws, Article VIII. D., the Executive Vice President for Health Affairs is responsible to the President for the coordination and formulation of policies and administration of administrative, business and other support department at the Health Center. The EVP shall, among other things: appoint those members of the University faculty and staff who report to him, approve the selection and adjustment in service of all personnel under his jurisdiction, be responsible for all monies and funds of the University Health Center regardless of their source and make provision for an accurate accounting of their receipt and

expenditure, and direct the assignment of all plant facilities, including buildings, offices, classroom, laboratories, equipment. (Deckers Aff. ¶5).

4.    Per Guidelines for the Operation of the School of Medicine, the Dean of the School is appointed by the University Board of Trustees and is responsible to the President of the University. (Deckers Aff. ¶7).

5.    Per those Guidelines, the Dean is the principal administrative office of the School of Medicine and is responsible for, among other things: implementation of the regulations and policies of the University and School of Medicine, preparing annual budget recommendations for the School, making recommendations regarding the appointment, promotion and tenure of members of the faculty, Department Heads, and Associate Deans, and assigning space which is available to the School of Medicine to departments and other units. (Deckers Aff. ¶8).

6.    Richard Berlin, Ph.D. is Associate Dean for Research Planning and Coordination at UCHC. ("Affidavit of Richard Berlin ("Berlin Aff.") ¶3).

7.    Stephen Wikel, Ph.D. is a full professor with tenure in Physiology and Interim Director of the Center for Microbial Pathogenesis at UCHC. (Affidavit of Stephen Wikel ("Wikel Aff.") ¶3-5).

8.    Justin Radolf, M.D. is a full professor with tenure at UCHC and works in the Center for Microbial Pathogenesis. (First Substituted Complaint ¶11).

9.    The University of Connecticut is a public institution of higher education and agency of the State of Connecticut. (First Substituted Complaint ¶17).

10.   The University of Connecticut Health Center and the School of Medicine are arms of the University of Connecticut and agencies of the State of Connecticut. (First Substituted Complaint ¶18, 19).

B.    **FACULTY APPOINTMENT AND GRIEVANCE PROCEDURE**

11.   In 1998, plaintiff accepted a position as a professor of medicine at UCHC and agreed to establish the Center for Microbial Pathogenesis and serve as Director for the Center. (Deckers Aff. ¶9; Berlin Aff. ¶5).

12.   Plaintiff began employment with UCHC on April 1, 1999. (Deckers Aff. ¶10).

13.   On April 7, 1999, the UCHC Tenure and Promotions Committee formally approved plaintiff's appointments as Professor of Medicine and Professor Microbiology with tenure, with further approval, per the University ByLaws, by the UConn Board of Trustees. (Deckers Aff. ¶11).

2

14.   On February 7, 2000, plaintiff resigned his appointment as a faculty member in the Department of Microbiology. (Radolf Dep. Ex. 4; Deckers Aff. ¶12).

15.   The UConn Health Center has a Faculty Grievance Procedure set forth in the University of Connecticut ByLaws which allows a faculty member to bring a grievance regarding promotion, tenure, and reppointment to a Faculty Review Board made up of elected UCHC peer faculty of senior rank and to pursue any other action via the appeals mechanism to the Health Center Appeals Committee and ultimately to the UConn Board of Directors. (Deckers Aff. ¶13).

## C.   RADOLF'S COMMISSION OF RESEARCH MISCONDUCT

16.   On July 26, 2001, a Special Review Board (SRB) of UCHC, upon investigation of an allegation of research misconduct by plaintiff, found that plaintiff has falsified data in two grant proposals/applications submitted to the United States Department of Agriculture and Connecticut Innovations Inc. (Radolf Dep. Ex. 5; Deckers Aff. ¶14).

17.   As a result of the SRB findings, Dr. Deckers took certain administrative steps outlined in a letter to plaintiff dated August 22, 2001, to wit:

   (a)   a letter of reprimand to be placed in plaintiff's personnel file; and

   (b)   creation of a committee of faculty members to be charged with thoroughly inspecting all new grant proposals which plaintiff authors or co-authors for a period of three years (September 1, 2001 through August 31, 2004) to ensure (i) compliance with all applicable regulations and (ii) integrity of research data presented. (Radolf Dep. Ex. 5; Deckers Aff. ¶15).

18.   The three-year period is considered a period of academic probation. (Radolf Dep. Ex. 5; Deckers Aff. ¶16, 17).

19.   Plaintiff was informed in this letter that he had the right to appeal this decision to the Health Center Appeals Committee in accordance with University ByLaws. (Radolf Dep. Ex. 5; Deckers Aff. ¶18).

20.   By letter dated December 27, 2001, Dr. Deckers further informed plaintiff of the process for review of grants, contracts, and philanthropic proposals submitted by plaintiff during this probationary period. (Deckers Aff. ¶19).

21.   Plaintiff never appealed or grieved the actions of Dr. Deckers on August 22, 2001 or December 27, 2001 relative to plaintiff's research misconduct. (Deckers Aff. ¶20).

22.   By October 2001, the Federal Office of Research Integrity ("ORI") independently exercised jurisdiction over plaintiff's research misconduct and began its own

3

investigation of plaintiff. The U.S. Department of Agriculture was also involved. (Deckers Aff. ¶21).

**D.    DIRECTORSHIP**

23.    Per University ByLaws, Article XIII.A. the director of a center is appointed by the Dean to which the unit reports, in this case Dr. Deckers as Dean of the School of Medicine. (Deckers Aff. ¶22).

24.    Per the Guidelines for the Operation of the School of Medicine, a Type II Center such as the Center for Microbial Pathogenesis may be dissolved at the discretion of the Dean, in this case, Dr. Deckers and the Director reports directly to the Dean. (Deckers Aff. ¶23).

25.    At UCHC, as with the majority of medical schools throughout the country, all Chairs of Departments, Deans within the medical school, and Center Directors report directly to the Dean of the School of Medicine and serve "at the pleasure of the Dean". No center director works on a permanent basis at UCHC. Every such appointment is reviewed on a yearly basis and can be terminated at any time at the discretion of the Dean, in this case Dr. Deckers. (Deckers Aff. ¶24-26).

26.    Dr. Radolf cannot recall that Dr. Deckers or Dr. Berlin ever used the word "permanent" with respect to the directorship position. (Radolf Dep. p. 16).

27.    Plaintiff was not appointed to a "permanent" position as Director for the Center for Microbial Pathogenesis and has no documentation to support such a "permanent" appointment. (Deckers Aff. ¶26; Berlin Aff. ¶6-8).

28.    Plaintiff was never granted tenure in the Directorship position by the UCHC Tenure and Promotions Committee nor by the UConn Board of Trustees. (Deckers Aff. ¶27).

