UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

RADOLF
    Plaintiff

                               CASE NO. 3:03CV242(MRK)
                               LEAD/MASTER DOCKET NO.

                               CASE NO. 3:03CV672(MRK)
v.                                 MEMBER CASE

CONNECTICUT, ET AL
    Defendants                         AUGUST /4 2004

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.   PRELIMINARY STATEMENT

In plaintiff's Second Substituted Complaint ("SSC"), he alleges that actions taken by defendant Deckers on April 4, 2003[1] deprived plaintiff of tenure without due process and that said actions were taken because plaintiff had filed a suit against defendant, <u>Radolf v. University of Connecticut, et al</u>, 3:03CV242(MRK).  The facts are set forth in Defendant's Local Rule 56(a)(1) Statement of Material Facts, referred to as "SF__, and are not reiterated here.

## II.   STANDARD OF REVIEW

A motion for summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

[1] To wit:  (1) exclusion from any academic and/or administrative leadership position on behalf of the University of Connecticut Health Center ("UCHC"); and its schools and hospital that could include, directly or indirectly any service of any kind to the United States Public Health Service ("USPHS"); (2) appointment of a co-major advisor to serve with plaintiff as advisor to a graduate student; (3) removal of plaintiff's name as an available mentor for new MD/Ph.D candidates in the resubmission of the NIH Training Grant for the MD/PhD program, a PHS-funded activity; and (4) removal from the MD/PhD Program Steering Committee.

no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000), if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . .[and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis

2

v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). "[U]nsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. "[M]ere speculation and conjecture" is insufficient to defeat a Motion for Summary Judgment. Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2nd Cir. 1997).

## III.    ARGUMENT

### A.    FIRST CAUSE OF ACTION - FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW

Plaintiff has apparently raised three claims in the First Cause of Action: 1) denial of procedural due process (SSC ¶1, 2, 3, 4, 51, 129, 130, 131, 132, 137, 138, 139, 140, 141); 2) denial of substantive due process (SSC ¶1, 2, 3, 49, 50, 54, 55, 61, 62, 131); and 3) deprivation of his liberty interests (SSC ¶3, 63, 64, 130, 133, 134, 141, 142, 144, 145, 146, 147).

#### 1.    Procedural Due Process

Plaintiff's procedural due process claim appears to be that he was removed from any academic and/or administrative leadership positions that include service to USPHS, removed from the list of available mentors for MD/Ph.D candidates, and removed him from the MD/Ph.D Steering Committee, all without notice or a meaningful opportunity to be heard.

##### a.    Plaintiff Has No Constitutionally Protected Property Interest

In order to state due process claim, plaintiff must be able to allege that he has a constitutionally protected property interest in a benefit.  The existence of such interest is determined by reference to state law.  Bishop v. Wood, 426 U.S. 341, 344 (1976); Board of Regents v. Roth, 408 U.S. 564, 577 (1972).  "To have a property interest in a benefit, a person

3

clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." <u>Roth</u>, 408 U.S. at 577. "Neither the hope for professional advancement nor a unilateral anticipation of possible job-related perquisites gives rise to a constitutionally protected property interest." <u>Hunt v. Prior</u>, 236 Conn. 421, 439, 673 A.2d 514 (1996). The relationship between a state institution and one of its teachers is essentially a matter of state concern and state law. An examination of relevant state law, consisting of state statutes, case law and university bylaws, establishes that there is no protected property interest involved in this case.

Plaintiff cites to no state law which provides such a property right. Rather, he claims that "[b]ased on <u>federal</u> law and regulations, the plaintiff possessed a vested interest in participating in the federal grant programs sponsored by the United States Public Health Service, and to compete for grants made available by the United States Public Health Service…" (SSC ¶137). Moreover, plaintiff states that the range of entitlement he claims he is entitled to in ¶29 of his Complaint are "expectations". (SF 44). He further admits he is not entitled to sit on every committee but only to be "considered" for a committee. (SF 45). (<u>See</u> <u>also</u> SF 40-43, 46, 47). Such claims do not establish a property right. <u>See</u>, <u>e.g.</u> <u>Tavoloni v. Mount Sinai Medical Center</u>, 26 F. Supp. 2d 678, 683 (S.D.N.Y. 1998).

Personnel decisions short of termination do not constitute deprivations of a property interest under the Fourteenth Amendment." <u>Rode v. Dellariprete</u>, 646 F. Supp. 876, 880 (M.D. Pa. 1986), <u>vacated in part on other grounds</u>, 845 F.2d 1195 (3d Cir. 1988) (<u>quoted</u> in <u>Ezekwo v.</u>

4

NYC Health & Hospitals Corp., 940 F.2d 775, 778 (2d Cir. 1991.)).[2]  See also Wargat v. Long, 590 F. Supp. 1213, 1215 (D. Conn. 1984).  In Ezekwo, the Second Circuit stated:  "'[t]hus far, the course of the law in this Circuit has not moved beyond according procedural due process protection to interests other than those well within the contexts illustrated by Goldberg [v. Kelly, 397 U.S. 254, 261-62 (1970)] and Roth.' S+D Maintenance Co. v. Goldin, 844 F.2d 962, 967 (2d Cir. 1988)." 940 F.2d at 788 (court did not equate plaintiff's "expectation of serving a term as chief resident with the loss of employment or of subsistence benefits.")  If plaintiff's argument held sway then every public employee would have a protected property interest not only in continued employment but in every condition or expectation of employment however trivial. Mahaffey v. Kansas Board of Regents, 562 F. Supp. 887, 889-90 (D. Kan. 1983). "Moreover, in an academic context such as this case presents, [ ] think we should be particularly wary of finding property rights that are not firmly grounded in state law.  See Board of Curators v. Horowitz, 435 U.S. 78, 82 (1978)."  Id.

