UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

RADOLF
    Plaintiff

CASE NO. 3:03CV242(MRK)
LEAD/MASTER DOCKET NO.

CASE NO. 3:03CV672(MRK)
MEMBER CASE

v.

CONNECTICUT, ET AL
    Defendants

AUGUST 4, 2004

## LOCAL RULE 56(a)(1) STATEMENT OF MATERIAL FACTS

**A.  PARTIES**

1. Peter J. Deckers, M.D. is Executive Vice President for Health Affairs of the University of Connecticut Health Center ("UCHC") and Dean of the University of Connecticut School of Medicine ("UCSOM"). (Affidavit of Peter Deckers ("Deckers Aff.") ¶3, 62).

2. Per University ByLaws, Article VIII. D., the Executive Vice President for Health Affairs ("EVP") is the executive director and chief operating officer of the Health Center as well as the coordinator of the University of Connecticut's programs of instruction, research, and health care performed by the University Health Center including the Schools of Medicine and Dental Medicine, and the John N. Dempsey Hospital; and is responsible for the implementation, and administration at UCHC and accountable to the President of the University. (Deckers Aff. ¶4).

3. Per University ByLaws, Article VIII. D., the Executive Vice President for Health Affairs is responsible to the President for the coordination and formulation of policies and administration of administrative, business and other support departments at the Health Center. The EVP shall, among other things: appoint those members of the University faculty and staff who report to him, approve the selection and adjustment of service of all personnel under his jurisdiction, be responsible for all monies and funds of the University Health Center regardless of their source and make provision for an accurate accounting of their receipt and expenditure, and direct the assignment of all plant facilities, including buildings, offices, classroom, laboratories, equipment. (Deckers Aff. ¶5).

4.  Per Guidelines for the Operation of the School of Medicine, the Dean of the School is appointed by the University Board of Trustees and is responsible to the President of the University. (Deckers Aff. ¶7).

5.  Per those Guidelines, the Dean is the principal administrative office of the School of Medicine and is responsible for, among other things: implementation of the regulations and policies of the University and School of Medicine, preparing annual budget recommendations for the School, making recommendations regarding the appointment, promotion and tenure of members of the faculty, Department Heads, and Associate Deans, and assigning space which is available to the School of Medicine to departments and other units. (Deckers Aff. ¶8).

6.  Justin Radolf, M.D. is a full professor with tenure at UCHC and works in the Center for Microbial Pathogenesis. (Second Substituted Complaint ¶11).

7.  The University of Connecticut is a public institution of higher education and agency of the State of Connecticut. (Second Substituted Complaint ¶17).

8.  The University of Connecticut Health Center and the School of Medicine are arms of the University of Connecticut and agencies of the State of Connecticut. (Second Substituted Complaint ¶18, 19).

**B.   FACULTY APPOINTMENT AND GRIEVANCE PROCEDURE**

9.  In 1998, plaintiff accepted a position as a professor of medicine at UCHC and agreed to establish the Center for Microbial Pathogenesis and serve as Director for the Center. (Deckers Aff. ¶9).

10. Plaintiff began employment with UCHC on April 1, 1999. (Deckers Aff. ¶10).

11. On April 7, 1999, the UCHC Tenure and Promotions Committee formally approved plaintiff's appointments as Professor of Medicine and Professor Microbiology with tenure, with further approval, per the University ByLaws, by the UConn Board of Trustees. (Deckers Aff. ¶11).

12. On February 7, 2000, plaintiff resigned his appointment as a faculty member in the Department of Microbiology. (Radolf Dep. Ex. 4; Deckers Aff. ¶12).

13. The UConn Health Center has a Faculty Grievance Procedure set forth in the University of Connecticut ByLaws which allows a faculty member to bring a grievance regarding promotion, tenure, and reappointment to a Faculty Review Board made up of elected UCHC peer faculty of senior rank and to pursue any other issue via the appeals mechanism to the Health Center Appeals Committee and ultimately to the UConn Board of Directors. (Deckers Aff. ¶14).

14  Per University ByLaws, assignments of duties of faculty members, including among other things, committee assignments, student counseling, and administrative duties, will be made by the appropriate deans, directors, and department heads as follows:

   (a)  **Professional Staff Load**

   While members of the professional staff of this University are employed for a variety of duties, as a general rule the University will expect to assign to each full-time member of the professional staff duties which are reasonable and consistent with good and effective teaching practices at both the undergraduate and graduate levels. In conjunction with this, staff members will be expected to carry a reasonable amount of ordinary departmental duties and routine committee responsibilities and to undertake those activities of self improvement and professional development which are part of every faculty member's investment in his or her own future. Such assigned responsibilities as unusually heavy loads of student counseling, the chairmanship of committees which are unusually time-consuming, research projects which have been designated as a part of the staff member's assigned load, unusually heavy enrollments in courses, and assigned administrative duties will be considered in determining the number of contract hours assigned to any individual.

