**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
|     Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
|     Defendants. | : | NOVEMBER 1, 2004 |

## LOCAL RULE 56(a)2 STATEMENT

**A.  Material Facts Asserted by the Defendant**

1. Admit.

2.  Admit

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7.  Deny to the extent that Wikel testified under oath that he considered his appointment a permanent appointment.  (Wikel Tr. 8).

8.  Admit.

9.  Admit.

10. Admit.

11. Admit to the extent that on September 9, 1998, the plaintiff was "formally offer[ed] ... the position of Director of the Center of Microbial Pathogenesis and appointment as Professor of Medicine (primary) and Microbiology (secondary) with tenure effective January 1, 1999, at a salary of one hundred seventy-five thousand dollars ($175,000) per annum."  (*Exhibit 1*.)

12. Admit.

13. Admit.

14. Admit.

15. Admit

16. Admit.

17. Admit.

18. Deny to the extent that the letter of reprimand states, "[t]his three year period will be considered a period of probation for you as a member of this academic community."  (*Exhibit 2.*)

19. Admit that the plaintiff was informed in the letter that he had the right to appeal this decision to the Health Center Appeals Committee.  However, Deckers and Berlin verbally warned the plaintiff not to appeal.  In fact, Deckers informed the plaintiff that the consequences of an appeal would be dire.  (Radolf Aff. ¶ 148).

20. Admit.

21. Admit.

22. Admit.

23. Admit.

24. Admit.

25. Deny to the extent that the defendant asserts that Deckers did not commit to the plaintiff's appointment to direct the Center for Microbial Pathogenesis so long as there did not exist just cause for his removal.  *(Radolf Tr. 16-20 ).*

26. Admit to the limited extent that the plaintiff does not remember the exact word "permanent" being used.  The plaintiff, however, does recall the clear representations made to him by the defendants, Deckers and Berlin, in their efforts to convince him to relocate his laboratory from the University of Texas Southwest to the University of Connecticut Health Center and to head up the newly established Center for Microbial Pathogenesis.  The mutual understanding of the plaintiff and the defendants, in particular, Deckers and Berlin, was that the University of Connecticut Health Center was making a

long-term commitment to the plaintiff to be the Director of the Center for Microbial

Pathogenesis and that his faculty appointments were integral components of the offer, not

separate and distinct proposals. *(Radolf Tr. 16-20; Radolf Aff. ¶¶ 5-21).*

27. Deny. The mutual understanding of the plaintiff and the defendants, in particular,

Deckers and Berlin, was that the University of Connecticut Health Center was making a

long-term commitment to the plaintiff to be the Director of the Center for Microbial

Pathogenesis and that his faculty appointments were integral components of the offer, not

separate and distinct proposals. *(Radolf Tr. 16-20).* The offer made to the plaintiff to

relocate to the University of Connecticut Health Center was not made in separate

components; the plaintiff was not offered a "position" as a "full Professor" and a separate

appointment as the Director of the Center for Microbial Pathogenesis. The appointments

were made in unison to establish the plaintiff as the permanent Director of the Center for

Microbial Pathogenesis. *(Radolf Tr. 16-20; Radolf Aff. ¶¶ 5-21).*

28. Deny. The defendants mischaracterize the realities of the plaintiff's recruitment. It is

indisputable that the University of Connecticut Health Center recruited the plaintiff to be

Director of the Center for Microbial Pathogenesis; it was not recruiting the plaintiff

merely for a faculty appointment. The faculty appointments were extended to the

plaintiff for the purpose of providing him tenure in the position for which he was

recruited, the Director of the Center for Microbial Pathogenesis. Although Type II

Centers are administratively autonomous, all faculty members, including the Director,

must be appointed through a department.  In other words, the plaintiff had to be

appointed through one or more departments in order to qualify for appointment as the

Director of the Center for Microbial Pathogenesis.  *(Exhibit 1; Radolf Tr. 16-20 ; Radolf*

*Aff. ¶¶ 5-21 )*

29. Deny.  *(Radolf Tr. 25-26).*

30. Admit that Deckers makes this assertion in his December 27, 2001 letter to the plaintiff.

31. Admit that the letter states as much.

32. Objection; the paragraph to which the defendants refer is unsupported by any factual

basis.  Deckers states, "I had indications that the trust necessary for Radolf to run the

Center was evaporating".  Deckers makes no reference to any admissible evidence upon

which he bases this claim.  L.Civ. R. 56 (a) 3 requires "[e]ach statement of material fact

by a movant in a Local Rule 56(a)1 Statement...be followed by a specific citation to (1)

the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence

that would be admissible at trial."  "The principles governing admissibility of evidence

do not change on a motion for summary judgment.  Rule 56(e) provides that affidavits in

support of and against summary judgment 'shall set forth such facts as would be

admissible in evidence.'  Fed. R. Civ. P. 56(e) (emphasis added); see also *Community of*

*Roquefort v. William Faehndrich, Inc*., 303 F.2d 494, 498 (2d Cir. 1962) ('Since the

object [of summary judgment] is to discover whether one side has no real support for its

version of the facts, the Rule specifically states that affidavits shall 'set forth such facts as

would be admissible in evidence.'') (citation omitted).  Therefore, only admissible

evidence need be considered by the trial court in ruling on a motion for summary

judgment.  *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988); see

also *United States v. United States Gypsum Co.*, 340 U.S. 76, 85, 95 L. Ed. 89, 71 S. Ct.

160 (1950) (right to present evidence to a court on summary judgment does not require

the court to admit irrelevant evidence); *Lavespere v. Niagara Mach. & Tool Works, Inc.*,

910 F.2d 167, 175-76 (5th Cir. 1990) ('As a general rule, the admissibility of evidence on

a motion for summary judgment is subject to the same rules that govern the admissibility

of evidence at trial.')." *Raskin v. Wyatt Co*., 125 F.3d 55, 66 (2d Cir.  1997). See also

*Barlow v. Connecticut*, 2004 U.S. Dist. LEXIS 9237, 10-11 (U.S. Dist.  2004) ("The

principles concerning admissibility of evidence do not change on a motion for summary

judgment.  *Raskin v. Wyatt Co*., 125 F.3d 55, 66 (2d Cir. 1997); *Newport Elecs. v.

Newport Corp.,* 157 F. Supp. 2d 202, 208 (D.Conn. 2001).

33.  Admit.  The plaintiff met with Dr. Deckers and Dr. Berlin.  The discussion concerning

the relinquishment of the directorship was strictly limited to the plaintiff giving up the

position only on a temporary basis.  *(Radolf Tr. 49; Deckers Tr. 100, Exhibit 5).*

34.  Object to the characterization that Deckers' belief was "reasonable". Further, during the

January 7 meeting the plaintiff stated unequivocally that he believed he was fully capable

of running the Center in spite of his personal issues.  Moreover, during the meeting

plaintiff was told by Deckers and Berlin that he had done an excellent job setting up and running the Center. *(Radolf Tr. 33, 37; Radolf Aff. ¶ 24).*

35. Object to the characterization that "Deckers' felt that it was "reasonable" for plaintiff to put aside his administrative responsibilities..."  Further, at that point in time there was no indication that the ORI investigation would in any way interfere with the plaintiff's responsibilities.  ORI was conducting a review of the University's investigation.  During the meeting plaintiff was not given any factual reason to support this claim. *(Radolf Aff. ¶ 149; Radolf Tr. 34, 49).*

36. Deny.  Deckers deceived the plaintiff into relinquishing his position on a temporary basis, by promising the plaintiff "[a]ll you have to do is come back and tell me you feel better" and the plaintiff would be reappointed as the Director of the Center for Microbial Pathogenesis. *(Radolf Tr. 49).*  Deckers did a complete reversal once the plaintiff agreed to his suggestion and temporarily gave up his position. *(Exhibit 6; Exhibit 7; Radolf Aff. ¶¶ 23-28).*

37. Deny. *(Radolf Tr. 49; Deckers Tr. 19-23).*  Additionally, in his email to the plaintiff dated January 13, 2002, *Exhibit 7*, Deckers made no mention of the ORI investigation or the role its investigation had in the removal of the plaintiff from his position as Director for the Center for Microbial Pathogenesis.

38. Deny.  In his conversation with the plaintiff, Deckers never mentioned that the plaintiff's resumption of his duties as Director for the Center for Microbial Pathogenesis was contingent upon the activities of the ORI.  *(Radolf Tr. 36-50; Exhibit 7).*

39. Deny.  *(Radolf Tr. 37-39; 48-49).*

40. Admit that by letter dated January 13, 2002, the plaintiff informed Deckers of his decision "to relinquish temporarily [his] position as Director of the Center for Microbial Pathogenesis for personal reasons."  *(Exhibit 6).*

41. Deny to the extent that the defendant alleges that the appointment had not been predetermined.  Wikel admitted as much to the plaintiff.  *(Radolf Tr. 42, 43; Radolf Aff. ¶ 28).*  Additionally, despite the semantics employed by Deckers and Berlin, the appointment of Wikel has been nothing less than permanent, employing the label interim to mask the true nature of the appointment in these present proceedings.  *(Wikel Tr. 8; Exhibit 8).*

42. Deny.  *(Radolf Tr. 42-43; 47, 49).*

43. Deny.  Deckers, under the guise of compensation review, misrepresents his willingness to discuss the plaintiff's resumption of the directorship position.  The characterization that Deckers had given the plaintiff numerous opportunities to discuss resumption of the directorship is likewise a blatant misrepresentation.  Deckers, knowing the plaintiff's unwillingness to intermix the issue of the directorship with the topic of compensation, unreasonably refused to meet with the plaintiff on either of the subjects.  Deckers never

offered to meet with the plaintiff on either of the issues in separate settings.  Additionally,
as the correspondence attached to Deckers affidavit clearly demonstrates, there were not
numerous opportunities to confer about the directorship; the entire correspondence
revolved about setting up one meeting to review the plaintiff's compensation.  *(Deckers
Aff. Attachment # 8).*  The plaintiff's submission which necessitated a meeting with
Deckers, who served as his immediate supervisor since January 14, 2002 *(Exhibit 7),*
demonstrates that it was limited to the plaintiff's appointment as Professor of Medicine
and Genetics and Developmental Biology *(Exhibit 11)* not the issue of the Directorship.
In fact, these materials were pre-reviewed by Deckers before the actual submission and
his comment was "very impressive".  *(Exhibit 12).*

44. Admit.

45. Deny.  Dr. Wikel's recognition is in a narrow area of vector biology that relates to the
immunological interactions that occur at the tick-host interface during tick feeding.
Unlike Dr. Radolf, Dr. Wikel has no recognized expertise in the pathogenesis of tick-
borne diseases, specifically Lyme disease, the development of vaccines against tick-borne
pathogens, molecular microbiology, human inflammatory processes, or clinical infectious
diseases.  Indeed, his one publication describing the blockage of *B. burgdorferi*
transmission by repeated tick infestation (Infection and Immunity 65:335-338; 1997) was
refuted shortly afterwards by Dr. Andrew Spielman and co-workers (Applied and
Environmental Microbiology 64:4596-4599; 1998), and other investigators also have

been unable to reproduce this finding.  Dr. Wikel's claim to be internationally recognized for molecularly oriented work on *Ixodes scapularis*, the vector of Lyme disease, is belied by the facts that he has never published a single paper involving molecular analysis of this organism and he is not a co-author on a recent publication describing the linkage map of *I., scapularis* (Ullman *et al.* Exp. Appl Acarol. 28:107-126; 2002); Dr. Wikel has stated in the past that he was designated to lead this project.  Lastly, in addition, to his expertise in Lyme disease and other vector-borne diseases, Dr. Radolf is also a world authority in the clinical features, immunobiology and pathogenesis of syphilis, a sexually transmitted spirochetal infection, caused by *Treponema pallidum*, with many similarities to Lyme disease.  *(Radolf Aff. ¶ 4; Caimano Aff. ¶¶ 25-28, Akins Aff. ¶¶ 10-17, 28, 29, 38).*

46. Deny.  There is no documentary evidence to support the claim that Dr. Wikel was engaged in any research that utilized molecular (i.e., recombinant DNA-based) techniques prior to his association with Dr. Radolf.  Prior to 2000, Dr. Wikel had not published any papers describing the use of recombinant DNA techniques to address problems in tick immunobiology or the pathogenesis of tick-borne infections.  A single paper in the Journal of Medical Entomology (35:505-509; 1998) described N-terminal sequence analysis of a protein called "p36"; this data, which was not derived in his laboratory, is not the result of a recombinant DNA technique and does not in any way indicate a capability within the Wikel laboratory to molecularly clone and sequence the

10

p36 gene and express the protein in recombinant form, the next logical steps for molecular characterization of the protein.  Moreover, prior to 2000, Dr. Wikel had no submissions to the GenBank database as would be expected for an investigator whose research was heavily dependent upon molecular, genetics, and recombinant DNA techniques, including DNA sequence analysis.  Further, Dr. Wikel's claim to have an extensive molecular collaboration with investigators at OSU is belied by the fact that prior to 2000, he had not co-authored any papers with OSU faculty that utilize recombinant DNA techniques.  His first GenBank submission with an OSU faculty member, Dr. Melanie Palmer, was made in 1999, at least two years after Dr. Radolf had initiated their collaboration.  *(Radolf Aff. ¶¶ 31-40 ; Caimano Aff. ¶¶ 25-28, Akins Aff. ¶¶ 10-17, 28, 29, 38).*

47. Deny.  Dr. Radolf contacted Dr. Wikel specifically to incorporate tick vector biology into his Lyme disease research program, which was heavily oriented towards Lyme disease vaccine development.  The idea of developing a vaccine to interrupt feeding by *I. scapularis* was a logical extension of Dr. Radolf's established research program in Lyme disease and did not originate with Dr. Wikel.  *(Radolf Aff. ¶¶ 41-58 ; Caimano Aff. ¶¶ 25-28, Akins Aff. ¶¶ 10-17, 28, 29, 38).*

48. Deny.  In the 1997 Texas grant application, Dr. Radolf described Dr. Wikel's technological base as follows (p6):  "Dr. Steven Wikel, Endowed Chair in Agricultural Biotechnology and Professor of Entomology, Oklahoma State University, maintains

uninfected and *B. burgdorferi*-infected *Ixodes scapularis* colonies and is thoroughly

familiar with methodologies for tick infestation of animals". The accompanying letter of

collaboration provided by Dr. Wikel does not describe any molecular or recombinant

DNA work being conducted in his laboratory. *(Radolf Aff. ¶¶ 48,49 ; Caimano Aff. ¶¶*

*10-28, Akins Aff. ¶¶ 10-38).*

49. Deny to the extent that the defendants imply that Wikel would have been awarded the

grant if he had been eligible to apply without the plaintiff. *(Caimano Aff.; Akins Aff.).*

50. Deny to the extent that the defendant implies that the plaintiff was a minor player in the

award of the grants. None of these molecularly oriented grants would have been

competitive without Dr. Radolf's recognized expertise in microbial pathogenesis,

molecular biology and recombinant DNA techniques. *(Radolf Aff. ¶¶ 40-61; Caimano*

*Aff. ¶¶ 10-43, Akins Aff. ¶¶ 10-38).*

51. Deny. This item has a major factual error. The Texas grant involved the use of ELI to

develop a vaccine to interrupt feeding and pathogen transmission by *Ixodes scapularis*,

the vector for Lyme disease. The DOD proposal focused on the same tick. The

withdrawal of the grants has nothing to do with the intellectual property issues and the

joint ownership of the EST libraries, data, derived reagents, etc. *(Radolf Aff. ¶¶ 48-50).*

52. Deny. Dr. Radolf was the Principal Investigator on the funded Texas Advanced

Technology Proposal, which means that he was responsible for conceiving and

coordinating the described research activities. For the 1998 USDA grant, Dr. Radolf was

to direct a UT Southwestern-based consortium that would provide all of the necessary molecular and recombinant DNA technology required to do the proposed work. This consortium was developed in explicit recognition of the fact that Dr. Wikel and Wikel laboratory personnel lacked the technological base required to conduct the ELI and genetic immunization experiments that were central to the proposal. Dr. Johnston's role in this endeavor was entirely supportive and in no way subordinated Dr. Radolf's function as director of the USDA grant-related research activities at UT Southwestern. The integration and application of these new technologies to tick borne diseases was the product of Dr. Radolf's intellect and was dependent upon the technological base already existing in Dr. Radolf's laboratory. The 1995 publication referred to was on tuberculosis and does not even mention ticks or tick vaccines. Dr. Johnston was not in any way responsible for the idea to apply these technologies towards the development of a tick vaccine. It was Dr. Radolf who conceived of this application and contacted Dr. Johnston to serve as collaborator. If Dr. Radolf were not a credible Principal Investigator, the Texas grant, which is extraordinarily competitive (10% funding rate) would not have been funded. Note affidavits which state that Dr. Radolf spearheaded both ELI and EST approaches for identifying biologically relevant molecules in tick saliva and for developing a tick vaccine. *(Radolf Aff. ¶¶ 48-50; Caimano Aff. ¶¶ 10-43, Akins Aff. ¶¶ 10-38).*

