**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
|     Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
|     Defendants. | : | NOVEMBER 1, 2004 |

## **EXHIBIT 25**

## Wetstone, Scott L.

| | |
|---|---|
| **From:** | Mauriello, Iris |
| **Sent:** | Thursday, September 12, 2002 8:59 AM |
| **To:** | Wetstone, Scott L. |
| **Cc:** | Turling, Deborah |
| **Subject:** | RE: Radolf case - DIO/ORI notification |

Dos this mean his request to discuss with you, me and Bob is no longer needed???????????

-----Original Message-----
| | |
|---|---|
| **From:** | Wetstone, Scott L. |
| **Sent:** | Thursday, September 12, 2002 8:29 AM |
| **To:** | Turling, Deborah |
| **Cc:** | Mauriello, Iris |
| **Subject:** | FW: Radolf case - DIO/ORI notification |

Debbie,

Please prepare this as a letter. Peter needs to review it. Once he approves, we will send it out as both a letter and an email.

bcc's to Iris and me.

Scott

-----Original Message-----
| | |
|---|---|
| **From:** | Deckers, Peter J. |
| **Sent:** | Wednesday, September 11, 2002 5:31 PM |
| **To:** | Wetstone, Scott L. |
| **Subject:** | RE: Radolf case - DIO/ORI notification |

I made a few corrections   otherwise fine   let's get it out no later than Friday let me read once more before it is sent

-----Original Message-----
| | |
|---|---|
| **From:** | Wetstone, Scott L. |
| **Sent:** | Wednesday, September 11, 2002 5:16 PM |
| **To:** | Deckers, Peter J. |
| **Subject:** | Radolf case - DIO/ORI notification |

Peter,

This is short and sweet as you requested.

Scott

-------------------------------------

Draft letter (and email) from PJD to Dr. Kay Fields (DIO) cc to Alan Price (ORI)

In our earlier communications concerning Dr. Justin Radolf, you asked that my office keep you aware of any new local issues involving him.  Please be advised that our compliance office has recently received an allegation concerning Dr. Radolf.  This allegation concerns whether Dr. Radolf has misrepresented the percentage of effort of a research associate on one or more NIH grant proposals, progress reports for funded grants, and/or time and effort reports for funded grants.  The compliance office believes the allegations are sufficiently credible to initiate a formal investigation.  This investigation will commence immediately and I will keep your office informed as the situation develops and as to results.

Sincerely *[Deckers, Peter J.]*  yours,

1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 1, 2004 |

## **EXHIBIT 26**



# University of Connecticut Health Center

Office of the
Executive Vice President
for Health Affairs

Dean, School of Medicine

September 12, 2002

Dr. Kay Fields
Office of Research Integrity
Division of Investigative Oversight
Department of Health and Human Services
5515 Security Lane, Suite 700
Rockville, MD 20852

Dear Doctor Fields:

In our earlier communications concerning Dr. Justin Radolf, you asked that my office keep you aware of any new local issues involving him. Please be advised that our Compliance Office has recently received an allegation concerning Dr. Radolf. This allegation concerns whether Dr. Radolf has misrepresented the percentage of effort of a research associate on one or more NIH grant proposals, progress reports for funded grants, and/or time and effort reports for funded grants. The Compliance Office believes the allegations are sufficiently credible to initiate a formal investigation. This investigation will commence immediately and I will keep your office informed as the situation develops and as to results.

Sincerely yours,

Peter J. Deckers, M.D.
Executive Vice President
for Health Affairs, UCHC
Dean, UConn School of Medicine
Murray-Heilig Chair and Professor in Surgery
UConn School of Medicine

PJD:djt

*An Equal Opportunity Employer*

263 Farmington Avenue
Farmington, Connecticut 06030-3800

Telephone: (860) 679-2594
Facsimile: (860) 679-1255

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 1, 2004 |

## **EXHIBIT 27**

 **UConn Health Center**   Office of Corporate Compliance

### Recommendations to the Executive Vice President for Health Affairs on Compliance Office Log # 23-02

The allegation described below was brought to the Corporate Compliance Integrity Officer on 8/22/02 by Dr. Scott Wetstone and entered into the Compliance Office's tracking log. This allegation had been evaluated in the EVP's office as a credible complaint that required further investigation.

<u>Summary of Meeting:</u>
A meeting was held on 8/27/02 to discuss the allegation made that Dr. Justin Radolf has either sent fraudulent reports to the government or has made fraudulent (omitted) T & E reports on a research associate, Ken Bourell. This meeting was attended by Iris Mauriello, Robert Kozol, Stephen Wikel, David Gillon, and Scott Wetstone.

The following facts were reviewed:

1. 2 NIH funded grants show the research associate on each grant at 50%.

   Grant # 1. Membrane Immunogens of Treponema Pallidum; NIH AI26756
   This award was transferred from Dr. Radolf's previous institution (University of Texas) to UCHC beginning 4/1/99 through 6/30/02.

