**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 1, 2004 |

<u>**PAGES OF TRANSCRIPT TESTIMONY OF DAVID GILLON**</u>

1      A     That's fine.

2      Q     And it's best for the court reporter if we

3   both don't speak at the same time, so you should allow

4   me to finish my question before responding and I

5   should allow you to finish responding before I ask you

6   another question.

7      A     Right.

8      Q     Is that agreeable?

9      A     That's fine.

10     Q     If your attorney objects to a question,

11  you're still to respond unless your attorney directs

12  you otherwise.  Is that agreeable?

13     A     That's fine.

14     Q     My questions for you today in particular will

15  deal with an individual known as Ken Bourell and your

16  familiarity with his pay, his salary being paid by

17  salary or general funds, in that vicinity.  And I

18  believe you have some awareness about those issues.

19     A     That's correct.

20     Q     When do you recall, sitting here today, that

21  there became -- that discussions started involving you

22  with regard to the proper funding source for Ken

23  Bourell's salary?

24     A     There was a meeting that was called in the

25  vice president's conference room in January of 2002 --

1    okay, in January, I believe it's 2002 and based on

2    review of information that I provided to -- at your

3    request, I believe it was January 19, 2002, which was

4    attended by myself, Dr. Berlin, Dr. Deckers and

5    Dr. Wikel.

6        Q    And what in particular was the reason for the

7    meeting?

8        A    There was a question -- a question was raised

9    that Ken Bourell was charged -- although he was paid

10   one hundred percent on state general fund dollars,

11   that he had time -- that Dr. Radolf had indicated time

12   on his, either grant application or progress reports,

13   filed with the federal government that there was --

14   again, time -- that Ken Bourell was listed as a

15   percent of effort on that grant.

16       Q    And who brought that to your attention?

17       A    Dr. Wikel.

18       Q    And this was in January, to the best of your

19   recollection, of 2002?

20       A    I believe -- I guess I'm confused on the

21   year.  I want to make sure I got the year right.  I

22   think it was 2002.  Was it January?  I think that's --

23       Q    I will say that the written documents that I

24   have E-mails and correspondence all indicate taken

25   place in 2002.

1    A    Yeah, that's it, 2002.

2    Q    And what was decided at that meeting?

3    A    It was decided that I should meet with

4    Dr. Radolf and get Dr -- or get Ken Bourell's time and

5    effort charged appropriately to the grant.

6    Q    Was there any discussion of fraudulent

7    activity at that meeting?

8    A    I don't recall.  It was more from my seat

9    there, I don't think the word fraud was discussed.  I

10    think the appropriateness -- there was discussion on

11    what the agreement had been to fund Ken Bourell when

12    Dr. Radolf was hired, however, I do not believe there

13    was any indication that there was fraud involved at

14    that meeting.

15    Q    And when you say there was discussion about

16    the agreement, what the agreement was to fund Ken

17    Bourell, to your best recollection did anybody state

18    with that agreement was?

19    A    We discussed -- I discussed it with

20    Dr. Berlin and we were not clear.  We did not have --

21    we could not recollect what the agreement had been

22    when we had hired Dr. Radolf and how much support

23    would be provided to Ken Bourell.  Normally it's

24    short-term support, but this had been a couple of

25    years and Ken was still funded on the general fund.

```
 1        A     Other than the fact that we had hired -- when

 2   we hired Justin Radolf we brought Ken Bourell into the

 3   Health Center and we placed him on the general fund.

 4   Again, whether that was a short-term commitment or a

 5   long-term commitment, there is nothing that I could

 6   find that documents that -- support.

 7        Q     But when he did initially come on -- come to

 8   the University of Connecticut with Dr. Radolf, he was

 9   put strictly on general funds?

10        A     Yes.

11        Q     What steps did you take after -- initially

12   after that meeting to implement what you were asked to

13   do?

14        A     Okay.  In June of '02, I processed

15   paperwork -- attempted to contact Dr. Radolf because

16   we were under the deadline of the end of the state

17   year and I had to get the paperwork in to make the

18   appropriate charges to the grant and reduce the

19   general fund.  Dr. Radolf was out of town so I made

20   the changes on the assignment authorizations and the

21   labor distribution change authorization forms and I

22   asked the administrative assistant Kim Young to have

23   Dr. Radolf contact me when he returned and we would

24   discuss the action that I took.

25        Q     Did you meet with Dr. Radolf any time prior
```

1    to June of 2002?

