# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 1, 2004 |

## PAGES OF TRANSCRIPT TESTIMONY OF PETER DECKERS

1    removing him as director?  As the Center's director?

2        A    I'm recollecting this to the best of my

3    ability.  I believe that was Dr. Berlin's

4    recommendation.

5        Q    And did you concur with that recommendation?

6        A    Well, I know that I met with Justin,

7    certainly at least once but I believe it was more than

8    once during that time frame to discuss this situation

9    with him.  And I discussed it from the point of view

10   of personal stress on both Justin and his family, and

11   that particular circumstance was exceptionally obvious

12   to everybody around who was interacting with Justin.

13   And he admitted that to me.  And I suggested to him

14   that from a personal perspective it would make a lot

15   of sense, in my opinion, for him to have active

16   psychiatric help and that perhaps it would be -- I

17   believe that this entire thing was not something that

18   he could leave at work and wasn't taking home, and

19   that it clearly had to have an impact at home and he

20   admitted that as well.  And I suggested if he wanted

21   support in that respect, that I would be happy to get

22   it for him because, obviously, given my position I had

23   access to the best of psychiatrists and psychologists.

24   He evidenced -- he thanked me for that and evidenced

25   to me that he was getting that kind of support but

1     would let me know if he needed additional support.

2          I think there were two other issues at that

3     particular time.  One is Justin is a person of

4     phenomenal intelligence and high skills, and it's my

5     recollection that he still had significant federal

6     support for his research endeavors and his research

7     lab was busy and productive, and that given all of the

8     difficulties with our internal investigation, which I

9     think were minimal compared to what he was going

10    through with the ORI, and given his personal intense

11    reaction to these investigations, I was concerned that

12    it was going to interfere with his ability to get his

13    research done.

14          But, thirdly, a leader of a -- of anything, a

15    department, a division, a center, there is much more

16    to being a leader than just skills and intelligence in

17    conducting your research.  There are a lot of people

18    that one has to be responsible for, one has to

19    interact with on a daily basis, one has to mentor, one

20    has to plan strategically, one has to be in a

21    recruitment mode if we have authorized recruitments as

22    we had.  And my personal assessment was there was no

23    way that Justin could accomplish all of these things

24    given the pressure he was under.

25          So I suggested to him that he step down and I

1    thought the best way to do it, rather than having me

2    relieve him of the position temporarily was for him to

3    voluntarily step down and to not cloud the issue by

4    putting in there that he was worried about the ORI

5    investigation or leadership issues or his grants, but

6    just say he blandly is stepping down for personal

7    reasons.

8            Quite frankly, I felt there were enough

9    personal things going on for Justin that independent

10   of all the other things I said, I would have stepped

11   down and taken a deep breath until this ORI

12   investigation, at the very least, was beyond me.

13   That's what led to this.

14       Q    Did you discuss with him or try to convince

15   him in terms of stepping down to craft a letter where

16   it would be on the basis of a voluntary relinquishment

17   of his duties for a temporary period of time?

18       A    Yes.  And we didn't specify any time in this.

19   But I did say to him, quite honestly, I said, "Justin,

20   you have got to get beyond this, the psychological,

21   psychiatric issues that are really obvious to you and

22   obvious to everybody who interacts with you, and you

23   don't know where this ORI is going to end up.  We

24   don't know where it's going to end up.  We don't know

25   how long it will take.  We hope it's over next week

1    and they agree with what our scientific review board,

2    our own internal assessment is, but I don't know that.

3    So until you resolve these stress issues," which were

4    worrisome to a lot of people, they weren't so

5    personally worrisome to me because I think the stress

6    that he was expressing was very appropriate given the

7    pressure he was under, but to a lot of people they

8    were alarmed about the stress they saw and, quite

9    honestly, given the fact that we didn't know where the

10   ORI was going to end up and what the implications were

11   for him and the implications for the institution, from

12   my perspective temporary was both of those issues

13   being resolved at the very least.

