**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
|    Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
|    Defendants. | : | NOVEMBER 1, 2004 |

**PAGES OF TRANSCRIPT TESTIMONY OF RICHARD BERLIN**

Case 3:03-cv-00242-MRK     Document 67-3     Filed 11/04/2004     Page 2 of 6

10

```
 1    effort situation.  Had that come up before August 12,
 2    2002 with you at any time?
 3       A    When the concern first arose I think that it
 4    appeared that -- as I recall, it began with the
 5    discovery on reviewing one of Justin's grants that was
 6    almost incidental.  One of the faculty in the
 7    Microbial Pathogenesis Center had asked to see a grant
 8    that was really well formulated.  He was a young
 9    faculty person.  And in the process of reviewing it,
10    he discovered that Ken Bourell was listed on the grant
11    and he asked Steve Wikel about it because, again, as I
12    recall, Ken Bourell was being paid from institutional
13    funds and not from the grant.  I was asked about it.
14    I think it was brought to Dave Gillon's attention, who
15    asked me what should be done because it was clearly an
16    inconsistency in listing Bourell on the grant for
17    salary when he was apparently being paid from state
18    funds.
19           So there apparently had been no time and
20    effort report given, so there was no ongoing
21    monitoring, as it were, of the process.  So my
22    response was if Justin had listed Bourell half time on
23    the grant, it seemed to me that he should be paid half
24    time from the grant.
25           Now, you asked me why I was not in the loop.
```

32

```
1      A    Well, I wouldn't have come back until the
2   19th and it sounds like Wikel was away for the few
3   days preceding the 22nd.
4      Q    What in particular do you recall about the
5   meeting of the 22nd?
6      A    Not very much.  I do recall that Gillon's
7   basic plan was that he had agreed to with Justin was
8   held sway, that that was the direction we were going
9   to proceed.  The issue of Ken's support beyond the
10  grants might have come up, but I don't recall any
11  detail about it.
12     Q    Doctor, was this the first meeting you
13  attended that the issue of whether Dr. Radolf had
14  committed fraud came up?
15     A    Well, I don't really recall that.  I think, I
16  don't recall in that meeting if the issue of fraud
17  appeared.
18     Q    Well, do you know, Doctor, if a complaint was
19  filed after this meeting or from the discussions at
20  this meeting with the Compliance Office?
21     A    I had heard that a description of this issue
22  was going to be sent to the Office of Research
23  Integrity.
24     Q    Where did you hear that?
25     A    I presume it was Gillon.  I had no -- I don't
```

57

1    proposal, Dr. Radolf was placed on academic probation

2    for issues related to conduct of his laboratory.

3    Consequently, Dr. Radolf's participation in the

4    proposal was effectively terminated."

5           Did you inform Dr. Radolf at any time that

6    his participation in the proposal had been terminated?

7         A    I didn't.

8         Q    And what did you mean by "as a consequence,"

9    where you say, "Consequently, Dr. Radolf's

10   participation in the proposal was effectively

11   terminated," and the sentence that precedes that is

12   "his being placed on academic probation."

13          Was Dr. Radolf informed that because of his

14   academic probation he would be -- his participation in

15   this grant would be effectively terminated?

16        A    I did not inform him of that.

17        Q    Did you have discussions with Dr. Deckers

18   with regard to the preparation of this letter?

19        A    Yes.

20        Q    And did it come up as to who would inform

21   Dr. Radolf that he had been terminated from the

22   proposal?

23        A    I don't recall that it did, that we did ever

24   discuss that.

25        Q    Was there any discussion when this letter was

58

1    being drafted as to what steps had been taken to
2    implement Dr. Radolf's termination from the project?
3        A    I don't recall related to this letter, no.  I
4    think that the, as you know, this opportunity came
5    about as a result of a markup in the Department of
6    Defense appropriations, and after it had been approved
7    the -- it passed as part of the law and we received
8    information about who would be the contact person.
9            Now, up to this point, the exact individual
10   who -- the specific individual who would be
11   responsible for leading this project was really not
12   specified except that, in the white paper that was
13   drawn up for the presentation to our legislature, our
14   legislative delegation, it was Wikel who did the
15   formulation of that white paper.
16           And so, Radolf's involvement in this whole
17   operation was relatively small throughout and --
18       Q    But he was a participant?
19       A    He was a participant in our original request
20   of our lobbyist to engage our delegation in trying to
21   promote this effort.
22       Q    And if I'm not mistaken, and correct me if
23   I'm wrong, he remained a participant even after the
24   university made its finding that he had committed
25   scientific research misconduct?