# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
|     Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
|     Defendants. | : | NOVEMBER 1, 2004 |

## PAGES OF TRANSCRIPT TESTIMONY OF JUSTIN RADOLF

5

```
 1                      STIPULATIONS

 2

 3            IT IS STIPULATED by the attorneys for the

 4     Plaintiffs and the Defendants that each party

 5     reserves the right to make specific objections in

 6     open court to each and every question asked and the

 7     answers given thereto by the witness, reserving the

 8     right to move to strike out where applicable, except

 9     as to such objections as are directed to the form of

10     the question.

11

12            IT IS STIPULATED and agreed between

13     counsel for the parties that the proof of the

14     authority of the Notary Public before whom this

15     deposition is taken is waived.

16

17            IT IS FURTHER STIPULATED and agreed that

18     the reading and signing of this deposition are not

19     waived and any defects in the notice are waived.

20

21

22

23

24

25
```

6

```
 1              (Commencing at 10:10 a.m.)

 2

 3              MR. BUCCI:  We would like to read and

 4         sign.

 5              MS. COMERFORD:  That's fine.  I

 6         understand.

 7              MR. BUCCI:  Normal stipulations?

 8              MS. COMERFORD:  Sure.

 9

10                   JUSTIN RADOLF,

11         having first been duly sworn, was examined

12         and testified as follows:

13                   DIRECT EXAMINATION

14   BY MS. COMERFORD:

15      Q   Good morning, Dr. Radolf.  I'm

16   Jane Comerford.  I represent the defendants that you

17   have brought suit against, the University of

18   Connecticut and various other parties employed by the

19   Health Center.

20              Have you ever been deposed before?

21      A   Many years ago.  I was an expert witness in a

22   case that was in Dallas, Texas before I moved here.

23      Q   So you're somewhat familiar with the process?

24      A   Yes.

25      Q   I'm going to be asking you a series of
```

1    questions.  You're under oath today.  If I ask you a

2    question and you answer it, I'm going to assume that

3    you understood the question.  If you don't understand

4    it, you know, feel free to ask me to rephrase it.

5          I'm going to ask that you wait until I ask

6    the question before you answer it because the court

7    reporter can't take the two of us talking over each

8    other.  And that if you answer, when you answer it to

9    be verbal because she can't record nods of the head

10   and things like that, and gestures.

11   A    Okay.

12   Q    Are you under any medication today?

13   A    I am not.

14   Q    If at any time you need to take a break in

15   the middle of the question, if I have asked a

16   question, I would appreciate if you'd answer the

17   question first and then take a break if need be.

18         If I speak too fast, ask me to slow down.

19   The usual common courtesy kind of thing.  And that's

20   basically the gist of it.

21         I'm going to make every effort to get through

22   the deposition today.  I think you can appreciate that

23   you raised numerous allegations in your two

24   complaints, but I am going to make an effort to finish

25   it today.  If that becomes an issue as to time,

8

1     hopefully your attorney and I can work something out.

2     Otherwise, I will have to move before Judge Kravitz to

3     get extra time for your deposition, but let's hope

4     that that doesn't happen.

5              Did you bring documents with you today?  I

6     notice --

7     A     I have many.

8     Q     Okay.  Did you review anything prior to

9     coming to today's deposition?

10    A     I did.

11    Q     And what was that?

12    A     The complaints.

13    Q     Okay.

14    A     The discovery documents, the documents we had

15    received from Freedom of Information.

16    Q     When you say discovery documents, were those

17    what you provided to the defendants or that the

18    defendants provided to your attorney?

19    A     Both.

20    Q     Okay.  And is there any additional discovery

21    that you brought today that you hadn't provided?

22    A     Not that I'm aware of.

23    Q     All right.  What is your current position

24    here at the Health Center, Dr. Radolf?

25    A     I'm a professor of medicines, genetics and

1    developmental biology.

2        Q    Is that a full professor?

3        A    Yes.

4        Q    Are you currently tenured?

5        A    I am.

6        Q    At one time were you also a professor of

7    microbiology?

8        A    I was.

9        Q    And why did you give that up?  Or did you

10   give that up?

11       A    I did give that up.

12       Q    Why was that?

13       A    It was because of the fact that the -- the

14   lack of cooperation that I was experiencing with the

15   department of microbiology led me to believe that

16   there was not going to be a productive relationship

17   between us.

18       Q    And what was the cooperation you were looking

19   for that you felt was lacking?

20       A    Well, first of all, let me point out that I

21   was brought in to head a center that was regarded by

22   the department of microbiology as something that they

23   felt should be within their department.  And this was

24   a matter that had been discussed with Dr. Berlin at

25   length during my recruitment process.  And the

10

1    dissatisfaction of the department of microbiology and

2    their unhappiness with the establishment of the Center

3    was something that Dr. Berlin brought up with me on a

4    number of occasions.  In fact, it was a major concern

5    of mine, as far as whether or not I should accept the

6    position.

7          And, as time went forward, when I came here,

8    it became more and more apparent to me that they were

9    not going to -- we just didn't see things similarly

10   and that they were going to be undermining me.  And

11   that was also an issue that I discussed on numerous

12   occasions with Dr. Berlin, from whom I received the

13   approval to disassociate myself from the department.

14       Q    Okay.  And while you were at the University

15   of Texas Southwestern, what was your position?

16       A    At the end, when I left there, professor of

17   microbiology and professor of internal medicine.

18       Q    Was that a full professorship?

19       A    Uh-hum.

20            MR. BUCCI:  You have to say yes or no,

21            Doctor.

22            THE WITNESS:  Yes, sorry.

23   BY MS. COMERFORD:

24       Q    Were you tenured as well there?

25       A    Yes.

11

1       Q    And did you hold any other positions at that

2   time when you were at University of Texas?

3       A    I was the head of the -- I forget the title,

4   but I think chairman of the graduate program in

5   microbiology.  I was also the director of the

6   fellowship program in infectious diseases.

7       Q    What caused you to leave University of Texas

8   Southwestern to come to UCONN?

9       A    I was attracted by an ad that I saw in, I

10  think what is called ASM News.  It was advertising for

11  a position, the directorship of the Center, to

12  establish a center.  And I thought it presented a good

13  opportunity.

14      Q    And what is ASM News?

15      A    American Society for Microbiology.

16      Q    I'm sorry.  I'm not familiar with all the

17  scientific acronyms.

18           So you submitted an application pursuant to

19  that ad; is that how that occurred?

20      A    Yes, in the discovery documents.

21      Q    And you mentioned in your Complaint you were

22  recruited by various individuals here at UCONN.  Who

23  specifically at UCONN recruited you?

24      A    Well, the person who was instrumental in the

25  recruitment, of course, was Dr. Berlin.

12

1        Q     Was there anybody at UCONN at Storrs that

2    recruited you?

3        A     Not in a major way that I can recall.

4        Q     Okay.  Well, was there anybody in a minor

5    way?

6        A     No.  I don't believe so.  I don't recollect

7    that.

8        Q     So when you refer to UCONN, you really mean

9    the UCONN Health Center individuals?

10        A     Yes, that's correct.

11        Q     After you sent in the ad to the Health

12    Center, what occurred?  I should say your response to

13    the ad.

14        A     Right.  I received a -- well, actually when I

15    saw the ad -- well, sort of an ad, it was post the

16    period when they were accepting applications, but I

17    sent my application in anyway.  I received the

18    response, I believe from Ms. Smail, and that followed,

19    I don't recall exactly how long, but a conversation

20    with Dr. Berlin.

21        Q     And did he call you or did you call him?

22        A     He called me.

23        Q     And do you recall what the conversation

24    involved?

25        A     Let me point out we're going back now six

13

1    years.

2         Q    I understand.  To the best of your

3    recollection.

4         A    Other than that there were mutual -- that by

5    the end of the conversation there was mutual interest

6    in pursuing the position, I can't remember any

7    details.

8         Q    Okay.  And after those series of

9    conversations, what occurred?

10        A    Then there was -- there were two recruitment

11   trips, as I recall.  I came out, I believe, I think it

12   was August for the first time.  And then there was a

13   second trip, I think it was with my family, and I

14   believe it may have been after the letter, after I was

15   offered the position.  I can't remember.  But anyway,

16   I came out with my family.

17             And then there was a third -- this was after,

18   I believe after I accepted the position, there was a

19   third trip where I brought out members from my

20   laboratory to see the institution and the laboratory.

21        Q    And during -- go ahead.  I'm sorry.

22        A    I meant my laboratory from Dallas to look at

23   the facilities here.

24        Q    During these trips that you came out here

25   with various individuals, who at the Health Center

1    were you speaking to at the time regarding the

2    position?

3        A    Well, there were itineraries.  I mean, there

4    were a number of people.  I don't think I can remember

5    everybody that I met with.  There were, obviously,

6    because of departmental appointments -- may I

7    backtrack on one important point?  On the part that

8    you started off on, the department of microbiology

9    that actually Dr. Berlin was not enthusiastic about my

10   appointment in at the time.  I thought it was

11   important to point that out.

