**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 1, 2004 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.    *Background*

The plaintiff is currently a tenured Professor in the Departments of Medicine and Genetics

and Developmental Biology at the University of Connecticut Health Center ("UCHC").  He is a

board-certified internist, a board-certified infectious disease specialist, a physician-scientist, and

a microbiologist.  He is internationally recognized for his clinical and scientific expertise in syphilis and Lyme disease, infectious disorders caused by the spirochetal pathogens *Treponema pallidum* and *Borrelia burgdorferi*, respectively.  A major goal of his research has been and continues to be the development of innovative strategies for preventing syphilis and Lyme disease, which includes vaccine development.  The plaintiff's research program, from its inception in the 1980s, has made extensive use of molecular biological, genetic, and recombinant DNA techniques.  *Radolf Aff. ¶ 4.*

a.  *Appointment As Chair of the Center for Microbial Pathogenesis*

During the summer of 1998, while a tenured Professor in the Departments of Internal Medicine and Microbiology at the University of Texas Southwestern Medical Center at Dallas, Texas ("UT Southwestern"), the plaintiff applied for the Directorship of a newly created Center for Microbial Pathogenesis ("CMP") at UCHC in response to an advertisement in a then-recent issue of the American Society for Microbiology ("ASM") News.  No other specific faculty appointment or position was mentioned in the advertisement.  *Radolf Aff. ¶ 5.*  Shortly thereafter the plaintiff submitted the requested application materials to the defendant, Dr. Richard Berlin ("Berlin").  Included was a statement of research interests which described the plaintiff's collaborative work with the defendant, Dr. Stephen Wikel ("Wikel") on tick immunobiology and tick vaccine development.  Berlin and the plaintiff discussed this work on a number of occasions,

both during the plaintiff's recruitment and during his subsequent recruitment of Wikel after the plaintiff assumed the CMP Directorship.  The plaintiff made his first recruitment visit to UCHC in July or August, 1998, which included interviews with a number of senior UCHC faculty and the presentation of a research seminar.  Before deciding to accept the position, the plaintiff made another return visit; this time accompanied by Drs. Melissa Caimano and Timothy Sellati, two postdoctoral research fellows in the plaintiff's laboratory.  Based on the verbal understanding with Berlin that UCHC would offer the plaintiff the Center Directorship, the plaintiff returned with his family during Labor Day weekend, 1998.  During this visit, Berlin and the plaintiff entered into extensive, formal negotiations regarding the number of faculty to be recruited to the Center, its scientific directions and orientation, the Institutional resources that would be allocated for its development and the long-term commitment to the plaintiff in establishing the Center. *Radolf ¶¶ 6-10.*  As the direct outcome of the plaintiff's negotiations with Berlin during the Labor Day Weekend visit, the plaintiff was formally offered by letter dated September 9, 1998, the position of "Director of the Center for Microbial Pathogenesis" in addition to tenured appointments in the Departments of Medicine and Microbiology.  The letter also stated that "your principle responsibility will be the formulation and development of the Center's research program" and it outlined the Institutional resources that would be allocated to the plaintiff for this new research Center.  These statements indicate very clearly that the Center Directorship,

not the faculty appointments, were the focus of the recruitment. Without these written representations and the clearly implied understanding that UCHC was making a long-term commitment to the plaintiff as Center Director, the plaintiff would not have accepted the position, nor would his personnel have agreed to make the move to a smaller and less established Institution with comparatively little research strength in their chosen field. *Radolf ¶ 12*. In an email to Berlin dated September 11, 1998, *Exhibit 48*, the plaintiff formally accepted the position. *Radolf ¶ 13*.

Sometime in January, 1999, several months after the plaintiff had accepted the Center Directorship, he made another visit to UCHC to meet faculty members and discuss various details regarding the transfer of his laboratory and the establishment of the Center with Berlin. It was during these discussions with Berlin that the plaintiff discovered that his initial appointment would be as Assistant Professor and that his tenured appointments as Professor in the Departments of Medicine and Microbiology would not be made by the UCHC Senior Appointments and Promotions Committee (SAPC) for as long as one year after the move. The plaintiff informed Berlinthat he considered the appointment as Assistant Professor to be contrary to the representations made by the defendant, Dr. Peter Deckers ("Deckers"), and Berlin during their earlier discussions and in the letter of offering. The plaintiff emphatically indicated that if this situation was not remedied, he would withdraw his acceptance of the Center Directorship

and remain at UT Southwestern.  *Radolf ¶ 16*.  On January 8, 1999, following his return to Dallas, Texas, the plaintiff received a letter from Deckers stating "[t]his is to indicate that you will be appointed Professor of Medicine with tenure effective April 1, 1999".  The plaintiff had previously agreed to April 1, 1999 as the start date for his position as Center Director.  Thus, months before the actual move, Deckers and Berlin had given the plaintiff an unmistakable understanding that the appointments as Center Director and Professor of Medicine and Microbiology were inseparably interconnected.  *Radolf ¶ 17*.  The mutual understanding of the plaintiff and the defendants, in particular, Deckers and Berlin, was that the University of Connecticut Health Center was making a long-term commitment to the plaintiff to be the Director of the Center for Microbial Pathogenesis and that his faculty appointments were integral components of the offer, not separate and distinct proposals.  *Radolf Tr. 16-20*.  The offer made to the plaintiff to relocate to the University of Connecticut Health Center was not made in separate components; the plaintiff was not offered a "position" as a "full Professor" and a separate appointment as the Director of the Center for Microbial Pathogenesis.  The appointments were made in unison to establish the plaintiff as the permanent Director of the Center for Microbial Pathogenesis.  *Radolf Tr. 16-20; Radolf Aff. ¶¶ 5-21*.

Shortly after the plaintiff's arrival, he received a letter from Dr. Leslie Cutler, then Chancellor of the University of Connecticut, stating that he had received an appointment as

Assistant Professor, a non-tenured position. The plaintiff was confused by this and concluded that Deckers had not informed Dr. Cutler about his January 8 letter. Upon his relocation, the plaintiff also discovered that the CMP had not been formally recognized by the UCHC Board of Trustees ("BOT") and that established guidelines for the operation of Type II Centers, of which CMP was supposed to have already have been designated, did not exist. Subsequently, Deckers and Berlin represented to the plaintiff that formal establishment of the CMP by the BOT was a mere formality and should not be a concern to him. *Radolf ¶ 18.* The September 9, 1998 letter of offering did not make any mention that the CMP had not been approved by the BOT as an academic entity. Had this point been revealed in the letter and not concealed by Deckers and Berlin until the plaintiff had relocated to UCHC, he would have categorically stated his unwillingness to accept the Center Directorship until the Center was formally established as a permanent academic entity by the BOT. *Radolf ¶ 19.* On April 1, 1999, the plaintiff assumed his responsibilities as Director of the CMP. On April 7, 1999, the Senior Appointments and Promotions Committee confirmed the plaintiff's appointments as Professor in the Departments of Medicine and Microbiology. From the moment of his arrival at UCHC, the plaintiff endeavored to fulfill his commitment to establish a world-class CMP at UCHC. During the next three years, he received numerous accolades and two excellent annual compensation reviews, with commensurate increases in salary. On August 28, 2000, in response to the first Annual

Report for the CMP, the plaintiff received a letter from Deckers stating "I congratulate you, your staff, and your faculty on an exceptionally productive academic year.  Your collective scholarship, presentations, and research funding are a credit to your industry, intellect, and enthusiasm.  Be assured of the continued support of this office".  *Radolf ¶¶ 20, 21.*

> b.   *Removal as Director of the Center for Microbial Pathogenesis*

Because a Special Review Board ("SRB") of the University of Connecticut Health Center determined that the plaintiff had been guilty of research misconduct, the plaintiff was issued a letter of reprimand by Deckers on August 22, 2001.  The letter stated, "[y]ou engaged in research misconduct by falsifying figure 2 of the USDA application.  You confirmed this conclusion by admitting to the referenced falsification of data."  Deckers further noted, "there is (1) no evidence that your action in this circumstance is part of a pattern of dishonest behavior, or that (2) this falsification had any impact on the research record, research subjects, other researchers, institutions, or the public welfare and, further, (3) the grant applications to USDA and CII were withdrawn before review, and 'problems with the data' in the grants correctly offered as reasons for such withdrawal.  *Exhibit 2.*  As a result of the finding of the SRB, Deckers imposed the following disciplinary measures on the plaintiff: "(a) a letter of reprimand will be placed in your personnel file (consider this letter to be that letter of reprimand) and (b) a committee of faculty researchers who are tenured Professors of the School of Medicine will be created who shall

thoroughly inspect all research grant proposals which you author or co-author for a period of

three years (September 1, 2001 through August 31, 2004) to ensure (1) compliance with all

applicable regulations and (2) the integrity of research data presented.  This three year period

will be considered a period of probation for you as a member of this academic community."  The

Special Review Board and Deckers decided, independent of the plaintiff, that it would not report

its investigation and findings to the federal Office of Research Integrity[1].  *Exhibit 2*.  Deckers

took no action that impacted on the plaintiff's position as Director of CMP or any of his other

UCHC appointments.  Berlin delivered Deckers' letter to the plaintiff at which time he assured

the plaintiff that he retained the strong support of UCHC for his continued leadership of the

CMP.  *Radolf ¶ 22*.  However, some four months later, in early January, 2002, the plaintiff

received a letter authored by Deckers, dated December 27, 2001, requesting that he meet with

Deckers and Berlin to discuss Berlin's recommendation that the plaintiff temporarily relinquish

the Directorship of the CMP.  *Radolf ¶ 23*.  "Richard Berlin has expressed to me his concern that

your academic probation and the potentially prolonged Office of Research Integrity (ORI)

investigation into this entire matter could become very serious handicaps to the maintenance of

morale and productivity amongst faculty in the Center for Microbial Pathogenesis, to the

recruitment of new faculty, and to the development of the Center as an institutional resource.

---

[1]Subsequently, the ORI exercised its oversight jurisdiction to review the research misconduct admitted to and found by the SRB, not as a result of any acts of misconduct.  The defendants imply that the plaintiff was independently found guilty by the SRB and the ORI for separate violations.  That simply was not the case.

Consequently, he has recommended that you be relieved of your directorship during this probationary period[2]." *Exhibit 5.* In his letter Deckers welcomed a discussion with the plaintiff "on the advisability of this course". Pursuant to Deckers' invitation, the plaintiff met with Deckers and Berlin on January 7, 2002. They told the plaintiff that the Center's existence was in jeopardy because it had not been approved by the BOT as a permanent academic entity. They also told the plaintiff repeatedly that he had done an excellent job running the Center. They restated and emphasized that he was being asked to relinquish the Directorship on a temporary basis. The plaintiff stated that he believed he was fully capable of running the Center; that there was no one else in the Center capable of providing the necessary scientific and administrative leadership and that the best way to ensure the Center's survival was for the plaintiff to continue as Director. To convince the plaintiff to relinquish his position, Deckers unequivocally told the plaintiff that in order to resume the Center Directorship he need only inform Deckers when "he was feeling better". On January 11, 2001, the plaintiff met privately with Deckers. Deckers told him that it was his decision that the plaintiff should temporarily relinquish the Center Directorship. Deckers reiterated that for the plaintiff to resume his position as Center Director all he needed to do was to meet with Deckers, inform him that he was feeling better, and Deckers would reinstate him as Center Director. Deckers went on to request that the plaintiff provide him

---

[2] It must be noted that there is no reference in the letter that the plaintiff's return to the position would be dependent on the outcome of the ORI investigation.

with a letter stating that he would relinquish the Directorship "temporarily due to personal reasons". *Radolf Tr. 49; Radolf Aff. ¶ 25.* In his conversations with the plaintiff, Deckers never mentioned that the resumption of plaintiff's duties as Director for the Center for Microbial Pathogenesis was conditioned in any way upon the activities of the ORI. *Radolf Tr. 36-50; Exhibit 7.*

On January 13, 2002, Deckers sent the plaintiff an email in which he restated his view that the plaintiff must relinquish the Center Directorship and stated for the first time that his authority in this matter was "absolute". On January 14, 2002, the plaintiff met with Deckers at which time he accepted a letter in which the plaintiff, using the wording Deckers had suggested, informed Deckers "…of my decision to relinquish temporarily my position as Director of the Center for Microbial Pathogenesis for personal reasons." When presenting the letter to Deckers, the plaintiff asked him if he felt comfortable with the exact wording. Deckers stated that he was. Several weeks later, in discussing with Wikel the "Interim" nature of Wikel's appointment, Wikel acknowledged that in December, 2001, Deckers and Berlin had informed him that they were going to ask the plaintiff to step aside; that Wikel was going to succeed the plaintiff, and that, contrary to the representations made to the plaintiff by Deckers and Berlin, the plaintiff's stepping aside was not temporary. Despite the semantics employed by Deckers and Berlin, the appointment of Wikel has been nothing less than permanent, employing the label interim to mask

the true nature of the appointment while the present legal proceedings are pending.  *Wikel Tr. 8; Exhibit 8.*

By letter dated July 3, 2002, the plaintiff requested that he be restored to the position of Director of the Center for Microbial Pathogenesis.  *Exhibit 39.*   Although the defendants allude to the willingness of Deckers to discuss the plaintiff's request, the so-called willingness was at all times entangled with compensation review process.  Deckers has never evinced a willingness to meet with the plaintiff to discuss the plaintiff's return to the Director's position.  The communications from Deckers were that the topic "may" come up when the plaintiff met with Deckers to discuss his performance as a Professor of Medicine and Genetics and Developmental Biology.  Deckers, knowing the plaintiff's unwillingness to mingle the issues regarding the directorship with the topic of his compensation, unreasonably refused to meet with the plaintiff on either of the subjects.  The correspondence attached to Deckers affidavit dispels any notion that there were numerous opportunities to confer about the directorship; the entire correspondence revolved around the setting up of one meeting to review the plaintiff's compensation.  *Deckers Aff.-Attachment # 8.*  The compensation review documents submitted by the plaintiff to Deckers which, pursuant to Deckers' own procedures, necessitated his meeting with the plaintiff[3], demonstrates that it was limited to the plaintiff's performance as Professor of

---

[3] Deckers served as the plaintiff's immediate supervisor since January 14, 2002 , *Exhibit 7.*

Medicine and Genetics and Developmental Biology, *Exhibit 11,* not the issue of the Directorship.  As of the present date, the plaintiff has not been restored to the position of Director of the Center for Microbial Pathogenesis, nor has he been informed of the reasons why he has not been restored nor has he been accorded a hearing of any type on his request to be restored.

<blockquote>c.   *Plaintiff's Research Endeavors vis-à-vis Dr. Stephen Wikel*</blockquote>

In the 1980s the plaintiff's laboratory began to conduct research in Lyme disease, a tick-borne infection caused by the spirochete *Borrelia burgdorferi.*  The addition of Lyme disease to the laboratory's already established research program in syphilis was prompted by the increasing recognition of Lyme disease as a major global public health problem.  The primary objective of the laboratory's Lyme disease research was to characterize outer membrane proteins of *B. burgdorferi* as virulence determinants and potential vaccine candidates.  By the mid 1990s, the plaintiff and members of the plaintiff's laboratory became increasingly aware of the need to incorporate ticks into our Lyme disease research program.  This awareness was prompted by increasing evidence that transmission of *B. burgdorferi* by *Ixodes scapularis*, the tick-vector of Lyme disease, which differs from needle inoculation of spirochetes, the technique routinely used in the laboratory to infect mice.  During this period, the plaintiff also became increasingly aware of work in the entomological literature describing biological, immunological, and

pharmacological properties of molecules in tick saliva and the related notion that interference with one or more of these activities by immunization might interrupt pathogen transmission; this latter concept is often referred to as a "tick vaccine". To facilitate this new direction in the plaintiff's laboratory's research, during the summer of 1996, the plaintiff telephoned Dr. Stephen Wikel ("Wikel"), an investigator in the Department of Entomology at Oklahoma State University ("OSU"), who had extensive experience in the rearing of ticks. During a lengthy telephone conversation, they agreed that they shared a number of research interests in the area of ticks and tick-borne diseases and that a collaboration appeared to be the appropriate means for pursuing these mutual scientific interests. To further the collaborative interactions, the plaintiff invited Wikel down to UT Southwestern to present a seminar and meet members of the plaintiff's laboratory and that of Dr. Michael Norgard, the plaintiff's close associate and then Vice-Chairman of the UT Southwestern Department of Microbiology. The seminar focused on immunological aspects of mammalian host-tick interactions and did not describe the use of recombinant DNA techniques, proteomics, or genomics as a means of identifying individual salivary gland proteins that might be responsible for the immunological activities Wikel appeared to be detecting in tick salivary gland extracts. During that visit, Wikel readily acknowledged that his research program lacked molecular or genetics techniques and that he viewed collaboration with the plaintiff's laboratory as a means of remedying this deficiency.

Several weeks after this first meeting, Dr. Wikel invited the plaintiff to present a seminar in the Department of Entomology at OSU. With Wikel as host, the plaintiff presented a seminar in the Department of Entomology that centered largely on the *B. burgdorferi* outer membrane and Lyme disease vaccine-related work being conducted by Dr. Darrin Akins, then a postdoctoral research fellow. During this visit, it was readily apparent from direct discussions that no one in the Wikel laboratory was familiar with the use of molecular biological, genetic, or recombinant DNA techniques and that these powerful methodologies were not being employed to identify salivary gland proteins responsible for the immunological effects he claimed to be observing in salivary gland extracts. During that visit, the plaintiff met Dr. Melanie Palmer, an investigator in the OSU Department of Entomology and an experienced tick molecular biologist. The plaintiff was surprised to discover that, despite their mutual interests, the research interactions between Wikel and Palmer were minimal. A computer-based search of the literature and the sequence databases upon the plaintiff's return confirmed that Palmer and Wikel had not co-authored any publications or jointly submitted any sequences to GenBank.[4] Wikel's assertion in the affidavit submitted with the defendant's motion for summary judgment of extensive molecular biology collaboration with Dr. Palmer at OSU prior to his collaboration with the plaintiff is a clear misrepresentation.

---

[4] GenBank, the National Institutes of Health (NIH) genetic sequence database, is an annotated collection of all publicly available DNA and protein sequences.

In addition to obtaining ticks for Lyme disease work, the plaintiff began to discuss with members of his laboratory the possibility of using molecular techniques to identify biologically important molecules in tick saliva as well as the related idea of developing a tick vaccine.  These ideas were discussed with Wikel and quickly became a central theme of the collaboration between the Radolf and Wikel laboratories.  The plaintiff was directly responsible for initiating two parallel and complementary approaches to accomplish these research objectives.  One was to extract RNA from salivary glands of feeding ticks in order to generate cDNA libraries; clones encoding biologically relevant molecules and vaccine candidates would be "pulled" from these libraries.  The other involved Expression Library Immunization or ELI, a methodology developed by Dr. Stephen Johnston, a colleague of the plaintiff at UT Southwestern.  Efforts to generate fed tick salivary gland cDNA libraries got underway in the fall of 1996.  Given the amounts of RNA needed to generate a single cDNA library, it was decided to make the first library from the glands of the relatively large tick *Dermacentor andersoni*.  Dr. Darrin Akins, a postdoctoral fellow in the plaintiff's laboratory, was directly responsible for this work.  Dr. Akins personally received the *D. andersoni* salivary glands shipped from Wikel's laboratory and extracted the RNA from which the cDNA library would be constructed.  After assessing the RNA both qualitatively and quantitatively, Dr. Akins personally shipped it to Stratagene, a biotechnology company based in La Jolla, CA that makes fee-for-service custom libraries.  The

completed library (UT Southwestern Purchase Order # R60299, Stratagene Order # 468492,

Customer # 1210) was sent from Stratagene to the Radolf laboratory at UT Southwestern on

November 20, 1996; Akins personally handled this transaction.  It was the clear understanding

between the Radolf and Wikel laboratories that the library was jointly owned as were any and all

data generated from it.  By the established norms of scientific collaboration, a collaboration of

this type would include sharing in hard copy and electronic forms any and all data generated by

either lab with regard to the library, including, but not limited to, the nucleotide sequences,

recombinant proteins, peptides, or other reagents.  The initial plan was to screen the library with

tick immune antiserum provided by Wikel.  However, the "protective antiserum" that Wikel

provided did not react specifically with any clones from the library, indicating that it was

unusable for identifying clones that might encode vaccine candidates.  It was at this point that the

plaintiff suggested we begin "high throughput sequencing" of expression sequence tags or ESTs.

The plaintiff's rationale was that the library should be highly enriched for tick salivary gland

cDNAs.  This fundamental idea of high-throughput sequencing of random clones underlies all of

the subsequent tick-related EST research conducted or proposed by Wikel, including that in the

Department of Defense proposal, discussed below.  Prior to any substantive interactions with

Wikel, Dr. Johnston and the plaintiff had begun to experiment with the use of genetic

immunization, a key technique for ELI, as a means of developing vaccines against *T. pallidum*

and *B. burgdorferi*. This work was conducted in the plaintiff's laboratory by Dr. Melissa

Caimano; a postdoctoral fellow recently arrived from the University of Alabama at Birmingham.

