UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3:03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 1, 2004 |

**AFFIDAVIT OF JUSTIN D. RADOLF**

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUSTIN D. RADOLF, | : CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : LEAD/MASTER DOCKET NO. |
| | : |
| V. | : |
| | : |
| UNIVERSITY OF CONNECTICUT; | : CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : MEMBER CASE |
| HEALTH CENTER; | : |
| PETER J. DECKERS, EXECUTIVE | : |
| VICE PRESIDENT FOR HEALTH | : |
| AFFAIRS AND DEAN OF THE SCHOOL | : |
| MEDICINE, INDIVIDUALLY AND | : |
| IN HIS OFFICIAL CAPACITY; | : |
| RICHARD BERLIN, ASSOCIATE DEAN, | : |
| INDIVIDUALLY AND IN HIS | : |
| OFFICIAL CAPACITY; AND STEPHEN | : |
| WIKEL, INDIVIDUALLY AND IN HIS | : |
| OFFICIAL CAPACITY, | : |
| Defendants. | : October 28, 2004 |

## **AFFIDAVIT**

STATE OF CONNECTICUT)
                     ) Avon, CT
COUNTY OF FAIRFIELD)

The undersigned, being duly sworn, hereby deposes and says:

1. I am over the age of eighteen (18) years and believe in the obligations of an oath.

2. I am familiar with the facts alleged contained in this affidavit.

3.  I attest that the facts and matters contained herein are true and accurate.

4.  I am currently a tenured Professor in the Departments of Medicine and Genetics and Developmental Biology at the University of Connecticut Health Center (UCHC) in Farmington, CT. I am a board-certified internist, a board-certified infectious disease specialist, a physician-scientist, and a microbiologist. I am internationally recognized for my clinical and scientific expertise in syphilis and Lyme disease, infectious disorders caused by the spirochetal pathogens *Treponema pallidum* and *Borrelia burgdorferi*, respectively. A major goal of my research has been and continues to be the development of innovative strategies for preventing syphilis and Lyme disease; this included vaccine development. My research program, from its inception in the 1980s, has made extensive use of molecular biological, genetic, and recombinant DNA techniques.

5.  During the summer of 1998, while a tenured Professor in the Departments of Internal Medicine and Microbiology at the University of Texas Southwestern Medical Center at Dallas, Texas (UT Southwestern), I applied for the Directorship of a newly created Center for Microbial Pathogenesis (CMP) at UCHC in response to an advertisement in a then-recent issue of the American Society for Microbiology (ASM) News. No other specific faculty appointment or position was mentioned in the advertisement.

6.  Shortly thereafter I submitted the requested application materials to Dr.

Richard Berlin. Included was a statement of research interests which described my collaborative work with Dr. Wikel on tick immunobiology and tick vaccine development.

7. Dr. Berlin and I discussed this work on a number of occasions, both during my recruitment and during my subsequent recruitment of Dr. Wikel after I assumed the CMP Directorship.

8. I made my first recruitment visit to UCHC in July or August, 1998, which included interviews with a number of senior UCHC faculty and the presentation of a research seminar.

9. Before deciding to accept the position, I made a return visit with Drs. Melissa Caimano and Timothy Sellati, two postdoctoral research fellows in my laboratory.

10. Based on the verbal understanding with Dr. Richard Berlin that I was going to be offered the Center Directorship, I returned with my family during Labor Day weekend, 1998. During this visit, Dr. Berlin and I entered into extensive, formal negotiations regarding the number of faculty to be recruited to the Center, its scientific directions and orientation, and the Institutional resources that would be allocated for its development.

