published in 1998 in the Journal of Medical Entomology. This paper described only approximately 25 amino acids from the N-terminus of p36 and did not involve the use of recombinant DNA techniques.

54. The p36 EST that Dr. Caimano pulled from the *D. andersoni* library encoded the entire polypeptide. This information helped Dr. Wikel complete the p36 sequence and was published in the June, 2000 issue of the Journal of Parasitology with Dr. Caimano and me as co-authors. This publication was the first paper from the Wikel laboratory that described the use of recombinant DNA techniques, and it is thus, completely inaccurate to state that Dr. Wikel had any recognized molecular expertise prior to the year 2000.

55. Dr. Wikel failed to notify me or Dr. Caimano when the p36 sequence was submitted to the GenBank database (Accession Number AF 167171) in July, 1999. Based on our documented contribution to this sequence, it is fully correct to state that we co-own the intellectual property rights for the p36 sequence and should have been included as co-authors on the GenBank submission.

56. As noted earlier, we viewed the *D. andersoni* work as a "feasibility study" for the more difficult *I. scapularis* research. Once Dr. Caimano had established that the cDNA library generated from *D. andersoni* was a good source of salivary gland ESTs, we decided to proceed with generating an *I.*

18

*scapularis* library.

57. Dr. Wikel sent the salivary glands to Dr. Caimano at UT Southwestern so that she could coordinate this process with Stratagene. Dr. Caimano sent these materials by FedEx to Stratagene (tracking number 809929697068) on December 18, 1998. Several months later she was notified by Mr. Michael Kobrin at Stratagene that an accident had occurred and that the glands were not usable. Dr. Wikel and I spoke with Stratagene officials and convinced them to make a new library free of charge. These materials had to be regenerated by Dr. Wikel.

58. The library was sent by Stratagene to UCHC on March 29, 2000. The accompanying product information sheet lists me as the recipient for Stratagene Order # 98236, UT Southwestern purchase order # 916505. Dr. Caimano personally received the shipment from Stratagene and insured that the library was properly aliquoted and stored.

59. One of the major reasons for my recruitment of Dr. Wikel to the CMP in 1999 was to further our collaboration on tick vaccine development. As noted earlier, this collaborative research was discussed in depth with Dr. Berlin on a number of occasions.

60. Soon after Dr. Wikel's arrival at UCHC in 2000, Dr. Caimano gave Dr. Wikel amplified and unamplified aliquots of the library as a safety precaution in the event of an accident such, as a freezer-failure. At the

time, no one in his laboratory was capable of working with the library and no plans were entertained for Wikel laboratory personnel to do so.

61.  Some time after Dr. Wikel relocated from OSU, he hosted a visit by Dr. Jose Ribeiro from the NIH. Sometime afterwards, Dr. Wikel told me that he and Dr. Alarcon-Chaidez, a postdoctoral fellow in his laboratory, had either transported or arranged to transport large numbers of clones from our *I. scapularis* library to Dr. Ribeiro's laboratory for automated sequence analysis. While surprised, I did not express my discomfort with this transaction at the time because Dr. Wikel reaffirmed my understanding that the library was jointly owned. Indeed, in recognition of our joint ownership and the conditions of our collaboration, on several occasions in research meetings with Dr. Alarcon-Chaidez, he showed me spreadsheets summarizing the sequence information generated by Dr. Ribeiro. These spreadsheet summaries were did not contain complete sequence information for the various EST clones. He has never provided to me or Dr. Caimano hard copy or electronic files containing this sequence information, even when requested to do so. Any statement that sequence information from our jointly owned *I. scapularis* library was shared with me or my personnel in a usable or analyzable form that would enable us to publish this information or use it in independent grant applications is absolutely incorrect.

62. About June, 1999, Dr. Isaac Onyango, a trained veterinary molecular entomologist, joined my laboratory specifically to work on the *D. andersoni* EST project. Dr. Caimano worked closely with Dr. Onyango to ensure a smooth transition. During the period Dr. Onyango was in the laboratory, I spent much time with him discussing and interpreting the growing body of bioinformatics data generated from his analysis of the *D. andersoni* cDNA library. Dr. Onyango and I were responsible for developing the in-house database delineating the relevant biological categories in which newly generated sequences were placed following bioinformatics analyses; this included the identification of recognized functional motifs and conserved protein domains. This work led to the identification of Kunitz domains in a number of the sequences; such domains are a potential indicator of anti-hemostatic activity.

