117.    Between April, 1999 and June, 2002 no concerns regarding Mr. Bourell's salary were brought to my attention and no discussions of this matter occurred with Mr. Gillon or Dr. Berlin.

118.    Progress reports for the two grants submitted during this period stated that there were no changes in support of key personnel. I was the only key personnel listed on each of these grants. Progress Reports do not require documentation of changes relating to non-key personnel.

119.    On or about February, 2002, Dr. Stephen Wikel began to monitor Mr. Bourell's research activities for me without my knowledge or permission. No mechanism was put in place for me to confirm the accuracy of the hours being reported to Dr. Wikel.

120.    The information provided by Mr. Bourell to Dr. Wikel indicates that only a small percentage of Mr. Bourell's time and effort was devoted to my NIH-funded research.

121.    In June, 2002, without any prior discussion or notification, UCHC encumbered funds from these two NIH grants to pay a percentage of Mr. Bourell's salary and fringes that was markedly disproportionate to the actual time and effort expended. For one of the grants, "Membrane Immunogens of *Treponema pallidum*", Mr. Bourell had not expended any time and effort during the entire one-year period covered by the 50% encumbrance of salary and effort. For the other grant, "Membrane Proteins

35

of *Borrelia burgdorferi*", funds were encumbered for 25% of Mr. Bourell's salary and fringes for a period of time dating back to December 1, 2001; during this period it was my estimate that he had expended approximately 10% time and effort.

122. Funds for the grant "Membrane Proteins of *Borrelia burgdorferi*" were initially encumbered on an Assignment Authorization form prepared by Ms. Kimberly Young, the CMP Administrative Coordinator and signed by Mr. David Gillon and Dr. Wikel.

123. On this form, "employee unavailable to sign" was written by Ms. Young on the line reserved for the Principal Investigator's signature. I was not given a copy of this form.

124. Dr. Wikel had in hand information from Mr. Bourell which indicated that the encumbered funds for one of the NIH grants, "Membrane Proteins of *Borrelia burgdorferi*", were in excess of Mr. Bourell's expenditure of time and effort on that project.

125. During the entire month of June, 2002, I was neither on vacation nor away on official business. No efforts were made to contact me directly, either in my office, at home, by pager, by Fax, or by email to notify me that funds were being encumbered from two of my NIH grants.

126. University vacation and travel records and my office calendar document that I was on-station for the entire month of June, 2002. Thus, any

        statement that I was away or otherwise unreachable for any appreciable period of time is a misrepresentation.

127.     I never received any message from Ms. Young or Mr. Gillon informing me that Mr. Gillon was processing paperwork for Mr. Bourell, nor did I receive a message requesting that I contact Mr. Gillon so as to determine the actual time and effort and, if necessary, file an amended report.

128.     At this time, I did not receive, nor was I made aware of, any manual Time and Effort reports prepared by Ms. Young relating to Mr. Bourell. The existence of such forms is directly contrary to statements made to me by Mr. Gillon in our August, 1, 2002 meeting that no Time and Effort reports existed for Mr. Bourell.

129.     These funds were encumbered without any effort by UCHC officials to accurately ascertain the level of effort Mr. Bourell had actually dedicated to my NIH-funded research.

130.     Around June or July, 2002, Ms. Young presented to me copies of Labor Distribution forms regarding Mr. Bourell. The forms were sent to Ms. Young by Ms. Ruth Batagowski in the office of Mr. David Gillon.

131.     Nowhere does this paperwork indicate the intention of University officials to notify me that funds had been encumbered from my NIH grants, and I have no documentation or recollection of Ms. Young stating that she was instructed by Mr. Gillon to give these forms to me.

132. At this time I was not told by Mr. Gillon or Ms. Young that these forms could be or would be amended to show actual time and effort expended by Mr. Bourell.

133. Immediately after receiving these forms, I notified Mr. Gillon to inform him that the funds encumbered were far in excess of the actual time and effort Mr. Bourell had expended and was continuing to expend on these projects and thus constituted a violation of federal law and regulations.

134. Over the summer of 2002, I engaged in discussions (some via email) with Mr. Gillon in order to resolve this matter.

135. On August 1, 2002 I met with Mr. Gillon and Dr. Berlin. I reminded Dr. Berlin that Mr. Bourell was not relocated from Dallas to be a research technician for my laboratory per se and that he was to be a resource for the Center as spelled out in his original job description. The issue as to whether Mr. Bourell functioned as key or non-key personnel on my NIH-related research was not discussed. During this meeting I was told that no Time and Effort reports had been filed for Mr. Bourell and that this was an oversight because he had been paid from State of Connecticut General Funds. I stated very plainly my belief that it would be contrary to NIH regulations to overcharge the grants for time and effort by Ken and that Gillon clearly acknowledged his agreement on this issue.

136. Prior to these discussions during the summer of 2002, I was not aware of

the Institution's Time and Effort policy. Furthermore, the specifics of the policy were not discussed when I met on August 1, 2002 with Mr. Gillon and Dr. Berlin. A written copy of the policy was not provided to me at the time of this meeting or during the subsequent period when I prepared the Time and Effort reports relating to Mr. Bourell.

