FILED

2004 NOV -8 P 12: 45

US DISTRICT COURT
NEW HAVEN, CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUSTIN D. RADOLF,<br>Plaintiff, | : CIVIL NO. 3: 03CV242 (MRK)<br>: LEAD/MASTER DOCKET NO.<br>: |
| V. | : |
| UNIVERSITY OF CONNECTICUT;<br>UNIVERSITY OF CONNECTICUT<br>HEALTH CENTER;<br>PETER J. DECKERS, EXECUTIVE<br>VICE PRESIDENT FOR HEALTH<br>AFFAIRS AND DEAN OF THE SCHOOL<br>MEDICINE, INDIVIDUALLY AND<br>IN HIS OFFICIAL CAPACITY;<br>RICHARD BERLIN, ASSOCIATE DEAN,<br>INDIVIDUALLY AND IN HIS<br>OFFICIAL CAPACITY; AND STEPHEN<br>WIKEL, INDIVIDUALLY AND IN HIS<br>OFFICIAL CAPACITY,<br>Defendants. | : CASE NO. 3:03CV242 (MRK)<br>: MEMBER CASE<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: NOVEMBER 5, 2004 |

## SUBMISSION OF CORRECTED
## AFFIDAVIT OF DR. MELISSA J. CAIMANO

On the cover sheet accompanying the affidavit of Dr. Melissa J. Caimano, the affidavit is incorrectly referred to as the affidavit of Chiara Strezsiewski instead of that of Dr. Melissa J. Caimano. In fact, Chiara Strezsiewski is the notary public who took the oath of Dr. Melissa J.

Caimano. Therefore, the plaintiff resubmits a copy of the affidavit of Dr. Melissa J. Caimano with the proper cover sheet, attached hereto, without any revision to the affidavit itself.

PLAINTIFF – JUSTIN D. RADOLF

BY: _____
Thomas W. Bucci, Esq.
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT 06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net
Federal Bar # ct07805

## CERTIFICATION

I hereby certify that I caused to be served a copy of the above and foregoing *Corrected Affidavit of Dr. Melissa J. Caimano* by sending same, via U.S.P.S. postage prepaid this 5th day of November 2004, to the following:

Jane D. Comerford, Esq.
Office of the Attorney General
University of Connecticut Health Center
Room LMO43
Farmington, CT 06030
Tel: 860-679-1114
Fax: 860-679-1997
Fed. Bar No. ct06328

_____
Thomas W. Bucci, for
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT 06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Fed. Bar #ct07805
Email: thomasbucci@earthlink.net

**FILED**

2004 NOV -8  P 12: 45

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

U.S. DISTRICT COURT
NEW HAVEN, CT

| | |
|---|---|
| JUSTIN D. RADOLF,<br>Plaintiff, | : CIVIL NO. 3: 03CV242 (MRK)<br>: LEAD/MASTER DOCKET NO.<br>: |
| V. | : |
| UNIVERSITY OF CONNECTICUT;<br>UNIVERSITY OF CONNECTICUT<br>HEALTH CENTER;<br>PETER J. DECKERS, EXECUTIVE<br>VICE PRESIDENT FOR HEALTH<br>AFFAIRS AND DEAN OF THE SCHOOL<br>MEDICINE, INDIVIDUALLY AND<br>IN HIS OFFICIAL CAPACITY;<br>RICHARD BERLIN, ASSOCIATE DEAN,<br>INDIVIDUALLY AND IN HIS<br>OFFICIAL CAPACITY; AND STEPHEN<br>WIKEL, INDIVIDUALLY AND IN HIS<br>OFFICIAL CAPACITY,<br>Defendants. | : CASE NO. 3:03CV242 (MRK)<br>: MEMBER CASE<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: NOVEMBER 1, 2004 |

**AFFIDAVIT OF DR. MELISSA J. CAIMANO**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**FILED**
2004 NOV -8  P 12: 45

