UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
|    Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| PETER J. DECKERS, EXECUTIVE | : | CASE NO. 3:03CV672(MRK) |
| VICE PRESIDENT FOR HEALTH | : | MEMBER CASE |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| OF MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
|    Defendants. | : | NOVEMBER 15, 2004 |

**LOCAL RULE 56(a)2 STATEMENT**

   **A.  Material Facts Asserted by the Defendant**

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. Admit.

8. Admit.

9. Admit that on September 9, 1998, the plaintiff was "formally offer[ed] ... the position of Director of the Center of Microbial Pathogenesis and appointment as Professor of Medicine (primary) and Microbiology (secondary) with tenure effective January 1, 1999, at a salary of one hundred seventy-five thousand dollars ($175,000) per annum." (*Exhibit 1*.)

10. Admit.

11. Admit.

12. Admit.

13. Admit.

14. Admit.

15. Admit.

16. Admit

17. Admit that in the letter of August 22, 2001 to which reference is made in preceding statement of undisputed fact, #16, Deckers wrote, "[t]his three year period will be considered a period of probation for you as a member of this academic community." (*Exhibit 2.)*

18. Admit that the plaintiff was informed in the letter that he had the right to appeal this decision to the Health Center Appeals Committee. However, Deckers and Berlin verbally warned the plaintiff not to appeal. In fact, Deckers informed the plaintiff that the consequences of an appeal would be dire. (Radolf Aff. ¶  ).

19. Admit.

20. Admit.

21. Admit.

22. Admit that the plaintiff voluntarily submitted a written statement to the ORI in which this admission was included. However, the admission by the plaintiff of scientific misconduct related to the same instance of misconduct to which the defendant makes reference in statement of undisputed fact # 15. The SRB investigation and that of the ORI involved the identical instance of misconduct. After the finding of the SRB, or at any other time, there was no new allegation that the plaintiff had committed an act of scientific misconduct.

23. Admit that the plaintiff voluntarily submitted a written statement to the ORI in which this admission was included.

24. Admit that the plaintiff voluntarily submitted a written statement to the ORI in which this admission by the plaintiff was included.

25. Admit that the plaintiff and the ORI entered into a voluntary agreement that, in part, contained these provisions.

26. The plaintiff is only able to admit that he did not participate with the defendant in negotiating a voluntary agreement with the ORI. He has no knowledge of the communications that the ORI may have had with the defendant.

27. Admit.

28. Admit.

29. Deny that the notice to the plaintiff was "in accordance with the ORI's mandate." The plaintiff admits that a supervisory plan was the only aspect of Deckers' communication that could be viewed as being "in accordance with the ORI's mandate." *(Exhibit 3).* However, the Voluntary Exclusion Agreement did not require that the academic probation imposed on the plaintiff by Deckers on August 22, 2001 be extended through March 9, 2008, or that the ORI required the plaintiff to be "excluded from any academic and/or administrative leadership position on behalf of the UCHC and its schools and hospital that could include, directly or indirectly any service of any kind to the USPHS." Likewise, the ORI did not mandate that the plaintiff be excluded "as an available mentor for new MD/PhD candidates on the resubmission of the NIH Training Grant" for the UCSOM program, or that his appointment on the Steering Committee of the MD/PhD Program be immediately terminated.

30. The plaintiff admits that the ORI reviewed and revised the Supervisory Plan.

31. Admit; however, the plaintiff was never provided with notice of this policy. Admit; however, the plaintiff was never provided with notice of this policy, nor of the meeting at which the policy was adopted. Since the minutes of the meeting (Deckers Aff. Attachment 8) demonstrates that the plaintiff's conduct was discussed at this meeting, notice of the meeting should have been provided him pursuant to the Connecticut Freedom of Information Act. Further, since the policy was adopted on April 8, 20023, it could not have been the basis of the action that was taken by Deckers on April 4, 2003.

4

32. Admit.

33. Admit.  However, since the policy was adopted on April 8, 20023, it could not have been the basis of the action that was taken by Deckers on April 4, 2003.

