**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| PETER J. DECKERS, EXECUTIVE | : | CASE NO. 3:03CV672(MRK) |
| VICE PRESIDENT FOR HEALTH | : | MEMBER CASE |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| OF MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 15, 2004 |

<u>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

I.    *Background*

There is little or no dispute regarding the factual background giving rise to the plaintiff's

causes of action.  However, there is dispute, as will be discussed, over significant material facts

regarding the disciplinary measures imposed on the plaintiff and the consequences those

measures have had on the plaintiff's status as a tenured professor at the University of

Connecticut Health Center.  During the summer of 1998, while a tenured Professor in the

Departments of Internal Medicine and Microbiology at the University of Texas Southwestern

Medical Center at Dallas, Texas ("UT Southwestern"), the plaintiff applied for the Directorship

of a newly created Center for Microbial Pathogenesis ("CMP") at University of Connecticut

Health Center ("UCHC") in response to an advertisement in a then-recent issue of the American Society for Microbiology ("ASM") News. *(Radolf Aff. ¶ 5)*. After a series of meetings with Dr. Richard Berlin, a ranking official of UCHC who was responsible for recruiting candidates for the director's position, the plaintiff was formally offered, by letter dated September 9, 1998, *(Exhibit 1)*, the position of "Director of the Center for Microbial Pathogenesis" in addition to the tenured appointments in the Departments of Medicine and Microbiology. *(Exhibit 1)*. The letter also stated that "your principle responsibility will be the formulation and development of the Center's research program" and it outlined the Institutional resources that would be allocated to the plaintiff for this new research Center. *(Radolf Aff. ¶ 7)*. In an email to Berlin dated September 11, 1998, the plaintiff formally accepted the position. *(Exhibit 7; Radolf ¶ 8)*. Sometime in January, 1999, several months after the plaintiff had accepted the Center Directorship, he made another visit to UCHC to meet faculty members and discuss various details regarding the transfer of his laboratory and the establishment of the Center with Berlin. It was during these discussions with Berlin that the plaintiff discovered that his initial appointment would be as Assistant Professor and that his tenured appointments as Professor in the Departments of Medicine and Microbiology would not be made by the UCHC Senior Appointments and Promotions Committee (SAPC) for as long as one year after the move. The plaintiff informed Berlin that he considered the appointment as Assistant Professor to be contrary to the representations made by the defendant, Dr. Peter Deckers ("Deckers"), and Berlin during their earlier discussions and in

the letter of offering.  The plaintiff emphatically indicated that if this situation was not remedied, he would withdraw his acceptance of the Center Directorship and remain at UT Southwestern. (*Radolf ¶ 9)*.  On January 8, 1999, following his return to Dallas, Texas, the plaintiff received a letter from Deckers stating "[t]his is to indicate that you will be appointed Professor of Medicine with tenure effective April 1, 1999".  The plaintiff had previously agreed to April 1, 1999 as the start date for his position as Center Director.  (*Radolf ¶ 10)*.  Shortly after the plaintiff's arrival, he received a letter from Dr. Leslie Cutler, then Chancellor of the University of Connecticut, stating that he had received an appointment as Assistant Professor, a non-tenured position.  The plaintiff was confused by this and concluded that Deckers had not informed Dr. Cutler about his January 8 letter.

On April 1, 1999, the plaintiff assumed his responsibilities as Director of the CMP.  On April 7, 1999, the Senior Appointments and Promotions Committee confirmed the plaintiff's appointments as Professor in the Departments of Medicine and Microbiology.  From the moment of his arrival at UCHC, the plaintiff endeavored to fulfill his commitment to establish a world-class CMP at UCHC.  During the next three years, he received numerous accolades and two excellent annual compensation reviews, with commensurate increases in salary.  On August 28, 2000, in response to the first Annual Report for the CMP, the plaintiff received a letter from Deckers stating "I congratulate you, your staff, and your faculty on an exceptionally productive academic year.  Your collective scholarship, presentations, and research funding are a credit to

your industry, intellect, and enthusiasm.  Be assured of the continued support of this office".
(*Radolf ¶ 13*).

On July 26, 2001, a Special Review Board ("SRB") of the University of Connecticut Health Center determined that the plaintiff had been guilty of research misconduct.  As a consequence, the plaintiff was issued a letter of reprimand by Deckers on August 22, 2001. (*Exhibit 2).*  The letter stated, "[y]ou engaged in research misconduct by falsifying figure 2 of the USDA application.  You confirmed this conclusion by admitting to the referenced falsification of data."  Deckers further noted, "there is (1) no evidence that your action in this circumstance is part of a pattern of dishonest behavior, or that (2) this falsification had any impact on the research record, research subjects, other researchers, institutions, or the public welfare and, further, (3) the grant applications to USDA and CII were withdrawn before review, and 'problems with the data' in the grants correctly offered as reasons for such withdrawal.  (*Exhibit 2).*  As a result of the finding of the SRB, Deckers imposed the following disciplinary measures on the plaintiff: "(a) a letter of reprimand will be placed in your personnel file (consider this letter to be that letter of reprimand) and (b) a committee of faculty researchers who are tenured Professors of the School of Medicine will be created who shall thoroughly inspect all research grant proposals which you author or co-author for a period of three years (September 1, 2001 through August 31, 2004) to ensure (1) compliance with all applicable regulations and (2) the integrity of research data presented.  This three year period will be considered a period of

probation for you as a member of this academic community." Deckers assured the plaintiff that the foregoing was the extent of the disciplinary action that the Health Center would take against the plaintiff.

