foundation, or any other employee thereof; "invention" means any invention or discovery and shall be divided into the following categories: A. any invention conceived by one employee solely, or by employees jointly; B. any invention conceived by one or more employees jointly with one or more other persons; C. any invention conceived by one or more persons not employees.

*2. Establishment and management of foundation*

The Board is authorized to establish and manage the foundation as provided herein. The foundation may, subject to direction, regulation and authorization or ratification by the Board: (1) Receive, solicit, contract for and collect, and hold in separate custody for purposes herein expressed or implied, endowments, donations, compensation and reimbursement, in the form of money paid or promised, services, materials, equipment or any other things tangible or intangible that may be acceptable to the foundation; (2) disburse funds acquired by the foundation from any source, for purposes of instruction, research, invention, discovery, development or engineering, for the dissemination of information related to such activities, and for other purposes approved by the Board and consistent with section H.1. to H.8., inclusive; (3) file and prosecute patent applications and obtain patents, relating to inventions or discoveries which the University may be justly entitled to own or control, wholly or partly, under circumstances hereinafter defined; and receive and hold in separate custody, assignments, grants, licenses and other rights in respect to such inventions, discoveries, patent applications and patents; (4) make assignments, grants, licenses or other disposal, equitably in the public interest, of any rights owned, acquired or controlled by the foundation, in or to inventions, discoveries, patent applications and patents, and to charge therefor and collect, and to incorporate such funds in the custody of the foundation, reasonable compensation in such form and measure as the Board authorizes or ratifies; and (5) execute contracts with employees and others for the purpose of carrying out the provisions of sections H.1. through H.8., inclusive. All property and rights of every character, tangible and intangible, placed in the custody of the foundation in accordance with said sections shall be held by the foundation in trust for the uses of the University. The entire beneficial ownership thereof shall vest in the University and the Board shall exercise complete control thereof.

*3. Ownership of inventions*

> The University shall be entitled to own, or to participate in the ownership of, and to place in the custody of the foundation to the extent of such ownership, any invention, on the following conditions:

a. The University shall be entitled to own the entire right, title and interest in and to any invention in category A, in any instance in which such invention is conceived in the course of performance of customary or assigned duties of the employee inventor or inventors, or in which the invention emerges from any research, development or other program of the University, or is conceived or developed wholly or partly at the expense of the University, or with the aid of its equipment, facilities or personnel. In each such instance, the employee inventor shall be deemed to be obligated, by reason of employment by the University, to disclose the invention fully and promptly to an authorized executive of the University; to assign to the University the entire right, title and interest in and to each invention in category A; to execute such instruments of assignment to that effect; to execute such proper patent applications on such invention as may be requested by an authorized executive of the University, and to give all reasonable aid in the prosecution of such patent applications and the procurement of patents thereon;

b. The University shall have the rights defined in subsection (a) of this section with respect to inventions in category B, to the extent to which an employee has or employees have disposable interests therein; and to the same extent the employee or employees shall be obligated as defined in said subsection (a);

c. The University shall have no right to inventions in category C, except as may be otherwise provided in contracts, express or implied, between the University or the foundation and those entitled to the control of inventions in category C.

*4. Employees to share in proceeds*

> Each employee who conceives any invention and discharges his or her obligations to the University as herein before provided shall be entitled to share in any net proceeds that may be derived from the assignment, grant, license or other disposal of such invention. The amount of such net proceeds shall be computed by, or with the approval of, the Board, with reasonable promptness after collection thereof, and after deducting from gross proceeds such costs and expenses as may be allocated to the particular invention or discovery. A minimum of twenty percent of the amount of such net proceeds shall be paid to an employee who solely conceived or made the invention, and shall be paid in shares to two or more employees who jointly made the invention in such respective proportions as the Board may determine. The Board in its

      discretion may increase the amount by which any employee or employees may participate in such net proceeds.

