**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| PETER J. DECKERS, EXECUTIVE | : | CASE NO. 3:03CV672(MRK) |
| VICE PRESIDENT FOR HEALTH | : | MEMBER CASE |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| OF MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY, | : | |
| Defendants. | : | NOVEMBER 15, 2004 |

**PAGES OF TRANSCRIPT TESTIMONY OF JUSTIN RADOLF**

1    honors."

2            What are the other commonly recognized

3    faculty honors that you're referring to?

4        Q    Well, I think that -- well, what one could

5    consider an honor might be somewhat debatable, but I

6    would think one very good example would be the MSTP

7    program because there's an honorific aspect to that.

8        Q    I missed that.

9        A    MSTP.

10       Q    MSTP?

11       A    Yes, MSTP.  I want to -- he called it the MDP

12   program.

13       Q    Is that what you're referring to?

14       A    Yes, Medical Science Training Program, I

15   think is actually the formal name for the program.

16       Q    Are there any others that fall within the

17   category of commonly recognized faculty honors that

18   you're referring to is this paragraph?

19       A    May I have the liberty of looking at the

20   actual wording of the Complaint since we're in the six

21   hundreds, so I can refresh my memory?

22            I have it, if you don't mind.  May I?

23       Q    No.  You can look at that paragraph, it's

24   paragraph 26.  Mine is just marked up.

25       A    Well, I would go back -- first let me --

1       Q    On page eight.

2       A    Hang on.

3            So, now, tell me again what question you're

4   asking?

5       Q    I want to know what commonly recognized

6   faculty honors you're referring to?  Other commonly

7   recognized faculty honors, and you've mentioned the

8   MSTP program.

9       A    Well, first, there may be other things that

10  one might be appointed to that one doesn't know about.

11  I mean, the thrust of the complaint is that when one

12  comes to a -- as a tenured professor especially in a

13  leadership position that you're anticipating that you

14  will be requested to serve in a variety of capacities,

15  some of which are honorific or that you may be given

16  honors or other kinds of commendations to your

17  research, to your support of the university, things

18  along that line.

19           So while one can't be -- I can't point to a

20  litany, but that's the nature of academic life.  And

21  so I think it's perfectly appropriate to -- in light

22  of the way that Dr. Deckers has enforced this

23  voluntary agreement, to look at it in general terms.

24      Q    Okay.  So as you sit here now, the only one

25  you can specifically refer to as falling in this

1    category of other commonly recognized faculty honors

2    is the MSTP program?

3        A    Again, I will point out that when you're not

4    given things you don't know what you have not been

5    given because Dr. Deckers, as he himself said, shut

6    the door.

7        Q    Well, what is it you think other faculty have

8    been given that you haven't been given that fall

9    within this category?

10       A    There are many capacities in which people are

11   asked to serve or given -- I'm not saying, not trying

12   to argue that I should be deserving of a particular

13   honor, but there are distinguished professorships, all

14   kinds of ways university chairs, in which universities

15   honor their faculty who have been distinguished in and

16   helped further the university.

17       Q    Are there any of those that you're thinking

18   of that you have been denied?

19       A    I believe that at the present time I have

20   been secluded from consideration for any and all

21   meritorious activities or honors that the university

22   would bestowe.

23       Q    How do you know that?

24       A    Just a hunch.  Because of the -- let me point

25   out, I'm probably being a little flippant,

1      Dr. Deckers' letter basically states that.

2      Q    Well, you know, the letter I think can speak

3      for itself, but it says, "You will be secluded from

4      academic or administrative leadership positions that

5      could include directly or indirectly any service of

6      any kind to the USPHS."

7            Are you saying there are no other academic or

8      leadership positions in the Health Center that aren't

9      directly or indirectly of service to USPHS?

10     A    Almost everything relate -- first of all, let

11     me point out that this is a misreading of the

12     voluntary agreement.

13     Q    I didn't ask you that.  I'm just saying --

14     A    There are very few positions that are

15     administrative at any medical school that do not in

16     one way or another relate to in some form the Public

17     Health Service, particularly if you're a

18     physician/scientific such as myself.

19     Q    Those that don't relate directly or

20     indirectly to U.S. Public Health Service here at the

21     Health Center, have you been denied any of those

22     positions?

23     A    I believe that I have been excluded from

24     consideration from any types of positions of that sort

25     that have been -- which have become available.

1      Q    How do you know that?

2      A    Because of the manner in which I have been

3    treated by Dr. Deckers and as he, himself, told me,

4    that the doors were shut.

5      Q    When did he say this?

6      A    He made that statement in the settlement

7    conference.

