UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
|    Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| PETER J. DECKERS, EXECUTIVE | : | CASE NO. 3:03CV672(MRK) |
| VICE PRESIDENT FOR HEALTH | : | MEMBER CASE |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| OF MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY, | : | |
|    Defendants. | : | NOVEMBER 15, 2004 |

**PAGES OF TRANSCRIPT TESTIMONY OF PETER J. DECKERS**

Case 3:03-cv-00242-MRK    Document 76-15    Filed 11/16/2004    Page 2 of 17

1    Q    Besides your concerns and what you felt the
2    academic probation meant, is there any definitional
3    policy as to what, in fact, academic probation is?
4    A    No, no.  They were effectively defined by me.
5    The other piece of this, I'm not sure if it's in this
6    letter or not counselor, but it might be, I just
7    haven't read the whole thing thoroughly, is that,
8    again, to not compromise Justin, academic probation
9    also meant that he would report to me directly and not
10   to the chair of his department for definition of his
11   responsibilities in the domains that faculty operate
12   in, specifically clinical care, research, education,
13   and administration related to all those activities.
14        I felt that, you know, quite honestly, he was
15   under enough stress, and to have to explain his
16   circumstance to his chair and then have to explain his
17   circumstance through his chair to the academic dean,
18   and then through the academic dean to the research
19   dean, and through the research dean to Peter Deckers,
20   the dean, would just create more havoc in Justin's
21   mind.  So I included in the definition of academic
22   probation a necessity to report directly to me for all
23   of those issues which I have never done for any other
24   faculty member in this institution.
25   Q    Okay.  But, again, getting back to --

106

1    A    A strict definition of academic probation,
2  I'm not aware of, but I say that hesitantly because
3  there may be a definition in the bylaws of the
4  university that I just haven't reviewed.
5    Q    So you're not aware but there could be
6  somewhere a definition of academic probation?
7    A    It wouldn't surprise me.
8    Q    But at the time that you implemented this
9  academic probation, do you recall whether you were
10  referring to anything that was --
11    A    I was not.
12    Q    Doctor, this is a new exhibit and I believe
13  this is a letter that you sent to Dr. Radolf on
14  April 4, 2003 in which you referenced receiving a
15  letter from Chris P. Pascal JD, Director, Office of
16  Research Integrity?
17    A    Correct.
18                    (Defendant's Exhibit No. 19,
19                    Letter dated 4-4-03, marked for
20                    identification.)
21  BY MR. BUCCI:
22    Q    In this letter you implement or take some
23  actions with respect to Dr. Radolf.  And the second
24  paragraph reads, "Given the terms of your voluntary
25  exclusion agreement with PHS, the following is the

114

```
 1      Q    Right.  And so he's free to participate in
 2   funded activities by the PHS?
 3      A    Of his own.
 4      Q    Well, it limits him from serving on PHS
 5   advisory committees.
 6      A    I'm not sure I see your point.
 7      Q    It limits him from serving on PHS advisory
 8   committee, board, or peer review committee?
 9      A    Right.
10      Q    Why would he be excluded from serving on
11   University of Connecticut boards?
12      A    Because much of what the University of
13   Connecticut does in education and research is
14   PHS-funded independent of the grants that are the
15   unique property of Dr. Radolf.
16      Q    I understand that.  But even if those boards
17   and agencies are funded, it doesn't make Dr. Radolf
18   serving on a PHS advisory committee, it doesn't make
19   him serving on a PHS advisory board or peer review
20   committee?
21      A    I would -- you asked how I interpreted this.
22   I am telling you how I interpreted it which is
23   apparently more broadly than you interpreted it.  From
24   my point of view it says, "From serving in any
25   advisory capacity to the PHS including but not limited
```

