**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| PETER J. DECKERS, EXECUTIVE | : | CASE NO. 3:03CV672(MRK) |
| VICE PRESIDENT FOR HEALTH | : | MEMBER CASE |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| OF MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| Defendants. | : | NOVEMBER 11, 2004 |

## A F F I D A V I T

STATE OF CONNECTICUT)
                                         ) Avon, CT
COUNTY OF HARTFORD)


The undersigned, being duly sworn, hereby deposes and says:

1.        I am over the age of eighteen (18) years and believe in the obligations of an

oath.

2.        I am familiar with the facts alleged contained in this affidavit.

3.        I attest that the facts and matters contained herein are true and accurate.

4.        I am currently a tenured Professor in the Departments of Medicine and

Genetics and Developmental Biology at the University of Connecticut Health Center (UCHC) in Farmington, CT. I am a board-certified internist, a board-certified infectious disease specialist, a physician-scientist, and a microbiologist. I am internationally recognized for my clinical and scientific expertise in syphilis and Lyme disease, infectious disorders caused by the spirochetal pathogens *Treponema pallidum* and *Borrelia burgdorferi*, respectively. A major goal of my research has been and continues to be the development of innovative strategies for preventing syphilis and Lyme disease; this included vaccine development. My research program, from its inception in the 1980s, has made extensive use of molecular biological, genetic, and recombinant DNA techniques.

5.      During the summer of 1998, while a tenured Professor in the Departments of Internal Medicine and Microbiology at the University of Texas Southwestern Medical Center at Dallas, Texas (UT Southwestern), I applied for the Directorship of a newly created Center for Microbial Pathogenesis (CMP) at UCHC in response to an advertisement in a then-recent issue of the American Society for Microbiology (ASM) News.

6.       Based on the verbal understanding with Dr. Richard Berlin that I was going to be offered the Center Directorship, I returned with my family during Labor Day weekend, 1998. During this visit, Dr. Berlin and I entered into

extensive, formal negotiations regarding the number of faculty to be

recruited to the Center, its scientific directions and orientation, and the

Institutional resources that would be allocated for its development.

7.       The letter of offering, dated September 9, 1998, was the direct outcome of

my negotiations with Dr. Berlin during the Labor Day Weekend visit. This

letter formally offered me the position of "Director of the Center for

Microbial Pathogenesis" in addition to tenured appointments in the

Departments of Medicine and Microbiology. The letter also stated that

"your principle responsibility will be the formulation and development of

the Center's research program" and it outlined the Institutional resources

that would be allocated to me for this new research Center. These

statements indicate very clearly that the Center Directorship, not the faculty

appointments, were the focus of the recruitment. The letter concluded by

stating "It has been a great pleasure for all of us here to interact with you,

your family, and members of your laboratory".

8.       In an email to Dr. Berlin dated September 11, 1999, I formally accepted the

position and stated that I "will commit all of my energies and abilities to

make the Center successful". In that same email, I also provided detailed

information about Radolf laboratory personnel and their spouses/families in

order to begin the long and complex logistical process of permanently

relocating these individuals in parallel with the relocation of my family and laboratory.

9.     On or about January, 1999, several months after I had accepted the Center Directorship, I made another visit to UCHC to meet faculty members and discuss various details regarding the transfer of my laboratory and establishment of the Center. It was during these discussions with Dr. Berlin that I discovered that my initial appointment would be as Assistant Professor and that my tenured appointments as Professor in the Departments of Medicine and Microbiology would not be made by the UCHC Senior Appointments and Promotions Committee (SAPC) for as long as one year after the move. I stated uncategorically that I considered the appointment as Assistant Professor to be contrary to the representations made by Drs. Deckers and Berlin during our discussions and in the letter of offering. I also indicated that if this situation were not remedied, I would withdraw my acceptance of the Center Directorship and stay at UT Southwestern.

