UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

JUSTIN D. RADOLF                           CASE NO: 3:03CV242(MRK)
    Plaintiff                           LEAD/MAJOR DOCKET NO.

                                        CASE NO. 3:03CV242(MRK)
                                        MEMBER CASE

v.

UNIVERSITY OF CONNECTIICUT, ET AL          DECEMBER 12 2004
    Defendants

**DEFENDANTS' REPLY TO PLAINTIFF'S
MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I.    **ARGUMENT**

Defendants have moved to strike many of plaintiff's paragraphs set forth in his Local

Rule 56(a)2 Statement under a separate Motion to Strike filed with the Court this date with

accompanying Memorandum. Therefore, defendants will not separately address plaintiff's

factual statements in his Opposition Memorandum except as needed.

    A.    **Defendants Did Not Violate Due Process In The Appointment
And Removal As Director Of The Center For Microbial Pathogenesis**

The facts regarding plaintiff's appointment and removal are set forth in Defendants'

Local Rule 56(a)(1) Statement at ¶ 1-44 and 155-168.[1]

---

[1]  References are to defendants' Local rule 56(a)(1) Statement of Material Facts dated August 16, 2004 and noted by SF.

Defendants do not deny that plaintiff accepted a position as professor of medicine and microbiology and agreed to establish the Center for Microbial Pathogenesis and serve as its Director. (SF ¶ 11). Even if there was an "implied understanding" of a long-term commitment,[2] such does not guarantee a permanent position as plaintiff so argues. Deckers Aff. ¶ 24-28; Berlin Aff. ¶6-8. Nor does such an implied understanding lead to the conclusion, as plaintiff so fervently wishes, that he was granted tenure in the directorship position. No matter how interconnected his faculty appointments and center directorship may have been, tenure is not granted for such administrative positions. (SF ¶ 23-28). It would be absurd for Dr. Deckers, after years of holding the position of Dean in academic medicine, to operate contrary to the Guidelines for the Operations of the School of Medicine and the ByLaws of the University.[3] (SF ¶ 22-25). See Deckers Tr. 12, 31-33, 143-144.

Tenure is associated with the concept of hierarchical academic rank, i.e. assistant professor, associate profess, full professor, and is linked to professorship, not administrative positions. See Academic Tenure: Its Historical and Legal Meaning in the United States and Its Relationship to the Compensation of Medical School Faculty Members, 44 St. Louis U.L.J. 51 (2000); Craine v. Trinity College, 259 Conn. 625 (2002). Tenure has no specified end date and is therefore an appointment of indefinite, not permanent, term. 44 St. Louis U.L.J. at 66. Academic tenure does not constitute a guarantee of life employment, American Ass'n of Univ. Professors v. Bloomfield College, 322 A.2d 846, 853 (N.J. Super. Ct. Ch. Div. 1974), aff'd, 346 A.2d 615 (N.J. Super. Ct. App. Div. 1975). It exists only if identified in the governing documents, handbook or by contract, i.e. an appointment letter, with specific provisions outlined.

---

[2] Dr. Berlin's understanding of a long-term commitment was "more than a year," (Berlin Tr. 46) not permanent

[3] See also ByLaws Article XV, C fn 4 states: "Academic tenure does not confer upon any staff member the right to continued assignment to administrative responsibilities." (Exhibit 1)

2

<u>Raines v. Haverford College</u>, 849 F. Supp. 1009, 1013 (E. D. Pa. 1994); <u>Sweeney v. St. Joseph's</u>

<u>Hospital</u>, 769 F. Supp. 747, 751 (M.D. Pa. 1991), <u>aff'd mem.</u>, 980 F.2d 724 (3rd Cir. 1992);

<u>Williams v. Northwestern University</u>, 497 N.E. 2d 1226 (Ill. App. 1986).

