project" and misrepresentation of "Wikel's stature" (Pltf's. Mem. at p. 95). Again, these are origin of work claims, not misrepresentations of a product placed in commerce.

Plaintiff is seeking to have this Court determine that the submission of a research proposal to a funding agency is commercial advertising without providing any legal support to substantiate this theory. The Lanham Act refers to tangible goods and services, not ideas, concepts or communications. Nor does plaintiff provide support for his bold assertion that "the efforts to obtain the earmark involved interstate commerce".

The term "commercial" refers to "'commercial speech' that is made for the purpose of influencing the purchasing decision of the consuming public." Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., et al, 314 F.3d 48, 56-57 (2d Cir. 2002). "To constitute advertising or promotion, commercial speech must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals." The Podiatrist Association, Inc. v. La Cruz Azul de Puerto Rico, Inc. and Triple-S. Inc., 332 F.3d 6, 19 (lst Cir. 2003) (citing Seven-Up v. Coca-Cola Co., 86 F. 3d 1379, 1384 (5th Cir. 1996) and cases cited therein)).

"Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement" that "the contested representations are part of an organized campaign to penetrate the relevant market." Fashion Boutique, 314 F.3d at 57. Plaintiff has failed to present evidence that the proposal and the statements therein were part of an organized campaign to penetrate the relevant marketplace. Id at 58. See Sports Unlimited, Inc. v. Lankford Centers, Inc., 275 F.3d 996, 1005 (10th Cir. 2002) (finding evidence of dissemination of information to two customers insufficient to constitute "commercial advertising or promotion") (cited in Fashion Boutique, 314 F.3d at 58). See also Gordon and Breach Science Publishers, S.A., STBS. Ltd. v. American Institute of Physics, 859 F. Supp. 1521 (S.D.N.Y.

18

1994) ("the courts have made clear that Section 43(a) 'is clearly directed only against false representations in connection with the sale of goods and services'") (emphasis added). The DoD proposal is akin to the "isolated individualized written statement", Gordon and Breach, 859 F. Supp. at 1535, rather than the kind of "public dissemination of information" necessary to state a claim under the Lanham Act. Id.

Defendants submit that said proposal is not "commercial speech." See Gordon and Breach, 859 F. Supp. At 1536-41. Moreover, the requirement of "advertising or promotion" has not been met. And, unlike the Debs case cited by plaintiff, there was no widespread dissemination through several states so as to have an effect on interstate commerce. In short, plaintiff has failed to state any claim for violation of the Lanham Act.[12]

### E. Plaintiff Has Failed To Establish A Violation of CUTSA

It should be noted that plaintiff has not addressed defendants' Eleventh Amendment Immunity argument.

Nevertheless, it has already been established several times by Committees of Dr. Radolf's peers, senior, tenured researchers at the UConn Health Center, that the DoD proposal was not utilizing Dr. Radolf's work and moved beyond the technology of the former Radolf collaborations. See also Supplemental Affidavit of Stephen Wikel, Ph.D., attached hereto.[13] Plaintiff has no ownership interest in the science that Dr. Wikel is employing and, therefore, has no basis upon which to participate in the DoD funded research. The information which makes up the substance of the research proposal (not the preliminary data section used for illustrative

---

[12] Defendants submit that plaintiff cannot argue on the one had that the research which is the subject of the DoD proposal is "academic speech" under the First Amendment and on the other "commercial speech" subject to the Lanham Act and not the protections of the First Amendment.

[13] In support of his argument, plaintiff cites to the "expert opinion" of Melissa Caimano. Defendants have moved to strike said opinion as Ms. Caimano was never disclosed as an expert witness nor was an expert's report provided to defendants. See Defendants' Motion to Strike filed this date.

19

purposes) is based on information commonly available. "Independent discovery and analysis of publicly available products or information are not improper means of acquisition." Restatement (Third), Unfair Competition, Appropriation of Trade Values § 43 (1995). See Wikel Supp. Affidavit.

### F.     There Is No Cause of Action for Violation of Public Policy of the United States and Tortious Interference

Plaintiff does not indicate in his prayer for relief that he seeks damages from defendants in their individual capacities. Nor does he address defendants' arguments other than to make a conclusory statement that the "plaintiff has submitted admissible evidence on the essential elements for proving a case of tortuous interference." Summary judgment is appropriate.

