# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | CIVIL NO. 3: 03CV242 (MRK) |
| Plaintiff, | : | LEAD/MASTER DOCKET NO. |
| | : | |
| V. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT; | : | CASE NO. 3:03CV242 (MRK) |
| UNIVERSITY OF CONNECTICUT | : | MEMBER CASE |
| HEALTH CENTER; | : | |
| PETER J. DECKERS, EXECUTIVE | : | |
| VICE PRESIDENT FOR HEALTH | : | |
| AFFAIRS AND DEAN OF THE SCHOOL | : | |
| MEDICINE, INDIVIDUALLY AND | : | |
| IN HIS OFFICIAL CAPACITY; | : | |
| RICHARD BERLIN, ASSOCIATE DEAN, | : | |
| INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY; AND STEPHEN | : | |
| WIKEL, INDIVIDUALLY AND IN HIS | : | |
| OFFICIAL CAPACITY, | : | |
| Defendants. | : | JANUARY 17, 2004 |

## PLAINTIFF'S SUR-REPLY

### I.    Health Center Appeals Committee

The defendants have submitted the recent report of the Health Center Appeals Committee

in an attempt to defend the unlawful manner in which they excluded Dr. Radolf from

participating in a research project funded by the Department of Defense grant.  However, in their

obvious rush[1] to buttress their defense to the plaintiff's causes of action, the defendants ignore

---

[1] The rush to submit this report so that it could be included in the defendants' reply to the plaintiff's opposition to defendants' motion for summary judgment is evident by the chronology of the issuance of the report.  More

the deficiencies that plague both the process and the substance of the report. Despite these deficiencies, the report fully supports the plaintiff's underlying claims that he had a constitutionally protected property interest in the anti-tick and –mosquito research conducted at UCHC and the related project funded by the DOD, and that the defendants deprived him of his property interest and his right of academic freedom without due process of law.

At the very start, the HCAC misstates the date it met with the plaintiff to discuss his claims. The cover page states that the plaintiff's sole meeting with the HCAC occurred on July 9, 2004, nearly two months before it met with Dr. Wikel, Dr. Berlin, and Dr. Deckers. Inexcusably, this is untrue. The plaintiff's sole meeting with the HCAC occurred on September 10, 2004, after the HCAC had met with the three defendants. Furthermore, the plaintiff was denied the opportunity to address, rebut, or challenge the veracity of points that had arisen or witness testimony before the report was composed. The HCAC interviewed individuals who supported the defendants' rendition of events, but, except for the plaintiff, did not meet or communicate with anyone who could speak without bias regarding the plaintiff's allegations. Incomprehensibly, the HCAC did not interview Dr. John Shanley. It was the failure of UCHC officials to properly charge Dr. Shanley's committee, as per the plaintiff's original complaint,

---

disturbing are the defendant's efforts to hinder the plaintiff from making a timely and thoughtful response to the report. The cover page of the report is dated December 7, 2004. The plaintiff first saw the report when the defendants submitted a copy of their court filings, reply memorandum and supporting documents, that were dated December 17, 2004 and received by the plaintiff on December 20, 2004. Defendants now claim the filings were made on December 22 or 23, 2004, and the final report was not made official until the final signature was appended to it on December 16 or December 17, 2004. Nevertheless, it was only when the plaintiff complained that he did not receive a copy of the official report did the defendants finally forward one to him without any notification during the Christmas holiday break.

and their inadequate response to his committee's findings that led the plaintiff to submit grievances to the HCAC.

Substantively, the report is based on a distorted and incomplete timeline regarding the events surrounding the DOD grant. It entirely ignores the history of the collaborative scientific research on which the DOD funding application was based without which it is impossible to understand the intellectual property and data ownership issues at the heart of the grievance. Instead, it selectively focuses on administrative events related to the DOD earmark, emphasizing those in which Dr. Wikel participated without the plaintiff or from which the plaintiff was excluded, as a means of bolstering the specious argument that the plaintiff was not a central player in the procurement efforts. An accurate timeline also must include the key events involving the decision to exclude the plaintiff from the proposal and the related research, and it must relate these events chronologically to the ongoing research.[2]

*Specific Points Regarding the Timeline as Presented:*

-----

[2] By attempting to backdate the decision to exclude the plaintiff from the DOD project to as early as April, 2001 (the Kelly email, which was not provided to the plaintiff), the timeline actually strengthens the plaintiff's allegation that Wikel and University officials colluded to deprive the plaintiff of the fruits of his intellectual labors, while, at the same time, exploiting his research expertise, reputation, and public speaking ability in order to procure funding. While the second Wikel affidavit dates this collusion from January, 2002, the HCAC report indicates that it began much earlier.

