## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN D. RADOLF, | : | |
| | : | |
| Plaintiff, | : | NO. 3:03CV242(MRK) (lead) |
| | : | |
| v. | : | NO. 3:03CV672(MRK) (member) |
| | : | |
| UNIVERSITY OF CONNECTICUT, | : | |
| ET AL., | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OF DECISION</u>

This case arises out of a bitter dispute between Plaintiff Justin D. Radolf, M.D., a tenured professor, and his colleagues at the University of Connecticut Health Center ("UCHC") and the University of Connecticut School of Medicine. It is regrettable that this dispute has required a judicial resolution. All parties involved originally came together in a common effort to direct their time, energy and passion towards the greater public good – conducting research that may one day find a cure for Lyme disease, a debilitating tick-borne illness that affects many people in Connecticut and beyond. Now, it appears that much of the time, energy and passion of the parties has been redirected towards this destructive, accusation-laden battle. Indeed, the relationships among the parties have deteriorated so much that frankly no court is capable of providing a remedy that truly would heal the parties' wounds and put them all back on track towards realizing their collective goal of improving public health. Yet, the parties remain locked in this bitter fight, and so, a judicial answer appears to be the only one that is available at this time.

1

Dr. Radolf's First Substituted Complaint [doc. #18][1] has eight counts (which are a combination of federal and state causes of action), and his Second Substituted Complaint [attached to doc. #34] has two additional counts (both of which are federal causes of action).  Dr. Radolf seeks prospective injunctive relief against the Defendants in their official capacities and monetary damages against the Defendants in their individual capacities.  Currently pending before the Court are Defendants' two Motions for Summary Judgment [docs. #52 & #55] on all ten of Dr. Radolf's federal and state law claims.  For the reasons stated below, the Court GRANTS summary judgment for the Defendants on all of Dr. Radolf's federal claims and declines to exercise supplemental jurisdiction over Dr. Radolf's state law claims.

## I.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(b).  A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so.  *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather the opposing party must "set forth specific facts showing that there is a genuine issue for trial."  Fed.

---

[1] Unless otherwise noted, the document numbers used throughout this opinion refer to the numbers used in 3:03CV242(MRK) (lead).

R. Civ. P. 56(e).  The Court must draw all ambiguities and inferences in favor of the plaintiff. *See Andersen*, 477 U.S. at 255.  However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Andersen*, 477 U.S. at 249-50.

## II.

The basic facts of this case are not in serious dispute.  Dr. Radolf joined the faculty of the UCHC as a tenured professor in April 1999 in order to establish the UCHC Center for Microbial Pathogenesis (the "Center") and to serve as its Director.  *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 11-13; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 11-13. Defendant Peter J. Deckers, M.D., is the Executive Vice President for Health Affairs of the UCHC and Dean of the University of Connecticut School of Medicine.  Defendant Richard Berlin, Ph.D., is Associate Dean for Research Planning and Coordination at UCHC.  Defendant Stephen Wikel, Ph.D., is a full professor with tenure in the Department of Physiology at UCHC and the Interim Director of the Center for Microbial Pathogenesis.  *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 1, 6, 7; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 1, 6, 7.

On July 26, 2001, a Special Review Board of the UCHC found that Dr. Radolf had falsified data in two grant proposals submitted to the United States Department of Agriculture and to Connecticut Innovations, Inc.  *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 16; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 16.  As a result of this finding of academic misconduct, Dr. Radolf was disciplined by the University: a letter of reprimand was

placed in his personnel file and he was placed on academic probation for three years. *See* Defs.'
Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 17-18; Pl.'s Local Rule 56(a)(2) Statement [doc.
#65], at ¶¶ 17-18. By letters dated August 22, 2001 and December 27, 2001, Dr. Deckers
informed Dr. Radolf of the procedures by which his grants, contracts, and philanthropic
proposals would be thoroughly inspected and reviewed by a committee of faculty members
during his academic probation, to ensure compliance with all applicable regulations and the
integrity of all research data presented. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at
¶¶ 17, 20; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 17, 20; *see also* Defs.' Local Rule
56(a)(1) Statement [doc. #54], at Affidavit of Peter J. Deckers, Attach. 4 (August 22, 2001 letter
from Dr. Deckers to Dr. Radolf) & Attach. 5 (December 27, 2001 letter from Dr. Deckers to Dr.
Radolf).

    Furthermore, in and around October 2001, the Federal Office of Research Integrity
("ORI"), part of the United States Department of Health and Human Services, independently
began its own investigation of this incident of academic misconduct. *See* Defs.' Local Rule
56(a)(1) Statement [doc. #54], at ¶ 22; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 22.
Approximately a year and a half later, on March 10, 2003, Dr. Radolf and ORI entered into a
Voluntary Exclusion Agreement, in which Dr. Radolf admitted that he had engaged in scientific
misconduct involving research supported by the National Institute of Health ("NIH"). Though
neither the UCHC nor the Defendants was a party to the Voluntary Exclusion Agreement or
involved in its negotiation, they were subject to its requirements. *See* Defs.' Local Rule 56(a)(1)
Statement [doc. #54], at ¶ 159; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 159.
According to the terms of the Voluntary Exclusion Agreement, Dr. Radolf was placed on

academic probation for a period of five years (*i.e.*, until March 2008) regarding his participation in certain activities connected to the United States Public Health Service. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 155, 158; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 155, 158. As required by ORI, the UCHC submitted to ORI a "Supervisory Plan to Ensure the Scientific Integrity of Dr. Justin Radolf's Research Contribution as Required in the Radolf–ORI Agreement" (the "Supervisory Plan"), which was designed to ensure compliance with all applicable regulations and the integrity of all research data Dr. Radolf presented in grant proposals. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 162; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 162; *see also* Defs.' Local Rule 56(a)(1) Statement [doc. #57], at Affidavit of Peter J. Deckers, Attach. 7 (April 4, 2003 letter from Dr. Deckers to Dr. Radolf, with Supervisory Plan attached). The UCHC's Supervisory Plan, which was similar to the UCHC procedures already in place at the time, was reviewed and refined by ORI prior to implementation. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 163; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 163.

Dr. Radolf continues to be employed as a full professor with tenure at UCHC and he may still work at the Center for Microbial Pathogenesis, though the parties were unclear about that latter fact at oral argument on January 31, 2005. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 8; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 8. At their core, Dr. Radolf's claims in this lawsuit arise from the actions and decisions of the Defendants in their attempt to navigate the difficult terrain of continuing to employ a tenured professor who was on academic probation imposed by the UCHC and under investigation by the federal government for scientific misconduct, an investigation which eventually resulted in an extended term of academic

probation.  Additional facts regarding the nature and context of the Defendants' actions and

decisions will be presented as necessary in the Court's analysis of each of Dr. Radolf's claims.

## III.

The Court turns first to Dr. Radolf's seven federal claims.[2]  At the outset, the Court notes

from the record before the Court and as confirmed at oral argument, that because of Eleventh

Amendment state sovereign immunity, Dr. Radolf has wisely abandoned any and all federal

claims against Defendants University of Connecticut ("UConn" or the "University") and UCHC,

as well as any and all claims for money damages against the Defendants in their official

capacities.  *See also* Pl.'s Mem. in Opp'n to Summ. J. [doc. #70], at 77.  Therefore, judgment

shall enter for Defendants UConn and UCHC on all Dr. Radolf's federal claims, and for the other

Defendants on Dr. Radolf's federal claims insofar as they seek money damages from these

Defendants in their official capacities.  As a result of Dr. Radolf's concession, the only federal

claims that remain are claims against Drs. Deckers, Berlin and Wikel in their individual

capacities.

The parties have provided the Court with reams upon reams of paper in support of and in

opposition to the motion for summary judgment, and one need not look far into this mountain of

paper to find factual disputes (though the Court notes, to its great dismay, that a good deal of the

parties' submissions and factual disputes involve the scientific intricacies of tick research).  But

the presence of a factual dispute does not prevent an award of summary judgment.  Rather, only

the existence of genuine issues of *material* fact precludes summary judgment, and in deciding

---

[2] Though Dr. Radolf styles Count 6 of 3:03CV242(MRK) (lead) as a violation of "the
public policy of the United States," this is in reality only a state law tortious interference claim,
and will be discussed as such in Part IV, *infra*.

whether a factual dispute is actually *material*, a court must look at the claim alleged and assess it

against existing law.  As the Supreme Court observed in *Andersen*, *supra*,

> [b]y its very terms, [the summary judgment] standard provides that the mere
> existence of some alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the requirement is
> that there be no *genuine* issue of *material* fact.  As to materiality, the substantive
> law will identify which facts are material. Only disputes over facts that might
> affect the outcome of the suit under the governing law will properly preclude the
> entry of summary judgment. Factual disputes that are irrelevant or unnecessary
> will not be counted.

*Andersen*, 477 U.S. at 247-48 (emphasis in original) (quoted in part in *Burt Rigid Box, Inc. v.*

*Travelers Prop. Cas. Corp.*, 302 F.3d 83, 90-91 (2d Cir. 2002)).  A careful analysis of Dr.