29.    The position of Director is an uncompensated position. (Deckers Aff. ¶28).

30.    In his December 27, 2001 letter to plaintiff, Dr. Deckers informed plaintiff of Dr. Berlin's concern that plaintiff's academic probation and potentially prolonged ORI investigation could become very serious handicaps to the maintenance of morale and productivity amongst faculty in the Center for Microbial Pathogenesis, to the recruitment of new faculty, and to the development of the Center as an institutional resource, and that Dr. Berlin recommended removal of plaintiff from the directorship during the probationary period. (Deckers Aff. ¶29-31; Berlin Aff. ¶10-13).

31.    Dr. Deckers also informed plaintiff that before any decision was made on this issue, he and Dr. Berlin would welcome a discussion with plaintiff on the advisability of this course. (Deckers Aff. ¶32; Berlin Aff. ¶14).

32.  Dr. Deckers had indications that the trust necessary for plaintiff to run the Center was evaporating and had further concerns regarding the tremendous strain that the original SRB misconduct investigation and subsequent ORI investigation had wrought upon plaintiff and that the administrative and mentoring responsibilities of the Center were considerable. (Deckers Aff. ¶30).

33.  On January 7, 2002, plaintiff met with Dr. Deckers and Dr. Berlin and again with Dr. Deckers on January 11, 2002 during which the subject of plaintiff relinquishing the directorship position was discussed. (Deckers Aff. ¶33; Berlin Aff. ¶15).

34.  During these meetings, Dr. Deckers indicated he felt there were obvious personal tensions that were being created by the federal investigation and that these personal tensions might increase or accelerate as the ORI inquiry ensured, leading him to the reasonable belief that such tensions would interfere going forward with plaintiff's work. (Deckers Aff. ¶34).

35.  Dr. Deckers felt that it was reasonable for plaintiff to put aside his administrative responsibilities to the Center while he dealt with issues related to ORI and its ongoing inquiry. (Deckers Aff. ¶35-38).

36.  Dr. Deckers hoped that all the issues related to the ORI investigation and personal issues that were troublesome to plaintiff could be resolved in a timely fashion and that plaintiff's voluntary removal would be on a temporary basis. (Deckers Aff. ¶39).

37.  Dr. Deckers informed plaintiff that his ability to resume the position of Director would be determined when he was feeling better _and_ after the opinion of the ORI had been received. (Deckers Aff. ¶40; Berlin Aff. ¶17-20).

38.  Most important to Dr. Deckers was the determination of the ORI investigation and his hope that ORI would not add further limiting aggravation to plaintiff's role in the institution. The resumption of the directorship was not simply to follow plaintiff's self-evaluation of his mental health status. (Deckers Aff. ¶41).

39.  Dr. Radolf does not recall whether there was any conversation about waiting for the outcome of the ORI investigation before the directorship position could be reinstated and further cannot recall what was discussed regarding the temporary nature of his removal. (Radolf Dep. p.36-38).

40.  By letter dated January 13, 2002, plaintiff voluntarily removed himself from the Director position. (Radolf Dep. Ex. 8; Deckers Aff. ¶42, 43; Berlin Aff. ¶21).

5

41.    Stephen Wikel, Ph.D. was appointed Interim Director of the Center on or about February 1, 2002. This appointment had not been "predetermined" and is not a "permanent" appointment. (Deckers Aff. ¶44-45; Berlin Aff. ¶22).

42.    Dr. Radolf admits Dr. Deckers and Dr. Berlin decided on a course of action after his meetings with them. (Radolf Dep. p. 40; Berlin Aff. ¶15, 16).

43.    Dr. Radolf was given numerous opportunities to discuss resumption of the directorship position with Dr. Deckers but specifically refused to participate in any discussion concerning this position. (Deckers Aff. ¶48).

44.    Plaintiff has never filed a grievance pursuant to the UCHC Faculty Grievance Procedure regarding his removal from the Director position. (Deckers Aff. ¶49; Radolf Dep. p. 42.).

**E.    GRANT PROPOSAL AND DATA OWNERSHIP**

45.    Plaintiff, unlike Dr. Wikel, is not a recognized or published authority in the area of the immunobiology of tick vectors but rather on the molecular microbiology of a Spirochete, Borrelia burghdorfei, the causative agent of Lyme disease. Deckers Aff. ¶50; Wikel Aff. ¶6-10; Berlin Aff. ¶23-25; Affidavit of Roger Thrall ("Thrall Aff.") ¶6).

46.    Dr. Wikel was already engaged using "molecular approaches" for the identification of tick salivary gland proteins. These molecular biological approaches were being employed to identify tick salivary gland proteins/genes in Dr. Wikel's lab at Oklahoma State University in collaboration with a faculty colleague there. (Wikel Aff. ¶7).

47.    Dr. Radolf was not using molecular approached to identify tick salivary glands or involved in the application of molecular approaches to developing a tick vaccine prior to his collaboration with Dr. Wikel. (Radolf Dep. p.56-57).

48.    While at the University of Texas Southwestern Medical Center, plaintiff received a grant from the Texas Advanced Technology program to fund research activities involving the application of molecular approaches to identify biologically active and/or protective molecules in the saliva of the hard tick *Ixodes scapularis*. This work was dependent on Dr. Wikel's expertise in providing the tick materials essential for the study ("EST project"). (Radolf Dep. p. 51-53; Wikel Aff. ¶11).

49.    This Texas Advanced Technology Program grant had to be made to an investigator based in Texas. At the time, Dr. Wikel was based at Oklahoma State University. (Wikel Aff. ¶12).

50.    Three other grants were subsequently submitted. Two USDA grants were submitted with Dr. Wikel as principal investigator and plaintiff as co-investigator.

6

A Connecticut Innovations Inc. (CCI) grant was also submitted with Dr. Wikel as principal investigator and plaintiff as collaborator. (Wikel Aff. ¶13).

51.     The Texas Advanced Technology Program grant and one of the USDA grant applications, submitted in January 1998, suggested the use of expression library immunization (ELI) to screen tick salivary cDNA clones for protective capacities of selected *D.andersoni* proteins identified by sequencing clones from the *D.andersoni* cDNA expression library. This USDA grant was not funded. The other USDA grant application and the CCI application which focused on the delineation of the anti-hemostatic and protective capacities of selected *D.andersoni* proteins identified by sequencing of clones from the *D.andersoni* cDNA expression library were ultimately withdrawn from consideration for funding being because plaintiff had fabricated the data and committed scientific misconduct. (Wikel Aff. ¶14).