In the present case, plaintiff is still employed, still a Professor, still tenured, and still receiving the same salary and fringe benefits.[3]  The interests plaintiff has alleged in acting as a mentor or advisor or serving on the Steering Committee are equated with those "of an employee who has been denied a promotion or a specific job assignment." Ezekwo, 940 F.2d at 789.  Such interests do not rise to the levels of a protected property interest.

In Huang v. Board of Governors of Univ. of North Carolina, 902 F.2d 1134, 1142 (4th Cir. 1990), the Court rejected a procedural due process challenge by a full tenured professor to an interdepartmental transfer on the basis that the transfer of a tenured professor from one

---

[2]  The Supreme Court has noted that "we have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." Gilbert v. Homar, 520 U.S. 924, 929 (1997).

[3]  In fact, plaintiff received research incentives thus increasing his salary.  (Radolf Dep. p. 41).

5

department to another, without loss of rank or pay, does not implicate any property interest

protected by the Due Process Clause. The Court recognized that its position was consistent with

that of the Fifth and Sixth Circuits, which had already held that "certain intradepartmental

demotions do not implicate property interests subject to procedural due process protection." Id.

(citing Garvie v. Jackson, 845 F.2d 647, 651 (6th Cir. 1988) (demotion from department head to

professor not a denial of a protected property interest); Kelleher v. Flaw, 761 4.2d 1079, 1087

(5th Cir. 1985) (reduction of graduate student's teaching duties is not denial of a protected

property interest)). See also Parkman v. University of South Carolina, et al, (4th Cir. 2002)

(Reassignment of tenured faculty member from Head Librarian at Univ. of South Carolina's

Music Department to a Special Project Librarian position outside the Music Department, without

reduction in pay or benefits, not a denial of a protected property interest); Dorsett v. Board of

Trustees for State Colleges and Universities, 940 F.2d 121, 123 (5th Cir. 1991) (plaintiff not

deprived of constitutional rights despite allegations of harm from lack of pay increases, change

in teaching assignments, and department procedures); Edwards v. California University of

Pennsylvania, 156 F.3d 488, 492 (3rd Cir. 1995) (tenured professor's removal from class duties

when suspended with pay for one semester does not constitute deprivation of employment);

Schrier v. University of Colorado, et al, Civ. No. 02-mk-2366(BNB) (D. Colo. May 19, 2003)

(attached) ("Dr. Schrier's claim that he has a property interest in his continuous appointment as

chairman [of the department of medicine] must find its base, if at all, in some substantive

restriction on the University's discretion to terminate the chairmanship;" no irreparable harm

found); Maples v. Martin, 858 F.2d 1546 (11th Cir. 1988) (transfers and reassignments are not

held to implicate a property interest); Childers v. Independent School Dist., 676 F.2d 1338, 1341

(10th Cir. 1982) (tenured teacher has property interest in continued employment but not in

6

particular assignment); <u>Fields v. Durham</u>, 909 F.2d 94, 98 (4th Cir. 1990) ("The constitutionally protected property interest in employment does not extend to the right to possess and retain a particular job or to perform particular services."); <u>Wagner v. Texas A&M University</u>; 939 F. Supp. 1297, 1311 (S.D. Tx. 1996). ("[T]he property interest is more generally in continued employment and no deprivation exists so long as the employee received payment of the full compensation due under the contract.")  Therefore, as in these cases, plaintiff possesses no property right in performing a mentorship, being an advisor or serving on the Steering Committee.

In essence, plaintiff is claiming that he has been denied certain "benefits" of tenure. However, at best, these so-called "benefits" are actually responsibilities that UConn School of Medicine faculty members, such as plaintiff, are expected to perform if called upon to do so.  Dr. Radolf's appointment letter provides that "[t]he terms and conditions of all faculty appointments include and are subject to the University of Connecticut Laws and By-Laws."

The University of Connecticut Laws and By-Laws state:

### l. **Professional Staff Loads**

1.  While members of the professional staff of this University are employed for a variety of duties, as a general rule the University will expect to assign to each full-time member of the professional staff duties which are reasonable and consistent with good and effective teaching practices at both the undergraduate and graduate levels.

In conjunction with this, staff members will be expected to carry a reasonable amount of ordinary departmental duties and routine committee responsibilities and to undertake those activities of self-improvement and professional development which are part of every faculty member's investment in his or her own future.  Such assigned responsibilities as unusually heavy loads of student counseling, the chairmanship of committees which are usually time-consuming, research projects which have been designated as a part of the staff member's assigned load,

unusually heavy enrollments in courses, and assigned administrative duties will be considered in determining the number of contact hours assigned to any individual.

Assignment of duties will be made by the appropriate deans, directors, and department heads, subject to review as to general policy by the Chancellor and Provost for University Affairs or the Executive Vice President for Health Affairs or appropriate Vice President and President. Insofar as it is possible, consistent with the development of a balanced offering of University services, these assignments should take into account the aptitudes and wishes of individual staff members and their opportunities for long-run professional development. (SF 16).

The University of Connecticut School of Medicine Guidelines for Appointment or Promotion to Senior Faculty Rank and/or Tenure state: "The faculty of medicine is engaged in teaching, research, patient care, and other professional activities." While it is expected that all faculty members will teach and that excellence in teaching is a requirement for senior rank, the nature and extent of the other activities vary among faculty members. In recognition of this, different professional categories have been designed which differ in their requirements for attainment of senior rank." Id. "The criteria for appointment, promotion and tenure reflect the diverse activities of the faculty and provide a basis by which performance may be rewarded. The criteria for academic rank will be weighted according to the effort by the candidate in teaching, research, patient care and other professional activities." Id. Plaintiff is already a tenured full professor. (SF 8, 13). He admits that Dr. Deckers does not control all appointments to committees, and that it is possible a tenured faculty member would not be given leadership positions or participate in student mentoring programs or be given committee assignments. (SF 46, 47).

Thus, none of the perquisites plaintiff claims to have lost are "benefits of tenure," but rather duties and responsibilities of UConn's medical school faculty members, the assignment of

8

which are made by the appropriate deans, directors and department heads. See Kirschenbaum v.