   Assignment of duties will be made by the appropriate deans, directors, and department heads, subject to review as to general policy by the Provost and Executive Vice President for Academic Affairs or the Executive Vice President for Health Affairs or Vice President and President. In so far as it is possible, consistent with the development of a balanced offering of University services, these assignments should take into account the aptitudes and wishes of individual staff members and their opportunities for long-run professional development. (Deckers Aff. ¶13).

C.  **RADOLF'S COMMISSION OF RESEARCH MISCONDUCT**

   15.  On July 26, 2001, a Special Review Board (SRB) of UCHC, upon investigation of an allegation of research misconduct by plaintiff, found that plaintiff has falsified data in two grant proposals/applications submitted to the United States Department of Agriculture and Connecticut Innovations Inc. (Radolf Dep. Ex. 5; Deckers Aff. ¶15).

   16.  As a result of the SRB findings, Dr. Deckers took certain administrative steps outlined in a letter to plaintiff dated August 22, 2001, to wit:

      (a)  a letter of reprimand to be placed in plaintiff's personnel file; and

(b) creation of a committee of faculty members to be charged with thoroughly inspecting all new grant proposals which plaintiff authors or co-authors for a period of three years (September 1, 2001 through August 31, 2004) to ensure (i) compliance with all applicable regulations and (ii) integrity of research data presented. (Radolf Dep. Ex. 5; Deckers Aff. ¶16).

17. The three-year period is considered a period of academic probation. (Radolf Dep. Ex. 5; Deckers Aff. ¶17, 18).

18. Plaintiff was informed in this letter that he had the right to appeal this decision to the Health Center Appeals Committee in accordance with University ByLaws. (Deckers Aff. ¶19).

19. By letter dated December 27, 2001, Dr. Deckers further informed plaintiff of the process for review of grants, contracts, and philanthropic proposals submitted by plaintiff during this probationary period. (Deckers Aff. ¶20).

20. Plaintiff never appealed or grieved the actions of Dr. Deckers on August 22, 2001 or December 27, 2001 relative to plaintiff's research misconduct. (Deckers Aff. ¶21).

21. By October 2001, the Federal Office of Research Integrity ("ORI") had independently exercise jurisdiction over plaintiff's research misconduct and began its own investigation of plaintiff. The U.S. Department of Agriculture was also involved. (Deckers Aff. ¶22).

**D.   ORI VOLUNTARY EXCLUSION AGREEMENT**

22. On March 10, 2003, plaintiff entered into a Voluntary Exclusion Agreement with ORI which states: "In January of 2000, I [plaintiff] engaged in scientific misconduct involving research supported by the National Institute of Health." (Radolf Dep. Ex. 6; Deckers Aff. ¶23).

23. In the Voluntary Exclusion Agreement, plaintiff admitted that he "falsified and fabricated preliminary data by intentionally altering the labeling of an ethidium bromide-stained agarose gel purporting to demonstrate the expression of genes in the salivary glands of feed Dermacentor andersoni ticks… The texts of the two proposals also contained inaccurate statements relating to these falsified and fabricated data." (Radolf Dep. Ex. 6).

24. In the Voluntary Exclusion Agreement, plaintiff also stated that "[his] action also could have compromised the integrity and careers of individuals with whom I work, individuals who place their trust in me and who look to me for scientific leadership." (Radolf Dep. Ex. 6; Deckers Aff. ¶24).

25. As a result of the Voluntary Exclusion Agreement, the United States Department of Health & Human Services implemented the following administrative actions for a period of five (5) years, beginning on March 10, 2003:

- "[The plaintiff] voluntarily agreed to exclude himself from serving in any advisory capacity to PHS [U.S. Public Health Service] including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

- [The plaintiff] voluntarily agreed that any institution that submits an application for PHS support for a research project on which his participation is proposed or which uses him in any capacity on PHS-supported research, or that submits a report of PHS-funded research, or that submits a report of PHS-funded research in which he is involved, must concurrently submit a plan for supervision of Dr. Radolf's duties to the funding agency for approval. The supervisory plan must be designed to ensure the scientific integrity of Dr. Radolf's research contribution. A copy of the supervisory plan must also be submitted to ORI by the institution. [The plaintiff] agreed that he will not participate in any PHS-supported research until such a supervision plan is submitted to ORI.

- [The plaintiff] agreed to ensure that any institution employing him submits, in conjunction with each application for PHS funds or report, manuscript, or abstract of PHS funded research in which he is involved, a certification that the data provided by him are based on actual experiments or are otherwise legitimately derived, and that the data, procedures, and methodology are accurately reported in the application or report. [The plaintiff] must ensure that the institution send the certification to ORI." (Radolf Dep. Ex. 6; Deckers Aff. ¶25).