53. Deny.  Dr. Radolf was the Principal Investigator on the funded Texas Advanced
    Technology Proposal, which means that he was responsible for conceiving and
    coordinating the described research activities.  For the 1998 USDA grant, Dr. Radolf was
    to direct a UT Southwestern-based consortium that would provide all of the necessary
    molecular and recombinant DNA technology required to do the proposed work.  This
    consortium was developed in explicit recognition of the fact that Dr. Wikel and Wikel
    laboratory personnel lacked the technological base required to conduct the ELI and
    genetic immunization experiments that were central to the proposal.  Dr. Johnston's role
    in this endeavor was entirely supportive and in no way subordinated Dr. Radolf's
    function as director of the USDA grant-related research activities at UT Southwestern.
    The integration and application of these new technologies to tick borne diseases was the
    product of Dr. Radolf's intellect and was dependent upon the technological base already
    existing in Dr. Radolf's laboratory.  The 1995 publication referred to was on tuberculosis
    and does not even mention ticks or tick vaccines.  Dr. Johnston was not in any way
    responsible for the idea to apply these technologies towards the development of a tick
    vaccine.  It was Dr. Radolf who conceived of this application and contacted Dr. Johnston
    to serve as collaborator.  If Dr. Radolf were not a credible Principal Investigator, the
    Texas grant, which is extraordinarily competitive (10% funding rate) would not have
    been funded.  Note affidavits which state that Dr. Radolf spearheaded both ELI and EST
    approaches for identifying biologically relevant molecules in tick saliva and for

developing a tick vaccine. *(Radolf Aff. ¶¶ 48-50; Caimano Aff. ¶¶ 10-43, Akins Aff. ¶¶ 10-38).*

54. Deny. No publication from Dr. Wikel's laboratory prior to 2000 describes the molecular cloning and sequence analysis of a tick gene or tick salivary protein. All of Dr. Wikel's publications up to that point involved poorly characterized mixtures of salivary gland extracts and described putative immunological activities that have not been consistently corroborated by other investigators inside or outside of the Wikel laboratory. Prior to his association with Dr. Radolf, Dr. Wikel's laboratory was devoid of molecular and genetic technology; remedying this deficit was a primary motivation for Dr. Wikel to engage in a collaboration with Dr. Radolf. *(Radolf Aff. ¶¶ 31-62; Caimano Aff. ¶¶ 10-43, Akins Aff. ¶¶ 10-38).*

55. Admit. This statement of fact is correct. The 2000 submissions centered about tick salivary gland ESTs, just as did the DOD proposal. In fact, the *ad hoc* committee chaired by Dr. John Shanley found that preliminary EST data contained in these two proposals was misappropriated by Dr. Wikel for the DOD submission. *(Exhibit 9).*

56. Deny. The work was transitioned to the Wikel laboratory as part of the negotiated arrangement for Dr. Wikel's relocation to the University of Connecticut Health Center. This transition did not involve any alteration in the conditions of the collaboration, ownership of the cDNA libraries or data, reagents, etc. generated from them. Following the transition, Dr. Radolf was only intermittently informed of the results and not given

hard copy or electronic files of Dr. Alarcon-Chaidez's data that would have made it possible for personnel in the Radolf laboratory to conduct their own analyses of this information. *(Radolf Aff.  ¶ 61; Caimano Aff.  ¶¶ 39-43).*

57. Deny to the extent that the collaboration also involved use of recombinant DNA techniques to characterize biological activities in the identified ESTs.  This is spelled out in the 2000 CII and USDA grants.  *(Radolf Aff.  ¶¶ 59-68).*

58. Deny.  *(Aikens Aff. ¶¶ 25-32; Caimano Aff. ¶¶ 10-24).*

59. Deny.  (Aikens Aff. *¶¶ 20-30; Caimano Aff. ¶¶ 42-43).*

60. Deny. There is no independent corroboration of Wikel's statement that sequencing from the original libraries or other uses of jointly owned data ceased in early 2002.  The sequestration of files by the ORI occurred in August, 2002 while the said outline of the manuscript was generated in early 2002.  The paper could have been completed and submitted beforehand.  Moreover, only hard copy files in Dr. Radolf's possession were sequestered so this would in no way have impeded work on a manuscript.  The hard copy files that were sequestered and subsequently returned were only those ESTs identified and analyzed by Dr. Onyango.  These files did not include hundreds of additional *D. andersoni* ESTs analyzed by Dr. Alarcon-Chaidez nor more than 1000 *I. scapularis* ESTs identified in Dr. Ribeiro's laboratory at the NIH from clones in the jointly owned *I. scapularis* 4 day fed tick cDNA library that were given to Dr. Ribeiro without Dr. Radolf's permission. *(Radolf Aff.  ¶¶ 75, 81-84)*

61. Deny.  There is no independent corroboration that Dr. Wikel re-initiated the project from scratch in early 2002.  If this were the case, it was done merely as a subterfuge to circumvent Dr. Radolf's intellectual property rights.  As stated in affidavits, there is no evidence to support the assertion that re-initiation of this work, if it did indeed occur, was conceptually or materially different from the work in the original collaboration or yielded any new information.  Dr. Thrall's assertions on this point are based on unsubstantiated statements from Dr. Wikel and represent a scientific judgment by an individual (i.e., Dr. Thrall) lacking the expertise to make this determination.  This also relates to the statement in the letter Berlin and Deckers authored to Jamie Kiser, Contract Specialist, U.S. Army Medical Research Acquisition Activity; again lacking validation by individuals with the appropriate scientific expertise.  *(Radolf Aff. ¶¶ 92-104; Aikens Aff. ¶¶ 30-36; Caimano Aff. ¶¶ 44-55).*

62. Deny.  There is no evidence, published or deposited in the databases, to support the assertion that these minor technical modifications would have resulted in information that could not have been obtained via the original approaches.  Indeed, as per Caimano's affidavit, the only *I. scapularis* EST in GenBank resulting from this "new approach" is calreticulin, the same molecule that was identified by Dr. Caimano at UT Southwestern.  *(Radolf Aff. ¶¶ 92-104; Aikens Aff. ¶¶ 30-36; Caimano Aff. ¶¶ 44-55).*

63. Deny to the extent that this statement ignores the collaboration of the plaintiff as regards the EST work described in the DOD proposal.  The statement fails to mention that the

collaboration extended beyond this work to include the use of ELI for development of tick vaccines (Texas grant and 1998 USDA grant) and the use of various recombinant DNA techniques to generate recombinant proteins for characterization of biological activity and evaluation of ability to induce protective immunity against tick feeding and pathogen transmission. *(Radolf Aff. ¶¶ 92-104).*

64. Deny. The statement completely misrepresents the research collaboration involving the plaintiff and Wikel. The Radolf-Wikel collaboration and their analysis of salivary gland ESTs began in 1997 before any papers were published describing ESTs from ticks. The uniqueness of the vast majority of the ESTs is also clearly stated in the 2000 USDA and CII grants. The 1998 paper (Crampton *et al.* Exp. Appl. Acarol. 22:177-186; 1998) describes ESTs from whole, unfed *Boophilus microplus* larvae. This paper does not apply to salivary glands or the possible interruption of tick feeding as a means of arthropod control or prevention of pathogen transmission. In fact the word "vaccine" is not even found in the paper. Another key point is that the vast majority of the ESTs identified are unique, newly discovered molecules that have no representation in the GenBank databases. *(Radolf Aff. ¶¶ 30-69).*

65. Deny. The 2000 USDA and CII grants describe the use of anti-hemostasis assays to characterize the biological activities of recombinant DNA-derived proteins identified from the *D. andersoni* cDNA library. The novel aspect of the proposal was the identification of these molecules and the characterization of their possible anti-hemostasis

assays, not the assays themselves.  The discovery of these novel tick salivary gland

proteins with potential anti-hemostasis activity was made in the Radolf laboratory and

was very much a product of molecular expertise present in the Radolf but not the Wikel

laboratory.  It is also a product of Dr. Radolf's intellect.  These same ideas were

incorporated directly into the DOD proposal.  *(Radolf Aff.  ¶¶ 65-69).*

66. Deny.  (Caimano Aff.  *¶ 40).*

67. As per Dr. Caimano's affidavit, the p36 submission in GenBank lists three individuals as

co-authors.  So the statement that this sequence is the sole property of Dr. Wikel is

factually incorrect.  Moreover, as per Dr. Caimano's and Dr. Radolf's affidavits, both Drs

Caimano and Dr. Radolf made substantial contributions to the determination of the

complete p36 sequence.  The idea to screen p36 for anti-hemostasis activity was based

upon the observation that it contains Kunitz domains.  The recognition of Kunitz domains

in *D. andersoni* salivary gland proteins/ESTs was made in Dr. Radolf's laboratory and

documented in the 2000 USDA and CII grant proposals.  Dr. Radolf was not informed of

many of the results of the assays conducted by Dr. Cappello.  Neither hard copy nor

electronic files containing these data were given to Dr. Radolf as would be the norm in a

scientific collaboration involving jointly owned data, reagents, etc.  *(Radolf Aff. ¶¶ 51-*

*58, 65-69; Caimano Aff. ¶¶ 22-25).*

68. Deny.  The 2000 USDA and CII grants describe the use of anti-hemostasis assays to

characterize the biological activities of recombinant DNA-derived proteins identified

from the *D. andersoni* cDNA library.  The novel aspect of the proposal was the

identification of these molecules and the characterization of their possible anti-hemostasis

assays, not the assays themselves.  The discovery of these novel tick salivary gland

proteins with potential anti-hemostasis activity was made in the Radolf laboratory and

was very much a product of molecular expertise present in the Radolf but not the Wikel

laboratory.  It is also a product of Dr. Radolf's intellect.  These same ideas were

incorporated directly into the DOD proposal.  *(Radolf Aff.  ¶¶ 65-69).*

69. Deny.  The DOD proposal describes the use of DNA immunization, a technique very

closely related to ELI.  *(Radolf Aff.  ¶¶ 92-102).*

70. Deny.  Dr. Radolf asked Dr. Wikel for hard copy and electronic files of the jointly owned

data generated in Dr. Wikel's laboratory on a number of occasions up to and through

August 2002; these requests were ignored.  Multiple requests to have research meetings

also were ignored through August, 2002 despite repeated assurances from Dr. Wikel of

Dr. Wikel's continued involvement in the collaborative research.  In one discussion, in

August, 2002, Dr. Wikel acknowledged that the project would not even exist were it not

for Dr. Radolf's intellectual contributions and technological base.  *(Radolf Aff.  ¶¶ 61,

84).*

71. Deny to the extent that the defendants fail to acknowledge the plaintiff's leading role in

developing the central idea for the Congressional DOD earmark.  Dr. Radolf initiated the

fundamental idea of the earmark after a meeting held by Dr. Gerald Maxwell and began

to put together the necessary group of investigators, including Dr. Wikel.  Dr. Radolf also was instrumental in developing the earmark to include malaria, Dengue fever, and other vector-borne diseases.  *(Radolf Aff.  ¶¶ 70-75; Radolf Tr. 91, 93).*

72. Deny to the extent that the defendants fail to acknowledge the plaintiff's leading role in developing the central idea for the Congressional DOD earmark.  The idea of developing vaccines to attack anti-hemostatic activities of arthropod salivary proteins was directly related to work in the Radolf laboratory conducted in the context of the Radolf-Wikel collaboration.  *(Radolf Aff.  ¶¶ 62-69).*

73. Deny.  Efforts to identify tick salivary gland proteins with anti-hemostatic activities are a prominent component of the DOD proposal.  This is the rationale for the collaborative involvement of Dr. Michael Cappello.  The idea to base tick vaccine development on the inhibition of anti-hemostatic activities of salivary gland proteins was described in detail in the 2000 CII and USDA grant submissions.  The ad hoc committee chaired by Dr. John Shanley found that data directly addressing this aspect of the proposal (Figs 2, 3, and 4) were misappropriated by Dr. Wikel for this proposal.  *(Exhibit 9).*  This includes the delineation of Kunitz domains, motifs potentially indicating anti-hemostatic activity, in jointly owned *D. andersoni* ESTs in Figure 4 of the DOD proposal.  *(Radolf Aff.  ¶¶ 62-69).*

74. Deny.  The feasibility of the proposal and Dr. Wikel as PI was entirely dependent upon inclusion of misappropriated data.  The proposed direction of the work did not represent a

substantive change from work conducted in collaboration with Dr. Radolf *(Aikens Aff. ¶¶ 33-38; Caimano Aff. ¶¶ 44-55)*. Drs. Deckers and Thrall have no expertise of their own to assess assertions by Deckers or Wikel on this point and did not obtain opinions from other individuals involved in both projects, individuals with recognized expertise in this area of scientific research, including Wikel's presumptive collaborators, Ribeiro and Valenzuela *(Aikens Aff. ¶¶ 33-38; Caimano Aff. ¶¶ 44-55)*. Moreover, during his interview with the misconduct committee, Dr. Thrall told Dr. Radolf that he had no intention of examining the findings of Dr. Shanley's committee. *(Radolf Aff. ¶¶ 89-104)*.

75. Deny. The 2000 USDA and CII grants describe the use of anti-hemostasis assays to characterize the biological activities of recombinant DNA-derived proteins identified from the *D. andersoni* cDNA library. The novel aspect of the proposal was the identification of these molecules and the characterization of their possible anti-hemostasis assays, not the assays themselves. The discovery of these novel tick salivary gland proteins with potential anti-hemostasis activity was made in the Radolf laboratory and was very much a product of molecular expertise present in the Radolf but not the Wikel laboratory. It is also a product of Dr. Radolf's intellect. These same ideas were incorporated directly into the DOD proposal. *(Radolf Aff. ¶¶ 89-104)*. There is no independent substantiation of Wikel's assertion of what was in the proposal or that this approach would result in materially different findings from the original approach. As per

Caimano and Akins affidavits, there is no documentary evidence (i.e., publication or GenBank submission) to support this claim. To the contrary, the only GenBank submission for *I. scapularis* by Wikel is for calreticulin, the same molecule identified by Dr. Caimano on or about 1998. *(Caimano Aff. ¶¶ 49; Radolf Aff. 52, 99).*

76. Deny. The preliminary studies section of the DOD proposal was essential to establish Dr. Wikel's credibility/feasibility as Principal Investigator and to establish the concept that tick salivary gland proteins are highly diverse and include molecules with possible anti-hemostatic activity. Without these data, the proposal would not have been funded. It is almost never the case that proposals without preliminary data are funded because this information is essential for reviewers to assess Principal Investigator's credentials and the technical and conceptual foundations for the research. *(Radolf Aff. ¶ 94).* Further, Deckers and Berlin in a letter to Jamie Kiser, Contract Specialist, U.S. Army Medical Research Acquisition Activity, clearly stated that Dr. Radolf had been terminated from the project, not that he had withdrawn from the project as a result of a breakdown in his relationship with Dr. Wikel. "However, some months prior to submission of the proposal, Dr. Radolf was placed on academic probation for issues related to the conduct of his laboratory. *Consequently, Dr. Radolf's participation in the proposal was effectively terminated."  (Exhibit 10).*

77. Deny.  The defendants misrepresent the deposition testimony of the plaintiff.  The DOD proposal did not explore a new avenue of research and this is explicitly stated by the plaintiff in the cited pages of the deposition.  *(Radolf Aff. ¶¶ 89-104; Radolf Tr. 70-71).*

78. Deny.  The plaintiff's deposition testimony was in response to a hypothetical situation, which the plaintiff clearly stated did not apply to the present situation because Wikel did not take the research in a new direction.  If he had, then there would have been no need for Wikel to misappropriate the plaintiff's intellectual property, *(Exhibit 9),* and inclusion of these jointly owned data would not have made any sense to the reviewers.  Moreover, going separate ways does not invalidate co-ownership of data, reagents, intellectual property rights, etc. stemming from the prior collaborative interactions.  In the situation under dispute, termination of the collaboration was never discussed, nor were arrangements made to protect each investigator's intellectual property rights in the event that the collaboration were terminated.  Of note is that Dr. Radolf was repeatedly told by Deckers, Berlin, and Wikel that the collaboration was ongoing.  Dr. Wikel's independent pursuit of this work was done covertly and in violation of the understanding that formed the basis for the research collaboration.  *(Radolf Aff. ¶¶ 77-104).*

79. Dr. Radolf's contribution to this data was factually misrepresented in the DOD proposal to give the false impressions that he had played only a minor role in the development of the preliminary data, rather than the central role he actually played, and to downplay his co-ownership of misappropriated intellectual properties.  Moreover, merely listing Dr.