   Grant # 2. Membrane Proteins of Borrelia Burgdorferi NIH AI 29735
   This award was transferred from Dr. Radolf's previous institution (University of Texas) to UCHC beginning 4/1/99 through 1/31/02.

2. Several continuing renewal reports to NIH by Dr. Radolf list the research associate at 50%.

   Grant # 1. Membrane Immunogens of Treponema Pallidum; NIH AI26756
   Continuation filed for dates 7/1/99 - 6/30/99 and again for 7/1/00 - 6/30/01.

   Grant # 2. Membrane Proteins of Borrelia Burgdorferi NIH AI 29735
   Continuation filed for dates 2/1/00 - 1/31/01.

3. The research associate, while at UCHC has been paid 100% by General Funds (State of CT. subsidy for academics and administration at the UCHC) since his hire date of 3/31/99.

4. Dr. Radolf has provided preliminary information showing minimal Time and Effort (T & E) for this research associate on the grants in question.

## Background Information

The Compliance Office was informed on 8/22/02 that Dr. Radolf has already been found by UCHC to have commited research misconduct and is currently under investigation by ORI. One element of ORI's decision making in this case may be whether Dr. Radolf engaged in a single case of misconduct or whether a pattern of misconduct exists. Therefore, prompt notification to ORI that another allegation has been made may be relevant to them.

The initial misconduct case involving Dr. Radolf was investigated at UCHC by a Scientific Review Board (SRB) appointed and charged by Dr. Peter Deckers as required by the Research Misconduct Policy of UCHC. The Compliance Office has not been privy to the details of the original UCHC and ORI investigation of Dr. Radolf. We have recently learned that ORI raised potential conflict of interest concerns last Fall relative to Mr. Len Paplauskas's involvement in the UCHC investigation of Dr. Radolf and asked that he not prepare any further UCHC responses to that case. Therefore, the Compliance Office recommends that we support ORI's directives in this matter related to these new allegations.

## Assessment

1. Dr. Radolf has provided inaccurate reports to NIH, since he has submitted no T & E reports to UCHC for this researcher.

2. Because Dr. Radolf is being investigated by ORI currently, and the SRB referenced above has recently found him guilty of research misconduct, we believe the institution continues to have risk given these behaviors.

## Compliance Office Recommendation:

At this time the Compliance Office strongly recommends that the EVP take the following two actions:
1. Immediately inform the DHHS Office of Research Integrity that we are beginning a formal investigation based on this new allegation.

2. When remanding the investigation to the Research Compliance Office, add the stipulation that Mr. Len Paplauskas should not conduct or take responsibility for any portion of the investigation.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 1, 2004 |

## **EXHIBIT 28**

## Wetstone, Scott L.

| | |
|---|---|
| **From:** | Deckers,Peter J. |
| **Sent:** | Tuesday, September 10, 2002 5:53 PM |
| **To:** | Mauriello,Iris; Kozol,Robert |
| **Cc:** | Wetstone,Scott L. |
| **Subject:** | RE: updated report |
| **Sensitivity:** | Confidential |

please come to see me with Scott

-----Original Message-----
**From:** Mauriello,Iris
**Sent:** Tuesday, September 10, 2002 5:11 PM
**To:** Deckers,Peter J.; Kozol,Robert
**Subject:** FW: updated report
**Importance:** High
**Sensitivity:** Confidential

Peter and Bob, I'm sure you have been following the email traffic below. I need to make a strong point. It will be 3 weeks this Thursday that Scott came to me at your request regarding this issue. I recommend that you contact ORI now, assign an investigation team to start our own review of this now and worry about crossing the "t's" and dotting the "i's" in this document at a later date!  3 weeks to action will not be viewed favorably in this case...especially if our contact with ORI happens to miss their final review of the previous case.

I also want to go on record here saying that the emails below worry me in the following regard: actions being taken after we know of a problem but before a full internal investigation is under way.

Iris

-----Original Message-----
**From:** Gillon,David C.
**Sent:** Tuesday, September 10, 2002 3:56 PM
**To:** Mauriello,Iris; Deckers,Peter J.; Kozol,Robert
**Cc:** Wetstone,Scott L.
**Subject:** RE: updated report
**Sensitivity:** Confidential

Iris,
Ken was paid entirely on General Funds from his date of hire, 3/31/99, to 6/14/01 .
From 6/15/01 to 12/9/01  50 % of his salary was charged to Justin's grants and 50 % to the General Fund  ;
from 12/10/01 to 6/13/02  75 % of his salary was charged to Justin's grants and 25 % to the Genral Fund  . These percentages will be  changed tomorrow to reflect the  time that will be documented by the Time And Effort forms that will be filed  . These changes  will not hit the system until the end of this month  .