2        A    No, I did not.

3        Q    To discuss the situation with Ken Bourell?

4        A    No, I did not.

5        Q    How do you explain the length of time between

6    January 19, 2002 and June of 2002 in preparing the

7    forms to move Ken Bourell?

8        A    There was just a lot of activity, other

9    activity that I was involved in with the Health Center

10    budget and my normal day-to-day routine and it just

11    got put on the back burner and it was not until it had

12    to be done prior to the end of the year that it got my

13    full attention.

14        Q    And do you recall where Dr. Radolf was

15    when --

16        A    That I do not know.

17                        (Plaintiff's Exhibit 1, E-mail,

18                         marked for identification.

19    BY MR. BUCCI:

20        Q    Mr. Gillon, I'm giving you what has been

21    marked as Exhibit No. 1 and it's a E-mail from

22    Kimberly Young to Dave Gillon subject Ken Bourell.

23    This is dated February 27, 2002.  Was this in

24    response -- were you sent this in response to a

25    request that you had made or do you know why you were

1    sent this E-mail?

2        A    No, it was not in response to a request that

3    I made.

4        Q    Do you recall receiving this E-mail?

5        A    Yes, I do.

6        Q    And do you know why it was sent to you?

7        A    No, I don't.

8        Q    And did you inquire from Ms. Young or

9    Steve Wikel why you had been sent this?

10       A    No, I did not.

11       Q    What did you do with it after you had been

12   sent it?

13       A    Nothing.

14       Q    After the -- between January of 2002 and June

15   of 2002, did Dr. Wikel come to you with this

16   information and tell you that -- inform you that he

17   felt that this was fraudulent activity on the part of

18   Dr. Radolf?

19       A    No.

20       Q    Did he ever provide you with information that

21   he thought you should commence an investigation of

22   Dr. Radolf?

23       A    No.

24       Q    Did you ever indicate to him that you were

25   investigating Dr. Radolf with regard to Ken Bourell's

14

1  salary between January and June of 2002?

2      A    No.

3      Q    Did Dr. Berlin ever ask you to -- between

4  January of 2002 and June of 2002, to commence an

5  investigation of Dr. Radolf?

6      A    No.

7      Q    Between January of 2002 and June of 2002, did

8  Dr. Wikel ever inform you that he felt that what

9  Dr. Radolf had indicated in the grants, the renewals

10  and the progress reports could be considered

11  fraudulent?

12      A    No.

13      Q    You're going to have to help me with these,

14  Mr. Gillon.  You will have to walk me through these

15  somewhat.

16                      (Plaintiff's Exhibit 2,

17                      assignment authorizations,

18                      marked for identification.)

19  BY MR. BUCCI:

20      Q    What has been marked as Exhibit 2, the

21  document on the first page states, "Assignment

22  authorization," and I believe the date is 6-25-02?

23      A    Let's see.  No.  What are you looking at, I'm

24  sorry?  That's probably a processing date.

25                      MS. COMERFORD:  Don't write on it.

25

1      Q      Well, in the assignment authorization where,

2    again, you're going, I believe prospectively,

3    Dr. Wikel did sign off on this.  Did he indicate to

4    you any concern with the percentages being used?

5      A      No.

6      Q      When did it first come to your attention that

7    there was questions that Dr. Radolf had questions with

8    regard to these percentages?

9      A      When Dr. Radolf returned and he found out the

10   changes had been made he contacted me.

11     Q      How did he find out that the changes were

12   made?

13     A      I'm not sure if Kim Young told him or he saw

14   the paperwork.

15     Q      Now, would he normally see the paperwork

16   after it's been prepared in this fashion?

17     A      Yes.  Again, the turnaround documents, the

18   completed change documents, get resubmitted back to

19   the departments.

20     Q      And so he would have received a copy and that

21   may have triggered an inquiry from him to you?