14        Q    Doctor, what were people who knew Dr. Radolf

15   reporting to you about his -- the stress he was

16   working under?

17        A    Truthfully, there were folks who were afraid

18   that he was either going to hurt himself or hurt

19   someone else.

20        Q    And these people brought that to your

21   attention?

22        A    Yes.

23        Q    And, at this period of time, December,

24   January -- December of 2001, January of 2002, the

25   university and Dr. Radolf were aware that the ORI

1    Office of Research Integrity, had opened an

2    investigation of this matter?

3        A    I believe so.

4        Q    And is it accurate to state at this period of

5    time that the university had already concluded its

6    investigation of Dr. Radolf?

7        A    I would have to check that, to be perform

8    honest with you.  I received a report from the SRB,

9    Scientific Review Board, and the precise date of it I

10   would have to -- you know, very honestly, these

11   reviews take much too long from my point of view and

12   so I'm a little confused as to the exact date, but I

13   would just tell you that I believe that the SRB report

14   as it was not given to me as of the dates we're

15   referencing right now, and it was a little bit after

16   that, but I could be wrong about that.

17       Q    I'm not here to try to trap you, Doctor.

18                        (Plaintiff's Exhibit No. 3,

19                        August 22, 2001 letter, marked

20                        for identification.)

21   BY MR. BUCCI:

22       Q    Exhibit 3 is a copy of a letter that you sent

23   to Dr. Radolf on August 22, 2001.  Does this refresh

24   your recollection as to the conclusions of the

25   university's own investigation of Dr. Radolf?

1          So I was aware this particular thing, this

2     complaint was generated.  And my responsibility at

3     that particular time as the executive vice-president

4     of the Health Center is to ask the compliance

5     organization that we have internally to investigate

6     that, and that was done.  And I subsequently have had

7     no involvement with that investigation.

8          Q     Subsequent to when, Doctor?

9          A     To that, forming that committee.

10         Q     You formed the committee and then you

11    basically --

12         A     I have had nothing to do with it, say for the

13    fact committee members came to me and asked me the

14    same question you asked me and I gave the same answer.

15         Q     Doctor, in April of 2002 did the university

16    adopt a formal time and effort reporting policy?

17         A     As part of the financial turn-around of the

18    university which went into place in '99, 2000, 2001,

19    we were advised by, at that time, an auditor appointed

20    by the General Assembly, Pricewaterhouse Coopers, that

21    we had to be sure that our time and effort forms were

22    aligned dollar-for-dollar with percent effort on

23    research grants.

24         And, you know, we were aware this was a major

25    problem in academic medicine, but they made us very

1  his time did not allow or permit?

2      A    I think there was maybe the reverse of that,

3  that there was -- that it was alleged on the grant

4  that Mr. Bourell was putting in a certain amount of

5  time conducting the research of the grant, and that it

6  was alleged that that amount of effort was not

7  occurring.  I think that's the flip side of what you

8  just said.

9      Q    But Mr. Bourell wasn't being paid moneys from

10  the grant in excess of what his time and effort

11  actually showed?

12      A    That's my understanding, but I would have to

13  look at the records to document that.

14      Q    Did you play a role in the drafting of the

15  complaint against Dr. Radolf?

16      A    None.

17                         (Plaintiff's Exhibit No. 5,

18                         E-mails, marked for

19                         identification.)

20  BY MR. BUCCI:

21      Q    Doctor, Exhibit No. 5 is a series of E-mails

22  between Scott Wetstone and yourself.  And the first is

23  dated August 9th, 2002 and it says, "Peter, Earlier

24  this week I told you that Steve Wikel had alerted me

25  to several potential compliance issues regarding

1   Gillon, Wikel, Scott Wetstone.  The issue, if there is

2   a credible complaint, we will cause that complaint to

3   be given to the Compliance Office, and the Compliance

4   Office will go the generation, do the investigation.

5          I remember telling them, "If you, after your

6   discussion, believe that there is a credible

7   complaint, generate it to Compliance Office."  I

8   charged them specifically and I left the room.