12       Q    Let me ask you this, going back there.  Who

13   made the appointment in that department?  Who

14   appointed you in that department?

15       A    Well, it would have been Dr. Osborne.

16       Q    Dr. Osborne appointed you.  Did you seek that

17   appointment from her?

18       A    Well, I based my appointments, my -- it was

19   pretty -- well, it was always pretty well understood

20   that my primary appointment would be in the Department

21   of Medicine because that's the way I had been

22   appointed beforehand, although it did not have to be

23   that way.  For the most part it was left up to me.  I

24   modeled my appointments after my appointments at

25   Southwestern where I had been recruited as a junior

1    faculty member in the Department of Medicine with a

2    secondary appointment in microbiology.

3            Now, at UT Southwestern, the departments of

4    medicine and -- the infectious disease division, the

5    division I was in, and the microbiology department

6    have a very close long-standing relationship.  And

7    that turned out very much not to be the case here.

8        Q    When you say Dr. Berlin wasn't too thrilled

9    about your appointment in microbiology, do you know

10   why that was?

11       A    Because he did not have a very good

12   relationship with either Dr. Osborne or Dr. Wellin and

13   he looked at them as constantly trying to meddle and

14   otherwise intrude themselves into affairs that related

15   to recruitment, the Center, and other things along

16   that line.

17       Q    Okay.  Who at the, in the Health Center

18   higher administration did you meet with regarding your

19   recruitment to the position?

20       A    The first visit, again, I don't have the

21   itinerary so I'm reconstructing this from memory.  I

22   believe Dr. Berlin was the highest person that I met

23   with on my first visit.

24           When I came back, I believe that's when I met

25   with Dr. Cutler, but that may not be correct; I just

1    can't remember.  I know that I met Dr. Deckers on my

2    second visit.

3        Q    Was there anything that occurred at the

4    University of Texas Southwestern that was causing you

5    to leave there?

6        A    No.

7        Q    During the course of your recruitment here at

8    the Health Center, did Dr. Deckers or Dr. Berlin ever

9    use the word permanent with you with respect to the

10   directorship position?

11       A    I can't recall but that was certainly the

12   implication.

13       Q    Well, when you say it was the implication, do

14   you recall what was said?

15       A    Well, what I know, there was actually some

16   discussions that came up at one point when I realized

17   that they were originally expecting me to come in as

18   an assistant professor and I said that was not

19   acceptable to me.  Having a very successful laboratory

20   at UT Southwestern and a very established scientific

21   reputation and professional reputation, both within a

22   much larger institution and in the field, as it was,

23   one wouldn't conceive of moving if something were not

24   permanent.

25       Q    Was it the directorship that you thought was

17

1    permanent, or did you think your position as a full

2    professor tenured was what was being implicated as

3    permanent?

4        A    I thought both.  I looked at them as being

5    integrally related to each other.

6        Q    When you were chairman of the graduate

7    program at UT, was that a permanent position?

8        A    I frankly don't recall.  It's a different --

9    let me point out, that's a different kind of

10   appointment because that's an appointment within a

11   department and it's not -- it's not the kind of

12   administrative position at the same -- of the same

13   nature as, say, chairmanship of a department.  So, I

14   think, well, they are very different positions.

15       Q    And let me ask you the same question as your

16   directorship in the fellowship training program at UT.

17   Was that considered a permanent appointment?

18       A    Well, it was mine as long as I wanted to do

19   it.

20       Q    In both of those positions, who appointed you

21   to them?

22       A    The graduate program was run out of the Micro

23   Department so I was appointed by the chairman of the

24   Micro Department.  And the ID division directorship

25   was, the -- excuse me.  The fellowship directorship

18

```
 1   was by the division director.

 2       Q    Okay.

 3       A    But let me point out that those are

 4   administrative positions that are entirely different

 5   than -- one would never move one's laboratory and all

 6   of the people in one's family to become chairman of a

 7   graduate program or to become director of a fellowship

 8   program.

 9       Q    You're saying you would never move to do

10   that?

11       A    Nobody would.

12       Q    All right.

13       A    They are not important enough.  They are not

14   significant enough.

15       Q    But to the best of your recollection, you

16   don't recall anyone using the word permanent with you

17   with regard to the directorship position at the Health

18   Center?

19       A    To the best of my recollection, the

20   discussions that we had were on the assumption that

21   this was a permanent position.

22       Q    Well, who made those assumptions?

23       A    I think it was mutually agreed upon.

24       Q    What do you base that on?

25       A    I base it on extensive discussions, the
```

1    recruitment letter that I was sent by Dr. Berlin.  I

2    mean the letter of offering.

3        Q    And what in those discussions led you to make

4    that assumption?

5        A    We talked about long-term plans for building

6    up the science within the Center.  Let me put it

7    another way.  Suppose I had been told that it were

8    temporary, would I have moved?

9        Q    I'm not answering questions today,

10   Dr. Radolf.

11       A    Well, that's my answer.

12       Q    I'm asking you what was said to you.

13       A    The discussions that we had about the

14   building of the Center, scientifically, recruitment of

15   faculty over many years, relationships to be developed

16   throughout the institution are all consistent with a

17   permanent position.

18       Q    But there is nothing specifically that you

19   recall that Dr. Deckers or Dr. Berlin said to you that

20   the permanent -- that the directorship position was a

21   permanent position?

22       A    I believe it was clearly implied.

23       Q    You didn't answer my question.

24       A    I can only answer it the best way I can.

25       Q    Okay.  So the answer to my question that you

1    don't recall anything they specifically said anything

2    is no, you don't recall?

3        A    I'm not saying that, no.

4        Q    What is your answer to that question.  I

5    don't want to play games with you, Doctor.  I really

6    don't.  I'm just trying to get an answer to my

7    question.

8        A    I can't answer the question the way it's

9    phrased.

10       Q    Okay.  What did Dr. Deckers specifically say

11   to you that led you to think that the position of

12   director was permanent?

13       A    First of all, we're talking about

14   conversations that we had six years ago.

15       Q    I understand.

16       A    So to be able to recollect word for word what

17   was discussed would be rather difficult.

18

19                        (Defendant's Exhibit No. 1, CV,

20                         marked for identification.)

21

22   BY MS. COMERFORD:

23       Q    You have been handed what has been marked as

24   Defendant's Exhibit 1 which I received during the

25   course of discovery.  Do you recognize that as your

```
 1   current curriculum vitae?
 2       A    I do.

 3       Q    Within your Complaint you mention that you
 4   are considered an expert with a worldwide reputation
 5   as an expert in the fields of microbiology, microbial
 6   pathogenesis and infectious diseases.  Those are
 7   pretty broad areas.  Do you specialize or have a
 8   narrower focus of expertise?

 9       A    Yes, I'm a spirochetologist.

10       Q    What is that?

11       A    A person who studies diseases caused by the
12   type of bacteria called spirochetes.

13       Q    And is that relative to just ticks or just in
14   general?

15       A    There are -- not all spirochete diseases are
16   caused by ticks.

17       Q    Is there one particular spirochete that you
18   have an expertise in?

19       A    No, there are actually several.

20       Q    And those would be?

21       A    The two that my expertise is best recognized
22   in are Treponema Pallidum which causes syphilis, and
23   Borrelia Burgdorferi, two words, that causes Lyme
24   disease.

25       Q    The discussions that you had with Dr. Berlin
```

1    and Dr. Radolf -- I'm sorry, Dr. Deckers regarding the

2    Center and your position as professor, were any of

3    those discussions put in writing, E-mail or fax?

4        A    Yes.  Well, I guess I'm not -- we had a lot

5    of discussions.  They wouldn't all have been put in

6    writing.  Can you be more specific?

7        Q    I'm asking if any of those discussions with

8    them were memorialized in writing.

9        A    Looking back over the E-mails, there were

10   some that were, yeah.

11       Q    And, to the best of your knowledge, have you

12   provided all of those during the course of discovery?

13       A    Yes.

14       Q    And the demands you had prior to accepting

15   the position, if you were able to move your lab and

16   family here to Connecticut, were those also put in

17   writing?

18       A    There were E-mails about moving the

19   laboratory.  There was a lot of -- there were a lot of

20   E-mails and other discussions about that and the

21   logistics of doing that.  I remember reviewing them

22   the other day.

23           Regarding my family, I can't recall for sure.

24   The focus was clearly on moving my laboratory.

25       Q    And similarly, those E-mails have already

1    been provided?

2        A    Yes.  In fact, the E-mails that I have, I

3    believe, originated from your end.

4        Q    Okay.

5

6                        (Defendant's Exhibit No. 2,

7                        Letter dated 9-9-98, marked for

8                        identification.)