Dr. Johnston had no prior research experience with Lyme disease, ticks, or tick-borne diseases.

The plaintiff was the one who conceived of the potential usefulness of ELI for the development

of a tick vaccine, and it was the plaintiff who proposed to Drs. Johnston and Wikel that ELI be

used as the basis for a grant application to the Texas Advanced Technology Program, an

extremely competitive funding in-state competition. The plaintiff authored and submitted this

proposal in August, 1997, which was funded. Dr. Johnston's role in this project was supportive.

The proposal described Wikel's technological base as follows (p6): "Dr. Steven Wikel,

Endowed Chair in Agricultural Biotechnology and Professor of Entomology, Oklahoma State

University, maintains uninfected and *B. burgdorferi*-infected *Ixodes scapularis* colonies and is

thoroughly familiar with methodologies for tick infestation of animals". The accompanying

letter of collaboration provided by Wikel does not describe any molecular, genetic, or

recombinant DNA work being conducted in his laboratory and does not anticipate any

contribution from his laboratory regarding the use of molecular biological, genetic, or

recombinant DNA techniques. In 1998, Wikel submitted a proposal to the USDA which

involved the use of ELI to develop a vaccine against the hard tick *Dermacentor andersoni*. As

Co-investigator, the plaintiff was to direct a consortium at UT Southwestern responsible for

providing the molecular biological and recombinant DNA expertise essential for the project, including the performance of ELI. While Dr. Johnston was a member of this research consortium, his role, as with the Texas grant, was entirely supportive. All of the proposed molecular studies were to be performed in the plaintiff's laboratory, by the plaintiff's personnel, and under the plaintiff's direct supervision. The consortium would not have been necessary if the relevant technical expertise already existed in Wikel's laboratory. *Radolf Aff. ¶¶ 29-50; Caimano Aff. ¶¶ 25-28, Akins Aff. ¶¶ 10-17, 28, 29, 38.*

In early 1998, Dr. Caimano became more involved in the tick EST project as Dr. Akins began preparing to leave UT Southwestern in order to assume a faculty position in the Department of Microbiology and Immunology at Oklahoma University Health Sciences Center. *Radolf Aff. ¶ 51; Caimano Aff. ¶18.* One of the first sequences that Dr. Caimano identified from the *D. andersoni* library was that for a molecule called calreticulin. She subsequently generated a recombinant form of calreticulin that was sent to the Wikel laboratory for immunization experiments. Wikel failed to provide to the plaintiff or Dr. Caimano a written summary of these results, even though the plaintiff requested that he do so. Because the results of these experiments were reportedly negative, the plaintiff did not pursue this request. *Radolf Aff. ¶ 52; Caimano Aff. ¶¶ 20, 21.* Another notable sequence that Caimano identified was that for "p36", a *D. andersoni* salivary gland protein that Wikel first described in a paper published in 1998 in the

Journal of Medical Entomology.  This paper described only approximately 25 amino acids from the N-terminus of p36 and did not involve the use of recombinant DNA techniques.  *Radolf Aff. ¶ 53; Caimano ¶22*.  The p36 EST that Dr. Caimano pulled from the *D. andersoni* library encoded the entire polypeptide.  This information helped Wikel complete the p36 sequence and was published in the June, 2000 issue of the Journal of Parasitology with Dr. Caimano and the plaintiff as co-authors.  This publication was the first paper from the Wikel laboratory that described the use of recombinant DNA techniques, and it is thus, completely inaccurate to state that Wikel had any recognized molecular expertise prior to the year 2000.  *Radolf Aff. ¶ 54; Caimano Aff. ¶ 23*.  Wikel failed to notify the plaintiff or Dr. Caimano when the p36 sequence was submitted to the GenBank database (Accession Number AF 167171) in July, 1999.  Based on their documented contribution to this sequence, the plaintiff and Wikel co-own the intellectual property rights for the p36 sequence and the plaintiff and Dr. Caimano should have been included as co-authors on the GenBank submission.  *Radolf Aff. ¶ 55; Caimano Aff. ¶ 24*.

A search of  the National Center for Biotechnology Information GenBank database, a public domain computer-based repository for molecular biology information, revealed that Wikel had no prior submissions in the GenBank database, further substantiating the conclusion that his laboratory had no recognized recombinant DNA expertise either prior to or during the first four years of the Radolf-Wikel collaboration.  *Caimano Aff. ¶ 25*.  As noted earlier, the plaintiff and

Wikel viewed the *D. andersoni* work as a "feasibility study" for the more difficult *I. scapularis* research. Once Dr. Caimano had established that the cDNA library generated from *D. andersoni* was a good source of salivary gland ESTs, the plaintiff and Wikel decided to proceed with generating an *I. scapularis* library. *Radolf Aff. ¶ 56; Caimano ¶ 33.* Wikel sent the salivary glands to Dr. Caimano at UT Southwestern so that she could coordinate this process with Stratagene. Dr. Caimano sent these materials by FedEx to Stratagene (tracking number 809929697068) on December 18, 1998. Several months later she was notified by Mr. Michael Kobrin at Stratagene that an accident had occurred and that the glands were not usable. Wikel and the plaintiff spoke with Stratagene officials and convinced them to make a new library free of charge. These materials had to be regenerated by Wikel. *Radolf Aff. ¶ 57; Caimano Aff. ¶35.* The library was sent by Stratagene to UCHC on March 29, 2000. The accompanying product information sheet lists the plaintiff as the recipient for Stratagene Order # 98236, UT Southwestern purchase order # 916505. Dr. Caimano personally received the shipment from Stratagene and insured that the library was properly aliquoted and stored. *Radolf Aff. ¶ 58; Caimano Aff. ¶ 36.*

One of the major reasons for the plaintiff's recruitment of Wikel to the CMP in 1999 was to further their collaboration on tick vaccine development. As noted earlier, this collaborative research was discussed in depth with Berlin on a number of occasions. *Radolf Aff. ¶ 59.* Soon

after Wikel's arrival at UCHC in 2000, Dr. Caimano gave Wikel amplified and unamplified aliquots of the library as a safety precaution in the event of an accident.  At the time, no one in Wikel's laboratory was capable of working with the library and no plans were entertained for Wikel laboratory personnel to do so.  *Radolf Aff. ¶ 60; Caimano Aff. ¶ 37.*  Some time after Wikel relocated from OSU, he hosted a visit by Dr. Jose Ribeiro from the NIH.  Afterwards, Wikel told the plaintiff that he and Dr. Alarcon-Chaidez, a postdoctoral fellow in his laboratory, had either transported or arranged to transport large numbers of clones from the Wikel and Radolf *I. scapularis* library to Dr. Ribeiro's laboratory for automated sequence analysis.  While surprised, the plaintiff did not express his disagreement with this transaction at the time because Wikel reaffirmed his understanding that the library was jointly owned.  Indeed, in recognition of their joint ownership and the conditions of their collaboration, on several occasions in research meetings with Dr. Alarcon-Chaidez, Wikel showed the plaintiff spreadsheets summarizing the sequence information generated by Dr. Ribeiro.  These spreadsheet summaries did not contain complete sequence information for the various EST clones.  Wikel has never provided to the plaintiff or Dr. Caimano hard copy or electronic files containing this sequence information, even when requested to do so.  Wikel's assertion that sequence information from their jointly owned *I. scapularis* library was shared with the plaintiff or his personnel in a usable or analyzable form that would enable them to publish this information or use it in independent grant applications is a

falsehood.  *Radolf Aff. ¶ 61; Caimano Aff ¶ 38 42.*

About June, 1999, Dr. Isaac Onyango, a trained veterinary molecular entomologist, joined the plaintiff's laboratory specifically to work on the *D. andersoni* EST project.  Dr. Caimano worked closely with Dr. Onyango to ensure a smooth transition.  During the period Dr. Onyango was in the laboratory, the plaintiff spent much time with him discussing and interpreting the growing body of bioinformatics data generated from his analysis of the *D. andersoni* cDNA library.  Dr. Onyango and the plaintiff were responsible for developing the in-house database delineating the relevant biological categories in which newly generated sequences were placed following bioinformatics analyses; this included the identification of recognized functional motifs and conserved protein domains.  This work led to the identification of Kunitz domains in a number of the sequences; such domains are a potential indicator of anti-hemostatic activity.  *Radolf Aff. ¶ 62; Caimano Aff. ¶ 39.*  This bioinformatics approach, as well as specific data generated from it, was incorporated directly by Wikel into the DOD proposal submitted in September, 2002.  The findings of the *ad hoc* committee chaired by Dr. Shanley fully support this statement.  *Exhibit 9; Radolf Aff. ¶ 63; Caimano Aff. ¶ 39.*  Because hard ticks, such as *D. andersoni* and *I. scapularis* feed over days, the ability of tick saliva to interfere with blood clotting (hemostasis) is believed to be critical for the feeding process.  It follows, therefore, that interference with the anti-hemostatic activity in tick saliva is one potential

approach to development of a tick vaccine. The identification of Kunitz domains in a number of the EST sequences led to the hypothesis, formulated by the plaintiff and Dr. Onyango, that these molecules were vaccine candidates. When this information was generated by Dr. Onyango in 1999, this was a new idea in the tick research field. *Radolf Aff. ¶ 64 Caimano Aff. ¶ 39.* When Dr. Onyango left the plaintiff's laboratory about June, 2000, Dr. Caimano worked directly with Dr. Francisco Alarcon-Chaidez to ensure a smooth transition of the *D. andersoni* project to Wikel's laboratory. There was no indication that the operational rules for the Radolf-Wikel collaboration had changed in any way or that this was the initiation of an independent project in the Wikel laboratory. *Radolf Aff. ¶ 75.*

The 2000 USDA and CII grants describe the use of anti-hemostasis assays to characterize the biological activities of recombinant DNA-derived proteins identified from the *D. andersoni* cDNA library. The novel aspect of these proposals was the identification of these molecules and the characterization of their possible anti-hemostasis activities, not the assays themselves. This idea was directly misappropriated by Wikel for the DOD proposal submitted in September, 2002. *Radolf Aff. ¶ 65.* In order to determine whether the *D. andersoni* molecules possess anti-hemostatic activity, it was necessary to enlist the collaborative support of an investigator with expertise in the required assays. Dr. Ray Koski, the Research Director of a New Haven, CT-based biotechnology company called $L^2$, referred the plaintiff to an investigator in the

Department of Pediatrics at Yale University, named Dr. Michael Cappello, an expert in the anti-hemostatic properties of hookworm saliva. At the time, the plaintiff already was working with Dr. Koski on a CII-funded project involving another *I. scapularis*-transmitted parasite called *Babesia microti*. *Radolf Aff. ¶ 66.* The plaintiff directly contacted Dr. Cappello in order to gauge his interest in working with Wikel and the plaintiff. This conversation led to a series of meetings, both at Yale University and UCHC, in which reagents, such as recombinant DNA-derived proteins, were given to Dr. Cappello for analysis. At one point, Wikel also gave Dr. Cappello *D. andersoni* salivary gland extracts for assay. The idea was to determine if they could "match" the anti-hemostasis activities in salivary glands with those of individual proteins. Dr. Alarcon-Chaidez participated in some of these meetings. *Radolf Aff. ¶ 67.* The idea to screen p36 for anti-hemostasis activity was based upon the observation that it contains Kunitz domains. *Radolf Aff. ¶ 68.* Without the plaintiff's knowledge or permission, Wikel pursued this collaboration independently with Dr. Cappello and included Dr. Cappello as a collaborator on the DOD proposal. *Radolf Aff. ¶ 69; Caimano Aff. ¶ 40.*

> d. *Plaintiff's Involvement and Participation in Congressional Earmark - DOD Proposal*

In 1999, before Wikel had relocated to UCHC, the plaintiff initiated the idea of pursuing Congressional funding (a so-called "earmark") after a meeting he held with Dr. Gerald Maxwell. As a result of the meeting the plaintiff started to put together the necessary group of

investigators, including Wikel, to advance the concept. *Radolf Aff. ¶ 70.* The plaintiff also was instrumental in structuring the earmark to include malaria, Dengue fever, and other vector-borne diseases. *Radolf Aff. ¶ 71.* Because of his longstanding interest in this area and recognized expertise, the plaintiff asked Wikel to take the lead on efforts to obtain the earmark, including the letter that was sent to the Honorable Nancy Johnson. There was a clear understanding with Wikel, Berlin, and Deckers that the plaintiff was to be a co-investigator if and when this proposal was submitted. *Radolf Aff. ¶ 72.* Despite the defendants' efforts to minimize the plaintiff's participation in the efforts to obtain the earmark, the plaintiff participated in numerous activities related to obtaining this earmark, including meetings with members of the Connecticut Congressional delegation. *Radolf Aff. ¶ 73; Exhibits 41-47.* The plaintiff's molecular, research, and clinical expertise in Lyme disease and tick-borne infections was a major selling point in the efforts to gain Congressional support for the earmark. *Radolf Aff. ¶ 74.*

During the course of the January 7, 2002 meeting when Deckers and Berlin discussed the advisability of the plaintiff taking a temporary leave from his position as Director, Deckers and Berlin informed the plaintiff that he would not be a co-investigator on the DOD proposal. The December 27, 2001 letter requesting that the plaintiff meet with Berlin and Deckers did not indicate in any way that the earmark or the DOD proposal would be a topic of discussion. *Radolf Aff. ¶ 77; Exhibit 5.* The administrative decision communicated to the plaintiff by

Deckers and Berlin was taken without providing the plaintiff with any notice that this action was even being contemplated. *Radolf Aff. ¶ 79.* Nevertheless, the plaintiff was assured during the meeting by both Deckers and Berlin that he would be allowed to continue as a major participant in the research. Wikel reaffirmed this commitment on a number of occasions thereafter. *Radolf Aff. ¶ 80.* Despite these assurances, the plaintiff found it increasingly difficult to engage Dr. Wikel in substantive discussions about the ongoing research or the upcoming DOD proposal, to the point where he found himself totally excluded from working on the project. *Radolf Aff. ¶ 81.* The reason behind the lack of cooperation can be found in the communications between Deckers and Berlin which took place on September 21, 2001, well before their meeting of January 7, 2002 with the plaintiff. The communications disclose that Berlin and Deckers had decided to exclude the plaintiff altogether from the DOD proposal. Deckers wrote Dr. Maxwell, with whom the plaintiff first initiated the concept of a congressional earmark, "I have re (sic) read all the material of the past week and today and Richard [Berlin] and I have further discussed.. Radolf is among other things on academic and administrative probation for the next three years...Given that, I believe we should instruct vanScoyoc to withdraw our proposal for the time being perhaps resurfacing as a Wikel issue in a year or so.....Wikel exclusively....In the interim let's announce that due to various logistical and preliminary data issues we are not ready to accept and act on such an award if granted...Richard  your thoughts??" Berlin responded, "I

agree completely with the decision to withdraw the proposal, and to submit it later under Wikel alone.  I think the stated rationale is appropriate for public consumption...I think, Peter, you and I should talk to Wikel first, then Radolf..."  *Exhibit 35*.  The earmark was not withdrawn.  *Exhibit 40*.  However, the plaintiff was excluded from all involvement in the proposal.  *Exhibit 36*.  In a letter dated February 10, 2003, Deckers and Berlin confirmed their unilateral exclusion of the plaintiff from the DOD proposal in a letter to Ms. Jamie Kiser, Contract Specialist, U.S. Army Medical Research Acquisition Activity, "some months prior to the submission of the [DOD] proposal, Dr. Radolf was placed on academic probation for issues related to conduct of his laboratory."  *(Exhibit 10)*.  The plaintiff was never informed of his total exclusion by either Deckers or Berlin.  *Deckers Tr. 137-139; Berlin Tr. 57-58*.  In keeping with their strategy to exclude the plaintiff from the DOD proposal and to surface it as one that was exclusively advanced by Wikel, Wikel submitted a revised proposal to the DOD without acknowledging the plaintiff's participation in the proposal or the contributions he made to the science underlying it. The defendants, Deckers, Berlin and Wikel, misrepresented the science supporting the proposal as being developed independently of the plaintiff.  The defendant, Wikel, even went to the extent of excluding the plaintiff's name from the proposal's personnel list.  *Exhibit 36*.

It can easily be inferred that Deckers, Berlin and Wikel divorced the plaintiff from any involvement with the proposal out of fear that the plaintiff's transgression involving research

misconduct would place the congressional funding in jeopardy. Regardless, the plaintiff

possessed ownership rights to the science underlying the proposal which had to be honored by

the defendants. Additionally, the University's By-Laws committed the defendants to respect the

plaintiff's full freedom in research and in the publication of the results[5]. They could not just

rewrite the history, surrounding the scientific endeavors that led to the proposal, as they

attempted to do, *Exhibit 36*, so as to diminish and, in fact, eliminate any traces of the plaintiff's

contributions in developing the DOD proposal as well as the essential science upon which the

proposal was based.

     As the chronology of events surrounding the DOD proposal establishes, the plaintiff's

removal on January 14, 2002 as CMP's Director and his replacement by Wikel played no part in

the defendants' decision to exclude the plaintiff from the DOD project. The decision, without a

doubt, had been made the previous September. The plaintiff was only informed of the decision

to remove him as a "co-investigator" in January of 2002. However, he was never informed that

his participation would completely cease. To the contrary, Deckers and Berlin assured the

plaintiff at their meeting in January of 2002 that he would continue to play a research role in the

---

[5] Article XV of the By-Laws reads, "1. All members of the faculty, whether tenured or not, are entitled to academic
freedom set forth in the 1940 Statement of Principles on Academic Freedom and Tenure formulated by the
Association of American Colleges and the American Association of University Professors. The faculty member is
entitled to *full freedom in research and in the publication of the results*, subject to the adequate performance of his
or her other academic duties, but research for pecuniary return should be based upon an understanding with the
authorities of the University." (Emphasis Added).

DOD project.  But in the Kiser letter, they acknowledged that they had, in truth, barred the

plaintiff from participating in the proposal.  This was done even though Deckers' action in

response to the SRB finding did not implicate the plaintiff's participation in the DOD project.

### e.   Plaintiff's Ownership of Science Underlying DOD Proposal

The defendants go to great lengths to buttress their claim that the science involved in the

latest proposal submitted to the Department of Defense is completely detached from the science

pioneered by the plaintiff.  Nonetheless, the overwhelming facts clearly demonstrate that the

plaintiff's scientific endeavors are critical to the scientific soundness of the proposal.  The

science developed by the plaintiff individually and jointly with the defendant form the essential

core of the DOD proposal.  The defendants' factual assertions are without an evidentiary base

and are refuted by the overwhelming evidence submitted by the plaintiff with regard to his and

his laboratory's scientific endeavors, his collaboration with Wikel, and Wikel's lack of expertise

in the most critical areas that scientifically support the DOD proposal.  *See plaintiff's Local Rule*

*56(a)(2) response to defendants' Local Rule 56(a)1 Statement of Material Facts, #'s 45-80, 81,*

*88, 89; See also, plaintiff's Local Rule 56(a)(2) Statement of Material Facts in Dispute #'s 92-*

*122; Radolf Aff. ¶¶ 70-104; Caimano Aff. ¶¶ 38-55.*  Wikel's and Thrall's affidavit testimony is

refuted in their totality by the affidavit testimony of Radolf, Aikens, Caimano and Doblies.

In June of 1999, the plaintiff and Dr. Onyango were responsible for developing the in-house organizational sequence database delineating the relevant biological categories in which newly generated sequences would be placed following bioinformatics analyses, including the identification of recognized functional motifs and conserved protein domains.  This approach led to the identification of Kunitz domains in a number of the sequences, such domains are a potential indicator of anti-hemostatic activity.  This bioinformatics approach, as well as specific data generated from it, was incorporated directly into the DOD proposal.  *Caimano Aff. ¶ 39.* The plaintiff was instrumental in the organization and interpretation of these data and was the driving force in formulating strategies to characterize the biological and/or pharmacological activities of recombinant proteins derived from ESTs with sequence homology to previously identified molecules.  *Caimano Aff. ¶ 40.*  Wikel was not capable of independently establishing a genomics- or proteomics-based research program.  Indeed, it was Dr. Caimano of the Radolf laboratory who personally supervised the introduction into his laboratory of two dimensional gel electrophoresis, a central proteomics technique.  .  *Caimano Aff. ¶ 46.*  Given that the DOD proposal does not contain any *I. scapularis* EST data, the feasibility of the proposal and Dr. Wikel's demonstrated capacity to conduct the proposed research rests entirely on jointly owned data derived from the jointly owned *D. andersoni* 4-day fed salivary gland EST library regardless of the cosmetic technical modifications that have been made during the original

submission or afterwards.  Thus, rather than being merely "illustrative" as the defendants' argue, these data are central to the proposal and were used as a primary justification for funding Wikel as Principal Investigator.  In other words, without the misappropriated data that Wikel incorporated into Figures 2, 3, and 4 of the proposal, reviewers would not have been able to conclude that Wikel had any demonstrated capacity to perform the proposed studies.  *Caimano Aff. ¶ 48.*  The modifications made by Wikel are purely technical and do not represent any conceptual advance beyond the work that was conducted in the Radolf laboratory as part of the established collaboration.  .  *Caimano Aff. ¶ 49.*  Other than for mere conclusory claims, the defendants have not provided any evidence to support the assertion that these "new directions" have generated information that could not have been derived from the libraries, methodologies, and bioinformatics approaches that were fully developed at the time the project was transitioned from the Radolf to the Wikel laboratory.  Indeed, the only *I. scapularis* EST submitted to GenBank from the Wikel laboratory is that for calreticulin, which a member of the Radolf laboratory, Dr. Caimano, was instrumental in identifying.  *Caimano Aff. ¶ 49.*  The bioinformatics methodologies described in the DOD proposal are the same as those used during the Radolf-Wikel collaboration and thus do not in any way represent an advancement or new research direction.  *Caimano Aff. ¶ 51.*  Contrary to ¶ 11 of the Thrall affidavit, because the "extended clonal analysis" performed by Wikel involved the original jointly owned *D. andersoni*

EST database and library, the resulting data are jointly owned by Radolf and Wikel and cannot be viewed as either independently derived or Wikel's sole intellectual property. The defendants do not offer any evidence to substantiate the claim that this work represents any degree of advancement over the findings made in the original Radolf-Wikel collaboration.