11. During this same visit, my family and I toured the Farmington Valley area with a realtor, Ms. Katie French, who was recommended to us by Dr. Deckers, in order for us to assess the desirability of the Farmington Valley

|   |   |
|---|---|
|   | area for our permanent relocation from Dallas, Texas. At dinner in the Grist Mill Restaurant during that visit, Dr. Deckers emphasized the livability of the area and how happy he had been since he had relocated with his family from Boston many years earlier. He stated very clearly that my family would not regret our decision to relocate from Dallas, Texas, where we had lived for the past 13 years. |
| 12. | The letter of offering, dated September 9, 1998, was the direct outcome of my negotiations with Dr. Berlin during the Labor Day Weekend visit. This letter formally offered me the position of "Director of the Center for Microbial Pathogenesis" in addition to tenured appointments in the Departments of Medicine and Microbiology. The letter also stated that "your principle responsibility will be the formulation and development of the Center's research program" and it outlined the Institutional resources that would be allocated to me for this new research Center. These statements indicate very clearly that the Center Directorship, not the faculty appointments, were the focus of the recruitment. The letter concluded by stating "It has been a great pleasure for all of us here to interact with you, your family, and members of your laboratory". Without these written representations and the clearly implied understanding that UCHC was making a long-term commitment to me as Center Director, my laboratory personnel, our families, and the discipline of microbial pathogenesis |

    research, I would not have accepted the position, nor would my personnel have agreed to make the move to a smaller and less established Institution with comparatively little research strength in our chosen field.

13.    In an email to Dr. Berlin dated September 11, 1999, I formally accepted the position and stated that I "will commit all of my energies and abilities to make the Center successful". In that same email, I also provided detailed information about Radolf laboratory personnel and their spouses/families in order to begin the long and complex logistical process of permanently relocating these individuals in parallel with the relocation of my family and laboratory.

14.    Over the ensuing months, members of my laboratory and their families visited UCHC and the Farmington Valley area in order to assess for themselves the desirability of permanently relocating. During these visits and during our remaining time at UT Southwestern, we began to plan the transfer of my laboratory from UT Southwestern to UCHC. In addition to ensuring the safe, smooth, and legal transfer of numerous equipment items, reagents, research records, etc. from UT Southwestern, we also planned the layout of the new laboratory at UCHC, including making renovations to the existing design, and ordered numerous items of equipment, large and small, that would be required for my new laboratory and Center. This required an extraordinary expenditure of time and effort by me and Radolf laboratory

|     | |
| --- | --- |
|     | personnel and, indeed, was conducted at the expense of our normal research activities. |
| 15. | During this transitional period, which extended from fall, 1998 to our departure in late March, 1999, I also engaged in discussions with UCHC grants officers, mainly Mr. William Tomlinson, but also Mr. Kenneth Landorff and Mr. Paul Hudobenko, in order to plan the transfer of my NIH research grants from UT Southwestern to UCHC. |
| 16. | On or about January, 1999, several months after I had accepted the Center Directorship, I made another visit to UCHC to meet faculty members and discuss various details regarding the transfer of my laboratory and establishment of the Center. It was during these discussions with Dr. Berlin that I discovered that my initial appointment would be as Assistant Professor and that my tenured appointments as Professor in the Departments of Medicine and Microbiology would not be made by the UCHC Senior Appointments and Promotions Committee (SAPC) for as long as one year after the move. I stated uncategorically that I considered the appointment as Assistant Professor to be contrary to the representations made by Drs. Deckers and Berlin during our discussions and in the letter of offering. I also indicated that if this situation were not remedied, I would withdraw my acceptance of the Center Directorship and stay at UT Southwestern. |

6

17. On January 8, 1999, following my return to Dallas, TX, I received a letter from Dr. Deckers stating "This is to indicate that you will be appointed Professor of Medicine with tenure effective April 1, 1999". April 1, 1999 was the agreed upon start date for my position as Center Director. Thus, months before the actual move, there was a clear understanding that the appointments as Center Director and Professor of Medicine and Microbiology were interconnected.

18. Shortly after my arrival, I received a letter from Dr. Leslie Cutler, then Chancellor, stating that I was appointed as Assistant Professor, a non-tenured position. I was confused by this and concluded that Dr. Deckers had not informed Dr. Cutler about his January 8 letter. Soon after my relocation I also discovered that the CMP had not been formally recognized by the UCHC Board of Trustees and that established guidelines for the operation of Type II Centers did not exist. In subsequent discussions with Drs. Deckers and Berlin, but contrary to the statements made during our January 7, 2002 meeting, I was told that formal establishment of the CMP by the BOT was a mere formality and should not be a concern.