63. This bioinformatics approach, as well as specific data generated from it, was incorporated directly by Dr. Wikel into the DOD proposal submitted in September, 2002. The findings of the *ad hoc* committee chaired by Dr. Shanley are in direct support of this statement.

64. Because hard ticks, such as *D. andersoni* and *I. scapularis* feeding over days, the ability of tick saliva to interfere with blood clotting (hemostasis) is believed to be critical for the feeding process. It follows, therefore, that interference with the anti-hemostatic activity in tick saliva is one potential

approach to development of a tick vaccine. The identification of Kunitz domains in a number of the EST sequences led to the hypothesis, formulated by me and Dr. Onyango, that these molecules were vaccine candidates. When this information was generated by Dr. Onyango in 1999, this was a new idea in the tick research field.

65. The 2000 USDA and CII grants describe the use of anti-hemostasis assays to characterize the biological activities of recombinant DNA-derived proteins identified from the *D. andersoni* cDNA library. The novel aspect of these proposals was the identification of these molecules and the characterization of their possible anti-hemostasis activities, not the assays themselves. This idea was directly appropriated by Dr. Wikel for the DOD proposal submitted in September, 2002.

66. In order to determine whether the *D. andersoni* molecules possess anti-hemostatic activity, it was necessary to enlist the collaborative support of an investigator with expertise in the required assays. Dr. Ray Koski, the Research Director of a New Haven, CT-based biotechnology company called $L^2$, referred me to an investigator in the Department of Pediatrics at Yale University, named Dr. Michael Cappello, an expert in the anti-hemostatic properties of hookworm saliva (Koski email was entered into Discovery). At the time, I already was working with Dr. Koski on a CII-funded project involving another *I. scapularis*-transmitted parasite called

22

*Babesia microti.*

67. I directly contacted Dr. Cappello in order to gauge his interest in working with Dr. Wikel and me. This conversation led to a series of meetings, both at Yale University and UCHC, in which reagents, such as recombinant DNA-derived proteins, were given to Dr. Cappello for analysis. At one point, Dr. Wikel also gave Dr. Cappello *D. andersoni* salivary gland extracts for assay. The idea was to determine if we could "match" the anti-hemostasis activities in salivary glands with those of individual proteins. Dr. Alarcon-Chaidez participated in some of these meetings.

68. The idea to screen p36 for anti-hemostasis activity was based upon the observation that it contains Kunitz domains.

69. Without my knowledge or permission, Dr. Wikel pursued this collaboration independently with Dr. Cappello and included Dr. Cappello as a collaborator on the DOD proposal.

70. In 1999, before Dr. Wikel had even relocated to UCHC, I initiated the idea of pursuing Congressional funding (a so-called "earmark") after a meeting held by Dr. Gerald Maxwell and began to put together the necessary group of investigators, including Dr. Wikel.

71. I also was instrumental in developing the earmark to include malaria, Dengue fever, and other vector-borne diseases.

23

72. Because of his longstanding interest in this area and recognized expertise, I asked Dr. Wikel to take the lead on efforts to obtain the earmark, including the letter that was sent to the Honorable Nancy Johnson. There was a clear understanding with Drs. Wikel, Berlin, and Deckers that I was to be a co-investigator if and when this proposal was submitted.

73. I participated in a number of activities related to obtaining this earmark, including meetings with members of the Connecticut Congressional delegation.

74. My molecular, research, and clinical expertise in Lyme disease and tick-borne infections was a major selling point in our efforts to gain Congressional support for the earmark.

75. When Dr. Onyango left my laboratory about June, 2000, Dr. Caimano worked directly with Dr. Francisco Alarcon-Chaidez to ensure a smooth transition of the *D. andersoni* project to Dr. Wikel's laboratory. There was no indication that the operational rules for the Radolf-Wikel collaboration had changed in any way or that this was the initiation of an independent project in the Wikel laboratory.