137. As agreed upon in a memorandum of understanding, dated August 2, 2002, I obtained from Mr. Bourell a log of Mr. Bourell's activities that subsequently was used to fill out Time and Effort reports dating back to April, 1999. To do this, Mr. Bourell, at my request, prepared a list of the experiments and research-related work he had conducted at UCHC through July, 2002. The work list was reviewed jointly by me and Mr. Bourell and together we estimated the amount of time required to have performed this work.

138. After receiving final approval from Mr. Gillon and Dr. Berlin in the beginning of September and meeting once more with Mr. Gillon to review the final paperwork, on September 11, 2002 I filed the electronic Time and Effort reports for Mr. Bourell.

139. At no time was I given any delinquent report cards or notification regarding missing Time and Effort reports for Mr. Bourell.

140. At no time did I ask Mr. Gillon to tell me what information he wanted me to submit regarding Mr. Bourell's time and effort. I do recall inquiring as to

whether Mr. Gillon wanted to review the information I was compiling and whether the finalized information was to be filed directly by me or by Dr. Gillon. My queries to Mr. Gillon were solely for guidance and assistance in this process and to assure him that I was moving expeditiously to provide the requested time and effort information.

141. Shortly afterwards, I received by registered mail a letter from Dr. Robert Kozol, Executive Director, Compliance, UCHC, informing me that I was the subject of a complaint concerning the "reporting of percentage effort of research associates on grant proposals".

142. I subsequently have found out that Dr. Wikel was the source of the complaint.

143. Because of the once close collaborative interactions between the Radolf-Wikel laboratories, Dr. Wikel's greater than two year period of residence within the Center before the allegation was filed, and his frequent interactions with Mr. Bourell in administrative and research-related contexts after assuming the position of Interim Director, it is inconceivable that he could have believed that Mr. Bourell was functioning as a key personnel on my NIH-related research.

144. Given his prior research background and administrative responsibilities as Interim Director, it is perfectly reasonable to expect that Dr. Wikel would have known the difference between the requirements for key personnel as

opposed to other personnel.

145. Dr. Wikel made his complaint against me after I was led to believe, based on the memorandum of understanding dated August 2, 2002, that the matter had been satisfactorily resolved.

146. I did not file a faculty grievance regarding the encumbrance of the funds because I was led to believe, based on the memorandum of understanding dated August 2, 2002, that the matter had been satisfactorily resolved.

147. The monies were restored to the NIH accounts late in 2002.

148. In the August 22, 2001 letter from Dr. Deckers to me, I was informed I had the right to appeal the administrative steps he imposed on me to the Health Center Appeals Committee. However, Deckers and Berlin verbally warned me at this time not to appeal. In fact, Deckers informed me that the consequences of an appeal would be dire for me.

149. At the time of Deckers' December 27, 2001 letter, in which he advised me that Dr. Berlin had expressed a concern that I be relieved of my duties as Director of the Center for Microbial Pathogenesis, there was no indication that the ORI investigation would in any way interfere with the plaintiff's responsibilities. ORI was conducting a review of the University's investigation.

150. The DOD proposal submitted by Dr. Wikel describes the use of DNA immunization, a technique very closely related to ELI.

151. In one discussion he had with me in August, 2002, Dr. Wikel acknowledged that the DOD project would not even exist were it not for my intellectual contributions and technological skills.

152. The proposal submitted by the University of Connecticut Health Center failed to acknowledge the major contributions I made in the area of research forming the basis of the DOD project. Contrary to the central role I played in developing the DOD proposal and the science underlying it, mention of my contributions were unremarkably noted in the Preliminary Data section of the DOD funding request which down played my efforts and intellectual property.

153. As a research scientist with experience with the federal requirements regarding payments from NIH grant funds for personnel salaries to individuals performing services covered by the grant, I was aware that the University of Connecticut Health Center had violated federal grant requirements when it encumbered my grants for the payment of Bourell's salary without any regard to the Time and Effort he expended on grant related research.

154. I was allowed to retain my position as Director of the Center for Microbial Pathogenesis even after the Office of Research Integrity independently exercised jurisdiction over the issue of my research misconduct and began its own investigation of my conduct.

155. It is scientifically inconceivable that over a period of a mere two months all of the original data submitted with the DOD proposal were no longer necessary because in that short period of time Dr. Wikel could have generated new data supplanting the entire Preliminary Data section which took years to develop.

156. Between the time of the commencement of the investigation of the my conduct by the Office of Research Integrity and Deckers' decision to permanently relieve me of my position as Director of the Center for Microbial Pathogenesis, there were no intervening circumstances of which I was aware or of which Deckers informed me that justified my removal of from the position of Director of the Center for Microbial Pathogenesis.

157. By letter dated July 3, 2002, I requested through my attorney that I be restored to the position of Director of the Center for Microbial Pathogenesis. *(Exhibit 39)*.

158. As of the present date, I have not been restored to the position of Director of the Center for Microbial Pathogenesis, nor have I been informed of the reasons why I have not been restored nor have I been accorded a hearing of any type on my request.

*[signature]*
Justin D. Radolf

Personally appeared JUSTIN D. RADOLF, and made Oath to the truth of the matters contained in the foregoing affidavit, before me.

SUBSCRIBED AND SWORN TO, before me, on this 26th day of October, 2004.

*[signature]*
Commissioner of Superior Court/Notary Public

44