U.S. DISTRICT COURT
NEW HAVEN, CT

| | |
|---|---|
| JUSTIN D. RADOLF,<br>　　Plaintiff,<br>NO.<br><br>V.<br><br>UNIVERSITY OF CONNECTICUT;<br>UNIVERSITY OF CONNECTICUT<br>HEALTH CENTER;<br>PETER J. DECKERS, EXECUTIVE<br>VICE PRESIDENT FOR HEALTH<br>AFFAIRS AND DEAN OF THE SCHOOL<br>MEDICINE, INDIVIDUALLY AND<br>IN HIS OFFICIAL CAPACITY;<br>RICHARD BERLIN, ASSOCIATE DEAN,<br>INDIVIDUALLY AND IN HIS<br>OFFICIAL CAPACITY; AND STEPHEN<br>WIKEL, INDIVIDUALLY AND IN HIS<br>OFFICIAL CAPACITY,<br>　　Defendants. | CIVIL NO. 3:03CV242 (MRK)<br>LEAD/MASTER DOCKET<br><br><br><br><br>CASE NO. 3:03CV242 (MRK)<br>MEMBER CASE<br><br><br><br><br><br><br><br><br><br><br><br>October 12, 2004 |

## AFFIDAVIT

STATE OF CONNECTICUT)
　　　　　　　　　　　　) West Hartford, CT.
COUNTY OF FAIRFIELD)

　　The undersigned, being duly sworn, hereby deposes and says:

1. 　　I am over the age of eighteen (18) years and believe in the obligations of an oath.

2. 　　I am familiar with the facts alleged contained in this affidavit.

3. 　　I attest that the facts and matters contained herein are true and accurate.

4. 　　I am a Research Instructor in the Department of Pathology and in

the Center for Microbial Pathogenesis at the University of Connecticut Health Center.

5. I am recognized for my expertise in molecular microbiology and the pathogenesis of arthropod-borne infections, particularly Lyme disease, and have extensive experience working with *Borrelia burgdorferi*, the Lyme disease spirochete, and *Ixodes scapularis*, the tick vector that transmits Lyme disease. My current research focuses on the differential expression of *B. burgdorferi* genes within the mammalian and arthropod (i.e., tick) hosts. For the last 3 years, I have served as a co-instructor for a graduate-level course on computer-assisted sequence analysis

6. I entered Dr. Radolf's laboratory at UT Southwestern as a postdoctoral fellow in September, 1996.

7. I decided to join the Radolf laboratory because of Dr. Radolf's exceptional publication record in the field of molecular pathogenesis and spirochete molecular biology.

8. At that time he was already internationally recognized for his research accomplishments and expertise in molecular microbiology.

9. One of the projects that I was going to pursue involved the use of genetic immunization to develop vaccines against spirochetal infections, including Lyme disease.

10. I was responsible for developing this technology in Dr. Radolf's laboratory and this work was underway before there were any

                interactions between Dr. Radolf and Dr. Wikel.

11.     My first interaction with Dr. Wikel occurred in early 1997 when he and his research technician, Doug Berman, visited the Radolf laboratory at UT Southwestern to receive training in the screening of the *Dermacentor andersoni* library.

12.     This library was made from salivary glands removed from four day fed *D. andersoni* adult ticks. The salivary glands had been sent to Dr. Radolf's laboratory by Dr. Wikel; Dr. Akins in Dr. Radolf's laboratory had extracted the RNA for the library using methodologies that had been well established in the Radolf laboratory.

13.     Based on my interactions with the members of the Wikel laboratory, it was obvious to me that the Wikel laboratory had no prior experience with these fundamental genetic techniques.

14.     When it became evident that the antiserum provided by Dr. Wikel had no detectable reactivity with clones in the library, Dr. Radolf suggested that we take an EST approach, reasoning that the library should be highly enriched in clones encoding salivary gland ESTs important for the feeding process.

15.     This alternative approach was highly feasible because it utilized molecular and genetic technologies that were already fully operational in Dr. Radolf's laboratory for the study of *Borrelia burgdorferi* and *Treponema pallidum*.

16. Moreover, it was readily apparent that this work had to be conducted in the Radolf laboratory because no one in the Wikel laboratory had the technical training or expertise to either perform or oversee the development of this alternative, molecularly driven, EST-based approach.

17. Initially, the actual benchtop work was performed by Dr. Darrin Akins of the Radolf laboratory.

18. I took over the project after Dr. Akins joined the faculty at Oklahoma University Health Sciences Center in 1998.

19. I began the large scale sequencing of ESTs in late 1997 or early 1998.

20. One of the first interesting sequences I identified was for a molecule called calreticulin. Building upon an earlier report that calreticulin is present in tick saliva and that the feeding process is interrupted in calreticulin-immunized animals, I generated and purified a recombinant calreticulin protein that was sent to Dr. Wikel's laboratory in November, 1998. The purpose of these experiments was to determine if immunization with calreticulin protected animals against tick feeding; if this were successful, we would then move on to evaluate this molecule or the *Ixodes scapularis* ortholog as a potential Lyme disease transmission blocking vaccine.