34. Admit.

35. Admit.

36. Admit.

37. Admit.

38. Deny.  Defendant takes the plaintiff's response out of context.  *(Radolf Tr. 190-200).* Additionally, since January, 2002 that there have been many committee assignments made by the Health Center but none were given to the plaintiff.

39. Deny.  Defendant takes the plaintiff's response out of context.  *(Radolf Tr. 190-200).*

40. Deny.  Deckers committed to the plaintiff that he would receive an appointment as a full professor with tenure.  On or about January, 1999, several months after the plaintiff had accepted the Center Directorship, he made another visit to UCHC to meet faculty members and discuss various details regarding the transfer of my laboratory and establishment of the Center.  It was during these discussions with Dr. Berlin that the plaintiff discovered that his initial appointment would be as Assistant Professor and that his tenured appointments as Professor in the Departments of Medicine and Microbiology would not be made by the UCHC Senior Appointments and Promotions Committee (SAPC) for as long as one year

after the move.  The plaintiff stated without reservation that he considered the appointment as Assistant Professor to be contrary to the representations made by Drs. Deckers and Berlin during our discussions and in the letter of offering.  He also indicated that if this situation were not remedied, he would withdraw his acceptance of the Center Directorship and stay at UT Southwestern.  On January 8, 1999, following the plaintiff's return to Dallas, TX, he received a letter from Dr. Deckers stating "This is to indicate that you will be appointed Professor of Medicine with tenure effective April 1, 1999".  April 1, 1999 was the agreed upon start date for my position as Center Director.  Thus, months before the actual move, there was a clear understanding that the appointments as Center Director and Professor of Medicine and Microbiology were interconnected.  Shortly after the plaintiff's arrival at the Medical Center, he received a letter from Dr. Leslie Cutler, then Chancellor, stating that the plaintiff was appointed as Assistant Professor, a non-tenured position.  The plaintiff was confused by this and concluded that Dr. Deckers had not informed Dr. Cutler about his January 8 letter.  The deposition page, *Radolf Tr. 202,* cited by the defendant in support of the claim that "Dr. Radolf admits that Dr. Deckers did not make any assurance regarding his tenure status" does not support this statement.  Also, as a senior faculty member it was to be expected that the plaintiff would be given committee assignments.  Indeed, this occurred routinely and frequently at the outset of the plaintiff's employment at the Health Center without any requests on the plaintiff's part.  For instance, without making any request, the

plaintiff participated in a search committee for the Director of Research at Children's Medical Center. It is not customary for a faculty member to approach a Dean or Committee head to request assignment to a particular committee. Also, faculty members don't often know what committees are being formed; this happens at a higher administrative level. Without knowing what committees have been formed, it is not possible to request to be a member of such committee. In the vast majority of instances, one is contacted about serving on committees.

41. Admit. However, as a senior faculty member it was to be expected that the plaintiff would be given committee assignments. Indeed, this occurred routinely and frequently at the outset of the plaintiff's employment at the Health Center without any requests on the plaintiff's part. For instance, without making any request, the plaintiff participated in a search committee for the Director of Research at Children's Medical Center. It is not customary for a faculty member to approach a Dean or Committee head to request assignment to a particular committee. Also, faculty members don't often know what committees are being formed; this happens at a higher administrative level. Without knowing what committees have been formed, it is not possible to request to be a member of such committee. In the vast majority of instances, one is contacted about serving on committees.

42. Deny.  The defendant in his *Statement of Undisputed Material Fact #14* identifies the provisions of the University of Connecticut's By-Laws, Article XV.L.1., which "entitle full professors to a wide range of entitlements".

43. Admit.  Nevertheless, a senior faculty member has every reason to expect that he will be asked to serve on committees.