The Special Review Board and Deckers decided, independent of the plaintiff, that it would not report its investigation and findings to the federal Office of Research Integrity[1]. (*Exhibit 2*). Deckers determined "since this episode of research misconduct did not involve federally funded research, and since the grants in question were not submitted to the National Institutes of Health, I have further decided to accept the SRB interpretation that the UCHC is not obligated to report this investigation and its results to any outside party, including the Office of Research Integrity (ORI)", *(Exhibit 2)*. Nevertheless, the Office of Research Integrity independently exercised jurisdiction over the subject of the plaintiff's research misconduct and reviewed the findings of the SRB. Even then, Deckers reassured the plaintiff that he was not at risk for any further disciplinary action by the University of Connecticut and the University of Connecticut Health Center. *(Radolf Aff. ¶¶ 22, 23)*. Deckers represented to the plaintiff that the findings of the SRB and the administrative actions he had implemented were the complete and final responses of the University of Connecticut and the University of Connecticut Health Center to the incident involving the plaintiff's research misconduct. *(Radolf Aff. ¶¶ 22, 23)*. In a

---

[1]Subsequently, the ORI exercised its oversight jurisdiction to review the research misconduct admitted to and found by the SRB, not as a result of any acts of misconduct. The defendants imply that the plaintiff was independently found guilty by the SRB and the ORI of separate violations. That simply is not the case.

communication to the plaintiff on January 13, 2002 *(Exhibit 6)*, after Deckers had been notified

of the ORI review, Deckers continued to encourage the plaintiff; "I want you to, happily and

enthusiastically, grow your research productivity as completely as possible, engage our clinical

activity and contribute your considerable talent to the educational offerings of the School

separated from as much stress as possible".

On March 10, 2003, the plaintiff entered into a voluntary agreement with Office of

Research Integrity.  Under the terms of the agreement, the plaintiff agreed to "exclude himself

voluntarily from serving in any advisory capacity to the PHS [Public Health Service] including

but not limited to service on any advisory committee, board, and/or peer review committee, or as

a consultant for a period of five (5) years beginning with the effective date of this Agreement.

(*Exhibit 3).*  Other than for this exclusion, there was no requirement that the plaintiff's period of

academic probation imposed by Deckers on August 22, 2001 be extended, that the plaintiff be

disqualified from "any academic and/or administrative leadership position of the UCHC and its

schools and hospital that could include, directly or indirectly, any service of any kind to the

USPHS and that the plaintiff be expelled from participation in the MD/PhD Program of

UCSOM.  Absent from the Voluntary Exclusion Agreement is a "government-wide debarment"

(the capital punishment for research misconduct), which would have excluded the plaintiff from

participating in any activities in which government funds are used[2].  By letter dated April 4,

2003, *Exhibit 4*, Deckers summarily imposed a series of disciplinary actions against the plaintiff,

including the following:

> "1. [The plaintiff's] academic probation will continue at least through March 9, 2008.  During this interval you will be excluded from any academic and/or administrative leadership position on behalf of the UCHC and its schools and hospital that could include, directly or indirectly any service of any kind to the USPHS.
>
> 2.  …The now operative Supervisory Plan requested of UCHC by ORI is attached and was forwarded to them as requested on April 4, 2003…
>
> 4.  The MD/PhD Program of the UCSOM is a PHS-funded activity. Therefore, to ensure that the work of your current graduate student…who is an MD/PhD student, is not disturbed or disrupted in any way by these events, and that she is adequately mentored, a co-major advisor will be appointed by the Dean of the Graduate School to serve in conjunction with you…Additionally, you will not be listed as an available mentor for new MD/PhD candidates on the resubmission of the NIH Training Grant for this program and your appointment on the Steering Committee of the MD/PhD Program is terminated immediately.
>
> 5.  This communication to you and the recent letter from ORI to us and your attorney, as well as the materials relative to this PHS action placed in the Federal Register, the NIH Guide for Grants and Contracts and the ORI Newsletter will be turned over to the Compliance Subcommittee of the UCHC Board of Directors for their review and further consideration."  *(Exhibit 4).*

---

[2] As will be discussed below, Deckers, when imposing further discipline on the plaintiff on April 4, 2003, acted as if the plaintiff had been debarred from participating in any federal funded activities.  He erroneously claimed that the plaintiff was excluded from participation in any activity where PHS funding was involved.  Deckers Tr. 114-123.

Deckers imposed these disciplinary actions on the plaintiff without any prior notice or discussion with the plaintiff. *(Radolf Aff. ¶ 26 ).* Except for requiring a supervisory plan, the Voluntary Agreement did not necessitate that Deckers impose these additional punitive measures on the plaintiff. *(Exhibit 3; Exhibit 4).* Deckers cannot point to any official or unofficial communication from the ORI requiring that he implement further discipline on the plaintiff. The Voluntary Agreement did not represent a new finding of misconduct. Additional wrongdoing beyond that which was originally found by the SRB was not uncovered nor were there any implications of further wrongdoing on the plaintiff's part. *(Radolf Aff. ¶¶ 31-33; Deckers Tr. 123-126).* There were no further findings made by either the University of Connecticut Health Center or the Officer of Research Integrity that the plaintiff had committed any additional acts of scientific misconduct after the date of the original findings made by the SRB on July 26, 2001. *(Radolf Aff. ¶¶ 31-33).*

Deckers indicates in his affidavit that he took the action against the plaintiff "pursuant to" the terms of the Voluntary Agreement". A review of the provisions of the Voluntary Agreement refutes this suggestion. Other than for the plaintiff voluntarily excluding himself from serving in any advisory capacity to the PHS [Public Health Service] including but not limited to service on any advisory committee, board, and/or peer review committee, or as a consultant for a period of five (5) years beginning with the effective date of this Agreement, *(Exhibit 3).*, there was no mandate from the ORI that required that the period of academic probation imposed on the

plaintiff by Deckers on August 22, 2001 be extended, that the plaintiff be disqualified from "any academic and/or administrative leadership position of the UCHC and its schools and hospital that could include, directly or indirectly, any service of any kind to the USPHS and that he be expelled from participation in the MD/PhD Program of UCSOM.