5. *Disagreements; procedure.*

      Disagreements as to the allocation of any invention to one of said categories, or as to the obligations of any employee or due performance thereof, or as to participation of any employee in net proceeds, or as to the rights or obligations with reference to inventions in any category, shall be disposed of as follows: (a) By voluntary arbitration of all relevant issues, if the disagreeing parties approve and agree to be bound by the decision upon such arbitration; (b) by compulsory arbitration if that is provided for in any applicable contract between the disagreeing parties; (c) by recourse to courts of appropriate jurisdiction within the State if arbitration cannot be resorted to under either subsection (a) or (b) of this section.

6. *Regulations for arbitration*

      The Board is authorized to establish and regulate equitably in the public interest, such measures as the Board deems necessary for the purposes of such arbitration, and to make contracts for compulsory arbitration, in the name of the University or of the foundation.

7. *Enforcement of regulations*

      The Board is authorized to make and enforce regulations to govern the operations of the University and the foundation in accordance with the provision of sections H.1. to H.8., inclusive.

8. *Rights as to products of authorship*

      The provisions of sections H.1. to H.8. inclusive, shall not entitle the University or the foundation to claim any literary, artistic, musical or other product of authorship covered by actual or potential copyright under the laws of the United States; but the University and the foundation shall each be authorized to make and enforce any contract, express or implied, which it may make with respect to any such subject matter.

**I. Establishment of University Regional Campuses**

    Before a new campus of the University of Connecticut is opened in any locality, the University's Board of Trustees must be convinced that a significant number of prospective students in that locality are unable to secure education at the college level from resources already available in the community, and that there is urgent local demand for the University to establish a campus there. The recent policy of the Board has been to require interested persons in the locality to provide the original physical

      plant without cost to the state. Barring an unusual and demonstrable emergency, any decision to open a new campus would be preceded by full public discussion in the area to be served including discussion with existing institutions already in the area.

**J. Student Organizations**

1. The University recognizes the right of any group of students to form a voluntary organization for any purpose not forbidden by law. If an organization composed chiefly or exclusively of students desires to hold meetings in University buildings, it is required to have an advisor who is a member of the professional staff of the University, and to file with the Dean of Students such information as may be required about its purposes, officers, memberships, dues, and the like, such information to be uniform for all organizations. An organization which has fulfilled these requirements is called a registered organization. Aside from the supervision exercised through the Division of Student Affairs and Services over housing and certain purely social activities, the University as such assumes no responsibility for registered organizations or their programs, though such organizations, if closely connected with the activities of departments of instruction, may in some cases receive special help and supervision from those departments.

2. So far as its facilities permit, the University will provide each such registered organization with suitable meeting places without charge, and will endeavor to encourage and protect complete freedom of expression within the law in meetings of such organizations. The responsibility for any views expressed in such meetings is solely that of the individuals concerned, and the University is not held to approve or disapprove such views, whatever their nature, but to be concerned exclusively with the discharge of its educational obligation to facilitate free discussion of all points of view, to the extent guaranteed by the Constitution of the United States and of the State of Connecticut. The University does not pass upon the qualifications of speakers whom registered organizations invite to address them, nor, except as to availability of space, on the number or size of meetings which may be held.

3. The name of the University shall not be used by any group not duly authorized as a part of the University, nor by any individual, without the approval of the President. Registered organizations are considered to be "not duly organized as a part of the University." In authorizing or denying the use of the name of the University, the President will in general be guided by the need of making clear to the public the nature of the relation of the organization in question to the University.

4. The University places no restrictions as to purpose on the solicitation of funds by registered organizations, within or without the University community. The time, place, and method of solicitation within the University by registered

organizations shall be governed by regulations established by the Dean of Students in the interest of avoiding over-crowding and interference with those using an area for other purposes.

**K.** In accordance with State statutes, the use of intoxicating liquors by minors is not permitted in any of the dormitories, educational facilities, and public premises of the University.

**L. Regulations Regarding Residence**

1. All students, before registering for classes for the first time at the University of Connecticut, must file an affidavit of residence, on forms prescribed by the University. On the basis of this information, each entering student will be initially classified as a Connecticut or an Out-of-State student.

2. The status of each student will be determined by the definitions established by the Connecticut General Assembly in Connecticut General Statutes, Chapter 185, Part II.

3. The failure of a student to disclose fully and accurately all facts relating to his or her residence status shall be grounds for suspension or expulsion.