8             MS. COMERFORD:  I thought the settlement

9             conferences were confidential.

10            MR. BUCCI:  You can put a --

11            MS. COMERFORD:  I'm going to.

12            MR. BUCCI:  -- a confidentiality.

13            You're asking him the questions.

14            MS. COMERFORD:  I understand, but it's

15            interesting.

16            THE WITNESS:  I never signed a

17            confidentiality agreement with that

18            conference.

19            MR. BUCCI:  By rule they are.

20    BY MS. COMERFORD:

21      Q    Okay.  So other than that one statement that

22    Dr. Deckers made in 2003 at the settlement conference,

23    what else do you base your belief on?

24      A    We can go on this all day.  You're asking me

25    to prove a negative which is not something I am going

195

1    to be able to do.

2        Q    You said that you believe you've been shut

3    out of various things and I'm asking you what you base

4    it on and you said this statement by Dr. Deckers.

5        A    Before this matter came about, my services

6    were frequently requested and utilized for a variety

7    of issues and matters within the university governance

8    and things along that line.  And since that happened,

9    there have been none.

10       Q    When you're saying "this matter," are you

11   referring to your commission of scientific misconduct

12   where you falsified the data on your grant

13   application?

14       A    No, I'm referring to Dr. Deckers' letter

15   which is a misinterpretation of the voluntarily

16   agreement.

17       Q    Up until April 4, 2003, your services were

18   frequently required?

19       A    Well, not specifically that day, perhaps,

20   but, yes, before that they were utilized quite a lot.

21       Q    And these entitlements that you refer to in

22   your Complaint, this range of entitlements, are they

23   in writing anywhere?

24       A    We're on which one now?

25       Q    26.  You mention a complete range of

1   entitlements that you are entitled to.

2       A    Well, there are certainly -- I think one

3   understands that when one is at a certain level in an

4   academic environment that there are certain, I guess

5   entitlement is a good word, certainly that there are

6   certain kinds of activities and functions that --

7   well, let me give you one example.  To be on the HCAC,

8   Health Center Appeals Committee, it requires only

9   tenured; it's part of the rules.  There are many other

10  governance issues and mechanisms that in any

11  institution, as here, that require -- that

12  specifically are only for tenured.  So to be able to

13  function as a member of the university community is an

14  entitlement once you get to a certain level.

15      Q    All I asked you is:  Are any of these in

16  writing anywhere?

17      A    Many of them are.  You would have to through

18  the by-laws and other things to see which ones do and

19  do not require tenure.  Many do.  So the answer is

20  there is.

21      Q    So you're saying if I want to find this range

22  of entitlements I should go the UCONN by-laws?

23      A    Not just by-laws, but other -- not everything

24  is spelled out in the by-laws, but there are other

25  governing bodies and other functions within the

1    university where tenure is usually considered a

2    prerequisite.

3        Q    Tell me where else that they would be a

4    prerequisite.  But tell me where in writing I would

5    find this range of entitlements once you're a tenured

6    professor.  Does it say somewhere once you have tenure

7    you're entitled to X, Y, and Z?

8        A    There is a mark of respect or an element of

9    respect and distinction that one is accorded.  And

10   where you are considered more elite, for lack of a

11   better word, and that goes without saying, that is the

12   nature of tenure.  That's the nature of being a

13   distinguished member of a faculty which is what tenure

14   indicates.

15       Q    So what you're telling me is no, they are not

16   in writing, there is nothing that lists that as a

17   tenured faculty member you're entitled to A, B, C, D,

18   committee assignments, appointments?

19       A    I'm sorry.  Can you ask the question again?

20       Q    I asked you whether -- you mentioned that

21   this -- as a tenured professor you're entitled to a

22   complete range of entitlements.  You have listed them

23   in the Complaint.  And I asked you whether these are

24   in writing anywhere?

25       A    Well, I have already given you an example of

1    one, so some are.  Again, so the answer is some are.

2       Q    Some are.  And you mentioned the by-laws.

3    Anywhere else?

4       A    Yes.  And I mentioned, as an example, to be

5    on the Health Center Appeals Committee.  I would

6    suspect to be on the --

7       Q    You're misunderstanding me.  I don't mean

8    that in order to sit on a committee you have to have

9    tenure.  I'm saying, once you have tenure where does

10   it say in writing, if at all, you are then entitled to

11   do X, Y, Z, or hold an administrative position or

12   appointment?

13      A    As I have said, I can't cite chapter and

14   verse for that.  But the concept of tenure, with it

15   are certain entitlements and expectations in terms of

16   what your function is within the university and what

17   the university expects from you.

18      Q    This is your understanding of what tenure

19   means?