115

```
 1   to."
 2       Q    Okay.
 3       A    So --
 4       Q    So if you put Dr. Radolf in an administrative
 5   leadership position on campus here, are you saying
 6   that turns him into being on an advisory -- in some
 7   way advisory to the PHS?
 8       A    If it was PHS funded it would be.  If it was
 9   PHS funded and was independent of Dr. Radolf's grants,
10   I would consider that a violation of this voluntary
11   exclusion agreement.  Previously I have testified to
12   the fact that the academic probation, I felt, was
13   important to keep him from additional committee work
14   that might compromise him, the students, or the
15   faculty that were working with him.
16            I think one can look at these things as two
17   difference things depending on who funds them.
18       Q    I understand that, but what I'm saying is
19   taking the language of number two, how does that --
20       A    Let me say this:  It may be that you should
21   talk -- I told you how I interpreted it.
22       Q    Yes.
23       A    I think it's consistent with how reasonable
24   people would interpret Mr. Carmona's statement.  And I
25   think it's also consistent relative to how this
```

116

1  academic community would interpret that statement, so
2  I don't have any --
3      Q    My question, again, and it's limited to that
4  the action that you took to bar Dr. Radolf from any
5  academic or administrative leadership position on
6  behalf of UCHC, was in response to number two or it
7  was required by number two of the voluntary exclusion
8  agreement?
9      A    I tried to explain that.  If, in fact, it was
10 PHS funded, it was required.  If there were no PHS
11 funding associated with the activity, then effectively
12 I was continuing the academic probation that I defined
13 previously for you earlier this morning.
14     Q    What I'm asking you is, effectively what
15 you're saying is that Dr. Radolf was debarred from
16 participating in any activity that had PHS funding
17 other than his own grants.  Is that how --
18     A    That's how I interpreted this.
19     Q    Are you aware that there is a more serious
20 punishment than this exclusion, this voluntary
21 exclusion which is called debarment?
22     A    We have never been through that before here,
23 to the best of my knowledge, so I take your word for
24 that.
25     Q    For instance, in medical practice if somebody

117

```
1    is debarred from PHS-funded activities, they would be
2    debarred from participating in Medicare because that
3    deals with funding from PHS or government funds?
4         A    I accept that.
5         Q    But Dr. Radolf is participating in funded PHS
6    research activities as of the present time?
7         A    In his laboratory.
8         Q    In his laboratory.  And is there anything in
9    the agreement here that says Dr. Radolf is barred from
10   participation in PHS-funded activities other than for
11   his currently funded activities?
12        A    As I testified to earlier, that is how I
13   would interpret this.  I interpret it perhaps more
14   broadly than you did, and as I said, it may well be
15   you have to get a definition from the person who is
16   the senior -- that represents the Public Health
17   Service, but it says from any advisory capacity to the
18   public health service including but not limited to
19   service on any PHS advisory committee, board, and/or
20   other peer review committee.  I interpreted this very
21   broadly, not narrowly.
22        Q    Let me -- and I don't mean to be redundant.
23   Hopefully this will be the last question on it, does
24   the University of Connecticut Health Center have any
25   PHS advisory committee located within its campus?
```

118

```
 1      A    We have numerous committees that advise on
 2   PHS-funded activity in this organization.
 3      Q    But do you have any committee that is
 4   advising PHS presently?
 5      A    Directly?
 6      Q    Directly.
 7      A    I don't know the answer to that, but it
 8   wouldn't surprise me if we did.  I don't know the
 9   answer to that.
10      Q    If you did under this term, Dr. Radolf would
11   not be allowed participation?
12      A    On that more national committee.
13      Q    Right.
14      A    For sure.
15      Q    And he can't serve on a PHS advisory board?
16      A    Correct.
17      Q    Correct?  Is there presently on campus a PHS
18   advisory board?
19      A    I don't know that.
20      Q    All right.  But if there was, he would not be
21   able to participate in that?
22      A    Correct.
23      Q    And the same with the peer review committee?
24      A    Well, peer review committee, you might
25   interpret differently than I do.  One definition is
```