10.    On January 8, 1999, following my return to Dallas, TX, I received a letter from Dr. Deckers stating "This is to indicate that you will be appointed

11.      Shortly after my arrival, I received a letter from Dr. Leslie Cutler, then

Chancellor, stating that I was appointed as Assistant Professor, a non-

tenured position. I was confused by this and concluded that Dr. Deckers

had not informed Dr. Cutler about his January 8 letter.

12.      On April 1, 1999, I took up my responsibilities as Director of the CMP. On

April 7, 1999, the SAPC confirmed my appointments as Professor in the

Departments of Medicine and Microbiology.

13.      From the moment of my arrival, I endeavored to fulfill my commitment to

establish a world-class CMP at UCHC. During the next three years, I

received numerous accolades and two excellent annual compensation

reviews, with commensurate increases in salary. On August 28, 2000, in

response to the first Annual Report for the CMP, I received a letter from Dr.

Deckers stating "I congratulate you, your staff, and your faculty on an

exceptionally productive academic year. Your collective scholarship,

presentations, and research funding are a credit to your industry, intellect,

and enthusiasm. Be assured of the continued support of this office".

14.      On July 26, 2001, a Special Review Board (SRB) of the UCHC, which was

formed to investigate an allegation of research misconduct involving my

aforementioned mRNAs are expressed in the salivary glands. Dr. Radolf admitted to this misrepresentation of data…It seems quite clear that Dr. Radolf mislabelled (sic) the figure to support the statement in the grant that such mRNAs were expressed in the salivary glands of the Dermacentor andersoni. For example, lanes 3, 5, 13 and 15 are plasmid controls, which were labeled in Figure 2 as KD2, KD4, Mp(d) and BB respectively. These actions by Dr. Radolf clearly constitute misrepresentation of data. Although the conclusions that he made in the grant were ultimately shown to be true, the fact that lanes in the photograph were mislabelled (sic) knowingly constitutes scientific misconduct. Dr. Radolf admitted that this was his error in judgment. During the inquiry, and during Dr. Radolf's testimony, he admitted to the data falsification. Consequently, the SRB unanimously found that Dr. Justin Radolf engaged in research misconduct by falsifying Figure 2 of the USDA grant application."

15.  As a result of the findings of the SRB, Dr. Peter Deckers, informed me by letter dated August 22, 2001, *(Exhibit 2)*, that the following administrative steps would be implemented:

    a.  a letter of reprimand will be placed in your    personnel file

a committee of faculty researchers who are tenured Professors of
the School of Medicine will be created who shall thoroughly
inspect all new research grant proposals which you author or co-
author for a period of three years (September 1, 2001 through
August 31, 2004) to ensure (1) compliance with all applicable
regulations and (2) the integrity of research data presented. This
three year period will be considered a period of probation for you
as a member of this academic community."

16.     In the letter of reprimand, dated August 22, 2001, Dr. Deckers noted that
"there is (1) no evidence that your action in this circumstance is part of a
pattern of dishonest behavior, or that (2) this falsification had any impact on
the research record, research subjects, other researchers, institutions, or the
public welfare and, further, (3) the grant applications to USDA and CII
were withdrawn before review, and 'problems with the data' in the grants
correctly offered as reasons for such withdrawal." *(Exhibit 2).*

17.     Pursuant to the letter of August 22, 2001, my status as a Professor with
tenure was unaffected. I was not excluded from participating in academic
or administrative leadership positions on behalf of UConn and/or UCHC

participating on, or partaking in any academic committees or boards or events or functions.

18.     Dr. Deckers and the Special Review Board had decided, independent of my participation, not to report its investigation and findings to the federal Office of Research Integrity. *(Exhibit 2)*.

19.     In his August 22, 2001 letter to me, Deckers stated, "since this episode of research misconduct did not involve federally funded research, and since the grants in question were not submitted to the National Institutes of Health, I have further decided to accept the SRB interpretation that the UCHC is not obligated to report this investigation and its results to any outside party, including the Office of Research Integrity (ORI)", *(Exhibit 2)*.