Per University of Connecticut By-Laws, article XV, section C, (Exhibit 1), entitled

"Academic Appointment and Tenure," "the terms and conditions of every appointment to the

faculty will be stated or confirmed in writing, and a copy of the appointment document will be

supplied to the faculty member." Further, "tenure may be granted by the Board of Trustees upon

arrival at the University at the rank of Professor…" Under the Guidelines of the Univ. of

Connecticut School of Medicine for Appointment or Promotion to Senior Faculty Rank and/or

Tenure and Operating Guidelines for the Senior Appointments and Promotions Committee, the

SAPC must review and recommend positions of tenure to the Board of Trustees for approval.

(Exhibit 2)

In Dr. Radolf's case, he was never granted tenure in the Directorship by the SAPC or by

the Board of Trustees (SF 27-28). And while he received a letter from Dr. Deckers indicating he

has received tenure as a Professor, he admitted at deposition that he had never received a similar

letter relative to the directorship position. <u>See also</u> fn 2 on p. 2, supra.

Relative to his removal, plaintiff goes on at great lengths that Dr. Deckers' 12/27/01 letter

did not indicate that plaintiff's return to the position would be dependent on the outcome of the

ORI investigation. Clearly, however, said letter stated that "………and the potentially prolonged

Office of Research Integrity (ORI) investigation into the entire matter could become very serious

handicaps to the maintenance of moral and productivity amongst faculty in the Center…"

Apparently, plaintiff needs everything spelled out at an elementary level.

Regardless of plaintiff's argument, the fundamental, irrefutable bottom line is that plaintiff had no tenure in the directorship position, it was not a permanent position, plaintiff served at the pleasure of the Dean, every such position can be terminated at the discretion of the Dean, and it is within the Dean's discretion as to who would hold the position, for how long, and when plaintiff could or would resume it. That plaintiff continually states there was a "mutual understanding" to support his claim of entitlement to a property interest in the director position. Merely stating it repeatedly does not make it so. Clearly, there was no such mutual understanding on the part of the defendants. (SF ¶ 23-30).

Plaintiff tries to draw an analogy to the Malla case. However, unlike Malla, Dr. Radolf had only occupied the director position for less than three years. Per the University By-Laws and Operating Guidelines, there is no specified duration of the position and it can be dissolved at any time, unlike Malla in which the expected duration was for nine years. Unlike Malla, plaintiff did not receive separate compensation and there is an annual review of the appointment (SF ¶ 24-25). Further, in Malla, the University had a custom whereby the writer of the grant, in this case Malla, is entitled to be the lead investigator on it if received. Finally, plaintiff has produced no evidence that the position is one of special importance in the academic community, particularly where the Center was just being established and had no long-standing function. Nor has he presented evidence of his actual role in its establishment, unlike Malla. It should be noted that the Malla court did not indicate that Malla's position as Campus Director had a special importance in the academic community. Rather, it indicated that there was special importance to being the lead writer, recipient, and investigator on a grant. Thus, Malla does not support Dr. Radolf's claim that the Center directorship held special importance. In short, for the reasons previously outlined in defendants' Memorandum of Law in Support of Summary Judgment at pp.

4

4-9, plaintiff did not have a constitutionally protected property interest in this administrative position.

Even if such a property interest is found, Dr. Deckers met with plaintiff prior to plaintiff stepping down from the position. And, whether or not discussion regarding restoration to the position was "entangled" with his compensation review, the fact remains that the opportunity for such discussion was afforded to plaintiff and he refused it. Why plaintiff steadfastly refused to meet with Dr. Deckers was never understood. Moreover, plaintiff's argument that he was unwilling to mingle the issues regarding the directorship with the topic of his performance and compensation as a Professor (See plaintiff's memorandum p. 11) belies his argument that the Professorship and Directorship were interconnected. Clearly, plaintiff cannot have it both ways.