### G.     There Is No Cause of Action for Tortious Interference With Professional Opportunities

Again, plaintiff's prayer for relief is not addressed to defendant Wikel in his individual capacity. Plaintiff further does not address defendants' arguments other than make the conclusory statement that "there does exist disputed material facts if found in plaintiff's favor could result in a judgment on the cause of action in his favor." Therefore, summary judgment is appropriate.

### H.     There Is No Evidence of First Amendment Retaliation

The facts regarding the Time & Effort investigation are set forth in Defendants' SF ¶ 117-154. See also Wikel Supplemental Affidavit ¶ 54-56.

"Key personnel are defined as all individuals who contribute in a substantive way to the scientific development or execution of the project whether or not salaries are requested." U. S. Department of Health and Human Services, Public Health Service Grant Application Guidelines.

20

Dr. Radolf argues on the one hand that Ken Bourell was not key personnel and on the other, that he had exceptional computer skills and a unique position. It is understandable, given Dr. Radolf's view of Mr. Bourell's position, that Dr. Wikel thought he was key personnel. (See also Berlin Tr. 26).

The Compliance Committee which investigated this matter found that Mr. Bourell did work on the grants in question but that Dr. Radolf did not file Time & Effort reports that specifically reflected the grant work until the concern abut the lack of reports was brought to his attention. See Deckers Aff. Attachment 25. Such reporting is the responsibility of the Principal Investigator. Id.

Dr. Wikel, as the newly designated Interim Center Director, was presented with questions by another faculty member in the center pertaining to Mr. Bourell's salary support on one of Dr. Radolf's grants. Specifically, the faculty member wondered if he could also place Mr. Bourell on grants for funding considering Mr. Bourell was paid by general funds. Dr. Wikel was uncertain if this was problematic and discussed it with Dave Gillon and Dr. Berlin. See Deckers Aff. Attachment 26 (Compliance Committee investigative report). The Compliance Committee further determined that Dr. Wikel believed that a potential compliance concern existed. Id. The concern included that time and effort reports were not being filed regarding time and effort spent by Mr. Bourell on the grants, therefore, misrepresenting the percentage effort, (Wikel Tr. 25-26), because any such effort should have been reported. The Compliance Committee investigative team confirmed that Dr. Wikel was also concerned that no T&E reports had been filed for Mr. Bourell to reflect his work on the grants. At the same time, they found that Dr. Wikel had believed Mr. Bourell was "key personnel." (Wikel Tr. p. 18-20, 40-42, 48-49).

21

The Compliance Committee also found that Dr. Radolf was away for part of June 2002. Id.[14] It further determined that T&E data was submitted in "WO" status only, i.e. any T&E report would await approval by the 'Principal Investigator, in this case Dr. Radolf for final submission. Id. The system will only accept the PI's certified statement as to T&E. (Exhibit 8) Thus, defendants already knew even before Dr. Radolf said anything, that the reporting records needed to be corrected.[15] The Committee also found that when Dr. Radolf returned, he was informed of the T&E filings in "WO" status. Deckers Affidavit Attachment 26. Finally, the Committee found that the matter was brought to his attention in an appropriate and timely fashion and the matter resolved. Id.

The Committee specifically addressed Dr. Radolf's claims he has raised in this complaint and found them to be without merit. Specifically, the Compliance Committee found no intent to defraud the government on the part of Dr. Berlin, Id., and no retaliation on the part of Dr. Deckers. Indeed, the Committee found that Dr. Deckers, in his capacity as Executive Vice President, acted upon the reasonable concerns of others and, in compliance with the ORI directive, notified ORI. Id.

After a complete review of the forms and after interviewing those involved, the investigative committee found no evidence that the submission of the forms was a plan to evade UCHC safeguards for proper appropriation of salary. Id. Dave Gillon reported he asked Ms.

---

[14] See Affidavit of Iris Mauriello attached which renders Dr. Radolf's claims less than credible.
[15] It should also be pointed out the plaintiff admits only a small percentage of Bourell's T&E was devoted to the NIH funded research despite being listed at 50% on each of Dr. Radolf's two NIH grants. Indeed, he admits for one of the grants that Bourell had not expended any time and effort and on the other grant, only 10% time and effort.

Further, contrary to Dr. Radolf's unsupported assertion, assignment authorizations (AAs) are not a principal safeguard against misappropriation of NIH funds. Rather, AAs are utilized for all employees (not just those on NIH grants) and are the internal mechanism used to assure that, prospectively, monies are properly allocated to certain accounts. The AA's are then processed through Human Resources to determine which account pays salary and fringe benefits. Id. Contrary to his statement, Dr. Radolf did sign an AA for Ken Bourell. See Wikel Supp. Affidavit Attachment 8, thus calling into question Dr. Radolf's credibility on this matter.