Points 1 and 2. Omitted is the fact that the idea for the earmark originated with the plaintiff in 1999, before Dr. Wikel was recruited to UCHC. The plaintiff's central involvement in the initiation of the project is, nevertheless, clearly indicated in points 2 and 3 of the timeline.

Points 4 and 5. The timeline glosses over the fact that the meeting with Congresswoman Johnson actually occurred and that the plaintiff actively participated in it. In fact, Dr. Deckers emphasized the plaintiff's expertise in infectious diseases and Lyme disease research. The HCAC fails to recognize that as Center Director, the plaintiff had designated Dr. Wikel to take the lead on the project and did not feel it necessary to supervise every aspect of the process. The plaintiff was fully involved in the decision to focus the project on anti-mosquito and anti-tick vaccines; this decision was made to sharpen its scientific focus and to make it specifically relevant not just to Wikel's area of expertise but also to the existing jointly owned preliminary data generated in the plaintiff's laboratory. These decisions and the Kelly email did not in any way touch upon how the project was going to be administered. Indeed, at this time there was a clear understanding that the plaintiff was to be Co-Director and that his research expertise was central to the project. If administrative decisions to the contrary were made at the time, they were surreptitious and set the stage for the subsequent violation of the plaintiff's due process rights, intellectual property rights, and academic freedoms. Dr. Wikel has no documented expertise in anti-mosquito vaccines, and, as previously pointed out in the plaintiff's original opposition papers, his expertise in anti-tick vaccines was limited entirely to the use of non-molecular approaches.

Point 6.  Dr. Wikel composed the letter with the plaintiff's support as part of the collective efforts, which, despite the defendants' contrary claims, were found by the HCAC to have existed.  Point 7.  The HCAC clearly finds that the plaintiff was involved in the efforts to secure the Congressional earmark.  Point 8.  The plaintiff was perfectly aware that Dr. Wikel was trying to build support among his military contacts and he was kept fully abreast of these efforts.  Crane is not a University official.  An email from him does not have any bearing on administrative decision making for the project.  Point 9.  As with the Congresswoman Johnson visit, the timeline leaves out the fact that the plaintiff drove with Dr. Deckers and Dr. Wikel to Congressman Maloney's Waterbury office and actively participated in the presentation.  Point 10.  Dr. Berlin's use of the term "collective effort" is clear, per below.  Point 11.  Viewing point 11 in light of the affidavit submitted by Dr. Uwe Mueller-Doblies, a former postdoctoral research fellow in Dr. Wikel's laboratory, it is quite clear that by this point in time the plaintiff was surreptitiously being excluded from the DOD project.  Point 13.  For Dr. Berlin to claim that he had no knowledge of the specifics of the plaintiff's collaborative research with Dr. Wikel is simply fallacious.  In addition to recruitment-related discussions with Dr. Radolf both before and after he and Dr. Wikel relocated to UCHC, Dr. Berlin sat in on the Special Review Board's deliberations in which the collective efforts of Dr. Wikel and the plaintiff were discussed in detail.

Point 15.  Omitted is that Dr. Radolf was asked to step down temporarily and that Dr. Wikel was appointed as Interim Director.  Dr. Wikel's second affidavit gives January, 2002

as the date when he putatively re-started the research project.  Point 17.  It was not until almost one year later, and only after the plaintiff filed his grievance, that the plaintiff was informed of the existence of the letter of reprimand and the letter to Ms. Kiser.  Points 18 and 19.  The timeline clearly states that the Shanley report (dated January 13, 2003) and the letter to the DOD (dated February 10, 2003) predated the Thrall report (February 17, 2003).  Yet the DOD letter and the Thrall report, but not the Shanley report, made the same fallacious assertions (i) that the purloined data were of no consequence for the proposal and (ii) that Dr. Wikel had taken the research in new directions.  The only possible explanation for the inclusion of these statements in the letter to Ms. Kiser is that unreleased Thrall committee findings were funneled to Dr. Berlin and Dr. Deckers.  This obvious breach of process and confidentiality strongly undermines the HCAC's contention that Dr. Deckers' conflict of interest had no bearing on his charge to the Thrall committee, its deliberations, or its findings regarding the research misconduct committed by the defendants.

*Substance of the Report*

Overall, despite its erroneous timeline and its ineffectual recommendations, the findings of the Health Center Appeals Committee support Dr. Radolf's claims that his right to due process of law was violated by Dr. Deckers and Dr. Berlin when they excluded him from further participation in the DOD grant and related research and that his intellectual property rights and his academic freedom were likewise violated.  Additionally, the finding by the HCAC that Dr. Deckers was "conflicted" and should have recused himself in directing the investigation of Dr.