Radolf's many federal claims confirms that, even giving Dr. Radolf the benefit of all reasonable

inferences, there are no issues of disputed fact regarding his federal claims that are material and

thus Defendants are entitled to summary judgment as a matter of law.

### A.

In Count 1 of Dr. Radolf's First Substituted Complaint [doc. #18], he claims that Drs.

Deckers and Berlin violated his Fourteenth Amendment procedural due process rights by not

granting him a pre-decision hearing on reinstating him as Director for the Center of Microbial

Pathogenesis – a position Dr. Radolf admits he voluntarily resigned on January 13, 2002.  *See*

Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 40; Pl.'s Local Rule 56(a)(2) Statement

[doc. #65], at ¶ 40.  At oral argument, Dr. Radolf's counsel conceded that this claim was actually

asserted only against Dr. Deckers – the ultimate decision maker on whether Dr. Radolf would be

reinstated as Center Director.  Accordingly, judgment shall enter for Dr. Berlin on Count 1 of the

First Substituted Complaint [doc. #18].

"[T]he Fourteenth Amendment's Due Process Clause requires [a court] to (1) determine whether the claimant has a property interest, then (2) determine whether [he] received adequate process before being deprived of that interest." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 212 (2d Cir. 2003) (citing *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002)).  "While property interests are constitutionally protected, they are not generally constitutionally *established*." *Velez v. Levy*, --- F.3d --- , 2005 WL 564175, at *6 (2nd Cir. Mar. 11, 2005) (emphasis in original).  Rather, property interests under the Due Process Clause are

> created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.  To determine whether a contractual right can be characterized as a constitutionally protected property interest, a court must look to whether the interest involved would be protected under state law and must weigh the importance to the holder of the right. However, not every contractual benefit rises to the level of a constitutionally protected property interest.

*Harhay*, 323 F.3d at 212 (internal quotations omitted) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Ezekwo v. NYC Health & Hospitals Corp.*, 940 F.2d 775, 782, 783 (2d Cir. 1991)).  "[T]enured public employees have a constitutionally protected property interest in their employment." *Harhay*, 323 F.3d at 213 (citing *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 789 (2d Cir. 1999)).

Unfortunately, both parties expend a significant amount of time (and paper) arguing over the contractual nature of the agreement between Dr. Radolf and Dr. Deckers regarding Dr. Radolf's original appointment to the position of Center Director, in an attempt to demonstrate whether Dr. Radolf would or would not have a federally protected property interest in that position.  *See generally* Defs.' Mem. in Support of Summ. J. [doc. #53], at 4-10; Pl.'s Mem. in Opp'n to Summ. J. [doc. #70], at 2-12; 55-63.  But that is not the issue before the Court, and

therefore, this Court need not, and does not, decide whether the Due Process Clause would

protect Dr. Radolf in any effort by the Defendants to remove him from the Directorship. *See,*

*e.g.*, *Ciambriello*, 292 F.3d at 318 (holding that a municipal employee's "expectation of

continued employment" in a certain position "rises to the level of a constitutionally protected

property interest," joining "a number of other circuits that have concluded that the Fourteenth

Amendment protects a property interest in a particular position or rank."); *Ezekwo*, 940 F.2d at

783 ("the special nature of the Chief Resident designation" as well as "the 'policies and practices'

of the institution were such that an entitlement to the position of Chief Resident existed" that

implicated the Due Process Clause); *Malla v. Univ. of Connecticut*, 312 F. Supp. 2d 305, 321-22

(D. Conn. 2004) ("On these facts, if proved, the Court believes that, under controlling Second

Circuit law, [plaintiff] had a federally protected property right in his position as Campus Director

for UConn of the Consortium. . . . While not every contractual benefit rises to the level of a

constitutionally protected property interest, UConn's policies and practices were such that an

entitlement to the position of Campus Director existed.") (internal quotations, citations, and

footnote omitted). *But see Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (leaving open the

question of "whether the protections of the Due Process Clause extend to discipline of tenured

public employees short of termination.").

     Dr. Radolf's due process claim is not about what process was required before he could be

removed from the Directorship of the Center for Microbial Pathogenesis because, as he readily

admits, he *voluntarily relinquished* that title and position in January 2002. *See* Defs.' Local Rule

56(a)(1) Statement [doc. #54], at ¶ 40 ("By letter dated January 13, 2002, plaintiff voluntarily

removed himself from the Director position."); Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at

9

¶ 40 ("Admit that by letter dated January 13, 2002, the plaintiff informed Deckers of his decision 'to relinquish temporarily [his] position as Director of the Center for Microbial Pathogenesis for personal reasons."); *see also* Pl.'s Index of Exs. [doc. #66], at Exhibit 6 (letter dated January 13, 2002 from Dr. Radolf to Dr. Deckers, in which Dr. Radolf relinquishes the Directorship of the Center for Microbial Pathogenesis).[3]  Instead, Dr. Radolf's due process claim is limited to what process the Constitution required when he sought to regain that position after he had relinquished it.

Dr. Radolf argues that he has a property interest in regaining the position of Center Director and that the Due Process Clause required Dr. Deckers to give Dr. Radolf a hearing before Dr. Deckers decided not to reappoint Dr. Radolf to that position.  The Court disagrees with both premises of Dr. Radolf's argument.

First, Dr. Radolf cites no case that has found a property right in getting a job back that one previously relinquished.[4]  Once Dr. Radolf removed himself as Center Director, he became

---

[3] From time to time in his papers Dr. Radolf suggests that his resignation was not voluntary.  *See, e.g.*, Pl.'s Mem. in Opp'n to Summ. J. [doc. #70], at 64 ("[T]here is more than sufficient evidence for a trier of fact to conclude that the meetings Deckers had with the plaintiff leading to the plaintiff's voluntary relinquishment of the Director's position was a ploy meant to convince the plaintiff to willingly give up his position.").  Furthermore, Dr. Radolf also alleges he was misled as to the duration of his loss of the Directorship.  *See, e.g.*, *id.* at 66 ("It is demonstrably clear that the plaintiff was purposely misled about the temporary nature of his stepping aside so that he would voluntarily relinquish his position as Center Director.").  However, he has not asked the Court to decide these issues, and the Court does not do so.  As clarified at oral argument, Dr. Radolf's due process claim is limited to whether he was entitled to a hearing on his request for reinstatement to the position of Center Director and does not encompass issues related to the voluntariness of his relinquishment of the Directorship.

[4] Dr. Radolf's situation is markedly different from that of a municipal or government employee who was involuntarily terminated due to budget cutbacks (*i.e.*, not for cause) and has a contractual right under a collective bargaining agreement to reappointment in the event of a future vacancy.  *See Harhay*, 323 F.3d at 212 (a terminated tenured teacher's "right to

no different from any other professor seeking a discretionary appointment to an administrative

post, a subject that is governed by the University By-Laws.  The applicable section of the

University By-Laws on additional duties of UConn's professional staff states as follows:

> While members of the professional staff of this University are employed for a
> variety of duties, as a general rule the University will expect to assign to each full-
> time member of the professional staff duties which are reasonable and consistent
> with good and effective teaching practices at both the undergraduate and graduate
> levels. . . .  Assignment of duties will be made by the appropriate deans, directors,
> and department heads, subject to review as to general policy by the Provost and
> Executive Vice President for Academic Affairs or the Executive Vice President
> for Health Affairs or Vice President and President.  In so far as it is possible,
> consistent with the development of a balanced offering of University services,
> these assignments should take into account the aptitudes and wishes of individual
> staff members and their opportunities for long-run professional development.

Laws, By-Laws and Rules of UConn, art. XV, § L(1) (revised Aug. 3, 2004), quoted in Defs.'

Local Rule 56(a)(1) Statement [doc. #57], at ¶ 14.[5]  The plain language of the University By-

Laws cited above demonstrates that the assignment of additional duties, such as the Directorship

of the Center, is entirely at the discretion of the deans, directors, and department heads, subject

only to general policy review by the upper echelons of the university management structure.

Given the governing provisions of the University By-Laws, none of which Dr. Radolf

disputes, the Court concludes that Dr. Radolf had no protectible property interest in a

reappointment – explicitly delineated with the establishment of a 'reappointment list' in her
employment contract – is a property interest for the purposes of due process analysis.").