52.     The Texas grant and the 1998 USDA grant submission relied heavily on collaboration with Dr. Stephen Jonnston, for the expertise he possessed as the developer of the ELI technology and was based exclusively on ELI technology. This grant application did not include any research related to defining expressed sequence tags (SDTs), a distinct technology from ELI. (Wikel Aff. ¶15).

53.     The idea to use ELIs to study tick gene expression also was not the fruit of Dr. Radolf's intellect. Rather, the first publication on the topic of ELI was published by Dr. Johnston in 1995, well before the conception of the two grants noted above and was in the public domain as prior art as early as 1998. (Wikel Aff. ¶16).

54.     Tick salivary gland secretions were the focus of study from a molecular biology perspective going back as far as 1985. Work was published prior to the 2000 grant applications. Some of these publications were from Dr. Wikel's laboratory at Oklahoma State University. None of these publications were by Dr. Radolf. (Wikel Aff. ¶17).

55.     The 2000 proposal submissions to the USDA and the CCI application did not involve ELI. These involved expressed sequence tags (ESTs), a distinct technology from ELI. Dr. Wikel ultimately withdrew these before being funded because Dr. Radolf had fabricated the data and committed scientific misconduct. (Wikel Aff. ¶18).

56.     After the arrival of Dr. Wikel at the Health Center, the departure of the post-doctoral fellow, Dr. Onyango, from plaintiff's lab, and the arrival of Dr. Francisco Alarcon-Chaidez in Dr. Wikel's lab, all work related to the EST project was performed in Dr. Wikel's lab and plaintiff was informed of the results. (Radolf Dep. p. 66; Wikel Aff. ¶19).

57.    Plaintiff's collaboration with Dr. Wikel primarily involved the sequencing, analyses, and expression of cDNA expression libraries generated from feeding *Dermacentor andersoni* and *Ixodes scapularis* ticks. (Wikel Aff. ¶20).

58.    The preparation of the cDNA libraries was dependent upon the work of Dr. Wilel as all tick salivary glands were prepared by Dr. Wikel at Oklahoma State University prior to his arrival at UCHC. (Wikel Aff. ¶21).

59.    Approximately 600 pairs of salivary glands were collected from four-day fed *Dermacentor andersoni* female ticks. The library was prepared by Stratagene and Dr. Wikel paid for the construction of this library. A similar number of ticks were used for construction of the *Ixodes scapularis* four-day fed female salivary gland library. A technician at Stratagene dropped the salivary glands and they were destroyed. Dr. Wikel then spent an additional six months preparing another batch of salivary glands and Stratagene constructed this library free of charge. (Wikel Aff. ¶22).

60.    The *Dermacentor andersoni* and *Ixodes scapularis* cDNA libraries produced during the collaboration with Dr. Radolf were being analyzed until January 2002, at which time all activities involving those cDNA libraries ceased. All the files related to those projects were sequestered by the Office of Research Integrity (ORI) during their investigation of Dr. Radolf's scientific misconduct. A large box of files containing information on all the cDNA clones studied was returned to Dr. Radolf after the completion of the ORI inquiry and Dr. Radolf should have in his possession all files related to the cDNA clones analyzed which provide a complete data set of all work on the project. (Wikel Aff. ¶23).

61.    After cessation of the projects in January 2002, Dr. Wikel started over from scratch to develop new cDNA libraries generated at different time points from those developed in collaboration with Dr. Radolf and using different cDNA technologies. For instance, the work with Dr. Radolf involved only cDNA libraries prepared from salivary glands obtained from female ticks for four days. Dr. Wikel now collected salivary glands from ticks at 8-12 and 18-24 hours of feeding. Those techniques and approaches were the matters confirmed as employing different technology by the investigative committee chaired by Dr. Roger Thrall. (Wikel Aff. ¶24).

62.    All subsequent research post-January 2002 has been done by incorporation of new methods of cDNA library construction and analysis of salivary glands during 8-12 and 18-24 hours of feeding rather than at four days of engorgement. (Wikel Aff. ¶25; Thrall Aff. ¶9-12).

63.    The DoD project did not involve the use of ELI. The DoD proposal was based upon the use of expressed sequence tags (ESTs), which is an entirely different scientific approach. ELI and ESTs are two distinct techniques that require very different strategies to identify genes of interest. (Wikel Aff. ¶26).

8

64.   The use of ESTs by the scientific community is extensive and is not a unique scientific methodology or approach originating from Dr. Radolf. The initial description of the use of ESTs was published in 1991. The first mosquito EST paper was in 1996 and the first manuscript describing the use of ESTs to analyze gene expression by tick was published in 1998 by a group of Australian scientists, two years prior to the 2000 grant proposals in collaboration with Dr. Radolf. A second publication on the use of ESTs to characterize tick genes was published in 2000. (Wikel Aff. ¶27).

65.   The anti-hemostasis assays described in the 2002 DoD proposal and in the 2000 submissions to the USDA and CCI were also methods previously published in scientific manuscripts and described in textbooks of hematology. They are freely available, allowing anyone to utilize those techniques. Since those methods were available in the public domain as a result of their publication, they are widely used by scientists measuring hemostasis in the laboratory. Those methods have been used for years prior to the interactions of Dr. Radolf and Dr. Wikel. (Wikel Aff. ¶28).

66.   Both Dr. Wikel and plaintiff contacted Dr. Michael Cappello in the Department of Pediatrics at Yale University about acting as a consultant and providing information regarding the characterization of anti-coagulant activities. (Wikel Aff. ¶30).

67.   Dr. Wikel had Dr. Cappello screen a recombinant molecule (p36) that was the sole property of Dr. Wikel. Dr. Cappello also screened tick saliva and a salivary gland extract prepared by Dr. Wikel. Dr. Cappello did screen several recombinant *D.andersoni* salivary gland derived recombinant proteins in the Wikel lab as a result of the screening of the *D.andersoni cDNA* library in question and plaintiff was informed of the results. (Wikel Aff. ¶31).

68.   The collaboration with Dr. Cappello involves the use of assays that are published in the scientific literature and in the public domain. These assays are widely used by investigators assessing the ability of any number of factors to alter hemostasis. (Wikel Aff. ¶32-33).

69.   Dr. Wikel has neither used nor proposed the use of expression library immunization (ELI) in any applications since the USDA filing with plaintiff in January 1998 and the Texas Advanced Technology Program application in 1997. (Wikel Aff. ¶29).

70.   Dr. Radolf has not requested any data from Dr. Wikel since 2000 and does not remember if he has asked for data since then. (Radolf Dep. p. 78-79, 82-83).