Northwestern University, No. 1-98 – 3059, 1st District April 12, 2000, in which, plaintiff

asserted he was constructively discharged from his tenured position because Northwestern

allegedly failed to provide him with certain intangible "benefits" of tenure such as teaching

assignments, support for research projects and grant proposals, and opportunities to participate in

dissertation committees. The Court stated: "plaintiff's assertion is meritless. The evidence

showed that these alleged 'benefits' were duties and responsibilities that Northwestern's medical

school faculty members, such as plaintiff were expected to perform." See also Gertler v.

Goodgold, 107 A.D. 2d 481, 483, 487 N.Y.S. 2d 565, 567-69 (1985), aff'd, 498 N.Y.S. 2d 779,

489 N.E. 2d 748 (1985), in which a professor sued a university, medical school and three

administrators claiming, like plaintiff here, that the defendants "sought without justification, to

undermine [his] career and deprive him of the basic benefits and privileges of his academic

tenure." The plaintiff argued that he was deprived of "supposed contractual concomitants of his

tenure," alleging that he was denied adequate research space, fair teaching assignments, and an

adequate opportunity to compete for grants, and was thwarted in his efforts to participate in NIH

grants. Id. Further, he cited the fact that he was asked to relocate his office and work space,

which allegedly "render[ed] meaningless his ability to research or teach – a basic tenet of

academic freedom and the rationale underlying the tenure contract." Id. at 484, 487 N.Y.S. 2d at

568.

The Gertler Court granted defendants' motion to dismiss, explaining: "The University

has never expressly, by contract or otherwise, obligated itself to provide the amenities plaintiff

claims, and thus has not relinquished its authority to make its own academic judgments and to

administer and allocate its resources. The benefits which plaintiff seeks are undoubtedly

9

prerequisites of faculty life, but they are not contract entitlements." Id. at 484, 487 N.Y.S. 2d at 568-69. The court further noted that "[w]hile the complaint recites a litany of academic and administrative grievances couched in terms of a violation of a contractual right to tenure or a tortuous interference with that right, it is significantly devoid of any reference to the contractual basis of these privileges of tenure." Id. "While tenure is a concept of some elasticity and, no doubt, the source of many rights, it cannot be the wellspring of every conceivable academic amenity and privilege. Nor can the university's academic and administrative prerogatives be impliedly limited by custom, or by a strained theory of contractual construction. '[Implied] promises are to be cautiously and not hastily raised.'... The university has never expressly, by contract or otherwise, obligated itself to provide the amenities plaintiff claims, and thus has not relinquished its authority to make its own academic judgments and to administer and allocate its resources." Id. at 484-85, 487 N.Y.S. 2d at 568. So too, UCHC has never expressly obligated itself as to create contract entitlements to the "benefits" plaintiff claims. (SF 42).

Similarly, in Williams v. Northwestern Univ., 147 Ill. App. 3d 374, 497 N.E.2d 1226, 1229 (Ill. Ct. App. 1986), a professor sued Northwestern University, the chairman of the department of medicine, and the chief of the oncology section, alleging that the defendants committed a breach of contract by stripping him of many of the entitlements of his tenured position. Specifically, the professor claimed the defendants did not assign him any new patients or research assistants, removed him from the patient rotation hospital calendars, made his salary dependent on patient-generated income, deleted his name from University publications, and discontinued some of his fringe benefits, pending renewal of certain grants to Northwestern. He claimed, as here, that defendants were forcing him to resign from his position of tenured professor at the medical school by interfering with his position. The appellate court held that the

10

plaintiff's complaint should have been dismissed, explaining that "a court must look to the tenure agreement to define the relationship between an educational institution and a tenured faculty member". The professor had argued that his "contractual rights as a tenured professor, whatever their precise parameters, clearly encompass his ability to conduct his long-standing... research free from seemingly deliberate interference of defendants." Id. at 1230. The appellate court disagreed, holding that the professor's inability to allege a precise source of his supposed contractual rights was fatal to his claims. See also Williams v. Northwestern University, 169 Ill. App. 3d 692, 694-96, 523 N.E. 2d 145 (1988) (rejecting tenured professor's contract claim that he was entitled to "adequate laboratory facilities and equipment" where tenure documents did not reflect any agreement regarding professor's continued use of facilities at issue). So too, plaintiff here has failed to allege the precise state law source of his contractual rights.

Tenure, although a protectable property interest, does not grant any greater rights, either substantive or procedural, than the policy that defines the term. Plaintiff can point to nothing that affords him a property interest in administrative positions, being an advisor, mentoring a graduate student or sitting on the Steering Committee.[4] See, e.g. Janos v. Univ. of Washington, 851 P.2d 683 (Wash. App. 1993) (professor did not have tenure in an administrative position); Wagner, 939 F. Supp. 1297 ("Absent a contractual provision limiting the University's right to reassign Wagner, he has no property interest in his teaching assignment or in teaching classes at all"); Oladeinde v. City of Birmingham, 963 F.2d 1481, 1486 (11th Cir. 1992) (transfer with no loss of pay or rank did not deprive plaintiff of a protected property interest), cert denied, 597 U.S. 987 (1993); Parrett v. City of Connersville, 737 F. 2d 690, 693 (7th Cir. 1984) (expressing doubt

---

[4] Interestingly, the Steering Committee includes a non-tenured professor as a voting member and not every MD/Ph.D graduate student is mentored by a tenured faculty member, belying plaintiff's claim that sitting on such committee or mentoring is a "benefit of tenure". (SF 38-39).