26. Neither UCHC nor the defendants were parties to this Agreement or involved in its negotiation, despite being subject to its requirements. (Deckers Aff. ¶26).

27. Dr. Deckers received a copy of the Voluntary Exclusion Agreement on March 19, 2003. (Deckers Aff. ¶23).

28. The ORI published this Finding and Agreement in the Federal Register, in the ORI Newsletter, and on the NIH Guide for Grants and Contracts. (Radolf Dep. p.186).

29. In accordance with ORI's mandate, on April 4, 2003, Dr. Deckers provided notice to plaintiff of the following actions:

"(1) [The plaintiff's] academic probation will continue at least through March 9, 2008. During this interval you will be excluded from any academic and/or administrative leadership position on behalf of the UCHC and its

5

schools and hospital that could include, directly or indirectly any service of any kind to the USPHS.

(2) ...The now operative Supervisory Plan requested of UCHC by ORI is attached and was forwarded to them as requested on April 4, 2003...

(3) The MD/Ph.D. Program of the UCSOM is a PHS-funded activity. Therefore, to ensure that the work of your current graduate student...who is an MD/Ph.D. student, is not disturbed or disrupted in any way by these events, and that she is adequately mentored, a co-major advisor will be appointed by the Dean of the Graduate School to serve in conjunction with you...Additionally, you will not be listed as an available mentor for new MD/Ph.D. candidates on the resubmission of the NIH Training Grant for this program and your appointment on the Steering Committee of the MD/Ph.D. Program is terminated immediately.

(4) This communication to you and the recent letter from ORI to us and your attorney, as well as the materials relative to this PHS action placed in the Federal Register, the NIH Guide for Grants and Contracts and the ORI Newsletter will be turned over to the Compliance Subcommittee of the UCHC Board of Directors for their review and further consideration. (Radolf Dep. Ex. 24; Deckers Aff. ¶27-33).

30. The Supervisory Plan was reviewed and refined by ORI prior to implementation. (Deckers Aff. ¶34).

31. On April 8, 2003, the Executive Committee of the University of Connecticut Graduate Faculty Council at Storrs adopted a policy concerning actions to be taken to protect the integrity of a graduate student's experience should their major advisor be found to have committed scientific or academic misconduct. (Deckers Aff. ¶35).

32. Per this policy, in such cases, the Dean of the Graduate School of UConn at Storrs reviews the matter in consultation with the Executive Committee. That Dean may take a series of actions, including but not limited to, assignment of a co-major advisor or assignment of a new advisor and removal of the faculty member from the Graduate Faculty. (Deckers Aff. ¶36).

33. In the specific case of plaintiff, Janet Greger, Vice Provost for Research and Graduate Education and Dean of the Graduate School, agreed with Dr. Deckers that assignment of a co-major advisor was appropriate, notifying the graduate student of this fact on April 17, 2003. (Deckers Aff. ¶37).

34. All important compliance issues and litigation are routinely reported to the UCHC Board of Directors which did not take further action against Dr. Radolf. (Deckers Aff. ¶38).

6

35. The Steering Committee of the MD/Ph.D Program includes a non-tenured faculty member and three ex-officio members, two of whom are not tenured. (Deckers Aff. ¶39).

36. Not every MD/Ph.D. graduate student is mentored by a tenured faculty member. (Deckers Aff. ¶40).

37. Plaintiff never appealed or grieved the actions taken by Dr. Deckers on April 4, 2003. (Radolf Dep. p. 265-66).

E. **PLAINTIFF'S ALLEGED HARM**

38. Plaintiff admits what is a commonly recognized faculty honor "referred to in ¶26 of the Complaint is somewhat debatable and could list only the MSTP (MD/Ph.D program) (Radolf Dep. p. 190-91).

39. Dr. Radolf cannot cite facts to support his belief that he has been excluded from consideration for any meritorious activities or honors and does not claim he is deserving of a particular honor. (Radolf Dep. p. 192-95).

40. Dr. Radolf admits that Dr. Deckers did not make any assurance regarding his tenure status nor agreed to give him committee assignments when hired. (Radolf Dep. p. 202, 230).

41. Dr. Radolf admits that he has never approached Dr. Deckers or Dr. Berlin to ask for committee assignments. (Radolf Dep. p. 203-04).

42. Dr. Radolf cannot specify the policy and procedures entitling full professors to a wide range of entitlements as alleged in ¶29 of his complaint but states that these are "expectations." (Radolf Dep. p. 204-05).

43. Dr. Radolf admits a tenured faculty member is not entitled to sit on every committee but only states faculty are entitled to be considered for a committee. (Radolf Dep. p. 206).