Radolf as was done is not in conformity with the University's data ownership policy as per the determination of the Shanley committee. *(Exhibit 9)*. Dr. Radolf was repeatedly assured by defendants of his participation in the research. *(Radolf Aff. ¶¶ 79-81; Radolf Tr. 95).*

80. Deny. The defendant ignores the genesis of the DOD proposal. It was initiated by the plaintiff. His participation from the very beginning was as the lead player behind the proposal. His work and intellectual property were appropriated, or more correctly, misappropriated by Wikel and the defendants to form the bulk of the preliminary data identified by the defendants to support the proposal. Contrary to the defendant's claim of law, and that is what it is, a legal claim, the law in this area just does not repose unlimited authority in Wikel to exclude the plaintiff from participation and, at the same time use his intellectual property without any reference to his ownership. *(See responses to material facts #'s 71-76.)* Moreover, page "5-12" (the designation at the bottom of the page) of the proposal, it states that the studies were "initiated with Dr. Justin Radolf, a faculty colleague" without any indication of co-ownership. This mention of the plaintiff conveyed the false impression either that he had no rights to co-ownership, because he had played only a peripheral role in the generation of the preliminary data, or he had approved the use of the data.

81. Admit with the qualification that this asserted ability on the part of the University of Connecticut Health Center must still be exercised in a manner that honors a faculty

member's established intellectual property rights and his established involvement in the

conception and development of the project. Otherwise, as in the present case, the

University of Connecticut Health Center and its officers and agents have acted unlawfully

as well as in violation of the plaintiff's right to academic freedom the tenets of which the

University of Connecticut Health Center has explicitly recognized in its By-Laws[1].

82. Deny. Dr. Radolf was not involved in any request to Dr. Ribeiro to analyze *D. andersoni*

sequences. No sequence data was presented to Dr. Radolf by either Dr. Wikel or Dr.

Ribeiro in either hard copy or electronic form. *(Radolf Aff. ¶ 61).*

83. Admit to the extent that it was the plaintiff who asked Dr. Wikel to write the letter and

the plaintiff assisted in its preparation. *(Radolf Aff. ¶ 72)*

84. Admit.

85. Admit. However, the gratuitous inclusion by the defendants of the statement that the

plaintiff removed himself from the directorship position necessitates a response. The

plaintiff's temporary relinquishment of the directorship was unrelated to the DOD grant

and/or Representative Johnson's news conference.

---

[1]  Article XV of the By-Laws reads, "1. All members of the faculty, whether tenured or not, are entitled to academic freedom set forth in the 1940 Statement of Principles on Academic Freedom and Tenure formulated by the Association of American Colleges and the American Association of University Professors. The faculty member is entitled to *full freedom in research and in the publication of the results*, subject to the adequate performance of his or her other academic duties, but research for pecuniary return should be based upon an understanding with the authorities of the University." (Emphasis Added).

86. Admit that this is what Deckers is now claiming for the very first time. Even though he had extensive personal conversations and written communications with the plaintiff at this same time, he never even remotely suggested that the plaintiff would be barred from the news conference. Other than for Deckers unsupported statement, the defendants cannot point to any corroborating evidence to support this assertion. Nevertheless, accepting Deckers statement as true, it demonstrates his deceitfulness; just a matter of a few days earlier, he had assured the plaintiff that he would remain a participant in the DOD project. Then, he admittedly excludes the plaintiff from participation in the press conference by failing to inform him of that the conference had been scheduled. *(Radolf Tr. 95).* Regardless of Deckers' reasons, they did not give Deckers the right to violate or misrepresent the plaintiff's intellectual property rights or contributions to the project. The failure to recognize the plaintiff's contributions to the projects and to acknowledge his intellectual property rights at the press conference was meant to cause confusion and mistakes and to deceive others, in particular the Department of Defense, as to the plaintiff's central role in the development of the proposal and the science underlying the proposal.

87. Admit.

88. Deny. Plaintiff's deposition testimony very clearly states that any reasonable individual would draw the conclusion that Wikel was solely responsible for the research and that the article misrepresented his role in the research. *(Radolf Tr. 104).*

89. Deny.  The defendants attempt to justify their refusal to acknowledge plaintiff's significant participation in this scientific research on the basis of what it terms as "common knowledge" is without any supporting evidence other than the broad, self serving claim of a defendant, Wikel, in this action.  The defendants cannot point to any communication, verbal or written, where it willingly acknowledges the plaintiff's major contributions in this area of research and which were widely circulated to ensure that Dr. Radolf's central role in the project was extensively known.  Further, the "common knowledge" to which the defendants refer does not extend to the Department of Defense or to Representative Nancy Johnson.  In fact, there is substantial documentary evidence that the defendants conspired to do exactly the opposite, namely, to create the impression that the plaintiff's role in the project was minimal.  *(Radolf Aff. ¶¶ 70-89).*

90. Admit.

91. Admit.

92. Admit.

93. Admit.

94. Admit.  Plaintiff was only informed of this letter, over one year later, when he made a Freedom of Information demand for a copy of the letter.  *(Exhibit 34)*

95. Admit to the extent that Deckers and Berlin wrote a letter to Ms. Jamie Kiser in which they informed her that "data, which were accurate, but improperly included in the Preliminary Data of Dr. Wikel's proposal".  However, the letter is full of

misrepresentations, including the following; "[t]he impropriety relates simply to a violation of a clause of our institution's Data Ownership Policy"; "Dr. Radolf's participation was effectively terminated"; "Dr. Wikel extended his collaboration with NIH-investigators, Drs. Ribeiro and Valenzuela, who have developed an entirely different approach to the analysis of EST's (and in a different tick species). *(Exhibits 9, 10)*.

96. Admit that the committee made these findings. However, the Kiser letter clearly states that the plaintiff was removed from participation in the project. *(Exhibit 10)*. However, the findings listed by the committee and supported by the affidavits of Thrall, Deckers and Wikel, are clearly erroneous. First, the finding regarding the "implied permission" to use the data conflicts with the earlier determination that Wikel violated the University of Connecticut Health Center's Data Ownership Policy, which found that Wikel had no such permission. *(Exhibit 9)*. Second, the assertion that the data was used for illustrative purposes and did not form a major component of the project completely ignores the central role the preliminary data plays in the grant application process. The preliminary studies section of the DOD proposal was essential to establish Dr. Wikel's credibility/feasibility as Principal Investigator and to establish the concept that tick salivary gland proteins are highly diverse and include molecules with possible anti-hemostatic activity. Without these data, the proposal would not have been funded. It is almost never the case that proposals without preliminary data are funded because this

information is essential for reviewers to assess Principal Investigator's credentials and the technical and conceptual foundations for the research. *(Radolf Aff. ¶ 94).* Third, most certainly, the "new direction" argument is an attempt to evade the lawful responsibilities the defendant owes the plaintiff that extends beyond mere compliance with the University's Data Ownership Policy. As the affidavits of Caimano, Aikens and Radolf, who have a great deal more expertise than Deckers, Thrall and Wikel, there was no direction evident, then or now. The independent body of research, including scientific publications, clearly debunks this assertion. *(Aikens Aff. ¶¶ 30-36; Caimano Aff. ¶¶ 44-55; Radolf Aff. ¶¶ 82-104).*

97. Admit.

98. Admit.

99. Admit.

100.     Deny.  *(Radolf Tr. 105-107)*

101.     Admit.

102.     Admit.

103.     Admit.

104.     Admit.

105.     Admit.

106.     Deny.  Both Deckers and Wikel assured the plaintiff of an ongoing significant role in the project.  *(Radolf Tr. 81, 82, 95, 96; Radolf Aff. ¶ 80).*  Also, the statement,

"nor was he informed that his participation in the proposal had terminated" directly contradicts Berlin and Deckers' statement in the Kiser letter *(Exhibit 10)*.

107.    Deny.  The defendant misrepresents the plaintiff's testimony.  *(Radolf Tr. 79-89)*.

108.    Admit.

109.    Admit; but such hearsay is admissible hearsay.  *(Radolf Tr. 76)*.

110.    Deny.  Deckers and Berlins complicity is clearly evidenced by their correspondence to Kiser, in which they relate that the plaintiff's involvement in the DOD project had been effectively terminated.  This termination was effectuated by Deckers, Berlin and Wikel acting in concert, without even notifying the plaintiff that his role had been "effectively terminated".  *(Exhibit 10)*.  The defendants' claim that the plaintiff's participation in the grant resulted from a breakdown in the relationship between Wikel and the plaintiff is dispelled by the Deckers and Berlins' communication to Kiser.

111.    Admit that the plaintiff's name was mentioned in the DOD proposal.  However, the mere mention of the plaintiff's name does not overcome the fact that the defendant did not indicate, in the least, the plaintiff's central role in the development of the proposal and the science underlying the proposal.  This failure was done to create the false impression that the plaintiff had played only a minor role in the development of the preliminary data, rather than the central role he actually played, and to downplay his co-ownership of misappropriated intellectual properties.

31

112.     Deny.  The whole purpose of the Kiser communication, (Exhibit 10), was to cause confusion and mistakes and to deceive others, in particular the Department of Defense, as to the plaintiff's central role in the development of the proposal and the science underlying the proposal.  The Kiser communication evidences the scheme of the defendants to diminish the plaintiff's critical role played by the plaintiff in the development of the proposal and the science underlying the proposal.  The assertion that " the older data acquired jointly by Dr. Wikel and Dr. Radolf was included under Preliminary Data...even though it was no longer relevant to the work proposal" is an untruth meant to cause confusion and mistakes and to deceive the Department of Defense.  Similarly, the statement in the same letter that "[d]uring the subsequent months Dr. Wikel extended his collaboration with NIH-investigators, Drs. Ribeiro and Valenzuela, who had developed an entirely different approach to the analysis of ESTs (and in a different tick species) is a misrepresentation meant to cause confusion and mistakes and to deceive others.  *See Responses to Material Facts #'s 61-80.*  It is incredulous that over a period of a mere two months all of the original data submitted with the DOD proposal were no longer necessary because in that short period of time Wikel had generated new data supplanting the entire Preliminary Data section which took years to develop.  (Radolf Aff. ¶ 155).

113.     Deny.  See Defendant's Statement of Material Fact # 92, # 104 and # 105.

114.     Admit.

115.    Deny.  *(Radolf Aff. ¶¶ 102, 103 ).*

116.    Admit.

117.    Admit.

118.    Admit.

119.    Admit.  However, the defendants fail to mention that it is the explicit responsibility of the Grants and Compliance Office for the collection, review and retention of all Time and Effort reports.  *(Exhibit 13; Deckers Tr. 49, 50).*

120.    Admit.

121.    Admit.

122.    Admit.

123.    Deny.  This assertion of material fact is deceptive and fallacious.  Other than Wikel's uncorroborated and misleading statement in his affidavit, the issue brought to the attention of Berlin and Gillon dealt with Bourell being paid with state funds as opposed to grant funds.  Wikel did not assert any claim to Berlin or Gillon, and he is deceitful in asserting as much, that the percentage level listed in the two grants for the work level that Bourell would be working on the two grants was untrue.  Wikel, in fact, signed off on various "assignment authorizations" indicating the percentage level of Bourell's time, of which he now swears he informed Berlin and Gillon in February of 2002 was fraudulent.  If that was the case, why would he knowingly sign off on a document employing this untrue information?  *(Gillon Tr. 25; Exhibit 14).*  As Gillon testifies, Wikel never once

raised any issue with him regarding any claim of fraudulent activity involving the listing of Bourell's level of effort in the plaintiff's grant submissions. *(Gillon Tr. 12-14).* Berlin's affidavit ¶ 37 is bereft of any such claim. He merely states that "Wikel brought to the plaintiff's attention that Ken Bourell's salary charges on his grants did not reflect the level of effort that had been indicated on Dr. Radolf's grant documents; that no Time & Effort reports had been filed by Dr. Radolf, and that Ken Bourell was being paid 100% salary form state general funds." Berlin makes no claim that Wikel brought to his attention that the level of percentage listed in the grants were untrue. In fact, as evidenced by his deposition testimony, Berlin's sole concern was to pay Bourell from grant monies and take him off of state funds. "[M]y response was if Justin [the plaintiff] had listed Bourell half time on the grant, it seemed to me that he should be paid half time from the grant." *(Berlin Tr. 10).* Similarly, Gillon's affidavit is devoid of any support for the allegation that Wikel raised the truthfulness regarding the listing of Bourell's anticipated work level on the grants. Gillon states at ¶ 8 of his affidavit that "it was identified that Ken Bourell had done work on the grants, that his salary needed to be changed from general funds to the grants, and that grant applications or noncompetitive renewals and/or progress reports listed Ken Bourell as working on the grants while being paid 100% from state funds." Once again, there was no claim that the percentage level of Bourell's work was untrue; the only concern was to have Bourell's salary paid from grant funds as opposed to state funds. As a result, Gillon was to meet with the plaintiff "and

get Ken Bourell's time and effort charged appropriately to the grants." There is not a mention regarding Wikel's claim that at this time he raised the claim that the listing of Bourell's level of work was fictitious.  In Gillon's deposition testimony, he states that the first meeting to address Bourell's funding level occurred in January of 2002, and that "there was a discussion on what the agreement had been to fund Ken Bourell when Dr. Radolf was hired, however, I do not believe there was any indication that there was fraud involved at that meeting."  *(Gillon Tr. 9)*.  Underlying the defendants' assertions regarding the Bourell issue is their false implication that the plaintiff recited in the progress reports the percentage of work Bourell was performing on the grants.  This is a complete fabrication.  The Progress Reports do not indicate that Bourell was doing work on the grants.  Since Bourell was not considered one of the "key personnel" conducting research under the grant, there was no requirement that his work level be detailed in the progress reports or in the non-competitive renewals.  *(Radolf Aff. ¶¶ 105-146)*.

124.     Admit that the issue of "State General Fund usage was brought to Dave Gillon..." Nevertheless, the defendants imply that the plaintiff was somehow responsible for the payment of Bourell with state funds.  This simply is not true. The plaintiff had no responsibility and exercised no oversight function for the State Funds used to pay Bourell's salary.  Gillon was in charge of the state funds used to pay Bourell's salary and he used these funds without ever consulting the plaintiff.  Moreover, the plaintiff denies the statement that the issue "was not logged in with the Compliance Office *per UCHC*

*policy*".  The evidentiary support cited by the defendants for this factual assertion is

fabricated.  Neither the Gillon or the Deckers' affidavit provide any evidence to support

the claim that UCHC policy required the issue regarding the payment of Bourell's salary

from state funds or grant funds be docketed with the Compliance Office.  Likewise,

Attachment 25 to the Deckers' affidavit does not support this claim.  There was no reason

to log a complaint with the Compliance Office when the issue of State General Fund

usage was brought to the attention of Gillon because there simply was not even an

implication of wrongdoing.  *(See Response to # 123)*.

125.	Deny.  Once again, the defendants misrepresent the factual citations upon which

they rely in support of their assertions of fact.  Here, Berlin Affidavit ¶¶ 38-39, provides

no basis for the allegation propounded by the defendants with regard to Gillon not

attending to this issue until June 2002 *because of more pressing matters*.  Similarly,

Gillon makes no mention of "due to more pressing matters".  He merely states that since

this matter did not have to be dealt with until June of 2002, he placed it on the back

burner and attended to other matters in the interim.  *(Gillon Aff. ¶ 10; Gillon Tr. 12)*.

This assertion and Gillon's lackadaisical attitude with regard to this issue, *(Gillon Tr. 12)*,

most certainly belies any claim that Wikel had raised a trepidation with the Gillon or

Berlin that the plaintiff recorded untrue information in his grant documents or was

involved in some type of fraudulent conduct, which most certainly would have required

some form of activity between January and June, 2002.

126.    Deny.  It was not the responsibility of the plaintiff to access the grant funds for

the payment of Bourell's salary.  That is the function of the institution, in particular, the

Office of Finance and Administration.  *(Radolf Tr. 145).*  For instance, when the

plaintiff's salary was transitioned from state funds to grant funds, it was the Health

Center that initiated the change after it was notified the grant transfers had taken place..