Dave

-----Original Message-----
**From:** Mauriello,Iris
**Sent:** Tuesday, September 10, 2002 1:57 PM
**To:** Gillon,David C.; Deckers,Peter J.; Kozol,Robert
**Cc:** Wetstone,Scott L.
**Subject:** RE: updated report
**Sensitivity:** Confidential

Dave, All this info is confusing. Was Ken paid by general funds and for what period of time? If changes still need to happen, this will not be reflected in this report to the EVP as they have not occured yet. Are you saying that he was paid on gen. funds until 6/15/01 and since that time a portion has been paid by the grants? Please clarify. Iris

-----Original Message-----
**From:** Gillon,David C.
**Sent:** Tuesday, September 10, 2002 1:42 PM

1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF,<br>      Plaintiff, | : | CIVIL NO. 3: 03CV242 (MRK) |
| | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
|       Defendants. | : | NOVEMBER 1, 2004 |

**<u>EXHIBIT 29</u>**

**Deckers,Peter J.**

| | |
|---|---|
| **From:** | Gillon,David C. |
| **Sent:** | Tuesday, September 10, 2002 6:09 PM |
| **To:** | Deckers,Peter J. |
| **Subject:** | RE: updated report |
| **Sensitivity:** | Confidential |

Peter,

It is not any different than what we do with all others funded on research grants , the problem is that Justin indicated in the progress reports and  renewal applications  that Ken had a significant role in the research that was conducted,  when in essence,  the T&E reports, when filed, may not support those  statements .
It is not an issue of whether we charged  the NIH for time that was not devoted to the projects , but rather , did Justin indicate that Ken's  effort  was devoted to these  projects when it was actually  devoted to other Microbial Pathogenesis Center support activities .

Ken is listed on the budgets of  2  grants , at 25 % time and 50 % time  , but  Justin has indicated that Ken  did not spend that much time on those projects .

Dave


-----Original Message-----
| | |
|---|---|
| **From:** | Deckers,Peter J. |
| **Sent:** | Tuesday, September 10, 2002 3:50 PM |
| **To:** | Gillon,David C. |
| **Subject:** | RE: updated report |
| **Sensitivity:** | Confidential |

and Dave  how is this different from what we do with any one else around here... Is it stated that Ken was paid but never worked on these grants   Can that be documented?


-----Original Message-----
| | |
|---|---|
| **From:** | Gillon,David C. |
| **Sent:** | Tuesday, September 10, 2002 3:56 PM |
| **To:** | Mauriello,Iris; Deckers,Peter J.; Kozol,Robert |
| **Cc:** | Wetstone,Scott L. |
| **Subject:** | RE: updated report |
| **Sensitivity:** | Confidential |

Iris,
Ken was paid entirely on General Funds from his date of hire,  3/31/99,  to  6/14/01 .
From  6/15/01 to 12/9/01   50 %  of his salary was charged to Justin's grants and 50 %  to the General Fund  ;  from 12/10/01 to 6/13/02  75 % of his salary was charged to Justin's grants and 25 % to the General Fund  . These percentages will be  changed tomorrow to reflect the  time that will be documented by the Time And Effort forms that will be filed  . These changes  will not hit the system until the end of this month  .

Dave


-----Original Message-----
| | |
|---|---|
| **From:** | Mauriello,Iris |
| **Sent:** | Tuesday, September 10, 2002 1:57 PM |
| **To:** | Gillon,David C.; Deckers,Peter J.; Kozol,Robert |
| **Cc:** | Wetstone,Scott L. |
| **Subject:** | RE: updated report |
| **Sensitivity:** | Confidential |

Dave, All this info is confusing. Was Ken paid by general funds and for what period of time? If changes still need to happen, this will not be reflected in this report to the EVP as they have not occured yet.  Are you saying that he was paid on gen. funds until 6/15/01 and since that time a portion has been paid by the grants? Please clarify.  Iris


-----Original Message-----
| | |
|---|---|
| **From:** | Gillon,David C. |
| **Sent:** | Tuesday, September 10, 2002 1:42 PM |

**To:**          Mauriello,Iris; Deckers,Peter J.; Kozol,Robert
**Cc:**          Wetstone,Scott L.
**Subject:**    RE: updated report
**Sensitivity:**  Confidential

Iris ,
The system currently reflects salary charges for Ken Bourell's time on Justin's grants for the period 6/15/01 to 6/30/02
I had submitted Labor distributions in June, 2002 to charge 50 % of Ken's time to Justin's grants from 6/15/01 to 12/9/01
and 75 % of Ken's time from 12/10/01 to 6/13/02 . This was based on what I had been told was on Justin's grants to support Ken's time . I had a subsequent meeting with Justin and Dick Berlin to discuss the appropriate charges that should be reflected on Justin's grants for Ken's time . Justin then prepared the Time and Effort summary analysis that shows Ken's T&E from his date of hire to the present .

We will change Ken's assignment authorizations( via Labor Distribution ) to reflect the time as documented on his T&Es. The T&E forms have yet to be filed. I am meeting with Justin and Kim Young tomorrow AM to review the necessary changes .