22     A      Well, I did want to discuss the changes that

23   we had made and I knew that the time and effort forms

24   would have to make the charges we put on to the

25   grants.

1  it to Dr. Wikel and Richard Berlin, that you're not in

2  agreement with the assessment.

3      A    That's correct.

4      Q    Why weren't you in agreement with the

5  assessment?

6      A    Again, because the time and effort supports

7  the charge to the grant.

8      Q    And to charge anything more to the grant

9  would not be proper?

10     A    Correct.

11     Q    Dr. Berlin seems to continue to have a

12 disagreement to your position, in his E-mail at

13 3:37 p.m.  Is that how you read that E-mail?

14     A    Yes, I did.

15     Q    That he continued to disagree with your

16 position?

17     A    Yes.

18     Q    But you didn't change your position with

19 regard to this matter?

20     A    No, I did not.

21     Q    During the course of these E-mails, did

22 Dr. Wikel or Dr. Berlin tell you that Dr. Radolf is

23 committing a fraud here?

24     A    No.

25     Q    Doesn't appear to be anything in writing in

1   these E-mails where they raise an issue of fraud.

2       A    No.

3       Q    In the last sentence, did you ask Dr. Berlin

4   what he meant by, "Wizard wave your wand"?

5       A    Dr. Berlin tells me that all the time on

6   every issue we deal with as far as let's address this,

7   let's fix the problem, let's take care of the issue

8   and fix the problem.  So he'll say, "Magic wizard wave

9   your wand."  That's not the first time he's said that.

10      Q    Did he indicate to you how he wanted this

11  resolved?

12      A    No, he did not.

13      Q    Except what's in the E-mail?

14      A    No.  He is stating his opinion here and

15  that's not how he -- that's not how -- he did not

16  direct me to fix the problem that way.

17      Q    His next to the last sentence, "But the

18  indicated time should be taken as the measure of

19  effort unless it was declared otherwise in the grant,

20  at least in my opinion."

21      A    At least in his opinion, right.

22      Q    And that was not your opinion.

23      A    No, it was not.

24      Q    This E-mail is dated -- the E-mail on

25  Exhibit No. 5, the last one from Dr. Berlin to you is

1   the matter that is referred to in Exhibit 7?

2       A    Yes.

3       Q    And who was in attendance at that meeting, if

4   you recall?

5       A    Dr. Radolf, Dr. Berlin, and myself.

6       Q    Dr. Berlin was present in the meeting?

7       A    Yes, he was.

8       Q    And do you recall what was discussed in the

9   meeting?

10      A    Yes.  We had talked about Ken Bourell's

11  actual percent of time and efforts charged to the

12  grants.  We talked about the commitment that the --

13  the original commitment that had been made to Ken

14  Bourell when Justin Radolf arrived in the school of

15  medicine and we talked about fixing the time and

16  efforts and the grant charges to match.

17      Q    And Dr. Berlin was a part of this meeting?

18      A    Yes, he was.

19      Q    And the three points of agreement referred to

20  by Dr. Radolf, was that the understanding that came

21  out of that meeting?

22      A    Yes, it was.

23      Q    And was that the understanding you had with

24  Dr. Radolf?

25      A    Yes.

1      Q    And did Dr. Berlin object to it in any way at

2    that meeting?

3      A    He did not object at that meeting.  He did

4    indicate to me via E-mail that he did not agree with

5    these three points.

6      Q    But at the meeting did he participate in the

7    meeting in a -- you know, in the dialogue at the

8    meeting?

9      A    Oh, definitely.

10     Q    And what position was he taking at the

11   meeting?  The position, was it consistent with his

12   prior E-mails?

13     A    No, it was not.  It was consistent with we

14   should get things -- again, I think it was stated at

15   that meeting with Dr. Radolf, "Dave, wave your magic

16   wand and fix the problem, with Dr. Radolf in

17   attendance."

18     Q    And that's what Dr. Berlin basically said,

19   "Get this corrected"?

20     A    Yes.

21     Q    And this, in your view, was the proper way to

22   get it corrected?

23     A    Yes.

24     Q    During this meeting, did Dr. Berlin inform

25   Dr. Radolf that, what he was doing with his grants,

1    listing Ken Bourell was fraudulent?