9   Q    Do you know whether the individuals

10  participating in these meetings were going to be

11  complainants or were they assisting one individual who

12  would act as the complainant?

13  A    I think that's an interpretation that I can't

14  give you, an answer I can't give you because I wasn't

15  there.  My personal understanding is there was one

16  person generating the complaint.

17  Q    Do you know whether your office received in

18  August of 2002 an anonymous whistleblower complaint

19  concerning Ken Bourell and Dr. Radolf's treatment of

20  him on the grants in question?

21  A    I'm not aware of that.

22  Q    As far as you know that the initial

23  discussion concerning this particular issue started

24  with Steve Wikel and Scott Wetstone?

25  A    Yes.

1      Q    And not to jump around, Doctor, but in the

2    first E-mail it says, the second sentence, "Given that

3    Steve's initial descriptions were vague and on your

4    advice I then discussed this matter with Dave Gillon,"

5    I believe Dr. Wetstone is referring to you when he

6    says, "On your advice."  Would you have told him to

7    sit down with Dave Gillon?

8      A    As I have said before, if Scott Wetstone

9    wrote that, I did it.

10     Q    Did you at this point in time give any

11   thought to telling him, "Well, sit down with Steve

12   Wikel, Dave Gillon and Justin Radolf and see if there

13   is an explanation for this"?

14     A    I don't remember that.

15     Q    Doctor, again, on Exhibit No. 5, Scott

16   Wetstone says in the second paragraph, "Steve just

17   called me to confirm my understanding of the

18   situation, especially noting items three and four.

19   Further, Steve says he has copies of Justin's

20   non-competitive renewal (under lock and key) and these

21   reports continue to list Ken as a major contributor to

22   the grants."

23          Do you recall ever asking Scott Wetstone to

24   look at the grants or you wanted to look at the grants

25   to see if in fact Ken Bourell was listed as a major

1    contributor?

2        A    No, I don't recall that.

3                        (Plaintiff's Exhibit No. 6,

4                        E-mails, marked for

5                        identification.)

6    BY MR. BUCCI:

7        Q    Doctor, Exhibit No. 6 is another series of

8    E-mails.  You do a lot of communication by E-mails.

9            I would like you to read, just review the

10   first paragraph there and explain to me why at that

11   point you just didn't terminate this process of --

12   this complaint process because you seem to hit it

13   right on, in my opinion, and I will state it for the

14   record, you seem to hit it right on the nose.

15       A    Let me tell you, I was annoyed that, for

16   whatever reason, and you know I expect it's just human

17   nature, that the funding of Mr. Bourell on general

18   funds -- the full funding of Mr. Bourell on federal

19   funds hadn't stopped because we fund nobody in

20   perpetuity at that level on general funds.  Okay?  I

21   was more annoyed that there wasn't a letter in --

22   there didn't appear to be a letter in Dave Gillon's

23   file that effectively established when the general

24   funds support would stop.

25           But for someone at Mr. Bourell's level to be

1   know that.

2       Q    You do say in your second paragraph, "Before

3   we start throwing grenades, let's be very sure of the

4   data."

5       A    Correct.

6       Q    Then you have, "Dave??? Scott???  Get with

7   Steve Wikel and write up a formal complaint for me."

8       A    Right.

9       Q    "I am sure you both understand that while I

10  am not interested in taking prisoners, I equally

11  detest killing the innocent or the naive."

12      A    Right.

13      Q    It appears you were giving instructions to

14  Scott and Dave to meet with Wikel and write up a

15  formal complaint.

16      A    Well, and I further state in this, in this

17  statement, "If the written complaint warrant s further

18  action, we will put it into the compliance program

19  that we just wrote and distributed."