9

10   BY MS. COMERFORD:

11       Q    Dr. Radolf, what I have given you is a letter

12   dated September 9, 1998 to you signed by various

13   individuals here at the Health Center, and I ask you

14   if you recognize that letter.

15       A    Yes.

16       Q    And was this the formal offer to you of your

17   appointment and position here at the Health Center?

18       A    Yes, it was.

19

20                        (Defendant's Exhibit No. 3,

21                        Letter dated 1-8-99, marked for

22                        identification.)

23

24   BY MS. COMERFORD:

25       Q    Dr. Radolf, what has been marked as

1   Defendant's Exhibit 3 is a series of letters and the

2   reason they are together is that they seemingly relate

3   to the same subject matter.  Rather than break them

4   up, they are together in a packet.  Do you recognize

5   these letters regarding your various appointments?

6        A    Uh-hum.  Yes, I do.

7        Q    And did you receive all these various

8   letters, to the best of your knowledge?

9        A    Yes, I did.

10       Q    So this would be -- the first one is your

11  appointment to the professor of medicine with tenure;

12  is that correct?

13       A    You're taking them chronology because it's

14  not the first in the packet as it's stapled together.

15       Q    This is January 8, '99, correct?

16       A    Yes.  I'm sorry.  Please.  Restate the

17  question.

18       Q    Okay.  All I asked is whether the first one,

19  was this your indication you were going to be

20  appointed professor of medicine?

21       A    Yes, I'm sorry, I did misunderstand your

22  question.

23       Q    And am I correct that you were initially

24  appointed assistant professor but that was corrected

25  at a later time to have you appointed to professor?

1      A    I was never appointed as an assistant

2   professor because I had made it very clear to

3   Dr. Berlin in our discussions before I moved when this

4   came up at a very late point in the recruitment, I

5   might add, that I was not going to leave my position

6   at the University of Texas and come here as an

7   untenured assistant professor.  I noticed that there

8   is a letter from Dr. Cutler there.

9      Q    Right.

10      A    But, in point, that's why Dr. Deckers sent

11   this letter because I made it clear that I would

12   simply just not give up -- the recruitment process

13   would terminate if that was not corrected.  So when I

14   received that letter from Dr. Cutler, frankly, I was

15   surprised.  But since I had been -- I had the letter

16   from Dr. Deckers, I didn't give it much weight.

17      Q    Now, did you receive a similar letter

18   regarding just the directorship position from

19   Dr. Deckers or Dr. Cutler?

20      A    I believe not, no.

21      Q    Were you separately compensated for the

22   position of directorship?

23      A    I believe that the salary I was offered was

24   commensurate with the additional responsibilities of

25   being a center director.  And that's not the only form

1    of compensation, I might add, because the research

2    resources that were provided to me as part of the

3    package I considered to be compensation, too, and were

4    clearly related to the fact that I was going to be

5    setting up a center.

6        Q    Now, at the time that you were recruited and

7    took the position here at the Center, had the Center

8    been approved through the university by-laws?

9        A    Well, it turned out that was an area that was

10   not made clear to me.  I had thought that it was, but

11   I found out after I arrived that was not.  That was

12   one of the first indications to me that there were

13   maybe some issues of trust.

14       Q    When you say you thought it was approved

15   through the university by-laws, what made you think

16   that it wasn't?

17       A    I had never heard of a center being recruited

18   for, a -- director being recruited for a center that,

19   in essence, formally didn't exist.

20       Q    Were you recruited to establish the Center?

21       A    I was recruited to, well, in the sense, well,

22   not -- well, yes.  I mean, to create it from an

23   administrative standpoint as well as from a scientific

24   standpoint.  But that doesn't mean that it didn't

25   formally exist as an administrative entity or an

33

1          Q     And do you recall what the conversation was

2     at that time in early January?

3          A     I do.  It covered a fair amount of ground.

4     The -- I was never left with a very clear

5     understanding as to what prompted their -- this

6     letter.

7          Q     What did Dr. Deckers say to you?

8          A     Well, again, we're going back a long way, so

9     I can only paraphrase.  What I do remember him telling

10    me was -- Dr. Berlin telling me what a great job I had

11    done as the Center director.

12         Q     Did they say anything else?

13         A     Well, we touched upon issues related to the

14    Department of Defense vaccine grant.

15         Q     I will get to that in a minute.

16               What else -- did they say anything else about

17    the Center directorship position?

18         A     Well, again, I'm trying to reconstruct it in

19    my mind.  I left that meeting with a very vague

20    understanding of what their concerns were.

21         Q     So you don't recall what they said to you in

22    that meeting?

23         A     Not in a specific sense, no.  But I do recall

24    that we discussed the -- well, how do I put this?  I

25    can't remember the specifics about the meeting other

1    than that I also pointed out and they agreed how well

2    I had done as the center director.

3    Q    Was this a tense time for you?

4    A    I think it's fair to say it was stressful.

5    Q    Were you under psychiatric care at the time?

6    A    No.

7    Q    You mentioned some discussion about the DoD

8    vaccine grant?

9    A    Yes.

10    Q    What was that conversation about?

11    A    Well, actually let me, because, again, I'm

12    trying to recall some of these issues.  The issue

13    about the ORI, for example, which was mentioned there,

14    it was very unclear what exactly was going on at that

15    point in time.

16    Q    Unclear about what?

17    A    Well, the nature of the investigation and

18    what information was being sought was still not fully

19    clarified.  And my role in the investigation, as it

20    turned out, the university submitted its materials

21    without my knowledge.  So there were things going on

22    in the background that were not being shared with me

23    and I think that contributed greatly to the

24    circumlocution that was a key part of that meeting.

25    That's one of the reasons I have so much difficulty

1     A     It was just all concerns about some of the

2     things that were going on at the time.

3     Q     And some of those things going on at the time

4     being what?

5     A     We knew that there was some activity by the

6     Office of Research Integrity, but at that point in

7     time I must say the important thing is that I had

8     never -- I was under no sanctions nor have I ever been

9     that would prevent me from participating in that work.

10    Q     Were you under investigation by ORI at that

11    time?

12    A     I had not been notified personally by the

13    ORI.  I had been notified by the institution that

14    there was an interrogatory that had bent sent to the

15    school.

16    Q     Was there any conversation about waiting for

17    the outcome of the ORI investigation?

18    A     Before what happened?

19    Q     Before the directorship position could be

20    reinstated.

21    A     I don't recall.

22    Q     Was Dr. Berlin at this meeting at well?

23    A     He was there.

24    Q     Do you recall anything that Dr. Berlin said?

25    A     Well, I remember when it concluded he told me

1    he was still my friend.

2        Q    So you recall what was said regarding the DoD

3    vaccine grant, but you can't recall what was said to

4    you regarding the research directorship position?

5        A    As I said, there again, we're going back

6    aways.  There was a tremendous degree of

7    circumlocution.  I don't believe anything was clearly

8    stated and I believe that's the major reason why I'm

9    having such a difficult time recollecting.

10            What I do recall is telling them and agreeing

11    about the work I had done and I do recall telling them

12    that I believed I was far and above the best qualified

13    person in the center to be the director, which I still

14    continue to believe.  I did not get a clear reason

15    that I recall for the action.  But, again, I want to

16    emphasize that the purpose of the discussion was to

17    talk about a temporary relinquishing of the position.

18        Q    Okay.  And why do you say that the purpose of

19    the discussion was to talk about a temporary

20    relinquishing of the position?

21        A    Because, first of all, there were other

22    discussions with Dr. Berlin.  Let's look at what the

23    letter says because the letter talks about the

24    position being relinquished during the probationary

25    period.  Okay?

1      Q    Okay.

2      A    That's the purpose of the meeting.  In fact,

3    the tick vaccine issue was not even something that I

4    anticipated being brought up.  I was -- I had no

5    reason to expect that to be discussed.

6      Q    Okay.  Was there anything else that was said

7    during the meeting regarding the temporary nature of

8    your removal from the directorship?

9      A    Well, we did, again, I'm not trying -- I

10   really can't remember all the specifics.  It's been

11   too long.  But there was -- the conversation, to the

12   extent that I can recall it, revolved around the

13   letter and whether or not this should be -- whether or

14   not it was appropriate or was -- or for whatever the

15   right adjective might be, for me to step aside during

16   the probationary period.  That was the sole purpose of

17   the meeting.

18     Q    And you, in fact, did step aside; is that

19   correct?

20     A    Yes, but not under the conditions that were

21   expressed in the letter.

22     Q    All right.  You say the letter said you were

23   to be -- you were to be removed or possibly removed

24   during the probationary period.  Was that correct?

25     A    Well, Jane, we both can read the letter.  It

1    was to discuss Dr. Berlin's recommendation that I be

2    removed during the probationary period.  Okay?  That

3    is not the conditions under which I gave up the

4    directorship.

5        Q    What were the conditions under which you gave

6    up the directorship?