The defendants rewrote the DOD proposal with the intent of eliminating all vestiges of the plaintiff's endeavors with the proposal as well as with the science on which the proposal is built. No other conclusion can be drawn from the September 21, 2001 correspondence between Deckers and Berlin in which they expressed their intent to redo the grant proposal without any reference to the plaintiff, *Exhibit 35,* and the bordering on the giddy email when Wikel untruthfully communicated to Dr. Scott Wetstone ("Wetstone"), an assistant to Deckers, that he had produced such a proposal. *Exhibit 36.*

### f.  Allegation of Fraud Leveled Against the Plaintiff

As previously noted, the plaintiff accepted the Center Directorship position in an email to Berlin on September 11, 1998. In that email, the plaintiff began to lay the groundwork for the personal and professional relocation of his laboratory personnel. Mr. Kenneth Bourell ("Bourell") was specifically mentioned in that email. The plaintiff pointed out that, in addition to his talents as a light and electron microscopist, Bourell had exceptional computer skills that "will benefit greatly everyone within the Center". This was a clear indication that, from the very

32

outset, Bourell's position was considered differently from that of a technician working exclusively within the plaintiff's laboratory. It also laid the foundations of the oral cost sharing agreement that was central to the salary structure and time and effort requirements for Bourell's position. *Radolf Aff. ¶ 106.* During the transitional period between the plaintiff's acceptance of the Center Directorship in September, 1998 and his laboratory's move in late March, 1999, Berlin and the plaintiff engaged in further discussions to clarify Bourell's functions and position within the Center. The preferred job title was "Center Imaging Specialist". However, because such a job title or classification did not exist at UCHC, he was classified as a Research Associate. *Radolf Aff. ¶ 107.* Throughout these discussions, it was understood that Bourell would function in two capacities. The first was to provide technical support on an as-needed basis for research within the plaintiff's laboratory. The second was to provide microscopy ("imaging") and computer-related support to other investigators in the CMP and to anyone else at the Health Center who requested his services. The actual division of his time and effort would be flexible and at the plaintiff's discretion as Center Director. *Radolf Aff. ¶ 108.* Bourell's job description states that the principle responsibilities for this position are twofold: 1. responsible for conducting the electron microscopy experiments and maintaining all photo micrographic data for the Center and 2. responsible for maintaining the Center's light and electron microscopy equipment as well as the IBM and Apple-based computers in the laboratories and administrative

offices. *Radolf Aff. ¶ 109.*    In recognition of the fact that Bourell's position was unique and included responsibilities within the CMP, separate office space was created for him across from the administrative area of the Center. *Radolf Aff. ¶ 110.* None of the discussions with Berlin could have led him to believe that Bourell had ever functioned as key personnel on the plaintiff's NIH-supported research or that the plaintiff envisioned him functioning in that capacity after their relocation. *Radolf Aff. ¶ 111.* In the transitional period, Berlin and the plaintiff negotiated an oral cost sharing agreement regarding Bourell's salary structure. According to this agreement, Bourell's salary would be paid by UCHC out of Connecticut General Funds and then at some point in the future from the plaintiff's NIH grants or from other qualified source(s) of funding. *Radolf Aff. ¶ 112.* As Center Director the plaintiff was not in control of the Connecticut General Funds that were used to pay Bourell's salary. The plaintiff never received or signed off on any paperwork establishing Connecticut General Funds as Bourell's source of salary support. These funds were controlled by Mr. David Gillon ("Gillon"), the UCHC Chief Financial Officer. *Radolf Aff. ¶ 113.* In April, 1999, the plaintiff submitted requests to transfer the plaintiff's three NIH grants from UT Southwestern to UCHC. On all three grants, the plaintiff was listed as "Key Personnel". Bourell was listed on two of these grants, "Membrane Proteins of *Borrelia burgdorferi*" and "Membrane Immunogens of *Treponema pallidum*" only as a Research Associate, not as a key personnel. These requests were signed by a number of UCHC

34

officials, including Berlin and Gillon.  *Radolf Aff. ¶ 114.*  Through the plaintiff's years of

association with Bourell at UT Southwestern, Bourell never served as a key personnel on an NIH

grant.  No discussions to upgrade his status from non-key to key personnel ever occurred during

or after his relocation to UCHC.  *Radolf Aff. ¶ 115.*

The transfer agreements for the plaintiff's NIH grants were prepared in close consultation

with several grants officials at UCHC.  At that time, the plaintiff's laboratory was the only

functional laboratory in the CMP and it was uncertain how Bourell's time and effort would be

allocated between the plaintiff's laboratory and the Center.  It was possible, however, that he

would be working full-time on the plaintiff's NIH-funded research.  Given the undefined period

of time covered by the oral cost sharing agreement with Berlin, it was recommended that the

plaintiff budget[6] in the transfer agreements monies to cover Bourell's entire salary, evenly

divided between the two NIH grants "Membrane Proteins of *Borrelia burgdorferi*" and

"Membrane Immunogens of *Treponema pallidum*".  These grants were chosen for this budgeting

because they both involved microscopy and other microbiologic techniques that Bourell had

utilized in the plaintiff's laboratory at UT Southwestern.  *Radolf Aff. ¶ 116.*  Between April,

1999 and June, 2002 no concerns regarding Bourell's salary were brought to the plaintiff's

attention and no discussions of this matter occurred with Gillon or Berlin.  *Radolf Aff. ¶ 117.*

---

[6] A budget, unlike an audit, is a planning device; predicting future expenditures.

Progress reports for the two grants submitted during this period stated that there were no changes in support of key personnel. The plaintiff was the only key personnel listed on each of these grants. Progress Reports do not require documentation of changes relating to non-key personnel. *Radolf Aff. ¶ 118.* Since Bourell was not listed as key personnel on the plaintiff's grants, there was no requirement to report to the funding agencies, that his actual percentage of work varied from that which was contemplated in the grant applications, grant renewals and progress reports. *(Gillon Tr. 43, 44; Radolf Aff. ¶¶ 113, 128, 135, 136, 139).*

On or about February, 2002, Wikel unilaterally began to monitor Mr. Bourell's research activities Bourell conducted on the plaintiff's grants. The information provided by Bourell to Wikel indicated that only a small percentage of Bourell's time and effort was devoted to the plaintiff's NIH-funded research. *Radolf Aff. ¶ 120; Exhibit 15.* In June, 2002, without any prior discussion or notification, UCHC encumbered funds from these two NIH grants to pay a percentage of Bourell's salary and fringes that was markedly disproportionate to the actual time and effort expended by Bourell[7]. For one of the grants, "Membrane Immunogens of *Treponema pallidum*", Bourell had not expended any time and effort during the entire one-year period covered by the 50% encumbrance of salary and effort. For the other grant, "Membrane Proteins of *Borrelia burgdorferi*", funds were encumbered for 25% of Mr. Bourell's salary and fringes for

---

[7] The encumbering of the grants ran afoul of the Time and Effort requirements that underlie all federal grant programs. Payment from grant funds for work on the grant must directly related to the amount of time and effort expended on the research funded by the grant.

a period of time dating back to December 1, 2001; during this period it was the plaintiff's estimate that he had expended approximately 10% time and effort. *Radolf Aff. ¶ 121.* Funds for the grant "Membrane Proteins of *Borrelia burgdorferi*" were initially encumbered on an Assignment Authorization form prepared by Ms. Kimberly Young ("Young"), the CMP Administrative Coordinator and signed by Gillon and Wikel. *Radolf Aff. ¶ 122.* On this form, "employee unavailable to sign" was written by Ms. Young on the line reserved for the signature of the Principal Investigator, which was the plaintiff. *Exhibit 14.* The plaintiff was not given a copy of this form. *Radolf Aff. ¶ 123.* Wikel and Gillon, knowing full well the actual level of Bourell's time and effort on the plaintiff's grants as a result of Wikel's monitoring of Bourell's activities, signed off on the Assignment Authorization allowing for the encumbrance of funds that were vastly out of proportion to Bourell's actual expenditure of time and effort on the plaintiff's NIH-funded research. The encumbering of the funds at this disproportionate level constituted a violation of established federal regulations. Wikel had in hand information from Bourell which indicated that the encumbered funds were far in excess of Bourell's expenditure of time and effort on that project when he signed the authorization form in June of 2002. *Radolf Aff. ¶ 124; Exhibit 15.* Nevertheless, Wikel signed the form as Department Head allowing for the unlawful encumbrance. By transferring the funding for Bourell's salary to the plaintiff's grants, the monies would not have to come out of the CMP budget which Wikel was then

directing.

The assignment authorization forms are a principal safeguard against the misappropriation of NIH funds.  The mere fact that this occurred is an extraordinary impropriety. Wikel and Gillon's willingness to turn a blind eye to this wrongful action is compounded by their willingness to excuse it on the basis of the plaintiff's purportedly being out of town at the time. It is inconceivable that a short absence could be construed as an excuse for an action that involves the potential misappropriation of Federal funds.  *Exhibit 15; Radolf Aff. ¶¶ 119 -121, 124.* These funds were encumbered without any effort by UCHC officials to accurately ascertain the level of effort Bourell had actually dedicated to the plaintiff's NIH-funded research.  *Radolf Aff. ¶ 129.*

During the entire month of June, 2002, the plaintiff was neither on vacation nor away on official business.  No efforts were made to contact the plaintiff directly, either in the plaintiff's office, at home, by pager, by Fax, or by email to notify the plaintiff that funds were being encumbered from two of his NIH grants.  *Radolf Aff. ¶ 125.*  University vacation and travel records and the plaintiff's office calendar document that the plaintiff was on-station for the entire month of June, 2002.  Thus, any statement that the plaintiff was away or otherwise unreachable for any appreciable period of time is a transparent misrepresentation.  *Radolf Aff. ¶ 126.*  The plaintiff never received any message from Young or Gillon informing him that Gillon was

processing. paperwork for Bourell, nor did the plaintiff receive a message requesting that he contact Gillon so as to determine the actual time and effort and, if necessary, file an amended report. *Radolf Aff. ¶ 127.*

      Around June or early July, 2002, Young presented to the plaintiff with copies of Labor Distribution forms regarding Bourell. The forms were sent to Young by Ms. Ruth Batagowski ("Batagowski") in the office of Gillon. *Radolf Aff. ¶ 130.* Nowhere does this paperwork indicate the intention of University officials to notify the plaintiff that funds had been encumbered from the plaintiff's NIH grants, and the plaintiff has no documentation or recollection of Young stating that she was instructed by Gillon to give these forms to him. *Radolf Aff. ¶ 131.* At this time the plaintiff was not told by Gillon or Young that these forms could be or would be amended to show actual time and effort expended by Bourell. *(Radolf Aff. ¶ 132).*

      Immediately after receiving these forms, the plaintiff contacted Gillon to inform him that the funds encumbered were far in excess of the actual time and effort Bourell had expended and was continuing to expend on these projects and thus constituted a violation of federal regulations. *Radolf Aff. ¶ 133; Exhibit 15.* Over the summer of 2002, the plaintiff engaged in discussions (some via email) with Gillon in order to resolve this matter. *Radolf Aff. ¶ 134.* On August 1, 2002 the plaintiff met with Gillon and Berlin. The plaintiff reminded Berlin that Bourell was not relocated from Dallas to be a research technician for the plaintiff's laboratory

per se and that he was to be a resource for the Center as spelled out in his original job

description.  The issue as to whether Bourell functioned as key or non-key personnel on the

plaintiff's NIH-related research was not discussed.  During this meeting the plaintiff was told

that no Time and Effort reports had been filed for Bourell and that this was an oversight because

he had been paid from State of Connecticut General Funds.  The "Grants and Contracts" office is

the agency which is responsible for the collection, review and retention of all Time and Effort

reports."  *(Exhibit 13).*  It was the "Grants and Contracts" office that failed to collect, review

and/or retain and Time and Effort reports relating to Bourell's activities.  *(Radolf Aff. ¶¶ 113,*

*128, 135, 136, 139); Deckers Tr. 49, 50).*  The plaintiff also was informed that he needed to file

such reports so that the grant funds could be used to pay an appropriate part of Bourell's salary.

The plaintiff called to Dr. Berlin's attention the requirements of federal regulations as they

related to this issue; that it was a clear violation of federal law and regulations for the University

of Connecticut Health Center to encumber the plaintiff's grants in excess of the actual time and

effort Mr. Bourell had expended and was continuing to expend on these projects.  *Radolf Aff. ¶*

*135.*  As agreed upon in a memorandum of understanding, dated August 2, 2002, the plaintiff

obtained from Bourell a log of Bourell's activities that subsequently was used to fill out Time

and Effort reports dating back to April, 1999.  To do this, Bourell, at the plaintiff's request,

prepared a list of the experiments and research-related work he had conducted at UCHC through

July, 2002.  The work list was reviewed jointly by the plaintiff and Bourell and together they estimated the amount of time required to have performed this work.  *Radolf Aff. ¶ 137.*  After receiving final approval from Gillon and Berlin in the beginning of September and meeting once more with Gillon to review the final paperwork, on September 11, 2002 the plaintiff filed the electronic Time and Effort reports for Mr. Bourell.  *Radolf Aff. ¶ 138.*  At no time was the plaintiff given any delinquent report cards[8] or notification regarding missing Time and Effort reports for Bourell.  *Radolf Aff. ¶ 139.*  The plaintiff never suggested to Gillon that Gillon should use some arbitrary number to insert as Bourell's proper contribution to the grants in question. The plaintiff inquired as to whether Gillon wanted to review the information he was compiling and whether the finalized information was to be filed directly by the plaintiff or by Gillon.  The plaintiff queries to Gillon were solely for guidance and assistance in this process and to assure Gillon that the plaintiff was moving expeditiously to provide the requested time and effort information.  *Radolf Aff. ¶ 140.*

From the very start of the discussions regarding the over encumbering of the plaintiff's grants, Berlin objected to reversing the encumbrances.  However, he was overruled by Gillon. Shortly after Gillon overrode Berlin, and restored the plaintiff's grant funds, the plaintiff received by registered mail a letter from Dr. Robert Kozol ("Kozol"), Executive Director,

---

[8] It is the normal course for the University to issue notices when Time and Effort reports have not been received.

Compliance, UCHC, informing him that he was the subject of a complaint concerning the "reporting of percentage effort of research associates on grant proposals". *Radolf Aff. ¶ 141.* The plaintiff subsequently discovered that Wikel was the source of the complaint. *Radolf Aff. ¶ 142.* Because of the once close collaborative interactions between the Radolf-Wikel laboratories, Wikel's greater than two year period of residence within the Center before the allegation was filed, and his frequent interactions with Bourell in administrative and research-related contexts after assuming the position of Interim Director, it is inconceivable that Wikel could have believed that Bourell was functioning as a key personnel on the plaintiff's NIH-related research. *(Radolf Aff. ¶ 143).* Given his prior research background and administrative responsibilities as Interim Director, Wikel must be presumed to have known the difference between the requirements for key personnel and non-key personnel. *Radolf Aff. ¶ 144.* Wikel made his complaint against the plaintiff after the plaintiff was led to believe, based on the memorandum of understanding dated August 2, 2002, that the matter regarding Bourell had been satisfactorily resolved. *Radolf Aff. ¶ 145; Exhibit 20.* The plaintiff did not file a faculty grievance regarding the encumbrance of the funds because he was led to believe, based on the memorandum of understanding dated August 2, 2002, that the matter had been satisfactorily resolved. *Radolf Aff. ¶ 146.* The monies were restored to the NIH accounts late in 2002. *Radolf Aff. ¶ 147; Exhibit 20.*

When the issue regarding Bourell's salary funding first surfaced, it dealt with Bourell being paid with state funds as opposed to grant funds.  Despite his contention to the contrary, Wikel did not bring a concern to Berlin or Gillon in January or February, 2002, that he was worried about alleged fraudulent statements made by the plaintiff in the grant renewals and progress reports regarding Bourell's level of activity.  Wikel, in fact, signed off on various "assignment authorizations" in June of 2002, which listed a percentage level of Bourell's time, regarding which he now swears he informed Berlin and Gillon in February of 2002 was fraudulent.  *Gillon Tr. 25; Exhibit 14.*  Gillon testified that Wikel never once raised an issue with him regarding any claim of fraudulent activity involving the listing of Bourell's level of effort in the plaintiff's grant submissions.  *Gillon Tr. 12-14.*  Berlin's affidavit ¶ 37 is likewise devoid of any such claim.  Berlin merely states that "Wikel brought to my attention that Ken Bourell's salary charges on his grants did not reflect the level of effort that had been indicated on Dr. Radolf's grant documents; that no Time & Effort reports had been filed by Dr. Radolf, and that Ken Bourell was being paid 100% salary form state general funds."  Berlin makes no claim that Wikel brought to his attention that the level of percentage listed in the grants were untrue. In fact, as evidenced by his deposition testimony, Berlin's sole concern was to pay Bourell from grant monies and take him off of state funds.  "[M]y response was if Justin [the plaintiff] had listed Bourell half time on the grant, it seemed to me that he should be paid half time from the

grant." *(Berlin Tr. 10).*  Similarly, Gillon's affidavit is devoid of any support for the allegation

that Wikel raised an issue of fraud regarding the listing of Bourell's anticipated work level on the

grants.  Gillon states at ¶ 8 of his affidavit that "it was identified that Ken Bourell had done work

on the grants, that his salary needed to be changed from general funds to the grants, and that

grant applications or noncompetitive renewals and/or progress reports listed Ken Bourell as

working on the grants while being paid 100% from state funds."  Again, there was no claim that

the percentage level of Bourell's work was fraudulent; the only concern was to have Bourell's

salary paid from grant funds as opposed to state funds.  As a result, Gillon was to meet with the

plaintiff "and get Ken Bourell's time and effort charged appropriately to the grants." In Gillon's

deposition testimony, he states that the first meeting to address Bourell's funding level occurred

in January of 2002, and that "there was a discussion on what the agreement had been to fund Ken

Bourell when Dr. Radolf was hired, however, I do not believe there was any indication that there

was fraud involved at that meeting." *(Gillon Tr. 9).*  Underlying the defendants' assertions

regarding the Bourell issue is the totally false implication that the plaintiff recited in the grant

renewals or progress reports the percentage of work Bourell was performing on the grants.  This

is a complete fabrication.  The Progress Reports do not indicate that Bourell was doing work on

the grants.  Since Bourell was not considered a "key personnel" conducting research under the

grant, there was no requirement that his work level be detailed in the progress reports or in the

non-competitive renewals.  *(Radolf Aff. ¶¶ 105-146).*

After the January, 2002 meeting when Bourell's funding source first came under

discussion, Gillon took no action until he encumbered the plaintiff's funds in June of 2002.

Gillon explains that he didn't take any steps to move Bourell's funding source from general fund

dollars to grant dollars because he placed it on the back burner and attended to other matters in

the interim since this matter did not have to be dealt with until June of 2002[9].  *(Gillon Aff. ¶ 10;*

*Gillon Tr. 12).*  It was not the responsibility of the plaintiff to access the grant funds for the

payment of Bourell's salary.  That is the function of the institution, in particular, the Office of

Finance and Administration.  *(Radolf Tr. 145).*  For instance, when the plaintiff's salary was

transitioned from state funds to grant funds, it was the Health Center that initiated the change

after it was notified the grant transfers had taken place.