19. The September 9, 1998 letter of offering made no mention of the fact that the CMP had not been approved by the BOT as an academic entity (affidavits). Had this point been made in the letter, I would have stated uncategorically my unwillingness to accept the Center Directorship until the

          Center was formally established as a permanent academic entity by the BOT.

20.    On April 1, 1999, I took up my responsibilities as Director of the CMP. On April 7, 1999, the SAPC confirmed my appointments as Professor in the Departments of Medicine and Microbiology.

21.    From the moment of my arrival, I endeavored to fulfill my commitment to establish a world-class CMP at UCHC. During the next three years, I received numerous accolades and two excellent annual compensation reviews, with commensurate increases in salary. On August 28, 2000, in response to the first Annual Report for the CMP, I received a letter from Dr. Deckers stating "I congratulate you, your staff, and your faculty on an exceptionally productive academic year. Your collective scholarship, presentations, and research funding are a credit to your industry, intellect, and enthusiasm. Be assured of the continued support of this office".

22.    In a letter of reprimand, dated August 22, 2001, issued by Dr. Deckers, there was no indication that I was going to be relieved of my responsibilities as Center Director. Indeed, in the meeting with Dr. Berlin during which Dr. Deckers' letter was presented to me, I was reassured of the strong Institutional support for my leadership of the CMP.

23.    Early January, 2002 I received a letter, dated December 27, 2001, requesting that I meet with Drs. Deckers and Berlin to discuss Dr. Berlin's

informed me in this same email that he was appointing Dr. Stephen Wikel as Interim Director, the same title he currently holds.

27. On January 14, 2002, I met with Dr. Deckers at which time he accepted my letter informing him "...of my decision to relinquish temporarily my position as Director of the Center for Microbial Pathogenesis for personal reasons." When I presented the letter to him, I asked him if he felt comfortable with the exact wording. He stated that he was.

28. Several weeks later, in discussing with Dr. Wikel the "Interim" nature of his (Dr. Wikel's) appointment, Dr. Wikel acknowledged that in December, 2001, Drs. Deckers and Berlin had informed him that they were going to ask me to step aside, that he (Dr. Wikel) was going to resume my position, and that, contrary to the representations made to me by Drs. Deckers and Berlin, my stepping aside was not temporary. According to Dr. Wikel, Dr. Berlin told him "All appointments are, by nature, interim in nature".

29. In the 1980s my laboratory began to conduct research in Lyme disease, a tick-borne infection caused by the spirochete *Borrelia burgdorferi*. The addition of Lyme disease to our already established research program in syphilis was prompted by the increasing recognition of Lyme disease as a major global public health problem. The primary objective of our Lyme disease research was to characterize outer membrane proteins of *B. burgdorferi* as virulence determinants and potential vaccine candidates.

10

30. By the mid 1990s, I and members of my laboratory became increasingly aware of the need to incorporate ticks into our Lyme disease research program. This awareness was prompted by increasing evidence that transmission of *B. burgdorferi* by *Ixodes scapularis*, the tick-vector of Lyme disease, differs from needle inoculation of spirochetes, the technique routinely used in our laboratory to infect mice. During this period, I also became increasingly aware of work in the entomological literature describing biological, immunological, and pharmacological properties of molecules in tick saliva and the related notion that interference with one or more of these activities by immunization might interrupt pathogen transmission; this latter concept is often referred to as a "tick vaccine".

31. To facilitate this new direction in our research, during the summer of 1996, I telephoned Dr. Stephen Wikel, an investigator in the Department of Entomology at Oklahoma State University (OSU), who had extensive experience in the rearing of ticks. During a long telephone conversation, we agreed that we shared a number of research interests in the area of ticks and tick-borne diseases and that a collaboration appeared to be the appropriate means for pursuing these mutual scientific interests.

32. To further the collaborative interactions, I invited Dr. Wikel down to UT Southwestern to present a seminar and meet members of my laboratory and that of Dr. Michael Norgard, my close associate and then Vice-Chairman of

recommendation that I temporarily relinquish the Directorship of the CMP.