76. When I received the December 27, 2001 letter requesting that I meet with Drs. Deckers and Berlin, it was considered highly likely that the earmark was going to be funded.

77. The December 27, 2001 letter requesting that I meet with Drs. Berlin and

Deckers did not indicate in any way that the earmark or the DOD proposal would be a topic of discussion.

78. During the course of the January 7, 2002 meeting, Drs. Deckers and Berlin informed me that I would not be a co-investigator on the DOD proposal. I stated uncategorically that Dr. Wikel was not qualified to manage this project by himself.

79. The administrative decision communicated to me by Drs. Deckers and Berlin was taken without due process and in direct violation of my academic freedoms as stated in the UConn bylaws.

80. I was assured, however, during that meeting that I would be allowed to continue as a participant in the research. Dr. Wikel reaffirmed this on a number of occasions thereafter.

81. Despite these reassurances, I found it increasingly difficult to engage Dr. Wikel in substantive discussions about the ongoing research or the upcoming DOD proposal.

82. On several occasions in 2002, Drs. Wikel and Alarcon-Chaidez discussed with me the outline for a paper describing our *D. andersoni* EST data. The outline was generated with the clear understanding that Dr. Alarcon-Chaidez would be the primary author. At one point, Dr. Wikel simply stopped these discussions despite requests from me to continue. This paper easily could have been completed and submitted before the sequestration of

data by the ORI.

83. The sequestration of data by the ORI in August, 2002 involved only those hard copy files generated by Dr. Onyango that were in Dr. Radolf's possession. Dr. Wikel possessed hard copy and electronic versions of all of this information and, thus, could have continued working on the manuscript. At no time was Dr. Radolf told by the ORI or by UCHC that the sequestration of files prevented the generation of the stated manuscript.

84. The sequestered files did not include hundreds of *D. Andersoni* EST sequences generated by Dr. Alarcon-Chaidez and more than 1000 *I. scapularis* EST sequences generated by Dr. Alarcon-Chaidez which were never shared in hard copy or electronic form with me or any personnel in my laboratory.

85. The Thrall committee report does not mention the sequestration of data by the ORI as a reason why the outlined manuscript was not completed by Drs. Wikel and Alarcon-Chaidez.

86. Point 5 of the Thrall committee report states that the breakdown in my relationship with Dr. Wikel was the reason for the discontinuation of my participation in the research.

87. The letter sent by Drs. Berlin and Wikel to Ms. Jamie Kiser however, stated that my participation in the research was administratively terminated.

88. I have never received written or verbal notification from Drs. Berlin or

                Deckers informing me of an administrative decision to terminate my participation in the EST research or the DOD proposal.

89.     Point 5 of the Thrall affidavit also states that permission for Dr. Wikel to use jointly owned data was implied. This statement is directly contrary to the findings of the Shanley committee and Dr. Deckers' letter of reprimand to Dr. Wikel. As co-owner of the *D. andersoni* EST intellectual properties, I was never asked for permission to include any of the data I generated in this collaboration, nor was I informed that data generated by me were going to be incorporated into any proposal which did not include me or my personnel.

90.     During the Thrall committee investigation, I asked if there was any communication between his committee and the standing committee chaired by Dr. Shanley or if they were aware of their findings. Dr. Thrall replied that he had no interest in the Shanley committee.

91.     Dr. Thrall has no recognized or published expertise in the use of contemporary molecular biology or recombinant DNA techniques, in vector-borne diseases, in Lyme disease, in microbial pathogenesis, or bioinformatics.

92.     Contrary to points 7 and 8 of the Thrall affidavit, based upon my direct interactions with Dr. Wikel and my knowledge of his publication record through the year 2000, there is no reason to believe that he was capable of

independently establishing a genomics- or proteomics-based research program.