21. Dr. Wikel never communicated to me the results of these experiments, or provided to Dr. Radolf a written summary of these

experiments.

22. Another notable sequence that I identified using the EST approach at or about this same time was a molecule called "p36", that Dr. Wikel had first described in a paper published in 1998 in the Journal of Medical Entomology. This paper described only approximately 25 amino acids from the N-terminus of p36; by molecular mass one would expect the protein to have more than 300 amino acid residues. Of particular importance is that the N-terminal sequence published in the 1998 paper was obtained by automated Edman degradation, not by molecular cloning and sequencing.

23. The p36 EST that I pulled out of the *D. andersoni* library encoded the entire molecule, and therefore enabled Dr. Wikel to complete the p36 sequence. This information was published in the Journal of Parasitology in 2000 with Dr. Radolf and me as co-authors. This publication represents the first paper from the Wikel laboratory that utilized recombinant DNA techniques, and it is thus, completely inaccurate to state that he had recognized molecular expertise at this point in his career.

24. Dr. Wikel failed to notify Dr. Radolf or me or include either one of us as co-authors when the p36 sequence was submitted to the GenBank database (Accession Number AF167171) in July, 1999. Our names should have been included in this submission given our contribution to the complete p36 sequence and it is fully correct to

state, based on our work and the resulting publication that Dr. Radolf and I have co-ownership of the intellectual property rights relating to the p36 sequence.

25. A search of the National Center for Biotechnology Information GenBank database, a public domain computer-based repository for molecular biology information, reveals that Dr. Wikel had no prior submissions in the GenBank database, further substantiating the contention that his laboratory had no recognized recombinant DNA expertise either prior to or during the first four years of the Radolf-Wikel collaboration.

26. By comparison, a search of the GenBank database through 1999 reveals that Dr. Radolf had more than 60 submissions.

27. Dr. Melanie Palmer, with whom Dr. Wikel claims to have had a collaboration, submitted only a total of 13 sequences to GenBank before she Oklahoma State University ("OSU") in 1999; Dr. Wikel is listed only on the p36 submission.

28. Dr. Wikel's assertion that he had an extensive molecular biology collaboration with Dr. Palmer at OSU prior to his collaboration with Dr. Radolf is a clear misrepresentation of his documented experience.

29. In order to study p36 more fully, it was necessary to generate a recombinant form of the protein. A clone for expressing recombinant p36 as a His-tag fusion protein was generated by me

and sent to Dr. Melanie Palmer in January, 1999.

30. All of my discussions relating to the construction of this clone and the purification of the protein were conducted with Dr. Palmer, not Dr. Wikel or Wikel laboratory personnel, because no one in Dr. Wikel's laboratory had the technical background to participate in this work.

31. I estimate that I personally sequenced more than 100 clones from the *D. andersoni* cDNA library.

32. The tick research had begun with *D. andersoni* because they are relatively large ticks from which it is relatively easy to accumulate sufficient numbers of glands for RNA extraction and subsequent cDNA library construction.

33. However, our primary interest was in obtaining ESTs and developing a tick vaccine for *Ixodes scapularis*, the vector of Lyme disease. This is a much smaller tick and required more time to accumulate glands for RNA extraction. We also viewed the *D. andersoni* work as a "feasibility study" for the more difficult *I. scapularis* research. Indeed, my work, described above, clearly established that the cDNA library we had generated from *D. andersoni* was a good source of salivary gland ESTs.

34. Thus, Dr. Radolf and Dr. Wikel decided to proceed with generating an *I. scapularis* library along the lines of what had been done with Dr. Akins with the *D. andersoni* library.

35. Dr. Wikel sent the salivary glands to me at UT Southwestern so that I could coordinate this process with Stratagene, a biotechnology company based in La Jolla, CA. I sent these materials by FedEx to Stratagene (FedEx tracking number 809929697068) on December 18, 1998. Several months later I was notified by Mr. Michael Kobrin at Stratagene that an accident had occurred and that the glands were not usable. Dr. Radolf and I spoke with Stratagene officials and convinced them to make a new library free of charge. These salivary gland materials were regenerated by Dr. Wikel.