44. Admit.

45. Admit.  The plaintiff admits that such an occurrence is possible but highly unlikely.

46. Admit.  However, the plaintiff has received no notification of meeting dates and times for these committees, nor notification that he is still a member of them.  It is not the responsibility of committee members to chase after committee heads to find out when meetings are being held.  Notification of membership on committees comes from the Deckers' office or some higher administrative source and it is not customary for a faculty member to have to go around inquiring if he/she is still a member of a particular committee. *(Radolf Tr. 218, 219).*

47. Admit.  But this does not mean that the plaintiff was unable to handle other committee or teaching assignments.  The GCRC assignment is extremely time consuming.

48. Admit.

49. Admit.  However, these memberships are external to the University of Connecticut Health Center, and do not depend in any manner on the defendant's approval.

50. Deny. The plaintiff clearly takes Dr. Radolf's statement out of context. Deckers placed the plaintiff on probation on August 22, 2001 for a period of three years, *Exhibit 2*. Deckers then extended the academic probation to March 9, 2008. *Exhibit 3*. The ORI never placed the plaintiff on academic probation. *Exhibit 4*.

51. Deny. *(Radolf Tr. 241, 245-249).*

52. Deny that this is the only the complaint of the plaintiff. The plaintiff also complained about the arbitrary manner in which Deckers extended the plaintiff's academic probation. *(Radolf Tr. 241).*

53. Deny. *(Radolf Tr. 245-248).*

54. Deny. The plaintiff testified that the defendant used the ORI Voluntary Exclusion Agreement as a pretext for imposing further discipline on him. He testified on the face of Deckers' letter of April 4, 2003, *Exhibit 3*, the actions taken by Deckers resulted from the ORI agreement, *Exhibit 4*. However, the plaintiff's statement must be read in view of his other claim that correlating Deckers' discipline of him on April 4, 2003 to the terms of the Voluntary Exclusion Agreement, *Exhibit 4,* was a ruse. *(Radolf Tr. 242, 243, 245-248).* The only action justified by the Voluntary Agreement was the imposition of a Supervisory Plan. Further, the issue of retaliation is a question of law.

55. Admit.

56. Admit.

57. Admit.

58. Admit.

59. Admit.

60. Admit.

61. Admit.

62. Admit.

63. Admit.

64. Admit.

B. **Issues of Material Fact As To Which It is Contended There Is A Genuine Issue To Be Tried**

1. On July 26, 2001, a Special Review Board (SRB) of the UCHC, which was formed to investigate an allegation of research misconduct directed against the plaintiff *(Exhibit 5)*, determined, "It appears that the original photograph of the RT- PCR experiment was mislabelled (sic) to fit the contention that aforementioned mRNAs are expressed in the salivary glands.  Dr. Radolf admitted to this misrepresentation of data…It seems quite clear that Dr. Radolf mislabelled (sic) the figure to support the statement in the grant that such mRNAs were expressed in the salivary glands of the Dermacentor andersoni.  For example, lanes 3, 5, 13 and 15 are plasmid controls, which were labeled in Figure 2 as KD2, KD4,

Mp(d) and BB respectively. These actions by Dr. Radolf clearly constitute misrepresentation of data. Although the conclusions that he made in the grant were ultimately shown to be true, the fact that lanes in the photograph were mislabelled (sic) knowingly constitutes scientific misconduct. Dr. Radolf admitted that this was his error in judgment. During the inquiry, and during Dr. Radolf's testimony, he admitted to the data falsification. Consequently, the SRB unanimously found that Dr. Justin Radolf engaged in research misconduct by falsifying Figure 2 of the USDA grant application."

2. As a result of the findings of the SRB, the defendant, Deckers, informed the plaintiff by letter dated August 22, 2001, *(Exhibit 2)*, that the following administrative steps would be implemented:

   a. a letter of reprimand will be placed in your personnel file (consider this letter to be that letter of reprimand) and

   b. a committee of faculty researchers who are tenured Professors of the School of Medicine will be created who shall thoroughly inspect all new research grant proposals which you author or co-author for a period of three years (September 1, 2001 through August 31, 2004) to ensure (1) compliance with all applicable regulations and (2) the integrity of research data presented. This three year period will be considered a period of probation for you as a member of this academic community."