Deckers fails to recognize that he had already imposed discipline on the plaintiff for his misconduct and had promised the plaintiff that he would not suffer any further institutional discipline. There is simply no basis or justification for the imposition of further discipline on the plaintiff. Without any additional finding of wrongdoing, Deckers had no reason to exact more punishment on the plaintiff. *(Radolf Aff. ¶¶ 31-33).*

The defendant wholly discounts the severity of the punitive measures he enacted on the plaintiff on April 4, 2003 and the impact the newly exacted punishment had on the plaintiff's position as a tenured professor. Not only did he extend the plaintiff's "academic probation" through March 9, 2008, the defendant excluded the plaintiff "from any academic and/or administrative leadership position...that could include, directly or indirectly, any service of any kind to the USPHS." Deckers also barred the plaintiff from participation as a mentor in the MD/PhD program and terminated immediately his appointment on its Steering Committee. The defendant indicates that he merely extended the plaintiff's probation, and that the exclusion "from any academic and/or administrative leadership position...that could include, directly or

indirectly, any service of any kind to the USPHS", was implicit in the probation[3] enforced on the

plaintiff on August 22, 2001.  However, Deckers email to the plaintiff on January 13, 2002

dispels any such notion.  In that letter, Deckers specifically encourages the plaintiff to "grow

your research productivity as completely as possible, engage our clinical activity and contribute

your considerable talent to the educational offerings of the School..."  Deckers does not indicate

in this communication that the plaintiff's research, clinical and/or educational activities are in

any manner curtailed by the academic probation which had been imposed on him on August 22,

2001.  Similarly, the August 22, 2001 communication, unlike the April 4, 2003 letter, does not

mandate the plaintiff's exclusion from any academic and/or research activities.  There is not a

single mention made of any prohibition on the plaintiff's activities except to the extent of having

his future grant proposals reviewed by a panel of tenured faculty researchers.  The assertion that

punishment to this degree was inferred in the August 22, 2001 communication lacks credibility.

If it was inferred in the August 22, 2001 communication, then there would be no necessity to

spell it out in the April 4, 2003 letter.

Deckers describes the discipline exacted on the plaintiff as depriving him, at most, of

non-monetary perquisites of office.  He analogizes the punishment he imposed on the plaintiff on

April 6, 2003 to someone being denied a promotion or a specific job assignment.  Deckers

---

[3] The University has not defined "academic probation".  Berlin testified that it "seems to mean different things to different people".  Berlin Tr. 51, 54-56.  Deckers Tr. 105,106.

articulates a most limited view of the nature of the position of professor in an academic setting.

He asserts that so long as the plaintiff is tenured and receiving his salary and benefits, he does

not suffer a deprivation of his property interest in his position even when he suffers a loss of

rank.  Deckers paints a one-dimensional portrait, concentrating solely on money and tenure,

while totally ignoring the multifaceted role a university professor plays in the daily life of an

institution of higher education.  The so-called perquisites taken from the plaintiff, i.e. exclusion

"from any academic and/or administrative leadership position, comprise integral components of

the very essence of the professor position.  Participation in a leadership role in the academic and

administrative life of a university is an essential trait of a full professor.  It is not merely a

superfluous benefit that attaches to the job; it is a core element of the professor position itself.

Being excluded from participation as a leader in the university community, the plaintiff, as a

senior faculty member, has been deprived of the inherent value of his position in the university.

Without the ability to serve in a leadership role, the plaintiff, in reality, is no longer a full

professor.  Unquestionably, the plaintiff has suffered a loss of rank.  There can be little doubt that

if Deckers had formally demoted the plaintiff from professor to assistant professor without

advance notice or an opportunity to be heard, then the plaintiff would have had a cause of action

for a violation of his due process rights[4].

---

[4] *Ciambriello v. County of Nassau*, 292 F.3d 307, 313, 323(2d Cir. 2002) ("In summary, the Fourteenth Amendment granted Ciambriello the right to notice and an opportunity to be heard prior to his demotion, the County failed to provide such notice or opportunity, and Ciambriello did not waive this right in the CBA.  Therefore, Ciambriello has

## II.     Discussion

### a.  Legal Standard, Motion for Summary Judgment

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  See *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 202 (2d Cir. 1995) ; *Chambers v. TRM Centers Corp.*, 43 F.3d 29, 36 (2d Cir. 1994); *Stern v. Trustees of Columbia University in City of New York*, 131 F.3d 305 (2d Cir. 1997) ("It is of course well established that a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  See Fed.R.Civ.P. 56(c).  In assessing the record to determine whether there is such an issue, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. . ."); <u>Kerzer v. Kingley Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998) ("Summary judgment is inappropriate unless 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c).  On a motion for summary

---

sufficiently alleged a §  1983 claim against the County and the individual defendants for violation of his Fourteenth Amendment right to procedural due process."). See also *Lynch v. McNamara*, 2004 WL 2471545, *5(D.Conn. 2004), which implicitly recognizes that a "loss of rank" may implicate a protected property interest for the purpose of due process.

judgment, the moving party has the burden of showing the absence of a genuine issue of material fact, and the district court's task is limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them . . . In deciding such a motion, we, . . . must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. . . Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact. . . ").  The burden rests on the party seeking summary judgment, the moving party, to demonstrate that no genuine factual dispute exists.  *Kerzer v. Kingley Mfg.,* supra at p. 400.  In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and factual inferences in favor of the party against whom summary judgment is sought.  The inferences to be drawn from the underlying facts revealed in material such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.  See *Stern v. Trustees of Columbia University in City of New York,* supra at p. 312; *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994).

   In deciding a motion for summary judgment, the court cannot try issues of fact, but can only determine whether there are issues of fact to be tried.  *Kerzer v. Kingley Mfg.,* supra at p. 400; *Cronin v. Aetna Life Insurance Co.,* supra at p. 203.  If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference can be drawn in favor of the non-moving party, summary judgment is improper.

*Chambers v. TRM Copy Centers Corp., supra* at p. 37; *Lafond v. General Physics Services Corp.,* 50 F.3d 165, 171 (2d Cir. 1995). The trial court's function at this stage is to identify issues to be tried, not decide them. *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir. 2000).