**M. Policy Regarding the Expression of Dissent**

1. Orderly picketing and other forms of peaceful demonstration are permitted outside of buildings and other areas specifically designated for University activities. Interference with entry into or exit from such buildings or areas or with the free movement of any person on the University campus is not permissible.

2. Entry into University buildings, meeting halls, classrooms, and other designated areas may properly be restricted to those engaged in the normal or scheduled activities being conducted. The presence of unauthorized persons in such areas after due notice has been given, orally or in writing, will be construed as interfering with or obstructing a University activity and is not permissible.

3. The creation of loud or excessive noise that disrupts or interferes with classes or other University activities is not permissible.

4. Direct personal abuse, whether physical or verbal, that infringes upon individual rights in the academic community or leads to disruption of a University activity is not permissible.

**N. Commencement**

1. Commencement Exercises are authorized at the conclusion of both the Fall and Spring semesters.

2. All graduation ceremonies shall be held at Storrs.

3. The provisions of the preceding section to the contrary notwithstanding, a separate graduation ceremony at an appropriate time in Farmington and at the University of Connecticut School of Law in Hartford is authorized for the graduating students in the Schools of Medicine, Dental Medicine and Law.

## ARTICLE XVII – Advisory Search Committee for President

**A.** The purpose of the committee is to assist the Board of Trustees in its statutory responsibility of selecting the President of the University of Connecticut. To this end, the committee will need to conduct a broad search, screen qualified candidates, and make appropriate recommendations to the Board.

**B.** The committee will be appointed by the Board of Trustees from recommendations submitted from various constituencies, including trustees, administrators, faculty, students, and alumni. The committee should be large enough to represent each of the constituencies adequately. The Chairman of the Board of Trustees shall serve *ex officio* as the Chairman of the Search Committee. The faculty members of the search committee will include the faculty members of the Senate Executive Committee.

**C.** The Board of Trustees should designate a small steering committee composed of committee members who can devote long hours to the work. The steering committee will be used to expedite the search procedures in ways agreed upon by the full committee. It will keep the full committee informed of the progress of the search by means of periodic meetings and, when appropriate, by written report.

**D.** In order to insure equity and an objective evaluation of all candidates, it is essential that information on all candidates be available to each member of the committee and that no candidate be allowed to by-pass consideration by the committee.

**E.** The search will normally proceed along the following lines:
1. Clearly defining the needs of the University and the characteristics desired in the person to be chosen.
2. Developing a list of possible candidates and eliminating those unsuitable or not interested.
3. Developing a profile of the University for distribution to candidates being seriously considered.
4. Selecting and interviewing the most highly qualified candidates.
5. Ranking the leading candidates by vote and transmitting name(s) of finalist(s) to the Board of Trustees, with whatever qualifications the committee wishes to include.
>During all of these stages, the steering committee will recommend steps to be taken to the parent committee, which will be responsible for all decisions.

**F.** Every possible method should be used in developing the initial list of candidates, including advertising and the solicitation of names from the various

University constituencies, as well as from other sources, such as college presidents, foundation officials, officers of learned societies, business and labor leaders, and other prominent citizens.

**G.** Complete confidentiality of all proceedings must be maintained throughout the search; it becomes especially crucial during the later stages. Grave injustice to the candidates and serious harm to the University's reputation result from any breach of confidentiality. The damage to the University may not be immediately discernible, but will become evident in the willingness of outstanding men and women to be considered as candidates for high positions at the University of Connecticut.

## ARTICLE XVIII – Honorary Degrees

On recommendation of the Honors and Awards Committee and the President, the Board of Trustees may vote to confer honorary degrees on distinguished individuals. The Board should award an honorary degree only in recognition of extraordinary and lasting distinction. The award should represent the highest intellectual and moral values; it should reflect the very character and quality of the University itself.

**A.** There shall be an Honors and Awards Committee, consisting of the President, the Provost and Executive Vice President for Academic Affairs, the Executive Vice President for Health Affairs, (all *ex-officio*), three faculty members nominated by the Executive Committee of the University Senate and appointed by the President, four members of the Board of Trustees appointed by the Chairman of the Board, and two students appointed by the President. The President will chair the Committee. The faculty appointed by the President will serve for staggered terms of five years each and ordinarily may not succeed themselves. Students will serve one-year terms. The Board-appointed members will serve at the pleasure of the Chairman.