20      A    Well, it's part of my understanding.

21      Q    What's the other part of your understanding?

22      A    Well, I mean, there are other aspects in

23   terms of protection and other things along that line.

24   There is also a mark of academic -- it means you have

25   achieved a certain level of recognition in your field

199

1    scientifically.  Usually it means you're competent in

2    terms of certain teaching responsibilities.  It --

3    because you have got a certain level of experience

4    that -- because that's how tenure is evaluated.

5         Q    And you mention in the same paragraph in your

6    Complaint 26, that before accepting the offer of UCONN

7    to come here that you insisted that upon relocating

8    that you be appointed to a full professorship with

9    tenure, which we spoke about before.  Did you put that

10   insistence that you be appointed to a professor with

11   tenure in writing to Dr. Deckers?

12        A    At the present time I can't remember.  It was

13   certainly very clear that without that assurance --

14   because that -- let me also point out that I had been

15   involved in many recruitment activities at

16   Southwestern and I had never encountered a situation

17   where a faculty member was recruited at a senior level

18   and who was already tenured at another institution and

19   would be brought in at an untenured level.  So --

20        Q    But as you sit here now, you don't recollect

21   putting that in writing to Dr. Deckers?

22        A    So what I'm saying is that the discussions

23   that we had, I cannot recall  -- well, first of all,

24   my discussions on the matter were with Dr. Berlin.

25        Q    Did you put it in writing with Dr. Berlin?

1       A    I cannot recall but I certainly -- if the

2   discussions hadn't occurred, where did the letter come

3   from?

4       Q    If there was such a letter, would you have

5   already provided it to us pursuant to discovery

6   requests?

7       A    Unless I'm completely misunderstanding your

8   question, if there is such a letter.

9       Q    All I asked you, if you insisted upon

10  relocating you be appointed to a position of full

11  tenure, did you put that insistence in writing to

12  Dr. Deckers or Dr. Berlin?

13      A    I'm trying to say that I can't fairly recall.

14  I know there was extensive discussions on the matter

15  and it may have been verbal.

16      Q    Is there anywhere that you can look that

17  would help you recall whether or not you put it in

18  writing?

19      A    Well, I may have a few old computers or

20  something.  I didn't come across such written

21  communications in the course of preparing documents

22  for discovery, if that's what you mean.

23      Q    You state that your discussions were with

24  Dr. Berlin and yet in this paragraph you refer to

25  Dr. Deckers.  So I'm confused as to who you

202

1    you.

2        Q    Then you go on to state in paragraph 27,

3    Dr. Deckers fully agreed with the terms that you had

4    proposed and they committed to appointing plaintiff as

5    a full professor at UCHC.

6        A    Yes.

7        Q    Did Dr. Deckers agree to give you committee

8    assignments?

9        A    At that point in time we were not even at a

10    point of -- I had not even moved yet, so I would say

11    such discussions would have been premature.

12        Q    Did you, at any time, have a conversation

13    with Dr. Deckers apart from the April 4, 2003 letter,

14    or thereafter, about him agreeing to give you

15    committee assignments?

16        A    My interactions with Dr. Deckers were

17    infrequent because my immediate supervisor was

18    Dr. Berlin.  So discussions on that nature -- now,

19    I -- we both know Dr. Berlin and Dr. Deckers are in

20    close communication with each other.

21            So I know -- one example, let me say that I

22    was on a committee that evaluated the perio -- a

23    committee in the dental school, that was an

24    appointment that Dr. Dean Robinson made but it was in

25    consultation with Dr. Deckers.

218

```
 1        Q     What about the CLAC Advisory Committee.  What

 2   is that?

 3        A     CLAC.  That's an interesting one.  I just

 4   ceased hearing anything about.

 5        Q     What does that stand for?

 6        A     That's a good question.  It has to do with

 7   animal care.  I don't know what the CL stands for.

 8        Q     Have you asked anyone regarding your

 9   appointment to that committee?

10        A     No.

11        Q     Have you attempted to find out when they're

12   meeting so you could attend those meetings?

13        A     No.

14        Q     Okay.  Have you received anything saying that

15   you have been removed from that committee or not

16   reappointed to that committee?

17        A     No.  This is an example of where I believe

18   that I have simply been pushed aside.  There is a way

19   that things are done in this institution where you are

20   basically shunted aside.  What's the point of asking?

21        Q     The Molecular Core Advisory Committee, are

22   you still on that committee?

23        A     Again, as far as I know, but I don't know

24   when it has been meeting.  I haven't received any

25   communications.
```