119

```
 1   peer review of grants that are being submitted for
 2   funding.  Another definition of peer review is review
 3   of the progress, if you will, of candidates for the
 4   Ph.D. degree or MD degree, or the DMD degree in our
 5   school.  We have numerous committees that review the
 6   academic progress of our students, and in many
 7   circumstances those activities are PHS funded.
 8       Q    But peer review --
 9       A    Peer review, that's broadly interpreted.
10   Peers.
11       Q    Peers sort of means people of the same level
12   reviewing each other?
13       A    Well, that's the broad interpretation of it,
14   but peers -- peers, my associates and myself, often
15   review people who aren't at our level at this
16   particular time.
17       Q    So what you're saying, for instance, if you
18   had the intention of appointing Dr. Radolf, for
19   instance, to Dr. Wetstone's position, you feel that
20   you would be barred by this voluntary agreement from
21   doing that?
22       A    Well, that's a broad statement.  Let me say
23   the following --
24       Q    You have excluded him from any academic or
25   leadership position.
```

```
 1      A    Let me tell you how I feel about it.  We get
 2   about $86 million of Public Health Service funding in
 3   this organization direct and indirect.  Many of the
 4   indirect dollars that come, service administrative
 5   functions within the research domain and educational
 6   domain.  I would believe that the use of those
 7   indirect dollars from the Public Health Service in
 8   support of Dr. Radolf, given the debarment that you
 9   talked about or the term that you used, given the
10   voluntary exclusion agreement, given this agreement I
11   would believe that use of these dollars for Dr. Radolf
12   in an administrative position would be inappropriate.
13      Q    Okay.  But, again, what I'm saying to you is
14   that -- you have the document in front of you, I do
15   not see any provision that debars Dr. Radolf from
16   participating in activities that are funded by the
17   PHS.
18      A    That he has unique control over, is my
19   interpretation.
20      Q    Okay.  And --
21      A    And the other $86 million that we have unique
22   control of, I interpreted this, number two, to exclude
23   him from participating in that activity.
24      Q    But number two doesn't say that.  Number two
25   doesn't say Dr. Radolf is --
```

121

1    A    I said I interpreted it that way.
2    Q    Okay.  And, again, your interpretation is
3    just based upon the provisions of item two of this
4    voluntary agreement?
5    A    To the best of my knowledge, and obviously I
6    have just seen this again this morning for the first
7    time, it doesn't reference that anyplace else.
8    Q    And, again, when you implemented the
9    provisions of your letter to Dr. Radolf dated
10   April 4th, 2003, it was your understanding that you
11   were required to take those steps based upon the
12   voluntary exclusion agreement?
13   A    I agree with that statement and I don't
14   believe I took any steps that were significantly
15   different than what existed before except for the
16   timing, the five-year timing.
17   Q    Well, extending an academic probation from
18   three to five years is significant, is it not?  That's
19   a 40 percent increase, is it not?
20   A    I don't think I added anything that was
21   onerous to Dr. Radolf.
22   Q    But it was a significant increase?
23   A    But it was mandated by the ORI.
24   Q    I understand that, but it was a significant
25   increase, 40 percent?

122

```
 1      A    It was an increase.  I would not have
 2   personally considered it significant.  Given the
 3   circumstances he was in, let's put it that way.
 4      Q    And the exclusion from all leadership --
 5   administrative and leadership positions on campus, you
 6   don't consider that to be a substantial --
 7      A    I personally considered it protective of
 8   Dr. Radolf.
 9      Q    But you don't consider it a significant
10   disciplinary step?
11      A    No, because he already was in that mode, as I
12   defined for you earlier this morning.
13      Q    Okay.  But he was in that mode for --
14      A    Three years.
15      Q    Okay.  But in your letter of August 2, you
16   didn't specify that he would be excluded from academic
17   and administrative leadership positions?
18      A    You asked me how I defined academic
19   probation, and I said that -- I did reference this
20   earlier.
21      Q    Right.  And you're saying that in the
22   August 22nd, 2001 letter that would come under
23   academic probation.  Why did you feel it necessary --
24      A    Academic means research and education by
25   definition and any administration related to the two.
```