20.     Nevertheless, the Office of Research Integrity independently exercised jurisdiction over the matter dealing with my research misconduct and reviewed the findings of Dr. Deckers and the SRB.

21.     Although in the August 22, 2001 letter from Dr. Deckers to me, I was informed I had the right to appeal the administrative steps he imposed on me to the Health Center Appeals Committee, Dr. Deckers and Dr. Richard

appeal would have dire consequences for me.

22.     In spite of the decision of the ORI to review the SRB's findings, Dr.
        Deckers informed me that I was not at risk for any disciplinary action by the
        University of Connecticut and the University of Connecticut Health Center.

23.     Dr. Deckers assured me that the findings of the SRB and the administrative
        actions he had implemented were the complete and final responses of the
        University of Connecticut and the University of Connecticut Health Center
        to the incident involving the determination that I had admittedly committed
        research misconduct.

24.     I entered into a voluntary agreement with Office of Research Integrity on
        March 10, 2003.  Under the terms of the agreement, I consented to "exclude
        [myself] voluntarily from serving in any advisory capacity to the PHS
        [Public Health Service] including but not limited to service on any advisory
        committee, board, and/or peer review committee, or as a consultant for a
        period of five (5) years beginning with the effective date of this
        Agreement." (*Exhibit 3*).  Other than for this exclusion, there was no
        requirement that mandated that the period of academic probation imposed
        on me by Dr. Deckers on August 22, 2001 be extended, that I be

indirectly, any service of any kind to the USPHS and that I be excluded from participation in the MD/PhD Program of UCSOM.

25.      I did not agree to, nor did the ORI impose on me a "government-wide

debarment", which would have excluded me from participating in any

activities in which government funds are used.

26.      By letter dated April 4, 2003, *(Exhibit 4)*, Dr. Deckers imposed a series of

disciplinary actions on me, without prior notice or hearing, which included

the following punitive measures including the following:

> "1. [The plaintiff's] academic probation will continue at least through March 9, 2008. During this interval you will be excluded from any academic and/or administrative leadership position on behalf of the UCHC and its schools and hospital that could include, directly or indirectly any service of any kind to the USPHS.
>
> 2. ...The now operative Supervisory Plan requested of UCHC by ORI is attached and was forwarded to them as requested on April 4, 2003...
>
> 4. The MD/PhD Program of the UCSOM is a PHS-funded activity. Therefore, to ensure that the work of your current graduate student...who is an MD/PhD student, is not disturbed or disrupted in any way by these events, and that she is adequately mentored, a co-major advisor will be appointed by the Dean of the Graduate School to serve in conjunction with you...Additionally, you will not be listed as an available mentor for new MD/PhD candidates on the resubmission of the NIH Training Grant for this program and your appointment on the Steering Committee of the MD/PhD Program is terminated immediately.
>
> 5. This communication to you and the recent letter from ORI to us and your attorney, as well as the materials relative to this PHS action

Compliance Subcommittee of the UCHC Board of Directors for
their review and further consideration." *(Exhibit 4).*

27.     The actions of Dr. Deckers stripped me of the rights and privileges to which

        I was entitled as a Professor pursuant to the established policies, practices,

        and procedures of the University of Connecticut and the University of

        Connecticut Health Center.

28.     Dr. Deckers imposed these disciplinary measures on me without providing

        me with an opportunity to discuss these punitive actions with him either

        prior to or after he had imposed them.

29.     A meeting to discuss these punitive measures would have allowed me the

        opportunity to explain to him that his actions were not required by the terms

        of the Voluntary Agreement and that he had already imposed punishment

        on me for the very same transgressions on August 22, 2001.

30.     Since Dr. Deckers claims that the discipline he imposed on me was required

        by the terms of the Voluntary Agreement, I would have been able to explain

        to him that he was in error if he had met with me to discuss his actions.

31.     Except for requiring a supervisory plan, the actions taken by Dr. Deckers

        were not mandated by the provisions of the Voluntary Agreement entered