On August 22, 2001, defendant Deckers issued plaintiff a letter of reprimand and placed him on academic probation. In October 2001, ORI exercised jurisdiction and began its investigation into plaintiff's scientific misconduct. Dr. Deckers, noting psychological and stress concerns that had arisen since August and then after ORI became involved (see SF ¶ 34-42; Deckers Tr. 18-22, 74-75; see also Berlin Tr. 36-40; Berlin Aff. ¶ 10-13; Deckers Aff. ¶s 30, 34-42), quickly moved to address those concerns in December 2001, leading to the meeting with Dr. Radolf in January 2002. Dr. Radolf admitted he was already getting psychiatric help and there was concern the stress from the ORI investigation would lead to him hurting himself or others. (Deckers Tr. 19-20, 22.) There were no "charges" being levied at plaintiff of which he was entitled to notice or "evidence" requiring presentation. Unfortunately, Dr. Deckers' concern for plaintiff's well-being falls under the category of "no good deed goes unpunished." Under the circumstances, plaintiff was not due any greater pre-deprivation process than that provided him.

Finally, plaintiff never grieved this issue pursuant to the By-Laws Health Center grievance procedure. (Exhibit 3)

Plaintiff attempts to create the need for more formal due process requirements by trying to claim this was a disciplinary action on the part of Dr. Deckers. The facts show the contrary. (SF ¶s 30-39; Deckers Tr. 18-22; Berlin Aff. ¶ 21). Plaintiff was never "terminated" from the position. Rather, he voluntarily removed himself from the position. While Dr. Deckers had hoped this would be a temporary situation (Deckers Tr. 69), the results of the ORI investigation (SF 155-166) and even plaintiff's action since that time, including the incidents of inappropriate behavior and interpersonal issues (See Exhibit 4) have made it impossible to return him to that position at the present time. The personal and morale issues which caused concern in 2001/2002 have apparently not resolved themselves. See also Exhibit 5 (petition signed by Dr. Radolf's peers).

Plaintiff has presented no evidence to support his spurious claim that the meetings Dr. Deckers had with plaintiff were a "ploy". Nor can he support his claim that the issue of the ORI investigation has been dreamed up solely for purposes of litigation. Dr. Deckers letter of 12/27/01 at a minimum belies this claim. As to what was said during the pre-resignation meetings, plaintiff apparently thinks he is the only credible witness in the room and that only his story must be true.

Interestingly enough, plaintiff now states on p. 65 of his memorandum that he would resume his position at the end of this academic probation on August 31, 2004. Clearly, he now admits the probation of August 31 was an academic probation and moreover, he now admits that his return to the directorship position was not to be based simply "on when he was feeling better" or "whenever he so chose" or that there "were no conditions placed on his return to the position,"

6

rendering his statements less than credible.[4]  Indeed, not only was plaintiff on notice of the ORI

investigation but Dr. Deckers informed him of this issue relative to the directorship during his

meeting with Dr. Radolf (SF ¶s 33-39).  Dr. Berlin has corroborated this.  (Berlin Aff. ¶s 17-20,

37), and Dr. Radolf admitted during his deposition that he could not recall whether the ORI was

discussed during his meeting with Dr. Deckers (SF 39).  It is now disingenuous for him to argue

otherwise.

Even assuming that some pre-deprivation process was due, the balance of interest lies in

defendants' favor.  First, plaintiff never lost his job or tenure, salary or research support when he

stepped down from the directorship position.[5]  It was intended to be temporary, no different from

a personal leave.  Second, the risk of erroneous deprivation was small.  Dr. Radolf admitted he

was under care for stress and there was no disputing he had been found guilty of scientific

misconduct by his peers and was under investigation by the ORI (Deckers Tr. 19-22).  Third, the

governmental interest was great.  UConn is a state agency, of which the Health Center is a

constituent unit.  As Dr. Deckers pointed out in his deposition, as Center Director, Dr. Radolf

was responsible for other people, had to interact with them on a daily basis, had to mentor, plan

strategically and recruit.  See also Berlin Tr. 36-38 (e.g. Radolf became increasingly agitated,

saw in other faculty a conspiracy to undo him; began to alienate the faculty).  If as Dr. Radolf

argues, this is such a significant position, then it is absurd to argue that the government's interest

in having this Center function properly is "nonexistent."  Clearly, defendants' interests

outweighed that of Dr. Radolf.  Dr. Radolf's inability to function was impacting the morale and

productivity of many, the recruitment of new faculty, and the development of the Center as an