22

Young to notify Dr. Radolf of the changes. Indeed, when interviewed Dr. Radolf stated that Ms. Young <u>did</u> notify him of the changes. <u>Id</u>. Finally, the investigation did not reveal proof of fraud or malicious efforts to penalize Dr. Radolf. Nor was there evidence of a scheme to falsely accuse him of fraudulently preparing reports to NIH. <u>Id</u>.

Dr. Radolf after admitting that the level of percent listed in the grants was untrue, states in fn 7 of his Mem. that "payment from grant funds for work on the grant must be directly related to the amount of time and effort expended on the research funded by the grant." As no T&E reports had been filed by Dr. Radolf, and the work Mr. Bourell did on the grants did not match the percentage attributed to his salary, then Dr. Wikel's concern raised in early 2002 that T&E reports had not been filed <u>did</u> not raise a potential compliance concern regarding the grant documents and reports filed after the initial transfer requests as said documents did not correspond to T&E reporting or the payment of Ken Bourell's salary from state general funds while listed on the grants.

As for Dr. Deckers, he did not trump up charges of fraud. Rather, he testified at his deposition that his "responsibility [relative to the Bourell matter] was to determine whether there was a legitimate charge or something that was credible. And if it was credible to cause a committee to do there work to investigate it to protect the institution, and in order to protect the whistleblower, and in order to protect the person being complained against." (Deckers Tr. p. 65, 96-97, 157-59. <u>See also</u> Deckers Tr. p. 36-37). Clearly, Dr. Deckers sought to make sure <u>if</u> there were grounds for sending this to a compliance committee for investigation and felt obligated to report to ORI (Deckers Tr. 42-43, 46-47, 55-61). <u>See also</u> Wetstone Tr. 20-22 in which Dr. Wetstone testified that Dr. Deckers imposed an additional level of due diligence rather than sending the allegation directly to the compliance office for investigation, thus protecting Dr.

23

Radolf. (Wetstone Tr. p. 34-38, 71). The only other involvement in the complaint was to draft a letter to ORI that appropriately and clearly presented the situation. (Wetstone Tr. p. 42-43) per the ORI directive (Wetstone Tr. 44-45). There is nothing in the record to show that he "coached the Compliance Office into making the recommendation to report to ORI" as so spuriously claimed by plaintiff or that he spearheaded some witch hunt against Dr. Radolf. Indeed, the Compliance Committee found that because of Dr. Radolf's scientific misconduct, ORI had instructed UCHC to report behavior on the part of Dr. Radolf that might be viewed as suspicious. Deckers Aff. Attachment 26.[16] Again, no good deed goes unpunished.

As for Dr. Berlin, his testimony at deposition bears out that he was not attempting to defraud the federal government. (Berlin Tr. p. 16-19; See also Gillon Tr. p. 32, 37). And contrary to plaintiff's unsupported assertion that Dr. Wikel was upset over the fact the CMP budget would be responsible for Bourell's salary, Dr. Berlin testified that such a scenario of the Center paying for Bourell's salary "certainly wouldn't have affected the Center's budget" (Berlin Tr. p. 24). See also Wikel Tr. 57-58 in which Dr. Wikel states that it would not impact the Center's operating budget. If this was such a concern, then why did Dr. Wikel try to keep Mr. Bourell employed at the Center? (Gillon Tr. 40).

Finally, plaintiff goes on at length that Dr. Wikel did not bring concerns to Dave Gillon regarding Dr. Radolf's grant renewals or progress reports. On the contrary, Gillon's testimony not cited by plaintiff is that Dr. Wikel did bring this concern forward in January 2002. (Gillon Tr. p. 10). The pages plaintiff cites at p. 43 of his memorandum are in response to a question whether Dr. Wikel brought this to Dave Gillon after this point and prior to June 2002. Plaintiff further mischaracterizes the facts when he states that "It was only after the encumbered funds

---

[16] See also Exhibit 8, p. 7 in which the Compliance Officer notes that the compliance office was made aware of this issue by Dr. Wetstone, before Dr. Deckers involved the compliance office.