Radolf's complaints, since, at the very same time, he was orchestrating the illegitimate termination of Dr. Radolf's participation in the DOD grant proposal and the research project itself, clearly evidences the bias of the defendant, Dr. Deckers, in addressing the plaintiff's claims[3]. The HCAC found, in no uncertain terms, that "Dr. Deckers was conflicted in directing proceedings related to the grievance reviewed by the ad hoc committee chaired by Dr. John Shanley." (Point 1 and Point 3 of Findings re: February 17, 2004 Grievance[4]). Further, the HCAC findings raise grave concerns regarding the veracity of Dr. Berlin, who, just as with his testimony before the HCAC, falsely testified under oath that Dr. Radolf had not been an early participant in the DOD grant proposal.

The HCAC discussion regarding the plaintiff's participation in the endeavors to secure the Congressional earmark sustains the plaintiff's claim that he possessed a property interest in continuing his research efforts in the DOD funded project. The HCAC report clearly establishes that the plaintiff had extensive involvement in the activities related to the DOD grant. Even though the report tries to maintain an artificially narrow focus on the lobbying efforts and

---

[3] The determination by the HCAC that Dr. Deckers did not abuse his authority despite his obvious conflict of interest in directing the investigation of Dr. Radolf's claims grossly understates the extent and severity of Dr. Deckers' misconduct. The HCAC found that Dr. Deckers, acting in concert with Dr. Berlin, had determined early on to exclude Dr. Radolf from participating in the DOD research but concealed this decision from Dr. Radolf. Dr. Deckers then continued this pattern of misconduct by ignoring his own complicity, as well as that of Dr. Berlin, by directing the Shanley Committee to limit itself to investigating Dr. Wikel's misbehavior. Only when the plaintiff protested, did Dr. Deckers hand pick another committee to investigate his own conduct. (See Exhibit 1). He then further extended this misconduct by his deficient response to the Shanley committee findings, including his failure to take any steps to prevent further violations of Dr. Radolf's intellectual property rights.

[4] If Dr. Deckers was conflicted in directing the Shanley committee, how could he not have been as severely conflicted in directing the Thrall committee to look into even broader allegations of misconduct by Dr. Deckers and Dr. Berlin?

administrative issues and ignores the research and intellectual property issues underlying the proposal, the original complaint and the grievances, it is indisputable that the HCAC gave little or no weight to the claims of the defendants that the plaintiff's participation in the grant proposal before he was excluded was minimal.  To the contrary, the HCAC determined that the "collective effort" to which Berlin and Deckers made reference in their emails, when they were plotting the plaintiff's removal from participating in the grant endeavor, referred to the plaintiff's extensive participation in the efforts to secure the Congressional earmark.  The HCAC report points to disturbing questions regarding the testimony of Dr. Berlin concerning the role played by Dr. Radolf at the formative stages of the grant proposal.  When Dr. Berlin's deposition testimony is reviewed along with the HCAC findings, his lack of candor is pronounced.  *(Berlin Tr. 58, 59).*  In its preliminary discussion regarding the removal of the plaintiff as a co-investigator and his subsequent complete exclusion from participation in the research project and the research funded by the DOD grant, the HCAC necessarily determined that Dr. Deckers' and Dr. Berlin's rendition of the removal of Dr. Radolf as co-investigator and from the entire research project was not credible.  In particular, although Dr. Deckers and Dr. Berlin attempted to negate the fact that the plaintiff participated in a collective effort in advancing and securing the Congressional earmark, the committee notes that, [s]ince Deckers and Berlin emails are specifically directed toward removing Dr. Radolf from participation as a Co-Investigator in the research program it appears that the collective effort could be related to Dr. Radolf's participation as a Co-Investigator in the proposal submission. *Dr. Berlin did not recall that the*

*'collective effort' included Dr. Radolf.*  When read within the context of these and other emails,

this statement by Dr. Berlin is simply ludicrous.  Previous emails up to and including August 5,

2001, showed Dr. Radolf's participation in the lobbying effort to obtain Congressional support

for the research proposal."  (Emphasis added).  The inference drawn by the HCAC that the

plaintiff's involvement in securing the Congressional earmark was limited to his role as Director

of the Center for Microbial Pathogenesis is refuted by its own repeated recognition that Dr.

Wikel violated the University of Connecticut's data ownership policy when he used, without

permission, data that was not only jointly owned but generated in Dr. Radolf's laboratory as part

of the plaintiff's extensive collaborative efforts with Dr. Wikel.  Dr. Wikel's violation of the data

ownership policy necessarily implicated the plaintiff's protected activities as a research scientist.

The HCAC also determined that "according to the conditions of his academic probation [Dr.

Radolf] could have continued to participate as a researcher in any grant proposal".  The

importance of this finding, although left unspoken by the HCAC, was that Dr. Deckers and Dr.