[5] Though the parties have referenced the University By-Laws throughout their
submissions to the Court, only select portions have been reproduced in the record before the
Court.  *See, e.g.*, Pl.'s Mem. in Opp'n to Motion for Summ. J. [doc. #76], at Ex. 8 (reproducing
Laws, By-Laws and Rules of UConn, art. I through art. XV, § B (revised Dec. 2, 2003)); Defs.'
Reply to Pl.'s Mem. in Opp'n [doc. #92], at Ex. 1 (reproducing Laws, By-Laws and Rules of
UConn, art. XV, § C); *id.* at Ex. 3 (reproducing Laws, By-Laws and Rules of UConn, art. XV, §
T).  The full public version of the University By-Laws is available at
http://www.president.uconn.edu/BYLAWS.htm.

discretionary reappointment as Director of the Center for Microbial Pathogenesis.  As the Second Circuit held in *Bernheim v. Litt*, 79 F.3d 318 (2d Cir. 1996), where, as here, "the complained-of conduct concerns matters that are within an official's discretion, entitlement to that benefit arises only when the discretion is so restricted as to virtually assure conferral of the benefit," a situation that is not presented in this case.  *Id.* at 323; *see, e.g.*, *Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994) ("Indeed, we previously have stated that, if state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection.") (internal quotations omitted); *Petrario v. Cutler*, 187 F. Supp. 2d 26, 35 (D. Conn. 2002) ("[A] property interest does not exist solely because of the importance of the benefit to the recipient.  The existence of provisions that retain for the state significant discretionary authority over the bestowal or continuation of a government benefit suggests that the recipients of such benefits have no entitlement to them.") (internal quotations and citations omitted); *Russo v. City of Hartford*, 158 F. Supp. 2d 214, 223 (D. Conn. 2001) ("A person does not have a property interest in the . . . discretionary benefits of their employment.")*.  See also Double I Ltd. P'ship v. Plan & Zoning Comm'n of Glastonbury*, 218 Conn. 65, 78 (1991) ("A statute or ordinance providing procedural guarantees does not create a constitutionally protected property interest unless it sets forth substantive criteria that limit the discretion of the decision-making body.").

Second, even if Dr. Radolf did have a protectible property right in getting back what he had previously voluntarily relinquished, the Constitution would not require Dr. Deckers to conduct a hearing before deciding not to appoint Dr. Radolf to that position.  To determine whether the Constitution requires a *pre*-decision hearing under the circumstances of this case, the

Court must balance three factors set forth in the Supreme Court's well known decision in

*Mathews v. Eldridge*, 424 U.S. 319 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 334 (quoted in *Harhay*, 323 F.3d at 213; *Ciambriello*, 292 F.3d at 319-20).

The relevant private interest is Dr. Radolf's interest in being reappointed to a directorship he voluntarily relinquished. Not only does the Court doubt that this is a legally cognizable property interest, the Court also notes that the parties agree that Dr. Radolf did not experience any reduction in salary or fringe benefits or any monetary harm when he stepped down as Director; nor did he suffer a reduction in lab space or institutional support. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 171; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 171; *but see* Radolf Transcript [doc. #68], at 25 ln. 21-25 & 26 ln. 1-5 (when asked "Were you separately compensated for the position of directorship?" Dr. Radolf responds that "I believe that the salary I was offered was commensurate with the additional responsibilities of being a center director. And that's not the only form of compensation, I might add, because the research resources that were provided to me as part of the package I considered to be compensation, too, and were clearly related to the fact that I was going to be setting up a center."). *Cf. Ciambriello*, 292 F.3d at 320 (plaintiff "has alleged that, as a result of the demotion, he suffered a demotion in grade and a reduction in salary and benefits, among other things."). The Directorship undoubtedly may carry intangible benefits in prestige and honor. *See, e.g.*, Pl.'s Mem. in Opp'n

to Summ. J. [doc. #70], at 60 ("I regard [the Directorship] as a tremendous honor"), at 63 ("It is not speculation to assert that there is a special importance in the academic community to being the Director of the Center for Microbial Pathogenesis.") (internal quotations and citations omitted). On the whole, however, the Court is skeptical that such intangible benefits are sufficiently compelling to require a hearing before a decision is made on appointing a professor to the position of Center Director.

Furthermore, in the education and employment context, "[c]ourts have held that [] post-deprivation procedures, [such as] providing for a hearing to contest a challenged employment decision, are sufficient to satisfy due process." *Harhay*, 323 F.3d at 213 (citing *Narumanchi v. Bd. of Trustees*, 850 F.2d 70, 72 (2d Cir. 1988)). Here, Dr. Radolf had an array of University-sanctioned post-decision processes available to him if he wished to contest Dr. Deckers' decision not to reappoint him as Center Director. Specifically, the UCHC has adopted a Faculty Grievance Procedure, set forth in the University By-Laws, which allows a faculty member to present a grievance regarding promotion, tenure and reappointment to a Faculty Review Board made up of elected UCHC peer faculty of senior rank. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 15; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 15; *see also* Laws, By-Laws and Rules of UConn, art. XV, § T (describing, in detail, the Health Center Faculty Grievance Procedure), found in Defs.' Reply to Pl.'s Mem. in Opp'n [doc. #92], at Ex. 3. Dr. Radolf could have filed a grievance with the Health Center's Faculty Review Board, and if he was dissatisfied with the Review Board's decision, he could also have appealed the decision first to the Health Center's Appeals Committee, and then ultimately to UConn's Board of Directors. *See id.*

14

Yet, by his own admission, Dr. Radolf never filed a grievance pursuant to the Faculty Grievance Procedure and therefore, never availed himself of any of the post-decision processes provided by Defendants. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 44; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 44.  Of course, Dr. Radolf was not required by 42 U.S.C. § 1983 to exhaust state remedies before bringing his federal claims. *See Patsy v. Bd. of Regents of Florida*, 457 U.S. 496, 516 (1982) ("exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983") (cited in *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 789 (2d Cir. 2002)).  However, the existence of these post-decision procedural safeguards does bear on whether the Constitution requires Defendants to provide the additional safeguard of a pre-decision hearing.  There simply has been no showing that the available post-decision processes are inadequate to prevent erroneous or unfair decisions on whether to reappoint a professor, such as Dr. Radolf, to a discretionary administrative post he had previously relinquished.  In short, Dr. Radolf has "fail[ed] to articulate any way in which the [University's] established procedures failed to provide [him] with adequate procedural protection." *Harhay*, 323 F.3d at 213.

Finally, as articulated by Dr. Radolf's counsel at oral argument, the pre-decisional "hearing" that Dr. Radolf envisioned was simply having Dr. Deckers meet with Dr. Radolf to explain why he was not being reappointed as Center Director.  Dr. Radolf apparently does not seek a formal pre-decision hearing in which he could plead his case.  While such a meeting would not represent a significant burden on the University and would certainly have been the courteous thing to do, the question here is whether the Constitution *required* Dr. Deckers to provide Dr. Radolf with such a meeting.  Because, in these circumstances, Dr. Radolf's private

15

interest is not strong and because the probable value of adding the procedural requirement of a meeting is minimal in view of the much more meaningful post-decision processes already available to Dr. Radolf, the Court concludes that Dr. Deckers did not violate Dr. Radolf's constitutional rights by not meeting with Dr. Radolf before deciding not to reappoint him as Director of the Center for Microbial Pathogenesis, a position from which he had previously resigned.

Accordingly, the Court grants Defendants' motion for summary judgment on Count 1 of the First Substituted Complaint [doc. #18].

**B.**

In Count 2 of the First Substituted Complaint [doc. #18], Dr. Radolf alleges that his First Amendment right to academic freedom was violated when Drs. Deckers and Berlin prevented him from participating in the formulation of a grant proposal to the Department of Defense entitled "Anti-vector vaccines to control mosquito and tick transmitted diseases" (the "DOD Grant"), and in subsequent research funded by that grant. *See* First Substituted Compl. [doc. #18] at ¶ 229. The Court disagrees.

It is important at the outset to emphasize precisely what Dr. Radolf claims was a violation of his First Amendment right to academic freedom. He does not assert that Defendants prevented him from teaching or performing research on any subject matter. Nor does he claim in Count 2 that Defendants retaliated against him for engaging in protected First Amendment activities, by, for example, denying him the opportunity to participate in a grant available to others because of his speech on matters of public concern. *See generally Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005); *see also* Part III.E, *infra* (analyzing

16

Count 8 of the First Substituted Complaint [doc. #18] – Dr. Radolf's First Amendment retaliation claim against Defendants regarding separate conduct).  Rather, Dr. Radolf asserts that he had a constitutional right, derived from and based on the First Amendment right to academic freedom, to participate in research projects for which he was qualified, and Defendants violated that right when they allegedly denied Dr. Radolf the opportunity to participate in the DOD Grant.

There are plenty of factual disputes on the nature of the research in the DOD Grant, and on whether and/or why Dr. Radolf was denied participation in this research project.  *Compare* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 45-54, 56-80, 82, 88-89, 100, 106-107, 110, 112-13, 115; *with* Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 45-54, 56-80, 82, 88-89, 100, 106-107, 110, 112-13, 115.  For purposes of summary judgment, the Court draws all ambiguities and inferences in favor of Dr. Radolf, and thus accepts his version of the events surrounding the DOD Grant.  Yet, as will be apparent below, the Defendants are still entitled to summary judgment as a matter of law because in the circumstances of this case, Dr. Radolf has no First Amendment academic freedom right to participate in writing a particular grant proposal or performing research under a particular grant.

The general right to academic freedom is a "First Amendment protection that has long been recognized in the academic arena."  *Hayut v. State University of New York*, 352 F.3d 733, 745 (2d Cir. 2003).  Neither "students [nor] teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  And while "courts should accord deference to academic decisions, for decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free

exchange of ideas in the classroom." *Dube v. State Univ. of New York*, 900 F.2d 587, 598 (2d

Cir. 1990) (internal citations omitted) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603

(1967)).