71.   A Congressional DoD earmark was requested for research to establish the molecular scientific basis for a novel class of disease transmission – blocking

9

vaccines and ultimately help achieve the Army's stated goals of developing vaccines that would prevent malaria, Dengue fever, and other mosquito and tick transmitted diseases in all service members and finding new control measures against vectors of infectious disease. (Deckers Aff. ¶51, 54; Wikel Aff. ¶43-45).

72.    The vaccines would attack and neutralize the molecules in mosquito or tick saliva that inhibit blood clotting, block itch and pain responses, and suppress immune defenses and that are essential for the effective transmission of the infectious agent to the person upon which a vector is obtaining a blood-meal. (Deckers Aff. ¶52; Wikel Aff. ¶46-47).

73.    The DoD Research Award is based on a research area, specifically the immunobiology of blood-feeding anthropod (tick vector) – host interactions, in which Dr. Wikel, and not Dr. Radolf, is internationally recognized and published. (Deckers Aff. ¶53; Berlin Aff. ¶30; Wikel Aff. ¶59).

74.    The direction of the DoD project was reliant upon Dr. Wikel's research; the proposed studies did not contain anything done in collaboration with plaintiff. (Deckers Aff. ¶53, 58; Wikel Aff. ¶60; Thrall Aff. ¶5-12).

75.    The techniques described in the DoD proposal do not relate to anti-hemostasis other than those already published in the scientific literature and in the public domain. The techniques include new methods of cDNA library construction and focus on never previously explored time points for library construction and screening in a high throughput manner, which differ from the previous collaboration with plaintiff. (Wikel Aff. ¶61; Thrall Aff. ¶5-12).

76.    The only jointly derived material that was used in the DoD proposal was used solely in the preliminary data section to demonstrate that Dr. Wikel was familiar with the use of EST's and did not form a major component of the application ; the DoD grant was utilizing new technology and moving beyond the technology of the old data; plaintiff was not removed from the DoD proposal but rather an administrative decision was made that he would not be a Director or Co-Director of the project; and that his lack of participation was not due to any plan to bar him from the project but rather a breakdown in his relationship with Dr. Wikel. (Wikel Aff. ¶62-64; Deckers Aff. ¶68 Attachment 14; Thrall Aff. ¶5-12).

77.    Dr. Radolf admits that if Dr. Wikel's work explores a new avenue or the original work has evolved to a new area, then Dr. Wikel is not required to bring Dr. Radolf into Dr. Wikel's collaboration with a third party. (Radolf Dep. p.70-71).

78.    Dr. Radolf admits that when collaborators go in different research directions, they do not always participate in the new research even if there research is based upon their collaborative pre-existing research. (Radolf Dep. p.92).

79. Plaintiff was acknowledged in the text of the grant as having contributed to the preliminary data; he was not listed as a co-investigator or collaborator and no assurances were made that he would be. (Deckers Aff. ¶56, 57; Berlin Aff. ¶26-29).

80. The research project regarding the immunobiology of anthropod-host interactions as defined and agreed to by the U.S. Army Medical Research and Material Command is the responsibility of Dr. Wikel as Principal Investigator and any others with whom he may wish to collaborate. (Deckers Aff. ¶59).

81. The DoD grant enables UConn to draw together investigators from a broad range of disciplines, inside and outside of UConn, to create a comprehensive program for the detection and control of mosquito-and tick-borne diseases, which are a serious threat to military operations and the public. (Deckers Aff. ¶54).

82. At one point Dr. Jose Ribiero at the NIH was asked to use an analysis program that he developed to catalogue the *D.andersoni* sequences for plaintiff and Dr. Wikel. He did analyze that data and provided that information which was presented to plaintiff in the latter part of 2001. (Wikel Aff. ¶34-37).

83. On April 20, 2001, Dr. Wikel wrote to U.S. Representative Nancy Johnson seeking her support for the proposal. (Wikel Aff. ¶48).

84. On or about December 2001, the DoD granted $2.5 million to fund the preliminary proposal. The proposal was officially submitted in September 2002 and the award became effective February 1, 2003. (Deckers Aff. ¶55; Wikel Aff. ¶49-58).

85. The Health Center did not prepare or distribute a news release on this subject. Rather, U.S. Representative Nancy Johnson's office distributed a media invitation to attend a news conference on January 16, 2002, three days after plaintiff removed himself from the directorship position. (Deckers Aff. ¶60).

86. Dr. Deckers decided that since plaintiff had admitted to committing scientific misconduct, was still under investigation by the Federal Office of Research Integrity and still on academic probation, it was not in the best interest of the Health Center, the Center for Microbial Pathogenesis, Representative Johnson, Dr. Wikel or plaintiff himself that he participate in the press conference. (Deckers Aff. ¶61).

87. Dr. Radolf does not know whether the article that appeared in the University of Connecticut Advance (Vol. 20, issue 17) after the press conference was drafted or edited by the defendants. (Radolf Dep. p. 103-05).

88. Dr. Radolf could not state where in the article it fallaciously depicts Dr. Wikel as the sole originator and owner of the DoD research. (Radolf Dep. p.104).

11

89.     In early 2002, Dr. Alarcon-Chaidez presented an internal research-in-progress talk about work relating to the *D. andersoni* cDNA Library in the Center for Microbial Pathogenesis. It was common knowledge within the Center that plaintiff had collaborated with Dr. Wikel early on this project. An outline was prepared for possible publication of the *D. andersoni* EST project and was shared with plaintiff. When all the initial EST data prepared in the plaintiff's lab was sequestered by the Office of Research Integrity, Dr. Wikel stopped consideration of a possible publication. (Wikel Aff. ¶38).

90.     On October 7, 2002, plaintiff, through his attorney, filed a complaint with the Health Center claiming that Drs. Deckers, Berlin and Wikel had violated the UCHC data ownership policy by allegedly using plaintiff's proprietary information without permission, raising the same claims as in this federal court action. (Radolf Dep. Ex. 11; Deckers Aff. ¶62).

91.     This complaint was investigated via the UCHC Compliance Program by an ad hoc faculty Review Committee. (Deckers Aff. ¶63).

92.     On December 31, 2002, plaintiff, through his attorney, also filed a complaint with the Health Center alleging that Drs. Deckers, Berlin and Wikel had engaged in research misconduct, among other things, by excluding plaintiff from participating in the formulation of the DoD research proposal and U.S. Public Health Service research, used plaintiff's proprietary information without permission, and excluded him from a press conference as alleged in this federal court action. (Radolf Dep. Ex. 13; Deckers Aff. ¶64).

93.     On January 13, 2003, the ad hoc Review Committee issued a decision that jointly owned data related to the Dermacentor cDNA library was cited in the Preliminary Data section of the DoD application and was used by Dr. Wikel without plaintiff's express permission. The report was provided to plaintiff's attorney on January 30, 2003. (Radolf Dep. Ex. 14; Deckers Aff. ¶65).