11

as to whether a lateral transfer, involving no loss of pay, could ever be a sufficient deprivation to

violate the Fourteenth Amendment and noting that a contrary conclusion could subject all

personal actions by state and local governmental agencies to claims under Section 1983), cert.

denied, 469 U.S. 1145 (1985); Sekor v. Board of Education of Ridgefield, 240 Conn. 119, 128,

689 A.2d 1112 (1997) (Connecticut Supreme Court held that a tenured teacher had a right only to

a generic position as a teacher rather than a right to a specific position, and that the school bound

had plenary administrative authority over her assignments); Gordon v. Nicoletti, 84 F. Supp. 2d

304 (D. Conn. 2000) (tenured teacher's assertion of right in remaining at the same school,

teaching the same subjects, working with the same colleagues are not protected property

interests).

Plaintiff seeks to avoid the effect of this lack of law establishing a protected property

interest by arguing that the alleged informal assurances from the defendant implied that he would

remain on the MD/PhD Steering Committee forever, and that he would be entitled to be a sole

mentor of an MD/PhD graduate student funded by PHS.[5]  Yet, he admits that no such assurances

were made (SF 42).  Against the background of formal explicit rules governing the tenure status

of faculty members, informal representations do not create a property interest in employment

sufficient to invoke due process protections.  See e.g., McElearney v. University of Illinois, etc.,

612 F.2d 285, 290 (7th Cir. 1979).

> Even if plaintiff could prove some contractual benefit, not
> every contractual benefit rises to the level of a constitutionally
> protected property interest.  Rather, "[a] mere breach of a
> contractual right is not a deprivation of property and thus is not
> actionable under § 1983.  There is a distinction between contract

---

[5]  It should be noted that the Dean of the Graduate School, not defendant Deckers, instituted a policy that required the appointment of a co-mentor.  Thus, defendant Deckers' actions were ratified by UConn policy.  (SF33-35).

interests and protectable property interests." <u>Walentas v. Lipper</u>, 636 F. Supp. 331, 335 (S.D.N.Y. 1986). Even where a public employment contract is involved, "not every breach… is a deprivation of property within the meaning of the due process clause." <u>Brown [v.Brienen</u>, 722 F.2d 360, 364 (7th Cir. 1983)]; <u>see also</u> <u>Costello v. Town of Fairfield</u>, 811 F.2d 782, 784 (2d Cir. 1987) ("a contract dispute… does not give rise to a cause of action under section 1983.")

<u>Ezekwo</u>, 940 F.2d at 787. "Even where a contract specifies what an employee's duties and responsibilities are, duties outlined in the contract do not constitute protectable, non-economic property interests under the contract…If contractual, understandings guarantee that an employee will not be demoted or reassigned a position of less responsibility, a property interest may arise…Such a contractual understanding must be <u>mutual</u> and <u>explicit</u>." <u>Wagner</u>, 939 F. Supp. at 1312 (emphasis added). In the case at bar, there was no such mutual or explicit understanding.

Moreover, since the academic and administrative decisions of educational institutions involve the exercise of subjective professional judgment, public policy compels a restraint which removes such determinations from judicial scrutiny. <u>Gertler</u>, 107 A.2d at 485, 489 N.Y.S. 2d at 569 and cases cited therein. "[C]ourts have been meticulous not to invade, and only rarely [to] assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in institutions of higher learning.'" <u>Id</u>. at 486, 487 N.Y.S. 2d at 569. "In public schools and universities across this nation, interfaculty disputes arise daily over teaching assignments, room assignments, administrative duties, classroom equipment, teacher recognition, and a host of other relatively trivial matters. A federal court is simply not the appropriate forum in which to seek redress for such harms." <u>Dorsett</u>, 940 F.2d at 123 (citing <u>Connick v. Myers</u>, 461 U.S. 138, 138-39 (1983)).

13

Plaintiff has not shown any alteration in status secured by state law. Nor can he show any contractual provision which limits the ability of defendant to take the actions he did. Therefore, plaintiff does not possess a constitutionally protected property interest in these "benefits."

### b.    Plaintiff Has Been Afforded Due Process

Even if it is found that plaintiff has a property interest, plaintiff has been afforded due process. There has been no "abrupt and instantaneous expulsion from service in academic and/or administrative leadership positions," as plaintiff alleges. Rather, per a Voluntary Exclusion Agreement entered into with the Department of Health and Human Services, Office of Research Integrity ("ORI"), plaintiff voluntarily agreed to exclude himself from any advisory capacity involving PHS. (SF 24-27). This necessarily involves the PHS funded MD/PhD program and its Steering Committee or other positions that include service to PHS. (SF 31). The actions of the defendant Deckers have not "unilaterally arbitrarily and capriciously stripped the plaintiff of the rights and privileges to which he was entitled as a Professor." Rather, plaintiff voluntarily agreed to these actions. Defendants actions are not "disciplinary actions" as alleged in the Complaint, but rather federally mandated conditions.

Moreover, plaintiff claims that these alleged "disciplinary measures" were imposed without justification and without a hearing and an opportunity to contest them. On the contrary, defendant merely conformed its actions to those mandated by the Voluntary Exclusion Agreement Dr. Radolf executed with ORI. Dr. Deckers interpreted the Voluntary Exclusion Agreement as requiring the imposition of a five-year plan of supervisory review of all grants, contracts, papers, etc. that plaintiff was involved with as a research activity within his laboratory.

14

Thus, the three-year plan of supervisory review Dr. Deckers had already put in place in August 2001 was to be extended five years from the time of the Agreement. (SF 18, 19, 28-33). Indeed, Dr. Radolf stated in his deposition that the extension of his academic probation is a moot point because the Voluntary Exclusion Agreement takes precedence and that Dr. Deckers could have extended his academic probation to coincide with the Agreement. (SF 52-53; Radolf Dep. p.239). He further indicated that the actions which he is complaining about actually took place prior to April 4, 2003 when Dr. Deckers placed plaintiff on academic probation, explained that Dr. Radolf's academic probation extended to all areas of his work as a faculty member, and stated that his reporting relationship would be to Dr. Deckers as Dean. (SF 54). He claims Dr. Deckers tried to justify his actions in January 2002 via the Voluntary Exclusion Agreement! That action of placing Dr. Radolf on academic probation was a result of the finding of scientific misconduct after a hearing by a Special Review Board which plaintiff has the right to appeal and never chose to do so. (SF 17-20). Thus, plaintiff's due process claim is misdirected and not related to the April 4, 2003 letter. None of the allegations within this Complaint speak to defendant's action taken prior to April 4, 2003. At this point, if Dr. Radolf has any claim of due process violations, it is within the context of his proceedings before ORI. Having voluntarily entered into the Agreement, it is inconceivable and incomprehensible how Dr. Radolf can now argue that defendant has violated his due process rights.