44. Dr. Radolf admits that Dr. Deckers does not control all appointments to committees. (Radolf Dep. p.210-211).

45. Dr. Radolf admits it is possible a tenured faculty member would not be given leadership positions or participate in student mentoring programs or be given committee assignments. (Radolf Dep. p. 210).

46. Dr. Radolf still sits on the UCHC CLAC Committee and the Molecular Core Advisory Committee and has received no notification that he has been removed from those committees. (Radolf Dep. P. 218-20).

7

47. In 2002, Dr. Radolf declined to serve on the UCHC General Clinical Research Center (GCRC) Scientific Advisory Committee (SAC) because his "academic requirements were getting ponderous." (Radolf Dep. p. 217).

48. Dr. Radolf is still mentoring (Radolf Dep. p. 220); still reviewing proposals for the GCRG SAC (Radolf Dep. p. 224); still conducts medical school and graduate school admissions interviews (Radolf Dep. p. 224); still sits on non-NIH study sections and performs non-NIH grant reviews and journal manuscript reviews (Radolf Dep. p. 225-26); and still makes scientific presentations at institutions (Radolf Dep. p. 227).

49 Dr. Radolf is still a member of the Connecticut Infectious Disease Society, the Infectious Diseases Society (Fellow), the American Society for Clinical Investigation, the American Society for Microbiology; reviews manuscripts for several journals; and is still on the editorial board for sexually transmitted diseases and Clinical Infectious Diseases (Peer Reviewer); and is to be named to the editorial board of Current Immunology Review. (Radolf Dep. p. 214, 226, Ex. 26-28).

50. Dr. Radolf states that the extension of his academic probation by Dr. Deckers is a moot question because ORI's voluntary agreement takes precedence. (Radolf Dep. p. 238-39).

51. Dr. Radolf admits Dr. Deckers could have extended his academic probation to coincide with the ORI Agreement. (Radolf Dep. p. 239, 241, 246).

52. Dr. Radolf's actual complaint regarding the academic probation is that it extends to all areas of his work as a faculty member and that his reporting relationship was changed from his department chair to the Dean, Dr. Deckers. (Radolf Dep. p. 242-44).

53. Dr. Radolf admits these actions in ¶54 were taken in January 2002 (not April 4, 2003) and that he never grieved them. (Radolf Dep. p. 246).

54. The actions Dr. Deckers took on April 4, 2003 were not in retaliation for Dr. Radolf filing his lawsuit (Deckers Aff. ¶28-38) and Dr. Radolf admits these actions were spurred by the ORI Voluntary Exclusion Agreement. (Radolf Dep. p. 250).

55. As to the dissemination of Dr. Deckers April 4, 2003 letter, Dr. Radolf's actual contention is that if he had been informed that the compliance subcommittee was going to be monitoring the supervisory plan, then it might have been appropriate to have sent the letter to those individuals copied on the letter. (Radolf Dep. p. 253).

56. Dr. Radolf admits he does not know who all the individuals copied on the letter are (Radolf Dep. p. 252), and does not know of anyone else who is aware of the letter other than those copied on it. (Radolf Dep. p. 270).

57. Dr. Radolf's only fact to support his claim that Dr. Deckers intended to stigmatize his good name and reputation is the fact of the letter itself. (Radolf Dep. p. 255).

58. Dr. Radolf's claim that Dr. Deckers' action of April 4, 2003 "makes it unreasonably and injustifiably difficult for him to participate in federal grant programs sponsored by the U.S. Public Health Service" per ¶134 of his Complaint is based on his belief that the supervisory plan is too stringent. (Radolf Dep. p. 259).

59. Dr. Radolf admits ORI reviewed the supervisory plan. (Radolf Dep. p. 259).

60. Dr. Radolf has only applied for one small grant and has not applied for others because he says there is no need to. (Radolf Dep. p.163).

61. Dr. Radolf admits that he has not been turned down for grants because of any of the actions of the defendants. (Radolf Dep. p. 113).

62. Dr. Radolf has not had any manuscripts rejected because of any of the denfendants' actions. (Radolf Dep. 113).

63. Dr. Radolf is still a tenured, full professor (Radolf Dep. p.9); has not lost lab space (Radolf Dep. p.250); has not experienced a reduction in salary or fringe benefits (Radolf Dep. p. 41) and has received research plan increases (Radolf Dep. p. 41).

64. Dr. Radolf has mentored only one graduate student since 2001. (Radolf Dep. p. 265).

9

This is to certify that on this 16 day of August 2004, the foregoing was mailed to counsel of record as follows pursuant to FRCP 5(b):

Thomas W. Bucci, Esq.
Willinger, Willinger & Bucci, PC
855 Main Street
Bridgeport, CT 06604

Jane D. Comerford
Assistant Attorney General