127.    Deny.  The plaintiff was not out of town and could have provided more accurate

information regarding Bourell's actual level of effort than the information the defendant

employed if he had been requested at any time between January of 2002, the date of

Gillon's first meeting with Wikel, and June of 2002, when the funds were taken, to

provide such information.  In reality, without informing the plaintiff, the defendants

improperly took funds from the plaintiff's grants in June of 2002 in clear violation of

federal regulations because it had no factual basis to support the level of funding they

decided upon.  Only after the plaintiff contested the actions of the defendants was the

money restored.  The records of the University and those of the plaintiff clearly indicate

that the plaintiff was present at the institution during this time frame.  *(Radolf Aff. ¶¶*

*125, 126).*  Additionally, the defendants' characterization of their actions as involving the

mere filing of a "General Fund" report is erroneous.  Monies, in actuality, were

improperly taken from the plaintiff's grants for the payment of Bourell's salary in an

amount that was not legally proper because it exceeded the time and effort he had worked on the grants in question.  *(Radolf Tr. 139-140; Gillon Tr. 64).*

128.     Deny.  There simply was no issue regarding the progress reports submitted to the federal government that needed to be addressed.  There was no claim of fraud made at any time by Wikel for which an investigation was necessary.  *(Gillon Tr. 31, 40, 41, 44, 46).*

129.     Deny that Kim Young informed the plaintiff to contact Gillon.  Kim Young gave the plaintiff the documents or put them in his mailbox, but there was no communication given to the plaintiff, verbal or written, that she had done so in response to a request from anyone else.  When he perused these documents, the plaintiff discovered the improper taking of monies from the grants at an unjustified level to fund Bourell's salary in order to free up state funds.  *(Radolf Tr. 140-142).*  There is no documentation of anyone contacting the plaintiff to discuss this situation or call to the plaintiff's attention that the grant funds had been encumbered.  *(Radolf Aff. ¶¶ 129, 130).*

130.     Admit that UCHC improperly encumbered funds in violation of federal law and regulations to pay an excessive portion of Bourell's salary and fringe benefits.  *(Radolf Tr. 139 -142; Radolf Aff. ¶ 133; Gillon Tr. 64).*

131.    Deny.  The plaintiff came across the paperwork that had been returned to Ms. Young without any indication that it was to be shared with him or that Gillon wanted to discuss the paperwork with the plaintiff.  *(Radolf Tr. 141; Radolf Aff. ¶¶ 127, 130-132).*

132.    Admit that a series of meetings took place, but only after the plaintiff vehemently argued that the actions of the defendants had violated federal regulations. *(Radolf Tr. 142, 151, 152; Radolf Aff. ¶¶ 134, 135).*

133.    Deny.  This assertion is rebutted by the fact that the plaintiff, when he learned of the encumbering of his grants for the excessive payment of Bourell's salary, objected to this action.  *(Radolf Tr. 142, 151, 152).*  It makes no sense for the plaintiff to object to wrongful actions of the defendant, if he was going to agree to whatever Berlin and Gillon proposed to do.  And Gillon in his deposition testimony dispels the very notion that the defendants attempt to implant with this assertion of fact; that the plaintiff was willing to employ unsubstantiated percentages for Bourell's level of work for making payment from his grants to Bourell's salary - "tell plaintiff what Gillon wanted him to report on Bourell's time and effort and he would put that down".  Gillon testified that he understood the plaintiff to mean that Gillon should do the groundwork to determine the proper time and effort so that a legitimate percentage could be properly determined.  He did not understand the plaintiff to mean that Gillon could make up a number out of the air.  *(Gillon Tr. 54-56; Radolf Aff. ¶ 140).*

134.     The plaintiff admits that UCHC corrected its report to the State, but only after

persistent and coordinated resistance from Berlin and Wikel.  In an email to Gillon on

July 1, 2002, the plaintiff indicated the Bourell's grant work was far less than the level

for which the defendants had encumbered the plaintiff's grants.  *(Exhibit 15)*.  Gillon

reported this communication to Berlin, who expressed in an email dated July 2, 2002, his

opinion that the grants should be charged for what the percentage of effort that was

estimated by the plaintiff when he prepared the grant application.  "Then, I think those

are the percentages we should use.  If Justin [plaintiff] didn't actually gain those services,

that's his failure…"  *(Exhibit 16)*.  Wikel, in an email of that same date responded, "I

agree with your assessment". *(Exhibit 17)*.  However, Gillon replied to Berlin on July 2,

2002, "I am not sure that I agree with the assessment.  Just because the funds are

available on the Grant account does not mean that we can use the dollars to support Ken's

[Bourell] salary.  We have to document the time that is devoted to the project.  As I see it,

Justin has indicated 10% effort and Steve [Wikel] has confirmed that for at least a portion

of the time period.  From the information I see and my conversation with Justin [plaintiff]

*I doubt that either he or Ken would sign of on T&E that reflects more than 10% effort.*

Please let me know if I am missing something with my interpretation.  *(Exhibit*

*17)(Emphasis added)*.  Berlin's blunt response evidences his wrongful attempt to

circumvent federal grant policy.  He writes Gillon at the conclusion of the emails, "Dave,

you are the account wizard, so I can only register an opinion.  To reemphasize: a 25 or

50% commitment was indicated in the grant application, and presumably used to justify that part of the funding (whether it was folded into a block grant or not). To measure Ken's commitment solely on the basis of hours that could be accounted for in actually performing an experiment is unreasonable. There is frequently 'wasted time' for everyone. Further, the scheduling of the experiments might have prevented Ken from performing other tasks. Finally, would one want to accept Justin's [plaintiff's] word that his accounting includes all activities? To avoid a detailed examination of these issues may not be worth the trouble. *But…the indicated time should be taken as the measure of effort unless it was declared otherwise in the grant, at least in my opinion.* ***Wizard wave your wand***!" *(Exhibit 17) (Emphasis added).* Even in light of Gillon's admonitions to Berlin regarding the requirements of federal law, Berlin continued to voice his strong opposition to the legally required corrective action. In an email dated July 29, 2002, Berlin states "I understand from Kim Young and Stephen Wikel that Justin Radolf wants to reduce Ken Bourell's salary support on Radolf's grant from 25% to 10%. Since 25% was requested in Radolf's application, it should remain so...*Certainly, I do not approve of this reduction in Bourell's support on the Radolf grant.*" *(Exhibit 18) (Emphasis added).* Finally, at the conclusion of a meeting in which Gillon, Berlin and the plaintiff participated, a final resolution to the Bourell funding levels had been reached with all in agreement. Nevertheless, Berlin once again attempted to frustrate the process and voiced opposition to following the only legal route available. *(Exhibit 33).*

135.    Admit.  The plaintiff made no complaints other than to Gillon because Gillon agreed to take corrective action despite the opposition of Berlin and Wikel, which opposition was as yet unknown to the plaintiff.  *(Exhibit 20)*.

136.    Deny.  After Gillon agreed with Radolf that no more than 10% of Bourell's salary should be paid from federal grant funds, it became apparent to Wikel, who now headed the Center for Microbial Pathogenesis, that he would have to identify additional funding sources to cover the remainder of Mr. Bourell's salary.  *(Exhibit 20)*.  Despite the claims in his affidavit to the contrary, it was at this time that Wikel first raised with Wetstone the spurious allegation of fraudulent conduct on the part of the plaintiff.  The deposition testimony of both Berlin and Gillon fail to support Wikel's claim that he raised an issue of fraudulent reporting at any time prior to August of 2002.  *(Berlin Tr. 32; Gillon Tr. 9, 13, 14, 31, 32, 38)*.  And it was clearly out of his "frustration" with the results of the Gillon and Radolf resolution of the Bourell funding issue that spurred him to action.  *(Wetstone Tr. 10, 11)*.  Wikel had been supportive of the Berlin discredited and illegal approach to the matter.  *(Exhibit 17)*.

137.    Deny.  Deckers was involved from the very start in directing the illicit activities of Berlin, Wetstone, Gillon and Wikel in trumping up charges against the plaintiff.  Although Deckers testified under oath at his deposition that other than assembling a committee to review Wikel's charges, he played no role in the compliance complaint

42

filed by the defendants against the plaintiff.  He was forced to recant his testimony in view of the documentary evidence establishing his intimate involvement in the drafting the complaint and spurring the investigation of the plaintiff.  *(Deckers Tr. 37, 40, 47).*  Dr. Deckers played an instrumental role, directly and indirectly via his subordinate, Dr. Wetstone, in moving this false allegation forward.  Emails from Dr. Deckers in which he explicitly requested Dr. Wetstone to draft a complaint and that he subsequently reviewed and approved Dr. Wetstone's handiwork establish his complicity.  The emails show that Dr. Deckers' level of involvement was not just inappropriate, but a violation of the Health Center's algorithm for reporting and investigation of compliance allegations.  *(Exhibits 21-29).*

138.     Deny.  In an effort to diminish their complicity in knowingly subjecting the plaintiff to a spurious allegation of wrongdoing, the defendants misrepresent their activities leading up to the filing of a complaint with the Compliance Office.  *(Exhibits 15-29).*

139.     Deny.  Deckers directed and contrived the Compliance Office into recommending that he send such a letter.  Deckers even revised the contents of the recommendation before it was sent to him.  *(Exhibits 24-27).*

140.       Deny to the extent that Deckers claims that he notified Kay Fields at ORI per a

prior request for information from Dr. Fields.  Deckers manipulation of the Compliance

Office to obtain a "recommendation" that he send such a letter dispels this assertion.

*(Exhibits 24-27)*.  See plaintiff's statement of disputed material facts #'s 34, 35.

141.       Deny.  See response to # 140; and see plaintiff's statement of disputed material

facts #'s 34, 35.

142.       Admit.

143.       Admit.

144.       Admit that a woefully inadequate investigation was conducted by the Compliance

Office.

145.       Admit.

146.       Admit that the Compliance Committee issued a brazen cover up of the

respondents' retaliatory behavior.  *(Exhibit # 31)*(Letter *from plaintiff to Ms. Claire*

*Leonardi, Chairperson, Board of Directors, dated August 11, 2004)*.

147.       Deny.  Deckers effectively directed the activities of those who filed the complaint

against the plaintiff.  The evidence could certainly support a finding that the complaint

was filed on his instructions.  Further, he directed and manipulated the activities of the so-called independent Compliance Committee.  See Response to # 137.

148.        Deny.  Dr. Radolf raised his complaints with Berlin and Gillon who reported his complaints directly to Deckers.  *(Exhibit #'s 15-25).*  Further, in his communications with the Compliance Committee, the plaintiff fully informed it that the actions of the defendants in encumbering his grant funds for the payment of Bourell's salary was a violation of federal law.  Likewise, the plaintiff brought the violation of federal regulations to the attention of Claire Leonardi, Chairperson of the University of Connecticut Health Center Board of Directors, in a letter dated August 11, 2004.  *(Exhibit 31).*

149.        Deny.  The defendants rely on semantics to divert attention from the Berlin's persistent advocacy that federal regulations be violated by inappropriately encumbering the plaintiff's grants.  Berlin, the Health Center official charged with oversight of all research-related activities, was most vocal in advocating that an illegal path be followed.  Berlin clearly pressured Gillon to misrepresent Bourell's expenditure of time and effort in direct violation of NIH regulations.  *(Exhibit #'s 15, 16, 17, 18, 20; Gillon Tr. 36, 37).*

150.        Admit that the plaintiff engaged in a negotiation process with Gillon and Berlin that resulted in the monies being restored.  Nevertheless, as a result of the plaintiff's

insistence, against the vocal opposition of Berlin and Wikel, that federal requirements regarding time and effort allocation be followed, he was subjected to unlawful retaliation. It was only because of plaintiff's intervention, not any well meaning intention on the part of University officials, that the illegal encumbrance of funds came to light, and it was only after the plaintiff's intervention that allegations against him surfaced by email and were eventually filed.  Berlin, the pressured Gillon to misrepresent Bourell's expenditure of time and effort, in direct violation of NIH regulations.  More specifically, the false allegations against the plaintiff were filed only after he had (i) protested the misappropriation of funds from his NIH grants in June, 2002; (ii) engaged in good faith discussions with Berlin and Gillon to amicably resolve the matter in early August, 2002; and (iii) taken all the agreed upon steps immediately thereafter to file accurate Time and Effort reports for Bourell.  Indeed, the filings could have been made in mid-August, 2002, but the plaintiff was asked by Gillon to wait, ostensibly because Berlin was on vacation.  It is now readily apparent that, with Deckers' full knowledge and agreement, efforts were well underway during this interval to level false allegations against the plaintiff.  *(Exhibits 15-29; Radolf Aff. 134-142).*

151.    Admit.  There was no reason to file a grievance because Gillon seemingly acquiesced and restored the unlawfully encumbered grant funds.

152.    Admit.  Wikel, who had access to the renewal applications and progress reports falsely accused the plaintiff of indicating in these documents that Bourell was listed as one of the key personnel undertaking the grant research.  This was an outright untruth. Wikel misrepresented the contents of the progress reports and grant renewals in which he claimed the plaintiff listed Bourell as a major contributor to the scientific research being funded by the Radolf grants.  In truth, Bourell was never mentioned in the progress reports and there were never statements in the progress reports that he did any work on the grants.  Wikel advanced this false claim under oath at his deposition.  He falsely testified that Bourell "was listed under the list of key personnel…Yes, he was, I believe, listed as a key personnel on the transferred grants…"  *(Wikel Tr. 18, 19; Radolf Aff. ¶¶ 111, 115, 118, 124, 143, 144).*

153.    Deny.  The presence of malice is inferred from the intentional wrongful acts of Wikel.  Wikel, without any factual basis, charged the plaintiff with fraudulent conduct. In face of being found out, he is now playing with semantics to claim that he never filed a formal charge.  However, he put into place the vehicle with which he and the other defendants lodged a complaint of fraudulent behavior against the plaintiff with the Compliance Office.  All the defendants testified under oath that Wikel was the complainant.  The Compliance Office documents clearly indicate that it was Wikel's spiteful actions that formed the basis of the charges against the plaintiff.  The

communications by and between Deckers, Wikel, Gillon and Wetstone cements the critical role Wikel played. *(Wikel Tr. 11, 49, 65; Deckers Tr. 43, 51;Exhibits 21, 22, 31; Radolf Aff. ¶¶ 124, 143, 144).)*.

154.     Deny.  The defendant misrepresents the plaintiff's deposition testimony.  The plaintiff's support for his assertion that Deckers acted in concert with Wikel is the evidence establishing Deckers complicity in the filing of charges with the Compliance Office that resulted in a formal investigation of the plaintiff's behavior.  As previously noted, Deckers is at the center of this cabal, directing the others to do his bidding. *(Exhibits 21-29; Radolf Tr. 171).*

155.     Admit.

156.     Admit.

157.     Admit.

158.     Admit.

159.     The plaintiff can only admit that he did not participate with the UCHC or the defendants in negotiating a voluntary agreement with the ORI.  He has no knowledge of the communications that the ORI may have had with UCHC or the defendants.

160.     Admit.

161.    Admit.

162.    Deny that the notice to the plaintiff was "in accordance with the ORI's mandate." The plaintiff admits that a supervisory plan was the only aspect of Deckers' communication that could be viewed as being "in accordance with the ORI's mandate." *(Exhibit 32).*

163.    The plaintiff admits that the ORI reviewed and revised the Supervisory Plan.

164.    Admit; however, the plaintiff was never provided with notice of this policy, nor of the meeting at which the policy was adopted.  Since the minutes of the meeting (Deckers Aff. Attachment 29) demonstrate that the plaintiff's conduct was discussed at this meeting, notice of the meeting should have been provided him pursuant to the Connecticut Freedom of Information Act.

165.    Admit.

166.    Admit.

167.    Admit.  The defendant mistakenly refers to action taken against Dr. Deckers.  In all likelihood it should read "Dr. Radolf".

168.    Deny.  The only action justified by the Voluntary Agreement was the imposition of a Supervisory Plan.  Further, the issue of retaliation is a question of law.

169.     Deny.  The defendants inappropriately take the plaintiff's deposition testimony out of context.  He succinctly states in response to the question, "Could they also possibly draw the conclusion that you just didn't want to be a director anymore and you stepped down from it?", yes, but again, if one is going to go on with one's career and look at other possibilities, one would expect somebody may ask you, What happened?"

170.     Deny.  Once again the defendants inappropriately take the plaintiff's deposition testimony out of context.

171.     Admit.  But the plaintiff was barred from the compensation review process that should have resulted in his salary being augmented.  *(Radolf Tr. 41)*.

172.     Admit.

173.     Deny.  Once again the defendants inappropriately take the plaintiff's deposition testimony out of context.

174.     Admit.

175.     Deny.  The plaintiff did not "publicize his research misconduct".  The article was authored by David Malakoff independent of the plaintiff.  The plaintiff, when contacted by Malakoff, responded to his inquiries.