Please contact me if you wish to discuss or review the documents .

Dave

-----Original Message-----
**From:**         Mauriello,Iris
**Sent:**          Tuesday, September 10, 2002 8:21 AM
**To:**            Deckers,Peter J.; Kozol,Robert; Gillon,David C.
**Cc:**            Wetstone,Scott L.
**Subject:**     updated report
**Importance:**  High
**Sensitivity:**  Confidential

<< File: Research recommendation23_02.doc >>    I think this includes all the necessary changes.
Dave, would you please confirm # 3? I got this info from Steve and want to verify with you.
Thanks, Iris

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JUSTIN D. RADOLF,                              :    CIVIL NO. 3: 03CV242 (MRK)
      Plaintiff,                            :    LEAD/MASTER DOCKET NO.
                                    :

V.                                             :
                                      :

UNIVERSITY OF CONNECTICUT;                     :    CASE NO. 3:03CV242 (MRK)
UNIVERSITY OF CONNECTICUT                      :    MEMBER CASE
HEALTH CENTER;                                 :
PETER J. DECKERS, EXECUTIVE                    :
VICE PRESIDENT FOR HEALTH                      :
AFFAIRS AND DEAN OF THE SCHOOL                 :
MEDICINE, INDIVIDUALLY AND                     :
IN HIS OFFICIAL CAPACITY;                      :
RICHARD BERLIN, ASSOCIATE DEAN,                :
INDIVIDUALLY AND IN HIS                        :
OFFICIAL CAPACITY; AND STEPHEN                 :
WIKEL, INDIVIDUALLY AND IN HIS                 :
OFFICIAL CAPACITY,                             :
      Defendants.                           :    NOVEMBER 1, 2004

## EXHIBIT 30

 **UConn Health Center**

**Office of Corporate Compliance**

**PERSONAL AND CONFIDENTIAL**

| | |
|---|---|
| **TO:** | **Dr. Peter Deckers**<br>**Executive Vice President for Health Affairs** |
| **CC:** | **Ms. Claire Leonardi**<br>**Chairperson, Board Of Directors** |
| | **UCHC Compliance Office File** |
| **FROM:** | **Dr. Robert Kozol**  $R+ Kozol/IW$<br>**Chair, Investigation Team** |
| | **Ms. Iris Mauriello**<br>**Mr. Jeffrey Small**<br>**Dr. Joan Caron**<br>**Investigation Team Members** |
| **DATE:** | **3/10/04** |

**REGARDING:  Investigation Team Final Report to Executive Vice President for Health Affairs; Compliance log case # 23-02 - Dr. Justin Radolf - Filed 8/22/02**

**Allegation(s)**
1. Complainant states that Dr. Justin Radolf included a biologist, Kenneth Bourell (Research Associate II), on two grant proposal budgets at 50% each, knowing he was paid by General Funds here at UCHC.
2. It appeared to the complainant that Kenneth Bourell hasn't worked on either of the grants in question nor filed T&E reports.
3. Complainant has copies of purportedly "fraudulent" progress reports that Dr. Justin Radolf sent to government stating that Kenneth Bourell had been working on these grants.

**Team Members:**
Dr. Deckers called the investigation Team together on 9/18/02. Team consisted of:
    Chair: Robert Kozol, M.D., Executive Director for UCHC Compliance
    Iris Mauriello, Corporate Compliance Integrity and Privacy Officer
    Jeffrey Small, Associate Vice President, Fiscal Administration – Research
    Brendan Fraher, University Director, Internal Audit *(retired from position May 30, 2003)*
    Joan Caron, Ph.D., Director, Office of Research Compliance
    David Gillon, Associate Dean for Finance and Administration *(originally assigned to be member of investigation team; requested to be removed in late September of 2002 and was removed)*

**Chronology of Investigation**

| | |
|---|---|
| 8/22/02 | Complaint is given to the Compliance Office by Dr. Scott Wetstone after the complainant tells him of the concern. |
| 9/12/02 | Dr. Deckers sends letter to ORI notifying them of allegations. |
| 9/26/02 | Dr. Justin Radolf is notified of the investigation by Dr. Kozol. |
| 10/1/02 - present - | Investigation team gathers documentation for review, plans and carries out interviews. Team is delayed due to court action by the accused and subsequent inability to interview him. |
| 6/17/03 | Request received from the NIH Office of Management Assessment (OMA) for information relating to the case. All information requested by OMA has been sent. |

**Documents reviewed:**
- NIH Grant proposals for T Pallidum ( UCHC account # - 5-22460) and Borrelia (UCHC account # - 5-22686)
- Original grant transfers and progress reports on both grants noted above
- Laboratory notebooks of Ken Bourell's (reviewed only in preparation to send to OMA)
- T & E reports for Ken Bourell
- Labor Distribution Change Authorizations for Ken Bourell
- Cost Transfers regarding Ken Bourell
- Assignment Authorizations for Ken Bourell
- Email communications pertinent to the allegations being investigated.