2        A    No.

3                        (Plaintiff's Exhibit No. 8,

4                        E-mail, marked for

5                        identification.)

6    BY MR. BUCCI:

7        Q    Mr. Gillon, in Exhibit No. 8, the second

8    E-mail from the top dated August 6, 2002, is an E-mail

9    you forwarded to Dr. Radolf in which you state, "I

10   agree with the summary of our meeting last week."

11            And I believe you're referring to the E-mail

12   just below that that Dr. Radolf had sent to you.  Is

13   that accurate?

14       A    That's correct.

15       Q    After the meeting that you had with

16   Dr. Radolf, did you -- did Dr. Berlin meet with you

17   to -- and express any frustrations over this

18   situation?

19       A    Not to my recollection.

20       Q    You refer in that E-mail to possible problems

21   with covering Ken Bourell's salary if this is

22   implemented.  You say that, "Based on our budget

23   situation and recommendations of our consultants, PWC,

24   we may have to reduce Ken's employment percentage."

25            Would there be a direct impact on his

1    undated, from Stephen Wikel to you and says, "Dear

2    Dave, please have Francis schedule a meeting for you,

3    Dick, and me to discuss the impact of this matter on

4    the Center.  I know that Dick is out of town until

5    August 19th.  I'm presenting one of the plenary

6    lectures at the International Conference on Lyme

7    Disease in New York City, which is being held from

8    August 19th through the 22nd."

9           Do you recall whether a meeting with

10   Dr. Berlin and Dr. Wikel took place after this to

11   discuss the impact of the matter on the Center?

12       A    I do not recall a meeting with Dr. Berlin,

13   Dr. Wikel and myself.  I do recall Dr. Wikel coming to

14   talk to me about this matter after this E-mail was

15   sent.

16       Q    Okay.  So you don't recall a general meeting?

17       A    I do not recall.

18       Q    And what do you recall about the -- about

19   Dr. Wikel coming to see you?

20       A    He was concerned about the issue that we

21   might have to reduce Ken Bourell's employment

22   percentage and he indicated that Ken was a middle-aged

23   man and it might be difficult for him to find other

24   employment and he asked that I do anything I could to

25   keep him employed.

41

1      Q     And what was your response?

2      A     We did.

3      Q     And how did you accomplish that?

4      A     We left him on the general fund.

5      Q     Did Dr. Wikel, in that meeting with you, and

6  I guess it would have to be sometime in August or late

7  August, discuss with you that he wanted to file a plan

8  of any type against Dr. Radolf with regard to this

9  situation?

10     A     No, he did not.

11     Q     Did he indicate to you that he thought

12 Dr. Radolf's activity was improper?

13     A     No, he did not.

14     Q     Did he indicate to you that he had thought

15 you had been investigating the situation of listing

16 Ken Bourell in the grants since February and wanted

17 and update from you with regard to that investigation?

18     A     In August?

19     Q     In August.

20     A     No.  He, again, in August he was aware that I

21 was working with Kim Young and Justin to correct the

22 time and efforts in the labor distributions.

23                     (Plaintiff's Exhibit 10,

24                     E-mail, marked for

25                     identification.)

1    such a change from planning (the proposal) to

2    operations (the actual work) are allowable by the

3    grant sponsor.  Therefore, this mismatch of allocated

4    FTE doesn't represent a problem."

5            What does FTE stand for?

6    A    Full time equivalent.

7    Q    And do you recall informing Scott Wetstone of

8    that?

9    A    I don't recall but we would have discussed --

10   that's part of -- the discussion would have taken

11   place regarding matching the time and effort with the

12   salary charges that are made.

13   Q    All right.  And is that -- is he stating

14   accurately your opinion on that matter?

15   A    Not one hundred percent.  There would be a

16   question in my mind whether Ken Bourell was listed as

17   a key personnel on the project and whether there

18   should be notification made regarding any changes.

19   Q    So is it your testimony that there is a

20   different reporting requirement for somebody who is

21   listed as key personnel on a grant and somebody who is

22   not?