20      Q    But you wanted to see something in writing

21  and then to make a decision whether it deserved to

22  be -- whether it warranted further action?

23      A    I believe that's true.

24      Q    And your statement says, "While I am not

25  interested in taking prisoners -- I am sure you both

1    going.  I'm confident that they made the same

2    commitment to Mr. Bourell.

3        Q    And at some point you believe that should

4    have at least been offset by payments from the grants?

5        A    It's unequivocal.  That happens throughout

6    the organization, that people -- my biggest concern is

7    people on general funds who are not productive and,

8    therefore, keeping people on general funds when they

9    can be funded from grants is really troublesome to me

10   because the general funds could be used to enable

11   other research efforts in the organization.

12            So this person, Mr. Bourell, should have been

13   switched.  And it could be -- it could have been done

14   step-wise, it could have been done completely, but it

15   should have happened and it should not have been a

16   confused issue at this particular time.

17       Q    Doctor, do you know whether the policy that

18   was adopted with time and effort reporting in April of

19   2002 stated that the grants and contracts office is

20   responsibility for the collection, review, and

21   retention of all time and effort reports?

22       A    I believe it says that.  And if it doesn't,

23   that's the intent.

24       Q    That's the intent that the grants and

25   contracts office would be --

1      A    Specifically, it's a person by the name of

2    Jeff Small and, quite honestly, what his title is and

3    who he works directly for, I can't tell you, but he's

4    the person responsible for managing that data.

5      Q    Doctor, you also state in the E-mail to Scott

6    Wetstone dated August 9th, 2002, "Align T & E directly

7    with the dollars taken from grant -- percent effort

8    should equate directly to percent of salary

9    retrieved."

10         Was it your intent to say that, Take the

11    money from the grant and then align the time and

12    effort afterwards?

13     A    No, this is a statement of what should be

14    the -- what should be the practical operating

15    guidelines in every research endeavor in this

16    organization.

17         It should say, it isn't complete, it should

18    say, "Align T & E, time and effort in research

19    directly with the dollars taken from the grant.

20    Percent effort should equate directly to percent of

21    salary retrieved in research."

22         The clinical thing is a totally different

23    piece and the educational thing is a totally different

24    piece.  This is a research discussion.

25         But that's the operating guideline that this

51

1    institution works on.

2        Q    Doctor, again, you seem to instruct Dave

3    Gillon and Scott Wetstone to meet with Dr. Wikel and

4    to draw up a complaint and it says, "Draw up a

5    complaint for me."

6            Do you recall whether they drafted a

7    complaint and submitted it to you for your review?

8        A    If they have, I have not seen it recently.

9    It may exist, but I haven't seen it since this

10   particular date.

11           One of the things I said earlier is that if

12   there was a complaint, and I suspect there had to be,

13   it was given to the Compliance Office and they then

14   acted on it subsequent to this discussion.

15       Q    But as you sit here today, you don't have a

16   recollection as to whether a written complaint was

17   provided to you for your review?

18       A    I'm not trying to be difficult, I just don't

19   remember it, to be honest with you.

20                          (Plaintiff's Exhibit No. 7,

21                          Office of Corporate Compliance

22                          document, marked for

23                          identification.)