7        A    I gave up -- Dr. Deckers accepted a letter

8    from me, which I'm sure you have, maybe the next item

9    coming our way, where -- and this is on his

10   suggestion, the wording was actually told to me

11   verbatim by Dr. Deckers when I met with him.  This was

12   several days after the meeting we had with Dr. Berlin

13   and he said to me, "All I want is a letter that says

14   such and such," and basically that I was stepping

15   aside temporarily for personal reasons.

16       Q    Now, why did you meet with Dr. Deckers a

17   second time?

18       A    His secretary called me and asked me to meet

19   with him.

20       Q    And did she indicate why?

21       A    I don't recall but it was clearly going to be

22   a follow-up to the meeting I had with Dr. Berlin.

23   Well, actually let me say that as the meeting ended,

24   one of the things that ended -- one of the notes that

25   the meeting ended on was that Drs. Deckers and Berlin

1    were going to take into account or -- as the letter

2    says, it was, "I welcome discussion with you on the

3    advisability of this course."

4            And the way -- one of the notes that the

5    meeting ended on was that there would be further

6    discussions as to what they had decided after the

7    meeting.  And that was when I was contacted by, I

8    believe, Ms. Terling.

9            Again, I can't -- I don't know if it was

10   stated or not, but it was very clear that it was

11   conveyed to me what they had decided after the -- as a

12   result of this meeting.

13

14                           (Defendant's Exhibit No. 8,

15                           Letter dated 1-13-02, marked

16                           for identification.)

17

18   BY MS. COMERFORD:

19       Q    Defendant's Exhibit 8.  Is this the letter

20   you just referred to before, the letter you

21   submitted --

22       A    It is.

23       Q    -- relinquishing temporarily your position as

24   director?

25       A    Yes.

1      Q     After you relinquished your position as

2    director, did you experience a reduction in your

3    salary?

4      A     Well, I didn't experience reduction in

5    salary, but I never went through the compensation

6    process that would have resulted in an augmentation of

7    my salary.

8      Q     Did you experience any reduction of fringe

9    benefits?

10     A     No.

11     Q     Did Dr. Deckers or Berlin at any time tell

12   you that your removal or relinquishment of director

13   was permanent?

14     A     I think the implication of -- no.

15     Q     All right.  And after your removal as

16   director or relinquishment of the position, did you at

17   any time receive any increases under the research plan

18   at Health Center?

19     A     Those aren't increases.  Those were

20   disbursements on a one-time basis.

21     Q     You did receive them?

22     A     As any faculty member would.

23     Q     Do you know for a fact that every faculty

24   member received one?

25     A     Well, anybody that qualified for the plan

1    would have.  It had nothing to do with being a

2    director or not.

3        Q    Did you at any time file a faculty grievance

4    under the faculty grievance procedure of the UCONN

5    by-laws relative to your removal of director?

6        A    We did not.

7        Q    In your First Substituted Complaint in

8    paragraph 69 of the first federal lawsuit that you

9    filed, you state that, "The decision to replace the

10   Plaintiff," you, "as director for the center of

11   Microbial Pathogenesis on a pertinent basis had been

12   predetermined by the Defendants Deckers and Berlin

13   prior to their meeting with the Plaintiff."

14           First of all, what facts do you have to base

15   the allegation on that it had been predetermined?

16       A    I was told that by Dr. Wikel.

17       Q    And when did he tell you that?

18       A    It was sometime, I believe, in January.

19       Q    And what did he say?

20       A    He said that the decision had been made

21   before I had received the letter.  That's a

22   paraphrase.

23       Q    You don't recall specifically what he said?

24       A    Well, we're going back a number of years.

25   Dr. Wikel confirmed that the decision to relieve me

1    had been made before I had received the letter and

2    that he was a party to that discussion.

3        Q    And who did he have that discussion with?

4        A    I can only presume it was with Dr. Berlin

5    and/or Dr. Deckers.

6        Q    But you don't know who he discussed it

7    with --

8        A    I wasn't present.

9        Q    -- if anybody?

10       A    Okay.

11       Q    And you say he confirmed that.  Had you asked

12   him that fact, that question, that had it been

13   predetermined?

14       A    Yes, I did.

15       Q    And when was that?

16       A    I believe it was in January.  It was early in

17   2002.

18       Q    And why did you ask him that question?

19       A    Because I, at that point, had begun to be

20   concerned about the level of deceptiveness that had

21   been employed in this decision.

22       Q    And what made you concerned about, quote,

23   "the level of deceptiveness"?

24       A    Well, there were a number of things that had

25   made me -- I guess we can go back to the Adams

44

1    Committee being one of the first indications that

2    there were matters not being fully disclosed to me.

3    Looking back at that point, looking back on

4    Dr. Wikel's behavior, I could see indications that he

5    was aware of what -- knew more than he ought to have

6    as a faculty member.

7        Q    Let's start with the Adams Committee report.

8    When was that?

9        A    I believe it was in November.  I met with the

10   committee in November of 2001.  Exactly when the

11   report was issued is a mystery.

12       Q    And what was it about the Adams Committee

13   report that caused you concern about the level of

14   deceptiveness?

15       A    It's not the report, it's the process.

16   Again, the report, as you well know, was something we

17   had great difficulty getting and was in a draft form

18   for quite a long period of time.  The deceptiveness

19   had to do with the nature of the committee's meeting,

20   what I was told was going to be discussed, and the

21   fact that I wasn't given a full roster of the

22   individuals who were going to be present, with your

23   name being the most conspicuous one that was left off.

24       Q    And what were you told was going to be the

25   discussion of the Adams Committee?

1      A    I was told the Adams Committee was going to

2   be a general discussion -- well, first of all, what's

3   very important and I don't think we have was the

4   memorandum that was sent.

5      Q    What memorandum?

6      A    There was a memorandum that was sent out

7   about it that basically just said that it was to

8   discuss issues related to -- again, I wish I had it --

9   related to scientific misconduct.  But what I was told

10  by Dr. Deckers is that it was going to be a discussion

11  of policy.

12     Q    Okay.  And it didn't now turn out to be that?

13     A    I think it was an interrogation.

14     Q    Why do you think that?

15     A    Because of the nature of the questions that I

16  was asked.

17     Q    And what were those questions?

18     A    They asked -- went into great detail about

19  the issues and matters that had already been examined

20  by the Special Review Board.

21     Q    Okay.

22     A    With quite a lot of opinionating thrown in, I

23  might add.

24     Q    When you talk about Dr. Wikel's behaviors

25  that you mentioned previously, what are you referring

1    to?

2        A    Well, as Dr. Wikel -- well, it was just the

3    sense that he was aware of what was going on.

4        Q    Well, what gave you that --

5        A    Just intuition.

6        Q    You're talking about intuition.  Okay.

7             In paragraph 70 of your Complaint you say

8    that, "The meeting at which the Defendants Deckers and

9    Berlin convinced the Plaintiff to temporarily remove

10   himself as the director for the center of microbial

11   pathogenesis, was a deception to mask the real purpose

12   of Deckers and Berlin's -- of the Defendants Deckers

13   and Berlin removal of the Plaintiff on a permanent

14   basis."

15       A    Uh-hum.

16       Q    What facts do you have to base that on?

17       A    If it weren't the case, since I resigned for

18   personal reasons temporarily, why would I not have

19   been reinstated?

20       Q    Let me ask you this:  You were placed on

21   academic probation in August of 2001, right?

22       A    Uh-hum.

23       Q    Is that correct?

24       A    Yes, I believe so; August or September.  I

25   think I received the letter in September.

47

1       Q      That was a three-year probation?

2       A      But it had nothing to do with the

3    directorship.

4       Q      But it was a three-year probation?

5       A      It was, but there was nothing related to the

6    dealership.  In fact, in the discussion that I had

7    with Dr. Berlin --

8       Q      You have answered the question.  It was a

9    three-year probation and you already answered

10   Dr. Berlin suggested you be removed during the period

11   of probation.

12      A      Jane, that is -- the way you're phrasing the

13   question is not accurate.  I'm sorry.  So --

14      Q      I'm going by the answers you gave me,

15   Dr. Radolf.

16      A      Then let me clarify.  Okay.  The letter --

17      Q      I'm asking what do you base -- what facts do

18   you base it on that their purpose was to remove you on

19   a permanent basis?  I'm asking for the facts that form

20   the basis of that allegation.

21      A      The fact that I had been removed on a

22   permanent basis.

23      Q      How do you know it's permanent?

24      A      Because when somebody requests to be relieved

25   of a position temporarily for personal reasons and

1    then states that the personal reasons are no longer in

2    effect, then one would then expect that they would be

3    reinstated which has not occurred.

4        Q    Was it your understanding that the only --

5        A    One other point.  I'm sorry.  I was told that

6    Dr. Wikel's title would be interim director.  That was

7    in an E-mail from Dr. Deckers.

8        Q    Was it your understanding that the only

9    reason you were relinquishing the position as director

10   was because of your personal issues?