What should have been a routine reversal of the wrongfully encumbered funds turned

into a hostile proceeding highlighted by the protracted opposition of Berlin and Wikel, both

insisting that the plaintiff's grants be charged for Bourell's salary at a falsified level in spite of

federal requirements.  In an email to Gillon on July 1, 2002, the plaintiff indicated the Bourell's

grant work was far less than the level for which the defendants had encumbered the plaintiff's

grants.  *Exhibit 15.*  Gillon reported this communication to Berlin, who expressed in an email

---

[9] If fraud had been raised in January or February by Wikel, one would think that the matter would not have been
placed on the backburner.

dated July 2, 2002, his opinion that the grants should be charged for what the percentage of effort that was estimated by the plaintiff when he prepared the grant application. "Then, I think those are the percentages we should use. If Justin [plaintiff] didn't actually gain those services, that's his failure…" *Exhibit 16.* Wikel, in an email of that same date responded, "I agree with your assessment". *Exhibit 17.* However, Gillon replied to Berlin on July 2, 2002, "I am not sure that I agree with the assessment. Just because the funds are available on the Grant account does not mean that we can use the dollars to support Ken's [Bourell] salary. We have to document the time that is devoted to the project. As I see it, Justin has indicated 10% effort and Steve [Wikel] has confirmed that for at least a portion of the time period. From the information I see and my conversation with Justin [plaintiff] *I doubt that either he or Ken would sign of on T&E that reflects more than 10% effort.* Please let me know if I am missing something with my interpretation. *Exhibit 17(Emphasis added).* Berlin's negative response evidences his wrongful attempt to circumvent federal grant policy. He writes Gillon at the conclusion of the emails, "Dave, you are the account wizard, so I can only register an opinion. To reemphasize: a 25 or 50% commitment was indicated in the grant application, and presumably used to justify that part of the funding (whether it was folded into a block grant or not). To measure Ken's commitment solely on the basis of hours that could be accounted for in actually performing an experiment is unreasonable. There is frequently 'wasted time' for everyone. Further, the scheduling of the

experiments might have prevented Ken from performing other tasks.  Finally, would one want to

accept Justin's [plaintiff's] word that his accounting includes all activities?  To avoid a detailed

examination of these issues may not be worth the trouble.  *But…the indicated time should be*

*taken as the measure of effort unless it was declared otherwise in the grant, at least in my*

*opinion.  **Wizard wave your wand***!"  *Exhibit 17 (Emphasis added).*  Even in light of Gillon's

admonitions to Berlin regarding federal grant requirements, Berlin continued to voice his strong

disapproval to the legally required corrective action.  In an email dated July 29, 2002, Berlin

states "I understand from Kim Young and Stephen Wikel that Justin Radolf wants to reduce Ken

Bourell's salary support on Radolf's grant from 25% to 10%.  Since 25% was requested in

Radolf's application, it should remain so...*Certainly, I do not approve of this reduction in*

*Bourell's support on the Radolf grant.*"  *Exhibit 18 (Emphasis added).*  Finally, at the conclusion

of a meeting in which Gillon, Berlin and the plaintiff participated, a final resolution to the

Bourell funding levels had been reached with all in agreement.  Nevertheless, even after the

agreement had been reached, Berlin once again attempted to frustrate the process and voiced his

opposition to the agreement.  *Exhibit 33.*

     It was only because of plaintiff's intervention and insistence, not any well meaning

intention on the part of University officials, that the illegal encumbrances of funds came to light,

and it was only after the plaintiff's intervention that allegations against him surfaced by email

and were eventually filed.  Berlin, with Wikel's concurrence, pressured Gillon to misrepresent

Bourell's expenditure of time and effort, in direct violation of NIH regulations.  More

specifically, the false allegations against the plaintiff were filed only after the plaintiff had (i)

protested the misappropriation of funds from his NIH grants in June, 2002 as being prohibited by

federal regulations; (ii) engaged in good faith discussions with Berlin and Gillon to amicably

resolve the matter in early August, 2002; and (iii) taken all the agreed upon steps immediately

thereafter, in particular, to file accurate Time and Effort reports for Bourell.  Indeed, the filings

could have been made in mid-August, 2002, but the plaintiff was asked by Gillon to wait,

ostensibly because Berlin was on vacation.  It is now readily apparent that, with Deckers' full

knowledge and agreement, efforts were well underway during this interval to level false

allegations against the plaintiff.  *(Exhibits 15-29; Radolf Aff. 134-142)*

      Despite the claims in his affidavit to the contrary, it was only after the plaintiff prevailed

in his opposition to the illegal steps taken by Berlin, Wikel and Gillon (Gillon is not a defendant

in this action), did Wikel first raise with Wetstone the spurious allegation of fraudulent conduct

on the part of the plaintiff.  Wikel was upset over the fact that the CMP budget would be

responsible for Bourell's salary.  In an email to Gillon in early August of 2002, Wikel requested

that Gillon "schedule a meeting for you, Dick, and me to discuss the impact of this matter on the

Center..."  *Exhibit 20.*  The deposition testimony of both Berlin and Gillon fail to support

Wikel's claim that he raised an issue of fraudulent reporting prior to August of 2002. *Berlin Tr. 32; Gillon Tr. 9, 13, 14, 31, 32, 38.* And it was clearly out of his "frustration" with the results of the Gillon and Radolf resolution of the Bourell funding issue that spurred him to action. *Wetstone Tr. 10, 11.* From the very start, Wikel had been supportive of the Berlin. *Exhibit 17[10]*.

In making his complaint, Wikel misrepresented the contents of the progress reports and grant renewals in which he claimed the plaintiff listed Bourell as a major contributor to the scientific research being funded by the Radolf grants. Bourell was never mentioned in the progress reports and there were never statements in the progress reports or the grant renewals that he was a major contributor. Bourell was included in the grants based on estimates when the transfers were submitted to the NIH. There existed a strong possibility that he wouldn't be working full-time on the grants, given his responsibilities within the Center for Microbial Pathogenesis, but there was no way to make a final determination when the transfers were submitted. Since Bourell was not a "key personnel", the National Institutes of Health allows the principal investigator, without its approval, to make revisions in the budget based on changing circumstances. *Radolf Aff. ¶¶ 113, 128, 135, 136, 139.* Wikel as an experienced research scientist had to have been aware of this non-requirement. Incredulously, Deckers, Wetstone,

---

[10] Wikel only started monitoring Bourell's activities after the Bourell issue first surfaced in January or February of 2002. Wikel had no way of knowing the actual time and effort that Bourell expended on Radolf's NIH-funded research prior to the time when he began these covert monitoring activities. *Radolf Aff. ¶¶ 120, 124; Exhibit 15.* Therefore, he could not have been in a position to claim that the plaintiff was falsely reporting Bourell's time and effort.

Berlin and Gillon[11] claim that they never personally reviewed the grant documents to determine whether the information Wikel was providing them was true.  They claim they acted on the information he provided to them without ascertaining the accuracy of the information.  *(Deckers Tr. 44, 45*; *Gillon Tr. 52, 57)*

Deckers was involved from the very start in directing the illicit activities of Berlin, Wetstone, Gillon and Wikel in trumping up the charges of fraud against the plaintiff.  Although Deckers testified under oath that other than for assembling a committee to review Wikel's charges, he played no role in the compliance complaint filed by the defendants against the plaintiff.  He was forced to recant his testimony in view of the documentary evidence establishing his behind the scenes complicity in the drafting the complaint and spurring the investigation of the plaintiff.  *Deckers Tr. 37, 40, 47.*  He played an instrumental role, directly and indirectly via his subordinate, Wetstone, in moving the false allegations forward.  Emails from Deckers in which he explicitly instructed Wetstone to draft a complaint and which he subsequently reviewed and approved establish his deep involvement.  The emails show that Deckers' level of involvement was not just inappropriate, but a violation of the Health Center's algorithm for reporting an investigation of compliance allegations.  *Exhibits 21-29.*

---

[11] Berlin and Gillon are signatories on the grant renewals and progress reports; it is not credible that they sign these documents without reviewing them.

Not content with filing a complaint against the plaintiff with the Health Center's Compliance Office, Deckers notified the federal Office of Research Integrity of this as yet uninvestigated and unproven allegation. The Office of Research Integrity was currently investigating the plaintiff for the incident of research misconduct to which he admitted and for which Deckers had reprimanded him on August 22, 2001. Deckers' letter to the Office of Research Integrity informing it of the unsubstantiated allegation against the plaintiff regarding the Bourell matter on the basis that he was instructed to keep the ORI informed of local developments was a pretext to cover up retaliatory behavior. As the defendants knew, *Exhibit 44,* the ORI does not investigate financial issues of this sort[12]. Moreover, the timeline shows clearly that Deckers notified the ORI of an unsubstantiated allegation well before the plaintiff had received Dr. Kozol's letter informing the plaintiff of the allegation and before any form of due process had been conducted. The plaintiff was not even notified by the Health Center that this letter had been sent to the ORI; it came to his attention months later during subsequent legal proceedings. Consistent with Deckers' behind-the-scenes engineering of the actual allegation, this letter was a secretive attempt to adversely affect the plaintiff with the ORI. Even the University of Connecticut Health Center's Corporate Compliance and Integrity Officer, Iris Mauriello, voiced strong misgivings with regard to the Deckers' manipulation of the ORI

---

[12] "just to be clear, we notified Kaye Fields at ORI as well as the USDA. This issue is not true scientific misconduct and therefore is not handles (sic) by ORI." *Exhibit 44.*

communication.  In an email to Deckers, dated September 10, 2002, Mauriello states, "I want to go on record here saying that emails below worry me in the following regard: actions being taken after we know a problem but before a full internal investigation is under way."  *(Exhibit 28)*.

Deckers assertion that he acted on the recommendation from the Compliance Office when he communicated with the ORI is belied by the fact that he coached the Compliance Office into making the recommendation in the first place, even to the extent of reviewing and revising the letter from the Compliance Office which contained its so-called recommendation to him. *Exhibits 24-27*.

> g.  *Voluntary Exclusion Agreement*

The plaintiff entered into a voluntary agreement with Office of Research Integrity on March 10, 2003.  Under the terms of the agreement, the plaintiff agreed to "exclude himself voluntarily from serving in any advisory capacity to the PHS [Public Health Service] including but not limited to service on any advisory committee, board, and/or peer review committee, or as a consultant for a period of five (5) years beginning with the effective date of this Agreement. *Exhibit 32*.  Other than for this exclusion, the plaintiff was not barred from participating in research associated with or employing PHS or other federal funds.  With regard to research activities, the plaintiff's submissions and/or proposals are required to be certified, pursuant to a PHS approved supervisory plan, to ensure the scientific integrity of the plaintiff's research.  The

data involved in the plaintiff's research activities must be certified are "based on actual experiments or are otherwise legitimately derived, and that the data, procedures, and methodology are accurately reported in the application or report." *Exhibit 32.* Noticeably absent from the agreement is any form of a "government-wide debarment", which would have excluded the plaintiff from participating in any activities in which government funds are used. It must be restated that the ORI agreement related to the same misconduct for which the plaintiff had already been disciplined. This was not a new finding of additional wrongdoing as the defendants infer.

II.    *Discussion*

a.  *Legal Standard, Motion for Summary Judgment*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 202 (2d Cir. 1995) ; *Chambers v. TRM Centers Corp.*, 43 F.3d 29, 36 (2d Cir. 1994); *Stern v. Trustees of Columbia University in City of New York*, 131 F.3d 305 (2d Cir. 1997) ("It is of course well established that a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a

matter of law.  See Fed.R.Civ.P. 56(c).  In assessing the record to determine whether there is

such an issue, the court is required to resolve all ambiguities and draw all permissible factual

inferences in favor of the party against whom summary judgment is sought. . ."); <u>Kerzer v.</u>

<u>Kingley Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998) ("Summary judgment is inappropriate unless

'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law.'  Fed.R.Civ.P. 56(c).  On a motion for summary

judgment, the moving party has the burden of showing the absence of a genuine issue of material

fact, and the district court's task is limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them . . . In deciding such a motion, we, . . . must

construe the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in its favor. . . Conclusory allegations, conjecture, and speculation,

however, are insufficient to create a genuine issue of fact. . . ").  The burden rests on the party

seeking summary judgment, the moving party, to demonstrate that no genuine factual dispute

exists.  *Kerzer v. Kingley Mfg.*, <u>supra</u> at p. 400.  In assessing the record to determine whether

there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and

factual inferences in favor of the party against whom summary judgment is sought.  The

inferences to be drawn from the underlying facts revealed in material such as affidavits, exhibits,

interrogatory answers, and depositions must be viewed in the light most favorable to the party

opposing the motion. See *Stern v. Trustees of Columbia University in City of New York,* <u>supra</u> at

p. 312; *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994).

      In deciding a motion for summary judgment, the court cannot try issues of fact, but can

only determine whether there are issues of fact to be tried. *Kerzer v. Kingley Mfg*., supra at p.

400; *Cronin v. Aetna Life Insurance Co.,* supra at p. 203. If, as to the issue on which summary

judgment is sought, there is any evidence in the record from any source from which a reasonable

inference can be drawn in favor of the non-moving party, summary judgment is improper.

*Chambers v. TRM Copy Centers Corp., supra* at p. 37; *Lafond v. General Physics Services

Corp.,* 50 F.3d 165, 171 (2d Cir. 1995). The trial court's function at this stage is to identify

issues to be tried, not decide them. *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir. 2000).

      b.  *Violation of the Plaintiff's Fourteenth Amendment Right To Due Process of Law
          Regarding The Defendants' Removal of the Plaintiff from the Position of Director
          for the Center of Microbial Pathogenesis*

      The plaintiff asserts that he was wrongfully removed from his position of Director of the

Center for Microbial Pathogenesis in violation of his Fourteenth Amendment procedural due

process rights. In determining what procedure the plaintiff was due, "[t]he threshold questions

are whether [the plaintiff] has alleged a state law property interest, and whether the Fourteenth

Amendment protects that interest." *Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2nd

Cir. 2002).  Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).  In order to have had a property interest in the Director's position, the plaintiff must have had "a legitimate claim of entitlement to it." *Id.*  While state law determines whether a public employee has a property interest in continued employment, "federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 782 (2d Cir.1991) (citation and internal quotation marks omitted).  The defendants' unqualified assertion that "[p]ersonnel decisions short of termination do not constitute deprivations of a property interest under the Fourteenth Amendment", is absolutely erroneous.  The Second Circuit Court of Appeals has held that removals, short of termination most certainly may constitute violations of the Fourteenth Amendment.  *Ciambriello v. County of Nassau*, 292 F.3d  at 323 ("In summary, the Fourteenth Amendment granted Ciambriello the right to notice and an opportunity to be heard prior to his demotion, the County failed to provide such notice or opportunity, and Ciambriello did not waive this right in the CBA.  Therefore, Ciambriello has sufficiently alleged a § 1983 claim against the

County and the individual defendants for violation of his Fourteenth Amendment right to procedural due process.").

### 1.  *Property Interest*

The "nature and contours" of claimed property interests are defined not by the Constitution, but by some independent source.  *Greenwood v. New York,* 163 F.3d 119, 122 (2d Cir. 1998); *Ezekwo v. New York City Health & Hospitals Corp.,* 940 F.2d at 782.  A property interest may include any number of interests that are secured by "existing rules or understandings," *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), including those stated in a contract between the parties.  The circumstances surrounding the plaintiff's appointment clearly indicate that the plaintiff possessed a protected property interest in the position of Director of the Center for Microbial Pathogenesis.  Although the defendants choose to ignore the circumstances surrounding the plaintiff's appointment as Director and narrowly focus on his removal from the position, the background of the plaintiff's hiring establishes the plaintiff's property right to the position.  From the very start of the courtship between the plaintiff an the University of Connecticut Health Center, the plaintiff's overriding interest was in a long-term commitment from the University to make the Center for Microbial Pathogenesis a world class institution.  His response in 1998 to the advertisement published by the Health Center referred to the position of Director of the Center; he was not looking to

become a Professor in the Medical Center's Departments of Medicine and Genetics and

Developmental Biology.  The faculty appointments along with the defendant's long term

commitment to the Center were meant to provide him the security he needed in the position of

Director so that he could achieve the mutually shared goal of his and the University of

establishing the Center as an outstanding research facility.  The letter dated September 9, 1998

from Deckers, Berlin, Garibaldi and Osborn, which formally offered the plaintiff the position of

"Director of the Center for Microbial Pathogenesis" fully support the plaintiff's assertion that the

faculty appointments were  inseparably linked  with the Directorship.  "This is to formally offer

you the position of Director of the Center for Microbial Pathogenesis and appointment as

Professor of Medicine (primary) and Microbiology (secondary) with tenure effective January 1,

1999..." *Exhibit 1.*  Simply stated, the defendants Wikel and Berlin fully understood the plaintiff

was moving his laboratory to the Health Center not merely to accept faculty positions in its

Departments of Medicine and Microbiology.  He was relocating himself, his laboratory and his

personnel for the overriding purpose of accepting the directorship of the newly formed Center for

Microbial Pathogenesis.  The defendants' clearly understood this.  They charged him with the

principle responsibility of formulating and developing the Center's research program.  *Exhibit 1.*

And they pledged their support to him.  "Be assured it is our purpose to support the Center in

whatever way is within our means.  The Center will be 'Type II', signifying that you will report

directly to the Dean or his delegate, the Associate Dean for Research."  These statements indicate very clearly that the Center Directorship, not the faculty appointments, were the focus of the recruitment and appointment.  *(See plaintiff's responses to defendants' statement of material facts #'s 26-29; see plaintiff's statement of material facts in dispute #'s 1-5, 42-49).*  See *Malla v. University of Connecticut*, 312 F.Supp.2d 305, 321 (D.Conn. 2004) ("On these facts, if proved, the Court believes that, under controlling Second Circuit law, Malla had a federally protected property right in his position as Campus Director for UConn of the Consortium.  'Property interests are not created by the Constitution;  rather 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' ' *Ciambriello v. County of Nassau,* 292 F.3d 307, 313 (2d Cir. 2002) (*quoting Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). "[T]hat property can take many forms ... [and] '[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.' " *Ezekwo,* 940 F.2d at 782 (*quoting Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972))...").

The attempt by the defendants to compare the plaintiff's removal from the Director's position to a mere change in work assignments and/or employee benefits disregards the importance placed on securing the plaintiff's commitment to accept the Director's position, as well as the commitment they made to him to "support the Center in whatever way is within our means." Most certainly, the plaintiff's response to the defendants' offer made them aware the extent to which he viewed the appointment. "I have received the letter and reviewed it. It is exactly what I expected based upon our extensive conversations. I accept with unbridled enthusiasm. Let me add that I regard this as a tremendous honor and will commit all of my energies and abilities to make the Center successful..." *Exhibit 48.* As previously noted, the appointment to the Director's position was not a faculty assignment adjoined to a faculty appointment. The appointment of the plaintiff to the Director's position was the paramount goal of the defendants as well as that of the plaintiff. *Exhibit 1, 48.* Both placed great importance, as evidenced by their actions, on appointment. *Ezekwo v. New York City Health and Hosp. Corp.,* 940 F.2d 775, 783 (2d Cir.1991) ("Nor did it involve such a trivial and insubstantial interest as the purported right to a specific vacation period."). "A claim of entitlement is not precluded by absence of a formal right memorialized in an individual contract or a collective bargaining agreement because 'not every term of a contract must be reduced to writing[, and] [a]dditional contractual provisions may be implied into a contract as a result of a course of dealing between

the parties. [Thus,] [t]he parties through their conduct and practice can create additional rights and duties.' *Id.* (quotation omitted). While 'not every contractual benefit rises to the level of a constitutionally protected property interest,' *id.,* UConn's 'policies and practices ... were such that an entitlement to the position of [Campus Director] existed,' *id.* at 783." *Malla v. University of Connecticut*, 312 F.Supp.2d at 322.

The plaintiff's interest in the position of Director of the Center for Microbial Pathogenesis is as strong as the interests found by the Courts in *Ezekwo*, supra, and in *Malla,* supra. The representations conveyed by the defendant to the plaintiff were not merely puff; they were meant to secure the services of a renowned research scientist to grow the Health Center's reputation. The defendants cannot ignore the implications of the long-term commitment they made to the plaintiff by asserting that he had nothing more than a departmental assignment. The defendants are fully aware that the plaintiff's removal from the Director's position entailed much more than a department transfer or assignment.

"The key to determining whether a claimed benefit rises to the level of a constitutionally protected property interest is not whether the benefit is contained in a contract between the parties. That is only the starting point because, as recognized by the Second Circuit, not every breach of contract rises to the level of interference with a constitutionally protected property right. *Martz v. Village of Valley Stream,* 22 F.3d 26, 30 (2d Cir. 1994); *Ezekwo,* 940 F.2d at

782... Thus, 'to have a property interest in a benefit, a person must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it.' *Ezekwo,* 940 F.2d at 782, quoting, *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Sutton v. Village of Valley Stream,* 96 F.Supp.2d 189, 193 (E.D.N.Y. 2000). The question of entitlement requires the court to consider the importance of the right to the holder as well as the course of conduct of the party offering the right. *Ezekwo,* 940 F.2d at 783. Where the claimed right is no more than a claim to a particular work assignment or fringe benefit it will generally not be found to rise to the level of a constitutionally protected property right. *See, e.g., id.* at 782 ('trivial and insubstantial' interests do not rise to the level of property rights). On the other hand, where the right is significant and of great importance to the holder it may rise to such a level. An interest in a benefit is a property right if 'there are such rules ore mutually explicit understandings that support [the] claim of entitlement to the benefit....' *Greenwood,* 163 F.3d at 122, quoting, *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)." *Adler v. County of Nassau,* 113 F.Supp.2d 423, 428-430 (E.D.N.Y. 2000).