24. During the meeting, which occurred on January 7, 2001, I was told that the Center's existence was in jeopardy because it had not been approved by the BOT as a permanent academic entity. I also was told repeatedly by Drs. Deckers and Berlin that I had done an excellent job running the Center. It was restated that I was being asked to relinquish the Directorship on a temporary basis. I stated that I believed I was fully capable of running the Center, that there was no one else in the Center capable of providing the necessary scientific and administrative leadership, and that the best way to ensure the Center's survival was for me to continue as Director.

25. On January 11, 2001 I met privately with Dr. Deckers. He told me that it was his decision that I temporarily relinquish the Center Directorship. He reiterated that all I needed to do was come back at some future time; tell him that I felt better, and that I would be reinstated as Center Director. He also requested that the following Monday I give him a letter stating that I would relinquish the Directorship "temporarily due to personal reasons".

26. On Sunday I received an email from Dr. Deckers restating his viewpoint that I must relinquish the Center Directorship and that his authority in this matter was "absolute". This letter also reiterated, however, that this decision would be rescinded by him at some time in the future. The temporary nature of my stepping aside was reinforced by the fact that he

9

the UT Southwestern Department of Microbiology.

33. The seminar focused on immunological aspects of mammalian host-tick interactions and did not describe the use of recombinant DNA techniques, proteomics, or genomics as a means of identifying individual salivary gland proteins that might be responsible for the immunological activities Dr. Wikel appeared to be detecting in tick salivary gland extracts.

34. During that visit, Dr. Wikel readily acknowledged that his research program lacked molecular or genetics techniques and that he viewed collaboration with my laboratory as a means of remedying this deficiency.

35. Several weeks after this first meeting, Dr. Wikel invited me to present a seminar in the Department of Entomology at OSU.

36. With Dr. Wikel as host, I presented a seminar in the Department of Entomology that centered largely on the *B. burgdorferi* outer membrane and Lyme disease vaccine-related work being conducted by Dr. Darrin Akins, then a postdoctoral research fellow.

37. During this visit, it was readily apparent from direct discussions that no one in the Wikel laboratory was familiar with the use of molecular biological, genetic, or recombinant DNA techniques and that these powerful methodologies were not being employed to identify salivary gland proteins responsible for the immunological effects he claimed to be observing in salivary gland extracts.

38. During that visit, I met Dr. Melanie Palmer, an investigator in the OSU Department of Entomology and an experienced tick molecular biologist. I was surprised to discover that, despite their mutual interests, the research interactions between Dr. Wikel and Dr. Palmer were minimal.

39. A computer-based search of the literature and the sequence databases upon my return confirmed this. Drs. Palmer and Wikel had not co-authored any publications or jointly submitted any sequences to GenBank. GenBank, the National Institutes of Health (NIH) genetic sequence database, is an annotated collection of all publicly available DNA and protein sequences.

40. Dr. Wikel's assertion of extensive molecular biology collaboration with Dr. Palmer at OSU prior to our collaboration is a clear misrepresentation of their lack of documented scientific interactions.

41. In addition to obtaining ticks for our Lyme disease work, I began to discuss with laboratory members the possibility of using molecular techniques to identify biologically important molecules in tick saliva as well as the related idea of developing a tick vaccine. These ideas were discussed with Dr. Wikel and quickly became a central theme of the collaboration between our two laboratories.

42. I was responsible for initiating two parallel and complementary approaches to accomplish these research objectives. One was to extract RNA from salivary glands of feeding ticks in order to generate cDNA libraries; clones

13

|    |    |
|----|----|
|    | this type would include sharing in hard copy and electronic forms any and all data generated by either lab with regard to the library, including, but not limited to, the nucleotide sequences, recombinant proteins, peptides, or other reagents. |
| 46. | The initial plan was to screen the library with tick immune antiserum provided by Dr. Wikel. However, the "protective antiserum" that Dr. Wikel provided did not react specifically with any clones from the library, indicating that it was unusable for identifying clones that might encode vaccine candidates. It was at this point that I suggested we begin "high throughput sequencing" of expression sequence tags or ESTs. My rationale was that the library should be highly enriched for tick salivary gland cDNAs. This fundamental idea of high-throughput sequencing of random clones underlies all of the subsequent tick-related EST research conducted or proposed by Dr. Wikel, including that in the DOD proposal. |
| 47. | Prior to any substantive interactions with Dr. Wikel, Dr. Johnston and I had begun to experiment with the use of genetic immunization, a key technique for ELI, as a means of developing vaccines against *T. pallidum* and *B. burgdorferi*. This work was conducted in my laboratory by Dr. Melissa Caimano, a postdoctoral fellow recently arrived from the University of Alabama at Birmingham. |

encoding biologically relevant molecules and vaccine candidates would be "pulled" from these libraries. The other involved Expression Library Immunization or ELI, a methodology developed by Dr. Stephen Johnston, a colleague at UT Southwestern.