93. The "purification, reproduction, characterization, and cloning of hundreds of clones from the original collaboration" described in point 9 of the Thrall affidavit represents an unequivocal misappropriation of intellectual property and reagents jointly owned by me and other members of my laboratory. Rather than exonerating Dr. Wikel, this statement is fully consistent with the findings of the *ad hoc* committee chaired by Dr. John Shanley which found that Dr. Wikel violated UCHC Data ownership policy and intellectual property rights.

94. The DOD proposal does not contain any *I. scapularis* EST data. Thus, the feasibility of the proposal and Dr. Wikel's demonstrated capacity to conduct the proposed research rests entirely on jointly owned data. Preliminary data are a central component of all grant applications and are included to convince reviewers of the proposal's scientific soundness and the Principal Investigator's technical capabilities to conduct the proposed research. Without the misappropriated data that Dr. Wikel incorporated into Figures 2, 3, and 4 of the proposal, reviewers could not have concluded that the proposed studies were scientifically reasonable or that Dr. Wikel had the stated capacity to perform the proposed studies, contrary to the claims made in Points 6, 7, and 8 of the Thrall affidavit.

95. The new directions alluded to in point 10 of the Thrall affidavit represent only cosmetic technical modifications rather than any fundamental changes in scope, philosophy, underlying concepts, or direction from those developed during my collaboration with Dr. Wikel.

96. Contrary to point 10 of the Thrall affidavit, it is well established in patent law that changes in plasmid vector, cloning system, etc. such as that described here, do not represent significant advances over prior art.

97. Dr. Thrall and his committee failed in their responsibilities to evaluate the allegation of scientific misconduct by not obtaining the necessary expert opinions to address whether the statement made in point 10 would satisfy established legal criteria for advancement of prior art.

98. Based on the Thrall affidavit and the DOD proposal, Dr. Wikel has not provided any documentary evidence to support the claim that these "new directions" have generated information that could not have been derived from the libraries, methodologies, and bioinformatics approaches that were fully developed at the time the project was transitioned from the Radolf to the Wikel laboratory.

99. Contrary to point 10 in the Thrall affidavit, the "new approach" adopted by the Wikel laboratory for analyzing tick salivary gland ESTs has produced only a single molecule, calreticulin. This protein was previously identified by Dr. Caimano in the course of the *D. andersoni* EST studies conducted in

29

the context of the Radolf-Wikel collaboration.

100. Contrary to point 10 of the Thrall affidavit, the bioinformatics methodologies described in the DOD proposal are the same as those used during the Radolf-Wikel collaboration and thus do not in any way represent an advance or new research direction.

101. Regarding point 11 of the Thrall affidavit, because the "extended clonal analysis" performed by Dr. Wikel involved the original jointly owned *D. andersoni* EST database and library, the resulting data are jointly owned by Drs. Radolf and Wikel and cannot be viewed as either independently derived or Dr. Wikel's sole intellectual property.

102. Regarding point 12 of the Thrall affidavit, there is no evidence to support the statement that the collaboration between Drs. Wikel, Valenzuela, and Riberio is highly active or has led to any advancement of Dr. Wikel's research program beyond that of the original collaboration with Dr. Radolf. On the contrary, Dr. Wikel has had no co-publications with either Drs. Riberio or Valenzuela, while Drs. Riberio and Valenzuela have published numerous studies examining whole insect genome transcription analyses, analyses of salivary gland proteins and anti-hemostatic proteins, including one report, co-authored with Dr. Thomas Mather, University of Rhode Island, describing the analysis of ESTs isolated from *I. scapularis* salivary glands.

103. A May 20, 2003 article in the New York Times lists only Dr. Thomas Mather as a collaborator of Drs. Ribeiro and Valenzuela.

104. The Research Misconduct Committee convened by Dr. Thrall did not interview or query either Drs. Ribeiro or Valenzuela, Dr. Wikel's stated principal collaborators on the DOD proposal, to validate the claim that Dr. Wikel had materially and independently advanced the research from that of the original Radolf-Wikel collaboration.

105. The September 9, 1998 letter of offering stated that "...we will provide suitable support for establishing your own research program here, operating funds for the Center, and for the recruitment and start-up of the new faculty...Be assured that it is our purpose to support the Center in whatever way is within our means."