36. At this point, we were in the process of relocating to University of Connecticut Health Center ("UCHC"), and I arranged to have the library sent to Dr. Radolf's new laboratory at UCHC. The library was sent by Stratagene directly to Dr. Radolf at UCHC on March 29, 2000. The accompanying product information sheet also lists Dr. Radolf as the recipient for Stratagene Order # 98236, UT Southwestern purchase order # 916505. I personally received the library from Stratagene and insured that it was properly aliquoted, and stored.

37. Soon after Dr. Wikel's arrival at UCHC, I gave Dr. Wikel amplified and unamplified aliquots of the library. Since there were no immediate plans for this work to be performed in his laboratory, these aliquots were given to Dr. Wikel primarily as a safety precaution in the event of an accident such as a freezer-failure.

38.    These materials and any resulting data were jointly owned by Drs. Radolf and Wikel. In other words, it would have been contrary to the established collaboration for either investigator to use these materials in an independent endeavor. It is also worth noting that at the time when I gave the library aliquots to Dr. Wikel, there was no one in his laboratory capable of working with it.

39.    About June, 1999, Dr. Isaac Onyango, a trained veterinary molecular entomologist, joined Dr. Radolf's laboratory specifically to work on the *D. andersoni* EST project. I worked closely with Dr. Onyango to ensure a smooth transition and supervise his training. At that point, my direct involvement in the project substantially diminished. However, during the first year of Dr. Onyango's fellowship, Dr. Wikel was still at OSU. During that period, Dr. Radolf met with Dr. Onyango to discuss and interpret the growing body of bioinformatics data resulting from the ESTs that were being generated and analyzed. Drs. Radolf and Onyango were responsible for developing the in-house organizational sequence database delineating the relevant biological categories into which newly generated sequences would be placed following bioinformatics analyses, including the identification of recognized functional motifs and conserved protein domains. This approach led to the identification of Kunitz domains in a number of the sequences, such domains are a potential indicator of anti-hemostatic activity. This

bioinformatics approach, as well as specific data generated from it, was incorporated directly into the DOD proposal.

40. It was my direct observation that Dr. Radolf was instrumental in the organization and interpretation of these data and was the driving force in formulating strategies to characterize the biological and/or pharmacological activities of recombinant proteins derived from ESTs with sequence homology to previously identified molecules. As one example, on or about mid-2000, Dr. Radolf organized a meeting between members of the Radolf and Wikel laboratories and investigators at Yale University who were conducting Lyme disease and tick-related research. One of the participants in this meeting was Dr. Michael Capello, who discussed his anti-coagulant work with hookworms. This meeting was critical in laying the groundwork for the experimental collaboration between Dr. Capello and Drs. Radolf and Wikel intended to characterize the anti-hemostatic activities of tick salivary proteins. Soon afterwards, Dr. Radolf hosted a visit by Dr. Capello at the CMP in UCHC; this visit was clearly also within the context of the collaboration with Drs. Radolf and Wikel.

41. Dr. Onyango left Dr. Radolf's laboratory about June, 2000. I worked directly with Dr. Francisco Alarcon-Chaidez to ensure a smooth transition of the *D. andersoni* project to Dr. Wikel's laboratory. There was no indication that the operational rules for the

Radolf-Wikel collaboration had changed in any way or that this was the initiation of an independent project in the Wikel laboratory.

42. Regarding the *I. scapularis* library, approximately several months after Dr. Francisco Alarcon-Chaidez's arrival, Dr. Jose Ribeiro from the NIH visited the CMP, hosted by Dr. Wikel. Soon afterwards, Dr. Wikel told me that he was sending large numbers of clones (ESTs) from our *I. scapularis* library to Dr. Ribeiro for automated sequence analysis. Despite the express understanding that this library was jointly owned by Drs. Radolf and Wikel, these sequence data files were not shown to me or shared either in electronic or hard copy form with either Dr. Radolf or me.

43. I have co-authored six papers with Dr. Wikel, five of which originated from the laboratories of Dr. Radolf or Dr. Darrin Akins. In each of the latter five papers, Dr. Wikel's sole contribution was to provide either uninfected *I. scapularis* larvae or *B. burgdorferi*-infected nymphs or to instruct Radolf laboratory personnel in how to tick infest animals. He made no contributions to the design or implementation of the described experiments, the interpretation of the resulting data, or the preparation of manuscripts describing the results.