3. In the letter of reprimand, dated August 22, 2001, Deckers noted that "there is (1) no evidence that your action in this circumstance is part of a pattern of dishonest behavior, or that (2) this falsification had any impact on the research record, research subjects, other researchers, institutions, or the public welfare and, further, (3) the grant applications to USDA and CII were withdrawn before review, and 'problems with the data' in the grants correctly offered as reasons for such withdrawal." *(Exhibit 2).*

4. Pursuant to the letter of August 22, 2001, the plaintiff's status as a Professor with tenure was unaffected. The plaintiff was not excluded from participating in academic or administrative leadership positions on behalf of UConn and/or UCHC and its schools and hospitals. The plaintiff was not prohibited from belonging to, participating on, or partaking in any academic committees or boards or events or functions.

5. Deckers and the Special Review Board had decided, independent of the plaintiff, not to report its investigation of Radolf to the Office of Research Integrity. *(Exhibit 2).*

6. Although the defendant, Deckers, decided "since this episode of research misconduct did not involve federally funded research, and since the grants in question were not submitted to the National Institutes of Health, I have further decided to accept the SRB interpretation that the UCHC is not obligated to report this investigation and its results to any outside party, including the Office of Research Integrity (ORI)", *(Exhibit 2)*, the Office of Research

Integrity independently exercised jurisdiction over the subject of the plaintiff's research misconduct and reviewed the findings of the defendant, Deckers, and the SRB.

7. Despite the decision of the ORI to review the SRB's findings, the defendant, Deckers, informed the plaintiff that he was not at risk for any disciplinary action by the University of Connecticut and the University of Connecticut Health Center. *(Radolf Aff. ¶ 22 )*.

8. The defendant, Deckers, represented to the plaintiff that the findings of the SRB and the administrative actions he had implemented were the complete and final responses of the University of Connecticut and the University of Connecticut Health Center to the incident involving the plaintiff's research misconduct. *(Radolf Aff. ¶ 23)*.

9. The plaintiff entered into a voluntary agreement with Office of Research Integrity on March 10, 2003. Under the terms of the agreement, the plaintiff agreed to "exclude himself voluntarily from serving in any advisory capacity to the PHS [Public Health Service] including but not limited to service on any advisory committee, board, and/or peer review committee, or as a consultant for a period of five (5) years beginning with the effective date of this Agreement". *(Exhibit 3)*. Other than for this exclusion, there was no requirement that mandated that the plaintiff's period of academic probation be extended, that the plaintiff be disqualified from "any academic and/or administrative leadership position of the UCHC and its schools and hospital that could include, directly or indirectly, any service of any kind to

13

the USPHS and that the plaintiff be excluded from participation in the MD/PhD Program of UCSOM.

10. Absent from the Voluntary Exclusion Agreement is a "government-wide debarment", which would have excluded the plaintiff from participating in any activities in which government funds are used.

11. By letter dated April 4, 2003, *(Exhibit 4)*, the defendant, Deckers, summarily imposed a series of disciplinary actions against the plaintiff, including the following:

> "1. [The plaintiff's] academic probation will continue at least through March 9, 2008. During this interval you will be excluded from any academic and/or administrative leadership position on behalf of the UCHC and its schools and hospital that could include, directly or indirectly any service of any kind to the USPHS.
> 2. …The now operative Supervisory Plan requested of UCHC by ORI is attached and was forwarded to them as requested on April 4, 2003…
> 4. The MD/PhD Program of the UCSOM is a PHS-funded activity. Therefore, to ensure that the work of your current graduate student…who is an MD/PhD student, is not disturbed or disrupted in any way by these events, and that she is adequately mentored, a co-major advisor will be appointed by the Dean of the Graduate School to serve in conjunction with you…Additionally, you will not be listed as an available mentor for new MD/PhD candidates on the resubmission of the NIH Training Grant for this program and your appointment on the Steering Committee of the MD/PhD Program is terminated immediately.
> 5. This communication to you and the recent letter from ORI to us and your attorney, as well as the materials relative to this PHS action placed in the Federal Register, the NIH Guide for Grants and Contracts and the ORI Newsletter will be turned over to the