### b. Violation of Plaintiff's Procedural Due Process Rights

#### 1. Property Interest in the Position of Professor

It is indisputable that the plaintiff possesses a constitutionally protected property interest in his position as a professor at the University of Connecticut Health Center. He is a tenured professor at the University of Connecticut. As such, he can only be terminated from his position for cause. *(Exhibit 8; Article XV, E); Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576-577, 92 S.Ct. 2701, 2708 - 2709 (1972) ("Similarly, in the area of public employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, *Slochower v. Board of Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, and college professors and staff members dismissed during the terms of their contracts, *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, have interests in continued employment that are safeguarded by due process."). The assertion advanced by the defendant that the due process protections recognized in *Board of Regents of State Colleges v. Roth,* supra, only extend to termination of employment, and not a demotion, is a misrepresentation of controlling legal precedent in the Second Circuit. The Court of Appeals for the Second Circuit has held that

removals, short of termination most certainly may constitute violations of the Fourteenth Amendment. *Ciambriello v. County of Nassau*, 292 F.3d at 323 ("In summary, the Fourteenth Amendment granted Ciambriello the right to notice and an opportunity to be heard prior to his demotion, the County failed to provide such notice or opportunity, and Ciambriello did not waive this right in the CBA. Therefore, Ciambriello has sufficiently alleged a § 1983 claim against the County and the individual defendants for violation of his Fourteenth Amendment right to procedural due process."). Thus, the plaintiff does not only possess a property interest in continued employment, he also possesses "a right to continued employment at the higher grade". *Ciambriello v. County of Nassau*, 292 F.3d at 317.

The University recognizes various levels of faculty, Professor, Associate Professor, Assistant Professor and Instructor. *(Exhibit 8, Article VI, A)*. A loss of his professor status would deprive the plaintiff of a protected property interest. *Kamenesh v. City of Miami*, 772 F.Supp. 583, 587 -588 (S.D.Fla. 1991) ("A public employee can have a property interest in not being demoted without cause--as opposed to not being transferred without cause--where such an interest arises from established "rules" or the parties' "mutually explicit understandings." *Winkler v. County of DeKalb*, 648 F.2d 411, 412 (5th Cir.1981) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972)). In *DeKalb*, the former Fifth Circuit held that a county engineer had a property interest in not being demoted to 'a position of vastly diminished responsibilities' without cause. *Id.* Similarly, in, the Eleventh Circuit found

that a public school teacher had a property interest in not being "transferred" without cause to a lesser position. 809 F.2d 1546, 1551-52 (11th Cir.1987)")(Footnote Omitted).

Despite Deckers' earlier promise to the contrary, on April 6, 2003, Deckers, without any advance warning, sent the plaintiff a letter outlining a second round of punishment for the very same violation for which he had already been punished on August 22, 2001.  Even though Deckers asserts that this was merely an extension of the previous discipline; be it an extension or new discipline, it still represented the imposition of harsher punitive measures on the plaintiff than originally imposed.  In particular, unlike the first discipline meted out, the punishment imposed on the plaintiff on April 6, 2003 barred the plaintiff from "any academic and/or administrative leadership position on behalf of the UCHC and its schools and hospital that could include, directly or indirectly any service of any kind to the USPHS" and immediately expelled him from membership on the Steering Committee of the MD/PhD Program[5].

The punishment imposed on the plaintiff by Deckers on April 6, 2003, stripped the plaintiff of the essence of his position as a professor at UCHC.  Although the defendant attempts to minimize his actions as involving discretionary departmental assignments, non-monetary perquisites of the plaintiff's professor position, and the denial of specific job assignments, the discipline exacted by Deckers deprived the plaintiff of the very fabric of his position as a senior

---

[5] The issue of whether the plaintiff was deserving of more punishment is not relevant to these proceedings.  If the defendant believed that it was necessary, for whatever reason, to inflict additional discipline on the plaintiff, then it should have acted in a constitutionally permissible manner, not by blindsiding the plaintiff with the letter of April 6, 2003 without any notice, formal or otherwise.

professor.  "The ideal professor actually does three distinct jobs, each of which can be quite

demanding.  Professors are expected to be experts in a field of study and to design and give

courses that provide students an understanding of their subject...  Ideally, professors both keep up

with their own field and make their own contributions to it.  Given the explosive growth of

scholarly work, merely keeping up is often difficult to impossible.  Add to this the desire not just

to be a narrow specialist but to have some knowledge of work in related and unrelated

disciplines, and you have a task which requires considerable time and energy…  *Finally, good*

*professors are expected to be contributors to the life of the university.  We should be good*

*colleagues in our departments, serve on committees and support the life of the university in other*

*ways.  Many faculty members devote long hours to these tasks, even though there is no added*

*pay for them and even though they are seldom weighted heavily in decisions about tenure,*

*promotion and salary increases.*  Each of these areas of work - teaching, scholarship and service

- generates open-ended demands on professors.  Trying to do all three is a difficult task, and

conscientious people will devote themselves to it and feel burdened by it."  - *Stephen Nathanson.*

http://www.voice.neu.edu/951207/opinion.html.  (Emphasis Added)[6].

---

[6] The "Ideal Professor" has also been described in the following terms, "those famed and accomplished men of learning, possessed of praiseworthy qualities and vast erudition…in the mirror of (whose) minds the forms of transcendent realities are reflected, and the lamp of their inner vision derives its light from the sun of universal knowledge.  They are busy by night and by day with meticulous research into such sciences as are profitable to mankind, and they devote themselves to the training of students of capacity.  It is certain that to their discerning taste, the proffered treasures of kings would not compare with a single drop of the waters of knowledge, and mountains of gold and silver could not outweigh the successful solution of a difficult problem.  To them, the delights that lie outside their work are only toys for children, and the cumbersome load of unnecessary possessions is only

It is a question of federal constitutional law, not state law, as to whether the plaintiff's right to continued employment at the level of professor rises to the level of a constitutionally protected property interest. *Ezekwo v. New York City Health and Hosp. Corp.,* 940 F.2d 775, 782 (2d Cir.1991). "A claim of entitlement is not precluded by absence of a formal right memorialized in an individual contract or a collective bargaining agreement because 'not every term of a contract must be reduced to writing[, and] [a]dditional contractual provisions may be implied into a contract as a result of a course of dealing between the parties. [Thus,] [t]he parties through their conduct and practice can create additional rights and duties.' *Id.* (quotation omitted). While 'not every contractual benefit rises to the level of a constitutionally protected property interest,' *id.,* UConn's 'policies and practices ... were such that an entitlement to the position of [Campus Director] existed,' [*Ezekwo v. New York City Health and Hosp. Corp.,* 940 F.2d 775, 783 (2d Cir.1991)]". *Malla v. University of Connecticut*, 312 F.Supp.2d 305, 322 (D.Conn. 2004). "Thus, 'to have a property interest in a benefit, a person must have more than an abstract need or desire for it.... He must, instead, have a legitimate claim of entitlement to it.' *Ezekwo,* 940 F.2d at 782, quoting, *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Sutton v. Village of Valley Stream,* 96 F.Supp.2d 189, 193 (E.D.N.Y. 2000). The question of entitlement requires the court to consider the importance of the right to