**B.** The Honors and Awards Committee will prepare for approval of the Board of Trustees written criteria and procedures for the selection of candidates for honorary degrees.

**C.** Honorary degrees may be conferred at Commencement or at special convocations. Only under extraordinary circumstances will honorary degrees be conferred in absentia.

## ARTICLE XIX – Repeal and Amendment

**A.** All rules, orders, and resolutions of the Board heretofore enacted and in conflict with these By-Laws are hereby repealed.

**B.** These Laws, By-Laws and Rules may be amended at any regular meeting of the Board by a recorded majority vote of all members of the Board, provided

that notice of any proposed amendment, including a draft thereof, shall have been given at the previous regular meeting.

## FOOTNOTES

[1] Persons charged with responsibility for convening special or emergency meetings of the Board of Trustees should be aware of the following information:
Section 1-225 (formerly Sec. 1-21) of the Connecticut General Statutes requires that notice of each special meeting be given not less than twenty-four (24) hours prior to the time of such meeting. Notice must be posted in the office of the Secretary of State. Notice must include the time and place of the special meeting as well as the business to be transacted.
In case of emergency a special meeting may be held without complying with the foregoing requirement for the posting of notice, but a copy of the minutes of every such emergency special meeting, adequately setting forth the nature of the emergency and the proceedings occurring at such meeting, shall be filed with the Secretary of State not later than seventy-two (72) hours following the holding of such meeting. No business shall be considered other than that noticed, or in the case of an emergency special meeting, other than issues related to the emergency.
Written notice of special meetings must be delivered to the residence of each Board member prior to the special meeting. This requirement may be dispensed with by the filing of a written waiver with the secretary of the Board at or prior to the meeting. The delivery is dispensed with as to any member actually present when the meeting is convened.

[2] For University Senate constituency purposes, professional staff shall be defined as:
I. Full-time (nine month or more) management exempt employees not included in the faculty or administrative constituencies.
II. Full-time (nine month or more, non-student) professional staff represented by the professional employees collective bargaining unit and not included in the faculty constituency.
III. Full-time (nine month or more, non-student) professional staff represented by the faculty collective bargaining unit but not included in the faculty constituency.

[3] This provision notwithstanding, vacancies of one year or less in the Senate Executive Committee, the Committee of Three, and the Senate Nominating Committee shall be filled by the available candidate with the highest vote in the last previous election in the appropriate class and constituency.

[4] The regulations concerning academic tenure in this and the following sections apply only to members of the professional staff who hold full-time appointments in certain ranks recognized by the Board of Trustees. These recognized ranks include Instructor, Assistant Professor, Associate Professor and Professor, but do not include the following: Lecturer; Professor in Residence; Associate Professor in Residence; Assistant Professor in Residence; Instructor in Residence; Clinical Professor; Associate Clinical Professor; Assistant Clinical Professor; Clinical Instructor; Research Professor; Associate Research Professor; Assistant Research Professor; Research Instructor; Research Associate I, II, III; Research Assistant I, II, III; Research Specialist; Special Research Technician; Graduate Assistant; Extension Professor; Associate Extension Professor; Assistant Extension Professor; Extension Instructor; Specialist I, II, III, IV; Assistant Instructor; University Educational Director; Department Head, Student Affairs; University Educational Assistant I, II, III; University Associate Librarian; University Assistant Librarian; University Librarian I, II, III; University Library Assistant I, II, III; University Library Specialist; University Staff Professional I, II, III, IV, V, VI; University Technician I, II; University Physician; Resident Educational Counselor; and titles that contain the words "University Hospital" (e.g., University Hospital Nurse I).
Academic tenure does not confer upon any staff member the right to continued assignment to administrative responsibilities.

[5] All references to days are to calendar days.

[6] This procedure applies to individual grievances not covered by Article XV.F. and G.

[7] This procedure applies to individual grievances not covered by Article XV.F. and G.