219

```
 1        Q     Who heads up that committee?

 2        A     David Rowe.

 3        Q     Have you gone to Dave Rowe and asked him when

 4   the committee meets?

 5        A     These committees never -- well, that

 6   committee never met on a regular basis anyway.

 7        Q     Have you gone to David Rowe and asked him

 8   when the committee meets?

 9        A     No, because I don't believe I need to.  When

10   you're on a committee and the chair of the committee

11   is going to convene the meeting, they're supposed to

12   contact you.

13        Q     You don't even know if this committee has

14   met?

15        A     No.  But, again --

16        Q     Do you know if the CLAC Advisory Committee

17   has met?

18        A     No.

19        Q     Okay.

20        A     But what I'm also saying is that the

21   committee is still in existence and I didn't decline

22   to be on that committee anymore.

23        Q     Have you gotten any notification that you

24   haven't been reappointed or that you have been removed

25   from the committee?
```

1      Q    What things are you claiming are not mandated

2    by the Voluntary Exclusion Agreement?

3      A    Well, to be precise, I need to get back to

4    that letter.

5                MR. BUCCI:  Exhibit 24.

6      A    Let us go down the list.  Okay.  First of

7    all, as far as number one, the academic probation for

8    him to have continued that was done in an arbitrary

9    fashion.  Even though I'm not saying he couldn't have

10   done it or it couldn't have been done, he imposed this

11   as if it was mandated by the voluntarily agreement

12   when it was not.

13               Okay.  Number two, there is no issue with.

14               Number three, okay, is emanated from an

15   E-mail that he sent me on January 13 where he changed

16   the probationary conditions unilaterally, arbitrarily,

17   to involve activities that were never envisioned or

18   included in the original letter that I received in

19   August of 2001 and that have no relationship

20   whatsoever.

21     Q    What activities were those?

22     A    I'm talking here of the original letter.  The

23   original letter spoke only for grants.

24     Q    What did he change?

25     A    He sent me an E-mail in January of 2002, the

1    day before we -- he accepted my letter temporarily

2    resigning the directorship for personal reasons, he

3    sent me a letter where he put me under this, for lack

4    of better word, draconian probationary conditions that

5    involved all my academic activities that had nothing

6    to do with the ORI matter, and that are listed here,

7    that have nothing to do with the voluntary agreement.

8    For example, clinical, okay?

9         Q    What letter are you referring to that he sent

10   again?  I'm sorry, I don't have this letter here that

11   he refers to clinical activities.

12        A    It says here "Clinical," number three, CREAM.

13   That's one of his favorite acronyms.

14        Q    Isn't every faculty member here part of the

15   CREAM?

16        A    The point is that I'm trying to establish

17   there is nothing in the voluntary agreement that

18   relates to -- to clinical activities.

19        Q    But he's just saying, "During your academic

20   probation you will continue to report specifically to

21   the dean of the school of medicine, specifically in

22   these areas."

23        A    He had no right to arbitrarily create these

24   probationary conditions that have no relationship to

25   what is in the voluntary agreement because that's what

1    he's claiming, it's the voluntary agreement that gave

2    him the basis for him doing that.  There is no

3    relationship.

4         Q    Let's see if I understand it.  You're under

5    academic probation?

6         A    I was under academic probation with regard to

7    one type of activity  grant writing.

8         Q    At that time were you reporting to the dean

9    or not?

10        A    No.  That was, again, in January, out of

11   nowhere, he suddenly created this --

12        Q    That's what I'm asking you, this January

13   business.  Is this in writing somewhere?

14        A    Yes, of course.

15        Q    Was it a letter?

16        A    Well, would you like me to find it because

17   I --

18        Q    I would.  I would appreciate it if you would.

19        A    Okay.  We must have submitted it for

20   discovery, too.  Give me a second.

21             MR. BUCCI:  Take your time.

22        A    That's a notated copy but there are many

23   copies of that document in the Freedom of Information,

24   discovery.

25

245

1    been your chairs of your departments.  It would be

2    Dr. Garibaldi or Dr. Mallon.  And, in fact, what I

3    would assume would have happened, there would have

4    been discussion of what my academic, you know, how to,

5    you know, there would have been some discussion of

6    academic reporting relationships.  And instead what

7    arrived on a Sunday evening was this E-mail where

8    Dr. Deckers just suddenly created his own idea of what

9    he wanted, how he wanted to control my academic

10   career.

11        Q    Let's go back to this April 4, 2003 letter.

12   I'm not sure I understand the issue that you had with

13   number three, since it appears to me, just the way I'm

14   reading it and I could be wrong, to be a continuation

15   of what was in the January 13 E-mail.

16        A    What we're saying, first of all, is that this

17   is -- he had no right to impose this to begin with.