123

```
 1      Q    Why would you feel the need then in the
 2    April 4, 2003 letter to go on and -- not just specify
 3    academic probation, but to go on to say that, "during
 4    this interval you will be excluded from any academic
 5    or administrative leadership position"?
 6      A    I think by this time we had learned that it
 7    was in our best interest to be very precise with
 8    Dr. Radolf.
 9      Q    All right.  So that was the reason that you
10    included that and did not include it in the original
11    letter?
12      A    It certainly was one of the reasons.
13      Q    And, again, prior to implementing the steps
14    that you imposed in your April 4, 2003 letter, you did
15    not discuss that with Dr. Radolf?
16      A    I didn't.  To the best of my knowledge, I did
17    not.  I don't remember that.
18      Q    Was there anything in the voluntary exclusion
19    agreement where Dr. Radolf admitted research
20    misconduct that was not originally determined by the
21    Special Review Board and Dr. Radolf's admissions
22    before the Special Review Board of the State of
23    Connecticut?
24      A    To answer that I would have to review the
25    report of the SRB and the voluntary exclusion
```

124

1    agreement which I didn't do last night.
2        Q    Let me just narrow the question then.  On
3    Exhibit No. 3 the second page, in the paragraph that
4    reads, "As executive vice-president for health
5    affairs" -- I lost my place, Doctor.  Okay.
6             In the third sentence it says, "You admitted
7    that this was done intentionally and knowingly, that
8    previously existing information confirmed the data
9    presented in the falsified figure is not relevant but
10   it does contain that you admitted that this was done
11   intentionally and knowingly."
12            Do you recall Dr. Radolf admitting to the
13   Special Review Board that he had committed scientific
14   research --
15       A    I was not part of any of the deliberations of
16   the Special Review Board, but Dr. Radolf, in the past,
17   told me that specifically, that he told Dr. Berlin
18   that specifically.
19       Q    So his admission in the voluntary exclusion
20   agreement should not have come as a surprise to you?
21       A    It did not come as a surprise to me.
22       Q    And did his admission in the voluntary
23   exclusion agreement bring about, from your
24   perspective, additional punishments?
25       A    Oh, I think -- well, are you talking about

125

```
 1    the voluntary exclusion agreement itself or his
 2    admissions within it?
 3         Q    I'm talking his admission within it.
 4         A    I think it brought about considerable
 5    additional punishment for him.
 6         Q    In what sense?
 7         A    At the national and international level, this
 8    was a public piece of information that was published
 9    in the Federal Register.  I can't imagine anything
10    more humiliating to an established investigator.
11         Q    But as to the admission itself, was it the
12    same admission he had made to you earlier?
13         A    Well, again, I would believe the answer to
14    that is yes, but I would have to read the SRB report
15    and his admission of guilt to the ORI to be sure.
16              As I'm sitting here talking with you,
17    Mr. Bucci, I believe that the ORI came down strongly
18    on the fact that NIH US Public Health Service dollars
19    were involved in this particular research.  We felt
20    that when we did the examination that if they were, it
21    was, your term now, a legal term, de minimis, very
22    little.  That was the reason for my decision to not
23    initially report that to them.  They made it very
24    clear to me did they not only have jurisdiction over
25    Public Health Service dollars and Public Health
```

126

```
 1    Service dollars were involved, but they had
 2    jurisdiction over the Public Health Service grant as
 3    well, and even a grant that wasn't reviewed or funded,
 4    falsification of the data in it was especially
 5    important to them.
 6         So I think there were, in the voluntary
 7    exclusion agreement, several things that were
 8    disruptive and the most important of which is this was
 9    a public document distributed to all of academe
10    admitting to this particular guilt.
11       Q   I understand that.  But as a result of the
12    voluntary exclusion agreement and its contents, did
13    you feel that other than what was required by the
14    voluntary exclusion agreement, did you feel that there
15    should have been additional disciplinary steps taken
16    with regard to Dr. Radolf?
17       A   Well, I had numerous additional steps
18    available to me.  I had a board of directors, a board
19    of trustees that wanted numerous additional steps
20    taken.  I felt that they were excessive and, quite
21    frankly, I felt I was just extending what was already
22    agreed to as a result of the SRB report, my sanctions,
23    in compliance of what was requested of me by the ORI.
24       Q   You seem to take special note in your letter
25    after the voluntary exclusion agreement to state to
```