---

[4]  Defendants note plaintiff provides no support for his assertion in footnote 13 of his memorandum
[5]  Plaintiff obfuscates the issue by repeatedly stating he lost his job.  Nothing could be further from the truth.  He
retained his full professorship, received merit increases, retained his tenure and continues to do research as a fully
employed faculty member.

7

institutional resource (SF ¶ 30). Any formal pre-deprivation hearing with subsequent appeals up through the Board of Trustees would have been a lengthy process with an enormous deleterious affect on the functioning of the Center and other faculty. The balance of interests tips heavily in favor of not affording plaintiff a more formal pre-removal hearing. "[I]t is treading on thin ice to impose additional procedural requirements in the context of an academic decision such as this one." Ezekwo, 940 F.2d at 790 (Timbers, J., concurring impact, dissenting in part).

As a result, the grievance procedures provided by the Health Center under the University By-Laws provide adequate due process under the circumstances presented by this case.

As to the qualified immunity argument, defendants submit that Ezekwo did not clearly establish that Dr. Radolf had a constitutionally protected property interest in the directorship. In Ezekwo, the resident brochure stated explicitly that each resident would serve as chief resident for four months. Appointment was not based on academic merit or any formal evaluative process nor was it reviewed. Thus, the position was guaranteed, rather than an "at-will" position as here. The Court found, based on this specific fact, that Ezekwo had an "entitlement" to the position due to the establish practice of awarding the position to all third year residents, 940 F.2d at 783. That created a contractual right.

In contrast, Ezekwo does not address the situation at present whereby a center director is appointed by the Dean after an evaluative process, sits at the pleasure of the Dean, is reviewed annually, and may be removed. There is no guaranteed position which rises to the level of a contractual right that would be protected under state law. Indeed, the Connecticut Supreme Court has held that a tenured teacher had a right only to a "generic" position as a teacher and not a right to a specific position. Sekor v. Road of Education of Ridgefield, 240 Conn. 119, 128, 689

8

A.2d 1112 (1997).[6] Here, plaintiff has not lost employment but remains tenured with full salary. "[I]n the academic context such as this case presents, [ ] think we should be particularly wary of finding property rights that are not formally grounded in state law. See Board of Curators v. Horowitz, 435 U.S. 78, 82 (1978)." Mahaffey v. Kansas Board of Regents, 562 F. supp. 887, 889-90 (D. Kan. 1983). See also Tuckman v. Florida State University, 530 So. 2d 1041 (Fla. Ct. App. 1988) (Tuckman entered into contract to serve as dean and professor. Court found he was a faculty member without tenure in deanship. Tuckman served at the pleasure of the president of the University. Upon removal as dean, he retained his assigned rank and continued to serve as a faculty member at his full salary. His removal as dean did not breach his contract of employment).

Defendants submit that the law was not clearly established as to a property right in an administrative position such as that of the Center directorship in the particularized sense as required by Anderson v. Creighton and its progeny. Even if case law can be said to have foreshadowed the unconstitutionality of a given act, when that case law leaves "open a 'legitimate question'" regarding the constitutionality of a given practice, the immunity lies. Gittens v. LeFerre, 891 F.2d 38, 42-43 (2d Cir. 1989). An official is not bound to anticipate