24

were paid back to the grant, did Wikel advance a complaint against plaintiff alleging that the plaintiff had committee fraud with regard to federal grants." (Pltf's Mem. p. 104). First, the citation to Dr. Wetstone's transcript at p. 10-11 does not support this statement. Second, Dr. Wikel raised this issue back in late January early February 2002. (Wikel Aff. ¶ 65-74; Berlin Aff. ¶ 37; Gillon Aff. ¶ 7-8). Third, the compliance investigation determined that Dr. Wikel reported this in the proper performance of his duties as Center Director (Deckers Aff. Attachment 25). The investigation did not find this action to be retaliatory on the part of Dr. Wikel. Finally, the funds were not paid back to the grant until September 2002 (Gillon Aff. ¶ 23-25), <u>after</u> Dr. Wikel spoke to Dr. Wetstone in August 2002.

Plaintiff also mischaracterizes the testimony of Dr. Berlin on p. 43 of his memorandum regarding whether Dr. Wikel raised an allegation of fraud at the early 2002 meeting with Dr. Berlin and Dave Gillon, Dr. Berlin stated "I don't recall in that meeting if the issue of fraud appeared. (Berlin Tr. p. 32). Dr. Berlin did <u>not</u> state that the issue was not raised. He further testified "It was clear to me that this might have been fraudulent...." (Berlin Tr. p. 33). In addition, Mr. Gillon explained why he did not address the issue of the progress reports (Gillon Aff. 26-29, 64-65) which has not been refuted by plaintiff.

Finally, Dr. Radolf's arguments to the contrary, University documents indicate Dr. Radolf was away from the Health Center on consulting activity. <u>See</u> Affidavit of Iris Mauriello provided this date. Moreover, Dr. Radolf fails to mention that the documents were in "WO status" meaning they were awaiting the review and approval of Dr. Radolf. Nothing had been submitted in final form to that date. It is important to note that distinction between the State appropriations processing system, which Dave Gillon was working on with Dr. Radolf, and the reports to the federal government which were the sole responsibility of Dr. Radolf and were the

25

subject of the compliance investigation into Dr. Radolf's activities. The salary effort of Ken Bourell was not being reported to the federal government by the Health Center. That information would be reported by the Health Center only when the grants are closed out. As a result of meetings with Gillon and Berlin, Dr. Radolf was told to document the amount of time and effort Bourell had actually spent on the grants and that the Health Center would correct the state accounting papers based on the information Dr. Radolf provided. (SF ¶ 134; Gillon Aff. ¶ 26-29). Further, the initial changes made by Mr. Gillon in June 2002 were done to match that information provided by Dr. Radolf on the papers already filed with NIH. The Health Center relies on the representations of its faculty researchers as it is their responsibility as Principal Investigator on the grant to properly budget the grant dollars. (Berlin Tr. 14-15). So while the State payroll processing might have been cleared up by September 2002, the issue of what was the federal government being told was not. This was the potential compliance concern that was the subject of the investigation.

Regardless of plaintiff's recitation of facts, "[t]he determinative question is whether [the speaker's interest in the matter of public concern] arises from the speaker's status as a public citizen or from the speaker's status as a public employee." Blum v. Schegel, 18 F.3d 1005, 1013 (2d Cir. 1994). The fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's motive for that speech is private and personal." Id. at 1012. See Ezekwo v. New York City Health & Hosp. Corp., 940 F.2d 775, 781 (2d Cir.), cert denied, 502 U.S. 1013 (1991) (physician's criticism of a public hospital residency program not protected speech as plaintiff was "not on a mission to protect the public welfare.").

Dr. Radolf admits that he engaged in discussions with UCHC personnel to resolve this matter and thought that it had been satisfactorily resolved. Such admission belies any claim that

26

he was speaking out about a public concern as to bring him within the umbrella of First Amendment protections.[17]

This Court, in ruling on plaintiff's Motion for Preliminary Injunction stated:

> The Court cannot find that plaintiff has proved an improper motive for the investigation on this record. Rather, the Court finds that these communications reflect that UCHC administration officials were concerned about UCHC's research compliance responsibilities and determined not to repeat past mistakes, referred to as the "Katz/Besdine affair.... Indeed, plaintiff readily acknowledges that UCHC has an independent responsibility to report and investigate compliance issues. [Doc. #22 at 7-8]