Berlin attempted to mislead Ms. Jamie Kiser in their letter to her of February 10, 2003[5] as well as

the HCAC by claiming that the plaintiff's academic probation, in the first instance, disqualified

the plaintiff from all participation in the grant research.  (See February 10, 2003 letter to Ms.

---

[5] In the letter to Jamie Kiser, Dr. Deckers and Dr. Berlin not only were untruthful in expressing the reason for the plaintiff's exclusion, but they also concealed from Ms. Kiser the Shanley Committee report regarding Dr. Wikel's violation of the University of Connecticut's Data Ownership Policy, as well as the letter of reprimand issued by Dr. Deckers to Dr. Wikel stating that the proposal should not have been submitted with the misappropriated data.  While the HCAC report notes that the letter omitted mention of the Shanley committee and its report, it fails to mention that the existence of the letter of reprimand was not disclosed to the Army because to have done so would obviously have contradicted the statement in the letter that Dr. Wikel's violation was inadvertent and that he had merely overlooked university policy.

Jamie Kiser, attached to HCAC report).  The terms of Dr. Radolf's limited academic probation

did not preclude or negate his continued participation in this or any line of research or funding

initiative.  Without this crutch to lean on, Dr. Deckers and Dr. Berlin are left without any

legitimate reason to explain their exclusion of the plaintiff from the research project itself or the

DOD grant application, let alone a reason justifying their failure to even notify the plaintiff of his

exclusion.  Again the HCAC attempted to minimize this misconduct with the inane statement

that Dr. Radolf, on his own should have realized he had been excluded from the grant research[5],

when, in fact, he was repeatedly reassured by Dr. Deckers, Dr. Berlin, and Dr. Wikel of his

continued participation in the research and the DOD grant proposal.

    The committee's finding that "[w]e find that according to the conditions of his academic

probation he could have continued to participate as a researcher in any grant proposal...We do

find that he was not notified in writing of this administrative decision to exclude him from the

DOD proposal", demonstrates that no legitimate reason existed to exclude Dr. Radolf from the

research and that Dr. Deckers' claim that Dr. Radolf was excluded from DOD research as a

result of his academic probation was patently false.  Additionally, although the Committee only

states that Dr. Radolf was not notified "in writing" of the administrative decision to exclude him,

there is no evidence that he was even verbally informed of this unlawful decision.  The

committee in its factual rendition explicitly states, "Drs. Maxwell, Berlin, and Deckers did not

remember directly telling Dr. Radolf about the decision to remove him from the research

program.  Regardless of the reasons for the exclusion, and putting aside the issue of whether Dr.

Deckers had any legal basis for this action, the report agrees with the plaintiff that Dr. Deckers egregiously disregarded basic principles of due process when he excluded the plaintiff from his research activities.

The HCAC's recitation of facts in Paragraph 3 of the recommendation portion of its decision regarding Dr. Radolf's February 17, 2004 grievance at unnumbered page 12 is bewildering at best. This particular factual rendition displays a complete misunderstanding of the circumstances surrounding the exclusion of Dr. Radolf from participation in the DOD research and conflicts with the HCAC's previous findings of fact. It is as if a different person authored this section without regard to the unarguable facts that the HCAC had earlier recited in its findings. The confusion results from the HCAC juxtaposing the removal of the plaintiff as co-director and his exclusion from participation in the DOD research. Despite the HCAC's statement, Dr. Radolf has not grieved his removal as a co-director on the DOD grant. He has objected to his exclusion from participation in the grant research, as well as the manner in which Dr. Deckers and Dr. Berlin excluded him from such participation. Despite the Committee's confusing the two issues in its recommendation, it is clear from a reading of Dr. Radolf's grievance that his removal as co-director is a non-issue. In its recitation of Dr. Radolf's grievance at page 6, paragraph 5, the Committee recites that Dr. Radolf alleges that "[t]he February 10, 2003 letter[6] *falsely* states that Dr. Radolf's participation in the proposal was

---

[6] The letter from Dr. Deckers and Dr. Berlin to the United States Army regarding, among other topics, the Shanley Committee's determination that Dr. Wikel had violated the University of Connecticut Data Ownership Policy.

effectively terminated.  In reality, there is no documentary evidence to substantiate the assertion

that Dr. Radolf's participation in this project...was terminated by Dr. Deckers and Dr. Berlin for

any reason whatsoever..."  (Emphasis added).  The facts surrounding his removal as a co-director

of the DOD grant are irrelevant to the issue involving his exclusion from participating in the

grant research.

　　　　Similarly, the HCAC's statement that "HCAC cannot render an opinion as to Dr.