However, courts understandably have been hesitant to define the precise contours of the

First Amendment right to academic freedom. *See, e.g.*, *Univ. of Pennsylvania v. EEOC*, 493

U.S. 182, 198 (1990) ("Fortunately, we need not define today the precise contours of any

academic-freedom right . . ."); *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir. 1982)

("The precise contours of the concept of academic freedom are difficult to define.").  The right to

academic freedom is often formulated as a right of a university or other academic institution to be

free from government interference with its curriculum and its decisions on who may or may not

teach or be admitted to study.  *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) ("We

have long recognized that, given the important purpose of public education and the expansive

freedoms of speech and thought associated with the university environment, universities occupy

a special niche in our constitutional tradition."); *Univ. of Pennsylvania*, 493 U.S. at 197

(characterizing the "so-called academic-freedom cases" as cases where the "government was

attempting to control or direct the content of the speech engaged in by the university or those

affiliated with it"); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 n.12 (1985)

("Discretion to determine, on academic grounds, who may be admitted to study, has been

described as one of 'the four essential freedoms' of a university."); *Sweezy v. New Hampshire*,

354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result) ("It is the business of a university

to provide that atmosphere which is most conducive to speculation, experiment and creation. It is

an atmosphere in which there prevail the four essential freedoms of a university – to determine

for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.") (internal quotations and citations omitted); *see also Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000) ("Our review of the law, however, leads us to conclude that to the extent the Constitution recognizes any right of 'academic freedom' above and beyond the First Amendment rights to which every citizen is entitled, the right inheres in the University, not in individual professors.").

In some instances, however, courts have acknowledged that an individual professor or student possessed an individual right to academic freedom. *See, e.g.*, *Vega v. Miller*, 273 F.3d 460, 467 (2d Cir. 2001) ("*Dube* serves as a caution to governmental administrators not to discipline a college teacher for expressing controversial, even offensive, views lest a pall of orthodoxy inhibit the free exchange of ideas in the classroom.") (citing *Dube*, 900 F.2d at 589, 598) (internal quotation omitted); *East Hartford Ed. Ass'n v. Bd. of Ed. of East Hartford*, 562 F.2d 838, 843 (2d Cir. 1977) ("Freedom to teach in the manner of one's choice is a form of academic freedom that is universally recognized, if not invariably protected, at the college level."). And some courts have also suggested that the right of academic freedom may extend to research done in a laboratory. *See, e.g.*, *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir. 1982) (academic freedom "extends as readily to the scholar in the laboratory as to the teacher in the classroom.") (quoted in *McMillan v. Togus Reg'l Office, Dep't of Veterans Affairs*, 294 F. Supp. 2d 305, 317 (E.D.N.Y. 2003)).

Nonetheless, what is clear from the available case law in this admittedly amorphous area of First Amendment jurisprudence is that no court has ever held that a university professor has a First Amendment right of academic freedom to participate in writing any particular grant

19

proposal or performing research under any particular grant. Indeed, Dr. Radolf's counsel

conceded that fact at oral argument. The cases Dr. Radolf cites in support of his argument all

concern a public actor (a university or other government entity) either directly forbidding a

teacher from teaching a particular subject or preventing a researcher from performing research on

a certain subject, or otherwise chilling the teacher's or researcher's expressive rights – factual

circumstances that are not even alleged here. *See, e.g., Keyishian*, 385 U.S. at 604 (holding that a

law seeking to root out Communists from the state teaching ranks was unconstitutional, because

"[w]hen one must guess what conduct or utterance may lose him his position, one necessarily

will steer far wider of the unlawful zone. For the threat of sanctions may deter almost as potently

as the actual application of sanctions. The danger of that chilling effect upon the exercise of vital

First Amendment rights must be guarded against by sensitive tools which clearly inform teachers

what is being proscribed."); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001)

(addressing the termination of a professor for an allegedly sexist and racially-derogatory in-class

discussion, finding that "a teacher's in-class speech deserves constitutional protection" and "a

professor's rights to academic freedom and freedom of expression are paramount in the academic

setting") (internal citations and quotations omitted); *Vega*, 273 F.3d at 467 (addressing "the

extent to which a college professor could be disciplined for permitting student speech in a

classroom to exceed reasonable bounds of discourse"); *Rubin v. Ikenberry*, 933 F. Supp. 1425,

1433 (C.D. Ill. 1996) ("Academic freedom refers to the freedom of university professors and the

university administrators to function autonomously, without interference from the government. It

also refers to the freedom of individual teachers to not suffer interference by the administrators of

the university.") (citations omitted); *Levin v. Harleston*, 770 F. Supp. 895, 925 (S.D.N.Y. 1991)

20

("Academic tenure, if it is to have any meaning at all, must encompass the right to pursue scholarship wherever it may lead, the freedom to inquire, to study and to evaluate without the deadening limits of orthodoxy or the corrosive atmosphere of suspicion and distrust . . . "), *aff'd in part, vacated in part by* 966 F.2d 85 (2nd Cir. 1992); *Cooper v. Ross*, 472 F. Supp. 802, 813 (D.C. Ark. 1979) ("The present case is particularly difficult because it involves a fundamental tension between the academic freedom of the individual teacher to be free of restraints from the university administration, and the academic freedom of the university to be free of government, including judicial, interference."). *Cf. Dow Chemical*, 672 F.2d at 1275 (addressing the question of the extent to which administrative subpoenas seeking enormous amounts of primary data would "threaten substantial intrusion into the enterprise of university research," stating that "there are several reasons to think they are capable of chilling the exercise of academic freedom").[6]

Dr. Radolf does not allege, and certainly has not submitted any evidence, that Defendants denied Dr. Radolf participation in the DOD Grant to silence or chill his research on the subject matter of the grant proposal.  To the contrary, he was free to investigate the subject of the DOD Grant as he chose, and apparently he continues to do so.  *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 114, 116 (undisputed facts that Dr. Radolf is conducting similar research as that done in the DOD Grant with colleagues at the University of Rhode Island and Yale University, continues to have access to and conduct research with ticks); Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 114, 116.  Furthermore, there is no evidence that either Dr.

---

[6] Dr. Radolf also cites *McMillan*, 294 F. Supp. 2d at 317 and *Hamid v. John Jay College of Criminal Justice*, No. 99 CIV 8669 WK, 2000 WL 666344, at *6 (S.D.N.Y. 2000), yet these two cases do not concern the First Amendment right to academic freedom.  *Hamid* will be addressed in Part III.C, *infra*.

Radolf's personal financial situation, his academic resources or even his research has suffered at all because he was unable to participate in this particular DOD Grant. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 171, 172 (undisputed facts that Dr. Radolf is still a tenured faculty member, has not had his salary or fringe benefits reduced, has not suffered a reduction in lab space or institutional support, and has received pay increases); Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 171, 172. In the circumstances, therefore, the Court does not believe that Dr. Radolf had a First Amendment right of academic freedom to participate in the DOD Grant.

In any event, even if the Court is wrong and Dr. Radolf did have a First Amendment right to participate in the DOD Grant, Defendants would nonetheless have qualified immunity from his claims in this lawsuit because that supposed constitutional right was not clearly established at the time of the events in question – or, for that matter, even today. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted) (quoted in *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 101 (2d Cir. 2003)). Thus, the "qualified immunity doctrine protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively unreasonable." *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998) (quoted in *Sadallah v. City of Utica*, 383 F.3d 34, 37 (2d Cir. 2004)).

According to the Second Circuit,

a defendant's claim of qualified immunity requires the court to engage in a

three-step inquiry: (1) Has the plaintiff alleged a violation of a constitutional right?; (2) Was the violated right clearly established at the time of the conduct?; and (3) If the plaintiff had a clearly established constitutional right that was violated, did the plaintiff show that defendant's actions were not objectively reasonable?

*Lorusso v. Borer*, --- F. Supp. 2d --- , 2005 WL 517617, at *7 (D. Conn. Feb. 28, 2005) (citing

*Harhay*, 323 F.3d at 211-12).

Here, even if the Court erred in concluding that Dr. Radolf did not have a First Amendment right of academic freedom entitling him to participate in the DOD Grant, the Defendants would nonetheless have qualified immunity from any personal liability because this particular alleged variant of the First Amendment right to academic freedom was not clearly established at the time of the Defendants' conduct. In fact, as previously noted, Dr. Radolf's counsel rightly conceded at oral argument that no court had ever previously recognized such a right.

Accordingly, the Court grants Defendants' motion for summary judgment on Count 2 of the First Substituted Complaint [doc. #18].

## C.

In Count 3 of the First Substituted Complaint [doc. #18], Dr. Radolf also claims that Drs. Deckers and Berlin infringed his Fourteenth Amendment right to procedural due process when they barred him from participating in the DOD Grant proposal.[7] The Court has already set forth

---

[7] Count 3 also alleges that Defendants violated his Fourteenth Amendment rights when they allegedly took credit for Dr. Radolf's scientific research, data, and results in the DOD Grant proposal and subsequent research without properly attributing them to Dr. Radolf. *See* First Substituted Compl. [doc. #18], at ¶¶ 319-26. Insofar as Dr. Radolf's claim here concerns his alleged intellectual property rights, the Court will take up that issue in Part III.D when the Court discusses Dr. Radolf's Lanham Act claim.

the standards for a procedural due process claim in Part III.A, *supra*, and need not do so again here. At issue in Count 3 is whether Dr. Radolf has established that he has a property interest in participating in the DOD Grant proposal. *See, e.g.*, *Harhay*, 323 F.3d at 212. The Court concludes that he does not. Under the undisputed facts of this case, it is clear that participation in the DOD Grant proposal was a discretionary benefit that cannot support a procedural due process claim.