94.     On January 31, 2003, Dr. Deckers issued Dr. Wikel a letter of reprimand to be included in his personnel file. (Deckers Aff. ¶66).

95.     On February 10, 2003, Dr. Deckers and Dr. Berlin wrote to Ms. Jamie Kiser, Contract Specialist, U.S. Army Medical Research Acquisition Activity, informing her of the improper inclusion of data in the Preliminary Data section of Dr. Wikel's proposal. (Deckers Aff. ¶67).

96.     On February 17, 2003, the Standing Committee on Research Misconduct, comprised of scientists who are peer faculty members of senior rank, after investigation, made a finding that no research misconduct was committed by any of the accused; that Drs. Deckers and Berlin did not remove plaintiff from the DoD project but rather made an administrative decision that he would not participate as the Director or Co-Director of the project; that the lack of

participation by plaintiff appeared to be due to a breakdown in his relationship with Dr. Wikel rather than any plan to bar him from the project; that permission to use the co-jointly owned preliminary data was implied; that the data was used for illustrative purposes as to the type of work previously done and did not form a major component of the project; and that the DoD grant was utilizing new technology and moving beyond the technology of the old original data. (Deckers Aff. ¶56, 57, 68; Wikel Aff. ¶39; Thrall Aff. ¶5-12).

97.  Plaintiff's attorney was provided a copy of this decision on March 6, 2003. (Radolf Dep. Ex. 14).

98.  On April 24, 2003, David Vaughn, M.D. Director, Military Infectious Diseases Research Program, U. S. Army Medical Research and Materiel Command, wrote to Dr. Wikel stating that "[t]he letter from the University of Connecticut dated 10 February 2003 concerning this issue demonstrates the University's willingness to be forthright in disclosing any impropriety" and requested that Dr. Wikel apply for additional available funding for his project. (Deckers Aff. ¶69; Wikel Aff. ¶56).

99.  DoD did not rescind the grant, remove Dr. Wikel as Principal Investigator (PI) from the grant, or add plaintiff as PI or Co-PI on the grant. (Radolf Dep. p. 123; Deckers Aff. ¶70).

100. At the time of development and submission of the DoD proposal, neither Dr. Deckers nor Dr. Berlin had any knowledge that the preliminary data referenced in the proposal was co-jointly owned or developed in collaboration with the plaintiff. (Deckers Aff. ¶71; Berlin Aff. ¶9, 33).

101. On May 19, 2003 plaintiff filed a complaint with the U.S. Army Medical Research and Materiel Command (USAMRMC) claiming that the two internal investigations conducted by UCHC were flawed in substance and procedure. The USAMRMC responded on June 24, 2003 and declined to initiate an independent investigation stating that plaintiff had not appealed the investigations pursuant to the UCHC appeal process. (Radolf Dep. Ex. 15).

102. On December 2, 2003, plaintiff, through his counsel, again filed a complaint with USAMRMC claiming that UCHC had failed to take appropriate action in response to the January 13, 2003 ad hoc Review Committee findings. The USAMRMC responded on January 15, 2004 and declined to initiate an independent investigation. It further stated that "UCHC has thus far handled the allegations in a manner consistent with the Federal Policy." (Radolf Dep. Ex. 16).

103. On December 4, 2003, plaintiff, through his counsel, filed a grievance pursuant to the Faculty Grievance Procedure claiming that Dr. Deckers had failed to act on the January 13, 2003 findings of the ad hoc Review Committee. (Radolf Dep. Ex. 17; Deckers Aff. ¶72).

13

104.    Upon learning that Dr. Deckers had taken action against Dr. Wikel and informed the USARMRC, plaintiff amended his original grievance on February 17, 2004 to 1) restate his original claims, 2) dispute any claim that Dr. Deckers' letter to the USAMRMC was a meaningful response to the Committee's findings, and 3) raised new allegations stemming from this letter, and requested eight (8) different actions be taken. (Radolf Dep. Ex. 18; Deckers Aff. ¶73).

105.    On April 29, 2004, plaintiff amended his grievance again to include "Dr. Wikel's revisions of the originally submitted proposal; that University officials aided Dr. Wikel's efforts to violate UCHC policy; and the failure to disclose information to the ad hoc Review Committee." (Radolf Dep. Ex. 19; Deckers Aff. ¶74).

106.    Dr. Radolf was not assured that he would continue to serve as a key collaborator on the research, nor was he informed that his participation in the proposal had terminated, nor was he intentionally excluded from the research. (Berlin Aff. ¶27-29; Deckers Aff. ¶56-57, 67, Attachment 14).

107.    Dr. Radolf admits that he has not been prohibited from doing research in the same area; that he is not prohibited from applying for grants to do this research; and that he has not applied for such grant funding. (Radolf Dep. p. 79-80, 87,94).

108.    Dr. Radolf admits defendants have not taken any grant funding away from him nor has he been removed as a PI on a funded grant. (Radolf Dep. p. 92-93).

109.    Dr. Radolf's contention that Dr. Wikel instructed members of his lab not to discuss research with Dr. Radolf is based upon hearsay. (Radolf Dep. p. 73-75).

110.    Dr. Radolf's contention that Dr. Deckers, and Dr. Berlin acted in concert with Dr. Wikel to instruct members of his lab not to discuss research with Dr. Radolf or his lab personnel is based on speculation. (Radolf Dep. p. 94-95, 97).

111.    Dr. Radolf admits he was mentioned in the DoD proposal. (Radolf Dep. p. 101).

112.    Dr. Radolf produced no facts to support his claim in ¶421 of the Complaint that defendants' purpose was to cause confusion and/or to cause mistakes and/or to deceive others into believing that defendant Wikel was the sole and exclusive owner of the ideas or intellectual properties in the DoD proposal. (Radolf Dep. p.108).

113.    Dr. Radolf never grieved or appealed his alleged exclusion from participation in the research. (Deckers Aff. ¶75).

114.    Dr. Wikel introduced Dr. Radolf to Dr. Thomas Mather, University of Rhode Island, and by summer 2002, Dr. Radolf was collaborating with Dr. Mather and with Dr. Erol Fikrig, Yale University School of Medicine, both of whom are

14

direct competitors of Dr. Wikel and who are engaged in similar research as Dr. Wikel. (Wikel. Aff. ¶40).

115.   One of Dr. Mather's publications describes characterizations of ESTs from the salivary glands of four day fed *Ixodes scapularis* females, and another publication focuses on an anti-coagulant from the salivary glands of *Ixodes scapularis*. Dr. Mather does not communicate with Dr. Wikel regarding the work he does with Dr. Radolf. (Wikel Aff. ¶41).