Finally, "an employee deprived of a property interest in a specific benefit, term or condition of employment suffers a loss which is defined easily, … and therefore, any interference with that interest is redressed adequately in a state breach of contract action," i.e. a post-deprivation remedy. Ezekwo, 940 F.2d at 791 (quoting Ramsey v. Board of Educ. Of Whitley County, 844 F.2d 1268, 1272 (6th Cir. 1988)). In order to state a claim for failure to provide due

15

process, a plaintiff must have taken advantage of the processes that are available to him unless those processes are unavailable or patently inadequate. "[A] state cannot be held to have violated due process requirements when it has made procedural protections available and the plaintiff has simply refused to avail himself of them." Dusanek v. Hannon, 677 F.2d 538, 543 (7th Cir. 1982); see also Bohn v. County of Dakota, 772 F.2d 1433, 1441 (8th Cir. 1985); Alvin v. Suzuki et al, 227 F.3d 107, 116 (3rd Cir. 2000). A due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." Zinernon v. Burch, 494 U.S. 113, 126 (1990). If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants. See Dwyer v. Regan, 777 F.2d 825, 834-35 (2nd Cir. 1985); McDaniels v. Flick, 59 F.3d 446, 460 (3rd Cir. 1995), modified on other grounds, 793 F.2d 457 (2nd Cir. 1986); Riggins v. Board of Regents, 790 F.2d 707, 711-12 (8th Cir. 1986). See also UDC Chairs Chapter, American Association of University Professor v. Board of Trustees of the University of the District of Columbia, 56 F.3d 1469 (D.C. Cir. 1995) (Because the faculty chairs had not used the University Grievance System to challenge the denial of summer pay contracts, any lack of due process protections was the result of their own inaction); Maples, 858 F.2d at 1551 and cases cites therein.

In the present case, plaintiff failed to utilize the faculty grievance procedure set forth in the University By-Laws that provide ample due process. (SF 15, 22, 39). Therefore, he cannot be heard to claim his due process rights have been violated.

## 2.   **Substantive Due Process**

Plaintiff's substantive due process claim appears to be that he was arbitrarily removed from the aforementioned positions without just cause, reason or legal right. He claims these actions "stripped [him] of the rights and privileges to which he was entitled as a Professor.[6] In order to succeed with a claim based on substantive process in the public employment context, a plaintiff must show that he had a property/interest right and that the public employer's termination of the interest/right was arbitrary and capricious or not reasonably related to a legitimate government purpose. Substantive due process protects [individuals] against government action that is arbitrary, conscience – shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect' or 'ill-advised.'" Gordon, 84 F. Supp. 2d at 312 (citations omitted). However, only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." Collins v. City of Harker Heights, 503 U.S. 115, 129 (1992). The egregious conduct must be that which is so "brutal and offensive to human dignity" as to shock the conscience. Johnson v. Glick, 481 F.2d 1028, 1033 & n.6 (2d Cir. 1973). "[T]he cases in which the courts have recognized a viable substantive due process claim are limited to those presenting extraordinary circumstances." McDonald v. Sweetman, Civ. No. 3:02CV1040(MRK) (D. Conn. 2004), p.10 (citing Torres v. Sup't of Police of Puerto Rico, 893 F.2d 404, 410 (1st Cir. 1990) (where "plaintiff has not been physically abused, detained, prosecuted due to racial or political motivation or otherwise deprived of equal protection of the law, courts are reluctant to find 'conscience – shocking' conduct that would implicate a constitutional violation")).

---

[6] In SSC ¶2, he adds an additional complaint regarding the imposition "of an additional minimum of nearly four years on his current academic probation extending it from August 31, 2004 'at least through March 9, 2008.'" Yet, in ¶53, he admits that extension of the supervisory plan, which formed the basis of his academic probation, was mandated to run concurrently with the duration of the ORI Voluntary Agreement which ends on March 9, 2008.

As previously set forth, see at p. 3-14, _supra_ plaintiff does not possess a property interest in being a mentor, sitting on a steering committee or other academic and/or administrative positions. Therefore, there can be no substantive due process violation. Moreover, there is no evidence which suggests defendants' actions were "arbitrary, conscience – shocking, or outrageous." At most, said actions might be found "incorrect or ill-advised." This is insufficient to find a substantive due process violation.

Finally, where a meaningful opportunity to address the grounds for defendants' action is provided, defendants cannot be found to have acted in an arbitrary and capricious manner. Plaintiff had the opportunity to utilize the faculty grievance procedures and chose not to do so. (_see_ p.14-16, _supra_).

### 3.   **Liberty Interest**

Plaintiff's liberty interest claim appears to be that Dr. Deckers communicated his letter of April 4, 2003 to "an overly broad number of University officials" thus stigmatizing "the plaintiff's good name and reputation," "making it unreasonably and unjustifiably difficult for the plaintiff to participate in federal grant programs sponsored by the United States Public Health Service." (SSC ¶133). To prevail on his liberty interest claim, plaintiff must show that the defendant (1) in conjunction with the deprivation of an interest recognized by state law (2) officially publicized (3) false charges (4) that were so stigmatizing (5) as to foreclose employment opportunities in his chosen profession. _Roth_, 408 U.S. at 573.