176.     Admit.

177.        Admit.

178.        Admit.

179.        Admit.

180.        Admit.

181.        Admit.

**B.   Issues of Material Fact As To Which It is Contended There Is A Genuine Issue To Be Tried**

1.  Radolf was first offered a position by the University of Connecticut Health Center as Assistant Professor which offer he refused because he viewed the appointment as an Assistant Professor as being contrary to the representations made to him by Deckers and Berlin that he would be afforded the necessary stature in the University of Connecticut Health Center community to establish the Center for Microbial Pathogenesis on a long-term, permanent basis.  *(Exhibit 1; Exhibit 3; Exhibit 4; Radolf Tr. 5-26; Radolf Aff. ¶¶ 5-22).*

2.  Radolf requested that the University of Connecticut Health Center provide him with the necessary stature in his position as Director of the Center for Microbial Pathogenesis,

which request was honored by the University of Connecticut Health Center when it granted him a dual appointment as a full Professor. *(Exhibit 1; Exhibit 3; Exhibit 4; Radolf Aff. ¶¶ 5-22).*

3.   The plaintiff's appointment as the Director of the Center for Microbial Pathogenesis was interconnected with his appointment as a full Professor with tenure. *(Radolf Tr. 16-20; Radolf Aff. ¶¶ 5-21).*

4.   The clear understanding of the parties was that the plaintiff was being brought to the University of Connecticut Health Center to head up its new Center for Microbial Pathogenesis. The extension of tenure to the plaintiff was to meet his demands for security in his position as the Center's Director. *(Radolf Tr. 16-20; Radolf Aff. ¶¶ 5-21).*

5.   Contrary to the plaintiff's inference, the offer made to the plaintiff to relocate to the University of Connecticut Health Center was not made in separate components; the plaintiff was not offered a "position" as a "full Professor" and a separate appointment as the Director of the Center for Microbial Pathogenesis. The two appointments were made in unison to establish the plaintiff as the permanent Director of the Center for Microbial Pathogenesis. *(Radolf Tr. 16-20; Radolf Aff. ¶¶ 5-21).*

6.   In the letter of reprimand, dated August 22, 2001, issued by Deckers to the plaintiff, Deckers noted that "there is (1) no evidence that your action in this circumstance is part of a pattern of dishonest behavior, or that (2) this falsification had any impact on the research record, research subjects, other researchers, institutions, or the public welfare

and, further, (3) the grant applications to USDA and CII were withdrawn before review, and 'problems with the data' in the grants correctly offered as reasons for such withdrawal." *(Exhibit 2).*

7.  Deckers and the Special Review Board had decided, independently of the plaintiff, not to report its investigation of Radolf to the Office of Research Integrity. *(Exhibit 2).*

8.  When Deckers and Berlin met with the plaintiff on January 7, 2002 and January 11, 2002, they discussed with the plaintiff that he relinquish the position of Director on a temporary basis. There was never any discussion with the plaintiff that he should give up the position on anything but a temporary basis. The discussions involved Deckers and Berlin's attempts to convince the plaintiff to cede the position on a temporary basis. *(Radolf Tr. 49; Deckers Tr. 100; Exhibit 5; Radolf Aff. ¶¶ 22-28).*

9.  It was only after the plaintiff agreed to relinquish temporarily his position as Director of the Center for Microbial Pathogenesis, that Deckers reversed himself and made the plaintiff's removal involuntary and no longer on the temporary basis that had been originally communicated to the plaintiff. *(Exhibit 6; Exhibit 7; Radolf Aff. ¶¶ 22-28).*

10. When Deckers informed the plaintiff on August 22, 2001 of the disciplinary action he had imposed on him, the plaintiff was allowed to retain his position as Director of the Center for Microbial Pathogenesis. *(Exhibit 2).*

11. The plaintiff was allowed to retain his position as Director of the Center for Microbial Pathogenesis even after the Office of Research Integrity independently exercised

jurisdiction over plaintiff's research misconduct and began its own investigation of the plaintiff's conduct.  *(Radolf Aff.  ).*

12. Between the time of the commencement of the investigation of the plaintiff's conduct by the Office of Research Integrity and Deckers' decision to permanently relieve the plaintiff of his position as Director of the Center for Microbial Pathogenesis *(Exhibit 7),* there were no intervening circumstances upon which Deckers based his removal of the plaintiff from the position of Director of the Center for Microbial Pathogenesis.  *(Radolf Aff. ¶  )*

13. The "Grants and Contracts" office is responsible agency of the University of Connecticut Health Center for the collection, review and retention of all Time and Effort reports." *(Exhibit 13).*

14. The "Grants and Contracts" office failed to collect, review and/or retain and Time and Effort reports relating to Bourell's activities.  *(Radolf Aff. ¶¶ 113, 128, 135, 136, 139); Deckers Tr. 49, 50).*

15. Bourell was not listed as one of the key personnel in the two transfer requests filed with the NIH to transfer two grants from the University of Texas Southwestern Medical Center to UCHC.  *(Radolf Tr. 138, 139; Radolf Aff. ¶¶ 113, 128, 135, 136, 139).*

16. Bourell does not meet the definition of key personnel under NIH guidelines with regard to his participation in the two grants transferred from the University of Texas

Southwestern Medical Center. *(Radolf Tr. 138, 139; Radolf Aff. ¶¶ 113, 128, 135, 136, 139)).*

17. Since Bourell was not listed as key personnel on the Radolf grants, there was no requirement to report to the funding agencies, that his actual percentage of work varied from that which was contemplated in the grant applications, grant renewals and progress reports. *(Gillon Tr. 43, 44; Radolf Aff. ¶¶ 113, 128, 135, 136, 139).*

18. Before the defendants submitted a complaint against the plaintiff with the Compliance Office the defendants were well aware that federal regulations did not require the plaintiff to amend the grant submissions, including non-competitive renewals, to the National Institutes of Health regarding the amount budgeted for Bourell's salary because Bourell was not considered under federal regulations  one of the "key personnel". *(Radolf Aff. ¶¶ 143-145; Exhibit 21, "Dave [Gillon] has told me that changes in the personnel portion of a grant budget are the prerogative of the PI and that such a change from planning (the proposal) to operations (the actual work) are allowable by the grant sponsor.  Therefore, this mismatch of allocated FTE doesn't represent a problem."*

19. Before the defendants submitted a complaint against the plaintiff with the Compliance Office the defendants were well aware that federal regulations had not been violated with regard to the budgeting of Bourell's salary because no federal grant monies had been paid to Bourell. *(Radolf Aff. ¶¶ 143-145; Exhibit 21, Exhibit 30).*

20. In spite of their awareness that federal regulations had not been violated, the defendants persisted in filing a complaint against the plaintiff in which it was alleged that the plaintiff had committed fraud under federal regulations with regard to the budgeting of Bourell's salary. *(Exhibit 30).*

21. Between the initial meeting in January of 2002, *(Gillon Tr. 7-9),* and August of 2002, when Wikel complained to Wetstone, no claims of fraud or misrepresentation or the like were raised by Wikel or anyone else regarding the percentage of effort for which Bourell had been listed in the plaintiff's grants, grant renewals and/or progress reports. *(Gillon Tr. 11-14).*

22. During this period of time, Wikel authored a number of emails on the Bourell matter, none of which raised the assertion that the plaintiff was involved in wrongful conduct, let alone, fraudulent behavior. *(Exhibit 15; Exhibit 16; Exhibit 17; Exhibit 20).* Wikel, in fact, signed off on an "Assignment Authorization" permitting the unlawful encumbrance of federal grant monies for the payment of Bourell's salary in excess of Bourell's time and effort without raising any claim that the percentages employed to determine the payment were untrue *(Exhibit 14; Gillon Tr. 12-14, 25).* It was only after the encumbered funds were paid back to the grant, did Wikel complain. *(Wetstone Tr. 10, 11).*

23. Since Bourell was being paid from state funds, and not grant funds, there was no requirement to file time and effort reports for his work activities.  *(Exhibit 13; Radolf Tr. 148).*

24. Wikel only started monitoring Bourell's activities after the Bourell issue first surfaced in January or February of 2002 and he did so without Dr. Radolf's knowledge or confirming the accuracy of the time and effort data he was obtaining.  Wikel had no way of knowing the actual time and effort that Bourell expended on Radolf's NIH-funded research prior to the time at which he began these covert monitoring activities.  *(Radolf Aff. ¶¶ 120, 124; Exhibit 15).*

25. Wikel misrepresented the contents of the progress reports and grant renewals in which he claimed the plaintiff listed Bourell as a major contributor to the scientific research being funded by the Radolf grants.  In truth, Bourell was never mentioned in the progress reports and there were never statements in the progress reports that he did any work on the grants.  Bourell was put on the grants based on estimates when the transfers were submitted to the NIH.  It was always a strong possibility that he wouldn't be working full-time on the grants, given his responsibilities within the Center for Microbial Pathogenesis, but there was no way to know for sure.  Putting someone down on a budget does not make it obligatory that they do exactly that.  A budget is a planning device.  The NIH allows the principal investigator, without its approval, to make revisions in the budget based on changing circumstances.  *(Radolf Aff. ¶¶ 113, 128, 135, 136, 139).*

26. Deckers, Wetstone, Berlin and Gillon claim that they never personally reviewed the grant documents to determine if the information Wikel was providing them was true.  They claim they acted on the information he provided to them without ascertaining his accuracy.  *(Deckers Tr. 44, 45*; *Gillon Tr. 52, 57)*.

27. Emails unequivocally establish that, beginning in February, 2002, there was interest on the part of Dr. Wikel and University officials to charge Mr. Kenneth Bourell's salary and fringes to Dr. Radolf's NIH grants.  No effort was made to bring this concern to Dr. Radolf's attention, or, after discussing the matter with him, to establish a system for monitoring Mr. Bourell's activities to ensure that Dr. Radolf's grants were accurately charged.  These basic oversights are, in themselves, extremely irregular and contrary to the spirit, if not the letter, of University policies and Federal statues.  *(Exhibits 15-29)*.

28. Emails also clearly indicate that, beginning on or about March, 2002, Mr. Bourell began providing to Dr. Wikel "internal" Time and Effort reports.  This information establishes without doubt that Dr. Wikel and University officials knew that the funds encumbered in June, 2002 were vastly out of proportion to Mr. Bourell's actual expenditure of T&E on Dr. Radolf's NIH-funded research.  *(Exhibit 15)*.

29. There was no attempt on the part of University officials, specifically Gillon, to notify the plaintiff that the funds had been encumbered, as would be expected, nor does the report offer any documentation to support the dubious claim that Ms. Young was instructed by Mr. Gillon to notify him.  *(Radolf Aff. ¶¶ 121-132)*.

30. Ms. Young never informed Dr. Radolf about time and effort filings in June, 2002, nor have printouts of this information or other evidence supporting their existence been presented to him. This certainly did not occur in his August, 2002 meeting with Gillon and Berlin at which time the plaintiff was told that there were no time and effort reports for Bourell. To the best of the plaintiff's recollection, the online system was completely blank when he inputted the time and effort data for Mr. Bourell in September, 2002. (Radolf Aff. ¶ 120).

31. Wikel and Gillon, knowing full well the actual level of Bourell's time and effort on the plaintiff's grants, signed off on an Assignment Authorization for one of plaintiff's grants allowing for the encumbrance of funds in June, 2002 that were vastly out of proportion to Bourell's actual expenditure of time and effort on Dr. Radolf's NIH-funded research in violation of federal law and regulations. The assignment authorization forms are a principal safeguard against the misappropriation of NIH funds. The mere fact that this occurred is an extraordinary impropriety. Their willingness to turn a blind eye to this wrongful, and, almost certainly, unprecedented action is compounded by their willingness to excuse it on the basis of the plaintiff's purportedly being out of town at the time. It is inconceivable that a short absence could be construed as an excuse for an action that involves the potential misappropriation of Federal funds. *(Exhibit 15; Radolf Aff. ¶¶ 119 -121, 124).*

32. This assertion also implies that no means existed for Ms. Young, Dr. Wikel, or Mr. Gillon to contact Dr. Radolf to ascertain whether he was in agreement with this action and to obtain, at the very least, a verbal authorization (no less faxing the form for his signature). *(Radolf Aff. ¶¶ 125-127).*

33. The contention that the plaintiff was out of town, and, therefore, unavailable to sign off on the assignment authorization is another fabrication.  This assertion also implies that whenever an investigator is out of town, University officials can encumber monies from his/her NIH grants based on their perception of budgetary exigencies. *(Radolf Aff. ¶¶ 125-127).*

34. Dr. Deckers' letter to the Office of Research Integrity informing it of the unsubstantiated allegation against the plaintiff regarding the Bourell matter on the basis that he was instructed to keep the ORI informed of local developments is a pretext to cover up his retaliatory behavior.  The ORI does not investigate financial issues of this sort. Moreover, the timeline shows clearly that Dr. Deckers, without any regard for fairness or due process, notified the ORI of an unsubstantiated allegation well before the plaintiff had received Dr. Kozol's letter informing the plaintiff of the allegation and before any form of due process had been conducted.  The plaintiff was not even notified by the Health Center that this letter had been sent to the ORI; it came to his attention months later during subsequent legal proceedings.  Consistent with Dr. Deckers' behind-the-

60

scenes engineering of the actual allegation, this letter was a secretive attempt to adversely affect the plaintiff with the ORI.  Even the University of Connecticut Health Center's Corporate Compliance and Integrity Officer, Iris Mauriello, voiced misgivings with regard to the Deckers' manipulation of the ORI communication.  In an email to Deckers, dated September 10, 2002, Mauriello states, "I want to go on record here saying that emails below worry me in the following regard: actions being taken after we know a problem but before a full internal investigation is under way."  *(Exhibit 28).*

35. Deckers manipulated the communication to the ORI of the complaint that had been initiated by Wikel, Berlin, and Deckers against the plaintiff regarding the Bourell funding matter, by directing that the Office of Corporate Compliance "recommend" that he take such action.  *(Exhibits 24-27).*

36. It was only because of plaintiff's intervention, not any well meaning intention on the part of University officials, that the illegal encumbrance of funds came to light, and it was only after the plaintiff's intervention that allegations against him surfaced by email and were eventually filed.  Berlin, the pressured Gillon to misrepresent Bourell's expenditure of time and effort, in direct violation of NIH regulations.  More specifically, the false allegations against the plaintiff were filed only after he had (i) protested the misappropriation of funds from his NIH grants in June, 2002; (ii) engaged in good faith discussions with Berlin and Gillon to amicably resolve the matter in early August, 2002;

and (iii) taken all the agreed upon steps immediately thereafter to file accurate Time and Effort reports for Bourell.  Indeed, the filings could have been made in mid-August, 2002, but the plaintiff was asked by Gillon to wait, ostensibly because Berlin was on vacation.  It is now readily apparent that, with Deckers' full knowledge and agreement, efforts were well underway during this interval to level false allegations against the plaintiff.  *(Exhibits 15-29).*

37. Gillon was untruthful in stating that the plaintiff had "indicated in the progress reports and renewal applications that Ken [Bourell] had a significant role in the research that was conducted, when the T&E reports when filed may not support those statements". *(Exhibit 29).*  The renewal applications and progress reports are devoid of any such indication.  *(Radolf Aff. 111, 114, 115, 118).*

38. In spite of signing off on the progress reports and renewal applications, Gillon claims that he never reviewed the progress reports and the renewal applications.  *(Gillon Tr. 52, 57).*

39. Deckers claims that he never reviewed the progress reports and the renewal applications. *(Deckers Tr. 44, 45).*

40. The false information regarding the progress reports and renewal applications filed by the plaintiff with the NIH emanated from Wikel, who informed the University of Connecticut Health Center's Office of Corporate Compliance that he had "copies of purportedly

'fraudulent' progress reports that Dr. Justin Radolf sent to government stating that Kenneth Bourell had been working on these grants." *(Exhibit 21, 30).*

41. On August 11, 2004, the plaintiff in a letter to Iris Mauriello, the chairperson of the University of Connecticut Health Center's Board of Directors, objecting to the findings of the Compliance Committee regarding his complaint against Deckers, Berlin, and Wikel. *(Exhibit 31).*

42. During the summer of 1998, while a tenured Professor in the Departments of Internal Medicine and Microbiology at the University of Texas Southwestern Medical Center at Dallas, Texas (UT Southwestern), the plaintiff applied for the Directorship of a newly created Center for Microbial Pathogenesis (CMP) at UCHC in response to an advertisement in a then-recent issue of the American Society for Microbiology (ASM) News. No other specific faculty appointment or position was mentioned in the advertisement. *(Radolf Aff. ¶ 5).*

43. The letter of offering, dated September 9, 1998, was the direct outcome of the plaintiff's negotiations with Dr. Berlin during the Labor Day Weekend visit. This letter formally offered him the position of "Director of the Center for Microbial Pathogenesis" in addition to tenured appointments in the Departments of Medicine and Microbiology. The letter also stated that "your principle responsibility will be the formulation and

development of the Center's research program" and it outlined the Institutional resources that would be allocated to the plaintiff for this new research Center.  These statements indicate very clearly that the Center Directorship, not the faculty appointments, were the focus of the recruitment.  The letter concluded by stating "It has been a great pleasure for all of us here to interact with you, your family, and members of your laboratory".  Without these written representations and the clearly implied understanding that UCHC was making a long-term commitment to the plaintiff as Center Director, his laboratory personnel, their families, and the discipline of microbial pathogenesis research, the plaintiff would not have accepted the position, nor would his personnel have agreed to make the move to a smaller and less established Institution with comparatively little research strength in their chosen field.  *(Radolf Aff. ¶ 12).*