**Interviews:**
Mr. David Gillon
Mr. Kenneth Bourell
Dr. Richard Berlin - phone interview
Ms. Kimberly Young

Attempts to schedule an interview with Dr. Justin Radolf were precluded due to a court action. As a result, access to Dr. Radolf for interview was not forthcoming within the time constraints of this investigation.

**Findings:**
The following facts were established during the course of the investigation.
1. It was determined that Dr. Justin Radolf was aware that Kenneth Bourell was to be paid on General Funds. At the time Dr. Radolf was recruited, there was not a written agreement documenting where Mr. Bourell's salary support would be from or how long salary support would last.
2. Kenneth Bourell states that he did work on the grants in question, but did not file proper T&E reports until concern about the lack of reports was brought to Dr. Radolf's attention.
3. Accurate T & E reports that UCHC required to be filed, were filed. Mr. Bourell and Dr. Radolf performed a retrospective review of the effort by Mr. Bourell on the grants and the agreed upon data was entered into the T & E system.
4. It was determined that Kenneth Bourell was not considered to be "key personnel" on either grant in question, therefore there was no requirement to report any changes to Mr. Bourell's percent of effort on progress reports sent to the government.

**Conclusion:**
1) Dr. Radolf did place Mr. Bourell on research grants knowing that he was funded by UCHC General Funds, and Mr. Bourell did expend effort on the grants. T & E reports were certified by Dr. Radolf and filed retrospectively.

2) The progress reports filed were not fraudulent. Dr. Radolf was not required to report any changes to the percent effort of Mr. Bourell in progress reports to the government because only effort changes for "key personnel" are required to be reported and Mr. Bourell was not "key personnel" on either of the grants in question.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
|     Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
|     Defendants. | : | NOVEMBER 1, 2004 |

## **EXHIBIT 31**

August 11, 2004

Ms. Claire Leonardi
Chairperson, Board of Directors
University of Connecticut Health Center
Farmington, CT  06001

RE:    Justin D. Radolf, M.D.

Dear Ms. Leonardi:

My client, Dr. Radolf, has reviewed the final report by the Office of Corporate Compliance regarding compliance log case #22-03 dated July 7, 2004.  He is most disappointed that this report was finalized before he was given an opportunity to offer a response.  As noted below, in addition to containing distortions, inaccurate statements, and outright fabrications, the report is seriously marred by a failure on the part of the investigative team to perform due diligence in its investigation:

1. Emails unequivocally establish that, beginning in February, 2002, there was interest on the part of Dr. Wikel and University officials to charge Mr. Kenneth Bourell's salary and fringes to Dr. Radolf's NIH grants.  No effort was made to bring this concern to Dr. Radolf's attention, or, after discussing the matter with him, to establish a system for monitoring Mr. Bourell's activities to ensure that Dr. Radolf's grants were accurately charged.  These basic oversights are, in themselves, extremely irregular and contrary to the spirit, if not the letter, of University policies and Federal statues.  Furthermore, emails also clearly indicate that, beginning on or about March, 2002, Mr. Bourell began providing to Dr. Wikel "internal" Time and Effort reports.  This information, never requested by the Compliance office, establishes without doubt that Dr. Wikel and University officials knew that the funds encumbered in June, 2002 were vastly out of proportion to Mr. Bourell's actual expenditure of T&E on Dr. Radolf's NIH-funded research.  Additionally, there was no attempt on the part of University officials, specifically Mr. David Gillon, to notify Dr. Radolf that the funds had been encumbered, as would be expected, nor does the report offer any documentation to support the dubious

Ms. Claire Leonardi
Chairperson, Board of Directors
University of Connecticut Health Center
August 11, 2004

Page Two

claim that Ms. Young was instructed by Mr. Gillon to notify him.  Indeed, it stretches the bounds of credulity for the investigative team to state that this was an appropriate manner for University officials to notify Dr. Radolf of an unexpected encumbrance of grant funds of this magnitude.  In point of fact, Dr. Radolf has no recollection of Ms. Young telling him that she acted on Mr. Gillon's instructions, nor was he asked about this by the investigative team.  It is worth noting that a previous draft of the report excused this action by stating that it was of no consequence because, ultimately, it would have to be certified by Dr. Radolf. However, the fallacy of this logic is brought out by the fact that, when he refused to certify it, a retaliatory allegation was brought against him.  Indeed, one can see why this implausible line of reasoning was deleted from the final report.  The final report also states that Ms. Young submitted T&E data for Mr. Bourell into the University's online system in June, 2002 and that Dr. Radolf was informed of these filings "after he returned" (see below). <u>This is without doubt a fabrication</u>. Ms. Young never informed Dr. Radolf about T&E filings in June, 2002, nor have printouts of this information or other evidence supporting their existence been presented to him.  This certainly did not occur in his August, 2002 meeting with Mr. Gillon and Dr. Berlin at which time he was told that there were no T&E reports for Mr. Bourell.  To the best of Dr. Radolf's recollection, the online system was completely blank when he inputted the T&E data for Mr. Bourell in September, 2002.  Interestingly, there is nothing in the report to indicate how the investigative team corroborated this assertion.