23   A    There's -- the reporting requirement is that

24   if there is a change in the funding level of a key

25   personnel, the granting agency should be made aware of

1    that change.

2        Q    If I'm listed on a grant as a test tube

3    washer and they're increasing my salary from eight

4    dollars an hour to eight-fifty an hour, would that

5    have to be reported?

6        A    No, that would not have to be reported.

7        Q    Yet on the grant the PI's salary is going up

8    10 percent on the grant, would that have been to be

9    reported?

10       A    I don't believe that would have to be

11   reported.  I think it's 25 percent threshold is the

12   change but I'm not one hundred percent sure about

13   that.

14       Q    If I'm increasing my salary 75 percent and

15   I'm the PI, that would have to be reported.

16       A    I believe so, yes.

17       Q    Do you know where -- what Dr. Wetstone was

18   talking about when he said he discussed it with you,

19   these issues with you?

20       A    Well, we probably had discussion on the

21   situation regarding Ken Bourell's time and effort and

22   what we were trying to do to match it up with the

23   salary charge and the time and effort forms.

24       Q    Okay.  Prior to this point in time, August 9,

25   2002, did you go to Dr. Deckers and say, there should

1    matter."

2         Had Dr. Wetstone discussed this with you

3    before sending this E-mail to Dr. Deckers?

4    A    I don't recall.  We had several discussions

5    but I don't recall the specifics.

6    Q    At this time, August 9, 2002, did you concur

7    with him that an investigation should be conducted, a

8    formal investigation should be conducted?

9    A    I do not believe I did.

10   Q    The E-mail preceding, not in time but on the

11   page, the one dated August 12, 2002, 9:04 a.m. from

12   Scott Wetstone to Richard Berlin, Dave Gillon, Steven

13   Wikel, subject Clarification, and it says, "Peter has

14   asked me to arrange a meeting next week (those in the

15   To list and Peter) in order to discuss the matter

16   below."

17        Was such a meeting held?

18   A    I do not recall.

19   Q    Do you recall meeting with Richard Berlin,

20   Stephen Wikel, Dr. Deckers, Dr. Wetstone.

21   A    I vaguely remember there was a meeting, but I

22   don't recall the subject matter.

23   Q    You don't recall the subject matter at all?

24   A    No.

25   Q    Do you recall whether it had to do with Ken

52

1      A    I do not recall.

2      Q    Do you recall what was discussed in the

3  compliance -- with Iris Mauriello at the meeting that

4  she had called?

5      A    I believe that the issue was that Ken

6  Bourell's, that -- the charges had not been made in

7  accordance with the -- again, either the grant

8  application or the progress reports that Justin Radolf

9  had signed -- had filed.

10     Q    Did they -- were the progress reports at the

11  meeting, were they present at the meeting, physically

12  present for the people to review?

13     A    I do not believe so.

14     Q    Did you ever review those progress reports?

15     A    No, I never did.

16     Q    So were you relying on what somebody else was

17  telling you, what was in those progress reports?

18     A    Was I relying on them?  Well, I wasn't really

19  relying on anything.  I wasn't at that point involved

20  in anything that was going on other than getting the

21  time and effort and the salary charges to line up for

22  Dr. Radolf's grants.

23     Q    Did Ms. Mauriello ask you to prepare

24  information for herself?

25     A    No.

1    September 10, 2002, you must have realized that now

2    Dr. Radolf is being investigated?

3        A    Yes.

4        Q    Were you asked to sit on the investigation

5    committee?

6        A    Yes, I was.

7        Q    And did you accept that position?

8        A    No, I turned it down.

9        Q    Why did you turn it down?

10       A    Because at the time the investigation

11   started, the time the committee was formed, I was

12   working with Dr. Radolf in getting the documents

13   corrected in the system and I did not think it would

14   be appropriate for me to sit in judgment of Dr. Radolf

15   when I was helping him and he was helping me get the

16   paperwork correct.

17       Q    And so you declined or, as we would say,

18   recused yourself?

19       A    Recused.

20       Q    Mr. Gillon, at this time at the meeting with

21   Iris Mauriello, did you inform her that, look,

22   Dr. Radolf told me to use whatever percentages I want

23   and that he would sign off on them?