24   BY MR. BUCCI:

25       Q    Doctor, Exhibit No. 7 is a document of the

```
 1          Doctor, when you say the statement

 2    relinquishes temporarily, did you contact Dr. Radolf

 3    and say, "That's not acceptable.  I want you to

 4    relinquish it without any conditions"?

 5        A    Did I?  I did not contact him to that effect.

 6        Q    After receiving this letter?

 7        A    To the best of my knowledge, I did not

 8    contact anybody to that effect.

 9        Q    Did you have any qualms with saying

10    "relinquish temporarily"?

11        A    No.  As a matter of fact, Dr. Radolf and I

12    discussed that as it's stated there.  That's a fair

13    statement of my position and his position.

14        Q    So, Doctor, again, I believe this was

15    Exhibit 12.  And this is an E-mail from you to Richard

16    Garibaldi, Stephen Strongwater, and Richard Berlin,

17    and copies to Scott Wetstone, Bruce Carlson and Dave

18    Gillon.  And in this E-mail you state, "Please see

19    below.  Consider this all very confidential.  I have

20    the letter stepping down from the leadership position

21    in hand.  The change will be effective 2-1-02."

22          It appears from this E-mail you may have had

23    discussions with this group prior to January 14 with

24    reference to a change of leadership at the Center?

25        A    Well, I believe, as I have said in previous
```

137

1   terminated."

2           Who informed Dr. Radolf his participation in

3   the proposal had been terminated?

4       A   This letter was written and edited by Richard

5   Berlin.  I then saw it and read it and agreed with

6   that, so I would have to ask you to talk to Richard

7   Berlin about that, or Dr. Wikel, because I did not

8   have any contact with Dr. Radolf.

9       Q   But did you question this statement that

10  Dr. Radolf's participation in the proposal was

11  effectively terminated?

12      A   I did not.

13      Q   Do you know, had you known that it had been

14  effectively terminated?

15      A   Truthfully, at the time that they are

16  referencing, some months prior to the submission, I

17  did not know that.

18      Q   And on February 10, 2003, when you signed

19  this letter, assuming you signed it on February 10,

20  2003, did you know that Dr. Radolf's participation had

21  been effectively terminated?

22      A   That's effectively what I read, so I presumed

23  that to be true.

24      Q   But, okay.  Did you inform Dr. Radolf at any

25  time before February 10, 2003 that his participation

138

1   in this grant had been terminated?

2        A    I did not.

3        Q    Do you know of anyone who may have told him?

4        A    As I said, I think that -- I'm telling you

5   this letter was written by Dr. Berlin.

6        Q    I may ask Dr. Berlin.

7        A    You have to talk to Dr. Berlin specifically.

8        Q    I may ask him that, but based on your

9   knowledge sitting here today, do you know of anyone,

10   just based on your knowledge --

11        A    The answer is no.

12        Q    Let me just finish the question, so it's on

13   the record.

14        A    I'm sorry.

15        Q    Do you know of anyone who may have informed

16   Dr. Radolf that his participation in this grant had

17   been terminated?

18        A    Not directly.

19        Q    How about indirectly?

20        A    Well, I believe the relationship that we had

21   hoped would be so productive between Dr. Wikel and

22   Dr. Radolf was deteriorating rapidly.  And rapidly, I

23   think, meant there was little communication going on

24   that was productive between the two of them.  So it

25   wouldn't surprise me in response to a request to

1    prepare a full grant and a request from the United

2    States Army coming to Dr. Wikel that, indirectly at

3    least, he did this on his own.

4        Q    But with Dr. Radolf's participation

5    terminated as a consequence of his being placed on

6    academic probation?

7        A    Well, I did not do that.  I testified to that

8    earlier.  Dr. Berlin may have interpreted it that way,

9    I don't know that.  You would have to ask him that.

10   And I have testified to the fact that the relationship

11   between Dr. Wikel and Dr. Radolf was deteriorating

12   rapidly.  But this particular sentence is not one that

13   I implemented.  And, you know, quite frankly,

14   Dr. Radolf if he didn't like this could easily have

15   appealed this.

16       Q    But Dr. Radolf didn't receive a copy of this?

17       A    No, but if he had been excluded from

18   participation, and clearly he knew what was going on,

19   if he had -- if he was excluded he could have appealed

20   that at any time.

21       Q    But you don't know if he was ever formally

22   notified that he was being excluded from participation

23   in this grant?

24       A    I don't know that.  I have testified to that.

25       Q    Your letter to Dr. Radolf after the voluntary