11       A    Yes.

12       Q    And what were those personal issues?

13       A    They were personal.

14       Q    So --

15       A    I don't have to discuss personal issues with

16   you.

17       Q    Well, I think you do because it's the subject

18   of your lawsuit.  Okay?  This is one of your

19   allegations is that you were removed because these

20   personal issues went away.

21       A    One of the issues, one of the most serious

22   things, a big issue in my family is that my sister is

23   dying of multiple sclerosis.  It was at that period in

24   time when her illness took a very drastic turn for the

25   worse and I have had to take a very direct role in

49

1    helping her husband, my brother-in-law, deal with that

2    and to take care of his two children.

3        Q    Was there any personal issue relative to your

4    mental health that was of a concern?

5        A    Not to me.

6        Q    Was it of concern to Dr. Deckers and

7    Dr. Berlin?

8        A    It was not brought up.

9        Q    And was it your understanding at all that the

10   outcome of the ORI investigation could impact whether

11   or not you could be reinstated as director?

12       A    It was not clearly stated.

13       Q    So your claim is all you needed to do was to

14   tell Dr. Deckers that you were feeling better and you

15   would be able to be reinstated as director?

16       A    You want the truth?  That's what he told me.

17   He said, "All you have to do is come back and tell me

18   you feel better."  And I said I would when I did.

19       Q    Has he at any time told you that your removal

20   is permanent?

21       A    I believe in the --

22       Q    Just listen to my question.  Has Dr. Deckers

23   at any time told you your removal is permanent?

24       A    I think in the settlement conference he made

25   statements to that effect.

50

1      Q      But you don't know?

2      A      Well, without transcripts, I believe he did.

3      Q      You are seeking monetary damages against

4   Dr. Deckers and Dr. Berlin regarding this count of

5   your Complaint involving the directorship.  What

6   damages have you incurred?

7      A      When one is demoted for any reason, there is

8   a tremendous amount of stigma attached to that.  I

9   came here because there was -- at the time I thought

10  there was prestige associated with this position.  And

11  in the scientific community these positions are

12  considered prestigious.  To lose a position such as

13  this is stigmatizing.  And within the institution as

14  well, I might add.

15     Q      But what monetary damages have you incurred?

16     A      In terms of salary, there have not been, but

17  that's not the reason we're seeking monetary damages.

18     Q      Okay.  Now, when you say it's been

19  stigmatizing, how do you know that?

20     A      Do you know of any circumstances when

21  somebody gets demoted and it's not?

22     Q      I asked you the question, Dr. Radolf.

23     A      Jane --

24     Q      Just answer my question.

25     A      In all due respect, when somebody is demoted

1    with Dr. Capello based upon the work -- the data that

2    Dr. Wikel and I have generated as Dr. Wikel is of

3    doing the same thing.

4        Q    Do you know whether that -- do you know

5    whether the work that Dr. Wikel has been collaborating

6    with Dr. Wikel on is the exact same work that you and

7    Dr. Wikel had collaborated on, or is it new work that

8    Dr. Wikel has been doing?

9        A    Well, it may have evolved since then, but it

10   began with biochemical analysis of tick saliva.  It

11   also, and let me say, it also involved Dr. Capello

12   helping us interpret and analyze EST sequences that we

13   had developed that we believed were indicators that

14   there were anti-coagulant activity.

15       Q    But if the researcher is involved in

16   collaboration on something, and I'm trying to

17   understand this whole collaborative realm, is involved

18   with another researcher and then he goes off and

19   starts exploring new avenues, and goes off and

20   collaborates with a third individual, are you saying

21   that he's required to bring in that first researcher

22   into this collaboration with the third individual even

23   though it involves a whole new area of research?

24       A    It doesn't involve a whole new area of

25   research.  That's where your whole line of questions

1     is in error.

2         Q     I'm asking under my hypothesis, would he have

3     to bring in that first researcher to collaborate with

4     the third individual if he has gone on off on a new

5     area of research, if it's evolved to a new area?

6         A     No, but that's not what happened in this

7     case.

8         Q     I'm just asking you to answer my question.

9     That's all.

10        A     I'm trying.

11        Q     In your Complaint in paragraph 228, you state

12    that your removal as director, that since your removal

13    as director the defendants have intentionally excluded

14    you from participating in a most significant area of

15    your research interest and research endeavors.

16            What area are you referring to in the

17    Complaint?

18        A     We had -- the tick research.  The tick

19    vaccine research and the effort to identify

20    biologically and pharmacologically active molecules.

21        Q     Can you be more specific because tick vaccine

22    research is a pretty broad area.

23        A     It is?  Can you tell me about it?  I'm sorry.

24    It's not that broad.

25        Q     Well, for a layman like me it sounds very

1     Q     Right.

2     A     Those are the three that I remember.

3     Q     And the first two that you mentioned, the

4     husband and wife, what did they tell you?

5     A     They told me that Dr. Wikel specifically told

6     them not to discuss any work that was being done in

7     his lab.  And with regard to the Department of Defense

8     grant, they told him -- made it very clear they were

9     not even to discuss the fact that the research was

10    occurring -- I mean, that the grant proposal was going

11    forward.

12          They were also instructed not to tell me

13    there was going to be a press conference where it was

14    announced that the grant was awarded.

15    Q     They told you this as well?

16    A     Yes.

17    Q     Do you recall when this occurred?

18    A     When they told me?

19    Q     Yes.

20    A     I would say it would have to be sometime in

21    the middle of 2002.  I'm guessing, but about then,

22    spring, maybe.  Maybe.  I'm guessing it was about that

23    time.

24    Q     Okay.  Now, what other facts do you have that

25    support your allegation that you have been

79

1    About 300 clones were done in my laboratory and a
2    total of six hundred were done.  So an additional
3    three hundred, at least were done in Dr. Wikel's
4    laboratory and those data were never provided to me.
5        Q    And is it your contention that that data
6    resulted directly from the prior work that you and
7    Dr. Wikel had done?
8        A    It is absolutely my contention.
9        Q    Okay.  And you mentioned you saw
10   spreadsheets.  What spreadsheets are these?
11       A    You have one that was provided for discovery,
12   but the spreadsheets that have, you know, there is a
13   lot of information about each individual clone that is
14   on the spreadsheet, on each EST.
15       Q    And are you saying that Dr. Wikel has not
16   given you any information regarding the sequencing
17   that has gone on in his lab since 2000?
18       A    I believe that's correct.
19       Q    Has anyone expressly prohibited you from
20   doing research in the same area?
21       A    Well, first of all, again, you have to follow
22   what is called the data ownership rules.  So the data
23   that were generated have to be mutually agreed upon if
24   one is going to do anything with it.  To start over a
25   project from scratch, did not seem a very appealing

1     thing for me to do.

2            The idea, okay, one of the major purposes for

3     the recruitment of Dr. Wikel was for this project to

4     be transitioned from my laboratory to his because it

5     was going to be a focus in his lab.  And the resources

6     for doing it, the personnel for doing it were going to

7     be largely in his laboratory.

8            So in order for me to, in my --

9     collaborations are based upon different types of

10    contributions.  In addition to providing personnel and

11    resources, there are other ways in which expertise is

12    provided and it was largely at the level of expertise,

13    both myself and other people in my laboratory that was

14    how this collaboration was going to continue.

15    Q     So I will take that as a no?

16    A     I have to admit I actually forgot the

17    question.

18    Q     Has anyone expressly prohibited you from

19    doing this research?

20    A     Well, what I'm trying to do -- the answer is

21    no.  But I am trying to --

22    Q     Thank you.

23           Has anyone blocked you from applying for any

24    grants to do the same research?

25    A     I wouldn't be able to use that data without

1    Dr. Wikel's permission.

2        Q    But you haven't asked him for the data?

3        A    I did and he didn't give it to me.

4        Q    But that was back in 2000?

5        A    Would he give it to me now?

6        Q    Would you like to answer my question?

7        A    To the best, as far as -- Dr. Wikel has

8    systematically excluded me from the research.  He has

9    the data in his possession.  He's not been sharing it

10   with me as one would expect to occur with a colleague.

11       Q    So I take the answer to say my question is

12   no.  Since 2000, you haven't gone back and asked

13   Dr. Wikel to share this with you so you could continue

14   the research if you so choose?

15       A    Actually, that's not true.  In 2000 -- I'm

16   sorry, that's not accurate.  In 2002, I recall that we

17   had a discussion.  In fact, I remember this very

18   vividly because it was in the summer of 2002 we

19   started having a discussion about the research.  He

20   indicated to me as he had on several other occasions

21   that the collaboration was still going forward.

22           Now, he had to -- what happened in the middle

23   of the conversation, he sort of had to leave and he

24   told me that he would resume the conversation at some

25   later time and he never did.

1           And, in fact, I believe that there were other

2     instances where I tried to initiate discussions with

3     him about the status of the collaboration and he was

4     extremely evasive.