The defendants' course of conduct in recruiting the plaintiff and the representations and commitments they gave to him "created a contractual right that rose to the level of a significant property interest that would be protected under state law." *Ezekwo,* 940 F.2d at 783. Likewise, the interest at stake here was of significant professional value. "Your principle responsibility will

be the formulation and development of the Center's research program. *To this end we are committing four tenure-track positions and a floor (7th) of the new research building. In addition, as we have discussed, we will provide suitable support for establishing your own research program here, operating funds for the Center, and for the recruitment and start-up of the new faculty." Exhibit 1(Emphasis Added).* This was not a trivial undertaking as the defendant suggests. Professionally, the plaintiff was going to head up a "Type II" Center, with "four tenure-track positions" and an entire floor in the Health Center's new research building. It is not speculation to assert that there is a special importance in the academic community to being the [Director of the Center for Microbial Pathogenesis]". *Malla v. University of Connecticut*, 312 F.Supp.2d at 322.

### 2. *Due Process Protections*

Having determined that the position of Director of the Center for Microbial Pathogenesis is a property interest of constitutional dimension, it is clear that the removal of the plaintiff from the Director's position did not comport with minimal due process requirements. See *Thomas v. Zaharek,* 289 F.Supp.2d 167 (D.Conn. 2003) and see *Garraghty v. Jordan,* 830 F.2d 1295 (4th Cir. 1987). "It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). "At a minimum due process requires that an employee be given notice of the charges against him and

some kind of a hearing before being disciplined by suspension...The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings...The timing, content of notice and the form of hearing will depend upon a proper balancing of the competing interests involved." *Garraghty v. Jordan,* 830 F.2d at 1300. "The pretermination process need not be elaborate or approach the level of a full adversarial evidentiary hearing, but due process does require that before being terminated such an employee be given oral or written notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story." *Otero v. Bridgeport Housing Authority* 297 F.3d at 151. "[C]ertain features must be present to fulfill the minimum requirements of fairness: the employee must be given oral or written notice of the charges against him, an explanation of the employer's evidence, and the opportunity to present his side of the story." *Todaro v. Norat*, 112 F.3d 598, 599 (2d Cir. 1997). The procedures employed by Deckers failed by a wide margin to comport with these rudimentary due process requirements. Putting aside for later discussion the constitutional requirement for a *pre-removal* hearing, there is more than sufficient evidence for a trier of fact to conclude that the meetings Deckers had with the plaintiff leading to the plaintiff's voluntary relinquishment of the Director's position was a ploy meant to convince the plaintiff to willingly give up his position. In the two meetings the plaintiff had with Deckers on January 7 and 11, 2001, Deckers represented to the plaintiff that

his removal would be temporary and that he could return to the position whenever he so choose. There were no conditions placed on his return to the position. For the purposes of this litigation, the defendants now assert that the plaintiff's return was conditioned on the outcome of the ORI investigation. However, there are no contemporaneous records that support such a position. Deckers' final email on the topic makes no reference to such a contingency. His earlier correspondence of December 27, 2001, states that the "potentially prolonged Office of Research Integrity (ORI) investigation into this entire matter could become very serious handicaps to the maintenance of morale and productivity amongst faculty in the Center for Microbial Pathogenesis, to the recruitment of new faculty, and to the development of the Center as an institutional resource". *Exhibit 5.* Nonetheless, the defendant did not make the plaintiff's return to the position contingent on the outcome of the ORI investigation. To the contrary, the recommendation, at that point in time, was that the plaintiff would resume his position when his academic probation was completed on August 31, 2004. The communications between the plaintiff and Deckers conclusively establishes that the plaintiff's return to the position was not based on the outcome of the ORI investigation or any other contingency.

Deckers repeatedly emphasized to the plaintiff that he could return when he chose to do so. However, after meeting with the plaintiff on January 11, 2004, Deckers reversed himself and fundamentally changed the dynamics of the plaintiff's removal; it was no longer voluntary and

the resumption of his duties was no longer within his discretion.  Without providing the plaintiff

any opportunity to discuss his decision, Deckers in an email dated January 13, 2001, informed

the plaintiff that the plaintiff must relinquish the Center Directorship and that his authority in the

matter was "absolute". *(See plaintiff's response to defendants' statement of material facts #'s 33,*

*36, 40, 43; plaintiff's statement of disputed material facts #'s 8, 9, 51-55).*  In his letter of

January 13, 2002 (delivered January 14) *Exhibit 6,* the plaintiff used the wording urged upon him

by Deckers in their meeting of January 11, namely, that he was relinquishing the position

"temporarily" and "for personal reasons".

Wikel was subsequently named Center Director, and this appointment, despite

defendant's claims to the contrary, in reality has been made on a permanent basis.  The formal

designation as such has not been made so as to conceal the true nature of the appointment from

the Court in these present proceedings.  *Wikel Tr. 8; Exhibit 8.*  It is demonstrably clear that the

plaintiff was purposely misled about the temporary nature of his stepping aside so that he would

voluntarily relinquish his position as Center Director.  Should a jury find the plaintiff's testimony

credible[13], it certainly could decide that the pretermination meeting was a sham that failed to

satisfy due process requirements.

---

[13] At this stage of the proceedings, credibility of the plaintiff's testimony is not an issue; the Court must take the
plaintiff's deposition and affidavit testimony as true in judging whether there are material facts in dispute.

The notice provided the plaintiff of Deckers' contemplated action was misleading under any view of the evidence. If as the defendants now state that the return of the plaintiff to the Director's position was dependent on the outcome of the ORI investigation, the notice to the plaintiff was inadequate because it did not inform the plaintiff of this reason. Stating that the plaintiff must have been aware that this was the reason for his removal and the outcome of the investigation would determine whether he would be ultimately reinstated does not satisfy due process requirements. See *Otero v. Bridgeport Housing Authority*, 297 F.3d at 151, 152 ("The district court in the present case did not properly apply these principles in granting JMOL against Otero after the trial of her due process claim. First, rather than noting that Otero was entitled to 'an explanation of [BHA's] evidence,' *Loudermill, 470 U.S.* at 546,[*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985)]*, the district court stated only that she must be provided with 'some semblance of the evidence,' JMOL Ruling at 10. Merely presenting 'some semblance' of the evidence, however, does not necessarily afford the accused an adequate opportunity to present her side of the story... the district court appears to have equated 'explanation of the employer's evidence' simply with 'notice of the charge,' *for the court repeatedly returned to its observation that Otero knew she was being charged with theft of a toilet...Mere notice of the charge, however, is not an explanation of the evidence and does not necessarily suffice to provide due process*.") (Emphasis Added).

The defendants also assert that the Deckers had provided the plaintiff numerous opportunities to discuss the issue of his return to the Director's position.  First, these so-called numerous offers were made post-deprivation, and therefore do not satisfy the constitutional requirement that the plaintiff be provided a pre-deprivation hearing.  *Todaro v. Norat* 112 F.3d 598, 599, 600 (2d Cir. 1997).  Second, the facts just do not support the defendants' assertion that Deckers offered to meet with the plaintiff on various occasions to discuss the issue of the Director's position.  The contention that Deckers had given the plaintiff numerous opportunities to discuss resumption of the directorship misstates the facts.  Deckers, knowing the plaintiff's unwillingness to intermix the issue of the directorship with the topic of compensation regarding his faculty appointment, unreasonably refused to meet with the plaintiff on either of the subjects.  Deckers never offered to meet with the plaintiff on either of the issues in separate settings.  Additionally, as the correspondence attached to Deckers affidavit clearly demonstrates, there were not numerous opportunities to confer about the directorship; the entire correspondence revolved about setting up one meeting to review the plaintiff's compensation.  *(Deckers Aff. Attachment # 8).*  The plaintiff's submission to Deckers, which necessitated a meeting with Deckers because he served as the plaintiff's immediate supervisor since January 14, 2002 *(Exhibit 7),* demonstrates that it was limited to a review of the plaintiff's performance as

Professor of Medicine and Genetics and Developmental Biology *(Exhibit 11)* not the issue of the Directorship.

By letter dated July 3, 2002, the plaintiff requested that he be restored to his position of Director of the Center for Microbial Pathogenesis. *(Exhibit 39).* As of the present date, the plaintiff has not been restored to the position of Director of the Center for Microbial Pathogenesis, nor has he been informed of the reasons why he has not been restored nor has he been accorded a hearing of any type on his request. However, by February 13, 2004, Deckers clearly signaled the Wikel is the Director and his appointment is anything but temporary. *Exhibit 8.* The plaintiff was entitled to notice and a hearing before he was removed from his position on anything but a temporary status, and likewise, he was entitled to notice and a hearing before the decision not to restore him and to retain Wikel in the position was made. *Ezekwo v. New York City Health and Hosp. Corp.,* 940 F.2d at 786.

The plaintiff does not claim that Deckers could not remove him if there existed proper cause. For instance, if the investigation by the ORI had resulted in his debarment from any activities, research or otherwise, involving federal funds, the capital punishment for research scientists, then Deckers most certainly would have been justified in considering the removal of the plaintiff from the Director's position. But even under that scenario, the plaintiff would still be entitled to the due process protections of adequate notice and pre-deprivation hearing.

### 3. Pre-Deprivation Opportunity To Be Heard

"Although the Supreme Court has stated that it will 'tolerate some exceptions to the general rule requiring predeprivation notice and hearing', it will do so 'only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53, 126 L. Ed. 2d 490, 114 S. Ct. 492 (1993) (internal quotation marks and citations omitted). Under a balancing of interests analysis required by *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), there is simply no governmental interest at stake in this case that justifies the failure to provide the plaintiff with notice of the charges and an explanation of the defendant's evidence prior to the plaintiff's removal. *Ciambriello v. County of Nassau,* 292 F.3d at 319-322. This case does not present issues of secrecy based on matters of national security or the investigation of criminal conduct. Nor does the case involve the actual commission of a crime where the need for swift governmental action is required. See *Gilbert v. Homar,* 520 U.S. 924, 930, 138 L. Ed. 2d 120, 117 S. Ct. 1807 (1997) ("This Court has recognized, on many occasions, that where a *State must act quickly*, or where it would be *impractical to provide predeprivation process*, postdeprivation process satisfies the requirements of the Due Process Clause"). The defendant does not even advance an interest that it could claim was paramount to the plaintiff's interest.

"In order to determine whether the Constitution requires a pre-demotion hearing under the circumstances of this case, we must balance three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge,* 424 U.S. at 335." *Ciambriello v. County of Nassau*, 292 F.3d at 319. "In applying its Mathews test, the Supreme Court has held that, in most circumstances, a pretermination or suspension hearing is required, although it may be very limited if a post-discipline hearing occurs. See *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985). See also *Gilbert v. Homar,* [ 520 U.S. 924, 929-30, 138 L. Ed. 2d 120, 117 S. Ct. 1807 (1997)]." *Thomas v. Zaharek,* supra at 177.

First, as discussed above, the plaintiff's interest remains substantial. "While this interest is undoubtedly less significant than a public employee's interest in not being dismissed altogether, the private interest involved here is still substantial." *Ciambriello v. County of Nassau*, 292 F.3d at 320. Second, the risk of error is great, where, as here, the plaintiff was misinformed as to the extent of his removal and the reasons for the removal. Based on the evidence, a jury could reasonably find that the plaintiff was not provided with the true reasons

for his removal, an explanation of the defendants' evidence, if any, or an opportunity to refute the reasons on which the defendants based his removal. Deckers met with the plaintiff on January 7 and 11, 2002, when Deckers insisted that he only wanted the plaintiff to agree to temporarily remove himself from the position of Director. At that meeting, the plaintiff was not the subject of disciplinary action; he was not charged with the violation of Health Center policy[14]. There can be little doubt that due process requires, in the least, a leveling by Deckers with the plaintiff as to the true reasons for the plaintiff's removal. If it was because of the ORI investigation, then the plaintiff should have been informed of that so that he could provide a rebuttal, i.e., that the ORI investigation was reviewing the adequacy of the SRB procedures and not any new allegations of wrongdoing against the plaintiff. By not informing the plaintiff of the true reasons behind his determination to remove the plaintiff, Deckers ran a grave risk of mistakenly disciplining the plaintiff. "[T]he risk of erroneous deprivation under such circumstances is a substantial one, because the employer never gets to hear the employee's side of the story." Gupta v. Norwalk, 221 F. Supp. 2d at 293, 294.

Third, the governmental interest involved in the present case is next to nonexistent. The plaintiff was disciplined by Deckers on August 22, 2001. By October of 2002, the ORI had exercised its jurisdiction to investigate the matter involving the SRB's uncontested finding that

---

[14] Deckers had already imposed discipline on him with regard to the finding of research misconduct in his letter of August 22, 2001. No action was taken at that time to remove the plaintiff from the Director's position. *Exhibit 2.*

the plaintiff had committed research misconduct, as well as Deckers' decision not to report the

SRB's finding to the ORI, in the first instance.  If there was a need to act expeditiously because

of the ORI investigation, then most certainly, Deckers would not have waited until December 27,

2001, when he first informed the plaintiff that his temporary removal from the position was

under consideration.  *Exhibit 5.*  The chronology of events dispels any claim that circumstances

required immediate action by Deckers without providing the plaintiff with a meaningful pre-

deprivation hearing.  There is no legitimate excuse to justify Deckers dissembling at his meetings

with the plaintiff other than to avoid an adversarial process over the plaintiff's removal.

However, Deckers desire to avoid a contest over the plaintiff's removal simply does not validate

his misinforming the plaintiff into believing he was being temporarily removed from his position

without any preconditions to his restoration.  Obviously, the defendant took this course of action

to mislead the plaintiff into voluntarily removing himself from his position.  Additionally, the

defendant can not cite, nor can it seriously argue, that the fiscal and administrative burdens

associated with a pre-removal hearing would be anything but minimal, as such a hearing need

not be elaborate.  *Loudermill, 470 U.S. at 545.*  "Indeed, the governmental interest in not

providing a pre-demotion hearing is particularly minimal in this case because the County

actually held a hearing prior to Ciambriello's demotion; it simply failed to invite Ciambriello's

participation.  The relevant governmental interest, then, is the County's interest in not notifying

an employee of the pendency of a grievance that could cost him his job and not affording him the opportunity to be heard on this issue prior to demotion.  This interest is minimal"  *Ciambriello v. County of Nassau*, 292 F.3d at 320.

        *vi. Health Center's Grievance Procss*

        In light of the facts particular to the present case, the balance of interests tips heavily in favor of affording the plaintiff a pre-removal hearing.  The defendant's argument that the Medical Center's grievance process provides the plaintiff with all the due process to which he is due is misguided.  Simply, the grievance process does not satisfy due process standards because it fails to provide for a pre-removal hearing.  "Due process does not require a full, judicial-type hearing before employment is terminated, but certain features must be present to fulfill the minimum requirements of fairness: *the employee must be given oral or written notice of the charges against him, an explanation of the employer's evidence, and the opportunity to present his side of the story*. *Id.* at 546, 105 S. Ct. at 1495.  A post-termination proceeding such as that provided under Article 78 does not meet the *Loudermill* requirements because it takes place after the employee has lost his job.  *Todaro v. Norat* 112 F.3d 598, 599, 600 (2d Cir. 1997) .") (Emphasis added).  In *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 331 (9th Cir. 1995), the Ninth Circuit Court of Appeals rejected the proposition that "despite the apparent inadequacies of the pre-termination process . . . numerous post-termination hearings provided

[the plaintiff] with all the process she was due." The Ninth Circuit held that "a full post-deprivation hearing does not substitute for the required pre-termination hearing." See also *Enterprise Firefighters Association v. Watson,* 869 F.Supp. 1532, 1541, 1542 (D.Ala. 1994). ("The court further concludes that the violation of procedural due process in this case was 'complete when Davis was terminated without a hearing' and that the violation was not 'cured by the hearings he received after his termination'. . . By its very nature, however, when the violation of due process is a failure to provide a pre-termination hearing, the violation cannot be cured subsequent to termination. The right is lost once termination has been effected. If the rule were otherwise, a public employee's right to a pre-termination hearing as explicated in *Loudermill*, would be chimerical and ultimately meaningless because it could be 'cured' in each instance simply by providing a hearing after termination...Moreover, the violation of due process is complete even if it later appears certain that the termination was substantively correct. . .").

Likewise, the plaintiff was not required to exhaust his administrative remedies before instituting this present action. The law has long been settled that exhaustion of administrative procedures is *not* a requirement to advancing a due process claim pursuant to Title 42 U.S.C. § 1983. A plaintiff in a § 1983 case is not required to exhaust her administrative remedies before bringing suit. *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). However, a plaintiff must avail herself of the right to be heard pursuant to

75

constitutionally adequate state remedies, if available.  See *Narumanchi,* 850 F.2d at 72; *Alba v. Ansonia Bd. of Educ*., 999 F. Supp. 687 (D.Conn. 1998).  In contrast to the grievance procedure in *Narumanchi,* which provided for a pre-suspension hearing, the grievance procedure in the present case lacks that same protection, and is, therefore, constitutionally inadequate.  It is the defendants' failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim.  *Cotton v. Jackson*, 216 F. 3d 1328, 1331 (11th Cir. 2000).  The grievance procedure does not provide the plaintiff with due process since the grievance procedure fails to satisfy the minimal protections for an employee faced with removal from a position in which such employee has a constitutionally protected property interest.

The fact that the Health Center's grievance procedures do not provide for a pre-deprivation hearing only means that the plaintiff is entitled to more due process than the Health Center's policies provide.  *Ciambriello v. County of Nassau*, 292 F. 3d at p. 323.  Due Process requires pre-termination notice and an opportunity to respond even where policies provide for post-deprivation procedures that fully compensate the wrongfully terminated employee.  *Chaney v. Suburban Bus Div. of the Reg'l Transp. Auth*., 52 F.3d at 629 (7th Cir. 1995).  See also *Malla v. University of Connecticut*, 312 F.Supp.2d at 326-328.

### 4.  Immunity From Suit

Even a cursory review of the plaintiff's first substituted complaint will reveal that the Eleventh Amendment immunity issue raised by the defendants is a red herring. With regard to his due process cause of action, the plaintiff addresses his prayer for relief only against Berlin and Deckers. Other than for Deckers and Berlin, the plaintiff does not seek any form of relief against the University of Connecticut, the University of Connecticut Health Center or any of the other named defendants. Deckers and Berlin have been sued in both their official and individual capacities. However, the plaintiff seeks only prospective injunctive relief against the two defendants in their official capacities. He does seek damages against them in their individual capacities. Section 1983 jurisprudence is well settled that "a state official acting in his official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar... a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief . . . and may not include a retroactive award which requires the payment of funds from the state treasury...[A] State official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State...The Eleventh Amendment, however, provides no immunity for state officials sued in their personal capacities." *Dube v. State University of New York,* 900 F. 2d 587, 595 (2d Cir. 1990) (Internal citations and quotations omitted.). The defendants fail to differentiate the

immunity that applies to a claim for prospective injunctive relief against Deckers and Berlin in their official capacities from one involving a claim against them in their same official capacity for monetary damages. In the former, there exists no immunity under the Eleventh Amendment, while in the latter there does. Deckers and Berlin are not protected by the provisions of the Eleventh Amendment from the authority of the Court to issue prospective injunctive relief.

5. Qualified Immunity

The plaintiff asserts monetary claims against Deckers and Berlin in their individual capacities. As such, the defendants do not have Eleventh Amendment immunity from the plaintiff's cause of action. Likewise, the defendants, having been sued in their official capacities for prospective injunctive relief, are persons under § 1983, and possess no Eleventh Amendment immunity from the plaintiff's cause of action. See *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F. 2d 84, 87, 89, fn.4 (2d Cir. 1991); *Ying Jing Gan v. City of New York*, 996 F. 2d 522, 529 (2d. Cir. 1993); *State v. Cahill*, 217 F.3d 93, 101 (2d Cir. 2000); *Garcia v. Akwesasne Housing Authority*, 268 F. 3d 76 (2d Cir. 2001). The claim for qualified immunity by Deckers and Berlin must likewise fail. The plaintiff is in a very similar position that Dr. Ezekwo was in the case of *Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 782 (2d Cir.1991). Since that decision, the plaintiff's possession of a constitutionally protected property interest in the position of Director of a research center in a State operated Health Center has been clearly established.

"A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights. *McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 278 (2d Cir.1999).  In deciding whether a right was "clearly established," the Court considers the following: (1) Was the law defined with reasonable clarity?  (2) Had the Supreme Court or the Second Circuit affirmed the rule?  and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?  *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998).  In addition, a right is "clearly established" if " '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right' ". *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998) (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

Deckers conduct, in particular, rules out any qualified immunity on his behalf.  As discussed earlier, Deckers conducted himself in a manner to deprive the plaintiff of his due process rights.  He knowingly deceived the plaintiff into believing he was being requested to temporarily relieve himself of the Director's position.  An official in Deckers' position most certainly should have known that his actions were unlawful.  Deckers went to great lengths to keep from the plaintiff any knowledge of his true plans with regard to the plaintiff's future as the

Director of the Center for Microbial Pathogenesis.  Deckers' dissembling resulted in the plaintiff foregoing the exercise of his due process rights.  There is no other reasonable explanation for Deckers' deception.  If he had informed the plaintiff that he was being permanently removed, or his return to the position was conditioned in any manner, the plaintiff could have resorted to his constitutional rights to contest Deckers' actions.  In light of Deckers' behavior, most assuredly as a reasonable state official, he would understand that what he was doing violated the plaintiff's due process right, the contours of which are reasonably clear.