43. Efforts to generate fed tick salivary gland cDNA libraries got underway in the fall of 1996. Given the amounts of RNA needed to generate a single cDNA library, it was decided to make our first library from the glands of the relatively large tick *Dermacentor andersoni*.

44. Dr. Darrin Akins, a postdoctoral fellow in my laboratory, was directly responsible for this work. Dr. Akins personally received the *D. andersoni* salivary glands shipped from Dr. Wikel's laboratory and extracted the RNA from which the cDNA library would be constructed. After assessing the RNA both qualitatively and quantitatively, Dr. Akins personally shipped it to Stratagene, a biotechnology company based in La Jolla, CA that makes fee-for-service custom libraries. The completed library (UT Southwestern Purchase Order # R60299, Stratagene Order # 468492, Customer # 1210) was sent from Stratagene to the Radolf laboratory at UT Southwestern on November 20, 1996; Dr. Akins personally handled this transaction.

45. It was the clear understanding between the Radolf and Wikel laboratories that the library was jointly owned as were any and all data generated from it. By the established norms of scientific collaboration, a collaboration of

14

48.    Dr. Johnston had no prior research experience with Lyme disease, ticks, or tick-borne diseases. I was the one who conceived of the potential usefulness of ELI for the development of a tick vaccine, and it was I who proposed to Drs. Johnston and Wikel that ELI be used as the basis for a grant application to the Texas Advanced Technology Program, an extremely competitive funding in-state competition. I authored and submitted this proposal in August, 1997, which was funded. Dr. Johnston's role in this project was supportive.

49.    The proposal described Dr. Wikel's technological base as follows (p6): "Dr. Steven Wikel, Endowed Chair in Agricultural Biotechnology and Professor of Entomology, Oklahoma State University, maintains uninfected and *B. burgdorferi*-infected *Ixodes scapularis* colonies and is thoroughly familiar with methodologies for tick infestation of animals". The accompanying letter of collaboration provided by Dr. Wikel does not describe any molecular, genetic, or recombinant DNA work being conducted in his laboratory and does not anticipate any contribution from his laboratory regarding the use of molecular biological, genetic, or recombinant DNA techniques.

50.    In 1998, Dr. Wikel submitted a proposal to the USDA which involved the use of ELI to develop a vaccine against the hard tick *Dermacentor andersoni*. As Co-investigator, I was to direct a consortium at UT

Southwestern responsible for providing the molecular biological and recombinant DNA expertise essential for the project, including the performance of ELI. While Dr. Stephen Johnston was a member of this research consortium, his role, as with the Texas grant, was entirely supportive. All of the proposed molecular studies were to be performed in my laboratory, by my personnel, and under my direct supervision. The consortium would not have been necessary if the relevant technical expertise already existed in Dr. Wikel's laboratory.

51. On or about early 1998, Dr. Melissa Caimano became more involved in the tick EST project as Dr. Akins began preparing to leave UT Southwestern in order to assume a faculty position in the Department of Microbiology and Immunology at Oklahoma University Health Sciences Center.

52. One of the first sequences that Dr. Caimano identified from the *D. andersoni* library was that for a molecule called calreticulin. She subsequently generated a recombinant form of calreticulin that was semt tp the Wikel laboratory for immunization experiments. Dr. Wikel failed to provide to me or Dr. Caimano a written summary of these results, even though I requested that he do so. Because the results of these experiments were reportedly negative, I did not pursue this request.

53. Another notable sequence that Caimano identified was that for "p36", a *D. andersoni* salivary gland protein that Dr. Wikel first described in a paper

17