106. As noted already, I accepted the Center Directorship position in an email to Dr. Berlin on September 11, 2001. In that email, I began to lay the groundwork for the personal and professional relocation of my laboratory personnel. Mr. Kenneth Bourell was specifically mentioned in that email. I pointed out that, in addition to his talents as a light and electron microscopist, Mr. Bourell had exceptional computer skills that "will benefit greatly everyone within the Center". This was a clear indication that, from the very outset, Mr. Bourell's position was considered differently from that of a technician working exclusively within my laboratory. It also laid the

foundations of the oral cost sharing agreement that was central to the salary structure and time and effort requirements for Mr. Bourell's position.

107. During the transitional period between my acceptance of the Center Directorship in September, 1998 and our move in late March, 1999, Dr. Berlin and I engaged in further discussions to clarify Mr. Bourell's functions and position within the Center. The preferred job title was "Center Imaging Specialist". However, because such a job title or classification did not exist at UCHC, he was classified as a Research Associate.

108. During these discussions, it was understood that Mr. Bourell would function in two capacities. The first was to provide technical support on an as-needed basis for research within my laboratory. The second was to provide microscopy ("imaging") and computer-related support to other investigators in the CMP and to anyone else at the Health Center who requested his services. The actual division of his time and effort would be flexible and at my discretion as Center Director.

109. Mr. Bourell's job description states that the principle responsibilities for this position are twofold: 1. responsible for conducting the electron microscopy experiments and maintaining all photo micrographic data for the Center and 2. responsible for maintaining the Center's light and electron microscopy equipment as well as the IBM and Apple-based

computers in the laboratories and administrative offices.

110. In recognition of the fact that Mr. Bourell's position was unique and included responsibilities within the CMP, separate office space was created for him across from the administrative area of the Center.

111. None of the discussions with Dr. Berlin could have led him to believe that Mr. Bourell had ever functioned as key personnel on my NIH-supported research or that I envisioned him functioning in that capacity after our relocation.

112. During the transitional period, Dr. Berlin and I negotiated an oral cost sharing agreement regarding Mr. Kenneth Bourell's salary structure. According to this agreement, Mr. Bourell's salary would be paid by UCHC out of Connecticut General Funds and then at some point in the future from my NIH grants or from other qualified source(s) of funding.

113. As Center Director I was not in control of the Connecticut General Funds that were used to pay Mr. Bourell's salary. I never received or signed off on any paperwork establishing Connecticut General Funds as Mr. Bourell's source of salary support. These funds were controlled by Mr. David Gillon, the UCHC Chief Financial Officer.

114. In April, 1999, I submitted requests to transfer my three NIH grants from UT Southwestern to UCHC. On all three grants, I was listed as "Key Personnel". Mr. Bourell was listed on two of these grants, "Membrane

33

Proteins of *Borrelia burgdorferi*" and "Membrane Immunogens of *Treponema pallidum*" only as a Research Associate. These requests were signed by a number of UCHC officials, including Dr. Berlin and Mr. Gillon.

115. During my years of association with Mr. Bourell at UT Southwestern, Mr. Bourell never served as a key personnel on an NIH grant. No discussions to upgrade his status from non-key to key personnel ever occurred during or after our relocation to UCHC.

116. The transfer agreements for my NIH grants were prepared in close consultation with several grants officials at UCHC, principally Mr. William Tomlinson. At that time, my laboratory was the only functional laboratory in the CMP and it was uncertain how Mr. Bourell's time and effort would be allocated between my laboratory and the Center. It was possible, however, that he would be working full-time on my NIH-funded research. Given the undefined period of time covered by the oral cost sharing agreement with Dr. Berlin, it was recommended that I budget in the transfer agreements monies to cover Mr. Bourell's entire salary, evenly divided between the two NIH grants "Membrane Proteins of *Borrelia burgdorferi*" and "Membrane Immunogens of *Treponema pallidum*". These grants were chosen for this budgeting because they both involved microscopy and other microbiologic techniques that Mr. Bourell had utilized in my laboratory at UT Southwestern.