44. Dr. Thrall has no recognized or published expertise in the use of contemporary molecular biology or recombinant DNA techniques, in vector-borne diseases, in Lyme disease, in microbial

pathogenesis, or bioinformatics.

45. Contrary to point 5 of the Thrall affidavit, use of "co-jointly owned preliminary data was implied" is a misrepresentation of the collaboration in which I played a key role. As co-owner of the *D. andersoni* EST intellectual properties, I was never asked for permission to include any of the data I generated in this collaboration, nor was I informed that data generated by me were going to be incorporated into any proposal which did not include me or Dr. Radolf as co-investigators.

46. Contrary to points 7 and 8 of the Thrall affidavit, based upon my direct interactions with Dr. Wikel and my knowledge of his publication record through the year 2000, there is no reason to believe that he was capable of independently establishing a genomics- or proteomics-based research program. Indeed, I personally supervised the introduction of two-dimensional gel electrophoresis with isoelectric focusing (2D-IEF), a central proteomics technique, into his laboratory.

47. The "purification, reproduction, characterization, and cloning of hundreds of clones from the original collaboration" described in point 9 of the Thrall affidavit was a misappropriation of intellectual property and reagents jointly owned by me, Dr. Radolf, and other members of the Radolf laboratory, consistent with the findings of the *ad hoc* committee chaired by Dr. John Shanley.

48. Given that the DOD proposal does not contain any *I. scapularis* EST data, the feasibility of the proposal and Dr. Wikel's demonstrated capacity to conduct the proposed research rests entirely on jointly owned data derived from the jointly owned *D. andersoni* 4-day fed salivary gland EST library, including data generated by me, regardless of any cosmetic technical modifications that may have been made during the original submission or afterwards. Thus, rather than being merely "illustrative", these data are central to the proposal and were used as a primary justification for funding Dr. Wikel as Principal Investigator. In other words, without the misappropriated data that Dr. Wikel incorporated into Figures 2, 3, and 4 of the proposal, reviewers would not have been able to conclude that Dr. Wikel had any demonstrated capacity to perform the proposed studies.

49. Contrary to point 10 of the Thrall affidavit, the modifications made by Dr. Wikel are purely technical and do not represent any conceptual advance beyond the work that was conducted in the Radolf laboratory as part of the established collaboration. Based on the Thrall affidavit and the DOD proposal, Dr. Wikel has not provided any evidence to support the claim that these "new directions" have generated information that could not have been derived from the libraries, methodologies, and bioinformatics approaches that were fully developed at the time the project was

transitioned from the Radolf to the Wikel laboratory. Indeed, the only *I. scapularis* EST submitted to GenBank from the Wikel laboratory is that for calreticulin, a homolog of the *D. andersoni* calreticulin referenced in point 20 of this Affidavit.

50. Contrary to point 10 in the Thrall affidavit, the "new approach" adopted by the Wikel laboratory for analyzing tick salivary gland ESTs has produced only a single molecule and, as stated earlier, one that was previously identified by me in the course of the *D. andersoni* EST studies clearly conducted in the context of the Radolf-Wikel collaboration.

51. Contrary to point 10 of the Thrall affidavit, the bioinformatics methodologies described in the DOD proposal are the same as those used during the Radolf-Wikel collaboration and thus do not in any way represent an advancement or new research direction.

52. Regarding point 11 of the Thrall affidavit, because the "extended clonal analysis" performed by Dr. Wikel involved the original jointly owned *D. andersoni* EST database and library, the resulting data are jointly owned by Drs. Radolf and Wikel and cannot be viewed as either independently derived or Dr. Wikel's sole intellectual property. No evidence is offered to substantiate the claim that this work represents any degree of advancement over the findings made in the original Radolf-Wikel collaboration.

53. Regarding point 12 of the Thrall affidavit, there is no evidence to

collaboration. As noted above, Dr. Thrall lacks the expertise in tick-borne diseases, EST analysis, or molecular biology to make an independent, informed judgment on this critical point.

Personally appeared Melissa J. Caimano, and made Oath to the truth of the matters contained in the foregoing affidavit, before me.

SUBSCRIBED AND SWORN TO, before me, on this 12th day of October 2004.

CHIARA A. STRZESIEWSKI

_Chiara A. Strzesiewski_

Commissioner of Superior Court/Notary Public

CHIARA A. STRZESIEWSKI
NOTARY PUBLIC
MY COMMISSION EXPIRES 12/31/2007

_Melissa J. Caimano_
Melissa J. Caimano