        Compliance Subcommittee of the UCHC Board of Directors for their review and further consideration." *(Exhibit 4).*

12. The actions of the defendant, Deckers, unilaterally, arbitrarily, and capriciously stripped the plaintiff of the rights and privileges to which he was entitled as a Professor pursuant to the established policies, practices, and procedures of the University of Connecticut and the University of Connecticut Health Center. *(Radolf Aff. ¶ 26).*

13. The defendant, Deckers, imposed these disciplinary actions on the plaintiff, unilaterally and without prior discussion with the plaintiff. *(Radolf Aff. ¶¶ 27, 28 ).*

14. The defendant, Deckers, imposed these disciplinary measures on the plaintiff without according the plaintiff a hearing in which the plaintiff would have a fair opportunity to contest the actions of the defendant, Deckers. *(Radolf Aff. ¶ 27 ).*

15. Deckers cannot point to any official or unofficial communication from the ORI requiring that he implement further discipline on the plaintiff. The Voluntary Agreement did not represent a new finding of misconduct. Additional wrongdoing beyond that which was originally found by the SRB was not uncovered nor were there any implications of further wrongdoing on the plaintiff's part. *(Radolf Aff. ¶¶ 31-33).*

16. A meeting to discuss these punitive measures would have allowed the plaintiff the opportunity to explain to Deckers that his actions were not required by the terms of the

Voluntary Agreement and that he had already imposed punishment on the plaintiff for the very same transgressions on August 22, 2001. *(Radolf Aff. ¶ 28 )*.

17. Except for requiring a supervisory plan, the actions taken by the defendant, Deckers, were not mandated by the provisions of the Voluntary Agreement entered into between the plaintiff and the ORI. *(Exhibits 3, 4)*.

18. After imposing the administrative measures on August 22, 2001 regarding the plaintiff's research misconduct, the defendant, Deckers, assured the plaintiff through a communication dated January 13, 2002 *(Exhibit 6)*, "Such a decision will not affect your rank, tenure, salary, space or secretarial support…I want you to, happily and enthusiastically, grow your research productivity as completely as possible, engage our clinical activity and contribute your considerable talent to the educational offerings of the School separated from as much stress as possible".

19. The Voluntary Agreement did not include, nor did it uncover, any additional implications of wrongdoing on the plaintiff's part beyond that which was originally found by the SRB on July 26, 2001.

20. After July 26, 2001, there were no additional findings made by the University of Connecticut Health Center or the Officer of Research Integrity or any other federal or state agency, officer or employee that the plaintiff had committed scientific misconduct. *(Radolf Aff. ¶ 32 )*.

21. Although the University of Connecticut Health Center has not defined the phrase "academic probation", it is viewed as rendering the faculty member on academic probation "ineligible for holding positions of responsibility or special recognition of any kind.  I wouldn't take someone on academic probation and give that person a leading role as a spokesperson for the university or representative, nor would we recommend him for a distinguished professorship or an alumni award.  We wouldn't send him to represent the institution in a formal meeting where it was an institutional position ... *(Berlin Tr. 55, 56).*

                PLAINTIFF – JUSTIN D. RADOLF


BY:_____
Thomas W. Bucci, Esq.
Federal Bar # ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net

## **CERTIFICATION**

I hereby certify that I caused to be served a copy of the above and foregoing *Local Rule 56(a)2 Statement* by sending same, via U.S.P.S. postage prepaid this 15th day of November, 2004, to the following:

Jane D. Comerford, Esq.
Office of the Attorney General
University of Connecticut Health Center
Room LMO43
Farmington, CT 06030
Tel: 860-679-1114
Fax: 860-679-1997
Fed. Bar No. ct06328

                                                 _____
Thomas W. Bucci, for
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Fed. Bar #ct07805
Email: thomasbucci@earthlink.net