---

good for the ignorant and base. Content, like the birds, they give thanks for a handful of seeds, and the song of their wisdom dazzles the minds of the world's most wise." --*Abdu'l-Baha*
http://dynamo.ecn.purdue.edu/~cparikh/prof.htm.

the holder as well as the course of conduct of the party offering the right.  *Ezekwo,* 940 F.2d at 783.  Where the claimed right is no more than a claim to a particular work assignment or fringe benefit it will generally not be found to rise to the level of a constitutionally protected property right.  *See, e.g., id.* at 782 ('trivial and insubstantial' interests do not rise to the level of property rights).  On the other hand, where the right is significant and of great importance to the holder it may rise to such a level.  An interest in a benefit is a property right if 'there are such rules ore mutually explicit understandings that support [the] claim of entitlement to the benefit....' *Greenwood,* 163 F.3d at 122, quoting, *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)."  *Adler v. County of Nassau,* 113 F.Supp.2d 423, 428-430 (E.D.N.Y. 2000).

Based on the indisputable evidence before the Court, one of the most important considerations, equal to being named the Director of the Center for Microbial Pathogenesis, which entered into the plaintiff's decision to relocate to UCHC, was the plaintiff's appointment by the University of Connecticut to the position of Professor.  When told he would only receive an "assistant professor" appointment, the plaintiff made it known that unless he received an appointment to the rank of professor, he would decline the offer to head the Center for Microbial Pathogenesis.  The defendant then secured the plaintiff the appointment to the position of professor.  There can be little doubt that the appointment to the faculty level of professor was important to the plaintiff.  Likewise, the University of Connecticut, in its By-Laws, recognizes

the professor rank as the highest faculty position and, most certainly, a position of significant value to the holder.

Furthermore, the defendant by his own commitment to the plaintiff recognized the plaintiff's strong interest in being free of further discipline with regard to the finding of research misconduct. The plaintiff received his punishment at the conclusion of the SRB proceedings, when on August 22, 2001, Deckers imposed discipline on the plaintiff. After the ORI exercised its oversight jurisdiction with regard to the finding of research misconduct, Deckers unequivocally assured the plaintiff that he was no longer at jeopardy for UCHC discipline. He informed the plaintiff that the findings of the SRB and the administrative actions he had implemented were the complete and final responses of the University of Connecticut and the University of Connecticut Health Center to the incident involving the plaintiff's research misconduct. Obviously, being free of concern of additional discipline was a matter of great importance to the plaintiff. He would be able to resume scientific endeavors and contributions to the University, without fear that a guillotine was poised over his head.[7] Additionally, it was Deckers who explicitly promised the plaintiff that the ORI investigation would not result in any further punitive measures. Clearly, the mutual understanding between the plaintiff and the defendant with regard to the plaintiff being exempt from further discipline for the same act of

---

[7] The plaintiff does not foolhardily claim that if the ORI uncovered additional wrongdoing, he would be free of further discipline. However, he does claim, based on the explicit understanding between Deckers and him, that further discipline would be meted out in a manner that accorded with due process principles.

research misconduct bestowed on the plaintiff a constitutionally protected property right in his position free of added discipline.

Various courts have held that "the transfer of tenured professors from one department to another, without loss of rank or pay, does not implicate any property interest protected by the Due Process Clause", see *Huang v. Board of Governors of University of North Carolina,* 902 F.2d 1134, 1142 (4th 1990). Because the plaintiff has suffered a loss of rank, the punishment which Deckers meted out on him does implicate a property interest protected by the Fourteenth Amendment. Notwithstanding that the plaintiff has not suffered a loss of monetary benefits, his standing as a professor is constitutionally protected from the type of summary action taken by the defendant on April 6, 2003.

### 2. *Due Process Protections*

It is clear that in punishing the plaintiff on April 6, 2003, Deckers completely ignored the plaintiff's due process protections. See *Thomas v. Zaharek,* 289 F.Supp.2d 167 (D.Conn. 2003) and see *Garraghty v. Jordan,* 830 F.2d 1295 (4th Cir. 1987). "It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). "At a minimum due process requires that an employee be given notice of the charges against him and some kind of a hearing before being disciplined by suspension...The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent

proceedings...The timing, content of notice and the form of hearing will depend upon a proper balancing of the competing interests involved." *Garraghty v. Jordan,* 830 F.2d at 1300. "The pretermination process need not be elaborate or approach the level of a full adversarial evidentiary hearing, but due process does require that before being terminated such an employee be given oral or written notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story." *Otero v. Bridgeport Housing Authority* 297 F.3d at 151. "[C]ertain features must be present to fulfill the minimum requirements of fairness: the employee must be given oral or written notice of the charges against him, an explanation of the employer's evidence, and the opportunity to present his side of the story." *Todaro v. Norat*, 112 F.3d 598, 599 (2d Cir. 1997). The procedures employed by Deckers failed by a wide margin to comport with these rudimentary due process requirements. Deckers did not meet with the plaintiff either before or after punishing the plaintiff. The only notice the plaintiff received with regard to the imposition of additional discipline was the April 6, 2003 letter announcing the punitive measures.

### 3. Pre-Deprivation Opportunity To Be Heard

"Although the Supreme Court has stated that it will 'tolerate some exceptions to the general rule requiring predeprivation notice and hearing', it will do so 'only in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53, 126

L. Ed. 2d 490, 114 S. Ct. 492 (1993) (internal quotation marks and citations omitted).  Under a

balancing of interests analysis required by *Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d

18, 96 S. Ct. 893 (1976), there is simply no governmental interest at stake in this case that

justifies the failure to provide the plaintiff with notice of the charges and an explanation of the

defendant's evidence prior to the plaintiff's removal.  *Ciambriello v. County of Nassau,* 292 F.3d

at 319-322.  This case does not present issues of secrecy based on matters of national security or

the investigation of criminal conduct.  Nor does the case involve the actual commission of a

crime where the need for swift governmental action is required.  See *Gilbert v. Homar,* 520 U.S.