18        Q    That goes back to January of '02, I

19   understand.

20        A    So nobody in an academic environment, dean or

21   otherwise, has a right to tell you your entire

22   academic reporting relationships are being

23   unilaterally changed because it's at his whim.  That's

24   not acceptable in an academic environment.  That's

25   what he did here.  He further compounded that by

```
 1    trying to justify that action by relating it to the

 2    Voluntary Exclusion Agreement where on item three he

 3    said, "During your academic probation," which as it

 4    was spelled out in the letter of September or late

 5    August 2001, it related to one single activity, grant

 6    writing.  He then went on, as he did here, to then

 7    claim that my academic probation included every form

 8    of activity that I might be engaged in at the medical

 9    center.  Which had --

10    Q    Where does it say that?

11    A    CREAM.  CREAM is an acronym for everything

12    clinical, research, education, administrative, and

13    miscellaneous.  To my knowledge, there is no other

14    academic activity that one engages in that is not

15    covered by that acronym.

16    Q    I guess what I'm asking you, isn't every

17    faculty member subjected to this CREAM equation, if

18    you will, in determining their compensation?  Are you

19    saying you're the only faculty member that has this

20    CREAM formula?

21    A    No, what I'm saying -- no.  It's supplied to

22    every faculty member.  What I'm saying, there was

23    no -- that to basically relate the -- all of my

24    academic activities, to place them under academic

25    probation as he did basically back in January, was not
```

1     an acceptable or --

2         Q    Where does it say -- I'm trying to understand

3     what you said.

4         A    May I finish?  Let's make sure this is

5     perfectly clear.

6         Q    I'm trying to understand where in that

7     paragraph does it say that clinical research,

8     education, administrative, miscellaneous activity are

9     under academic probation?

10        A    "During your academic probation, you will

11    continue to report directly to the dean of the school

12    medicine for evaluation.  Specifically clinical

13    research, education, administrative, miscellaneous

14    activity."  It will be determined.

15        Q    Isn't he -- is it possible that this could be

16    read that it will be determined by him since you're

17    reporting to him?

18        A    Ms. Comerford, I'm trying to make two points

19    and we can go round and round on this.  One is, he had

20    no right to arbitrarily designate that all of my

21    clinical activities -- excuse me -- all my academic

22    activities I was directly responsible to him.  That

23    was punitive and that was unacceptable and

24    unwarranted.

25             Second of all, what he did is that he just

1   tried to -- let me read you the beginning the sentence

2   that begins before those points were enumerated,

3   "Given the terms of your Voluntary Exclusion Agreement

4   with PHS, the following is responsive of UCONN Health

5   Center and UCONN school of medicine."

6        So the implication is somehow his complete

7   control of all of my academic activities and an

8   academic probation that did not initially cover all of

9   my activities was somehow related or mandated by the

10  voluntary exclusion agreement.  He made the

11  relationship between them, not me.

12  Q    Okay.  And what else are you basing your

13  allegation on that he employed the terms of the

14  voluntary agreement as a ruse to justify his actions?

15  A    Okay.  Let's go on to point four.  Because

16  there, if you notice, if we look at the language of

17  the voluntary agreement, what it states is that I

18  can't engage in consultative activities or appoint

19  committees, things along that line, that are created

20  by the Public Health Service to provide information to

21  the Public Health Service or to the NIH.

22       What he wrote here is, "The MD/Ph.D program

23  the UCSOM is a PHS-funded activity."  I was not

24  prohibited by the voluntary agreement from

25  participating in PHS funded activities.

1       Q    Okay.  Anything else?

2       A    No, that's enough.

3       Q    Okay.  And paragraph 55 you claim Dr. Deckers

4    acted with malice to force you to resign.  And, again,

5    I'm going to ask you what facts do you base that

6    allegation on?

7       A    I'm sorry.  We're on 55?

8       Q    Yes.

9       A    Oh, okay.  Because I believe that the purpose

10   of this letter and the other activities is to make it

11   so unpalatable to be at this institution, that I have

12   no choice but to leave.  Anybody who has a modicum of

13   reason would come to that conclusion.

14      Q    Okay.  So this is based upon your belief that

15   this is why Dr. Deckers is doing this?

16      A    I think it's a very reasonable interpretation

17   of the documents that we have at hand and the

18   activities that he and his cohorts have engaged in.

19      Q    Why would Dr. Deckers wait a year and a half

20   after the initial SRB determination of August of 2001

21   to now try and force you to resign?

22      A    The year and a half being from when to when?

23      Q    August of 2001 to April of 2003.

24      A    Well, for one very good reason was at the

25   time that I received the letter in August there was no