---

[6] See also cases cited in defendants' Memorandum In Support of Motion for Summary Judgment: Huang v. Board of Governors of Univ. of North Carolina, 902 F.2d 1134, 1142 (4th Cir. 1990) (demotion from department head to professor not a denial of protected property interest); Parkman v. University of South Carolina, 2002 U.S. App. LEXIS 15880 (4th Cir. 2002), cert. denied, 538 U.S. 922 (2003) (reassignment of tenured faculty member from Head Librarian to Special Project Librarian not a denial of protected property interest); Schier v. Univ. of Colorado, Cir. No. OL– MK – 2366 (BNB) (D. Colo. May 19, 2003) (removal as chairman of department of medicine not a protected property interest); Janos v. Univ. of Washington, 851 P.2d 683 (Wash. App. 1993) (professor had no tenure in administrative position). Finally, see also Mitchell v. Vanderbilt University, 2004 WL 2534237 at *4 (6th Cir. 2004), in which the Court stated that the removal of a professor from the position of Medical Director for Pathology Laboratory Services is not an adverse employment action, referring to it as a "mere inconvenience or an alteration of job responsibilities." (attached hereto).

9

correctly possible future extensions of the law if the question was open at the time he acted. Mitchell v. Forsyth, 471 U.S. 511, 535 (1985).[7]

In short, even if defendants breached some contractual obligation to plaintiff, it does not necessarily follow that they deprived Dr. Radolf of a constitutionally protected property interest and plaintiff has not cited any authority clearly holding that the Fourteenth Amendment requires a predeprivation hearing for the administrative restriction or removal of noneconomic benefits.

**B.     First Amendment Right To Academic Freedom is Not Clearly Established In the Particularized Sense**

The facts regarding the DoD proposal and data ownership are set forth in Defendants' SF ¶s 45-116. Defendants also submit a supplemental affidavit of Stephen Wikel in response to plaintiff's arguments and affidavits which shows that the research in the DoD proposal is not that of Dr. Radolf and further shows the affidavits submitted by plaintiff are not credible. See also Exhibit 6, which is the report of the Health Center Appeals Committee which supports this. See also p. 12-13, infra.

Plaintiff goes to great lengths to buttress his claim that the science in the DoD proposal was his and that he was excluded from it. Plaintiff mischaracterizes the testimony of Dr. Deckers and Dr. Berlin. Both individuals never informed Dr. Radolf he was terminated from participation in the proposal nor was it even discussed (Berlin Tr. ¶ 58-61; Deckers Tr. ¶s 137-139, 141). This testimony provided by both defendants does not indicate a strategy to exclude plaintiff from the DoD proposal completely. Rather, there was a complete breakdown in the

---

[7] Defendants submit the present case more closely parallels those cited in Defendants Memorandum of Law in Support of Motion for Summary Judgment pp. 5-9.

10

relationship between Drs. Wikel and Radolf. (Exhibit 6). Even assuming everything plaintiff claims is true, this factual basis still does not provide a solid legal claim under the First Amendment. Plaintiff admits that "[t]he precise contours of the concept of academic freedom are difficult to define." (Pltf's Mem. at p. 81). He fails, however, to cite any Second Circuit or U.S. Supreme Court case which defines the parameters of any so-called right under the First Amendment. More particularly, no case is cited which defines the concept in the particularized sense required by Anderson. Rather, plaintiff cites to the classic First Amendment cases regarding a teacher's right to engage in free speech in the classroom or merely dicta from a Seventh Circuit case which dealt with an administrative subpoena seeking research notes, reports and raw data. The only Second Circuit case plaintiff cites noted a due process problem with a university deterring a faculty member from seeking outside grants. Plaintiff here has not been deterred from seeking outside grants but continues to apply for them and conduct research. (SF ¶s 106-114, 176-181).

No matter how vociferously plaintiff argues or how many pages of facts he sets forth, this boils down to a dispute over intellectual property rather than a First Amendment violation. Plaintiff has been unable to address defendants' qualified immunity claim that a constitutional right was not clearly established to fund plaintiff's research other than to continue to repeat his claims as to who owns what data.