Plaintiff was simply responding to efforts of the Health Center to correct the facts, left in "WO status" pending Dr. Radolf's review and approval. His speech was spoken in the role of Principal Investigator on the two grants in question and thus as an employee, not a private citizen as it is the PI who is responsible for monitoring and appropriate accounting of federal budgets on his grants. See Morris v. Crow, 142 F.3d 1379, 1382 (11th Cir. 1988) (distinguishing employee voluntary reports for which he has no responsibility and reports as part of job requirements) ("when an employee communicates matters in the 'normal course of his duties' these matters are communicated an as employee and are not protected speech); Nero v. Hospital Authority of Wilkes County, 86 F. Supp. 2d 1214, 1224 (S.D. Ga. 1998) ("Thus, even if the plaintiffs in this case were doing a great job and were fired or pressured to resign, it is irrelevant to the First Amendment question if they were acting in their professional roles."); Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 143 (2d Cir. 1993) (plaintiff's complaint of sexual harassment

---

[17] Plaintiff states at p. 45 of his Mem. that these discussions "turned into a hostile proceeding highlighted by the protracted opposition of Berlin and Wikel..." without providing any support for this statement. Such unsupported statements are found throughout plaintiffs memorandum and defendants respectfully submit such statements should be disregarded. See also unsupported statements that "It was only because of plaintiff's intervention and insistence....that the alleged encumbrances came to light...." (Pltf's Mem. p. 47);" it was only after the plaintiff prevailed...did Wikel first raise with Wetstone the spurious allegation..." (Pltf's Mem. p. 48); "Wikel was upset over the fact that the CMP budget would be responsible for Bourell's salary." (Plft's Mem. p. 48). Plaintiff is very clever at taking statements, some of which don't even exist, totally out of context and spinning a deceptive and misleading tale without providing the factual support to substantiate his tall stories.

27

rather than system-wide discrimination, not a matter of public concern and not protected under the First Amendment).

The cases ruled on by plaintiff at Mem. p. 114-118 are inapplicable. In all those cases, it was clear plaintiff was acting as a citizen, not in his or her role as an employee and bringing evidence of wrongdoing forward to outside bodies. These cases were rejected by this Court in its Ruling on Motion for Preliminary Injunction on the same issue. In the present case, Dr. Radolf did not bring a complaint to the Compliance Office about this matter until October 16, 2003, almost a year later. (SF ¶ 143, 148, 150, 151).

In Lewis, the defendants conceded on appeal that plaintiff's speech addressed a matter of public concern. That speech was directed to the Connecticut Gaming Policy Board. In Hale, the matter involved affected not just internal facility administration but issues that were the subject of ongoing public discourse and a report to an outside commission. In Dangler, plaintiff reported suspected wrongdoing of OTB officials to the OTB Inspector General. In Vasbinder, plaintiff reported to the FBI his suspicions of wrongdoing in a federally funded program overseen by the New York State Department of Education's Office of Vocational Rehabilitation. In Blum, plaintiff advocated in classes and in campus publication the legalization of marijuana and criticized national drug policy, and participated in a debate on civil disobedience. On appeal, Blum did not challenge the District Court's determination that his private interest in the substance of various letters concerning his promotion and tenure as well as suggestions relating to school policies and curriculum precluded a finding that the letters were protected speech. In Bieluch, plaintiff engaged in political speech regarding tax expenditures, town budgets and school construction, quintessential public concerns, through town organizations and community activities. In Charvat, plaintiff reported the faculty's regulatory violations to its Board and to the

28

Ohio EPA. Finally, in <u>Chappel</u>, plaintiff voiced concern over the mismanagement of finances of an ambulance district at public meetings. Plaintiff's "profession of public concern loses force when it is considered that he took no affirmative steps…to inform the public at large about the problems with which he was so gravely concerned." <u>Kurtz v. Vickery</u>, 855 F.2d 723, 727-29 (11th Cir. 1988). As at oral argument on the Motion for Preliminary Injunction, plaintiff states he did not file a faculty grievance regarding the encumbrance of funds because he believed the matter had been settled, <u>See</u> Ruling on Motion for Preliminary Injunction, Doc. #30, at p. 28, which belies his claim that he was speaking out on a matter of public concern.

As to an adverse employment action, the only case plaintiff cites which involved an investigation against a plaintiff is the <u>Ulrich</u> case (Pltf's. Mem. p. 119-20). In <u>Ulrich</u>, plaintiff protested a layoff decision that would have had <u>no</u> effect upon him and this did not involve his own personal interest, unlike here. His comments then sparked <u>public</u> debate. Further, he took his protest <u>outside</u> his employment by engaging in speech with officials in the San Francisco Department of Health. Thus, he spoke "in order to bring wrongdoing to light." Finally, Dr. Ulrich's employer refused to rescind his resignation and then filed an adverse action report against him with the California Medical Board and the National Practitioner Data Bank, "marring his employment record."