Radolf's charge that he was informed of his exclusion from the DOD proposal during the

meeting of January 2002", is deceptive and contrary to the very substance of the plaintiff's

grievance.  Dr. Radolf never advanced such a claim.  He has consistently charged that, without

notice of any type, he was excluded from participating in the DOD research.  With regard to the

January 2002 meeting, Dr. Radolf has stated that it was during this meeting that he was informed

by Dr. Deckers and Dr. Berlin that he would not serve as a co-investigator on the grant proposal

but he also was assured that he would continue to participate in the research project.

　　　　It is irrefutable that Dr. Radolf has contended that he was excluded from the research and

the DOD funded project without notice or an opportunity to be heard and that the defendants

have not come forward with any evidence either before the HCAC or this Court to prove the

contrary.  The discussion of Dr. Radolf's removal as co-investigator either evidences an attempt

to obfuscate[7] the legally deficient manner in which Dr. Deckers and Dr. Berlin excluded Dr.

───────────────

[7] In the similar vein to confuse the issues raised by Dr. Radolf, the HCAC misleadingly stated that " [i]n Mr. Bucci's
correspondence he says the term 'purposely' was in the correspondence from Dr. Shanley's committee, but it is not

Radolf from participating in the DOD research, or, in the least, the HCAC's complete confusion of the facts regarding Dr. Radolf's claim. Nevertheless, the HCAC fails to properly address the inappropriate conduct of Dr. Deckers and Dr. Berlin in excluding Dr. Radolf from participating in research. What is true is that there was no academic bar to Dr. Radolf's participation, that Dr. Deckers and Dr. Berlin summarily decided to exclude Dr. Radolf, that they never informed Dr. Radolf of their decision, and that they proceeded knowing full well that the project and the subsequently funded proposal were largely based on Dr. Radolf's intellectual property.

II.    *Wikel's Affidavit*

The following is the plaintiff's paragraph by paragraph rebuttal of the defendant, Wikel's latest affidavit.

1. Paragraph 4. The plaintiff never claimed that Wikel was recruited to help develop the program for the Congressional earmark. See Radolf affidavit previously submitted.

2. Paragraph 5. At the time of his recruitment, Wikel had no demonstrated or recognized expertise in molecular biology and his program was virtually, if not entirely, devoid of genetic and molecular biological techniques. There are no publications or database entries to

---

in the document." However, Mr. Bucci never made such a claim. In pertinent part, the letter of Mr. Bucci reads, "[i]n the February10, 2003 letter to Unites States Army, Dr. Deckers and Dr. Berlin knowingly misrepresented the *ad hoc* committee's finding that Dr. Stephen Wilkel purposely violated the University of Connecticut's Data Ownership Policy." The letter does not state that the word "purposely" was used by the Shanley Committee. It describes, in Mr. Bucci's view, what the Shanley Committee had concluded with regard to Dr. Wikel's unauthorized use of the plaintiff's intellectual property; that Dr. Wikel's violation was "purposeful" and not simply a matter of Dr. Wikel innocently overlooking the requirements of the University of Connecticut's Data Ownership Policy, as Dr. Deckers and Dr. Berlin asserted in their misleading letter to Ms. Jamie Kiser. Undoubtedly, this point would have been clarified had the HCAC interviewed Dr. Shanley.

dispute this statement. In the scientific community, expertise is measured by papers. The items he lists as supporting his "molecular" expertise indicate only that he belatedly came to an understanding of the importance of sequencing the tick genome. As Dr. Radolf has pointed out, in 1999, Dr. Wikel was asked to serve as a leader in the effort to sequence the *Ixodes scapularis* genome and he declined. In the current genome sequencing initiative, his laboratory is not providing molecular expertise, only ticks. Dr. Wikel also neglects to mention that while holding the endowed Chair in Biotechnology at OSU he enjoyed extensive funding from Pfizer to develop anti-tick vaccines from immortalized tick epithelial cells, yet this research did not result in any patents, papers, or database submissions.

3. Paragraph 6. None of this speaks to any expertise in molecular biology. There is a difference between using techniques and having expertise. The molecular expertise and know how was coming from Dr. Melanie Palmer. Dr. Wikel has had only one NIH grant, received in 1999, during his entire career, and the plaintiff was instrumental in pushing him to make the submission. After he moved to UCHC, Dr. Wikel asked the plaintiff to be a co-investigator specifically to provide guidance on the molecular aspects of the work.

4. Paragraph 7. This one Note (as opposed to a full-length paper), published in Infection and Immunity in 1997, is the only report on Lyme disease that has ever originated from Dr. Wikel's laboratory. Not mentioned is that the manuscript was submitted in 1996, three years before the papers cited in point 12. The plaintiff also pointed out that the major findings of this brief report have not been reproduced in his or other investigators' laboratories and that

14

Dr. Andrew Spielman (Harvard University) directly refuted them shortly after publication. The plaintiff has stated clearly that the Note made the plaintiff aware of Dr. Wikel's work and it prompted the plaintiff to initiate the interactions that led to his collaboration with Dr. Wikel.