To be clear from the outset, Dr. Radolf does not claim he was originally designated as the lead researcher in the DOD Grant proposal or was nominated to receive particular grant funds until Drs. Deckers and Berlin denied him the position of lead researcher or took away the research funds that he was supposed to receive under the DOD Grant.[8] Therefore, whether in those circumstances Dr. Radolf would have an expectation in continued participation in the grant that the Due Process Clause would protect, is not the question before the Court. For Dr. Radolf himself admits that Drs. Deckers and Berlin have not taken any grant funding away from him, nor has Dr. Radolf been removed from the position of Principal Investigator on any funded grant. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 108; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 108. Here, Dr. Radolf simply alleges that Drs. Deckers and Berlin decided not to allow Dr. Radolf to participate in formulating the DOD Grant proposal or in receiving DOD Grant funds. The question before the Court, therefore, is whether Dr. Radolf has

---

[8] Apparently, the DOD Grant was a congressional earmark of funds which were ultimately received by the UCHC, not by any individual professor. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 71; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 71; Defs.' Reply to Pl.'s Mem. in Opp'n [doc. #92], at 11. *See generally* 32 C.F.R. § 32.1 *et seq.* (outlining the Department of Defense regulations governing research grants given to institutions of higher education, hospitals, and other non-profit organizations); Conn. Gen. Stat. § 10a-130 (establishing the University of Connecticut Health Center Research Fund).

a protectible property interest in participating in a grant of his choosing.

Dr. Radolf cites no provision of state law and no section of the University By-Laws that establish a tenured professor's cognizable property interest in participating in research grant proposals of his or her choice. Rather, according to the University By-Laws, Dr. Deckers, as Executive Vice President for Health Affairs and Dean of the Medical School, appears to be the member of the UCHC with the greatest discretion over personnel assignments and the distribution of research funding, and Dr. Radolf does not dispute this fact. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 3 ("Per University By-Laws, Article VIII.D [*sic*], the Executive Vice President for Health Affairs ["EVP"] is responsible to the President for the coordination and formulation of policies and administration of administrative, business and other support department [*sic*] at the Health Center. The EVP shall, among other things: appoint those members of the University faculty and staff who report to him, approve the selection and adjustment in service of all personnel under his jurisdiction, be responsible for all monies and funds of the University Health Center regardless of their source and make provision for an accurate accounting of their receipt and expenditure, and direct the assignment of all plant facilities, including buildings, offices, classroom, laboratories, equipment."); *id. at* ¶ 4 ("[T]he Dean is the principal administrative office of the School of Medicine and is responsible for, among other things: implementation of the regulations and policies of the University and School of Medicine, preparing annual budget recommendations for the School, making recommendations regarding the appointment, promotion and tenure of members of the faculty, Department Heads, and Associate Deans, and assigning space which is available to the School of Medicine to departments and other units."); Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶

25

3, 4; *see also* Laws, By-Laws and Rules of UConn, art. VIII, § C (describing, in detail, the

responsibilities of the Executive Vice President for Health Affairs), found in Pl.'s Mem. in Opp'n

to Motion for Summ. J. [doc. #76], at Ex. 8.[9]  As discussed previously, Dr. Radolf has no

cognizable property interest in a discretionary benefit or privilege such as this.  *See, e.g.*,

*Bernheim*, 79 F.3d at 323; *Gagliardi*, 18 F.3d at 193; *Petrario*, 187 F. Supp. 2d at 35; *Russo*, 158

F. Supp. 2d at 223.

Furthermore, though the question of whether a tenured professor has a cognizable

property interest in the participation in a particular grant seldom arises, two cases help delineate

when participation in a particular grant proposal may or may not be protected by the Due Process

Clause.  In *Abbs v. Sullivan*, 756 F. Supp. 1172 (W.D. Wisc. 1990), *vacated on other grounds*,

963 F.2d 918 (7th Cir. 1992), a case concerning a professor merely accused of scientific

misconduct, the court discussed a professor's possible property interest in either receiving future

federal funding or in receiving continued funding from an ongoing federal grant, stating:

> As to future federal funding, plaintiff Abbs has no enforceable right to receive
> grants or awards, whatever his status as a researcher.  Such funding is always
> discretionary with the funding agency. As to the current grants . . . [t]here is no
> evidence that Abbs would incur any personal financial injury if current funding
> for his research were suspended or terminated.

*Id.* at 1182-83.  While not directly on point, the funding agency's discretion in disbursement of

particular funds to particular researchers is analogous to Defendants' discretion in deciding which

professors will participate in which grant proposals.  Furthermore, like Professor Abbs, there is

---

[9]  Though the record before the Court does not mention Dr. Berlin's job duties, the Court
notes that his job title as "Associate Dean for Research Planning and Coordination" at the very
least implies that he has some discretion in the planning and coordination of research activities at
the UCHC.  *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶ 6; Pl.'s Local Rule 56(a)(2)
Statement [doc. #65], at ¶ 6.

also no evidence that Dr. Radolf incurred any personal financial injury or damage to his research capabilities because he was unable to participate in this particular DOD Grant. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 171, 172 (undisputed facts that Dr. Radolf is still a tenured faculty member, has not had his salary or fringe benefits reduced, has not suffered a reduction in lab space or institutional support, and has received pay increases); Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 171, 172.

In *Hamid v. John Jay Coll. of Criminal Justice*, No. 99 CIV 8669 WK, 2000 WL 666344 (S.D.N.Y. May 19, 2000), Professor Hamid claimed that his supervisors used their power over the administration of a particular research grant to maliciously orchestrate Professor Hamid's dismissal as lead researcher on the grant. *Id.* at *1. Though Dr. Radolf heavily relies on *Hamid* in support of his arguments, the Court does not find *Hamid* controlling here for several reasons. First, *Hamid* involved a denial of a motion to dismiss, not summary judgment. Second, the *Hamid* court determined that Professor Hamid had sufficiently plead a property interest in *continuing* as the principal investigator on the research project to survive a motion to dismiss, because, among other things, Professor Hamid had alleged that "as a result of his appointment as [principal investigator] his total income was increased" and he asserted a " 'tenure right' to unimpeded research and this right (if proven) constitutes a substantive rule of entitlement independent of his source of funding." *Id.* at *6. Third, Professor Hamid claimed he was being removed as the principal investigator on a research project for discriminatory purposes because of his previous research on politically and racially sensitive topics. *Id.* at *1.

Here, on summary judgment, Dr. Radolf (unlike Professor Hamid) does not claim a property interest in *continuing* his participation in the DOD Grant. Instead, he claims a

27

constitutionally protectible property interest in being included in grant proposals of his choosing, a claim not asserted in *Hamid*. Furthermore, Dr. Radolf has failed to present evidence from which a reasonable fact-finder could conclude either that his income, tenure or research was intimately connected and dependent on the DOD Grant so as to create a property interest in participation in this grant, or that he had any other right to participation in the DOD research which would create such a property interest. Nor has Dr. Radolf alleged that Drs. Deckers' and Berlin's actions were in retaliation for his previous research on sensitive topics. Therefore, *Hamid* does nothing to counter the simple fact that participating in a particular research grant proposal is a discretionary benefit or privilege that cannot support a due process claim on the facts presented. *See, e.g.*, *Bernheim*, 79 F.3d at 323; *Gagliardi*, 18 F.3d at 193; *Petrario*, 187 F. Supp. 2d at 35; *Russo*, 158 F. Supp. 2d at 223.

Accordingly, the Court grants Defendants' motion for summary judgment on Count 3 of the First Substituted Complaint [doc. #18].

## D.

In Count 4 of the First Substituted Complaint [doc. #18], Dr. Radolf alleges that Drs. Deckers, Berlin, and Wikel violated his rights under § 43(a) of the Lanham Act, 11 U.S.C. 1125(a)(1). Specifically, Dr. Radolf asserts that in the DOD Grant proposal and subsequent research described in Part III.B, *supra*, these Defendants falsely attributed his data and findings as their own and that they did the same thing at a press conference held with Representative Nancy Johnson. *See* First Substituted Compl. [doc. #18], at ¶¶ 409-24.

Dr. Radolf concedes that the Supreme Court's recent decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), forecloses any claim he may formerly

have had under the "origin of work" provision of § 43(a) of the Lanham Act.  *See* Pl.'s Mem. in

Opp'n to Summ. J. [doc. #70], at 92-93.  As *Dastar* made abundantly clear,

> in construing the Lanham Act, we have been careful to caution against misuse or
> over-extension of trademark and related protections into areas traditionally
> occupied by patent or copyright.  The Lanham Act . . . does not exist to reward
> manufacturers for their innovation in creating a particular device; that is the
> purpose of the patent law and its period of exclusivity. *Federal trademark law has
> no necessary relation to invention or discovery*, but rather, by preventing
> competitors from copying a source-identifying mark, reduces the customer's costs
> of shopping and making purchasing decisions, and helps assure a producer that it
> (and not an imitating competitor) will reap the financial, reputation-related
> rewards associated with a desirable product.