116.   Dr. Radolf is continuing to conduct research with ticks. Dr. Mather has supplied Dr. Radolf with ticks. Dr. Radolf has also obtained ticks from Oklahoma State University. (Wikel Aff. ¶42).

F.     **COMPLIANCE PROGRAM AND TIME & EFFORT INVESTIGATION**

117.   The 1991 Federal Sentencing Guidelines set forth requirements, organizations including UCHC, must meet to create an effective compliance program to prevent and detect violations of law. (Deckers Aff. ¶76).

118.   By 1998, UCHC had established a compliance program to ensure compliance with all federal and state laws as they relate to any and all activities within UCHS's administrative, financial, clinical, research and education domains, which requires of its employees reporting of instances of possible non-compliance, a process for reporting in confidence, and full and independent review of such report by the UCHC Compliance Office. Deckers Aff. ¶77).

119.   UCHC policy requires documentation of all salary expenses charged directly or indirectly against federally sponsored projects. Individual time and effort reports are required of all employees who are directly charged or cost shared on sponsored research projects. The Principal Investigator is required to review and certify all Time and Effort reports associated with the sponsored project using suitable means of certification that the reported work was performed. (Deckers Aff. ¶78).

120.   When plaintiff relocated to UCHC, he brought with him a research associate, Ken Bourrell, whose salary would initially be paid by UCHC out of Connecticut General Funds and then at some point in the future from eligible grant on which Bourrell was working, or other qualified sources of funding. (Radolf Dep. p. 133-134, 136; Berlin Aff. ¶34-35; Affidavit of David Gillon ("Gillon Aff.") ¶5-6).

121.   As the Principal Investigator, plaintiff filed two transfer requests with NIH to transfer two grants from the University of Texas Southwestern Medical Center to UCHC. (Radolf Dep. p. 131).

122.   The two transfer requests each budgeted fifty percent (50%) of Bourrell's salary as research assistant based on plaintiff's assumption that Bourrell would be

performing a significant amount of laboratory work toward plaintiff's competitive renewals of the two grants. (Radolf Dep. p.132, 137-38; Berlin Aff. ¶36).

123. In February 2002, Dr. Wikel brought to Dr. Berlin's attention that the non-competitive renewals filed by plaintiff with the federal government (NIH) showed that Bourrell was working at a certain percentage level on two grants transferred from the University of Texas Southwestern Medical Center, that this percentage level was untrue, and that it did not match up to Bourrell's actual time and effort. Dr. Wikel questioned why Bourrell was paid on the State General Fund when he was shown in the noncompetitive renewals to be working on plaintiff's grants. (Wikel Aff. ¶65-74; Berlin Aff. ¶37; Gillon Aff. ¶7-8).

124. The issue of State General Fund usage was brought to Dave Gillon, Associate Dean for Finance and Administration and not logged in with the Compliance Office per UCHC policy. (Gillon Aff. ¶7-8; Deckers Aff. ¶88 Attachment 25).

125. Due to more pressing matters, Mr. Gillon did not attend to this issue until June 2002 when the Health Center filed year-end (June'02) State General Fund closeout reports which show a processing of payroll charges as part of total General Fund usage. (Gillon Aff. ¶9-10; Berlin Aff. ¶38-39).

126. Plaintiff never used the grant funds for Bourrell's work as projected. (Radolf Dep. p. 139).

127. Because plaintiff was out of town and could not provide appropriate information regarding Bourrell's actual level of effort, a time deadline had to be met, and these reports to the State could be amended later to show actual time and effort, Gillon filed the General Fund report to show a 50% effort so as to match the grant documents filed by plaintiff with NIH. (Gillon Aff. ¶11-12).

128. Mr. Gillon did not address the issue of progress reports to the federal government as that is the responsibility of the Principal Investigator on the grant. (Gillon Aff. ¶26-29).

129  Gillon then called Kim Young, the administrator in the Center, to inform plaintiff that he was processing the paperwork and to ask that plaintiff call him when he returned so as to determine actual time and effort and file a corrected report if necessary. (Gillon Aff. ¶13).

130. In June 2002, as a result of the State filing, UCHC encumbered funds from the two NIH grants to pay a portion of Bourrell's salary and fringe benefits. (Gillon Aff. ¶11-12).

131. Plaintiff became aware of this action upon his return to work when Ms. Young gave him a copy of the paperwork emanating from Gillon's office which showed the encumbrances. Radolf Dep. p. 141-42; Gillon Aff. ¶14).

16

132.   A series of meetings was held in which it was agreed that plaintiff would
       document the level of effort Bourrell had actually spent on plaintiff's grants and
       that the Health Center would correct the state accounting papers based on that
       information plaintiff provided. (Gillon Aff. ¶15; Berlin Aff. ¶39-42).

133.   On at least two occasions, plaintiff asked Dave Gillon to tell plaintiff what Gillon
       wanted him to report on Bourrell's time and effort and that he would put that
       down. Gillon responded that it was not his position to determine Bourrell's level
       of effort on his research projects and that it was up to plaintiff and Bourrell to
       make that determination. (Gillon Aff. ¶16-20).

134.   Once the information was provided by plaintiff, UCHC corrected its report to the
       State regarding payment from the General Fund (Labor Distribution Charge
       Authorization) in September 2002. (Gillon Aff. ¶23-25).

135.   Plaintiff never complained to Dr. Deckers or Dr. Berlin or other higher-level
       administrators and did not report this matter to the Compliance Office or other
       state or federal agencies which investigate violations of federal regulations and
       NIH policy. (Radolf Dep. p. 149-50; Deckers Aff. ¶86).

136.   In early August 2002, Dr. Wikel met with Dr. Scott Wetstone, Director, Health
       Center Administration regarding various matters and voiced his concern that
       plaintiff had filed noncompetitive renewals as well as progress reports with the
       federal government that still indicated a percentage level of effort on the grants
       that did not match that on the time and effort reports and that did not match actual
       time and effort by Bourrell. Dr. Wikel's concern was that these incorrect reports
       to the federal government were fraudulent and had not been corrected by plaintiff.
       (Affidavit of Scott Wetstone ("Wetstone Aff.") ¶7; Wikel Aff. ¶67-76).

137.   This information was brought to the attention of Dr. Deckers on August 12, 2002,
       who called for a meeting on August 22nd to clarify whether a compliance
       investigation should be initiated regarding this issue of grant documents filed with
       the federal government. (Wetstone Aff. ¶8-11, 13-15; Deckers Aff. ¶79-82).