First, plaintiff has not been deprived of an interest recognized by state law. Second, "[t]he concept of 'liberty' guaranteed by the Fourteenth Amendment is broad, but not so broad as to encompass plaintiff's claim." _Gordon v. Nicoletti_, 84 F. Supp. 2d at 311. Mere defamation by

18

a state official is not sufficient to establish a liberty claim under the Fourteenth Amendment. "[T]he defamation had to occur in the course of termination of employment." Paul v. Davis, 424 U.S. 693 (1976); see also Easton v. Sundram, 947 F.2d 1011 (2d Cir. 1991), cert. denied, 504 U.S. 911 (1993); Donato v. Plainville – Old Bethpage Cent. Sch. Dist., 96 F.3d 623 (2d Cir. 1996). "[T]he Second Circuit has held that due process is implicated only when there is a stigma plus, in other words a loss of reputation coupled with some other tangible element. Morris v. Lindau, 196 F.3d 102, 114 (2d Cir. 1999)." Gordon, 84 F. Supp. at 312. "Damage to an employee's reputation brought about by an employer's stigmatizing comments standing alone … is a matter properly vindicated under state tort law, and does not rise to a deprivation of a constitutional right." Morris, 196 F.3d at 114.

> For government employee, a federal cause of action for deprivation of a liberty interest arises only when the alleged defamation occurs in the course of some negative alteration of the employee's status such as dismissal or refusal to rehire. Morris, 196 F.3d at 114. Thus, the Second Circuit has stated that the "plus" that is required is not only significant damage to a person's employment opportunities but dismissal from a government job or deprivation of some other legal right or status. Martz, 22 F.3d at 32 (internal citations and quotations omitted). Even in the case of a demotion, the Second Circuit has held that the liberty interest implicated is "at best ….weak". Baden v. Koch, 799 F.2d 825, 831 (2d Cir. 1986).

Gordon, 84 F. Supp 2d at 312.

In the present case, plaintiff admits he does not even know who all the individuals copied on the letter are so as to support a claim that the dissemination was overly broad. (SF 58). He does not know who else is aware of the letter other than the graduate student he mentored and the appointed co-advisor. (SF 58). His contention is that if he had been informed that the compliance subcommittee was going to be monitoring the supervisory plan, then it might have

19

been appropriate to have sent the letter to the individuals copied on it. (SF 57). That he has no clue who the individuals are who are copied on the letter does not then cause it to be stigmatizing. In point of fact, all important compliance issues and litigation are routinely reported to the UCHC Board of Directors (SF 36). Other individuals on the letter are the Associate Dean of the Medical School and the Associate Dean of the Graduate Program. Plaintiff's only fact to support his claim that Dr. Deckers intended to stigmatize his good name and reputation is the fact of the letter itself. (SF 59). Dr. Deckers has provided evidence to refute plaintiff's claim. (Deckers Aff. ¶25-33).

Third, Plaintiff has not been dismissed, demoted or deprived of some other legal status or rights. Nor has the state imposed upon him "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." Roth, 408 U.S. at 573. See Perry v. Sinderman, 408 U.S. 599 (the mere showing that a teacher was not rehired in one particular job, without more, did not amount to a showing of a loss of liberty); Donato, 96 F.3d at 630 (a decision not to rehire a teacher standing alone does not deprive that employee of liberty. Special aggravating circumstances are needed to implicate a liberty interest), cert. denied, 519 U.S. 1150 (1997); Maples, 858 F.2d at 1550 (transfer of university professors between departments without loss of rank or pay did not implicate a liberty interest of the professors); Gordon, 84 F. Supp. 2d at 312 (embarrassment or humiliation associated with suspension during termination hearings does not meet requirement of a stigma plus some other deprivation.); Raju v. Rhodes, 809 F. Supp. 1229, 1240 (S.D. Miss.), aff'd, 7 F.3d 1210 (5th Cir.), cert. denied, 114 S. Ct. 1543 (removal of professor from position as Director of Transplant Program was not "such a change of status to be regarded…as a loss of employment;" Court found no liberty interest meriting protection under due process); Parate v. Isibor, 868 F.2d 821, 831-32 (6th Cir. 1989)

(plaintiff "has only been discharged from one state university; no constitutional right to teach a specific class); Sullivan v. Brown, 544 F.2d 279 (6th Cir. 1976) (transfer of a tenured teacher did not implicate her liberty interest under the Fourteenth Amendment). See also Abbs v. Sullivan, 756 F. Supp. 1172, 1186 (W.D. Wis. 1990) (plaintiff's "ability to serve on committees, to review journal articles, to participate in peer review, to conduct his research without supervision or special reporting obligations is not a right that is protected by law. Thus, any interference with that ability does not amount to an alteration of legal status"); Garvie, 845 F.2d at 652 ("Garvie was terminated as Department Head, but continued to be employed by the University as a full-time tenured professor at full salary. Garvie has made 'no showing that, a definite range of opportunities is no longer open to him."). "[E]ven governmental allegations of professional incompetence do not implicate a liberty interest in every instance. Such allegations will support a right to a name-calling hearing only when they denigrate the employee's competence as a professional and impugn the employee's reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession." Donato, 96 F.3d at 630-31 (citations omitted). Plaintiff has not been denied his choice of career, but remains free to pursue it. He has applied for grants, been awarded grant renewals, submitted manuscripts, attended conferences, and presented at conferences. See Baden v. Koch, 799 F.2d 825, 831 (2d Cir. 1986) ("[i]n the years immediately following Baden's removal as CME he has prominently participated in medical-legal conferences, seminars, symposia and meetings...."); Dobkin v. Johns Hopkins University, 1994 U.S. Dist. LEXIS 5165 (D. Md. 1994) ("As a matter of law it is not enough that Mr. Dobkin has alleged that the perceived damage to his reputation may restrict his future academic and employment opportunities because such opportunities are

21

not created nor guaranteed by state law. Consequently, Mr. Dobkin's due process claim predicated upon the existence of a protected liberty interest will be dismissed").