44. In an email to Dr. Berlin dated September 11, 1999, the plaintiff formally accepted the position and stated that "I will commit all of my energies and abilities to make the Center successful".  In that same email, the plaintiff also provided detailed information about Radolf laboratory personnel and their spouses/families in order to begin the long and complex logistical process of permanently relocating these individuals in parallel with the relocation of my family and laboratory. *(Radolf Aff. ¶ 13).*

45. On or about January, 1999, several months after the plaintiff had accepted the Center Directorship, he made another visit to UCHC to meet faculty members and discuss

various details regarding the transfer of the plaintiff's laboratory and establishment of the Center. It was during these discussions with Dr. Berlin that the plaintiff discovered that his initial appointment would be as Assistant Professor and that his tenured appointments as Professor in the Departments of Medicine and Microbiology would not be made by the UCHC Senior Appointments and Promotions Committee (SAPC) for as long as one year after the move. The plaintiff stated uncategorically that he considered the appointment as Assistant Professor to be contrary to the representations made by Drs. Deckers and Berlin during their discussions and in the letter of offering. The plaintiff also indicated that if this situation were not remedied, he would withdraw his acceptance of the Center Directorship and stay at UT Southwestern. *(Radolf Aff. ¶ 16).*

46. On January 8, 1999, following the plaintiff's return to Dallas, TX, he received a letter from Dr. Deckers stating "This is to indicate that you will be appointed Professor of Medicine with tenure effective April 1, 1999". April 1, 1999 was the agreed upon start date for his position as Center Director. Thus, months before the actual move, there was a clear understanding that the appointments as Center Director and Professor of Medicine and Microbiology were interconnected. *(Radolf Aff. ¶ 17).*

47. Shortly after the plaintiff's arrival, he received a letter from Dr. Leslie Cutler, then Chancellor of the University of Connecticut, stating that the plaintiff was appointed as Assistant Professor, a non-tenured position. The plaintiff was confused by this and

concluded that Dr. Deckers had not informed Dr. Cutler about his January 8 letter.  Soon

after his relocation he also discovered that the CMP had not been formally recognized by

the UCHC Board of Trustees and that established guidelines for the operation of Type II

Centers did not exist.  In subsequent discussions with Drs. Deckers and Berlin, but

contrary to the statements made during our January 7, 2002 meeting, the plaintiff was

told that formal establishment of the CMP by the BOT was a mere formality and should

not be a concern. *(Radolf Aff. ¶ 18).*

48. The September 9, 1998 letter of offering made no mention of the fact that the CMP had

not been approved by the BOT as an academic entity.  Had this point been made in the

letter, the plaintiff would have stated uncategorically his unwillingness to accept the

Center Directorship until the Center was formally established as a permanent academic

entity by the BOT. *(Radolf Aff. ¶ 19).*

49. From the moment of his arrival, the plaintiff endeavored to fulfill his commitment to

establish a world-class CMP at UCHC.  During the next three years, the plaintiff received

numerous accolades and two excellent annual compensation reviews, with commensurate

increases in salary.  On August 28, 2000, in response to the first Annual Report for the

CMP, the plaintiff received a letter from Dr. Deckers stating "I congratulate you, your

staff, and your faculty on an exceptionally productive academic year.  Your collective

scholarship, presentations, and research funding are a credit to your industry, intellect,

and enthusiasm.  Be assured of the continued support of this office". *(Radolf Aff. ¶ 21).*

50. In a letter of reprimand, dated August 22, 2001, issued by Dr. Deckers, there was no indication that the plaintiff was going to be relieved of his responsibilities as Center Director.  Indeed, in the meeting with Dr. Berlin during which Dr. Deckers' letter was presented to him, the plaintiff was reassured of the strong Institutional support for his leadership of the CMP.  *(Radolf Aff. ¶ 22).*

51. During the meeting, which occurred on January 7, 2001 with Deckers, Berlin and the plaintiff, the plaintiff was told that the Center's existence was in jeopardy because it had not been approved by the BOT as a permanent academic entity.  The plaintiff also was told repeatedly by Drs. Deckers and Berlin that he had done an excellent job running the Center.  It was restated that the plaintiff was being asked to relinquish the Directorship on a temporary basis.  The plaintiff stated that he believed he was fully capable of running the Center, that there was no one else in the Center capable of providing the necessary scientific and administrative leadership and that the best way to ensure the Center's survival was for the plaintiff to continue as Director.  *(Radolf Aff. ¶ 24).*

52. On January 11, 2001, the plaintiff met privately with Dr. Deckers.  Dr. Deckers told the plaintiff that it was his decision that the plaintiff temporarily relinquish the Center Directorship.  He reiterated that all the plaintiff needed to do to come back at some future time as the Center Director was to tell him that he felt better, and that that the plaintiff would be reinstated as Center Director.  He also requested that the following Monday the

plaintiff give him a letter stating that I would relinquish the Directorship "temporarily due to personal reasons".  *(Radolf Aff. ¶ 25).*

53. On January 13, 2004, the plaintiff received an email from Dr. Deckers restating his viewpoint that the plaintiff must relinquish the Center Directorship and that his authority in this matter was "absolute".  This letter also reiterated, however, that this decision would be rescinded by him at some time in the future.  The temporary nature of the plaintiff stepping aside was reinforced by the fact that he informed the plaintiff in this same email that he was appointing Dr. Stephen Wikel as Interim Director.  *(Radolf Aff. ¶ 26).*

54. On January 14, 2002, the plaintiff met with Dr. Deckers at which time he accepted the plaintiff's letter informing him "…of my decision to relinquish temporarily my position as Director of the Center for Microbial Pathogenesis for personal reasons."  When the plaintiff presented the letter to him, the plaintiff asked him if he felt comfortable with the exact wording.  He stated that he was.  *(Radolf Aff. ¶ 27).*

55. Several weeks later, in discussing with Dr. Wikel the "Interim" nature of his (Dr. Wikel's) appointment, Dr. Wikel acknowledged that in December, 2001, Drs. Deckers and Berlin had informed him that they were going to ask the plaintiff to step aside, that he (Dr. Wikel) was going to take on the plaintiff's position, and that, contrary to the representations made to the plaintiff by Drs. Deckers and Berlin, the plaintiff's stepping

aside was not temporary.  According to Dr. Wikel, Dr. Berlin told him "All appointments are, by nature, interim in nature". *(Radolf Aff. ¶ 28).*

56. In the summer of 1996, during a visit to UT Southwestern at the plaintiff's invitation, Dr. Wikel readily acknowledged that his research program lacked molecular or genetics techniques and that he viewed collaboration with the plaintiff's laboratory as a means of remedying this deficiency.  *(Radolf Aff. ¶ 31).*

57. Several weeks after this first meeting, Dr. Wikel invited the plaintiff to present a seminar in the Department of Entomology at OSU.  *(Radolf Aff. ¶ 35).*

58. With Dr. Wikel as host, the plaintiff presented a seminar in the Department of Entomology that centered largely on the *B. burgdorferi* outer membrane and Lyme disease vaccine-related work being conducted by Dr. Darrin Akins, then a postdoctoral research fellow. *(Radolf Aff. ¶ 36).*

59. During this visit, it was readily apparent from direct discussions that no one in the Wikel laboratory was familiar with the use of molecular biological, genetic, or recombinant DNA techniques and that these powerful methodologies were not being employed to identify salivary gland proteins responsible for the immunological effects he claimed to be observing in salivary gland extracts.  *(Radolf Aff. ¶ 37).*

60. During that visit, the plaintiff met Dr. Melanie Palmer, an investigator in the OSU Department of Entomology and an experienced tick molecular biologist.  The plaintiff

was surprised to discover that, despite their mutual interests, the research interactions

between Dr. Wikel and Dr. Palmer were minimal.  *(Radolf Aff. ¶ 38).*

61. A computer-based search of the literature and the sequence databases conducted upon the

plaintiff's return confirmed this.  Drs. Palmer and Wikel had not co-authored any

publications or jointly submitted any sequences to GenBank.  GenBank, the National

Institutes of Health (NIH) genetic sequence database, is an annotated collection of all

publicly available DNA and protein sequences.  *(Radolf Aff. ¶ 39).*

62. Dr. Wikel's assertion of extensive molecular biology collaboration with Dr. Palmer at

OSU prior to the plaintiff and Dr. Wikel's collaboration is a clear misrepresentation of

their lack of documented scientific interactions. *(Radolf Aff. ¶ 40).*

63. In addition to obtaining ticks for the plaintiff's laboratory Lyme disease work, the

plaintiff began to discuss with laboratory members the possibility of using molecular

techniques to identify biologically important molecules in tick saliva as well as the

related idea of developing a tick vaccine.  These ideas were discussed with Dr. Wikel and

quickly became a central theme of the collaboration between the Wikel and Radolf

laboratories.  *(Radolf Aff. ¶ 41).*

64. The plaintiff was responsible for initiating two parallel and complementary approaches to

accomplish these research objectives.  One was to extract RNA from salivary glands of

feeding ticks in order to generate cDNA libraries; clones encoding biologically relevant

molecules and vaccine candidates would be "pulled" from these libraries.  The other

70

involved Expression Library Immunization or ELI, a methodology developed by Dr.

Stephen Johnston, a colleague of the plaintiff at UT Southwestern. *(Radolf Aff. ¶ 42).*

65. Efforts to generate fed tick salivary gland cDNA libraries got underway in the fall of

1996.  Given the amounts of RNA needed to generate a single cDNA library, it was

decided to make the first library from the glands of the relatively large tick *Dermacentor*

*andersoni.  (Radolf Aff. ¶ 43).*

66. Dr. Darrin Akins, a postdoctoral fellow in the plaintiff laboratory, was directly

responsible for this work.  Dr. Akins personally received the *D. andersoni* salivary glands

shipped from Dr. Wikel's laboratory and extracted the RNA from which the cDNA

library would be constructed.  After assessing the RNA both qualitatively and

quantitatively, Dr. Akins personally shipped it to Stratagene, a biotechnology company

based in La Jolla, CA that makes fee-for-service custom libraries.  The completed library

(UT Southwestern Purchase Order # R60299, Stratagene Order # 468492, Customer #

1210) was sent from Stratagene to the Radolf laboratory at UT Southwestern on

November 20, 1996; Dr. Akins personally handled this transaction.  *(Radolf Aff. ¶ 44).*

67. It was the clear understanding between the Radolf and Wikel laboratories that the library

was jointly owned as were any and all data generated from it.  By the established norms

of scientific collaboration, a collaboration of this type would include sharing in hard copy

and electronic forms any and all data generated by either lab with regard to the library,

including, but not limited to, the nucleotide sequences, recombinant proteins, peptides, or

71

other reagents.  *(Radolf Aff. ¶ 45).*

68. The initial plan was to screen the library with tick immune antiserum provided by Dr. Wikel.  However, the "protective antiserum" that Dr. Wikel provided did not react specifically with any clones from the library, indicating that it was unusable for identifying clones that might encode vaccine candidates.  It was at this point that the plaintiff suggested that they begin "high throughput sequencing" of expression sequence tags or ESTs. The plaintiff's rationale was that the library should be highly enriched for tick salivary gland cDNAs.  This fundamental idea of high-throughput sequencing of random clones underlies all of the subsequent tick-related EST research conducted or proposed by Dr. Wikel, including that in the DOD proposal.  *(Radolf Aff. ¶ 46).*

69. Prior to any substantive interactions with Dr. Wikel, Dr. Johnston and the plaintiff had begun to experiment with the use of genetic immunization, a key technique for ELI, as a means of developing vaccines against *T. pallidum* and *B. burgdorferi*.  This work was conducted in the plaintiff's laboratory by Dr. Melissa Caimano, a postdoctoral fellow recently arrived from the University of Alabama at Birmingham.  *(Radolf Aff. ¶ 47).*

70. Dr. Johnston had no prior research experience with Lyme disease, ticks, or tick-borne diseases.  The plaintiff was the one who conceived of the potential usefulness of ELI for the development of a tick vaccine, and it was the plaintiff who proposed to Drs. Johnston and Wikel that ELI be used as the basis for a grant application to the Texas Advanced Technology Program, an extremely competitive funding in-state competition.  The

plaintiff authored and submitted this proposal in August, 1997, which was funded.  Dr.

Johnston's role in this project was supportive.  *(Radolf Aff. ¶ 48).*

71. The proposal described Dr. Wikel's technological base as follows (p6):  "Dr. Steven

Wikel, Endowed Chair in Agricultural Biotechnology and Professor of Entomology,

Oklahoma State University, maintains uninfected and *B. burgdorferi*-infected *Ixodes*

*scapularis* colonies and is thoroughly familiar with methodologies for tick infestation of

animals".  The accompanying letter of collaboration provided by Dr. Wikel does not

describe any molecular, genetic, or recombinant DNA work being conducted in his

laboratory and does not anticipate any contribution from his laboratory regarding the use

of molecular biological, genetic, or recombinant DNA techniques.  *(Radolf Aff. ¶ 49).*

72. In 1998, Dr. Wikel submitted a proposal to the USDA which involved the use of ELI to

develop a vaccine against the hard tick *Dermacentor andersoni*.  As Co-investigator, the

plaintiff was to direct a consortium at UT Southwestern responsible for providing the

molecular biological and recombinant DNA expertise essential for the project, including

the performance of ELI.  While Dr. Stephen Johnston was a member of this research

consortium, his role, as with the Texas grant, was entirely supportive.  All of the

proposed molecular studies were to be performed in the plaintiff's laboratory, by the

plaintiff personnel, and under the plaintiff's direct supervision.  The consortium would

not have been necessary if the relevant technical expertise already existed in Dr. Wikel's

laboratory.  *(Radolf Aff. ¶ 50).*

73. On or about early 1998, Dr. Melissa Caimano became more involved in the tick EST project as Dr. Akins began preparing to leave UT Southwestern in order to assume a faculty position in the Department of Microbiology and Immunology at Oklahoma University Health Sciences Center. *(Radolf Aff. ¶ 51).*

74. One of the first sequences that Dr. Caimano identified from the *D. andersoni* library was that for a molecule called calreticulin. She subsequently generated a recombinant form of calreticulin that was sent to the Wikel laboratory for immunization experiments. Dr. Wikel failed to provide to the plaintiff or Dr. Caimano a written summary of these results, even though the plaintiff requested that he do so. Because the results of these experiments were reportedly negative, the plaintiff did not pursue this request. *(Radolf Aff. ¶ 52).*

75. Another notable sequence that Caimano identified was that for "p36", a *D. andersoni* salivary gland protein that Dr. Wikel first described in a paper published in 1998 in the Journal of Medical Entomology. This paper described only approximately 25 amino acids from the N-terminus of p36 and did not involve the use of recombinant DNA techniques. *(Radolf Aff. ¶ 53).*

76. The p36 EST that Dr. Caimano pulled from the *D. andersoni* library encoded the entire polypeptide. This information helped Dr. Wikel complete the p36 sequence and was published in the June, 2000 issue of the Journal of Parasitology with Dr. Caimano and the plaintiff as co-authors. This publication was the first paper from the Wikel laboratory

that described the use of recombinant DNA techniques, and it is thus, completely inaccurate to state that Dr. Wikel had any recognized molecular expertise prior to the year 2000.  *(Radolf Aff. ¶ 54).*

77. Dr. Wikel failed to notify the plaintiff or Dr. Caimano when the p36 sequence was submitted to the GenBank database (Accession Number AF 167171) in July, 1999. Based on their documented contribution to this sequence, it is fully correct to state that the plaintiff and Dr. Wikel co-own the intellectual property rights for the p36 sequence and should have been included as co-authors on the GenBank submission.  *(Radolf Aff. ¶ 55).*

78. As noted earlier, we viewed the *D. andersoni* work as a "feasibility study" for the more difficult *I. scapularis* research.  Once Dr. Caimano had established that the cDNA library generated from *D. andersoni* was a good source of salivary gland ESTs, the plaintiff and Dr. Wikel decided to proceed with generating an *I. scapularis* library.  *(Radolf Aff. ¶ 56).*

79. Dr. Wikel sent the salivary glands to Dr. Caimano at UT Southwestern so that she could coordinate this process with Stratagene.  Dr. Caimano sent these materials by FedEx to Stratagene (tracking number 809929697068) on December 18, 1998.  Several months later she was notified by Mr. Michael Kobrin at Stratagene that an accident had occurred and that the glands were not usable.  Dr. Wikel and the plaintiff spoke with Stratagene officials and convinced them to make a new library free of charge.  These materials had to be regenerated by Dr. Wikel.  *(Radolf Aff. ¶ 57).*

80. The library was sent by Stratagene to UCHC on March 29, 2000. The accompanying product information sheet lists the plaintiff as the recipient for Stratagene Order # 98236, UT Southwestern purchase order # 916505. Dr. Caimano personally received the shipment from Stratagene and insured that the library was properly aliquoted and stored. *(Radolf Aff. ¶ 58).*

81. One of the major reasons for the plaintiff's recruitment of Dr. Wikel to the CMP in 1999 was to further our collaboration on tick vaccine development. As noted earlier, this collaborative research was discussed in depth with Dr. Berlin on a number of occasions. *(Radolf Aff. ¶ 59).*

82. Soon after Dr. Wikel's arrival at UCHC in 2000, Dr. Caimano gave Dr. Wikel amplified and unamplified aliquots of the library as a safety precaution in the event of an accident such, as a freezer-failure. At the time, no one in his laboratory was capable of working with the library and no plans were entertained for Wikel laboratory personnel to do so. *(Radolf Aff. ¶ 60).*

83. Some time after Dr. Wikel relocated from OSU, he hosted a visit by Dr. Jose Ribeiro from the NIH. Sometime afterwards, Dr. Wikel told the plaintiff that he and Dr. Alarcon-Chaidez, a postdoctoral fellow in his laboratory, had either transported or arranged to transport large numbers of clones from our *I. scapularis* library to Dr. Ribeiro's laboratory for automated sequence analysis. While surprised, the plaintiff did not express his discomfort with this transaction at the time because Dr. Wikel reaffirmed his

76

understanding that the library was jointly owned.  Indeed, in recognition of their joint

ownership and the conditions of their collaboration, on several occasions in research

meetings with Dr. Alarcon-Chaidez, Wikel showed the plaintiff spreadsheets

summarizing the sequence information generated by Dr. Ribeiro.  These spreadsheet

summaries did not contain complete sequence information for the various EST clones.