2.  A key point concerns the signing by Dr. Wikel and Mr. Gillon of an Assignment Authorization for one of Dr. Radolf's grants.  These forms are a principal safeguard against the misappropriation of NIH funds.  The mere fact that this occurred is an extraordinary impropriety and should have been regarded as such by the investigative team.  Their willingness to turn a blind eye to this wrongful, and, almost certainly, unprecedented action is compounded by their willingness to excuse it on the basis of Dr. Radolf's purportedly being out of town at the time.  It is inconceivable that a short absence could be construed as an excuse for an action that involves the potential misappropriation of Federal funds.  Dr. Radolf disputes that this point was even touched upon during his December, 2003 interview.  When it surfaced during his June, 2004 conversation with Ms. Mauriello, his point to her was not that it was unimportant (as she insisted upon later and as implied in the report), but that <u>it was irrelevant in the sense of being completely unacceptable as an excuse</u>.  This assertion also implies that no means existed for Ms. Young, Dr. Wikel, or Mr. Gillon to contact Dr. Radolf to ascertain

Ms. Claire Leonardi
Chairperson, Board of Directors
University of Connecticut Health Center
August 11, 2004

Page Three

whether he was in agreement with this action and to obtain, at the very least, a verbal authorization (no less faxing the form for his signature). Putting all of this aside, it is nothing short of astonishing that the investigative team made no effort to obtain University records for Dr. Radolf's whereabouts in June, 2002 in order to assess the validity of this implausible, but apparently, central contention. Had they done so, they would have found that he was on station for the entire month. In other words, the contention that Dr. Radolf was out of town, and, therefore, unavailable to sign off on the assignment authorization is another fabrication. This assertion also implies that whenever an investigator is out of town, University officials can encumber monies from his/her NIH grants based on their perception of budgetary exigencies and that such an action would be condoned by the Compliance Office.

3. A related point is whether an Assignment Authorization for Dr. Radolf's syphilis grant also was signed by Dr. Wikel and Mr. Gillon. It is difficult to imagine that an AA was signed for only one of the two grants at the time when monies were taken from both. Dr. Radolf called this point to the attention of Ms. Mauriello during his June, 2004 telephone discussion at which time she acknowledged that it was peculiar. Nevertheless, there is no indication that the investigative team made a serious effort to determine if this other AA existed. This is important for two reasons: (i) this AA covered the majority of misappropriated funds and (ii) Mr. Bourell had performed no work on this particular project during the entire year for which salaries and fringes were encumbered. On the other hand, one might argue that the absence of this form is even further evidence of the willingness of University of officials to bypass critical safeguards and minimize the paper trail when doing so.

4. The report also states that Dr. Wikel was "under the impression" that Mr. Bourell was listed as a "key personnel" on Dr. Radolf's NIH grants. Where did this impression come from? Certainly not from Dr. Radolf's transfer of grantee institution forms which, correctly so, do not indicate Mr. Bourell as key personnel. In fact, there is nothing in the 2002 emails from Dr. Wetstone or Dr. Wikel to indicate that either was aware of the distinction between key and non-key personnel. This distinction also does not appear to have even been considered by the Compliance Office when it made its original inquiry into the matter in August, 2002. In reality, the distinction between key and non-key personnel was first made by Dr. Radolf and Dr. Melissa Caimano when they met separately with the investigative team in December, 2003. It is now apparent that this

Ms. Claire Leonardi
Chairperson, Board of Directors
University of Connecticut Health Center
August 11, 2004

Page Four

issue subsequently was seized upon by Dr. Wikel, and unquestioningly accepted by the investigative team, to help exculpate Dr. Wikel from his unfounded allegation. It also must be pointed out that the same preliminary investigative team (which included the complainants Drs. Wikel and Wetstone) that met in August, 2002 also failed to take note of the cost-sharing arrangement that existed for Mr. Bourell. This arrangement was fully known to Dr. Berlin and Mr. Gillon at that time because they had approved it when Dr. Radolf relocated in 1999.  In other words, even a cursory <u>objective</u> review of the facts would have brought to light the spurious nature of this allegation and the malicious intent of those who brought it forward.