24       A    I'm not sure at what meeting -- I'm not sure

25   when I first discussed that with Iris but I think it

55

1    might have been at a later date than August of 2002.

2        Q    Why wouldn't you have discussed it with her

3    in August of 2002?

4        A    Because we were still working on getting the

5    information correct in the system.

6        Q    But you when to a meeting with Iris Mauriello

7    and various other individuals to discuss improper

8    behavior by Dr. Radolf, and that would not be relevant

9    to that issue?

10        A    No, because I think my response back to

11    Dr. Radolf was it was up to him to determine what the

12    percentages of time were and then once he determined

13    that those percentages of time we would get the

14    documents to match the percent of time that he

15    indicated.

16        Q    When did Dr. Radolf make this statement to

17    you?

18        A    That was at the meeting I had with Dr. Berlin

19    and Dr. Radolf in the first part of July.

20        Q    And --

21        A    I can tell you exactly.  August 1, 2002.

22        Q    If that was the case, referring to

23    Exhibit No. 3, the E-mail to you from Dr. Radolf on

24    July 1, why would he even be concerned then with the

25    proper allocation of time for Mr. Bourell?

1      A    I'm sorry.  Repeat the question.

2      Q    Why would Dr. Radolf be concerned with

3  charging Ken Bourell's salary to his grant accounts if

4  he was telling you, use whatever figures you want?

5      A    Because it would still have to match the time

6  and effort that Dr.--

7      Q    Okay.  So, you understood him to mean, you go

8  about matching the time and effort, I don't want to be

9  bothered with it.

10     A    Yes, right.

11     Q    He wasn't telling to you make up a number out

12  of nothing?

13     A    I do not believe so.

14     Q    Do you have the E-mail at the top of

15  Exhibit 13 which says, "And Dave, how is this

16  different from what we do with anyone else around

17  here.  It is stated that Ken was paid but never worked

18  on these grants.  Can that be documented -- is it

19  stated that Ken was paid but never worked on these

20  grants.  Can that be documented?"

21          That wasn't the accusation, was it?

22     A    No, that was never the accusation.

23     Q    That would be fraudulent?

24     A    Yes, that's correct.  That was never the

25  accusation.

57

1                              (Plaintiff's Exhibit No. 14,

2                              E-mails, marked for

3                              identification.)

4    BY MR. BUCCI:

5        Q    Exhibit 14 appears to be your response to

6    Dr. Deckers' inquiry and you start by saying that, "It

7    is not any different than what we do with all others

8    funded on research grants.  The problem is that Justin

9    indicated in the progress reports and renewal

10   applications that Ken had a significant role in the

11   research that was conducted when, in essence, the T &

12   E reports, when filed, may not support these

13   statements."

14            Again, had you reviewed the progress reports

15   and renewal applications?

16       A    Probably not.

17       Q    Again, sitting here today, do you remember

18   who told you that the progress reports and renewal

19   applications listed Ken as playing a significant role

20   in the research?

21       A    It could have only been one of three people.

22       Q    Okay.  Which three people?

23       A    Dr. Wikel, Dr. Wetstone or Kim Young.

24       Q    And can you narrow that down at all?

25       A    No, I cannot.

64

```
 1    grants encumbered at all?  Are monies taken from the

 2    grants?

 3         A    Restate the question, please.

 4         Q    After the assignment authorization was

 5    completed, prior to the final time and effort reports

 6    being concluded and agreed upon, were those grants

 7    charged?

 8         A    Yes, they were.

 9         Q    And did they have to be reversed, the

10    charges?

11         A    Yes, they were.

12         Q    And do you recall when the charges were made?

13         A    The charges would have been made effective

14    with the assignment, at the start of the assignment

15    authorization, so June 14, 2002.

16         Q    And so Mr. Bourell's salary would have been

17    paid for a period of time from the grants?

18         A    Correct.

19         Q    And then had to be reversed to put the money

20    basically back in the grants?

21         A    Correct.

22         Q    Mr. Gillon, in your role do you review the

23    grants at all to see what percentages are in the

24    grants, who is listed as key personnel?

25         A    I review the grant applications to determine
```