5           Q     When was that?  Do you recall?

6           A     Well, I actually remember, now that you have

7     successfully jogged my memory, I remember that after

8     we left -- one of our meetings with Dr. Berlin and

9     Dr. Gillon in 2002 after I had temporarily

10    relinquished the directorship, I was walking back with

11    Dr. Wikel to the center and we talked about the

12    collaboration and I asked him, I said, "Is this still

13    an on-going collaboration?"  And he assured me that it

14    was.

15          Q     Have you asked him for any of the research in

16    2002?

17          A     But that's -- when you have a collaboration,

18    it means you're going to have access to the data.

19          Q     If someone doesn't give you the data, don't

20    you say at some point, "Hey, I would like the data

21    because you're supposed to be collaborating with me

22    and you said we're collaborating.  Give me the data."

23    Did you ever do that?

24          A     I know that there were instances when I asked

25    him for the data.  I can't remember if they were in

1    2002 or not.

2         Q    Were they before 2002?

3         A    I think, well, I know they were both.

4         Q    Were they after 2002?

5         A    You know, you research a point -- okay.

6              MR. BUCCI:  If you remember.

7         A    I don't remember.  No.

8    BY MS. COMERFORD:

9         Q    At that point, was all the research out of

10   your lab in this area and was being done solely in

11   Steve Wikel's lab?  I thought you mentioned that

12   Dr. Caimano was working in this area as well as

13   Dr. Onyango and he left.

14        A    Until Dr. Wikel joined the center, all of the

15   research -- that research, well, I'm sure there was

16   some being done at Dr. Wikel's end, but the vast

17   majority was being done in my laboratory.

18        Q    And then he joined you.  Was the research

19   still being done in your lab?

20        A    Yes.

21        Q    At what point did it stop being done in your

22   lab and being done solely in Steve Wikel's lab?

23        A    Well, I think that the major transition would

24   have been when Dr. Onyango left.

25        Q    That was sometime in --

1      A     In 2000.  But that --

2      Q     Was any of that work still being done in your

3   lab?

4      A     Yes, because there was still a lot of work

5   that -- technology sharing and training that was being

6   done by people in my laboratory, particularly

7   Dr. Caimano.  We had to train people in his laboratory

8   how to do a lot of this work.

9      Q     But there was still this research that you're

10  talking about being done in your lab as well.  You

11  hadn't handed it all over to Steve Wikel's lab?

12     A     The understanding was that from a technical

13  standpoint it was going to be done in Dr. Wikel's

14  laboratory.  And the exact moment in time when that

15  hand-off occurred, I cannot recollect.  I believe it

16  was certainly around the time when Dr. Onyango left.

17  But our involvement in the research, intellectually

18  and technically, did not cease at that time.

19     Q     Who is Tom Mather?

20     A     Tom Mather is a colleague at the University

21  of Rhode Island.

22     Q     Okay.  And what is your relationship with

23  him?

24     A     He's a friend.  He's also a collaborator.

25     Q     How did you meet him?

1      A    Well, I meet him at meetings, but I believe

2    that I was really -- formally introduced to him by

3    Dr. Wikel.

4      Q    And do you recall when that was?

5      A    I can't remember if it was before Dr. Wikel

6    moved or afterwards because we did have some

7    investigators visit during some of Dr. Wikel's

8    recruitment visits.

9      Q    Okay.  And do you know what the focus of

10   his -- Dr. Mather's research is at URI?

11     A    I only know the focus of what it is that we

12   do with him.

13     Q    What is it that you are collaborating with

14   him on?

15     A    He's been helping us look at what we call

16   expression constructs.

17     Q    What are those?

18     A    For Borrelia.  Trying to develop -- okay.

19   One of the major areas of focus in my laboratory is

20   trying to understand when genes are turned on and

21   turned off in the spirochete.  It has to do with the

22   feeding of the tick and the transmission to a mouse or

23   a human.  And Dr. Mather has helped us with certain

24   experiments related to that.

25     Q    Does Dr. Mather also collaborate with

1    Dr. Ribiero?

2        A    I believe so.

3        Q    Are you collaborating with Dr. Ribeiro?

4        A    No.

5        Q    Is the collaboration that you're performing

6    with Dr. Mather different than the research you and

7    Dr. Wikel were collaborating on?

8        A    Yes, quite different.

9        Q    And how is that?

10       A    Well, as I recall, Dr. Wikel may have done

11   one experiment involving the expression, but that's

12   just -- was never a major focus of the collaboration

13   between myself and Dr. Wikel.

14       Q    Is Dr. Wikel involved in this collaboration

15   with you and Dr. Mather?

16       A    I would hope not.

17       Q    Who is Erol Fikrig?

18       A    Yes, he's a very distinguished colleague and

19   collaborator at Yale University.

20       Q    You're collaborating with him?

21       A    We work together, yes.

22       Q    Okay.  What do you collaborate with him on?

23       A    The -- well, it's sort of an off-again

24   on-again thing.  I'm not trying to be evasive, but I

25   think the best way to put it is we have mutual

1    interests and our laboratories get together and

2    discuss our mutual interests.  There are some areas,

3    we did publish a paper involving expression of tick

4    genes in monkeys and so we have a shared interest in

5    that area.  Not just monkeys, but how tick genes --

6    excuse me.  Did I say tick?  I meant spirochete genes

7    at different points in time in different tissues in

8    monkeys and other animals.

9         Q    And was Dr. Wikel involved in that?

10        A    No, not that I recall.

11        Q    How did you meet Dr. Fikrig?

12        A    Oh, we have known each other for years.

13        Q    When did you first meet him?

14        A    It was probably at a Cold Spring Harbor

15   symposium in the early 1990's, but it may have been at

16   another meeting.  Scientists meet each other at

17   meetings.

18        Q    Have you shared any information that's

19   co-jointly owned with Dr. Wikel with Dr. Fikrig or

20   Dr. Mather?

21        A    No.  That would be a violation of our data

22   ownership policy.

23        Q    So except for the fact that you don't want to

24   re-invent the wheel as you mentioned before, could you

25   still apply for grants to do the research that you

1    claim Dr. Wikel is doing in his lab?

2        A    I think that would be very difficult because

3    the science has moved forward, and so the areas that

4    would be -- were, so to speak, hot at the time, now

5    have been covered and oftentimes been published on.

6    So the novelty of the research --

7            But let me also add that there is a resources

8    issue that was always in terms of how personnel and

9    other resources were going to be allocated, and the

10   understanding was that with those resources for

11   certain projects related to tick work would be in

12   Dr. Wikel's lab with us providing various kinds of

13   support, just as when he was recruited there would be

14   certain kinds of things that we do that he wouldn't

15   have to reproduce.

16           That's one of the notions behind the center

17   that you have people pooling their resources so that

18   others -- to economize, you reach an economy of scale

19   and expertise.

20       Q    This understanding was between who?

21       A    It was myself, Dr. Wikel, and other people in

22   my laboratory.  When Dr. Wikel came, he didn't have

23   much of a laboratory, so I did negotiate and discuss

24   it with other people.  Let me say that there were

25   people recruited by Dr. Wikel that came into his

```
 1    laboratory, I had found out, because of the

 2    opportunity not just to work with him but because of

 3    the opportunity to work with myself.  And some of them

 4    who left, they left because they discovered that that

 5    opportunity to work with me was being denied them.

 6         Q    Who denied them that opportunity?

 7         A    Dr. Wikel.

 8         Q    And how did he do so?

 9         A    Because the nature of the fact that he did

10    not -- he discouraged their interaction with me.

11         Q    How do you know that?

12         A    They have told me.

13         Q    Who are these people?

14         A    Dr. -- it's a German name.  And I think it's

15    M-U-H-L-E-R, dash, D-O-B-L-E-S.  His wife, too, by the

16    way.

17         Q    And who else?

18         A    And Dr. Jonathan Poe, who I encouraged to go

19    into Dr. Wikel's laboratory, with the assumption that

20    it was going to -- that John's project was going to be

21    one that would involve a very close interaction

22    between myself and -- with myself and Dr. Wikel and

23    him.  And that was one of the reasons why he left

24    because he realized that that wasn't going to occur.

25         Q    And he told you that?
```

1    that the defendants in this lawsuit have an obligation

2    to fund or commit resources so that you can carry out

3    the research that Dr. Wikel has been doing?

4         A    Our claim is that Dr. Wikel would not have

5    this grant, this Department of Defense grant were it

6    not for me.  I helped -- I was the originator of the

7    idea.  I helped nurture it.  I helped with the

8    initial -- all of the data that was necessary to get

9    it.  I participated in the various promotional

10   activities that were critical in getting the grant.

11   My reputation and scientific expertise and clinical

12   expertise were a major selling point for getting the

13   grant.  And were I not involved at that, then the

14   grant wouldn't exist.  And I have been deprived of my

15   opportunity to participate in that grant.