### c.  *Academic Freedom In Scientific Research*

The University of Connecticut explicitly recognizes a faculty member's academic freedom to pursue scientific research.  Article XV of the University of Connecticut's By-Laws provides, in relevant part, "All members of the faculty, whether tenured or not, are entitled to academic freedom set forth in the 1940 Statement of Principles on Academic Freedom and Tenure formulated by the Association of American Colleges and the American Association of University Professors.  The faculty member *is entitled to full freedom in research* and in the publication of the results, subject to the adequate performance of his or her other academic duties, but research for pecuniary return should be based upon an understanding with the authorities of the University."  (Emphasis Supplied).  The 1940 Statement of Principles on Academic Freedom and Tenure, to which the University of Connecticut has committed itself,

employs language identical to that contained in the University's By-Laws. This aspect of academic freedom finds protection in the First Amendment to the United States Constitution. "'Our nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate orthodoxy over the classroom. The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Hardy v. Jefferson Community College,* 260 F. 3d 671, 680 (6th Cir. 2001) quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967); See also, *Vega v. Miller*, 273 F. 3d 460, 466 (2d Cir. 2001). "The precise contours of the concept of academic freedom are difficult to define. See *Cooper v. Ross*, 472 F.Supp. 802, 813 (E.D.Ark.1979). One First Amendment scholar has written "(t)he heart of the system consists in the right of the individual faculty member to teach, carry on research, and publish without interference from the government, the community, the university administration, or his fellow faculty members." T. Emerson, The System of Freedom of Expression 594 (1970). *We think it clear that whatever constitutional protection is afforded by the First Amendment extends as readily to the scholar in the laboratory as to the teacher in the classroom.* See generally, id. at 619." *Dow Chemical Company v. Allen,* 672 F.2d 1262, 1275 (7th Cir. 1982) (Emphasis Added); *McMillan v. Togus Regional Office, Dept. of Veterans Affairs,* 294 F.Supp.2d 305, 317 (E.D.N.Y. 2003).

There can be little doubt that the plaintiff's academic freedom rights have been directly violated by the actions of Deckers, Berlin and Wikel, when they purposely excluded him from participating in scientific research in which  he had not only been participating but in which he had been the prime instigator.  *(See plaintiff's responses to defendants' statement of material facts #'s 61-112; See statement of material facts in dispute #'s 92-122;165-167).*  The defendant is unable to explain away the September 11, 2001 communication between Deckers and Berlin in which they first devised the scheme to terminate the plaintiff's participation in the DOD research.  *Exhibit 35.*  The plan was achieved when Wikel froze the plaintiff out of participation in the proposal, while at the same time misappropriating scientific research data, which he jointly owned with the plaintiff in violation of the University of Connecticut Health Center's Data Ownership Policy.  *(Exhibit 9).*  The exclusion of the plaintiff from the DOD research, in which he had a substantial and cognizable role, constitutes a direct violation of his academic freedom. The plaintiff had played an instrumental role in the efforts to procure these monies and his clinical and research expertise were critical selling points when this project was presented to members of the Connecticut Congressional delegation.  Academic freedom "refers to the freedom of individual teachers to not suffer interference by the administrators of the university." *Rubin v. Ikenberry*  933 F.Supp. 1425, 1433 (C.D.Ill.  1996).

The over simplistic characterization of the plaintiff's complaint by the defendants ("that the defendants chose to sponsor another researcher's science"), ignores the totality of the plaintiff's participation in the project and the science in which he had an ownership interest. This claim involves much more than two professors competing independently for the same grant with the University backing one of the two. There existed a collaboration between Wikel and the plaintiff, in which the plaintiff was the dominant player. It was the plaintiff's laboratory that developed the science on which the proposal's foundation was based. It was the plaintiff who initiated and pursued the concept of a congressional earmark. Wikel's effort to describe the proposal as involving all new science unrelated to his collaboration with the plaintiff is simply preposterous in light of the plaintiff's documented scientific contributions to the science involved in the proposal. The violation could be no more direct than if the Deckers and Berlin specifically informed the plaintiff that he could not participate in the DOD research endeavor instead of freezing him out of all participation. The violation is just as great as if the plaintiff had been barred from instructing a class on the science involved in the proposal. "The faculty member is entitled to freedom in the classroom in treating his or her subject and in conducting a class". It cannot be seriously disputed that in the latter case the plaintiff's academic freedom would have been violated. The same "constitutional protection...afforded by the First Amendment extends as readily to the scholar in the laboratory as to the teacher in the classroom." *Dow Chemical*

*Company v. Allen,* 672 F.2d at 1275.  In excluding the DOD proposal, the defendants trampled over the plaintiff's academic freedom as much as if they barred him physically from entering into his laboratory.  The defendants' right to choose who would participate in the research under the DOD proposal was qualified by the plaintiff's academic freedom.

The defendants mistakenly analogize this case to a wrongful first amendment retaliation claim.  That is not the plaintiff's claim.  In this cause of action, the plaintiff does not claim he is the victim of unlawful retaliation as a result of exercising his First Amendment rights, but that a violation of his First Amendment rights occurred because the defendants directly interfered with his academic freedom.  The evidence is substantial that the defendants through deception deprived him of his right to full freedom of research.  The defendants would be hard pressed to argue that the Deckers and Berlin, as evidenced by their September 11, 2001 communication did not interfere with the plaintiff's academic freedom to participate in scientific research.

The defendants take a most restricted view in arguing that the plaintiff has not suffered an adverse employment action.  They ignore the fact that the plaintiff is a renowned research scientist who was intimately involved in the DOD proposal from its very initiation.  It was his science on which the proposal was based, and on which a multi million dollar congressional earmark was awarded.  Most certainly, the plaintiff suffered an adverse employment action by being excluded from in the funded proposal.  "Surely, the right to guide a research project and

receive funding therefor constitutes an integral part of social science scholarship. *See [Levin v. Harlestron* 770 F.Supp. 895, 925*, (S.D.N.Y.1991), aff'd in part and vacated in part on other grounds,* 966 F.2d 85 (2d Cir.1992) (noting due process problem with university deterring a faculty member from seeking outside grants)." *Hamid v. John Jay,* 2000 WL 666344, *6 (S.D.N.Y. 2000).

In arguing for qualified immunity, the defendants turn a blind eye to the fact that the commitment to academic freedom is found in the very By-Laws of the University. It is incomprehensible that the defendants, in view of its own By-Laws, can argue that academic freedom in research was not a well-established right. The Supreme Court has long recognized the First Amendment to the United States Constitution as encompassing academic freedom. *Keyishian v. Bd. of Regents, supra.* As such, the doctrine of qualified immunity does not shield the defendants from the plaintiff's cause of action alleging a violation of his academic freedom.

      d. *Violation of the Plaintiff's Fourteenth Amendment Right To Due Process of Law Regarding The Defendants' Barring the Plaintiff From Participating In His Scientific Endeavors*

          1. *Property Right*

              a. *Participation in DOD Research*

As with the discussion concerning the plaintiff's claim that he possessed a property right to the position of Director of the CMP, "[t]he threshold questions are whether [the plaintiff] has

alleged a state law property interest, and whether the Fourteenth Amendment protects that interest." *Ciambriello v. County of Nassau*, 292 F.3d at 313.  Despite the blind eye with which the defendants view the role played by the plaintiff in developing and advancing the concept of a congressional earmark, the evidence before the Court firmly establishes the plaintiff's vital role in the project.  *Exhibits 41-47; Radolf Aff. ¶¶ 70-81.*  The plaintiff's role was so extensive that when the Deckers and Berlin contrived their plot to exclude the plaintiff from the proposal, they agreed among themselves to withdraw the proposal and resurface in a year or so as an exclusive Wikel proposal.  *Exhibit 35.*  If the plaintiff was only a minor player in the proposal, then logically there would be no need to withdraw the proposal and reconfigure it solely a Wikel project.  However, that was not the case, the idea for the proposal and the science supporting it emanated from the intellect of the plaintiff.

Regardless of acquiescing to his removal as a co-investigator on the project as the plaintiff was informed at the January 7, 2002 meeting with Deckers and Berlin, Deckers and Berlin, without qualification, assured the plaintiff that he would continue as a participant in the research.[15]  It cannot be overemphasized that this was not a new area of research for the plaintiff; the plaintiff and his laboratory had been leading the way in Lyme disease research well before

---

[15] Defendants' assertion that the plaintiff's non-participation resulted from a break down in the plaintiff's relationship with Wikel, and not on any intentional act of the defendants is refuted by both the Deckers and Berlin communication of September 11, 2001, *Exhibit 35* and their communication to the Kiser on February 10, 2003, *Exhibit 10.*

the plaintiff relocated to the University of Connecticut Health Center.  *Radolf Aff. ¶¶ 29-69; Caimano Aff. ¶¶ 6-43.*  The plaintiff possesses a property interest in the DOD funded research based on the mutual understandings he had with Deckers, Berlin and Wikel.  The plaintiff doesn't dispute that Deckers and Berlin could exclude the plaintiff from this research endeavor[16]; however, such a removal would have to be accomplished in a manner that respected the plaintiff's due process rights.  In the present case, when they excluded the plaintiff from the DOD research, Deckers and Berlin trampled all over the plaintiff's Fourteenth Amendment protections.

The Supreme Court has avoided inflexible or formalistic limitations on the Fourteenth Amendment's Due Process Clause, since "liberty" and "property" are "broad and majestic" terms that relate to the "whole domain of social and economic fact." *Board of Regents of State Colleges v. Roth* (1972) 408 U.S. 564, 576, 92 S.Ct. 2701. " In *Roth* and its companion case, *Perry v. Sindermann* (1972) 408 U.S. 593, 92 S.Ct. 2694, the Court made clear that the scope of academic interests evoking procedural due process requirements reaches well beyond the core protection of tenured positions." *Hamid v. John Jay,* 2000 WL 666344 at *5.  "While the Fourteenth Amendment's procedural requirements protect property, that property can take many forms.  In general, the nature and contours of a specific property interest are defined by some source

---

[16] In going forward with such research after excluding the plaintiff, the use of the plaintiff's co-owned intellectual property would require the plaintiff's permission as well recognizing his true contribution to the science underlying the project.

independent of the Constitution--most often state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The term ' 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' ' *Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699 (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). 'A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Id.* (citation omitted).' " *Ezekwo v. New York City Health & Hospitals Corp.,* 940 F.2d at 782. The assurances that the Deckers, Berlin and Wikel provided the plaintiff regarding his continuing participation in the research funded by the DOD proposal raise the plaintiff's interest to the level of a constitutionally protected property interest. "Surely, the right to guide a research project and receive funding therefor constitutes an integral part of social science scholarship." *Hamid v. John Jay,* 2000 WL 666344 at *6.

The defendants infer that the plaintiff's participation in the DOD proposal was too insignificant to garner Fourteenth Amendment protection. They mischaracterize the plaintiff's claim as being denied the opportunity to obtain the funding as a primary "Investigator". They claim there is no guarantee of that he would have received the funding if the University had supported him. Simply put, this is not the plaintiff's claim. The funding has been awarded. The

project is proceeding. The plaintiff has been excluded from participation.[17] The plaintiff does not assert that he is required to be the "Investigator" or "Co-Investigator". The plaintiff specifically states in his complaint at ¶¶'s 325, 326, that "[t]he defendants, Deckers, Berlin and Wikel, further deprived the plaintiff of his property without due process of law in violation of the Fourteenth Amendment to the United States Constitution *when they intentionally excluded the plaintiff from participating in the grant* the defendant, Wikel, submitted to the United States Department of Defense. The defendants, Deckers, Berlin and Wikel, deprived the plaintiff of his property without due process of law in violation of the Fourteenth Amendment to the United States Constitution when they intentionally misappropriated the plaintiff's intellectual property rights to the abovementioned scientific research, data, and results." (Emphasis Added).

### b. *Misappropriation of Plaintiff's Intellectual Property Rights*

In the minimum, there exist material facts in dispute concerning the following two critical issues: (1) whether the plaintiff's intellectual property formed the core of the science underlying the DOD project; *See plaintiff's responses to defendants' statement of material facts #'s 45-80; plaintiff's statement of material facts in dispute #'s 56-122; Aikens Aff. ¶¶ 6-38; Caimano Aff. ¶¶ 9-55;* and (2) whether the DOD proposal was based on the plaintiff's intellectual property and without the plaintiff's permission. *See plaintiff's responses to defendants' statement of material*

---

[17] The affidavit of Dr. Doblies refutes the assertions of the defendants that the plaintiff was not purposely excluded from the DOD research.

*facts #'s 45-80; plaintiff's statement of material facts in dispute #'s 56-122.*  Resolving all ambiguities and drawing all permissible factual inferences in favor of the plaintiff, a trier of fact could find for the plaintiff on these issues.  The assertion that neither Deckers nor Berlin could have been aware of the misappropriation of the plaintiff's property is contradicted by their September 11, 2001 communications.  They weren't interested in the science underlying the DOD proposal; they just wanted to eliminate any sign of the plaintiff's involvement.  They conceived of a plan to withdraw the proposal, obviously one on which they knew the plaintiff had participated, and resubmit the proposal in a year or more, exclusively as a Wikel proposal.  Neither Deckers nor Berlin evidenced any concern with the plaintiff's intellectual property rights.

### 2.  *Due Process Protections*

The defendants excluded the plaintiff from participating in the DOD research without notice or an opportunity to be heard[18].  The defendants halfheartedly assert that Deckers and Berlin met with the plaintiff on January 7, 2002 and discussed his non-participation in the DOD proposal.  The defendants ignore the fact that the plaintiff was not provided prior notice that his participation in the DOD research was to be discussed at the meeting.  The December 27, 2001 letter from Deckers to the plaintiff, *Exhibit 5,* fails to make any mention of the DOD research.

---

[18] The same analysis applies to the defendants' misappropriation of the plaintiff's intellectual property.

Also ignored by the defendants are the representations provided to the plaintiff at that meeting by Deckers and Berlin that he would be allowed to participate in the DOD funded research.[19]  "The pretermination process need not be elaborate or approach the level of a full adversarial evidentiary hearing, but due process does require that before being terminated such an employee be given oral or written notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story."  *Otero v. Bridgeport Housing Authority* 297 F.3d at 151.   It is indisputable, that Berlin and Deckers did not provide the plaintiff with any type of notice that his continuing participation in the DOD proposal would be under discussion.  As such, the plaintiff was not afforded due process in violation of the Fourteenth Amendment to the United States Constitution.

As discussed with reference to the plaintiff's property interest in the position of Director of the CMP, the Health Center's grievance process that does not provide for a pre-removal hearing is constitutionally inadequate.  *Ciambriello v. County of Nassau,* 292 F.3d at 323.  The application of the same balancing of interests inquiry, *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), demonstrates that the University had no paramount interest that required the plaintiff's exclusion without first giving him a hearing to discuss the matter.  There is simply no governmental interest at stake in this case that justifies the failure to

---

[19] Defendants opine that the plaintiff is seeking a forced collaboration.  It is not unusual for research on a scientific endeavor to take place in independent laboratories where the results are shared.  That was the basis of the original Wikel - Radolf collaboration, where Wikel was in Oklahoma and the plaintiff in Texas, and then Connecticut.

provide the plaintiff with notice of the charges and an explanation of the defendant's evidence prior to the plaintiff's exclusion. *Ciambriello v. County of Nassau,* 292 F.3d at 319-322. As the evidence clearly depicts, Berlin and Deckers partook in substantive discussions regarding the plaintiff's exclusion in September of 2001. Nothing prevented the Deckers or Berlin from notifying the plaintiff prior to his exclusion and conducting some form of rudimentary hearing before making his exclusion final.

3. Qualified Immunity

The legal issues involved in this matter are very clear and Berlin, Deckers and Wikel should have known that their exclusion of the plaintiff from the DOD research project without providing the plaintiff with notice or an opportunity to be heard violated the plaintiff's fundamental due process rights. *Hamid v. John Jay,* 2000 WL 666344, *7 (S.D.N.Y. 2000). Deckers and Berlin recognized as early as September 11, 2001 that the plaintiff was entitled to some type of hearing. "I think, Peter [Deckers], you and I should talk to Wikel first, then Radolf. I am at your service..." *Exhibit 35.* Also, the Health Center's own Data Ownership Policy prescribed the Wikel, Berlin and Deckers' behavior. *Exhibit 9.*

e. *Lanham Act*

The plaintiff concedes that the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.* 539 U.S. 23, 123 S.Ct. 2041 (2003), negates any claim he may formerly

have had under preexisting case law under the "origin of work" provision of the Lanham Act. Nevertheless, as noted by the Supreme Court in *Dastar Corp.*, 539 U.S. at 38, the plaintiff may still pursue a cause of action "--not for reverse passing off under the 'confusion ... as to the origin' provision of § 43(a)(1)(A), but for misrepresentation under the 'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B). The allegations of the plaintiff's complaint adequately raise such a claim.

The plaintiff asserts that Wikel, Berlin and Deckers, in the very first instance, in submitting their first proposal to the DOD, greatly diminished the plaintiff's role in the science on which the proposal was based and, at the same time, drastically overstated Wikel's importance. Thereafter, Wikel, Berlin and Deckers, rewrote the proposal excluding the plaintiff from all recognition. The Berlin, Wikel and Deckers misappropriated the plaintiff's scientific talent, which gave the proposal its necessary scientific credibility, and marketed it as belonging to Wikel. *Exhibits 35, 36; see plaintiff's responses to defendants' statement of material facts #'s 70-95.* Berlin and Deckers took their misrepresentations contained in the DOD proposal an additional step; in a letter to Jamie Kiser, Contract Specialist, U.S. Army Medical Research Acquisition Activity, dated February 10, 2003, they affirmatively made false representations concerning the plaintiff's contributions to the projects scientific underpinnings. The whole purpose of the Kiser communication, (Exhibit 10), was to cause confusion and mistakes and to

deceive others, in particular the Department of Defense, as to the plaintiff's central role in the development of the proposal and the science underlying the proposal. The Kiser communication evidences the intent of the defendants to trivialize the critical role played by the plaintiff in the development of the proposal and the science underlying the proposal. The assertion that " the older data acquired jointly by Dr. Wikel and Dr. Radolf was included under Preliminary Data...even though it was no longer relevant to the work proposal" is an untruth meant to cause confusion and mistakes and to deceive the Department of Defense. Similarly, the statement in the same letter that "[d]uring the subsequent months Dr. Wikel extended his collaboration with NIH-investigators, Drs. Ribeiro and Valenzuela, who had developed an entirely different approach to the analysis of ESTs (and in a different tick species) is likewise a misrepresentation meant to cause the same confusion and mistakes and to deceive the Department of Defense. *See plaintiff's responses to defendant's statement of material facts #'s 61-80.* It is just not credible that over a period of a mere two months all of the original data submitted with the DOD proposal would no longer be necessary because, in that short period of time, Wikel had generated new data supplanting the entire Preliminary Data section which took years to develop. (Radolf Aff. ¶ 155). The totality of the events surrounding the submission and rewriting of the DOD proposal establishes the plaintiff has been the victim of false advertisement in violation of the Lanham Act.

To state a claim for false advertising under this provision, the plaintiff must prove the following elements: (1) that defendants made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injury to the plaintiff. *Larkin Group, Inc. v. Aquatic Design Consultants, Inc.* 323 F.Supp.2d 1121, 1127 (D.Kan. 2004).

The defendants' effort to exculpate Deckers and Berlin from liability pays no heed to Deckers and Berlin's communications with each other, *Exhibit 35*, which provides substantial, if not conclusive, evidence of their intent to falsely promote the DOD proposal as an exclusive Wikel project, eradicating any evidence of the plaintiff's role as the author of the science behind the DOD proposal.  Equally, the letter to Kiser, *Exhibit 10,* is a most egregious attempt to denigrate the years of scientific accomplishment achieved by the plaintiff in this area of scientific research for the sole purpose of misrepresenting Wikel's stature to the Department of Defense.

The plaintiff has raised, in the very minimum, material issues of disputed facts that prevent the entry of summary judgment on the plaintiff's Lanham Act cause of action.  The affidavits of the plaintiff, Drs. Aikens, Caimano and Doblies fully support the plaintiff's assertion that he was the originator of the science behind the DOD proposal.  The evidence also

proves that Wikel, Berlin and Deckers falsely designated Wikel as the originator and major player in the DOD proposal, while, at the same time, diminishing plaintiff's part. Most certainly, the DOD proposal and the letter to Kiser, undoubtedly was meant to cause confusion as to the originator of the science on display in the DOD proposal. Finally, the plaintiff was excluded from all participation in the research being funded by the proposal as result of the misrepresentations of Deckers, Berlin and Wikel.