924, 930, 138 L. Ed. 2d 120, 117 S. Ct. 1807 (1997) ("This Court has recognized, on many

occasions, that where a *State must act quickly*, or where it would be *impractical to provide*

*predeprivation process*, postdeprivation process satisfies the requirements of the Due Process

Clause").  The defendant does not even advance an interest that it could claim was paramount to

the plaintiff's interest.

　　　　"In order to determine whether the Constitution requires a pre-demotion hearing under

the circumstances of this case, we must balance three factors:  First, the private interest that will

be affected by the official action; second, the risk of an erroneous deprivation of such interest

through the procedures used, and the probable value, if any, of additional or substitute procedural

safeguards; and finally, the Government's interest, including the function involved and the fiscal

and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. at 335." *Ciambriello v. County of Nassau*, 292 F.3d at 319.  "In applying its Mathews test, the Supreme Court has held that, in most circumstances, a pretermination or suspension hearing is required, although it may be very limited if a post-discipline hearing occurs.  See *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985).  See also *Gilbert v. Homar,* [ 520 U.S. 924, 929-30, 138 L. Ed. 2d 120, 117 S. Ct. 1807 (1997)]." *Thomas v. Zaharek,* supra at 177.

      The plaintiff satisfies the first element.  As discussed above, the plaintiff's interest is substantial.  "While this interest is undoubtedly less significant than a public employee's interest in not being dismissed altogether, the private interest involved here is still substantial."  *Ciambriello v. County of Nassau*, 292 F.3d at 320.  Retaining the rank of professor as well as not being receiving additional punishment for the same misconduct, are significant interests.  Second, the risk of error is great, where, as here,  Deckers was completely in error, intentionally or not, as to requirements of the Voluntary Agreement.  *(Deckers Tr. 114-123).*  Deckers misconstrued the terms of the Voluntary Agreement as necessitating the plaintiff's exclusion from any University activity in which PHS/NIH funds were involved.  In effect, he interpreted the Voluntary Agreement as imposing the harshest punishment, debarment from federally funded programs.  Such was not the case.  Debarment was imposed on the plaintiff; he was free to fully participate in federally funded programs.  "[T]he risk of erroneous deprivation under such

circumstances is a substantial one, because the employer never gets to hear the employee's side of the story." *Gupta v. Norwalk*, 221 F.Supp.2d 282, 294 (D.Conn. 2002).

Third, the governmental interest involved in the present case is next to nonexistent. Deckers received the Voluntary Agreement on March 19, 2003. If an immediate response was necessary in the form of disciplining the plaintiff, arguably, he would have acted well before April 6, 2003. Over two weeks transpired between the date Deckers received the Voluntary Agreement and the disciplinary letter he penned to the plaintiff. There is no excuse for Deckers not to have conducted a most rudimentary meeting with the plaintiff to discuss his decision to exact added punishment on the plaintiff, and to allow the plaintiff to voice his opinion on the matter. Even short of a meeting, Deckers could most certainly have forwarded to the plaintiff the letter requesting the plaintiff's comments before imposing the discipline. The chronology of events dispels any claim that circumstances required immediate action by Deckers without providing the plaintiff with a meaningful pre-deprivation hearing. Additionally, Deckers can not cite, nor can he seriously argue, that the fiscal and administrative burdens associated with a pre-deprivation hearing would be anything but minimal, because such a hearing need not be elaborate. *Loudermill, 470 U.S. at 545.* See *Ciambriello v. County of Nassau*, 292 F.3d at 320.

### 4.   *Health Center's Grievance Process*

In light of the facts particular to the present case, the balance of interests tips heavily in favor of affording the plaintiff a pre-deprivation hearing. The defendant's argument that the

Medical Center's grievance process provides the plaintiff with all the due process to which he is due is misguided.  Simply, the grievance process does not satisfy due process standards because it fails to provide for a pre-deprivation hearing.  "Due process does not require a full, judicial-type hearing before employment is terminated, but certain features must be present to fulfill the minimum requirements of fairness: *the employee must be given oral or written notice of the charges against him, an explanation of the employer's evidence, and the opportunity to present his side of the story*.  [*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S.] at 546, 105 S. Ct. at 1495. A post-termination proceeding such as that provided under Article 78 does not meet the *Loudermill* requirements because it takes place after the employee has lost his job." *Todaro v. Norat,* 112 F.3d 598, 599, 600 (2d Cir. 1997).  (Emphasis added).  In *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 331 (9th Cir. 1995), the Ninth Circuit Court of Appeals rejected the proposition that "despite the apparent inadequacies of the pre-termination process . . . numerous post-termination hearings provided [the plaintiff] with all the process she was due."  The Ninth Circuit held that "a full post-deprivation hearing does not substitute for the required pre-termination hearing."  See also *Enterprise Firefighters Association v. Watson,* 869 F.Supp. 1532, 1541, 1542 (D.Ala. 1994).  ("The court further concludes that the violation of procedural due process in this case was 'complete when Davis was terminated without a hearing' and that the violation was not 'cured by the hearings he received after his termination'. . .  By its very nature, however, when the violation of due process is a failure to provide a pre-termination

hearing, the violation cannot be cured subsequent to termination.  The right is lost once

termination has been effected.  If the rule were otherwise, a public employee's right to a pre-

termination hearing as explicated in *Loudermill*, would be chimerical and ultimately meaningless

because it could be 'cured' in each instance simply by providing a hearing after

termination...Moreover, the violation of due process is complete even if it later appears certain

that the termination was substantively correct. . .").

    Likewise, the plaintiff was not required to exhaust his administrative remedies before

instituting this present action.  The law has long been settled that exhaustion of administrative

procedures is *not* a requirement to advancing a due process claim pursuant to Title 42 U.S.C. §

1983.  A plaintiff in a § 1983 case is not required to exhaust her administrative remedies before

bringing suit.  *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d

172 (1982).  However, a plaintiff must avail herself of the right to be heard pursuant to

constitutionally adequate state remedies, if available.  See *Narumanchi,* 850 F.2d at 72; *Alba v.