Even if plaintiff were told he could not participate in the DoD research endeavor, this would still not rise to the level of a First Amendment violation. A congressional earmark was requested by the institution. This is not a traditional competitive grant application for which individual scientists compete for funding. (SF 71; Wikel Tr. 76). The institution is not then required to provide that funding to plaintiff. Nor are constitutional rights abridged because it

11

decides not to subsidize his research with those earmarked institutional funds.  See McElearney v. University of Illinois, 612, F.2d 285, 288 (7th Cir. 1979) ("the First Amendment does not require the state, through its University, to provide McElearney with facilities and financing for his research.")

Plaintiff does not have a "right" to receive this funding.  The institution approached its faculty members regarding the earmark (Wikel Tr. P. 76).  Moreover, there is no proof that defendants Berlin and Deckers knew of all the specific facts and details of the science regarding Dr. Radolf's research which has taken him sixteen pages to lay out. (Pltf's. Mem. p. 12-24, 29-31).  Plaintiff seems to think that just because he collaborated with Dr. Wikel that everyone must view them as joined at the hip forever after.  It is inconceivable that defendants would know the details of the actual science, and that plaintiff had a First Amendment right to be placed on an institutional grant, regardless of his initial role, as the primary researcher or investigator, particularly when defendants have a legal right to provide funding as they choose.[8]

Here, the Health Center was not suppressing the content of plaintiff's research.  In short, no law has clearly established that a First Amendment Right exists such as to mandate an institution place a researcher on a research proposal requesting the federal government award discretionary funds to the institution.  Plaintiff continues to couch an intellectual property dispute in terms of a violation of the First Amendment without the requisite case law to support such a legal claim.[9]

---

[8]  Plaintiff's statement on p. 84 of his memorandum that "[i]n excluding the DoD proposal, the defendants trampled over the plaintiff's academic freedom as much as if they barred him physically from entering his laboratory" is absurd and outrageous.  The implication that he has been cut off from all research is a complete fabrication.  (SF ¶s 107-116, 176-181).  Indeed, at the Preliminary Injunction Hearing on April 1, 2003, plaintiff's counsel represented "Dr. Radolf's career....it's far from in ruin, Your Honor.  He is a very productive research scientist and his....his lab is flourishing, actually."  (Prelim. Inj. Tr. At 11).
[9]  The cases cited by plaintiff on p. 55 of his Memorandum are inapposite.  In Levin, plaintiff claimed that action was taken against him based on the content of his writings thus raising a freedom of expression claim.  The Court

12

**C.    There Is No Property Right To Be Funded By A Congressional Earmark**

Plaintiff has again couched an intellectual property dispute in terms of a violation of procedural due process. Plaintiff admits the Congressional earmark involved vector-borne diseases and that this is an area of recognized expertise of Dr. Wikel. See also Exhibit 6 (Health Center Appeals Committee Report). He states that he asked Dr. Wikel to take the lead on efforts to obtain the earmark. He then claims that the preliminary data section of the DoD proposal was essential to establish Dr. Wikel's credibility as Principal Investigator without providing any support for this conclusion. Nor does he provide support for his conclusory opinion that without these data, the proposal would not have been funded. These self-serving statements fly in the face of the findings of the Thrall Committee, a body composed of a group of Dr. Radolf's peers, senior, tenured professors who engage in scientific research, (See also Berlin Tr. 58-59), as well as the Report of the Health Center Appeals Committee which heard and investigated each one of these claims. (Exhibit 6).

This Standing Committee for Research Misconduct chaired by Dr. Thrall met with Dr. Radolf, reviewed the pertinent grants, an outline of a proposed manuscript, and correspondence from 2001 regarding the "white paper" DoD grant. It specifically determined that Drs. Deckers and Berlin did not remove Dr. Radolf from the grant but rather he would not participate as Director or co-Director. (See also Deckers Tr. 137-41; Berlin Tr. 57-61). The Committee further determined that Dr. Radolf's lack of participation was due to a breakdown in his relationship with Dr. Wikel. (See also Deckers Tr. 138-39; Berlin Tr. 61).

---

was discussing Levin's unwritten "tenure rights" protected by the due process clause. In Hamid, a New York District Court case, plaintiff was terminated as Principal Investigator from two research projects which were already funded because the administration did not like the direction, i.e. the content, of his research.