Here, plaintiff fails to note he was not suspended or demoted, as a result of the investigation; he did not lose salary, nor was he reprimanded. In fact, the investigation found in his favor. <u>See</u> Deckers Aff. Attachment 25. There is no evidence that the investigation marred his employment record. (SF 171-181). There has been no "removal of a benefit or imposition of a benefit" as found in the cases cited at Pltf's Mem. p. 118-120. <u>See</u> <u>Boylan v. Arruda</u>, 42 F. Supp. 2d 352 (S.D.N.Y. 1999) in which plaintiff claimed he was the subject of an unwarranted

29

investigation into whether he had engaged in credit card fraud. The Court concluded that even assuming the investigation was unfounded and retaliatory, it did not give rise to First Amendment retaliation as simply undergoing an investigation is not sufficient to constitute adverse employment action.

As for the cases cited at p. 122-123 of Pltf's. Mem., the Hetzel court noted that it had serious doubt whether the Internal Affairs review – an investigation which led to an oral reprimand – constituted an adverse employment action and did not decide this issue. In Allen, the internal affairs investigation constituted an adverse employment action because it was inappropriate in light of the fact that the particular difficulties with that plaintiff were normally handled administratively and not through internal affairs. In Rakovich, there was a statement made regarding whether the investigation was an adverse employment action. The Court vacated the decision stating the officers were entitled to qualified immunity. Finally, in Mulhall, the parties did not dispute that the letter sent by the FBI to Mulhall's JCPD superior requesting that the JCPD review his time and attendance records, which letter resulted in Mulhall's reassignment constituted an adverse employment action. Further, the parties did not dispute that Mulhall was engaged in a protected activity prior to the sending of the letter. See Mulhall v. Ashcroft, 287 F.3d 543 (6th Cir. 2002) which vacated the judgment of the district court and remanded for the district court to grant summary judgment for defendant Ashcroft and dismiss the claims against the FBI.

The UConn Health Center is mandated to have a compliance program to prevent, detect and investigate violations of law as a matter of course. (SF ¶s 117-119). When the information was brought to Dr. Deckers, instead of sending it immediately for investigation, he inserted an additional level of due diligence so as to protect plaintiff. (SF ¶ 137; Deckers Tr. 36-37, 65, 96-

30

97, 157-159; Wetstone Tr. 20-22, 34-38, 71). The fact of the investigation was reported to ORI and the USDA per the ORI's mandate. (SF ¶ 140; Deckers Tr. 42-47, 55-61; Wetstone Tr. 44-45). Once the Compliance committee rendered its findings in July 2004, the committee's report which showed no wrongdoing by Dr. Radolf was then forwarded to ORI by Dr. Deckers on August 9, 2004. (Exhibit 7).

Finally, plaintiff admits that he did not bring his public concern "of illegal activity" to defendant Deckers. Nor does he produce any evidence that Dr. Deckers was aware of Dr. Radolf's alleged protected activity prior to allegedly taking adverse action against him. Therefore, Dr. Radolf has failed to produce evidence that alleged institution of a compliance investigation by Dr. Deckers or the correspondence to ORI by him were in retaliation for Dr. Radolf engaging in protected activity.

As regards a causal connection, defendants have already pointed out that the complaint in early 2002 (or at the latest in August 2002, if the Court accepts plaintiff's argument), preceded the reversal of encumbrances in September 2002 and not the other way around as plaintiff argues.

## CONCLUSION

For the foregoing reasons, as well as those set forth in defendants' Memorandum in Support of Motion for Summary Judgment, defendants respectfully submit that their Motion for Summary Judgment should be granted.

RESPECTFULLY SUBMITTED,

DEFENDANTS
UNIVERSITY OF CONNECTICUT, ET AL

RICHARD BLUMENTHAL
ATTORNEY GENERAL


_____
JANE D. COMERFORD (CT06328)
ASSISTANT ATTORNEY GENERAL
UNIVERSITY OF CONNECTICUT
  HEALTH CENTER
263 Farmington Avenue
Farmington, CT 06030-3803
Tel. (860) 679-1114
Fax (860) 679-1997
E-Mail-Comerford@ADP.UCHC.EDU

## CERTIFICATION

This is to certify that on this 17th day of December 2004, the foregoing was mailed to counsel of record as follows:

>Thomas W. Bucci, Esq.
>Willinger, Willinger & Bucci, PC
>855 Main Street
>Bridgeport, CT 06604

Jane D. Comerford
Assistant Attorney General

33