5.   Paragraph 8.  The graduate student's research involved entomological issues, not just molecular ones, and it was felt that Dr. Wikel's expertise in the latter might be useful.  Dr. Akins, like the plaintiff, was under the impression at the time that Dr. Wikel was a much stronger scientist than turned out to be the case.  It is often the case that one develops a true appreciation of an individual's scientific capabilities only after interacting with him/her in exactly this sort of capacity.  Dr. Akins' affidavit speaks to his opinion of Dr. Wikel's molecular expertise.

6.  Paragraph 9.  The plaintiff has never claimed that Dr. Wikel made no contributions to the project and had no relevant expertise.  If that were the case, it would have made no sense for the plaintiff to have established and continued their collaboration.   Dr. Wikel does have *bona fide* entomological expertise.  The plaintiff's claim is that the original idea and impetus for taking Dr. Wikel's work into the molecular realm came from the plaintiff.  Once the ticks were generated by Dr. Wikel, it was the plaintiff's mutually agreed responsibility to oversee all subsequent aspects of the work that were molecularly based.

7.  Paragraph 10.  This is true, but Dr. Wikel neglects to say that the original experiment that he supervised was unusable.  The technician who performed the corrected experiment was

15

trained by Dr. Palmer and worked in Dr. Palmer's laboratory before she left OSU; moreover, the corrected experiment was performed under Dr. Radolf's guidance. The sequences that were used for the original and corrected experiments were generated from the plaintiff's laboratory. Without these sequences, neither experiment could have been done.

8. Paragraph 11. This is a distortion of the plaintiff's statement. The plaintiff never stated that the idea of an anti-tick vaccine originated from him. The clear thrust of the plaintiff's statements is that he provided the impetus for the collaborative effort with Dr. Wikel to use molecular techniques (e.g., expression library immunization and sequencing of expressed sequence tags [ESTs]) for this purpose.

9. Paragraph 12. The plaintiff's collaboration with Dr. Wikel began in 1996 before any of these papers appeared; as stated above, his point seven actually is consistent with the plaintiff's timeline. The plaintiff was most definitely at the forefront of this area of research. The plaintiff's Texas Advanced Technology grant was funded in 1997. When the collaboration was initiated, there was no effort in Dr. Wikel's laboratory to employ molecular techniques to develop an anti-tick vaccine.

10. Paragraph 13. The fact remains that the initial screening approach was based upon Dr. Wikel's erroneous claim that his antiserum contained a high titer of protective antibodies. The plaintiff never claimed to be the first to think of high throughput sequencing of cDNA clones. However, at that time, this was a novel approach for tick vaccines and it was the plaintiff who implemented this alternative approach in his laboratory at UT Southwestern

16

Medical Center once it became evident that Dr. Wikel's antiserum was useless. Dr. Wikel cannot provide any meaningful evidence to support his contention that molecular techniques were in use in his laboratory at that time.

11. Paragraphs 14-16, 20. The plaintiff never stated that he developed ELI or that Dr. Johnston's role was minor. He was a valued collaborator and a friend of the plaintiff. The plaintiff's position is that the idea of applying ELI to tick vaccines was the plaintiff's and that the plaintiff assembled the collaborative team to do this work. No documentation exists to refute this claim. If the plaintiff's expertise in using these technologies were not real, the Texas Advanced Technology grant would never have been funded with the plaintiff as the Principal Investigator. The plaintiff's role on the USDA grant was as stated and is well documented. The plaintiff was to be Co-investigator and head the contractual effort/consortium at UT Southwestern that would use ELI to develop the tick vaccine. A key point here is that Dr. Wikel had no role in the conceptualization of the molecular aspects of the project and the contract with UT was created specifically because he lacked the recognized molecular expertise and required molecular capability to perform the research.

12. Paragraph 17. The 2000 USDA and CII grants were entirely focused on identifying anti-hemostatic molecules in tick saliva as vaccine candidates. Dr. Wikel's statement is blatantly misleading, and anyone reading just the titles and abstracts of the grants would conclude similarly. It was these ideas and data that Dr. Wikel purloined for the DOD submission. The

plaintiff agrees that Dr. Wikel has recognized expertise in tick immunity but he has no recognized expertise in the application of molecular or genetic techniques.

13. Paragraph 18-20. ELI and ESTs are related and highly complementary techniques, which is why they were developed in parallel from the outset of the collaboration. The difference in the techniques relates mainly to the order in which certain steps are performed; the quoted material agrees with this. The affidavit also demonstrates Dr. Wikel's lack of understanding. It quotes from a paper by Dr. Johnston describing the use of ELI for bacterial pathogens. To apply this technology for the development of anti-tick vaccines, one must make cDNA and a cDNA library from tick salivary gland mRNA, just as one must do for high throughput sequencing of ESTs. Furthermore, these statements are also misleading because the EST approach was central to the 2000 USDA and CII grants and was incorporated by Dr.Wikel , along with EST data generated in the plaintiff's laboratory, into the DOD grant.