*Dastar*, 539 U.S. at 34 (emphasis added) (internal quotations and citations omitted).  Thus, the

"origin of work" provision of the Lanham Act protects only "the producer of the tangible goods

that are offered for sale, and not . . . the author of any idea, concept, or communication embodied

in those goods," because copyright and patent laws sufficiently cover inventions, discoveries,

ideas and concepts.  *Id.* at 37.  Because Dr. Radolf's claim centers around his contention that he

was the "author" or originator of the ideas and concepts that underlie the DOD Grant, his Lanham

Act claim necessarily fails in light of *Dastar*.

In the face of *Dastar*, Dr. Radolf has sought to rescue his Lanham Act claim by re-

conceptualizing it as a "false advertisement" claim under § 43(a)(1)(B) of the Lanham Act.  *See*

Pl.'s Mem. in Opp'n to Summ. J. [doc. #70], at 93-95.  In that regard, the Court notes that *Dastar*

still allowed "cause[s] of action – not for reverse passing off under the 'confusion . . . as to the

origin' provision of § 43(a)(1)(A), but for misrepresentation under the 'misrepresents the nature,

characteristics [or] qualities' provision of § 43(a)(1)(B)."  *Dastar*, 539 U.S. at 38.  Dr. Radolf's

effort to shoe-horn his claim into this language from *Dastar* is unavailing.  For, at its core, Dr.

Radolf's Lanham Act claim remains one in which he asserts that Defendants used research and data that he originated without properly attributing the source of the research and data. In short, Dr. Radolf asserts that Defendants passed off his research as their own. And that type of claim, however styled, is barred by the language and holding of *Dastar*.

However, even if the Court were to allow Dr. Radolf to transmute his "origin of work" claim under § 43(a)(1)(A) into a quasi-"false advertisement" claim under § 43(a)(1)(B), the Court cannot see how the submission of an academic research proposal to a government funding agency constitutes "commercial advertising or promotion," as that phrase is used in § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B). According to the Second Circuit,

> in order to qualify as "commercial advertising or promotion," the contested representations must be "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services"; and, (4) although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public.

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56 (2d Cir. 2002) (quoting *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994)). Under the plain language of *Fashion Boutique*, the Defendants' alleged use of Dr. Radolf's data and results in their DOD Grant application or even at the press conference with Representative Johnson was not commercial speech. Also, there are no facts in this record that would allow the Court to conclude that Defendants are in commercial competition with Dr. Radolf, that there are consumers seeking to purchase Defendants' goods or services, or that the representations of which Dr. Radolf complains were made to a relevant purchasing public. As a consequence, Dr. Radolf's creatively re-conceptualized "false advertisement" claim also fails

because the research proposal to the DOD was not "commercial advertising or promotion," as that phrase is used in § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and construed by the Second Circuit.

Accordingly, the Court grants Defendants' motion for summary judgment on Count 4 of the First Substituted Complaint [doc. #18].

**E.**

In Count 8 of the First Substituted Complaint [doc. #18], Dr. Radolf asserts that Defendants retaliated against him when he exercised his First Amendment right to voice his opposition to the Defendants' wrongful use of funds from two of his NIH grants.  Dr. Radolf asserted that these funds were wrongly used to pay the salary of a research associate, Mr. Kenneth Bourell, who works in the Center for Microbial Pathogenesis.  *Id.* at ¶¶ 590-94, 788-89. In Count 8, Dr. Radolf alleges that because he voiced his concerns about the use of the NIH funds to pay Mr. Bourell's salary, Defendants retaliated against Dr. Radolf by wrongly accusing him of committing fraud in preparing and reporting on the NIH grants, thereby causing UCHC's Internal Compliance Office to conduct an internal investigation into Dr. Radolf's activities.  *Id.* at ¶¶ 603-04; *see also* Defs.' Local Rule 56(a)(1) [doc. #54] at ¶ 142; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶ 142.  As confirmed at oral argument, it is undisputed that the UCHC Internal Compliance Office investigation concluded that there was no basis for a finding that Dr. Radolf had committed fraud or other improper conduct in connection with these two NIH grants.

As recently explained by the Second Circuit,

[i]n order to establish a First Amendment claim of retaliation as a public employee, [a plaintiff] must show that (1) [his] speech addressed a matter of public concern, (2) [he] suffered an adverse employment action, and (3) a causal

> connection existed between the speech and the adverse employment action.
> Whether speech addresses a matter of public concern is a question of law to be
> determined by the content, form, and context of a given statement, as revealed by
> the whole record.

*Konits*, 394 F.3d at 124 (internal quotation marks and brackets omitted) (citing *Cobb v. Pozzi*,

363 F.3d 89, 102 (2d Cir. 2003); *Johnson v. Ganim*, 342 F.3d 105, 113 (2d Cir. 2003); *Connick*

*v. Myers*, 461 U.S. 138, 147-48 (1983)).

     For the purposes of this case, the Court accepts Dr. Radolf's assertion that complaining

about a state university's possible misuse of federal grant money constitutes speech on a matter of

public concern. *See, e.g.*, *Hale v. Mann*, 219 F.3d 61, 71 (2d Cir. 2000) ("the proper

administration of State facilities" is a matter of public concern); *Morris v. Lindau*, 196 F.3d 102,

110 (2d Cir. 1999) ("As a general rule, speech on 'any matter of political, social, or other concern

to the community' is protected by the First Amendment.") (quoting *Connick*, 461 U.S. at 146);

*Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) ("[D]iscussion regarding current

government policies and activities is perhaps the paradigmatic matter of public concern.")

(internal quotations and citations omitted) (quoted in *Ganim*, 342 F.3d at 112); *Vasbinder v.*

*Ambach*, 926 F.2d 1333, 1340 (2d Cir. 1991) ("potential fraud, theft, and misallocation of public

funds, were matters of serious public concern").  Furthermore, Dr. Radolf has raised sufficient

issues of material fact regarding whether there was a causal connection between, on the one

hand,  Dr. Radolf's public complaints about Defendants' potential misuse of federal grant money

to pay Mr. Bourell's salary and, on the other hand, Defendants' accusations that Dr. Radolf had

committed fraud in preparing and reporting on the NIH grants.  *See, e.g.*, *Morris*, 196 F.3d at 110

("Summary judgment is precluded where questions regarding an employer's motive predominate

in the inquiry regarding how important a role the protected speech played in the adverse

employment decision.") (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S.

274, 287 (1977)).

       Where Dr. Radolf's First Amendment retaliation claim founders, however, is on the

second requirement of the cause of action – namely, that he suffered an adverse employment

action.  The internal investigation into Dr. Radolf's possible fraud in preparing and reporting on

the NIH grants exonerated him, concluding that he had not committed fraud.  Moreover, neither

the investigation nor the original accusations themselves resulted in any discipline being imposed

against Dr. Radolf and also did not result in any reduction in his pay, benefits, or terms of his

employment.  In short, there is nothing in the record that shows that the pendency or conduct of

the internal investigation materially altered Dr. Radolf's employment at all.  *See* Defs.' Local Rule

56(a)(1) Statement [doc. #57], at ¶¶ 171, 172, 174, 176, 178, 179, 180, 181 (undisputed facts that

Dr. Radolf is still a tenured faculty member, has not had his salary or fringe benefits reduced, has

not suffered a reduction in lab space or institutional support, has received pay increases, has not

had grant applications or manuscripts rejected because of the investigation, remains a member of

various academic societies, serves on various committees and boards, and attends scientific

conferences); Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 171, 172, 174, 176, 178, 179,

180, 181; *see also* Ruling on Motion for Preliminary Injunction [doc. #30], at 22 ("After careful

consideration, the Court cannot find that the pending investigation, in and of itself, irreparably

harms Dr. Radolf.  Plaintiff has admitted that he has not been deterred from reporting violations

and that his employment duties or status have not been altered by the pendency of the

investigation.  Indeed, plaintiff has failed to proffer evidence of any negative career impact

stemming from the pending investigation.").

Therefore, Dr. Radolf's retaliation claim is based solely on the fact that he underwent an internal investigation (that cleared him of any wrongdoing) as a result of Defendants' retaliatory accusations. However, Dr. Radolf's counsel could not cite a single case in which a court had held that mere participation in an internal investigation – standing alone, without allegations of attendant material disadvantage in employment terms – could support a First Amendment retaliation claim. Indeed, case law on this subject holds precisely the opposite. *See Jones v. Fitzgerald*, 285 F.3d 705, 715 (8th Cir. 2002) (an internal investigation is no adverse employment action where employee "suffered no material disadvantage in a term or condition of employment as a result of the investigations"); *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998) ("Although a reprimand can constitute an adverse employment action, an investigation does not."); *Richards v. Connecticut Dep't of Corr.*, 349 F. Supp. 2d 278, 289-90 (D. Conn. 2004) (official investigations did not constitute adverse employment actions for plaintiff's First Amendment retaliation claim absent "evidence of an adverse impact on his employment"). *Cf. Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (employee put on paid administrative leave pending the outcome of an internal investigation, who was restored to her position upon the termination of the investigation, suffered no adverse employment action in Title VII context); *Lewis v. Connecticut Dep't of Corr.*, --- F. Supp. 2d --- , 2005 WL 299847, at *9 (D. Conn. Jan. 24, 2005) (employment not materially altered in Title VII retaliation claim when "internal investigation did not conclude that [plaintiff] was at fault, it did not result in any discipline against her, and it did not result in any reduction in her pay or benefits, either during or after the investigation"); *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 396

34

(S.D.N.Y. 2001) ("[A]n alleged deficiency in an employer's internal complaint procedure or internal investigation of a sexual harassment complaint – even if the deficiency is little more than an attempt to strengthen an employer's defense – is not a retaliatory adverse employment action.").