138.   This information was then reported to the Compliance Office on August 22, 2002.
       (Wetstone Aff. ¶12; Deckers Aff. ¶80-82).

139.   On September 10, 2002, the Compliance Office recommended that Dr. Deckers
       immediately notify ORI of their investigation and assign an investigation team.
       (Deckers Aff. ¶83).

140.   On September 12, 2002, Dr. Deckers notified Dr. Kay Fields at ORI of the
       allegation and investigation per a prior request for information from Dr. Fields as
       to new issues involving plaintiff. (Wetstone Aff. ¶5-6; Deckers Aff. ¶83-84).

141. On September 16, 2002, Dr. Deckers notified Sally J. Rockey, Deputy Administrator of the U.S. Department of Agriculture of the same information due to its involvement in the ORI case. (Deckers Aff. ¶85).

142. On September 26, 2002, plaintiff was notified by Robert Kozol, M.D., M.S.A., Executive Director, Compliance, UCHC, that an allegation concerning reporting of percentage effort of research associates by plaintiff on federal grant proposals had been received and would be investigated. (Radolf Dep. Ex. 20).

143. On October 16, 2003, plaintiff filed a complaint with the Compliance Office against Drs. Deckers, Berlin, and Wikel alleging retaliatory conduct by them regarding encumbering of the funds on the two NIH grant accounts and initiation of the Compliance investigation against him. (Radolf Dep. Ex. 22; Deckers Aff. ¶86-87).

144. An internal Compliance Office investigation was conducted relative to the plaintiff's October 16th complaint and this time plaintiff, as the accuser, agreed to be interviewed. (Deckers Aff. ¶89).

145. On July 8, 2004, the Compliance Committee issued a report regarding its investigation of the first compliance complaint against Dr. Radolf to Dr. Deckers and Claire Leonardi, Chairperson of the UCHC Board of Directors and Chairperson of the Board's Subcommittee on Compliance, which concluded that the progress reports were not fraudulent. (Deckers Aff. ¶88).

146. On July 8, 2004, the Compliance Committee issued a report regarding plaintiff's complaint to Ms. Leonardi in which it determined that no retaliatory conduct had been committed by Drs. Deckers, Berlin or Wikel. (Deckers Aff. ¶89).

147. Drs. Deckers, Berlin and Wikel were not members of the Compliance Committee which investigated and issued a determination on either the first complaint or plaintiff's retaliation complaint. (Deckers Aff. ¶88, 89 Attachment 25, 26).

148. Dr. Radolf admits that he did not bring to the attention of Dr. Deckers, the Compliance Committee, the Board of Directors, the Board of Trustees, or state of federal officials his complaints regarding the encumbering of funds allegedly in violation of NIH regulations. (Radolf Dep. p. 149; Deckers Aff. ¶86).

149. Dr. Radolf has no idea what Dr. Deckers involvement was relative to the encumbering of funds in June 2002 and states that Dr. Berlin had nothing to do with respect to the encumbering of funds in June 2002. (Radolf Dep. p. 144).

150. Dr. Radolf admits he engaged in a negotiation process with Dave Gillon and Dr. Berlin that led to the monies being restored to his grants. (Radolf Dep. p. 146).

18

151. Dr. Radolf did not file a faculty grievance regarding the encumbering of the funds. (Radolf Dep. p. 150).

152. The factual basis for Dr. Radolf's claim that defendant Wikel acted with malice is his claim that Dr. Wikel made up the allegations (Radolf Dep. p. 154-155) and as to the other defendants "there is no other alternative explanation." (Radolf Dep. p. 168).

153. Dr. Radolf's factual support for his claim in ¶692 of his Complaint that Dr. Wikel was acting with the clear purpose of destroying Dr. Radolf's scientific endeavors, his professional reputation and his employment with defendant UCHC is "[t]here is no alternative explanation." (Radolf Dep. p. 182).

154. Dr. Radolf's support for his allegation that Dr. Deckers acted in concert with Dr. Wikel is that Dr. Deckers instructed Dr. Wikel or Dr. Wetstone to draft a complaint, (Radolf Dep. p. 171), although Dr. Wikel did not file a formal written complaint. (Wikel Aff. ¶77-79).

## G.   ORI VOLUNTARY EXCLUSION AGREEMENT

155. On March 10, 2003, plaintiff entered into a Voluntary Exclusion Agreement with ORI which states: "In January of 2000, I [plaintiff] engaged in scientific misconduct involving research supported by the National Institute of Health." (Radolf Dep. Ex. 6; Deckers Aff. ¶90).

156. In the Voluntary Exclusion Agreement, plaintiff admitted that he "falsified and fabricated preliminary data by intentionally altering the labeling of an ethidium bromide-stained agarose gel purporting to demonstrate the expression of genes in the salivary glands of feeding Dermacentor andersoni ticks… The texts of the two proposals also contained inaccurate statements relating to these falsified and fabricated data." (Radolf Dep. Ex. 6).

157. In the Voluntary Exclusion Agreement, plaintiff also stated that "[his] action also could have compromised the integrity and careers of individuals with whom I work, individuals who place their trust in me and who look to me for scientific leadership." (Radolf Dep. Ex. 6; Deckers Aff. ¶91).

158. As a result of the Voluntary Exclusion Agreement, the United States Department of Health & Human Services implemented the following administrative actions for a period of five (5) years, beginning on March 10, 2003:

   • "[The plaintiff] voluntarily agreed to exclude himself from serving in any advisory capacity to PHS [U.S. Public Health Service] including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

19

- [The plaintiff] voluntarily agreed that any institution that submits an application for PHS support for a research project on which his participation is proposed or which uses him in any capacity on PHS-supported research, or that submits a report of PHS-funded research, or that submits a report of PHS-funded research in which he is involved, must concurrently submit a plan for supervision of Dr. Radolf's duties to the funding agency for approval. The supervisory plan must be designed to ensure the scientific integrity of Dr. Radolf's research contribution. A copy of the supervisory plan must also be submitted to ORI by the institution. [The plaintiff] agreed that he will not participate in any PHS-supported research until such a supervision plan is submitted to ORI.

- [The plaintiff] agreed to ensure that any institution employing him submits, in conjunction with each application for PHS funds or report, manuscript, or abstract of PHS funded research in which he is involved, a certification that the data provided by him are based on actual experiments or are otherwise legitimately derived, and that the data, procedures, and methodology are accurately reported in the application or report. [The plaintiff] must ensure that the institution sends the certification to ORI." (Radolf Dep. Ex. 6; Deckers Aff. ¶92).

159. Neither UCHC nor the defendants were parties to this Agreement or involved in its negotiation, despite being subject to its requirements. (Deckers Aff. ¶93; Radolf Dep. p. 186).