Here, plaintiff still sits on other committees, and has himself given up a committee, still mentors and reviews proposals, conducts interviews, is on non-NIH study sections and reviews grants and journal manuscripts, makes scientific presentations, and is a member of numerous local and national organizations and editorial boards. (SF 48-51). Rather, his claim is that the supervisory plan is too stringent and makes it "unreasonably and unjustifiably difficult for him to participate in federal grant programs sponsored by the U.S. Public Health Science." (SF 60). Yet, he admits he has not been turned down for grants because of any of the actions of the defendant, has not had any manuscripts rejected because of defendant's actions (SF 63, 64), the plan was reviewed by ORI (SF 61), he has only applied for one small grant because there is no need to apply for others, (SF 62), and has only ever mentored one graduate student since 2001 (SF 65).

Moreover, the stigmatizing information must be false and made public, <u>Cold v. Velger</u>, 429 U.S. 624 (1977). Here, the alleged stigmatizing information was that an investigation had been commenced. This was a matter of fact, not falsity. "[P]laintiff's case is also devoid of any showing of a falsehood propagated by [his] employer, which is fatal to [his] liberty interest claim." <u>Id</u>. <u>Compare Birnbaum v. Trussell</u>, 371 F.2d 672 (2d Cir. 1966) (following plaintiff's dismissal, Commissioner of New York City Department of Hospitals sent a letter to all municipal hospitals instructing them not to hire plaintiff). Defendant did not "denigrate the employee's competence as a professional [nor impugn the employee's professional reputation..." <u>Donato</u>, 96

22

F.3d at 631. He simply acted in accordance with the conditions imposed by the Voluntary Agreement.

Nor has there been publication or public disclosure. Rather, key individuals within the University structure were informed of the circumstances. Internal communications within management of the agency do not constitute "publication." Fittshur v. Village of Menomonee Falls, 31 F.3d 1401, 1409 (7th Cir. 1994), and cases cited therein. This is not a case where the disclosure that implicated a liberty interest involved public meetings or the press. See e.g., Owens v. City of Independence, 560 F.2d 925, 936-37 (8th Cir. 1977).

Finally, plaintiff had every opportunity to challenge the actions of defendant Deckers via the grievance process and receive a "name-clearing hearing." Gordon, 84 F. Supp. 2d at 312 (citing Geren v. Board of Educ. of Town of Brookfield, 36 Conn. App. 282, 290, 650 A.2d 616 (1994) (the remedy mandated by the Due Process clause for deprivation of a liberty interest is an opportunity to refute the charge, to provide the person with an opportunity to clear his name)); Kelly Kare v. O'Rourke, 900 F.2d 170, 177 (2d Cir.), cert. denied, 502 U.S. 907 (1991). Here, plaintiff has never sought or availed himself of that opportunity. See Baden, 799 F.2d 825 ("In order to succeed on his liberty interest claim [Baden] must also prove that [Koch] improperly refused to grant him a post-removal opportunity to refute the false charges that let to his removal.") No such improper refusal has occurred. See also Paul, 424 U.S. at 710 (no name-clearing hearing required by Roth when state employer defames employee "who continues to be an employee"), and plaintiff has never appealed or grieved defendant's action. (SF 39).

23

**4.     Plaintiff's Claim For Money Damages Against Dr. Deckers In His Individual Capacity Is Barred By The Doctrine Of Qualified Immunity**

The doctrine of qualified immunity balances Society's need to allow public officials to discharge their duties without fear of litigation against the individual's interest in being safe from official abuse. See Harlow v. Fitzgerald, 457 U.S. 800, 813-15 (1982). It shields state actors from liability for their official acts unless they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818. See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1063-64 (2d Cir.), cert. denied, 114 S. Ct. 185 (1993). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 471 U.S. 511 (1985); Giacalone v. Abrams, 850 F.2d 79, 84 (2d Cir. 1988). The Supreme Court has expressly encouraged the use of summary judgment to quickly extricate government officials from the burdens of defending against insubstantial suits. Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991).

A right is "clearly established" if it: (1) it is defined with reasonable clarity; or (2) the Supreme Court or the Second Circuit has affirmed its existence; or a reasonable defendant would understand from existing law that his acts were unlawful. Malley v. Briggs, 475 U.S. 335, 341 (1986); White Plains, 991 F.2d at 1064. Therefore, when government officials perform discretionary functions, they "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. In determining whether a particular right was clearly established, the Court must first identify the claimed right in a manner suited to the facts and circumstances of the particular case. Anderson v. Creighton, 107 S. Ct. 3034, 3039 (1987). "Even where the permissible scope of activity is clearly defined, the

24

qualified immunity defense protects an official if it was 'objectively' reasonable for him to believe his acts were lawful." <u>Magnott v. Kuntz</u>, 918 F.2d 364, 367 (2d Cir. 1990) (citing <u>Anderson</u>, 483 U.S. at 638). Yet, it is important for a Court "not to pose the issue in terms that are too general or abstract." <u>Mozzochi v. Borden</u>, 959 F.2d 1174, 1177 (2d Cir. 1992).

The Second Circuit has held that where motive or intent is part of the constitutional tort, the employer's subjective motive is not irrelevant in a qualified immunity inquiry. <u>Blue v. Koren</u>, 72 F.3d 1075, 1084 (2d Cir. 1995). Rather, where the subjective state of mind of the actor is part of the "constitutional mix," the Court has imposed a "heightened standard" upon the plaintiff, asserting unconstitutional motive. "[T]he plaintiff must proffer <u>particularized evidence of direct or circumstantial</u> facts …supporting the claim of an improper motive in order to avoid summary judgment." <u>Id</u>. (emphasis added).[7] "[T]he plaintiff may not respond [to defendant's motion] simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." <u>Crawford-El v. Britton</u>, 523 U.S. 574, 600 (1998) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57 (1986)). "[T]he primary focus is not on any possible animus directed at plaintiff; rather it is more specific, such as …to deter public comment on a specific issue of public importance." <u>Id</u>. An allegation of malice will not alone defeat an official's claim to immunity. <u>Malley</u>, 475 U.S. at 341.