Wikel has never provided to the plaintiff or Dr. Caimano hard copy or electronic files

containing this sequence information, even when requested to do so.  Any statement that

sequence information from our jointly owned *I. scapularis* library was shared with the

plaintiff or his personnel in a usable or analyzable form that would enable them to

publish this information or use it in independent grant applications is a falsehood.

*(Radolf Aff. ¶ 61).*

84. About June, 1999, Dr. Isaac Onyango, a trained veterinary molecular entomologist,

joined the plaintiff's laboratory specifically to work on the *D. andersoni* EST project.

Dr. Caimano worked closely with Dr. Onyango to ensure a smooth transition.  During the

period Dr. Onyango was in the laboratory, the plaintiff spent much time with him

discussing and interpreting the growing body of bioinformatics data generated from his

analysis of the *D. andersoni* cDNA library.  Dr. Onyango and the plaintiff were

responsible for developing the in-house database delineating the relevant biological

categories in which newly generated sequences were placed following bioinformatics

analyses; this included the identification of recognized functional motifs and conserved

protein domains.  This work led to the identification of Kunitz domains in a number of

the sequences; such domains are a potential indicator of anti-hemostatic activity.  *(Radolf*

*Aff. ¶ 62).*

85. This bioinformatics approach, as well as specific data generated from it, was incorporated

directly by Dr. Wikel into the DOD proposal submitted in September, 2002.  The

findings of the *ad hoc* committee chaired by Dr. Shanley are in direct support of this

statement.  *(Radolf Aff. ¶ 63).*

86. Because hard ticks, such as *D. andersoni* and *I. scapularis* feeding over days, the ability

of tick saliva to interfere with blood clotting (hemostasis) is believed to be critical for the

feeding process.  It follows, therefore, that interference with the anti-hemostatic activity

in tick saliva is one potential approach to development of a tick vaccine.  The

identification of Kunitz domains in a number of the EST sequences led to the hypothesis,

formulated by the plaintiff and Dr. Onyango, that these molecules were vaccine

candidates.  When this information was generated by Dr. Onyango in 1999, this was a

new idea in the tick research field.  *(Radolf Aff. ¶ 64).*

87. The 2000 USDA and CII grants describe the use of anti-hemostasis assays to characterize

the biological activities of recombinant DNA-derived proteins identified from the *D.*

*andersoni* cDNA library.  The novel aspect of these proposals was the identification of

these molecules and the characterization of their possible anti-hemostasis activities, not

the assays themselves.  This idea was directly appropriated by Dr. Wikel for the DOD

proposal submitted in September, 2002.  *(Radolf Aff. ¶ 65).*

88. In order to determine whether the *D. andersoni* molecules possess anti-hemostatic

activity, it was necessary to enlist the collaborative support of an investigator with

expertise in the required assays.  Dr. Ray Koski, the Research Director of a New Haven,

CT-based biotechnology company called $L^2$, referred the plaintiff to an investigator in the

Department of Pediatrics at Yale University, named Dr. Michael Cappello, an expert in

the anti-hemostatic properties of hookworm saliva.  At the time, the plaintiff already was

working with Dr. Koski on a CII-funded project involving another *I. scapularis*-

transmitted parasite called *Babesia microti*.  *(Radolf Aff. ¶ 66).*

89. The plaintiff directly contacted Dr. Cappello in order to gauge his interest in working

with Dr. Wikel and the plaintiff.  This conversation led to a series of meetings, both at

Yale University and UCHC, in which reagents, such as recombinant DNA-derived

proteins, were given to Dr. Cappello for analysis.  At one point, Dr. Wikel also gave Dr.

Cappello *D. andersoni* salivary gland extracts for assay.  The idea was to determine if

they could "match" the anti-hemostasis activities in salivary glands with those of

individual proteins. Dr. Alarcon-Chaidez participated in some of these meetings.  *(Radolf

Aff. ¶ 67).*

90. The idea to screen p36 for anti-hemostasis activity was based upon the observation that it

contains Kunitz domains.  *(Radolf Aff. ¶ 68).*

91. Without the plaintiff's knowledge or permission, Dr. Wikel pursued this collaboration

independently with Dr. Cappello and included Dr. Cappello as a collaborator on the DOD proposal. *(Radolf Aff. ¶ 69).*

92. In 1999, before Dr. Wikel had even relocated to UCHC, the plaintiff initiated the idea of pursuing Congressional funding (a so-called "earmark") after a meeting held by Dr. Gerald Maxwell and began to put together the necessary group of investigators, including Dr. Wikel (lots of discovery on this). *(Radolf Aff. ¶ 70).*

93. The plaintiff also was instrumental in developing the earmark to include malaria, Dengue fever, and other vector-borne diseases. *(Radolf Aff. ¶ 71).*

94. Because of his longstanding interest in this area and recognized expertise, the plaintiff asked Dr. Wikel to take the lead on efforts to obtain the earmark, including the letter that was sent to the Honorable Nancy Johnson. There was a clear understanding with Drs. Wikel, Berlin, and Deckers that the plaintiff was to be a co-investigator if and when this proposal was submitted. *(Radolf Aff. ¶ 72).*

95. The plaintiff participated in a number of activities related to obtaining this earmark, including meetings with members of the Connecticut Congressional delegation. *(Radolf Aff. ¶ 73).*

96. The plaintiff's molecular, research, and clinical expertise in Lyme disease and tick-borne infections was a major selling point in the efforts to gain Congressional support for the earmark. *(Radolf Aff. ¶ 74).*

97. When Dr. Onyango left the plaintiff's laboratory about June, 2000, Dr. Caimano worked

directly with Dr. Francisco Alarcon-Chaidez to ensure a smooth transition of the *D. andersoni* project to Dr. Wikel's laboratory.  There was no indication that the operational rules for the Radolf-Wikel collaboration had changed in any way or that this was the initiation of an independent project in the Wikel laboratory.  *(Radolf Aff. ¶ 75)*.

98. The December 27, 2001 letter requesting that the plaintiff meet with Drs. Berlin and Deckers did not indicate in any way that the earmark or the DOD proposal would be a topic of discussion.  *(Radolf Aff. ¶ 77)*.

99. During the course of the January 7, 2002 meeting, Drs. Deckers and Berlin informed the plaintiff that he would not be a co-investigator on the DOD proposal.  The plaintiff stated uncategorically that Dr. Wikel was not qualified to manage this project by himself.  *(Radolf Aff. ¶ 78)*.

100.     The administrative decision communicated to the plaintiff by Drs. Deckers and Berlin was taken without due process and in direct violation of the plaintiff's academic freedom as stated in the UConn bylaws.  *(Radolf Aff. ¶ 79)*.

101.     The plaintiff was assured, however, during that meeting that he would be allowed to continue as a participant in the research.  Dr. Wikel reaffirmed this on a number of occasions thereafter.  *(Radolf Aff. ¶ 80)*.

102.     Despite these reassurances, the plaintiff found it increasingly difficult to engage Dr. Wikel in substantive discussions about the ongoing research or the upcoming DOD proposal.  *(Radolf Aff. ¶ 81)*.

103.     On several occasions in 2002, Drs. Wikel and Alarcon-Chaidez discussed with the plaintiff the outline for a paper describing our *D. andersoni* EST data.  The outline was generated with the clear understanding that Dr. Alarcon-Chaidez would be the primary author.  At one point, Dr. Wikel simply stopped these discussions despite requests from the plaintiff to continue.  This paper easily could have been completed and submitted before the sequestration of data by the ORI.  *(Radolf Aff. ¶ 82)*.

104.     The sequestration of data by the ORI in August, 2002 involved only those hard copy files generated by Dr. Onyango that were in Dr. Radolf's possession.  Dr. Wikel possessed hard copy and electronic versions of all of this information and, thus, could have continued working on the manuscript.  At no time was Dr. Radolf told by the ORI or by UCHC that the sequestration of files prevented the generation of the stated manuscript.  *(Radolf Aff. ¶ 83)*.

105.     The sequestered files did not include hundreds of *D. Andersoni* EST sequences generated by Dr. Alarcon-Chaidez and more than 1000 *I. scapularis*  EST sequences generated by Dr. Alarcon-Chaidez which were never shared in hard copy or electronic form with the plaintiff or any personnel in the plaintiff's laboratory.  *(Radolf Aff. ¶ 84)*.

106.     The Thrall committee report does not mention the sequestration of data by the ORI as a reason why the outlined manuscript was not completed by Drs. Wikel and Alarcon-Chaidez.  *(Radolf Aff. ¶ 85)*.

107.     Point 5 of the Thrall committee report states that the breakdown in the plaintiff's relationship with Dr. Wikel was the reason for the discontinuation of the plaintiff's participation in the research.  *(Radolf Aff. ¶ 86).*

108.     The letter sent by Drs. Berlin and Wikel to Ms. Jamie Kiser however, stated that the plaintiff's participation in the research was administratively terminated.  *(Radolf Aff. ¶ 87).*

109.     The plaintiff has never received written or verbal notification from Drs. Berlin or Deckers informing him of an administrative decision to terminate his participation in the EST research or the DOD proposal.  *(Radolf Aff. ¶ 88).*

110.     Point 5 of the Thrall affidavit also states that permission for Dr. Wikel to use jointly owned data was implied.  This statement is directly contrary to the findings of the Shanley committee and Dr. Deckers' letter of reprimand to Dr. Wikel.  As co-owner of the *D. andersoni* EST intellectual properties, the plaintiff was never asked for permission to include any of the data he generated in this collaboration, nor was he informed that data generated by him were going to be incorporated into any proposal which did not include him or his personnel. *(Radolf Aff. ¶ 89).*

111.     Dr. Thrall has no recognized or published expertise in the use of contemporary molecular biology or recombinant DNA techniques, in vector-borne diseases, in Lyme disease, in microbial pathogenesis, or bioinformatics.  *(Radolf Aff. ¶ 91).*

112.        Contrary to points 7 and 8 of the Thrall affidavit, based upon the plaintiff's

direct interactions with Dr. Wikel and the plaintiff's knowledge of his publication record

through the year 2000, there is no reason to believe that he was capable of independently

establishing a genomics- or proteomics-based research program.  *(Radolf Aff. ¶ 92).*

113.        The "purification, reproduction, characterization, and cloning of hundreds

of clones from the original collaboration" described in point 9 of the Thrall affidavit

represents an unequivocal misappropriation of intellectual property and reagents jointly

owned by the plaintiff and other members of his laboratory.  Rather than exonerating Dr.

Wikel, this statement is fully consistent with the findings of the *ad hoc* committee chaired

by Dr. John Shanley which found that Dr. Wikel violated UCHC Data ownership policy

and intellectual property rights.  *(Radolf Aff. ¶ 93).*

114.        The DOD proposal does not contain any *I. scapularis* EST data.  Thus, the

feasibility of the proposal and Dr. Wikel's demonstrated capacity to conduct the proposed

research rests entirely on jointly owned data.  Preliminary data are a central component of

all grant applications and are included to convince reviewers of the proposal's scientific

soundness and the Principal Investigator's technical capabilities to conduct the proposed

research.  Without the misappropriated data that Dr. Wikel incorporated into Figures 2, 3,

and 4 of the proposal, reviewers could not have concluded that the proposed studies were

scientifically reasonable or that Dr. Wikel had the stated capacity to perform the proposed

studies, contrary to the claims made in Points 6, 7, and 8 of the Thrall affidavit.  *(Radolf*

*Aff. ¶ 94).*

115.        The new directions alluded to in point 10 of the Thrall affidavit represent only cosmetic technical modifications rather than any fundamental changes in scope, philosophy, underlying concepts, or direction from those developed during the plaintiff's collaboration with Dr. Wikel.  *(Radolf Aff. ¶ 95).*

116.        Contrary to point 10 of the Thrall affidavit, it is well established in patent law that changes in plasmid vector, cloning system, etc. such as that described here, do not represent significant advances over prior art. *(Radolf Aff. ¶ 96).*

117.        Dr. Thrall and his committee failed in their responsibilities to evaluate the allegation of scientific misconduct by not obtaining the necessary expert opinions to address whether the statement made in point 10 would satisfy established legal criteria for advancement of prior art. *(Radolf Aff. ¶ 97).*

118.        Based on the Thrall affidavit and the DOD proposal, Dr. Wikel has not provided any documentary evidence to support the claim that these "new directions" have generated information that could not have been derived from the libraries, methodologies, and bioinformatics approaches that were fully developed at the time the project was transitioned from the Radolf to the Wikel laboratory.  *(Radolf Aff. ¶ 98).*

119.        Contrary to point 10 in the Thrall affidavit, the "new approach" adopted by the Wikel laboratory for analyzing tick salivary gland ESTs has produced only a single molecule, calreticulin. This protein was previously identified by Dr. Caimano in the

course of the *D. andersoni* EST studies conducted in the context of the Radolf-Wikel collaboration. *(Radolf Aff. ¶ 99).*

120.        Contrary to point 10 of the Thrall affidavit, the bioinformatics methodologies described in the DOD proposal are the same as those used during the Radolf-Wikel collaboration and thus do not in any way represent an advance or new research direction. *(Radolf Aff. ¶ 100).*

121.        Regarding point 11 of the Thrall affidavit, because the "extended clonal analysis" performed by Dr. Wikel involved the original jointly owned *D. andersoni* EST database and library, the resulting data are jointly owned by Drs. Radolf and Wikel and cannot be viewed as either independently derived or Dr. Wikel's sole intellectual property. *(Radolf Aff. ¶ 101).*

122.        Regarding point 12 of the Thrall affidavit, there is no evidence to support the statement that the collaboration between Drs. Wikel, Valenzuela, and Riberio is highly active or has led to any advancement of Dr. Wikel's research program beyond that of the original collaboration with Dr. Radolf.  On the contrary, Dr. Wikel has had no co-publications with either Drs. Riberio or Valenzuela, while Drs. Riberio and Valenzuela have published numerous studies examining whole insect genome transcription analyses, analyses of salivary gland proteins and anti-hemostatic proteins, including one report, co-authored with Dr. Thomas Mather, University of Rhode Island, describing the analysis of ESTs isolated from *I. scapularis* salivary glands. *(Radolf Aff. ¶ 102).*

123.     The September 9, 1998 letter offering the plaintiff the position of Director of the Center for Microbial Pathogenesis stated that "…we will provide suitable support for establishing your own research program here, operating funds for the Center, and for the recruitment and start-up of the new faculty…Be assured that it is our purpose to support the Center in whatever way is within our means."  *(Radolf Aff. ¶ 105).*

124.     As noted already, the plaintiff accepted the Center Directorship position in an email to Dr. Berlin on September 11, 2001.  In that email, the plaintiff began to lay the groundwork for the personal and professional relocation of his laboratory personnel.  Mr. Kenneth Bourell was specifically mentioned in that email.  The plaintiff pointed out that, in addition to his talents as a light and electron microscopist, Mr. Bourell had exceptional computer skills that "will benefit greatly everyone within the Center".  This was a clear indication that, from the very outset, Mr. Bourell's position was considered differently from that of a technician working exclusively within the plaintiff's laboratory.  It also laid the foundations of the oral cost sharing agreement that was central to the salary structure and time and effort requirements for Mr. Bourell's position.  *(Radolf Aff. ¶ 106).*

125.     During the transitional period between the plaintiff's acceptance of the Center Directorship in September, 1998 and his laboratory's move in late March, 1999, Dr. Berlin and the plaintiff engaged in further discussions to clarify Mr. Bourell's functions and position within the Center.  The preferred job title was "Center Imaging Specialist".  However, because such a job title or classification did not exist at UCHC, he was

classified as a Research Associate.  *(Radolf Aff. ¶ 107).*

126.     During these discussions, it was understood that Mr. Bourell would function in two capacities.  The first was to provide technical support on an as-needed basis for research within the plaintiff's laboratory.  The second was to provide microscopy ("imaging") and computer-related support to other investigators in the CMP and to anyone else at the Health Center who requested his services.  The actual division of his time and effort would be flexible and at the plaintiff's discretion as Center Director. *(Radolf Aff. ¶ 108).*

127.     Mr. Bourell's job description states that the principle responsibilities for this position are twofold: 1. responsible for conducting the electron microscopy experiments and maintaining all photo micrographic data for the Center and 2. responsible for maintaining the Center's light and electron microscopy equipment as well as the IBM and Apple-based computers in the laboratories and administrative offices.  *(Radolf Aff. ¶ 109).*

128.     In recognition of the fact that Mr. Bourell's position was unique and included responsibilities within the CMP, separate office space was created for him across from the administrative area of the Center.  *(Radolf Aff. ¶ 110).*

129.     None of the discussions with Dr. Berlin could have led him to believe that Mr. Bourell had ever functioned as key personnel on the plaintiff's NIH-supported research or that the plaintiff envisioned him functioning in that capacity after their relocation.