5.  The report virtually ignores the fact that Dr. Deckers played an instrumental role, directly and indirectly via his subordinate, Dr. Wetstone, in moving this false allegation forward. I call your attention to emails from Dr. Deckers in which he explicitly requested Dr. Wetstone to draft a complaint and that he subsequently reviewed and approved Dr. Wetstone's handiwork.  This being the case, how was Dr. Deckers to maintain any objectivity in the event that he would have to make a determination based on an investigative team's report?  Indeed, the emails show that Dr. Deckers's level of involvement was not just inappropriate, but a violation of the Health Center's algorithm for reporting and investigation of compliance allegations. The report also excuses Dr. Deckers's letter to the Office of Research Integrity on the basis that he was instructed to keep the ORI informed of local developments. As Ms. Comerford has pointed out in one of her emails, and as should have been known to the Compliance Office, this could not have been the intent of the ORI given that the ORI does not investigate financial issues of this sort. Moreover, the timeline shows clearly that Dr. Deckers, without any regard for fairness or due process, notified the ORI of an unsubstantiated allegation well before Dr. Radolf had received Dr. Kozol's letter informing him of the allegation and before any form of due process had been conducted. Dr. Radolf was not even notified by the Health Center that this letter had been sent to the ORI; it came to his attention months later during subsequent legal proceedings. Consistent with Dr. Deckers's behind-the-scenes engineering of the actual allegation, this letter was a secretive attempt to adversely influence the ORI's deliberations.

6.  Of greatest significance is the investigating team's failure to acknowledge that <u>it was only because of Dr. Radolf's intervention, not any well meaning intention on the part of University officials, that the illegal encumbrance of funds came to light, and it was only</u>

Ms. Claire Leonardi
Chairperson, Board of Directors
University of Connecticut Health Center
August 11, 2004

Page Five

after Dr. Radolf's intervention that allegations against him surfaced by email and were eventually filed. Indeed the committee virtually glossed over the fact that Dr. Berlin, the Health Center official charged with oversight of all research-related activities, clearly pressured Mr. Gillon to misrepresent Mr. Bourell's expenditure of T&E, in direct violation of NIH regulations. More specifically, the false allegations against Dr. Radolf were filed only after he had (i) protested the misappropriation of funds from his NIH grants in June, 2002; (ii) engaged in good faith discussions with Dr. Berlin and Mr. Gillon to amicably resolve the matter in early August, 2002; and (iii) taken all the agreed upon steps immediately thereafter to file accurate Time and Effort reports for Mr. Bourell. Indeed, the filings could have been made in mid-August, 2002, but Dr. Radolf was asked by Mr. Gillon to wait, ostensibly because Dr. Berlin was on vacation. It is now readily apparent that, with Dr. Deckers's full knowledge and agreement, efforts were well underway during this interval to level false allegations against Dr. Radolf.

7.  Finally, it must be pointed out that the investigative team has not made any recommendations to prevent recurrences of these illegitimate and retaliatory actions. Indeed, to have done so would have been a tacit agreement that compliance violations had, in fact, taken place. Nevertheless, in failing to address the numerous substantive procedural irregularities that underlie these abuses, the investigative team has opened the door to a repetition of this activity and helped to validate the pretexts whereby they can be excused if challenged by other investigators at the Health Center.

In summary, in creating this highly flawed and untruthful document, the Compliance Office has failed in its responsibilities to ensure adherence to University policies and Federal statutes, to protect faculty members at your Institution against wrongful and retaliatory behavior, and to ensure that everyone in the Health Center community is held to the same ethical and legal standards. I urge you to reject it and, instead, to demonstrate your commitment to the academic community by initiating a new investigation under the purview of an independent investigative body.

Very truly yours,

Thomas W. Bucci

TWB:jq
cc:        Justin D. Radolf, M.D.
           Jane D. Comerford, AAG

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 1, 2004 |

**EXHIBIT 32**

VOLUNTARY EXCLUSION AGREEMENT

This Voluntary Exclusion Agreement (Agreement) is entered into by and between the United States Department of Health and Human Services (HHS), through the Public Health Service (PHS) and Justin Radolf, M.D. (Respondent).

The purpose of this Agreement is to settle HHS' scientific misconduct findings against Respondent made by the PHS. Based on the report of an investigation conducted by the University of Connecticut Health Center (UCHC Report), Dr. Radolf's admissions and additional analysis conducted by ORI in its oversight review, the PHS finds that Respondent engaged in scientific misconduct in research supported by National Institutes of Health grant R01 AI29735-11 and incorporated false claims into a grant application entitled "Tick Inhibitors of Hemostasis: Novel Therapeutic Agents and an Anti-Tick Vaccine" to the United States Department of Agriculture (USDA). Respondent falsified and fabricated preliminary research data to falsely claim that the genes that he proposed to characterize were specifically expressed in the tick salivary gland. The respondent represented the products of control samples as positive tests for mRNA expression from different genes and presented data as positive for genes that had not been tested.

Specifically, the PHS finds that Respondent, Professor at UCHC's Center of Microbial Pathogenesis, falsified and fabricated data in January 2000 by altering the labeling of a figure included in a USDA grant application and by falsifying the text in both the USDA application and in an overlapping application to a state-sponsored program.