16        Q    Is it your claim that the research that is

17   being done on that grant is the research that you and

18   Dr. Wikel had performed previously together?

19        A    It was an outgrowth of it, of course.

20        Q    Well, let me ask you this.  If research is an

21   outgrowth of something but it goes down a totally

22   different track --

23        A    But it didn't go down a totally different

24   track.

25        Q    I'm asking you hypothetically, if it's an

1          A      No.

2          Q      Have they removed you as a PI on a grant that

3     has already been funded?

4          A      No, but they couldn't do that anyway.

5          Q      Right.  You have mentioned your participation

6     in the formation of this research proposal, this

7     anti-vector vaccine proposal.  Just tell me, again,

8     what the extent of your participation was within that

9     so I can understand it.

10         A      Are we talking about the grant itself?

11         Q      It's within your Complaint.  You mention

12    participating in the formulation of a research

13    proposal entitled, "Anti-vector vaccines to control

14    mosquitoes and tick-transmitted diseases submitted on

15    September 10, '02 to U.S. Army Medical Research and

16    Material Command."

17         A      Yes.

18         Q      What was the extent of your participation?

19         A      I was excluded from participating in the

20    actual formulation of that proposal.  It was prepared

21    in secret and the people that work with Dr. Wikel in

22    preparing it were specifically told not to tell me

23    about it.

24         Q      Did you, yourself, file any applications with

25    the Department of Defense to do this research?

1    do this in concert with Wikel?

2        A    I believe the beginning of 2002, Dr. Wikel

3    was given strong encouragement and support to divorce

4    himself from me and to maintain secrecy of his

5    laboratory program.

6        Q    What facts do you have to support that

7    belief?

8        A    I have the fact that at that point in time,

9    on multiple occasions, I asked Dr. Wikel -- well, I

10   will back up and say that in my meeting with

11   Dr. Berlin and Dr. Deckers, I asked them if I was

12   going to remain an integral part of the research, and

13   in fact I pointed out that without me that research

14   would not develop properly.  And they assured me that

15   I would, but that's not the way events occurred.

16            When there was -- as I already stated, there

17   were several instances, at least in 2002, including

18   one where we discussed the outlines of a manuscript

19   that you have where I was told by Dr. Wikel that my

20   collaboration, my involvement in the research would

21   continue.  And yet there was no -- there was no

22   evidence of that.  He was not forthcoming.  And I

23   believe that -- well, again, this is speculative, but

24   he would not have done that were -- did he not feel he

25   had the support of the administration.

```
 1
 2                    (A brief recess was taken.)
 3
 4   BY MS. COMERFORD:
 5        Q    Dr. Radolf, what harm have you suffered as a
 6   result of your allegedly being excluded from
 7   participation in the DoD earmark, if you will?
 8        A    Could I go back to one of your more recent
 9   questions about the -- about the 200-something,
10   whatever, in the Complaint, about UCONN?
11        Q    Yes.
12        A    Okay.  That proposal was going to be
13   submitted jointly with my full participation.  That
14   was a very clear understanding based upon all the
15   meetings and discussions.  And the fact that that
16   proposal was submitted without my knowledge, and data
17   that belonged to me could not have occurred unless
18   University of Connecticut approved of it and officials
19   signed off on that proposal.
20        Q    The question I had asked you, though, was you
21   were alleging that Dr. Wikel --
22        A    You asked about UCONN.
23        Q    -- had instructed the members of his lab not
24   to discuss the research with you and had done this in
25   concert with the defendants.  It wasn't about the
```

1       A       I would have no way of knowing that.

2       Q       Okay.

3       A       Again, Jane, the issue is whether that press

4    conference, whether it was appropriate not to invite

5    me to the press conference for a grant that involved

6    research that I was instrumental in receiving.

7       Q       Well, you state that the article fallaciously

8    depicts the Defendant Wikel as the sole originator and

9    owner of the department research.  What I wanted to

10   ask you is where in the article does it do so?

11      A       I would say that anybody who read the

12   article, since it didn't mention myself and the

13   picture did not include myself, I would think anybody

14   with any -- reasonably would draw that conclusion.  It

15   would be certainly hard for them to understand what my

16   role was.

17      Q       Okay.  You also mention in your Complaint

18   about a June 2002 issue of ASM Press.

19      A       It was ASM News.

20      Q       Okay.  The article is entitled, "Lyme Vaccine

21   Lymerix Leads Market for others in the Wings."

22              Do you know whether or not the defendants

23   wrote that article?

24      A       The article was based upon -- one of the

25   things that prompted the article were the press

1    releases from the university about the grant.  And

2    Dr. Wikel was --

3        Q    Doctor, just try to answer my question,

4    that's all.  I'm asking you whether or not the

5    defendants wrote the article.

6        A    I don't know.

7        Q    Okay.  Do you know whether or not they edited

8    it?

9        A    No.

10       Q    And is ASM News a UCONN publication?

11       A    Of course not.

12       Q    Well, I didn't know.

13       A    But UCONN Advance is.

14       Q    Now, tell me what facts you have to support

15   the claim that any of the defendants you have listed

16   in your Complaint were aware of the ownership or

17   property interest you claim you had in the sequences

18   of the libraries that were used in the DoD proposal?

19       A    Oh, God.  That goes back to the time of my

20   recruitment.  The discussion -- there was a time when

21   Dr. Berlin and I actually had a close relationship and

22   we talked extensively about research that was being

23   done.  And in the course of my recruitment with

24   Dr. Wikel, I mean, they were too numerous to count

25   would be the answer to that.

1    Q    It goes back to the time of your recruitment

2    with Dr. Berlin?

3    A    Yes.  I mentioned I submitted a summary of

4    research interests which discusses the work that we

5    were doing in my collaboration with Dr. Wikel.

6    Q    Okay.  Now, what facts do you have that

7    Dr. Deckers was aware of the ownership or proprietary

8    interest?

9    A    Well, I had accompanied him on at least one

10   if not two meetings with Congressmen.  And he came up

11   to the center.  At least one time we went off the

12   campus, we went to, I think, Jim Maloney, is that his

13   name?  And then there was times when people came to

14   the medical center.  Nancy Johnson one time, and also

15   there were people from the legislature who would come,

16   so it was all in the context of that.

17        Plus, you know, you have to also recognize

18   that my relationship -- reporting relationship,

19   Dr. Deckers was one step removed from my reporting

20   relationship so that most of my research discussions

21   and discussions on these matters would have occurred

22   with Dr. Berlin.  Dr. Deckers wouldn't know a tick

23   vaccine -- I mean, he's a surgeon.  So it would be

24   very unlikely I would engage in lengthy discussions

25   with Dr. Deckers under any circumstances on such a

1    topic, but that he was familiar with the nature of the

2    research and what it involved and that was a

3    fundamentally colloboratively project between myself

4    and Dr. Wikel is something that he was abundantly

5    aware of.

6        Q    And you say he was abundantly aware because

7    he went with you on one meeting to Congressman Maloney

8    and he went up to your lab a couple of times?

9        A    I think those are pretty good indicators,

10   yes.

11       Q    Anything else?

12       A    Well, again, Dr. Deckers is not directly

13   involved in the research apparatus at the medical

14   school.  Most of my interactions were with Dr. Berlin.

15       Q    Okay.  You state in paragraph 421 of your

16   Complaint that, "The purpose of the Defendants UCONN,

17   UCHC, Deckers, Berlin and Wikel perpetually would

18   involve actions" -- and these are relative to the DoD

19   proposal, "was to cause confusion and/or to cause

20   mistake and/or to deceive others into believing that

21   the Defendant Wikel was the sole or exclusive owner of

22   ideas or intellectual properties in the proposal."

23            How do you know that this was the defendants

24   purpose?

25       A    I can't think of any other reason why I would

1    as?

2        A    It was projected to be 50 percent on each

3    grant.  Two of the three grants.  One grant he was not

4    involved in.

5        Q    Which one is that?

6        A    That's the syphilis, we call it the syphilis

7    immunology grant.

8        Q    Now, did there come a later period of time

9    where you filed non-competitive renewals on the

10    grants?

11        A    Yes, of course.

12        Q    These are the progress reports we'll talk

13    about?

14        A    Uh-hum.

15        Q    Did you then put Ken, list him as well on

16    those progress reports, your non-competitive renewals?

17        A    There would be no need to.

18        Q    Why not?

19        A    Because the only -- well, in terms of

20    budgetary issues with progress reports, what they

21    require you to do is to discuss changes involving key

22    personnel.

23        Q    Okay.  And was Ken Bourell listed as a key

24    personnel?

25        A    He was never listed as a key personnel nor

1   was it expected that he would be a key personnel.

2        Q    Was he ever a key personnel when he was in

3   Texas?

4        A    No.

5        Q    He wasn't listed at all on progress reports

6   or non-competitive renewals?

7        A    I would have to go over it line by line, but

8   I believe he's not.  I have reviewed them and I have

9   not found...