The DOD proposal, as well as the communication from Deckers and Berlin to Kiser, *Exhibit 10,* satisfy the "commercial advertising or promotion" element of a Lanham Act claim. "[W]hether representations constitute commercial advertising or promotion within the meaning of the Lanham Act depends upon whether those representations were sufficiently disseminated to the relevant purchasing public. Thus, the term "public"…appears to connote not the general public but rather the relevant purchasing public, which is consistent with holdings from other Courts of Appeals that have addressed this issue. *See, e.g., NXIVM Corp. v. Ross Institute,* 364 F.3d 471, 482 (2d Cir.2004) (observing that the touchstone of the inquiry is whether the 'representations are part of an organized campaign to penetrate the relevant market' (quotation omitted)); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 734- 35 (9th Cir.1999) (affirming a jury verdict that the defendant's representation to one client constituted dissemination to a sufficient segment of the relevant purchasing public where the evidence

showed that the relevant potential purchasers consisted of only two or possibly three institutions); *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1386 (5th Cir.1996) (affirming the district court's judgment that the defendant's sales presentation to eleven soft drink bottlers constituted commercial advertising or promotion where the relevant purchasing public consisted of seventy-four bottlers)." *Larkin Group, Inc. v. Aquatic Design Consultants, Inc.* 323 F.Supp.2d at 1128-1129. In the present case, there can be little doubt that the relevant "purchasing public" was very limited, the Department of Defense. The proposal was originated for marketing to that entity and that entity alone.

"An initial jurisdictional requirement for a section 43(a) claim is that the goods or services at issue must have an effect on interstate commerce. *Shatel Corp. v. Mao Ta Lumber and Yacht Corp., 697 F.2d 1352, 1356 (11th Cir. 1983)* ('commerce' requirement under section 43(a) includes any intrastate transaction that affects interstate commerce); *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, 214 U.S.P.Q. 409, 417 (7th Cir. 1982); Coca-Cola Co. v. Stewart, 621 F.2d 287, 290 (8th Cir. 1980)* ('Jurisdiction under the Lanham Act encompasses intrastate activity that substantially affects interstate commerce.')". *Debs v. Meliopoulos*, 1993 WL 566011, *11, (N.D.Ga. 1991). In this case, a congressional earmark was sought by the University of Connecticut Health Center with the plaintiff as the major initiator and actor. Necessarily, the efforts to obtain the earmark involved interstate commerce. Further, the

research proposals were developed at the Health Center and forwarded to Fort Detrick in

Maryland.  Deckers and Berlin's communication with Kiser, in which they minimized the

plaintiff's contributions to the proposal, was sent by mail from the Health Center in Connecticut

to Kiser in Maryland.  *Exhibit 10.*  Under these circumstances, the goods at issue in this case, the

DOD proposal, had an affect on interstate commerce.  See *Debs v. Meliopoulos*, 1993 WL at

*11, 12 ("In this case, Dr. Meliopoulos' 1981 and 1984 articles were distributed as part of the

I.E.E.E. journal throughout several states. In addition, although Dr. Meliopoulos' 1984 and 1985

EE6520 class notes were distributed only at Georgia Tech, his students could reasonably be

expected to obtain employment in other states and utilize the information contained in these

notes.  It is also reasonable to expect that Dr. Meliopoulos would be asked to travel out of state

on a consulting basis as a result of his students' exposure to the EE6520 class notes.

Accordingly, the court finds that the goods at issue in this litigation, Dr. Meliopoulos' 1981 and

1984 article and his 1984 and 1985 EE6520 class notes, have an effect on interstate commerce.

Plaintiff's unfair competition claim therefore meets the interstate commerce requirement under

section 43 (a).").

  The plaintiff's request for relief, despite the contentions advanced by the defendants, is

not moot.  The plaintiff is not seeking to have his name placed on the grant; he is seeking to

participate in the research funded by the grant.  Further, his request for monetary relief is not

limited to the defendants in their official capacities. The defendants have been sued in both their individual and official capacities; injunctive relief is appropriate against the defendants in their official capacities, and monetary damages are authorized against the defendants, Wikel, Berlin and Deckers, in their individual capacities.

### f. Connecticut Unfair Trade Practices Act

"Connecticut General Statutes § 35-51(d) defines a trade secret as: 'information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.' The three part statutory test for the definition of a trade secret therefore requires that the information: (1) be of the kind included in the nonexhaustive list contained in the statute; (2) be 'of independent economic value'; and (3) 'was the subject of reasonable efforts to maintain its secrecy'. *Elm City Cheese Co., Inc., v. Federico,* 251 Conn. 59, 78, 752 A.2d 1037 (1999). An alleged trade secret is not deprived of trade secret status simply because it is comprised of materials that are 'common [and] commercially available.' *Elm City Cheese Co., Inc., v. Federico,* 251 Conn. 59, 74, 752 A.2d 1037. Rather, a 'plaintiff's ability to combine these elements into a successful

process, like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection.' *Elm City Cheese Co., Inc., v. Federico,* 251 Conn. 59, 75, 752 A.2d 1037. Finally, and more importantly for purposes of this motion, whether a particular piece of information is a 'trade secret,' is a question of fact. *See Elm City Cheese Co., Inc., v. Federico,* 251 Conn. 59, 68, 752 A.2d 1037 (1999)." *Dreamcatcher Software Development, LLC v. Pop Warner Little Scholars, Inc.* 298 F.Supp.2d 276, 289(D.Conn. 2004).

        The evidence submitted by the plaintiff in the form of his testimony, his affidavit, the affidavits of Drs. Caimano, Aikens and Doblies, results in issues of material fact being legitimately disputed precluding the entry of summary judgment. The defendants argue that the information that was included in the DOD proposal, without the plaintiff's permission, was "generally known". However, the "ingredients" may have been known, but the body of findings from the research was not common knowledge. Otherwise, Wikel would not have had to violate the University's Data Ownership Policy by including admittedly jointly owned property in the proposal. As pointed out by the affidavits of the plaintiff and Dr. Caimano, the findings of the "UCHC internal investigative committee" are themselves suspect. Dr. Caimano, in her own right, an expert in the field of the pathogenesis of arthropod-borne infections, particularly Lyme disease, with extensive experience working with *Borrelia burgdorferi*, the Lyme disease spirochete, and *Ixodes scapularis*, the tick vector that transmits Lyme disease, disproves the

findings of the investigative committee.  In particular, she refutes the assertions that "jointly owned data was only used in the preliminary section" of the proposal, "that the data was used for illustrative purposes and did not form a major component of the project, and that the DoD grant was utilizing[20] and moving beyond the technology of the former Radolf collaboration."  *(See plaintiff's responses to defendants statement of material facts #'s 42-113; see plaintiff's statement of disputed material facts #'s 56-91, 96-122; Caimano Aff. ¶¶ 8-52; Aikens Aff. ¶¶ 7-33).*

In apparent recognition that summary judgment is not appropriate on the liability aspect of the CUTSA claim, the defendants mistakenly assert that the plaintiff is not entitled to any relief even it he profess a violation of the statute.  The defendant offhandedly asserts that with regard to injunctive relief the plaintiff cannot show irreparable harm.  However, the plaintiff and his laboratory have been denied participation, not by the DOD, but by Wikel, Berlin and Deckers, in the research that is being funded by the DOD.  One of the reasons for this exclusion is that the plaintiff has no ownership interest in the science that Wikel is employing.  The plaintiff is entitled to mandatory injunctive relief pursuant to the provisions of Connecticut General Statutes § 35-53(a) to prohibit the continued use of the plaintiff's intellectual property.  The assertion of the defendant that Deckers has already barred such use is not true in light of the

---

[20] Plaintiff assumes that the defendants meant to say that the DoD grant was *not* utilizing …the technology of the Radolf collaboration.  Otherwise, the plaintiff would agree with the statement.

facts that establish that jointly owned property had previously been used and is still being used in the research that is being funded by the DOD.

Additionally, the defendants' argument that to be entitled to monetary damages, the plaintiff is required to prove "that he should have and would have been awarded the proposal" is similarly erroneous; the plaintiff needs only to show that he would have participated in the research funded by the grant. The plaintiff has not made any claim that he should have been awarded the DOD grant; he only charges that the defendant is employing the science in which he has, in the least, a co-ownership interest. As such, the only way the defendant can continue the research is through the plaintiff's participation or with the plaintiff's permission to the use of his intellectual property.

Underlying the defendants' argument is the rather naïve notion that Wikel should be allowed to conduct his research with whomever he decides. The plaintiff disputes this contention. In Wikel's ongoing research activities, he cannot unilaterally ignore his past collaborations with the plaintiff and simply use, unfettered, the results of the collaborations. If he chooses to proceed without the participation of the plaintiff, he then must forego the use of the science that developed from their collaborations.

       *g.   Retaliation in Violation of the Plaintiff's First Amendment Right to Freedom of Speech*

The facts regarding the complaint filed against him by Wikel demonstrates that it was only filed after a contentious dispute, with the plaintiff on one side and Wikel and Berlin on the other, over the unauthorized encumbrancing of the plaintiff's federally funded grants, had been resolved in the plaintiff's favor. The facts relating to this dispute have been fully discussed in the *Background* section of this memorandum. The following facts bear repeating. Wikel only raised an allegation of possible fraudulent conduct after the encumbrances of the plaintiff's federal funds had been reversed. Berlin and Wikel strongly opposed the reversal of the encumbrances. Wikel misrepresented in his complaint the information that was contained in the plaintiff's grant proposals, transfers, renewals and progress reports regarding the role Bourell played in the research funded by the grants. Between the initial meeting in January of 2002, in which Berlin, Wikel and Gillon were in attendance in which the decision to move Bourell from state funds to grant funds was made, *(Gillon Tr. 7-9),* and August of 2002, when Wikel complained to Wetstone, no claims of fraud or misrepresentation or the like were raised by Wikel or anyone else. *(Gillon Tr. 11-14).* During this period of time, Wikel authored a number of emails on the Bourell matter, none of which raised any assertion that the plaintiff was involved in wrongful conduct, let alone, fraudulent behavior. *(Exhibit 15; Exhibit 16; Exhibit 17; Exhibit 20).* Wikel, in fact, signed off on an "Assignment Authorization" permitting the unlawful encumbrance of federal grant monies for the payment of Bourell's salary in excess of

Bourell's time and effort without raising any claim that the percentages employed to determine

the payment were untrue *(Exhibit 14; Gillon Tr. 12-14, 25)*.  It was only after the encumbered

funds were paid back to the grant, did Wikel advance a complaint against the plaintiff alleging

that the plaintiff had committed fraud with regard to his federal grants.  *(Wetstone Tr. 10, 11)*.

Wikel only started monitoring Bourell's activities after the Bourell issue first surfaced in January

or February of 2002.  Wikel had no way of knowing the actual time and effort that Bourell

expended on the plaintiff's NIH-funded research prior to the time when he began these covert

monitoring activities.  *(Radolf Aff. ¶¶ 120, 124; Exhibit 15)*.  Wikel, therefore, had no basis to

raise any concerns regarding Bourell's work effort prior to that time.  Thus, his averment that he

complained about possible fraud as early as February, 2002 is not credible.  Additionally, no

other witness has corroborated Wikel's claim that he raised a concern over fraudulent conduct in

February of 2002.

     The allegations documented by the Compliance Office include two blatantly false claims:

"…(2) It appeared to the complainant that Kenneth Bourell hasn't worked on either of the grants

in question nor filed T&E reports[21].  (3) Complainant has copies of purportedly 'fraudulent'

progress reports that Dr. Justin Radolf sent to government stating that Kenneth Bourell has been

working on these grants." *Exhibit 30.*   Similarly, Wetstone documented Wikel's complaints as

---

[21] Wikel stated that on the basis of his monitoring of Bourell's activities, Bourell was working approximately 10% of his time on the plaintiff's grants.  *Exhibit 15.*  Nevertheless, he lodged a complaint against the plaintiff asserting that Bourell did not work on the plaintiff's grants.

including … (3) I believe you told me that Justin's progress reports indicate that Ken was working on his grants, but that the effort reported on the progress report did not match those on the T&E reports[22] or in fact what his actual effort was.  If I understood you correctly, these progress reports constitutes a fraudulent report.  Based on your past experience, such incorrect reporting can be a very serious matter.  Please let me know if I understood your concern correctly.  If I did, this matter will require investigation, either by you as the Center director or by other auditors.  (4) I believe you told me that Justin's grant applications included Ken in the budget but that once funded he was not used at such levels.  Dave has told me that changes in the personnel portion of a grant budget are the prerogative of the PI and that such a change from planning (the proposal) to operations (the actual work) are allowable by the grant sponsor.  Therefore, this mismatch of allocated FTE doesn't represent a problem." *Exhibit 22.*  Wikel misrepresented the contents of the progress reports and grant renewals in which he claimed the plaintiff listed Bourell as a major contributor to the scientific research being funded by the Radolf grants.  In truth, Bourell was never mentioned in the progress reports and there were no statements in the progress reports regarding the work Bourell performed on the grants.  Bourell was properly included in the grants based on estimates when the transfers were submitted to the

---

[22] As discussed subsequently, there were no T&E reports done for the years 2000 and 2001.  *Exhibit 19.*

NIH.  There was nothing fraudulent with regard to the grant documents and Bourell's grant activities. *(Radolf Aff. ¶¶ 113, 128, 135, 136, 139).*

Gillon could have encumbered the funds in consultation with the plaintiff any time between February, 2002 and June 30, 2002.  There was no reason that he had to encumber the funds at the last possible date in June of 2002, and sign off on plaintiff's behalf because plaintiff was unavailable.  The excuse offered by the defendants that Gillon signed off on the authorization because the plaintiff was out of town implies that no means existed for Ms. Young, Wikel, or Gillon to contact the plaintiff to ascertain whether he was in agreement with this action and to obtain, at the very least, a verbal authorization (no less faxing the form for his signature).  This assertion also implies that whenever an investigator is out of town, University officials can encumber monies from his/her NIH grants based on their perception of budgetary exigencies.  The NIH and federal regulations provide that "[c]ompensation costs are allowable to the extent that they are reasonable; conform to the established policy of the organization consistently applied regardless of the source of funds; and *reflect no more than the percentage of time actually devoted to the NIH-funded project*."  (Emphasis supplied).[23]

The timing of the Wikel complaint demonstrates that it was retaliatory in nature.  Despite the efforts by the defendants to ascribe a much earlier date to the Wikel complaint, the irrefutable

---

[23] See NIH Grants Policy Statement   (03/01), Part II: Terms and Conditions of NIH Grant Awards, Subpart A: General -- Part 4 of 7.

evidence establishes that the Wikel complaint was not generated until September of 2002. Deckers in a letter to the ORI dated September 12, 2002, *Exhibit 26,* confirms the timing of te complaint. He states "[p]lease be advised that our Compliance Office *has recently received* an allegation concerning Dr. Radolf. This allegation concerns whether Dr. Radolf has misrepresented the percentage of effort of a research associate on one or more NIH grant proposals, progress reports for funded grants, and/or time and effort reports for funded grants."

The chronology of events culminating with Deckers' letters clearly shows that the Wikel complaint had its genesis in illegal retaliation. The actions of the University of Connecticut Health Center officials, including the defendants, Berlin and Wikel, demonstrate duplicity on their part to circumvent the regulations and policies of the NIH that necessitate salary payments from NIH grants be fully justified on the basis of "time and effort" documentation. A series of email communications clearly shows the efforts taken by University of Connecticut Health Center to evade the regulations and policies of the NIH. The first indication of these improper efforts surfaced in an email dated February 27, 2002, *Exhibit 19,* from Ms. Young to Gillon identifying "Dr. Radolf's two NIH awards which listed Mr. Bourell for salary support[24]." This

---

[24] Any attempt to fault plaintiff for the failure to file T&E reports is rebutted by Ms. Young's statement, "After consultation with Mary Rydingsward last year, electronic Time and Effort reports were not filed for years 2000 and 2001 because he was paid exclusively on a ledger 2 [state funds] account." It cannot be disputed that Ms. Rydingsward is employed in Gillon's office. This email also demonstrates the falseness of the Wikel allegation that "the effort reported on the progress report did not match those on the T&E reports …" As Young confirms, there were no T&E reports for the relevant time frame.

email was sent at the request of Wikel, who shortly thereafter began monitoring Mr. Bourell's

research activities on behalf of the plaintiff.  *Exhibit 15.*  The plaintiff's initial objection, *Exhibit*

*15,* to the amount of the encumbrances spawned a series of email communications between

University of Connecticut Health Center officials that clearly spell out the attempts of the

defendant, Berlin, to deliberately circumvent the NIH regulations.  Even after being informed

that the records of the defendant, Wikel, agreed with the plaintiff's estimate which showed

Bourell devoting approximately only 10% effort during 2002, the defendant, Berlin, insisted that

a substantially higher percentage be used.  *Exhibit 16.*  He insisted that the responsible official,

Gillon, "wave your wand" and somehow magically turn 10% into 50%.  *Exhibits 17, 18.*  After

Gillon acceded to the correctness of the plaintiff's position, subsequent communications between

officials of the University of Connecticut Health Center depict a malicious effort to punish the

plaintiff solely because he voiced opposition to their unlawful raid on the NIH grant funds.  After

Gillon agreed with the plaintiff that no more than 10% of Bourell's salary should be paid from

federal grant funds, it became apparent to Wikel, who now headed the Center for Microbial

Pathogenesis, that he would have to identify additional funding sources to cover the remainder of

Bourell's salary.  *(Exhibit 20).*  Despite the claims in his affidavit to the contrary, it was at this

time that Wikel first raised with Westone the spurious allegation of fraudulent conduct on the

part of the plaintiff.  The deposition testimony of both Berlin and Gillon fail to support Wikel's

claim that he raised an issue of fraudulent reporting at any time prior to August of 2002. *(Berlin Tr. 32; Gillon Tr. 9, 13, 14, 31, 32, 38).* And it was clearly out of his "frustration" with the results of the Gillon and Radolf resolution of the Bourell funding issue that spurred him to action. *(Wetstone Tr. 10, 11).* Wikel had been supportive of the Berlin discredited and illegal approach to the matter. *(Exhibit 17).*

Communications between Scott L. Wetstone, M.D., Director – Health Affairs Policy Planning and Gillon, Wikel, Berlin and Deckers map out a scheme to falsely accuse the plaintiff of fraudulently preparing and submitting progress reports concerning his two NIH grants. *Exhibits 20-29.* Deckers was involved from the very start in directing the illicit activities of Berlin, Wetstone, Gillon and Wikel in trumping up charges against the plaintiff. Deckers testified under oath at his deposition that, other than assembling a committee to review Wikel's charges, he played no role in the compliance complaint filed by the defendants against the plaintiff. He was forced to recant his testimony in view of the documentary evidence establishing his direct involvement in the drafting the complaint and spurring the investigation of the plaintiff. *(Deckers Tr. 37, 40, 47).* Deckers played an instrumental role, directly and indirectly via his subordinate, Wetstone, in moving this false allegation forward. Emails from Deckers, in which he explicitly requested that Wetstone draft a complaint for his review and approval, unquestionably establish his complicity. *(Exhibits 21-29).*

There can be little doubt that the plaintiff's determined opposition, both in verbal and written communications, to the defendants' unlawful conduct and his insistence that the defendants adhere to the legal mandates of the NIH policy and federal regulations resulted in Wikel, supported by Deckers, filing the complaint on which the defendants initiated their investigation of the plaintiff for fraudulent misconduct. "From my conversation with Justin I doubt that either he or Ken would sign off on T&E that reflects more than 10% effort." *Exhibit 17.* The defendants have abused and made a perversion of the Compliance Office policies in an unjustified and illegal manner. The complaint against the plaintiff and the resulting investigation is clearly a subterfuge to retaliate against the plaintiff as a result of his resolve that the defendants adhere to the mandates of federal grant policy.