Ansonia Bd. of Educ*., 999 F. Supp. 687 (D.Conn. 1998).  In contrast to the grievance procedure

in *Narumanchi,* which provided for a pre-suspension hearing, the grievance procedure in the

present case lacks that same protection, and is, therefore, constitutionally inadequate.  It is the

defendants' failure to provide adequate procedures to remedy the otherwise procedurally flawed

deprivation of a protected interest that gives rise to a federal procedural due process claim.

*Cotton v. Jackson*, 216 F. 3d 1328, 1331 (11th Cir. 2000).  The grievance procedure does not

provide the plaintiff with due process since the grievance procedure fails to satisfy the minimal protections for an employee faced with removal from a position in which such employee has a constitutionally protected property interest.

The fact that the Health Center's grievance procedures do not provide for a pre-deprivation hearing only means that the plaintiff is entitled to more due process than the Health Center's policies provide. *Ciambriello v. County of Nassau*, 292 F. 3d at p. 323. Due Process requires pre-termination notice and an opportunity to respond even where policies provide for post-deprivation procedures that fully compensate the wrongfully terminated employee. *Chaney v. Suburban Bus Div. of the Reg'l Transp. Auth.*, 52 F.3d at 629 (7th Cir. 1995). See also *Malla v. University of Connecticut*, 312 F.Supp.2d at 326-328.

### 5. *Substantive Due Process*

Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised. The first step in substantive due process analysis is to identify the constitutional right at stake. *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 -212 (2d Cir. 1995). In order to state a substantive due process claim premised on a deprivation of property, the plaintiff would have to establish that he was deprived of a valid property interest in a constitutionally-protected benefit. *Id.* at 211. As previously discussed, the plaintiff has a protected property interest in his position as a professor at UCHC. As a tenured professor at the

University of Connecticut, he can only be terminated from his position for cause. This state law "for cause" requirement creates a constitutionally protected property interest. The plaintiff's right to continued employment as a professor is a property right of constitutional dimension. *Board of Regents of State Colleges v. Roth,* 408 U.S. at 576-577, 92 S.Ct. at 2708 - 2709 (1972). Likewise, the plaintiff has a protected property interest from any further punishment resulting from his research misconduct. This property interest springs from the explicit promises made to the plaintiff by Deckers at the conclusion of the SRB proceedings and Deckers' imposition of discipline on the plaintiff as stated in his August 22, 2001 letter.

The facts surrounding the assurances given to the plaintiff by Deckers in 2001 that the plaintiff would not be subject to any further discipline as a result of the ORI's exercise of jurisdiction over the matter of his research misconduct allows a trier of fact to find for the plaintiff on his claim that his substantive due process rights have been violated by Deckers. Deckers guaranteed the plaintiff that he was no longer at jeopardy with regard to his misconduct after receiving Deckers letter of August 22, 2001. In that letter, Deckers fully addressed the situation involving the plaintiff's misconduct and imposed discipline on the plaintiff. In complete disregard for his prior commitments to the plaintiff, Deckers, arbitrarily, rescinded the promise he had extended to the plaintiff and imposed harsher punishment on the plaintiff on April 6, 2003. Deckers' behavior allows a trier of fact to conclude that a substantive due process

claim has been proven.  Deckers' conduct is conscience shocking in a constitutional sense[8].

Behavior of this form involving the highest official of UCHC is arbitrary and intolerable.  The

imposition of the harsher punishment under the guise that it was required by the Voluntary

Agreement is simply outrageous conduct.  The plaintiff was placed on three years of academic

probation on August 22, 2001.  On April 6, 2003, the plaintiff had completed over half of his

"sentence".  Without warning, and contrary to his previous commitment to the plaintiff, Deckers

summarily increased the plaintiff's probation for another five years, barred him from leadership

positions, and expelled him from a steering committee.  Deckers asserts that he was acting

pursuant to the Voluntary Agreement.  He states that the Agreement in some manner required the

extension of the academic probation because various aspects of the plaintiff's research activities,

grant proposals and article publications, required review by a supervisory panel for a period of

five years commencing with the signing of the Voluntary Agreement.  Deckers' duplicity is

evident from a review of the terms of the Voluntary Agreement.  The ORI required the

University to take but one single action, the submission of a plan of supervision to "ensure the

scientific integrity of the [plaintiff's] research contribution as well as certifying the scientific

accuracy of "each application for PHS funds or report, manuscript, or abstract of PHS funded

research."  *(Exhibit 3)*.  The Voluntary Agreement requires nothing else of the University.  The

Voluntary Agreement does not require any further punishment of the plaintiff by the University,

---

[8] Although a civil matter, it is tantamount to "double jeopardy".

and that is for a very good reason; the plaintiff consented to the punitive measure of excluding "himself from serving in any advisory capacity to PHS including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant for a period of five (5) years beginning with the effective date of this Agreement".  The monitoring of this exclusion was not committed to the University.  The exclusion is self enforcing, without any need for monitoring by the University, in that any violation results in the severest of penalties, debarment for one year.  *(Exhibit 3).*  As noted, the only role carved out for the University deals with the implementation of the plan of supervision in items 3 and 4 of the Voluntary Agreement. Without explanation of any type, the defendant would have the Court assume that the requirement of implementing a plan of supervision necessitated the plaintiff's probation be extended by an additional five years.  There is simply no evidentiary basis to support this conclusion.  The ORI requirement of a plan of supervision did not carry the corollary obligation that the plaintiff be placed on academic probation or that the academic probation he was serving be extended for any length of time by the University.

Similarly, the Voluntary Agreement provides no basis for Deckers' contention that the other actions he imposed on the plaintiff were mandated by the provisions of the Voluntary Agreement.  In particular, Deckers' assertion that the plaintiff was expelled from the MD/PhD program because it was a PHS-funded activity is misleading.  As previously noted, the plaintiff was not barred from PHS funded activities; his exclusion encompasses "serving in any advisory

capacity to the PHS including but not limited to service on any PHS advisory committee, board and/or peer review committee or as a consultant." The mere fact that funding for the MD/PhD program comes from the PHS does not transform it into a PHS advisory committee, board or peer review committee. Deckers has surreptitiously transformed the Voluntary Agreement into a full fledged debarment. Deckers behavior is not merely an artificial rendition of the terms of the Voluntary Agreement; it represents an egregious reneging on the assurances he gave the plaintiff.