13

In December, 2004, the Health Center Appeals Committee addressed all of Dr. Radolf's numerous grievances related to the DoD proposal, and raised here. That Committee likewise found that Dr. Radolf's participation in the grant was not blocked but only that he would not take a lead role as co-investigator; Dr. Raolf's participation in the grant effectively ended due to a breakdown in his relationship with Dr. Wikel; that the project was focused exclusively on an area of research in Dr. Wikel's expertise; that the DoD proposal did not need and was not based upon the research previously done in collaboration with Dr. Radolf; and he had not been removed from a personal list in connection with the proposal. See Exhibit 6 which provides a detailed outline of the events and findings. The claims and allegations raised in the present complaint are the very same raised in Dr. Radolf's grievances heard by the Health Center Appeals Committee and rejected by his peers who have expertise in these areas. More specifically, the Health Center Appeals Committee found that Dr. Deckers took appropriate action to protect Dr. Radolf's intellectual property rights in response to the findings of the Shanley Committee; Drs. Deckers and Berlin did not knowingly allow Dr. Wikel to use jointly owned data in the preliminary data section of the DoD proposal; and Dr. Deckers' letter to the DoD was not an attempt to conceal the Shanley Committee's findings from the U.S. Army. (Exhibit 6).

As for the outline, the Committees found that neither party had moved forward on this issue. Finally, the Committees found that the preliminary data, which acknowledged Dr. Radolf as having contributed to it, did not form a major component of the application. The Committees found that the DoD grant was utilizing new technology and moving beyond the methodology of the old original data. See Deckers Aff. Ex. 14; Thrall Aff. ¶ 4-12. See also Exhibit 6 (Report of Health Center Appeals committee). Thus, there is no property right as Dr. Radolf claims.

Dr. Deckers notified the DoD of the data ownership issue (SF ¶ 95). DoD chose not to take any action on the grant as a result of this issue. (SF ¶ 70). Dr. Radolf even went so far as to

14

complain to the U. S. Army Medical Research and Material Command that the investigations of the Shanley and Thrall Committees were flawed. The USAMRMC declined to initiate an investigation. (SF ¶ 101-102). It should be noted that it wasn't until February 17, 2004, that Dr. Radolf then filed a grievance, which was amended on April 29, 2004 and again on July 14, 2004. (SF ¶ 104-105; Deckers Aff. 73-74; Radolf Dep. Ex. 18, 19). Clearly, Dr. Radolf's issues have been looked into numerous times and all his allegations unsubstantiated. In short, the evidence does not support Dr. Radolf's "vital role in the project." (Pltf's Mem. at 86).

It does not automatically follow that Dr. Radolf has a constitutionally protected property interest under the 14th Amendment. Plaintiff cites again to the Hamid case for support (Pltf's Mem. at 87). Once again, the Hamid case involved a claim that plaintiff had his already funded research taken away from him because the administration disapproved of the content of his research, ultimately suspending his employment. As a result of his appointment as PI, Hamid's income was increased. Hamid also claimed a tenure right to his funded research. Finally, Hamid was challenging the employment sanctions placed upon him. None of these points are present in the instant case. Defendants submit this case is more similar to that of Abbs v. Sullivan, 756 F. Supp. 1172, 1182 F.2d 918 (7th Cir. 1992). Here, the University, and not the individual researcher, was the applicant for and recipient of the Congressional earmark. See also Needleman v. Healy, 1996 U.S. Dist. Lexis 21614 (W. D. Pa. 1996), aff'd, 127 F.3d 1096 (1999). Plaintiff here still has his tenure and no sanctions have been imposed against his continued employment at the University. See also Tavaloni v. Mount Sinai Medical Center, 26 7. Supp. 2d 678, 682-83 (S.D.N.Y. 1998). Plaintiff possesses no vested interest, based on state law, in participating in a federal earmark applied for and granted to the University. Plaintiff has pointed to no reference to state law to substantiate a constitutionally protected property interest in the DoD funded research. Bishop v. Wood, 426 U.S. 341, 344 (1976); Board of Regents v.