14. Paragraph 21. Dr. Wikel appears to be trying to undermine the plaintiff's argument that this was indeed novel work. The obvious point that Dr. Wikel neglects to address is that he failed to apply these developments to the central problem under investigation in his own research program. He has provided no evidence to refute the assertion that it was the plaintiff, not Dr. Wikel, who devised and directed this effort.

15. Paragraph 22. The plaintiff already has pointed out that these papers do not involve tick salivary glands and do not deal with anti-tick vaccines.

16. Paragraph 23.  Dr. Wikel omits that the same PubMed search does not identify any papers authored by him, thus negating his claim of expertise.  The plaintiff has always maintained that the tick vaccine work was a new avenue of investigation for the plaintiff and his laboratory and that the actions of the defendants deprived the plaintiff of the fruits of his hard work and intellect and the potential to establish a reputation in this new and rapidly growing area of research.

17. Paragraph 24.  The plaintiff has never stated that the notion that tick saliva contains anti-coagulants originated with the plaintiff.  The plaintiff's contentions are (i) that the work was very much in the forefront of molecularly based efforts to identify tick salivary proteins with anti-coagulant properties and to evaluate their usefulness as anti-tick vaccines and (ii) that the plaintiff was the driving force in these collaborative efforts.  Nowhere in any of these publications is the name Wikel to be found, so there is nothing in the literature to substantiate the defendant's claim that he had recognized molecular or biochemical expertise when Dr. Radolf initiated their collaboration.  Even now, there is nothing in the literature to substantiate such a claim.

18. Paragraph 25.  It is not the plaintiff's position that he developed the clinical assays used to measure anti-hemostatic activity or that he was an expert in using them.  It is his position that the DOD grant copied this whole line of investigation from our USDA and CII proposals and stole the supportive preliminary data that were generated in the plaintiff's laboratory.

19. Paragraphs 26 and 27.  The plaintiff made the initial contacts with Dr. Michael Cappello before Dr. Wikel had even moved to UCHC, as stated in the plaintiff's original opposition papers..  The fact that that Dr. Cappello might have been aware of Dr. Wikel's work has no relevance as to who assembled the investigative team and what data were subsequently generated.  It is quite clear that Dr. Wikel did not initiate contact with Dr. Cappello and that Dr. Cappello did not initiate contact with Dr. Wikel.  What Dr. Wikel also doesn't state is that the plaintiff didn't merely arrange a get-together and then bow out.  He participated actively in the three-way collaboration as per his affidavit.  Dr. Wikel exploited Dr. Radolf's efforts on their behalf to exploit this relationship surreptitiously sometime before the DOD grant was submitted.  His fallacious line of reasoning is that the DOD grant represented an independent research initiative, unrelated to his prior collaborative work with the plaintiff.  If this were true, then there would have been no need for Dr. Wikel to misappropriate the plaintiff's data; indeed, it would have made no scientific sense for him to have done so.

20. Paragraph 28.  The plaintiff stated that (a) Dr. Wikel sent large numbers of clones from their jointly owed *Ixodes scapularis* and *Dermacentor andersoni* libraries to Dr. Ribeiro at the NIH for sequencing without the plaintiff's knowledge or permission and (b) he did not share the resulting sequence data.  It is irrelevant that Dr. Ribeiro was pursuing his own independent research in this area.

21. Paragraph 29.  It is true that Dr. Champagne was the collaborator on those grants and that Dr. Wikel arranged this interaction.  Omitted is that Dr. Wikel failed to develop this

collaboration and, instead, chose to collaborate with Dr. Cappello after he relocated to

UCHC.

22.  Paragraph 30.  If the plaintiff's methodology was so poor and Dr. Wikel had so much

independently derived data when the DOD proposal was submitted, then why did Dr. Wikel

misappropriate these data in the first place?  Dr. Wikel also repeatedly expresses the patently

false notion that minor technical changes or refinements are equivalent to new lines of

research.

23. Paragraphs 32-36.  Again, nowhere has the plaintiff stated that he invented these standard

assays.  The point of the research was to use these established assays to evaluate the anti-

hemostatic activities of newly discovered molecules in tick saliva.

24. Paragraph 37.  The plaintiff and Dr. Wikel did discuss the work on several occasions but Dr.

Wikel would not give the plaintiff sequence data he (Dr. Wikel) generated either at UCHC or

with Dr. Ribeiro from the clones he admits he sent Ribeiro.  Deterioration in the relationship

has no bearing on data ownership or intellectual property.  Dr. Wikel also omits to mention

that his deceitful behavior is the principal reason why the relationship deteriorated.