The cases Dr. Radolf does rely on are either readily distinguishable or generally supportive of the consistent line of case law requiring, as a condition to a finding of adverse employment action, that the plaintiff have suffered some material change in employment terms or conditions as a result of the conduct of an investigation. *See* Pl.'s Mem. in Opp'n to Summ. J. [doc. #70], at 122-23. Specifically, Dr. Radolf's primary support, *Williams v. Hansen*, 326 F.3d 569 (4th Cir. 2003) (King, J., dissenting), is a dissenting opinion in an equal protection – not a First Amendment retaliation – case. The case involved a chief of police who received complaints of racial discrimination within his department, and chose to investigate only the African-American employees. *Id.* at 572, 582. As Dr. Radolf quoted to this Court in his brief, the dissent, in a footnote, stated that "[i]t should be noted that, if initiated for an illegal purpose, the investigation itself is actionable; the plaintiffs need prove no further adverse employment action." *Id.* at 585 n.1. However, there is no indication that this statement refers to anything other than the plaintiffs' equal protection claim.

The dissenter's footnote in *Williams* does cite a handful of cases from the Fourth, Ninth, and Seventh Circuits that concern First Amendment and Title VII retaliation claims, and this portion of the footnote is also quoted in Dr. Radolf's brief. *See* Pl.'s Mem. in Opp'n to Summ. J. [doc. #70], at 122-23. However, none of the cases cited in the footnote supports Dr. Radolf's contention that merely being the subject of an internal investigation – without something more –

35

constitutes an adverse employment action sufficient to support an employee's First Amendment

retaliation claim against his employer.  *See Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002)

(mentioning internal affairs investigations as one of a set of other adverse employment actions

inflicted on a plaintiff – including a five-day lockout, a thirty-day lockout, and a failure to

promote to a particular position – and noting that the issue of what constitutes an adverse

employment action was undisputed by the parties, and thus not before the court); *Hetzel v.*

*County of Prince William*, 89 F.3d 169, 172 (4th Cir. 1996) ("The only other evidence of

emotional distress that even arguably supports an award of damages is [plaintiff's] reaction

following a fifteen-to-twenty minute Internal Affairs interview, conducted on January 15, 1995,

concerning whether [plaintiff] had improperly advised a suspect of his *Miranda* rights – an

investigation which led to an oral reprimand for [plaintiff's] improper actions. While we have

significant doubts as to whether this interview constitutes an adverse employment action which is

actionable under Title VII or section 1983, we do not here need to conclusively decide that

issue."); *Huang v. Bd. of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990) (First Amendment

retaliation case stating, in passing, that a *transfer* could be deprive a plaintiff of a valuable

benefit – no mention of an investigation constituting an adverse employment action); *Rakovich v.*

*Wade*, 819 F.2d 1393, 1397 (7th Cir. 1987) (First Amendment retaliation claim *outside of the*

*employment context*, where the police department investigated a member of the city civil service

commission in retaliation for his earlier opposition to, and criticism of, city officials), *vacated on*

*other grounds on reh'g en banc*, 850 F.2d 1180 (7th Cir. 1988), *abrogated on other grounds by*

36

*Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir. 2004).[10]

Accordingly, the Court grants Defendants' motion for summary judgment on Count 8 of the First Substituted Complaint [doc. #18].

## F.

In Count 1 of the Second Substituted Complaint [attached to doc. #34], Dr. Radolf claims that Dr. Deckers violated both his procedural and substantive due process rights under the Fourteenth Amendment by allegedly denying Dr. Radolf certain rights associated with being a tenured professor. *Id.* at ¶¶ 47-55. Specifically, Dr. Radolf claims that his substantive and procedural due process rights were violated when Dr. Deckers: (1) excluded Dr. Radolf from academic and/or administrative leadership positions that could include, directly or indirectly, any service of any kind to the United States Public Health Service; (2) appointed a co-major advisor for Dr. Radolf's current MD/PhD student; (3) mandated that Dr. Radolf would not be listed as an available mentor for new MD/PhD candidates; and (4) terminated Dr. Radolf's appointment on the MD/PhD Steering Committee. *Id.* at ¶ 46.[11]

---

[10] Dr. Radolf also cites *Mulhall v. FBI*, No. 3:98CV-171-S, 1999 WL 33756650 (W.D. Ky. Apr. 16, 1999), for the proposition that an FBI investigation into alleged fraud by the plaintiff constituted an adverse employment action by itself. However, Dr. Radolf fails to mention that in *Mulhall*, "at the very least, the FBI took deliberate steps to put into motion the mechanism whereby [the plaintiff] was removed from" his position on a particular joint task force. *Id.* at *6. *Mulhall* thus supports the general proposition that an investigation must be associated with a tangible material disadvantage in the terms or conditions of employment for there to be an adverse employment action sufficient to support a First Amendment retaliation claim.

[11] Because Dr. Radolf voluntarily agreed to the imposition of the UCHC's Supervisory Plan as a part of his Voluntary Exclusion Agreement with the ORI, Dr. Radolf's due process claims in Count 1 of the Second Substituted Complaint [attached to doc. #34], rightly do not challenge the UCHC Supervisory Plan, which extended most of the requirements of the original UCHC probationary period until March 2008 to conform to the probationary period imposed by

Turning first to Dr. Radolf's substantive due process claim, the Court notes at the outset that "not all wrongs perpetrated by a government official violate substantive due process rights." *McDonald ex rel. McDonald v. Sweetman*, No. 3:02CV1040(MRK), 2004 WL 717166, at *5 (D. Conn. Mar. 24, 2004). As this Court recently explained in *Hepburn v. City of Torrington*, No. 3:02CV1252(MRK), 2004 WL 1771590 (D. Conn. Aug. 4, 2004):

> Substantive due process does not protect "against government action that is 'incorrect or ill-advised,' " *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (quoting *Bishop v. Wood*, 426 U.S. 341, 350 (1976)). The Second Circuit has stated that "the protections of substantive due process are available only against egregious conduct which goes beyond merely 'offending some fastidious squeamishness or private sentimentalism' and can fairly be viewed as so 'brutal and 'offensive to human dignity' as to shock the conscience." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 & n.6 (2d Cir. 1973) (Friendly, J.)); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). The standard for such claims is therefore quite high. As Judge Henry Friendly noted in *Johnson*, "[the acts] must be such as 'to offend even hardened sensibilities.' " *Johnson*, 481 F.2d at 1033 & n.6 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). Accordingly, the cases in which courts have recognized a viable substantive due process claim are limited to those presenting extraordinary circumstances. Indeed, the First Circuit has noted that where "plaintiff has not been physically abused, detained, prosecuted due to racial or political motivation or otherwise deprived of equal protection of the law, courts are reluctant to find 'conscience-shocking' conduct that would implicate a constitutional violation." *Torres v. Superintendent of Police of Puerto Rico*, 893 F.2d 404, 410 (1st Cir. 1990).

*Id.* at *3. "The standard for substantive due process violations has been set at an extremely high

---

the ORI. *See* Second Substituted Compl. [attached to doc. #34], at ¶ 53 ("Except for requiring the previously established supervisory plan (Deckers' December 22, 2001 [*sic*] letter) being extended to run concurrently with the duration of the Voluntary Agreement, the actions taken by the defendant, Deckers, were not mandated by the provisions of the Voluntary Agreement between the plaintiff and the ORI."). *See generally* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 17, 20; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 17, 20; *see also* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at Affidavit of Peter J. Deckers, Attach. 4 (August 22, 2001 letter from Dr. Deckers to Dr. Radolf) & Attach. 5 (December 27, 2001 letter from Dr. Deckers to Dr. Radolf).

level to prevent courts from reading the language of the due process clause overbroadly and thereby constitutionalizing large areas of law." *McDonald*, 2004 WL 717166, at *5.

Given the very high standard courts have consistently used in evaluating substantive due process claims, this Court has little difficulty concluding here that even giving Dr. Radolf the benefit of all reasonable inferences and resolving all factual disputes in his favor, Dr. Radolf has not satisfied that high standard. To be sure, the acts asserted in this case could be considered examples of poor human relations management or even heavy-handed. But no reasonable jury could find that these acts satisfy the "shock the conscience" standard necessary to establish a substantive due process claim. Defendants are therefore entitled to summary judgment on the substantive due process portion of Count 1 of the Second Substituted Complaint [attached to doc. #34].