160. Dr. Deckers received a copy of the Voluntary Exclusion Agreement on March 19, 2003. (Deckers Aff. ¶90).

161. The ORI published this Finding and Agreement in the Federal Register, the ORI Newsletter, and on the NIH Guide for Grants and Contracts. (Radolf Dep. p. 186).

162. In accordance with ORI's mandate, on April 4, 2003, Dr. Deckers provided notice to plaintiff of the following actions:

    "(1)    [The plaintiff's] academic probation will continue at least through March 9, 2008. During this interval you will be excluded from any academic and/or administrative leadership position on behalf of the UCHC and its schools and hospital that could include, directly or indirectly any service of any kind to the USPHS.

    (2)    …The now operative Supervisory Plan requested of UCHC by ORI is attached and was forwarded to them as requested on April 4, 2003…

    (3)    The MD/Ph.D Program of the UCSOM is a PHS-funded activity. Therefore, to ensure that the work of your current graduate student…who

20

is an MD/Ph.D student, is not disturbed or disrupted in any way by these events, and that she is adequately mentored, a co-major advisor will be appointed by the Dean of the Graduate School to serve in conjunction with you…Additionally, you will not be listed as an available mentor for new MD/Ph.D candidates on the resubmission of the NIH Training Grant for this program and your appointment on the Steering Committee of the MD/Ph.D Program is terminated immediately.

(4)     This communication to you and the recent letter from ORI to us and your attorney, as well as the materials relative to this PHS action placed in the Federal Register, the NIH Guide for Grants and Contracts and the ORI Newsletter will be turned over to the Compliance Subcommittee of the UCHC Board of Directors for their review and further consideration." (Radolf Dep. Ex. 24; Deckers Aff. ¶94-100).

163.    The Supervisory Plan was reviewed and refined by ORI prior to implementation. (Deckers Aff. ¶101).

164.    On April 8, 2003, the Executive Committee of the University of Connecticut Graduate Faculty Council at Storrs adopted a policy concerning actions to be taken to protect the integrity of a graduate student's experience should their major advisor be found to have committed scientific or academic misconduct. (Deckers Aff. ¶102).

165.    Per this policy, in such cases, the Dean of the Graduate School of UConn at Storrs reviews the matter in consultation with the Executive Committee. That Dean may take a series of actions, including but not limited to, assignment of a co-major advisor or assignment of a new advisor and removal of the faculty member from the Graduate Faculty. (Deckers Aff. ¶103).

166.    In the specific case of plaintiff, Janet Greger, Vice Provost for Research and Graduate Education and Dean of the Graduate School, agreed with Dr. Deckers that assignment of a co-major advisor was appropriate, notifying the graduate student of this fact on April 17, 2003. (Deckers Aff. ¶104).

167.    All important compliance issues and litigation are routinely reported. The Board took no further action against Dr. Deckers. (Deckers Aff. ¶105).

168.    The actions Dr. Deckers took on April 4, 2003 were not in retaliation for Dr. Radolf filing his lawsuit (Deckers Aff. ¶95-100 ), and Dr. Radolf admits these actions were spurred by the ORI Voluntary Exclusion Agreement (Radolf Dep. p. 250).

21

**H.     PLAINTIFF'S ALLEGED HARM**

169.    Dr. Radolf states the harm he has incurred from his removal from the directorship is that people might draw the conclusion he was removed for a particular reason but admits they might also conclude he just did not want to be a director anymore. (Radolf Dep. p. 276-77).

170.    Dr. Radolf states that if he is looking for another job, he might be asked what happened but admits he could say he stepped down for personal reasons and further states that, in effect, that is what happened. (Radolf Dep. p. 277).

171.    Dr. Radolf is still a tenured full professor and did not experience a reduction in salary or fringe benefits or money damages when he stepped down as Director, or a reduction in lab space or institutional support. (Radolf Dep. p. 9, 41, 50; Deckers Aff. ¶46).

172.    For the periods , July 2002 – December 2003, Dr. Radolf received three increases under the UCHC Research Incentive Plan totaling $18,322. (Deckers Aff. ¶47).

173.    Dr. Radolf's support for his claim that the allegation of fraud unjustly and unreasonably jeopardizes his ability to pursue and receive research grants in ¶607 of his Complaint is that "rumors of various sorts get circulated." (Radolf Dep. p. 160-61).

174.    Dr. Radolf is not aware of any study section that reviews grant applications that is aware of the Time and Effort allegation and stated even if they were aware, that the reviewers are "reminded that they are not to let those issues or the existence of those issues prejudice their thinking or the review process." (Radolf Dep. p. 161).

175.    On April 4, 2003, Dr. Radolf publicized his research misconduct as well as the Time & Effort allegation in his interview with Science, a widely distributed national journal for scientists. (Radolf Dep. Ex. 29).

176.    Dr. Radolf has continued to apply for grants and has not been turned down for grants because of any of the actions of the defendants. (Radolf Dep. p. 113).

177.    Dr. Radolf states he has only applied for one new, small grant "[b]ecause there hasn't been any need" to submit other new grant applications. (Radolf Dep. p.163).

178.    Dr. Radolf has not had any manuscripts rejected because of any of defendants' actions. (Radolf Dep. p. 113).

179.    Dr. Radolf is still a member of the Connecticut Infectious Disease Society, the Infectious Diseases Society (Fellow), the American Society for Clinical Investigation, the American Society for Microbiology; reviews manuscripts for

several journals and is still on the editorial board for sexually transmitted diseases and Clinical Infectious Diseases (Peer Reviewer); and is to be named to the editorial board of current Immunology Review (Radolf Dep. p. 226; Radolf Dep. Ex. 26-28).

180.  Dr. Radolf continues to attend and speak at scientific conferences (Radolf Dep. p. 163 and at institutions.  (Radolf Dep. p.163, 227).

181.  Dr. Radolf still sits on non-NIH study sections and performs non-NIH grant reviews and journal manuscript reviews.  (Radolf Dep. p. 225-26), and still reviews proposals for the UConn Health Center's General Clinical Research Center.  (Radolf Dep. p.224).

DEFENDANTS
UNIVERSITY OF CONNECTICUT, ET AL

RICHARD BLUMENTHAL
ATTORNEY GENERAL

*James Comerford*

JANE D. COMERFORD (Ct 06328)
ASSISTANT ATTORNEY GENERAL
UNIVERSITY OF CONNECTICUT
   HEALTH CENTER
263 Farmington Avenue
Farmington, CT 06030-3803
Tel. (860) 679-1114
Fax (860) 679-1997
E-Mail-Comerford@ADP.UCHC.EDU

23