Finally, the Court must decide whether defendants could have thought their actions were consistent with the rights that plaintiff claims to have been violated. <u>Anderson</u>, 107 S. Ct. at

---

[7] The Second Circuit explained that the above approach is necessary because "[o]fficials who may in the course of carrying out their duties have continuing run-ins with those whose conduct the officials must monitor, will be forced to go to trial when the only evidence of unconstitutional motive may be a prior dispute with the plaintiff, if that." <u>Id</u>.

25

3038. It is not determinative that the plaintiff has asserted a broadly stated right. Id. at 3039; see also Malley, 475 U.S. at 341 (if officers of reasonable competence could disagree on an issue, immunity should be recognized). Even if applicable caselaw can be said to have foreshadowed the unconstitutionality of a given act, when that caselaw leaves "open a 'legitimate question'" regarding the constitutionality of a given practice, the immunity lies. Gittens v. LeFevre, 891 F.2d 38, 42-43 (2d Cir. 1989) (holding immunity applies when "no case had ever marked the boundaries of reasonableness with sufficient clarity."). An official is not bound to anticipate correctly possible future extensions of the law if the question of law was open at the time he acted. Mitchell, 472 U.S. at 535. This question of whether qualified immunity attaches to an official's actions is a purely legal question for the trial judge to determine prior to trial.

Defendants submit that it was not clearly established in the necessary, particularized sense that plaintiff possessed a property interest in the "benefits" of tenure to which he alludes or that Dr. Deckers violated his liberty interest given plaintiff's continued employment and pursuit of research. See Section A, supra. Moreover, even if such a property right existed, it was objectively reasonable for defendant to have understood his actions were not unlawful and violative of due process or liberty interest protection, particularly in light of the Plaintiff's existing academic probation, ORI Voluntary Exclusion Agreement, and the availability of a grievance hearing.

The present circumstances were mandated by the Office of Research Integrity. Defendant was not a party to that proceeding. Plaintiff voluntarily agreed to exclude himself from serving in any advisory capacity to the PHS including but not limited to service on any PHS advisory committee, board and/or peer review committee or as a consultant. The MD/Ph.D.

26

program is a PHS-funded activity.  Plaintiff's removal from the Steering Committee of the

MD/Ph.D. program was in conformity with plaintiff's Voluntary Agreement to exclude himself

from serving in any such advisory capacity.  Further, plaintiff voluntarily agreed to be subject to

a supervisory plan mandated by ORI upon any institution, in this case, the UConn Health Center,

that submits an application for PHS support, a report of PHS-funded research, manuscript or

abstract. (SF 24-32).  It is inconceivable that plaintiff can claim that <u>defendant's</u> actions, which

were objectively reasonable and in accordance with plaintiff's Voluntary Exclusion Agreement

with the ORI, are damaging to his reputation and scientific career or that plaintiff has been

deprived of Due Process by defendant.

**B.      SECOND CAUSE OF ACTION - FIRST AMENDMENT RIGHT
         TO PETITION GOVERNMENT FOR REDRESS OF GRIEVANCES**

### 1.      Plaintiff Has Not Engaged In Constitutionally Protected Speech

Plaintiff claims defendant "has violated plaintiff's right to petition the government for

redress of grievances guaranteed to him by the provisions of the First Amendment to the United

States Constitution" by retaliating against plaintiff for instituting a prior action against UConn,

UCHC and Deckers.

The right to petition the government for a redress of grievances has been held to be no

greater than, and to be analyzed the same as, the right to free speech.  See <u>Cobb v. Pozzi</u>, 352

F.3d 79, 94-95 (2nd Cir. 2003); <u>White Plains</u>, 991 F.2d at 1059 (retaliation claims based upon

the right to petition for redress must satisfy the public concern requirement of the First

Amendment).  To make out a First Amendment claim for a governmental employer's retaliation

against an employee for exercising his right of free speech, a plaintiff must establish that "(1) his

speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a

causal connection exists between his speech and the adverse employment decision against him."
Morris, 196 F.3d at 110 (basing this standard on that set forth in Mount Healthy City School.
Dist. Bd. Of Educ. v. Doyle, 429 U. S. 274, 283-87 (1977)).  Accord Gorman – Bakos v. Cornell
Coop. Extension, 252 F.3d 545, 553 (2d Cir. 2001).

In Connick v. Myers, 461 U.S. 138, 146 (1983), the United States Supreme Court
established the test for determining public concern, i.e. constitutionally protected speech.  Speech
that addresses a matter of public concern involves statements that can "be fairly considered as
relating to any matter of political, social, or other concern to the community . . . ." That
determination is made by evaluating "the content, form, and context of a given statement, as
revealed by the whole record." Id. at 147-48.

Pursuant to the Connick analysis, the federal courts of appeals take various approaches in
determining whether a particular statement made by an employee is constitutionally protected.
"Some courts have adopted a content-based analysis, focusing exclusively on which information
is needed or appropriate to enable the members of society to make informed decisions about the
operation of their government, McKinley v. City of Eloy, 705 F.2d 1110, 1113-14 (9th Cir. 1983)
(quoting Thornhill v. Alabama, 310 U.S. 88, 102 (1940)), in effect providing per se protection to
public-employee speech on certain topics of inherent public interest, such as official malfeasance
or abuse of office.  See Koch v. City of Hutchinson, 847 F. 2d 1436, 1446 n.17 (10th Cir.) (en
banc), cert. denied, 488 U.S. 909 (1988).  Other courts have adopted an analysis which turns
either entirely or in part on the employee's subjective intent, i.e., on whether the employee's
speech was calculated to disclose misconduct or to inspire public debate on some issue of
significant public interest. Conway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988).  See also