*(Radolf Aff. ¶ 111).*

130.     During the transitional period, Dr. Berlin and the plaintiff negotiated an oral cost

sharing agreement regarding Mr. Kenneth Bourell's salary structure.  According to this

agreement, Mr. Bourell's salary would be paid by UCHC out of Connecticut General

Funds and then at some point in the future from the plaintiff's NIH grants or from other

qualified source(s) of funding.  *(Radolf Aff. ¶ 112).*

131.     As Center Director the plaintiff was not in control of the Connecticut General

Funds that were used to pay Mr. Bourell's salary.  The plaintiff never received or signed

off on any paperwork establishing Connecticut General Funds as Mr. Bourell's source of

salary support.  These funds were controlled by Mr. David Gillon, the UCHC Chief

Financial Officer.  *(Radolf Aff. ¶ 113).*

132.     In April, 1999, the plaintiff submitted requests to transfer the plaintiff's three NIH

grants from UT Southwestern to UCHC.  On all three grants, the plaintiff was listed as

"Key Personnel".  Mr. Bourell was listed on two of these grants, "Membrane Proteins of

*Borrelia burgdorferi*" and "Membrane Immunogens of *Treponema pallidum*" only as a

Research Associate.  These requests were signed by a number of UCHC officials,

including Dr. Berlin and Mr. Gillon.  *(Radolf Aff. ¶ 114).*

133.     During the plaintiff's years of association with Mr. Bourell at UT Southwestern,

Mr. Bourell never served as a key personnel on an NIH grant.  No discussions to upgrade

his status from non-key to key personnel ever occurred during or after their relocation to

UCHC.  *(Radolf Aff. ¶ 115).*

134.     The transfer agreements for the plaintiff's NIH grants were prepared in close

consultation with several grants officials at UCHC, principally Mr. William Tomlinson.

At that time, the plaintiff's laboratory was the only functional laboratory in the CMP and

it was uncertain how Mr. Bourell's time and effort would be allocated between the

plaintiff's laboratory and the Center.  It was possible, however, that he would be working

full-time on the plaintiff's NIH-funded research. Given the undefined period of time

covered by the oral cost sharing agreement with Dr. Berlin, it was recommended that the

plaintiff budget in the transfer agreements monies to cover Mr. Bourell's entire salary,

evenly divided between the two NIH grants "Membrane Proteins of *Borrelia*

*burgdorferi*" and "Membrane Immunogens of *Treponema pallidum*". These grants were

chosen for this budgeting because they both involved microscopy and other

microbiologic techniques that Mr. Bourell had utilized in the plaintiff's laboratory at UT

Southwestern.  *(Radolf Aff. ¶ 116).*

135.     Between April, 1999 and June, 2002 no concerns regarding Mr. Bourell's salary

were brought to the plaintiff's attention and no discussions of this matter occurred with

Mr. Gillon or Dr. Berlin.  *(Radolf Aff. ¶ 117).*

136.     Progress reports for the two grants submitted during this period stated that there

were no changes in support of key personnel.  The plaintiff was the only key personnel

listed on each of these grants.  Progress Reports do not require documentation of changes

relating to non-key personnel.  *(Radolf Aff. ¶ 118)*.

137.     On or about February, 2002, Dr. Stephen Wikel began to monitor Mr. Bourell's research activities for the plaintiff without the plaintiff's knowledge or permission. No mechanism was put in place for the plaintiff to confirm the accuracy of the hours being reported to Dr. Wikel.  *(Radolf Aff. ¶ 119)*.

138.     The information provided by Mr. Bourell to Dr. Wikel indicates that only a small percentage of Mr. Bourell's time and effort was devoted to the plaintiff's NIH-funded research.  *(Radolf Aff. ¶ 120)*.

139.     In June, 2002, without any prior discussion or notification, UCHC encumbered funds from these two NIH grants to pay a percentage of Mr. Bourell's salary and fringes that was markedly disproportionate to the actual time and effort expended.  For one of the grants, "Membrane Immunogens of *Treponema pallidum*", Mr. Bourell had not expended any time and effort during the entire one-year period covered by the 50% encumbrance of salary and effort.  For the other grant, "Membrane Proteins of *Borrelia burgdorferi*", funds were encumbered for 25% of Mr. Bourell's salary and fringes for a period of time dating back to December 1, 2001; during this period it was the plaintiff's estimate that he had expended approximately 10% time and effort.  *(Radolf Aff. ¶ 121)*.

140.     Funds for the grant "Membrane Proteins of *Borrelia burgdorferi*" were initially encumbered on an Assignment Authorization form prepared by Ms. Kimberly Young, the CMP Administrative Coordinator and signed by Mr. David Gillon and Dr. Wikel.

*(Radolf Aff. ¶ 122).*

141.    On this form, "employee unavailable to sign" was written by Ms. Young on the line reserved for the Principal Investigator's signature. The plaintiff was not given a copy of this form. *(Radolf Aff. ¶ 123).*

142.    Dr. Wikel had in hand information from Mr. Bourell which indicated that the encumbered funds for one of the NIH grants, "Membrane Proteins of *Borrelia burgdorferi*", were in excess of Mr. Bourell's expenditure of time and effort on that project. *(Radolf Aff. ¶ 124).*

143.    During the entire month of June, 2002, the plaintiff was neither on vacation nor away on official business. No efforts were made to contact the plaintiff directly, either in the plaintiff's office, at home, by pager, by Fax, or by email to notify the plaintiff that funds were being encumbered from two of his NIH grants. *(Radolf Aff. ¶ 125).*

144.    University vacation and travel records and the plaintiff's office calendar document that the plaintiff was on-station for the entire month of June, 2002. Thus, any statement that the plaintiff was away or otherwise unreachable for any appreciable period of time is a misrepresentation. *(Radolf Aff. ¶ 126).*

145.    The plaintiff never received any message from Ms. Young or Mr. Gillon informing him that Mr. Gillon was processing paperwork for Mr. Bourell, nor did the plaintiff receive a message requesting that he contact Mr. Gillon so as to determine the actual time and effort and, if necessary, file an amended report. *(Radolf Aff. ¶ 127).*

146.    At this time, the plaintiff did not receive, nor was the plaintiff made aware of, any manual Time and Effort reports prepared by Ms. Young relating to Mr. Bourell. The existence of such forms is directly contrary to statements made to the plaintiff by Mr. Gillon in our August, 1, 2002 meeting that no Time and Effort reports existed for Mr. Bourell. *(Radolf Aff. ¶ 128).*

147.    These funds were encumbered without any effort by UCHC officials to accurately ascertain the level of effort Mr. Bourell had actually dedicated to the plaintiff's NIH-funded research. *(Radolf Aff. ¶ 129).*

148.    Around June or July, 2002, Ms. Young presented to the plaintiff copies of Labor Distribution forms regarding Mr. Bourell. The forms were sent to Ms. Young by Ms. Ruth Batagowski in the office of Mr. David Gillon. *(Radolf Aff. ¶ 130).*

149.    Nowhere does this paperwork indicate the intention of University officials to notify the plaintiff that funds had been encumbered from the plaintiff's NIH grants, and the plaintiff has no documentation or recollection of Ms. Young stating that she was instructed by Mr. Gillon to give these forms to him. *(Radolf Aff. ¶ 131).*

150.    At this time the plaintiff was not told by Mr. Gillon or Ms. Young that these forms could be or would be amended to show actual time and effort expended by Mr. Bourell. *(Radolf Aff. ¶ 132).*

151.    Immediately after receiving these forms, the plaintiff notified Mr. Gillon to inform him that the funds encumbered were far in excess of the actual time and effort Mr.

Bourell had expended and was continuing to expend on these projects and thus constituted a violation of federal law and regulations. *(Radolf Aff. ¶ 133).*

152.    Over the summer of 2002, the plaintiff engaged in discussions (some via email) with Mr. Gillon in order to resolve this matter. *(Radolf Aff. ¶ 134).*

153.    On August 1, 2002 the plaintiff met with Mr. Gillon and Dr. Berlin.  The plaintiff reminded Dr. Berlin that Mr. Bourell was not relocated from Dallas to be a research technician for the plaintiff's laboratory per se and that he was to be a resource for the Center as spelled out in his original job description.  The issue as to whether Mr. Bourell functioned as key or non-key personnel on the plaintiff's NIH-related research was not discussed.  During this meeting the plaintiff was told that no Time and Effort reports had been filed for Mr. Bourell and that this was an oversight because he had been paid from State of Connecticut General Funds.  The plaintiff also was informed that he needed to file such reports.  The plaintiff called to Dr. Berlin's attention the requirements of federal law and regulations as they related to this issue; that it was a clear violation of federal law and regulations for the University of Connecticut Health Center to encumber the plaintiff's grants far in excess of the actual time and effort Mr. Bourell had expended and was continuing to expend on these projects. *(Radolf Aff. ¶ 135).*

154.    As agreed upon in a memorandum of understanding, dated August 2, 2002, the plaintiff obtained from Mr. Bourell a log of Mr. Bourell's activities that subsequently was used to fill out Time and Effort reports dating back to April, 1999.  To do this, Mr.

Bourell, at the plaintiff's request, prepared a list of the experiments and research-related work he had conducted at UCHC through July, 2002. The work list was reviewed jointly by me and Mr. Bourell and together we estimated the amount of time required to have performed this work. *(Radolf Aff. ¶ 137)*.

155.    After receiving final approval from Mr. Gillon and Dr. Berlin in the beginning of September and meeting once more with Mr. Gillon to review the final paperwork, on September 11, 2002 the plaintiff filed the electronic Time and Effort reports for Mr. Bourell. *(Radolf Aff. ¶ 138)*.

156.    At no time was the plaintiff given any delinquent report cards or notification regarding missing Time and Effort reports for Mr. Bourell. *(Radolf Aff. ¶ 139)*.

157.    At no time did the plaintiff ask Mr. Gillon to tell him what information he wanted me to submit regarding Mr. Bourell's time and effort. The plaintiff does recall inquiring as to whether Mr. Gillon wanted to review the information he was compiling and whether the finalized information was to be filed directly by me or by Dr. Gillon. The plaintiff queries to Mr. Gillon were solely for guidance and assistance in this process and to assure him that the plaintiff was moving expeditiously to provide the requested time and effort information. *(Radolf Aff. ¶ 140)*.

158.    Shortly afterwards, the plaintiff received by registered mail a letter from Dr. Robert Kozol, Executive Director, Compliance, UCHC, informing me that the plaintiff was the subject of a complaint concerning the "reporting of percentage effort of research

associates on grant proposals". *(Radolf Aff. ¶ 141).*

159.     The plaintiff subsequently discovered that Dr. Wikel was the source of the

complaint. *(Radolf Aff. ¶ 142).*

160.     Because of the once close collaborative interactions between the Radolf-Wikel

laboratories, Dr. Wikel's greater than two year period of residence within the Center

before the allegation was filed, and his frequent interactions with Mr. Bourell in

administrative and research-related contexts after assuming the position of Interim

Director, it is inconceivable that he could have believed that Mr. Bourell was functioning

as a key personnel on the plaintiff's NIH-related research. *(Radolf Aff. ¶ 143).*

161.     Given his prior research background and administrative responsibilities as Interim

Director, it is perfectly reasonable to expect that Dr. Wikel would have known the

difference between the requirements for key personnel as opposed to other personnel.

*(Radolf Aff. ¶ 144).*

162.     Dr. Wikel made his complaint against the plaintiff after the plaintiff was led to

believe, based on the memorandum of understanding dated August 2, 2002, that the

matter had been satisfactorily resolved. *(Radolf Aff. ¶ 145).*

163.     The plaintiff did not file a faculty grievance regarding the encumbrance of the

funds because he was led to believe, based on the memorandum of understanding dated

August 2, 2002, that the matter had been satisfactorily resolved. *(Radolf Aff. ¶ 146).*

164.     The monies were restored to the NIH accounts late in 2002. *(Radolf Aff. ¶ 147).*

165.     On September 11, 2001, the defendants, Deckers and Berlin, decided to exclude the plaintiff from the DOD proposal without informing the plaintiff of their decision either prior to or after they had reached their decision.  *(Exhibit 35).*

166.     On September 11, 2001, the defendants, Deckers and Berlin, agreed that the DOD earmark proposal be withdrawn and resurfaced at a later date as strictly a Wikel proposal to the exclusion of the plaintiff under the pretext that "due to various logistical and preliminary data issues we are not ready to accept and act on such an award if granted".  *(Exhibit 35).*

167.     In keeping with their strategy to exclude the plaintiff from the DOD proposal and to surface it as one that was exclusively advanced by Wikel, Wikel submitted a proposal to the DOD without acknowledging the plaintiff's participation in the proposal or the science underlying it.  The defendants, Deckers, Berlin and Wikel, misrepresented the science supporting the proposal as being developed independently of the plaintiff.  The defendant, Wikel, even went to the extent of excluding the plaintiff's name from the proposal's personnel list.  *(Exhibit 36).*

168.     In May of 2002, the defendant, Wikel, attempted to have Dr. Ben Mamoun, a colleague of the plaintiff, file a formal complaint against the plaintiff alleging that the plaintiff had been involved in some form of inappropriate behavior.  Dr. Mamoun refused to follow Wikel's request.  *(Exhibit 37).*

169.     On October 28, 2002, the defendant, Wikel, raised another baseless claim of

wrongdoing against the plaintiff alleging "issues concerning a "progress report" on one of the plaintiff's grant.  This information was officiously sent to the Compliance Committee, without the plaintiff's awareness, while it was conducting the investigation of the charge of fraud that Wikel had earlier brought against the plaintiff.  *(Exhibit 38).*

170.    By letter dated July 3, 2002, the plaintiff requested that he be restored to his position of Director of the Center for Microbial Pathogenesis.  *(Exhibit 39).*

171.    As of the present date, the plaintiff has not been restored to the position of Director of the Center for Microbial Pathogenesis, nor has he been informed of the reasons why he has not been restored nor has he been accorded a hearing of any type on his request.

PLAINTIFF – JUSTIN D. RADOLF

BY:_____
Thomas W. Bucci, Esq.
Federal Bar # ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net

98

**<u>CERTIFICATION</u>**

I hereby certify that I caused to be served a copy of the above and foregoing *Local Rule*

*56(a)2 Statement* by sending same, via U.S.P.S. postage prepaid this 1st day of November, 2004,

to the following:


Jane D. Comerford, Esq.
Office of the Attorney General
University of Connecticut Health Center
Room LMO43
Farmington, CT 06030
Tel: 860-679-1114
Fax: 860-679-1997
Fed. Bar No. ct06328


_____
Thomas W. Bucci, for
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Fed. Bar #ct07805
Email: thomasbucci@earthlink.net