This incident of falsification and fabrication is significant because the data was the first direct evidence that the isolated clones represented genes expressed in tick salivary gland, and therefore represented proteins that could be targets of vaccine development to protect the hosts from tick-transmitted microbial diseases. The misinformation of the extent of the progress in this project had the potential to mislead grant reviewers and the scientific community about an area of research that could have led to the prevention of Rocky Mountain Spotted Fever and other tick-transmitted diseases.

The Respondent submitted the following admission to ORI:

> In January of 2000, I engaged in scientific misconduct involving research supported by the National Institutes of Health. The misconduct occurred during the preparation of grant proposals submitted to the United States Department of Agriculture and Connecticut Innovations, Inc. More specifically, I falsified and fabricated preliminary data by intentionally altering the labeling of an ethidium bromide-stained agarose gel purporting to demonstrate the expression of genes in the salivary glands of feeding *Dermacentor andersoni* ticks. In so doing, I misrepresented the products of control samples as positive tests for the presence of mRNAs derived from unrelated genes, and I fabricated data to show the expression of genes that, in fact, were not tested. The texts of the two proposals also contained inaccurate statements relating to these falsified and fabricated data. By inaccurately portraying the extent

Voluntary Exclusion Agreement
Page 2

of our progress in characterizing salivary gland proteins that might interfere with tick feeding, my actions would have misled the reviewers of the proposals into thinking that we were closer to the development of an anti-tick vaccine that we actually were.

Truthfulness in the recording, presentation, and reporting of data—the accuracy and reliability of the research record—is the foundation of all scientific research. By intentionally misrepresenting preliminary findings in the two grant proposals, my actions violated this basic precept, compromised my scientific integrity and placed my 20-year career as a biomedical researcher in jeopardy. My actions also could have compromised the integrity and careers of individuals with whom I work, individuals who place their trust in me and who look to me for scientific leadership. I take full and complete responsibility for this misconduct. I committed this wrongful act without prompting by other individuals and without the consent or knowledge of others. I am deeply remorseful for my behavior and offer my strongest assurance to the Office of Research Integrity that it will never recur.

The terms of this Agreement are as follows:

1. Respondent accepts the findings of scientific misconduct as set forth above and in the UCHC Report, which is attached as Attachment A and made a part of this Agreement, and agrees not to appeal the jurisdiction of the PHS or its findings.

2. Respondent agrees to exclude himself voluntarily from serving in any advisory capacity to the PHS including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant for a period of five (5) years beginning with the effective date of this Agreement.

3. Respondent agrees that for a period of five (5) years beginning on the effective date of this Agreement, any institution which submits an application for PHS support for a research project on which the Respondent's participation is proposed or which uses the Respondent in any capacity on PHS-supported research, or that submits a report of PHS-funded research in which the Respondent is involved, must concurrently submit a plan for supervision of the Respondent's duties to the funding agency for approval. The supervisory plan must be designed to ensure the scientific integrity of the Respondent's research contribution. A copy of the supervisory plan must also be submitted to ORI by the institution. Respondent agrees that he will not participate in any PHS-supported research until such a supervision plan is submitted to ORI.

4. For a period of five (5) years beginning on the effective date of this Agreement, Respondent agrees to ensure that any institution employing him submits, in conjunction with each application for PHS funds or report, manuscript, or abstract of PHS funded

Voluntary Exclusion Agreement
Page 3

research in which the Respondent is involved, a certification that the data provided by the Respondent are based on actual experiments or are otherwise legitimately derived, and that the data, procedures, and methodology are accurately reported in the application or report. The Respondent must ensure that the institution also sends a copy of the certification to ORI.

5.    HHS and Respondent agree that Paragraphs 1, 2, 3, and 4 are material provisions of this Agreement. Pursuant to 45 C.F.R. § 76.305(c)(4), a violation of Paragraph 1, 2, 3, or 4 would constitute a violation of a material provision of this Agreement by Respondent. If the Respondent violates any of the material provisions, he voluntarily agrees to accept Government-wide debarment for one (1) year and to voluntarily exclude himself from serving in any advisory capacity to the PHS and special supervision for one (1) year in addition to the term stated in Paragraphs 2 , 3, and 4, respectively.

6.    This Agreement contains a complete description of the agreement between the parties. All material representations, understandings, and promises of the parties are contained in this Agreement. Any modifications must be set forth in writing and signed by all parties. Respondent represents that this Agreement is entered into voluntarily with knowledge of the events described and following consultation with his legal counsel.

7.    In accordance with its normal procedures, ORI shall provide public notice of this Agreement, and Respondent's current employer will also be notified.

8.    This Agreement shall become binding and effective only when it is signed by the PHS representative and by the Respondent and his counsel.

_2/2·/ω_
Date

_Justin D. Radolf, M.D._
Respondent

_2-27-2003_
Date

Concurrence by Thomas W. Bucci
Counsel for Respondent

_3 - 10 - 2003_
Date

Richard H. Carmona, M.D., M.P.H., F.A.C.S.
VADM, USPHS
Surgeon General and
Acting Assistant Secretary for Health