10       Q    Okay.  So when the grants were transferred to

11  NIH, did you use -- transfers by NIH to UCONN, did you

12  use any of the grant funds you received to pay for Ken

13  Bourell's salary?

14       A    No.

15       Q    So you state in paragraph 592 of your

16  Complaint, "In June of 2002, without prior

17  notification or discussion, Defendant UCHC encumbered

18  funds from two of the Plaintiff's NIH grants to pay a

19  disproportionate amount of the salary infringements on

20  Mr. Ken Bourell."

21            What do you mean by the encumbered funds?

22       A    You want to go over the paperwork?

23            MR. BUCCI:  Answer the question.

24       A    The monies were taken from my grants without

25  my knowledge.

1   BY MS. COMERFORD:

2       Q     How do they do that?  I'm trying to

3   understand how that occurs.

4       A     That's a very good question.  I wondered that

5   for a long period of time.  In the discovery documents

6   I've finally gotten a completely satisfactory answer

7   to that.  Do you want me to explain?

8       Q     I want you to tell me what you mean by, "They

9   encumbered funds."   What does that mean?

10      A     Encumbering means taking monies and

11  earmarking them or designating them for his salary.

12      Q     Okay.  That's all.  Thank you.

13      A     But you asked how that happened.

14      Q     When did you actually become aware that this

15  had occurred?

16      A     June of 2002.

17      Q     And how did you become aware of it?

18      A     I was given copies of labor distribution

19  forms by Ms. Young.

20      Q     And what are these labor distribution forms?

21      A     They are expo facto documents that indicate

22  what monies and what accounts somebody is being paid

23  from.

24      Q     And who do they get submitted to?

25      A     They weren't submitted.  They were actually

1    generated from Mr. Gillon's office.  I don't know

2    exactly what the route is, but these forms came from

3    Mr. Gillon's office and were given to Kim Young with,

4    I might add, no indication that they were to be shared

5    with me.

6       Q    Did she ever give you a message that Dave

7    Gillon had called and wanted you to call him back?

8       A    Ever?

9       Q    Well, around that period of time.

10      A    This matter, the issue about these grants

11   came about after I initiated the discussion.

12   Probably, yes.  I mean, Mr. Gillon did not call me to

13   discuss these grants with me, if that's what you're

14   asking.

15      Q    I asked if you got a message from Kim Young

16   around that period of time that indicated that Dave

17   had called and that you were to call him back

18   regarding this whole issue?

19      A    Before I was notified?

20      Q    Right.

21      A    No.

22      Q    Okay.

23      A    Actually, let me correct that.  Notified is

24   not the correct word.  Before I was given forms that

25   were actually sent to Ms. Young.

142

1      Q    Okay.  And when you got those forms, what did
2   you do?

3      A    I called Dave, Mr. Gillon.

4      Q    And what did you tell him?

5      A    I -- well, again, verbatim I can't remember,
6   but what I told him was that the funds that were taken
7   were well in excess of the time and effort, or the
8   work that Ken had been doing for the period that was
9   covered.  And that the monies couldn't be used for
10  that purpose because it would be in violation of NIH
11  regulations.

12     Q    And which NIH regulations or requirements
13  were you referring to at that point?

14     A    Ones that he reiterated to me on several
15  occasions, too.  I can't give you the number, but what
16  anybody who has a grant knows is that a person has to
17  be paid proportionally to -- they can't be paid in
18  excess of their time and effort on a particular grant.

19     Q    Now, what time and effort had Dave put down
20  on cumbered the funds?

21     A    It totaled 75 percent of Ken's effort
22  during -- well, it was broken up.  There -- it's a bit
23  complicated, but it was -- going back to June of the
24  previous year, or July 1st of the previous year to
25  December it was 50 percent.  And then from December to

1    about Ken because it wasn't recognized that there was

2    an error, that the time and effort reports weren't

3    being filed.

4        Q    These had not been filed?

5        A    Well, it turns out in retrospect -- it's not

6    a simple question because I was told initially none

7    were filed.  And that's what was maintained to me for

8    quite a long period of time.

9        Q    I'm trying to understand.  It's your

10   responsibility to file them.  Wouldn't you know if

11   they had been filed or not?

12       A    I knew none had been filed.  In other words,

13   I did not recall filing any either, so when Dave

14   Gillon told me none had been filed -- let me add, it's

15   not just the responsibility of the principal

16   investigator, it's the institution that has to pay

17   NIH.  There are financial officers who are involved in

18   these transactions.

19       Q    Is it the principal investigator that reviews

20   the reports and certifies them for their accuracy as

21   well?

22       A    Sure.  Yes.

23       Q    So after you called Dave Gillon and explained

24   to him that the percentages were not accurate, what

25   happened after that point?

148

1    system to begin with.  But quarterly, as I recall,

2    when there was a paper system, which wasn't in

3    existence that long after we -- for that long a period

4    of time after we relocated, there were paper filings

5    that would be done on a quarterly basis, I believe.

6        Q    And did you submit those paper filings?

7        A    The paper filings for Ken -- okay.  So paper

8    filings for Ken were not -- that's where the confusion

9    arose.  What was recognized was that because Ken

10   wasn't -- wasn't being paid off of an NIH grant, that

11   those had to be filed.

12       Q    But he was listed on the grant?

13       A    Yes, but what I'm saying is that nobody

14   seemed to recognize, including the institution, and as

15   Mr. Gillon pointed out to me that it was one of these

16   things that kind of basically fell through the cracks

17   that because he was being paid off the grants, it

18   wasn't recognized that time and effort reports needed

19   to be filed for him.  And, okay, it wasn't until --

20   the institution's policy on this wasn't really

21   elaborated until, I believe, it was February or April

22   of 2002.

23       Q    Okay.

24       A    Had I been asked to file time and effort

25   reports, there certainly would have been absolutely no

1      A    Well, Jane, the fact is we never got a clear

2    understanding what the complaint was.

3      Q    Was that what this letter was?

4      A    This is only a letter that an allegation had

5    been made.  That's all it is.

6      Q    You state in paragraph 600 of your Complaint,

7    you state that "This complaint or allegation was filed

8    against you in retaliation to your insistence that the

9    defendants comply with NIH regulations regarding

10   unauthorized and inappropriate use of NIH grants to

11   pay the salary of Ken Bourell."

12          What facts do you have or do you base this

13   claim of retaliation upon?

14     A    Well, can we start with the initial action

15   that led to -- because there can't be a retaliation if

16   there isn't an action that precipitates it, so the

17   first set of facts that we need to clarify is that the

18   monies were basically misappropriated.  Paperwork was

19   completed taking monies for time and effort that Ken

20   never did, signed off on by people that never

21   discussed it with me, and by people who, according to

22   E-mails that have been shared, knew that the time and

23   effort reporting -- the time and effort being claimed

24   was vastly disproportionate to what was being taken.

25          So that's what precipitated -- so that's what

152

1    was being retaliated against, my insistence that NIH

2    regulation be rigidly adhered to.

3        Q    Who did you make it to, Dave Gillon?

4        A    Yes, actually because there are E-mails and

5    then there were discussions.  And Dave, who, at the

6    time I didn't realize had signed off on these forms

7    reassured me that he was -- understood fully NIH

8    regulations and how important it was for the

9    institution to follow the PI's guide, direction, or

10   estimates of time and effort, and things along that

11   line.

12       Q    And Dave corrected the amount of percentages

13   that were encumbered; is that correct?

14       A    Not spontaneously.

15       Q    After negotiations and discussions with you?

16       A    After the allegation was submitted.

17       Q    So --

18       A    It didn't happen quickly, by any stretch of

19   the imagination.

20       Q    The fact there was this allegation is what

21   you base your claim that there was retaliation?

22       A    The allegation was -- yes.

23       Q    Okay.  And who exactly was retaliating

24   against who here?

25       A    Well, we know that the allegation originated

1    clear coordinated pattern of activity.

2          Let me also say I believe there are E-mails

3    that also relate to the Department of Defense grant in

4    terms of -- that may not be germane.  We'll come back

5    to that, I'm sure.

6      Q    When you testified earlier Dr. Deckers was

7    copied on those E-mails, is that how he acted in

8    concert with Dr. Wikel?

9      A    No, Dr. Deckers was a direct participant or

10   his designee, Dr. Scott Wetstone.  But the actually --

11   there was an E-mail from Dr. Deckers -- well, first of

12   all there were a number where he took part in

13   discussions involving the spherious allegations and

14   the retaliatory activities that they engaged in.

15         In addition, there is one E-mail that

16   Dr. Deckers instructed -- I cannot remember if it was

17   Dr. Wetstone or Dr. Wikel, but he instructed them to

18   go ahead and draft the complaint.

19     Q    So that's what the concerted efforts are

20   relative to, the actual initiation of the allegation

21   that wound up being investigated by the compliance

22   office; is that correct?

23     A    At the present time, that's the one that I

24   can best recollect but -- at the present time.

25     Q    Okay.