The communications of the plaintiff included his verbal and written opposition to the actions of the defendant in wrongfully encumbering two federal grants for the payment of a research associates salary. Upon learning that the defendants had inappropriately encumbered the grants in June of 2002, the plaintiff had a series of telephone conferences with Gillon, the School of Medicine's Financial Officer, in which the plaintiff asserted that the actions of the defendants had violated well-established federal policy and regulations. The plaintiff insisted that the encumbrances be adjusted to reflect, pursuant to federal policy and regulation, the actual time and effort Bourell had devoted to the grant projects. A series of email communications by

and between the plaintiff and Gillon; Gillon and Berlin; Wikel and Berlin; Gillon and Wikel and Berlin; and Berlin and Gillon and Wikel *(Exhibit 16-20, 24, 33)* unmistakably reveals the efforts taken by the plaintiff to challenge the defendant's violation of federal policy and the defendants' labors to contrary.  In an email to Gillon on July 1, 2002, the plaintiff indicated the Bourell's grant work was far less than the level the defendants had assessed the grants.  Gillon reported this communication to Berlin, who expressed in an email dated July 2, 2002, the opinion that the grants should be charged for what the percentage of effort that was estimated by the plaintiff when he prepared the grant application.  "Then, I think those are the percentages we should use. If Justin [plaintiff] didn't actually gain those services, that's his failure…"  Wikel, in an email of that same date responded, "I agree with your assessment".  However, Gillon replied to Berlin on July 2, 2002, "I am not sure that I agree with the assessment.  Just because the funds are available on the Grant account does not mean that we can use the dollars to support Ken's [Bourell] salary.  We have to document the time that is devoted to the project.  As I see it, Justin has indicated 10% effort and Steve [Wikel] has confirmed that for at least a portion of the time period.  From the information I see and my conversation with Justin [plaintiff] *I doubt that either he or Ken would sign of on T&E that reflects more than 10% effort.*  Please let me know if I am missing something with my interpretation.  (Emphasis added).  Berlin's response evidences his wrongful attempt to circumvent federal grant policy.  He writes Gillon at the conclusion of the

emails, "Dave, you are the account wizard, so I can only register an opinion.  To reemphasize: a 25 or 50% commitment was indicated in the grant application, and presumably used to justify that part of the funding (whether it was folded into a block grant or not).  To measure Ken's commitment solely on the basis of hours that could be accounted for in actually performing an experiment is unreasonable.  There is frequently 'wasted time' for everyone.  Further, the scheduling of the experiments might have prevented Ken from performing other tasks.  Finally, would one want to accept Justin's [plaintiff's] word that his accounting includes all activities?  To avoid a detailed examination of these issues may not be worth the trouble.  *But…the indicated time should be taken as the measure of effort unless it was declared otherwise in the grant, at least in my opinion.  **Wizard wave your wand***!"  (Emphasis added).  In spite of Berlin's furtive attempts to circumvent federal grant mandates, an agreement was reached on August 2, 2002, as a result of the plaintiff's determination, between the plaintiff, Berlin and Gillon, whereby the defendants acceded to the plaintiff's insistence that the defendants adhere to federal grant policy and regulations.  (See *Exhibit 20.*)

However, on the heels of this agreement, the defendants embarked on a course of malicious conduct with the intent to cause harm to the plaintiff because of the plaintiff's determined opposition to their efforts to fraudulently assess two federal grants for the payment of a research associates salary, knowing full well that the salary was not an eligible grant expense.

The contours of this plot are demonstrated in a second set of emails between these University officials, which were orchestrated by Deckers and Wetstone. *(See Exhibit 20 -30).* On August 9, 2002, Wetstone, after an apparent conversation with Wikel, who obviously was discontented after the plaintiff had prevailed over the defendants, *Wetstone Tr. 10, 11,* laid the groundwork for the attack on the plaintiff. Wetstone then wrote Deckers, whose hand is revealed in this scheme, "Earlier this week I told you that Steve Wikel had alerted me to several potential compliance issues regarding Dr. Radolf related to the employment of Ken Bourell. Given that Steve's initial descriptions were vague and *on your advice,* I then discussed the matter with Dave Gillon. Dave and I agreed I should send Steve the email below in order to clarify the situation. Steve just called to confirm my understanding of the situation, especially noting items 3 and 4. Further, Steve says he has copies of Justin's non-competitive renewal (under lock and key) and these reports continue to list Ken as a major contributor to the grants…I believe we need to conduct a formal investigation into this matter…" *Exhibit 21* (Emphasis added). On August 12, 2002, Wetstone then called a meeting with the defendants, Berlin and Wikel, and Gillon to plot their strategy for the attack they planned to make on the plaintiff. He asserted his authority by stating, "Peter [Deckers] has asked me to arrange a meeting next week (those in the TO list and Peter [Deckers]) in order to discuss the matter below. The *objective* of this meeting is to clarify the issues and to be sure we have a mutual understanding of the situation. It is also to perform a

preliminary assessment of the data that suggests problems we must investigate.  To the latter point, I am asking Steve and Dave to bring copies of the data at hand.  Please let me know how much time you will need to prepare what you have.  (Note – we are not looking for all the possible data, recognizing that might take more significant time and further investigation, but enough to clarify we have sufficient reason to start a more formal process."  And Deckers hovered over the proceedings directing and manipulating Wetstone, Wikel, Berlin and Gillon. "Get with Steve Wikel and write a formal complaint for me…'  *Exhibit 21.  See also Exhibits 24-27 evidencing Deckers manipulation of the Compliance Office's recommendation that he inform the ORI of the latest complaint against the plaintiff.*

### 1.  Public Concern

The plaintiff's communications in which he voiced his opposition to the defendants' violation of NIH policy and regulations is clearly conduct protected under the provisions of the First Amendment to the United States Constitution.  The plaintiff most assuredly charged the defendants with more than simply being unfair in the manner in which it had encumbered the federal grants.  As evidenced by the plaintiff's allegation of improper conduct and the defendants' reaction to it, the parties were all aware that they were dealing with a violation of federal policy.  See *Vasbinder v. Ambach,* 926 F.2d at 1336, ("On May 24-25, 1982, Vasbinder represented OVR in a joint state-and-federal review of a grant given by a federally funded

program called Projects with Industry ("Project").  The review was conducted to audit the use of

Project moneys given to the International Center for the Disabled ("ICD"), a rehabilitation

facility that accepted client referrals from OVR.  In the course of this review, Vasbinder

discovered several practices that appeared to him to be improper, if not unlawful.  It appeared

that there were overcharges and duplicative billing and that an effort had been made to code the

billing in a way that would mask the improprieties.  In particular, Vasbinder testified that in

many of the files he examined, there appeared three vouchers for placement of one individual; in

addition, the amount of each voucher, $ 900+, was higher than OVR would usually pay; and

though the vouchers were coded as requests for reimbursement for training rather than for

placement, one of the recipient organizations was not devoted to training the handicapped but

was merely an employment agency.  Vasbinder was also aware that both the founder and the

director of that employment agency had long-time personal relationships with Switzer; he had

heard Switzer refer to one of them frequently as his 'protégé'… the matters of which Vasbinder

spoke, *i.e.*, potential fraud, theft, and misallocation of public funds, were matters of serious

public concern.").  See also *Hale v. Mann,* 219 F.3d 61, 71 (2d Cir. 2000) ("A trier of fact could

conclude that [the plaintiff] voiced these concerns to management directly and via his

submission of the Langbein report to the Commission.  Although Mann assigned to Hale the task

of preparing the report, and Hale delegated the task to Langbein, Hale may have adopted the

Langbein report as his own.  A jury could find that by forwarding the unaltered report, Hale

endorsed the views expressed in it and thereby engaged in independent expression.  In support of

this position, there is evidence that Hale forwarded the Langbein report by a transmittal letter

over his signature to Mann (and to the Commission) precisely because he wanted to influence

OCFS policy…  Next, we address whether the report, if adopted by Hale, addressed a matter of

public concern.  Although the district court answered this question in the negative, we find that

determination erroneous.  We conclude that as a matter of law, the report addressed a matter of

public concern: the proper administration of State facilities for the incarceration of juveniles.

See *Morris, 196 F.3d at 110* ('As a general rule, speech on 'any matter of political, social, or

other concern to the community' is protected by the First Amendment.')  (quoting *Connick,* 461

U.S. at 146)*; Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130 (2d Cir. 1999)

(contacting OTB Inspector General about alleged improprieties at OTB); *Lewis v. Cowen,* 165

F.3d 154 (2d Cir.), cert. denied, 145 L. Ed. 2d 60, 120 S. Ct. 70 (1999) (objections to new lottery

policies voiced to Connecticut Gaming Policy Board by lottery official); *Blum v. Schlegel,* 18

F.3d 1005, 1012 (2d Cir. 1994) ("speech advocating the legalization of marijuana, criticizing

national drug control policy, and debating civil disobedience on its face implicates matters of

public concern"); *Bieluch v. Sullivan,* 999 F.2d 666, 671 (2d Cir. 1993) (Defendant's 'speech

concerned tax expenditures, town budgets, school construction, and the right to petition for

referenda--matters of utmost public concern.'))".  And see *Charvat v. Eastern Ohio Regional Wastewater Authority,* 246 F.3d 607, 617, 618 (6th Cir. 2001) ("The defendants interpret this statement from *Connick* expansively by arguing that regardless of the substance of Charvat's speech, it can never be deemed to be of public concern because Charvat was an employee of EORWA, not a private citizen, when he voiced his criticism of EORWA's noncompliance with the environmental regulations.  We disagree.  The First Amendment protects speech on matters of public concern made by public employees in their role as employees, even if their speech is not communicated to the public.  See *Chappel v. Montgomery Fire Prot. Dist. No. 1,* 131 F.3d 564, 579 (6th Cir. 1997) ('Constitutional protection for speech on matters of public concern is not premised on the communication of that speech to the public. ...  To the extent, then, that [the § 1983 plaintiff] spoke with individual board members about these important matters, we conclude that [he] spoke on matters of public concern.').  Characterizing Charvat's speech as regarding only personnel issues and internal operations is disingenuous at best. Charvat's reports about the sewage-treatment facility's violation of a number of environmental regulations, when analyzed for their "content, form, and context," *Connick,* 461 U.S. at 147-48*,* are a perfect example of protected speech that is designed to increase the awareness of regulatory violations and potential threats to the public health and safety of the community. This court has declared that the "public interest is near its zenith when ensuring that public organizations are being

operated in accordance with the law." *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir. 1986).)";

and see *Dangler v. New York City Off Track Betting Corporation*, 193 F.3d 130, 140 (2d Cir.

1999) ("In the present case, the complaint alleged that Dangler accused high-level OTB officials

of improper and corrupt behavior.  There can be no question that Dangler's speech therefore

implicated particularly strong First Amendment interests.")

### 2.  *Adverse Employment Action*

"When a government employee exercises his protected right of free expression, the

government cannot use the employment relationship as a means to retaliate for that expression.

The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation

cases.   The goal is to prevent, or redress, actions by a government employer that 'chill the

exercise of protected' First Amendment rights. *See   Rutan v. Republican Party,* 497 U.S. 62, 73,

111 L. Ed. 2d 52, 110 S. Ct. 2729 (1990).  The definition of "adverse employment action" is less

restrictive than that which the defendants would seek to have this Court adopt.  See *Morris v.

Landau*, 196 F.3d 102, 110 (2d Cir. 1999) ("Adverse employment actions include discharge,

refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. See *Kaluczky v.

City of White Plains,* 57 F.3d 202, 208 (2d Cir. 1995) (citing *Rutan v. Republican Party*, 497

U.S. 62, 75, 111 L. Ed. 2d 52, 110 S. Ct. 2729 (1990)).  "[A]dverse employment actions may

include negative evaluation letters, express accusations of lying, assignment of lunchroom duty,

reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Bernheim v. Litt*, 79 F.3d 318, 324-26 (2d Cir. 1996). See also, *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002) ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand…*We also have held that lesser actions may meet the adversity threshold, but we have not explicitly defined what quantum of lesser actions constitutes an adverse employment action*.") (Internal citations and quotations omitted) (Emphasis added). See also *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003) ("To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden. In *Allen v. Scribner*, the plaintiff alleged that he had been 'reassigned to another position, and otherwise harassed in retaliation for ... remarks he made to the press.' *812 F.2d at 428.* We found this allegation sufficient to form the basis of a First Amendment claim. In *Thomas v. Carpenter, 881 F.2d 828, 829 (9th Cir. 1989),* the plaintiff alleged that he had been banned from attending certain meetings and participating as an evaluator in training exercises in retaliation for his political activity. We found this allegation sufficient. In *Ulrich v. City and County of San Francisco, 308 F.3d 968 at 977,* the plaintiff alleged that his government

employer had subjected him to an investigation, refused to rescind his resignation, and filed an adverse employment report in retaliation for his protected speech. Again, we found that his allegation was sufficient to state a § 1983 claim seeking redress for violation of First Amendment rights. In *Anderson v. Central Point School District, 746 F.2d 505, 506 (9th Cir. 1984),* the plaintiff alleged that he had been temporarily suspended from his coaching duties and insulted by his employer. We allowed the plaintiff to recover under the First Amendment for emotional distress and damage to his reputation. Our findings in these cases were not dependent on any characterization of the government action as a denial of a valuable governmental benefit or privilege. As we stated in *Carpenter*, the relevant inquiry is whether the state had taken 'action designed to retaliate against and chill political expression.' *881 F.2d at 829* (quoting *Gibson v. United States, 781 F.2d 1334, 1338 (9th Cir. 1986)).* Or, as we had earlier stated in *Allen*, the inquiry is whether 'the exercise of the first amendment rights was deterred' by the government employer's action. *812 F.2d at 434 n.17."*)

In the present case the plaintiff has been subjected to allegations of fraudulent conduct which has resulted in a groundless investigation by the defendant. The allegation of fraudulent conduct and the resulting investigation comprise an adverse employment action because the clear intent by those filing the complaint was to punish the plaintiff for exercising his First Amendment rights. Not content with the internal investigation of the plaintiff, Deckers informed

the ORI of this fallacious allegation.  The reporting of the allegation brought by the defendants against the plaintiff to the attention of the ORI under the circumstances of the present case, where the defendants had not taken any preliminary steps to assess the truthfulness of the allegations, and where the plaintiff is under investigation by the ORI on a completely unrelated matter, constitutes, in and of itself, an adverse employment action.  This conclusion is reinforced by the fact that the defendants were aware that the ORI did not have any jurisdiction over allegations of this type.  *Exhibit 44.*  Deckers obviously sought to intrude in the ORI process to the plaintiff's detriment.[25]

Second, the reporting of this allegation by Deckers to the Office of Research Integrity ("ORI") without even a perfunctory assessment of its veracity is further evidence of wrongful retaliation, and is most certainly an adverse employment action.  Just as a disciplinary warning and an internal affairs investigation suffice as adverse employment actions, Deckers' letter to the ORI most certainly meets that standard.  It was on September 12, 2002 that Deckers, informed the ORI that the Compliance Office had received an allegation concerning the plaintiff.  This was two weeks before the plaintiff received his first notification of the allegation.  The letter Deckers sent to the ORI on September 12, 2002 states that as of September 12, 2002 "[t]he Compliance Office believes the allegations are sufficiently credible to initiate a formal investigation.  This

---

[25] It is reasonable to infer that the information supplied to the ORI would not be of benefit to the plaintiff, who was concluding a voluntary settlement of the charge that he had committed research misconduct.  *Exhibit 32.*

investigation will commence immediately…"  If such was the case, one would believe that the

plaintiff would have been notified at the same time of Deckers' notification to the ORI.  What

Deckers fails to explain is the manner in which he became aware of the complaint filed with the

Compliance Office, which had to be sometime prior to September 12, 2002[26].  The Compliance

Office protocol makes no provision for the initial reporting of complaints to the Executive Vice

President of the University of Connecticut Health Center, Deckers.  Obviously, Deckers, was

able to communicate information regarding the receipt by the Compliance Office of an allegation

of misconduct against the plaintiff, well before the plaintiff was notified of the allegation,

because Deckers, as the evidence plainly demonstrated,  plotted with the other defendants to file

the complaint in the first place.

"It should be noted that, if initiated for an illegal purpose, the investigation itself is

actionable; the plaintiffs need prove no further adverse employment action.  *See Hetzel v. County

of Prince William,* 89 F.3d 169, 171 (4th Cir.1996) (noting that internal affairs investigation

itself constitutes 'adverse employment action,' depriving employee of a 'valuable government

benefit' under *Huang v. Bd. of Governors,* 902 F.2d 1134, 1140 (4th Cir.1990), and treating such

investigation as actionable under § 1983); *see also Allen v. Iranon,* 283 F.3d 1070, 1076 (9th

Cir.2002) (discussing internal affairs investigations as among 'adverse employment actions' that

---

[26] Deckers, in fact, directed the drafting of the complaint and its filing with the Compliance Office.

could ground § 1983 liability); *Rakovich v. Wade,* 819 F.2d 1393, 1397 (7th Cir.1987) (holding

that investigation undertaken in retaliation for exercise of constitutionally protected rights is

actionable under § 1983), *vacated on issue of damages on reh'g,* 850 F.2d 1180 (7th Cir.1988)."

*Williams v. Hansen,* 326 F.3d 569, 585 (4th Cir. 2003). *See also Mulhall v. F.B.I.* 1999 WL

33756650, *6 (W.D.Ky. 1999) ("We conclude that the steps taken by the FBI to bring its

suspicions of fraud to the attention of JCPD constituted an adverse employment action.").

### 3. Causal Connection

The plaintiff's opposition to the wrongful encumbrances, the discussions between the

plaintiff and Gillon and Berlin to reverse the encumbrances, and the Wikel complaint are a series

of interrelated events. The complaint against the plaintiff was triggered by the reversal of the

encumbrances. A complaint did not exist until the misappropriated funds were restored to the

plaintiff's grants. Prior to the restoration of the grant funds, there simply is no evidence that

there was even the remotest contemplation of filing a complaint against the plaintiff. A trier of

fact could reasonably conclude that the complaint against the plaintiff was brought about by his

objection to the illegal tapping of his grant funds to pay Bourell's salary.

In the same vein, the time that elapsed between the plaintiff voicing his opposition to the

encumbrances and the filing of the complaint is sufficient to prove the causal connection

between the two events. The proximity in time between protected speech and adverse actions

can provide a basis for a jury to conclude that retaliation was the substantial or motivating factor behind the action.  When the plaintiff offers no other evidence that retaliation was the substantial or motivating factor, the temporal proximity must be close.  *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).  "Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation.  As we recently held in another § 1983 Fist Amendment employer retaliation case, "[A]n eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory." *Allen v. Iranon,* 283 F.3d 1070, 1078 (9th Cir.2002)."  *Coszalter v. City of Salem*  320 F.3d 968, *977 (9th Cir. 2003).

> *h.  Sixth Cause of Action - Public Policy of the United States and Tortious Interference*

As the plaintiff's prayer for relief amply demonstrates, the plaintiff has not sought any relief against Connecticut or any arm of Connecticut.  His prayer for relief is limited to the defendants, Berlin and Deckers; both are subject to this Court's equitable power to impose prospective injunctive relief as well as to impose monetary damages on the defendants, Deckers and Berlin, in their individual capacities.  Therefore, sovereign immunity does not impose a defense to the plaintiff's cause of action.

The disputed material facts if determined in favor of the plaintiff would allow a trier of fact to find for the plaintiff on his cause of action for tortious interference against Berlin and

Deckers[27].  "A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2)  the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct."  *Appleton v. Board of Education of the Town of Stonington,* 254 Conn. 205, 212, 213 (2000).  The plaintiff has submitted admissible evidence on the essential elements for proving a case of tortious interference.  Therefore, summary judgment is inappropriate.

> *i.    Seventh Cause of Action - Tortious Interference with Professional Opportunities*

The plaintiff's prayer for relief is limited to the defendant, Wikel; he is subject to this Court's jurisdiction to impose monetary damages on him in his individual capacity.  Therefore, sovereign immunity does not impose a defense to the plaintiff's cause of action as to Wikel in his individual capacity.

Further, as with the preceding discussion, there does exist disputed material facts if found in the plaintiff's favor could result in a judgment on this cause of action in his favor.  Thus, summary judgment is not appropriate.

> *III.    Conclusion*

---

[27] Since it appears that the investigation has been concluded, the plaintiff agrees his request for injunctive relief is moot.

The defendants, in its summation, propose a previous unheard legal rubric as controlling the determination of the issues in this case. They recite "a professor cannot be found guilty of scientific fraud both by the university at which he is employed and the federal government, and then complain when his employer retains him on staff to deal with the repercussions of that behavior". What goes unrecognized in this modern rule of law engendered by the defendants out of the rarefied air of academia is that the provisions of the Constitution trump its application. In dealing with the repercussions of the plaintiff's conduct, the defendants have obviously forgot that the rule of law, including the protections of the Constitution, still apply to their actions. Admitting to research misconduct dose not bring with it a forfeiture of the plaintiff's legal rights.

In truth, the plaintiff's misconduct is completely irrelevant to the present proceedings. The plaintiff had received the corrective action imposed by Deckers in August of 2001. The voluntary agreement with the ORI was not finalized until March of 2003. The actions of the defendants of which the plaintiff complains all took place before the voluntary agreement had been concluded. Therefore, the voluntary agreement could not have spawned nor can it excuse the actions of the defendants. Just as the defendants intruded in the ORI proceedings with irrelevant information, true to form, they attempt to do the same in these proceedings. Although the plaintiff has admitted to scientific misconduct, he is living with the consequences, abiding with the terms of the voluntary agreement, and conducting valuable scientific research. The

agreement with the ORI and the findings of the SRB do not justify or excuse the unlawful behavior of the defendants.

PLAINTIFF – JUSTIN D. RADOLF

BY:_____
Thomas W. Bucci, Esq.
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net
Federal Bar # ct07805

**<u>CERTIFICATION</u>**

I hereby certify that I caused to be served a copy of the above and foregoing

*Memorandum in Opposition to Defendants' Motion for Summary Judgment* by sending same, via

U.S.P.S. postage prepaid this 1st day of November, 2004, to the following:


Jane D. Comerford, Esquire
Office of the Attorney General
University of Connecticut Health Center
Room LMO43
Farmington, CT 06030
Tel: 860-679-1114
Fax: 860-679-1997
Fed. Bar No. ct06328


_____
Thomas W. Bucci
Fed. Bar #ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net