### 6. *Immunity*

Deckers having been sued in his official capacity for prospective injunctive relief[9], is a person under § 1983, and possesses no Eleventh Amendment immunity from the plaintiff's cause of action. See *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F. 2d 84, 87, 89, fn.4 (2d Cir. 1991); *Ying Jing Gan v. City of New York*, 996 F. 2d 522, 529 (2d. Cir. 1993); *State v. Cahill*, 217 F.3d 93, 101 (2d Cir. 2000); *Garcia v. Akwesasne Housing Authority*, 268 F. 3d 76 (2d Cir. 2001).

Deckers' conduct deprived the plaintiff of substantive due process. And as Executive Vice President of UCHC, Deckers was acting under color of law. Thus, unless shielded by qualified immunity, Deckers is individually liable under Title 42 U.S.C. § 1983. *Hayes v. Faulkner County, Ark.*, 2004 WL 2414160, *3 (8th Cir. 2004). "To accommodate the conflict

---

[9] Defendants urge the Court to view the plaintiff's request for injunctive relief as not addressing continuing misconduct by the defendant. Most certainly, the academic probation, the exclusion from leadership roles and the barring from the MD/PhD program continue for five years from March of 2003.

between the goals of § 1983 in deterring governmental abuse and remedying unlawful governmental transgressions on the one hand, and the societal interest in not unduly burdening legitimate government operations on the other, the Supreme Court established qualified immunity as an affirmative defense to § 1983 claims...A government actor performing a discretionary task is entitled to immunity from § 1983 suits if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law. *Johnson v. Newburgh Enlarged School Dist.* 239 F.3d 246, 250 (2d Cir. 2001) (Internal citations and quotations omitted).

The claim of qualified immunity by Deckers must fail. The plaintiff is in a very similar position that Dr. Ezekwo was in the case of *Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 782 (2d Cir.1991). Since that decision, the plaintiff's possession of a constitutionally protected property interest in the position of professor in a State operated Health Center has been clearly established. "A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights. *McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 278 (2d Cir.1999). In deciding whether a right was "clearly established," the Court considers the following: (1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant

have understood from the existing law that the conduct was unlawful? *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). In addition, a right is "clearly established" if " '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right' ". *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998) (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

As discussed earlier, Deckers conducted himself in a manner to deprive the plaintiff of both his substantive and procedural due process rights. He knowingly promised the plaintiff that the plaintiff had received his full and final punishment for misconduct in August of 2001. Nearly two years later, on April 6, 2003, without any finding of additional wrongdoing, Deckers summarily imposed added discipline, significantly harsher, on the plaintiff. Deckers' promises to the plaintiff gave rise to a protected property interest of which Deckers should have been aware. The Supreme Court has avoided inflexible or formalistic limitations on the Fourteenth Amendment's Due Process Clause, since "liberty" and "property" are "broad and majestic" terms that relate to the "whole domain of social and economic fact." *Board of Regents of State Colleges v. Roth* (1972) 408 U.S. 564, 576, 92 S.Ct. 2701. " In *Roth* and its companion case, *Perry v. Sindermann* (1972) 408 U.S. 593, 92 S.Ct. 2694, the Court made clear that the scope of academic interests evoking procedural due process requirements reaches well beyond the core protection of tenured positions." *Hamid v. John Jay,* 2000 WL 666344 at *5. The term ' 'property' denotes a broad range of interests that are secured by 'existing rules or

34

understandings.' ' *Sindermann,* 408 U.S. at 601, 92 S.Ct. at 2699 (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709).  'A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Id.* (citation omitted).' " *Ezekwo v. New York City Health & Hospitals Corp.,* 940 F.2d at 782.  The assurances given by Deckers to the plaintiff regarding his continuing employment as a professor free of any further penal jeopardy resulting from his misconduct gave forth to a constitutionally protected property interest.  An official in Deckers' position most certainly would have known that the promises he extended to the plaintiff would give rise to legal restraints on the very summary action he imposed on the plaintiff.  In light of Deckers' behavior, most assuredly, as a reasonable state official, he would understand that his actions violated the plaintiff's due process rights, the contours of which are reasonably clear.  To grant Deckers qualified immunity would allow him to turn his back on the explicit commitments he extended to the plaintiff without any liability for such inappropriate behavior.  Deckers cannot seriously argue that his words and deeds do not create substantial obligations with legal ramifications.

    III.    *Conclusion*

    The defendant, in its summation, propose a previous unheard legal rubric as controlling the outcome of this case.  He states, "a professor cannot be found guilty of scientific fraud both by the university at which he is employed and the federal government, and then complain when his

employer retains him on staff to deal with the repercussions of that behavior". What goes unrecognized in this so-called modern rule of law engendered by the defendants out of the rarefied air of academia is that the provisions of the Constitution take precedence over its application. In dealing with the repercussions of the plaintiff's conduct, the defendant has obviously failed to recall that the rule of law, including the protections of the Constitution, still apply to his actions. Admitting to research misconduct dose not bring with it a forfeiture of the plaintiff's legal rights. The plaintiff's rights to substantive and procedural due process have been completely ignored by Deckers. As such he is liable to the plaintiff in both his official and individual capacities.

PLAINTIFF – JUSTIN D. RADOLF

BY:_____
Thomas W. Bucci, Esq.
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net
Federal Bar # ct07805

## **CERTIFICATION**

I hereby certify that I caused to be served a copy of the above and foregoing

*Memorandum in Opposition to Defendants' Motion for Summary Judgment* by sending same, via

U.S.P.S. postage prepaid this 15th day of November, 2004, to the following:


Jane D. Comerford, Esquire
Office of the Attorney General
University of Connecticut Health Center
Room LMO43
Farmington, CT 06030
Tel: 860-679-1114
Fax: 860-679-1997
Fed. Bar No. ct06328


_____
Thomas W. Bucci
Fed. Bar #ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net