15

<u>Roth</u>, 408 U.S. 564, 577 (1972).  Plaintiff has received more process than Heinz has beans.  This matter has been investigated by three committees at this point.  That Dr. Radolf doesn't like their conclusions does not automatically lead to the conclusion that he has been denied a constitutionally protected property right or not afforded due process.

Finally, Plaintiff cites no U. S. Supreme Court or Second Circuit case to rebut defendants' qualified immunity argument.  It is ludicrous to conclude that because Dr. Deckers and Berlin thought someone should speak to Dr. Radolf about the proposal, that they therefore knew that there was a clearly established statutory or constitutional right to a due process hearing.  Case law from other circuits support defendant's actions as reasonable under the circumstances and at the least, that the legal issue was not readily discernable on the part of defendants.  Indeed, the findings of the Thrall Committee and the health Center Appeals Committee support defendants' position that their actions relative to the DoD proposal were objectively reasonable under the circumstances.

**D.    <u>Plaintiff Has No Cause of Action Under the Lanham Act</u>**

First, separate Committees have found that the research in the DoD proposal is not based on any prior collaborative work of Dr. Radolf and Dr. Wikel.  Nor was any prior collaborative research needed for, and thus not a relevant factor in, obtaining funding for the grant.  Several times Dr. Radolf's arguments raised here have been repeatedly rejected by panels of his peers, senior research scientists.  <u>See</u>, <u>e. g</u>. Thrall Committee report attached to Affidavit of Peter Deckers and Health Center Appeals Committee Report attached hereto as Exhibit 6.

Second, a careful review of the Complaint shows that plaintiff's allegations are as follows:

16

"¶ 421   The purpose of the defendants in perpetuating the above actions was to cause confusion and /or to cause mistake and/or to deceive others into believing that the defendant, Wikel was the sole developer and exclusive owner of the ideas and intellectual property presented in the United States Department of Defense proposal...."

422      ....to foster the erroneous impression that the defendant Wikel, was the sole owner and originator of certain intellectual properties in which plaintiff possessed an ownership interest ......"[10]

Clearly, plaintiff is making a claim of "false designation of origin". Having conceded that the Supreme Court's decision in Dastar negates any claim he may formerly have under preexisting case law under the "origin of work" provision of the Lanham Act (Pltf's Mem. p. 92-93), he now tries to twist his claim into one of misrepresentation of the "nature, characteristics [or] qualities" provision of § 43(a)(1)(B). Plaintiff is attempting to amend his complaint with an allegation made for the first time in his Memorandum. Once again, plaintiff goes on at length about misappropriated data. Every claim as to misrepresentation is founded on misrepresentations as to the origin of the work, not the nature, characteristics or quality of the work. See Pltf's Mem. p. 93 (false representations concerning plaintiff's contributions); p. 94 (plaintiff's central role in the development of the proposal....); p. 94 (intent of defendants to trivialize the critical role played by plaintiff). These claims are precluded against defendants.

Plaintiff then attempts to twist his claim into one of false advertising of a commercial product.[11] Again, section 43 claims are limited "to a purely commercial class of plaintiffs." Sandoz Pharmaceuticals Corp. v. Richardson-Ficks, Inc., 902 F.2d 722 (3d Cir. 1990). Once again, plaintiff complains about the false promotion of the DoD proposal as an "exclusive Wikel

---

[10]   A careful review of the Complaint shows that Plaintiff has not pled that he is seeking monetary damages against defendants in their individual capacities. Said damages are barred by the Eleventh Amendment. Fetterman v. University of Connecticut, 192 Conn. 539, 550 (1984).

[11]   Again, these claims are precluded under College Savings Bank v. Florida Prepaid Post Secondary Education Expense Board. 119 S. Ct. 2219 (1999).

17