25. Paragraph 38.  As the plaintiff stated in his original affidavit, he did ask for the sequence data

on multiple occasions.  According to Dr. Wikel's line of reasoning, there is nothing

preventing Dr. Wikel from giving Dr. Radolf the sequence data even now.  The statement

that these files were locked in CMP files is fallacious.  Neither the plaintiff nor the defendant

received any directive from the Institution or the ORI prohibiting them from analyzing these

data or submitting them for publication during this period.  Moreover, as the plaintiff stated earlier, the paper could easily have been completed before the data were sequestered.  Dr. Wikel did not write the paper because he wished to bolster the false impression that the plaintiff was no longer involved in the research.

26. Paragraph 39.  Different cloning systems or improved cloning systems are not the same as different technologies.  If Dr. Wikel possessed such new data, then there would have been no need for him to misappropriate data generated in the plaintiff's laboratory for the DOD application.

27. Paragraph 40.  The plaintiff's interactions with Dr. Fikrig and Dr. Mather have nothing to do with the anti-tick vaccine research under dispute.  The plaintiff has no involvement in either of their anti-tick vaccine projects.  Dr. Fikrig has submitted an affidavit to this effect.  Dr. Mather is a close collaborator with Dr. Ribeiro on a tick vaccine project that is completely separate from whatever Dr. Ribeiro does with Dr. Wikel; Dr. Mather maintains an inseparable wall between this project and Dr. Wikel because he is well aware of Dr. Wikel's propensity for misappropriating data.  A major cause of the deteriorating relationship was Dr. Wikel's repeated efforts to undermine the plaintiff's standing in the University and the Center for Microbial Pathogenesis, as outlined in the plaintiff's complaint.  None of this excuses his misconduct in appropriating the plaintiff's intellectual property or the university's failure to protect the plaintiff's intellectual property rights.

28. Paragraph 42.  This has nothing to do with misappropriation of intellectual property.  Dr. Wikel's deceitfulness and the collusion of UCHC officials deprived the plaintiff of resources that he rightfully earned along with the enhancement in scientific reputation and funding opportunities that would have resulted from a successful project.

29. Paragraph 43.  This is a blatant untruth.  The plaintiff originated the idea before Dr. Wikel moved to the University of Connecticut Health Center.

30. Paragraph 44.  This is also untrue. The plaintiff made many contributions to the discussions. When Congressman Johnson came to visit, Deckers showcased the plaintiff's infectious diseases and Lyme disease clinical and research credentials.

31. Paragraph 46.  Untrue; see Dr. affidavit of Dr. Mueller-Doblies.

32. Paragraph 47.  Dr. Mueller-Doblies' knowledge of Dr. Wikel's efforts to prevent Dr. Radolf from participating in the tick vaccine research and the preparation of the DOD proposal is based on statements by Dr. Wikel and his direct observations as a member of Dr. Wikel's laboratory.

33. Paragraph 48.  Dr. Wikel refers to work he did on a project that was funded with the plaintiff's help and the plaintiff's data.  Even if the assertions are true, they do not relate to the events prior to the submission and funding of the DOD proposal.

34. Paragraph 50.  Untrue; See Radolf affidavit.

35. Paragraph 51.  Not true when they were given.  Dr. Wikel had not yet hired Dr. Alarcon-Chaidez.

36. Paragraph 52.  Dr. Wikel does not dispute that he still submitted the entry without the plaintiff and Dr. Caimano's names.

37. Paragraph 54.  After repeated requests by the plaintiff, the defendants have never produced such authorizations.

38. Paragraph 56.  This is obviously untrue.  The plaintiff has entered into evidence an Assignment Authorization signed by Dr. Wikel which encumbered grant monies well in excess of the time and effort expended by Mr. Bourell on the project.  Emails and other documentation indicate that Dr. Wikel was instrumental in misappropriating monies from two of the plaintiff's NIH grants, including one on which Mr. Bourell had not performed any work for at least one year.

PLAINTIFF – JUSTIN D. RADOLF

BY:_____
Thomas W. Bucci, Esq.
Federal Bar # ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Email: thomasbucci@earthlink.net

**CERTIFICATION**

I hereby certify that I caused to be served a copy of the above and foregoing *Plaintiff's Sur-Reply* by sending same, via U.S.P.S. postage prepaid this 17th day of January 2005, to the following:

Jane D. Comerford, Esq.
Fed. Bar No. ct06328
Office of the Attorney General
University of Connecticut Health Center
Room LMO43
Farmington, CT 06030
Tel: 860-679-1114
Fax: 860-679-1997

_____
Thomas W. Bucci, for
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Fed. Bar #ct07805
Email: thomasbucci@earthlink.net