The procedural due process portion of Count 1 of the Second Substituted Complaint [attached to doc. #34] is governed by the same legal principles outlined in Part III.A, *supra*.[12] The Court is not aware of any state law principle or rule which establishes that Dr. Radolf had a property interest in any of the things he claims to have been deprived of. In fact, the relevant section of the University By-Laws governing the assignment of additional duties to professors, quoted at length in Part III.A, *supra*, contains no language establishing a property interest in any of the assignments Dr. Radolf was allegedly denied. *See* Laws, By-Laws and Rules of UConn, art. XV, § L(1) (quoted in Defs.' Local Rule 56(a)(1) Statement [doc. #57], at ¶ 14). Dr. Radolf

---

[12] The Court notes that, as was apparent from the lack of briefing on the matter in Plaintiff's Memorandum in Opposition to Summary Judgment [doc. #76] and as confirmed at oral argument, Dr. Radolf has abandoned any due process claim based on an alleged deprivation of his liberty – as opposed to his property – interests.

himself admits that a tenured faculty member is not entitled to membership on every faculty committee or any particular committee, and that it is possible that a tenured faculty member at UConn would not be given leadership positions or participate in student mentoring programs or even be given faculty committee assignments. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #57], at ¶¶ 43, 45; Pl.'s Local Rule 56(a)(2) Statement [doc. #65], at ¶¶ 43, 45. As discussed in Part III.A, *supra*, because tenured employees have no property interests in these types of discretionary appointments, Dr. Radolf's procedural due process claim related to the alleged denial of these privileges must fail. *See, e.g.*, *Bernheim*, 79 F.3d at 323; *Gagliardi*, 18 F.3d at 193; *Petrario*, 187 F. Supp. 2d at 35; *Russo*, 158 F. Supp. 2d at 223.

The Court hastens to note that it is certainly possible that an academic institution could make a tenured professor's life so onerous and so difficult through denial of the normal privileges and benefits of tenure that the University's actions could rise to the level of a constructive demotion. For example, a university might make it impossible for a professor to perform his duties by denying the tenured professor access to the library, laboratory spaces, classrooms, offices and other University resources that are usually accorded tenured professors. But those are not remotely the facts presented in this case. To the contrary, it is undisputed that Dr. Radolf continues to perform research in his chosen field; he is still a tenured faculty member; his salary and fringe benefits have not been reduced; he has not suffered any reduction in lab space or institutional support; he has received pay increases; he continues to apply for and receive grant funding; he continues to publish academic articles; he is still a member of academic societies, reviews manuscripts for academic journals and sits on editorial boards; he attends and speaks at scientific conferences; and he still sits on certain academic committees at the UCHC, just not the

ones he wants to sit on.  *See* Defs.' Local Rule 56(a)(1) Statement [doc. #54], at ¶¶ 114, 116, 171-72, 176-81; Pl.'s Local Rule 56(a)(2) Statement [doc. #65] at ¶¶ 114, 116, 171-72, 176-81.  Dr. Radolf certainly believes he has been treated poorly.  But on the facts presented, it is apparent that he has not been deprived of any property interest sufficient to trigger due process protection.

Accordingly, the Court grants Defendants' motion for summary judgment on Count 1 of the Second Substituted Complaint [attached to doc. #34].

## G.

In Count 2 of the Second Substituted Complaint [attached to doc. #34], Dr. Radolf alleges that Dr. Deckers retaliated against him for exercising his First Amendment right to bring this lawsuit.  At oral argument, counsel for Dr. Radolf confirmed that Dr. Radolf has withdrawn or abandoned this claim, and therefore there is no need for the Court to address it.  Judgment shall enter for Defendants on Count 2 of the Second Substituted Complaint [attached to doc. #34].

## IV.

Having granted the Defendants summary judgment on all of Dr. Radolf's federal claims, only three state law claims remain.  In Count 5 of the First Substituted Complaint [doc. #18], at ¶¶ 518-19, Dr. Radolf alleges that all of the Defendants have violated his trade secret rights under the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50 *et seq.*  In Count 6 of the First Substituted Complaint [doc. #18], at ¶¶ 590-615, Dr. Radolf asserts that Drs. Decker and Berlin violated "the public policy of the United States" and tortiously interfered with his professional opportunities by falsely charging him with fraud in the preparing and reporting on the NIH grants described in Part III.E, *supra.*  Though Dr. Radolf in this count invokes "the public policy of the United States," his brief in opposition to summary judgment is devoid of an

explanation of the meaning or relevance of the reference to the "public policy of the United States." *See* Pl.'s Mem. in Opp'n to Summ. J. [doc. #70], at 124. He has failed, therefore, to demonstrate that Count 6 is anything more than a basic state law tortious interference claim. Finally, in Count 7 of the First Substituted Complaint [doc. #18], at ¶¶ 685-92, Dr. Radolf alleges that Dr. Wikel tortiously interfered with his professional opportunities by seeking to have him terminated from his tenured faculty position.

"Under 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir. 1998) (internal quotations omitted). In both their briefing to the Court and at oral argument, Defendants have urged the Court not to exercise supplemental jurisdiction over Dr. Radolf's state law claims if summary judgment was granted on all the federal claims. *See* Defs.' Mem. in Support of Summ. J. [doc. #53], at 57. Though at oral argument Dr. Radolf's counsel opposed such a course of action, the Court agrees with Defendants. Having granted Defendants summary judgment on all Dr. Radolf's federal claims – the only claims over which this Court had original jurisdiction – considerations of judicial economy, convenience, fairness, and comity do not weigh in favor of exercising supplemental jurisdiction over the remaining state law claims against the Defendants, especially considering the fact that these claims present potentially novel questions of state law and involve state officials and state interests. *See, e.g.*, *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) ("Where a pendent state claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government, principles of federalism and comity may dictate that these

questions be left for decision by the state courts."); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("Moreover, the discretion implicit in the word 'may' in subdivision (c) of [28 U.S.C.] § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants.") (quoted in *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004)). *See also Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69, 81 (D. Conn. 2004) ("While considerations of judicial economy and convenience do not lean strongly in either direction, the nature of the case and Defendants' status as state actors suggest that it would be more appropriate and fair for a state court to determine whether the behavior of the [] officials in this case was sufficient to violate state law.").

Therefore, the Court dismisses Counts 5, 6, and 7 of the First Substituted Complaint [doc. #18] without prejudice to Dr. Radolf refiling those claims in state court, should he wish to do so after reviewing the Court's decision on his federal claims. *See Easterling v. Connecticut*, --- F. Supp. 2d --- , 2005 WL 292550, at *4 (D. Conn. Feb. 1, 2005) (dismissing state law claims after summary judgment granted on all federal claims); *Barnes v. CCH Corp. Sys.*, No. 01CV2575(AKH), 2004 WL 1516791, at *8 (S.D.N.Y. July 7, 2004) (same); *see also Braheney v. Town of Wallingford*, No. 3:00CV2468(CFD), 2004 WL 721834, at *20-21 (D. Conn. Mar. 30, 2004) (declining to exercise supplemental jurisdiction over plaintiff's state law claims after court dismissed as a matter of law all federal claims over which it had original jurisdiction).

## V.

Finally, the Court must address Defendants' two currently pending Motions to Strike [docs. #84 & #86] portions of the affidavits of Dr. Radolf [docs. #73 & #77], Darin Akins [doc.

#71], and Melissa Caimano [doc. #74], and portions of Plaintiff's two separate Local Rule 56(a)(2) Statements [docs. #65 & #75]. Defendants have moved to strike portions of these affidavits on the grounds, among others, that they contain statements that are not based on personal knowledge and/or contain hearsay. Defendants have moved to strike the portions of the Plaintiff's Local Rule 56(a)(2) Statements on the grounds, among others, that the statements are not supported by a specific citation to the affidavit of a witness competent to testify as to the facts at trial and/or evidence that would be admissible at trial. In reaching its decision on the two motions for summary judgment, the Court did not rely on this material that Defendants seek to strike. Therefore, Defendants' Motions to Strike [docs. #84 & #86] are denied as moot.

## VI.

To summarize, the Court hereby GRANTS Defendants' Motions for Summary Judgment [docs. #52 & #55] insofar as they seek summary judgment on Dr. Radolf's seven federal law claims (Counts 1, 2, 3, 4 & 8 of the First Substituted Complaint [doc. #18], and Counts 1 & 2 of the Second Substituted Complaint [attached to doc. #34]). Accordingly, the Clerk will enter judgment for the Defendants on the claims asserted in Counts 1, 2, 3, 4 & 8 of the First Substituted Complaint [doc. #18], and Counts 1 & 2 of the Second Substituted Complaint [attached to doc. #34]). The Court declines to exercise supplemental jurisdiction over Dr. Radolf's state law claims, and hereby DISMISSES WITHOUT PREJUDICE Dr. Radolf's state law claims (Counts 5, 6, and 7 of the First Substituted Complaint [doc. #18]). The Court DENIES AS MOOT Defendants' Motions to Strike [docs. #84 & #86].

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: March 30, 2005.**